Case 8:03-cr-00457-BAH    Document 384-1    Filed 08/11/10    Page 1 of 83

**PUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

| | |
|---|---|
| UNITED STATES OF AMERICA, *Plaintiff-Appellee,* v. KENNETH JAMAL LIGHTY, a/k/a Goat, *Defendant-Appellant.* | No. 06-6 |
| UNITED STATES OF AMERICA, *Plaintiff-Appellee,* v. KENNETH JAMAL LIGHTY, *Defendant-Appellant.* | No. 09-6 |
| UNITED STATES OF AMERICA, *Plaintiff-Appellee,* v. JAMES EVERETT FLOOD, III, a/k/a Junior, a/k/a Bug, a/k/a Junebug, *Defendant-Appellant.* | No. 06-4069 |

Case 8:03-cr-00457-BAH    Document 384-1    Filed 08/11/10    Page 2 of 83

2                    UNITED STATES V. LIGHTY

Appeals from the United States District Court
for the District of Maryland, at Greenbelt.
Peter J. Messitte, Senior District Judge.
(8:03-cr-00457-PJM-1; 8:03-cr-00457-PJM-3)

Argued: May 13, 2010

Decided: August 11, 2010

Before MOTZ and AGEE, Circuit Judges,
and HAMILTON, Senior Circuit Judge.

---

Affirmed by published opinion. Senior Judge Hamilton wrote
the opinion, in which Judge Motz and Judge Agee joined.

---

## COUNSEL

**(Nos. 06-6;09-6) ARGUED:** Amanda Michelle Raines,
SKADDEN, ARPS, SLATE, MEAGHER & FLOM, LLP,
Washington, D.C., for Appellant. Deborah A. Johnston,
OFFICE OF THE UNITED STATES ATTORNEY, Green-
belt, Maryland, for Appellee. **ON BRIEF:** Gary DiBianco,
Donald P. Salzman, Washington, D.C.; Jeffrey B. O'Toole,
Danya A. Dayson, O'TOOLE, ROTHWELL, NASSAU &
STEINBACH, Washington, D.C., for Appellant. Rod J.
Rosenstein, United States Attorney, Baltimore, Maryland,
Sandra Wilkinson, Assistant United States Attorney, OFFICE
OF THE UNITED STATES ATTORNEY, Greenbelt, Mary-
land, for Appellee.

**(No. 06-4069) ARGUED:** Michael Lawlor, LAWLOR &
ENGLERT, LLC, Greenbelt, Maryland, for Appellant. Debo-
rah A. Johnston, OFFICE OF THE UNITED STATES
ATTORNEY, Greenbelt, Maryland, for Appellee. **ON**

UNITED STATES V. LIGHTY                                    3

**BRIEF:** John M. McKenna, BRENNAN, TRAINOR, BILL-
MAN & BENNETT, LLP, Upper Marlboro, Maryland, for
Appellant. Rod J. Rosenstein, United States Attorney, Balti-
more, Maryland, Sandra Wilkinson, Assistant United States
Attorney, OFFICE OF THE UNITED STATES ATTORNEY,
Greenbelt, Maryland, for Appellee.

---

**OPINION**

HAMILTON, Senior Circuit Judge:

Kenneth Jamal Lighty, James Everett Flood, III, and
Lorenzo Anthony Wilson were charged in a five-count indict-
ment by a federal grand jury sitting in the District of Mary-
land with kidnapping resulting in the death of Eric Hayes, and
aiding and abetting the same, 18 U.S.C. §§ 1201(a) and 2,
conspiracy to kidnap, and aiding and abetting the same, *id.*
§§ 1201(c) and 2, and three counts of using a firearm in fur-
therance of a crime of violence, and aiding and abetting the
same, *id.* §§ 924(c) and 2. With respect to Lighty only, the
government sought the death penalty on the kidnapping
resulting in death count, pursuant to the Federal Death Penalty
Act (FDPA), *id.* §§ 3591-3598. Because Wilson made state-
ments implicating Lighty and Flood, Wilson's case was sev-
ered and tried separately.

Following a jury trial, the jury found Lighty and Flood
guilty on all counts. In his separate jury trial, Wilson was
found guilty of conspiracy to kidnap and not guilty on the
remaining counts. Lighty's case moved on to the sentencing
phase, at the conclusion of which the jury imposed a death
sentence on the kidnapping resulting in death count. Lighty
received a concurrent life term on the conspiracy to kidnap
count and a fifty-five year consecutive sentence on the
remaining counts. Flood received a life sentence on the kid-
napping resulting in death count and a sixty-five year consec-

4                    UNITED STATES V. LIGHTY

utive sentence on the remaining counts. Wilson received a life
sentence on his only count of conviction.

Lighty, Flood, and Wilson filed timely notices of appeal,
raising numerous assignments of error. While the appeals
were pending, both Lighty and Wilson filed motions for new
trial. Lighty also moved for a new sentencing hearing. As a
result, we held all three appeals in abeyance pending a deci-
sion of the district court on the motions for new trial, and
Lighty's request for a new sentencing hearing. Following an
evidentiary hearing, the district court denied the motions for
new trial and Lighty's motion for a new sentencing hearing,
and Lighty and Wilson filed timely notices of appeal concern-
ing the denial of their respective motions.

We heard argument in all three cases on May 13, 2010. On
August 10, 2010, we consolidated Lighty's and Flood's cases
for decision.

It is well-settled that a criminal defendant is entitled to a
fair trial not a perfect one. *See United States v. Hasting*, 461
U.S. 499, 508-09 (1983) ("[G]iven the myriad safeguards pro-
vided to assure a fair trial, and taking into account the reality
of the human fallibility of the participants, there can be no
such thing as an error-free, perfect trial, and . . . the Constitu-
tion does not guarantee such a trial."). While the actions of the
Assistant United States Attorneys (AUSAs) handling Lighty
and Flood's joint trial unnecessarily introduced error into it,
such error is not reversible, as both Lighty and Flood each
received a fair trial. Accordingly, we affirm.[1]

---

[1]Our decision in Wilson's appeal is being issued at the same time as our
decision in this consolidated appeal.

UNITED STATES V. LIGHTY                  5

I

A

Some time between 4:00 and 6:00 p.m. on January 3, 2002, Eugene Scott (also known as "Yogi") went to meet his girlfriend, Diamond Van, in front of Van's grandmother's apartment building, which was located near the intersection of Wheeler Road and Alabama Avenue, S.E., Washington, D.C. Scott parked his car across the street from the apartment building, but left the car running as he exited the car to meet Van. By the time he crossed the street, his car was stolen.

At around the same time Scott's car was stolen, Eric Hayes (also known as "Easy" or "E") and his friend, Antoine Forrest, were about a block away from the scene of the theft, at Paul Hill's apartment on Eighth Street, S.E., Washington D.C. According to Forrest, Hayes was wearing a green Eddie Bauer coat and Nike shoes with "swirls" on them, and Hayes also had a text pager.[2]

At about 6:45 p.m., Hill gave Hayes and Forrest ten dollars and asked them to purchase marijuana for him. As Hayes and Forrest were leaving, Washington, D.C. police officers arrived at the apartment "to serve a warrant or search something." Hayes and Forrest were not detained and, once on Eighth Street, the pair approached "Fat Dog," one of the many drug dealers that operated in the Eighth Street area. Fat Dog was not selling any marijuana at the time because of the presence of police officers on the street. As a result, the trio decided to enter a nearby apartment building (3210 Eighth Street) to observe the police officers from a third floor stairwell window.

---

[2]For Christmas 2001, Hayes' girlfriend, Capricia Yarborough, gave Hayes a pair of Nike "[f]oamposit" tennis shoes, which had "squiggly lines in them, and when you walk, the colors changed in them." Hayes' Eddie Bauer coat was a gift from his father.

6                    UNITED STATES V. LIGHTY

While sitting on the window sill, Forrest and Hayes observed a dark Lincoln Continental with tinted windows driving through and around an alley adjacent to the 3210 Eighth Street building. The car stopped in the alley, and the front passenger got out and approached the building.[3] The front passenger yelled to the trio, asking them if they had any "water," which Forrest understood to mean as a request for a cigarette soaked in PCP. After responding in the negative, the driver of the car got out, and the request for water was repeated.[4] Hayes told the pair that they did not have any water, but had some "sacks," *i.e.*, mint leaves soaked in PCP. The driver said he wanted a sack, so Hayes exited the building and walked with the front passenger and the driver towards the alley adjacent to the building.

When Hayes did not return after a few minutes, Forrest left the 3210 Eighth Street building and approached the alley. Once there, Forrest observed the driver of the Lincoln Continental holding Hayes at gunpoint over the front hood of the car. At this point, the front passenger approached Forrest, brandishing a firearm. Forrest knocked the firearm out of the front passenger's hand and fled to Hill's apartment, where several of Hayes' cousins were gathered. The group returned moments later, only to find that the Lincoln Continental and Hayes were gone. For about twenty to twenty-five minutes, Forrest drove "around Southeast" looking for the Lincoln Continental, but could not find it. Upon returning to Hall's apartment, Forrest called the police.

After reporting his car stolen, Scott went to the 2500 block of Keating Street, in the Hillcrest Heights area of Temple Hills, Maryland, to hang out on the street with some friends. Scott could not remember telling any of his friends on Keat-

---

[3]According to Forrest, the front passenger was wearing a "black skull cap, black coat, [and] black pants."

[4]According to Forrest, the driver was wearing a "[b]lack skull cap, army jacket, and black pants."

UNITED STATES V. LIGHTY 7

ing Street that his car had been stolen.[5] Scott observed an older model car speeding down the street. The car came to a "screech[ing]" halt, and the doors of the car opened. At about the same time, Scott turned his back and started walking away from the car. Scott heard a voice (or voices) saying, "Yogi is this him?," "[s]hut up," and "[w]hat the F." Scott did not respond, continued walking away, and entered Van's car and drove off.[6]

At approximately 8:30 p.m. that evening, Michael Davis was at his house on the 12800 block of Hillcrest Parkway in Temple Hills, Maryland.[7] A dog outside the house was barking uncontrollably, so Davis, who was upstairs packing for an upcoming vacation, looked out a second-story window to see what was going on. Davis saw an older model car stopped at the end of the street, next to undeveloped land owned by Prince George's County. At the time, the presence of the car meant nothing to Davis, as it was not uncommon to see a car parked at the dead end. The dog continued to bark, however, which caused Davis to look out the window again. This time, Davis saw the front passenger and a rear passenger exit the car and proceed to forcibly pull a man, later identified as Hayes, out of the back passenger area of the car. Davis saw Hayes on his knees and heard him saying "no" or "don't." Davis then heard what sounded like two gunshots, which resulted in Hayes falling over. The front passenger and the rear passenger reentered through the passenger side of the car, and the car left the scene. Davis left his house, entered his car,

---

[5]Scott indentified Flood in open court, but did not identify Lighty.

[6]Scott's stolen car was located the next day in Virginia, and the thief, an individual unconnected to Hayes' kidnapping and murder, was apprehended.

[7]The distance between the 2500 block of Keating Street and the 12800 block of Hillcrest Parkway is approximately one mile; the driving time is approximately three minutes.

8            U<small>NITED</small> S<small>TATES</small> v. L<small>IGHTY</small>

and drove to the end of the road, where he found Hayes lying on the ground.[8] At that time, he called 911.[9]

At 8:51 p.m., after receiving a call from the dispatcher, Officer Arvester Horner of the Prince George's County Police Department (PGPD) drove to the 12800 block of Hillcrest Parkway, arriving there at 8:53 p.m. Hayes was pronounced dead on the scene. At the scene, a PGPD evidence technician recovered two .380 caliber shell casings, the first was found in the woods, the other under Hayes' head.[10]

Between 8:43 p.m. and 9:03 p.m., Lorenzo Wilson (also known as "Baby Ann") used the cell phone of James Flood (also known as "June," "Junebug," or "Bug") at least seven times to communicate with his girlfriend, Krystal Phauls. Wilson instructed Phauls to meet him on Iverson Street in Hillcrest Heights, which is less than two miles from the 12800 block of Hillcrest Parkway.[11] At the time of their first conversation, Phauls was traveling back to her house with her friend, Melissa Coles, in Coles' car. After a few minutes at her house, Phauls and Coles drove in Phauls' car to the 1900 block of Iverson Street. They arrived in the vicinity of 1902 Iverson Street around the time the last call at 9:03 p.m. was ending.

---

[8]The distance from Davis' second-story window to the murder scene was approximately 200 feet.

[9]From the time Davis heard the gunshots until the time he called 911, approximately five minutes had elapsed.

[10]Hayes suffered multiple gunshot wounds, including three head shots which were each independently fatal and would have caused Hayes to immediately collapse and become unconscious. Hayes also suffered additional nonfatal gunshot wounds to the hand and leg, and a patterned blunt force nonfatal injury to his head, all of which preceded the fatal gunshots to his head.

[11]The driving time between the 12800 block of Hillcrest Parkway and 1902 Iverson Street is approximately four minutes.

Case 8:03-cr-00457-BAH Document 384-1 Filed 08/11/10 Page 9 of 83

Phauls and Coles observed Lighty, Flood, and Wilson walking away from a single-family home with a garage.[12] The men entered the back seat of the car, with Wilson seated behind Phauls, Flood behind Coles, and Lighty in the middle. Lighty held a pair of Nike "[foam] posit[ ]" shoes with "squiggly lines" and was observed with blood on his T-shirt. While in the car, Lighty, Flood, and Wilson talked about having done "something to some boy," which Coles interpreted to mean that the trio had done "something bad" to some boy, "like killed him, hurt him, something like that." At Wilson's direction, Phauls drove the three men to the 2500 block of Keating Street where, earlier in the evening, Scott had seen an older model car pull up. When Phauls stopped the car, the three men got out and checked the street for blood. Thereafter, Phauls dropped Lighty off at an apartment building in Hillcrest Heights and then returned to her home with Wilson and Coles.[13] Upon arriving at Phauls' house, Coles left. After Coles departed, Phauls and Wilson went inside the house. While inside, a text pager Wilson was carrying started to ring, "with [the message] 'Easy' going across it."

Around 11:00 p.m. that evening, Lighty called Ebony Miller, a female friend and sexual partner.[14] During their conversation, Lighty told Miller "he had just slumped somebody," meaning that "he [had] just killed somebody, shot somebody." Lighty explained that he shot the person because he "tried to steal his man's car." Lighty told Miller he "got him[,] . . . put him in the trunk[,]" and "took him around the way." Near the

---

[12]Prior to this evening, Phauls and Coles had never met Flood. Flood was introduced to the women by his nickname "Junebug."

[13]Phauls and Coles could not recall whether Flood reentered the car after he looked for blood on Keating Street. However, they both agreed that Flood was not in the car when they, along with Wilson, returned to Phauls' house.

[14]Although this 11:00 p.m. phone call was not made using Flood's cell phone, the government presented evidence that Lighty used Flood's cell phone to contact Miller on the evening of Hayes' kidnapping and murder at 6:45 p.m., 7:18 p.m., and 8:37 p.m. Miller did not know Flood.

Case 8.03-cr-00457-BAH   Document 384-1   Filed 08/11/10   Page 10 of 83

10                    UNITED STATES V. LIGHTY

conclusion of the conversation, Miller agreed to meet Lighty in an area behind Iverson Mall in Temple Hills.

Miller arrived at the area near Iverson Mall, and Lighty entered her car. Lighty again told Miller that "he had just slumped somebody." Lighty indicated that he got the person "off of Alabama Avenue[,] . . . put him in the trunk[,] and . . . took him around his friends." Lighty said, when he pulled the person out of the trunk, the person kept saying "on my mother," meaning that he was not the person responsible for the car theft.

Lighty then directed Miller to drive to Keating Street, and, once at the 2500 block, he showed her blood stains on the street. Thereafter, Lighty directed Miller to drive to the 12800 block of Hillcrest Parkway. There were no police officers at the murder scene, just police tape, which led Lighty to comment to Miller "that [the police] work fast[,] . . . they got him already."

The next morning, Miller saw a news report about the murder of a police officer's son.[15] Coincidentally, Miller knew Hayes, by his nicknames Easy or E, and she knew that Hayes frequently used the phrase "on my mother." Later that morning, Miller spoke with Lighty by telephone. Miller asked Lighty whether he killed Hayes, to which Lighty responded, "[h]e shouldn't have tried to steal his man's car."

Sometime in January 2002, Lighty went to visit his friend, CW,[16] who was recuperating at his mother's house in Temple Hills.[17] CW received a gunshot wound in his stomach while

---

[15]At the time of the incident, Hayes' father was a Washington, D.C. police officer with almost thirty years' experience on the force.

[16]CW is referred to herein pseudonymously.

[17]CW was arrested on March 27, 2002 on several Maryland state felony charges. Thereafter, he made several statements to PGPD officers in connection with the Hayes kidnapping and murder and a shooting that occurred on Afton Street.

he was being robbed on December 24, 2001. While talking with CW, Lighty said that "he went down 8th Street [in the Lincoln Continental], kidnapped a dude or whatever, threw him in the trunk of the car and took him back on the Maryland side and shot him in the head." Lighty added that he initially approached Hayes and asked Hayes to sell him some PCP. Lighty said that he did not kill Hayes on Eighth Street because police officers were nearby. Lighty indicated that he shot Hayes "once or twice" and that he took Hayes' Eddie Bauer coat and Nike "[f]oam [p]osit[ ]" shoes off to make it appear that robbery was the motive for the killing.[18]

At the time of Hayes' kidnapping and murder, Flood was dating Tynika Marshall, who lived in Hillcrest Heights. On the evening of Hayes' kidnapping and murder, Marshall was driving to a laundromat when she observed Flood pull his Lincoln Continental up behind her car at an intersection approximately one block from Keating Street. According to Marshall, there "could have been one other person" in Flood's car, but she did not "know who it was." After seeing Flood, Marshall called him on his cell phone, but she could not recall the substance of their two-minute conversation. The call was placed at 8:12 p.m.[19]

Marshall also called Flood at approximately 9:18 p.m. and 9:22 p.m. During these conversations, Flood made arrangements for Marshall to pick him up near Keating Street. After Marshall picked up Flood, he directed Marshall to drive down Hillcrest Parkway, where they observed police officers at the murder scene.

---

[18]During their conversation, Lighty also told CW that Flood, Wilson, and Tony Mathis were with him on Eighth Street. At trial, to protect Flood's Confrontation Clause rights, the district court refused to allow Lighty's counsel to ask CW who were the individuals Lighty said were present during the Hayes kidnapping. Instead, on cross-examination, Lighty's counsel was permitted to ask CW "how many other people . . . were there," to which CW responded, "three other people."

[19]Marshall made an earlier call to Flood at 7:47 p.m.

12                    UNITED STATES V. LIGHTY

According to Marshall, sometime in February 2002, Flood asked her to help him take his Lincoln Continental to North Carolina.[20] Flood directed Marshall to a house on Iverson Street, the same house identified by Phauls as the location from which Lighty, Wilson, and "Junebug" were walking on the night of the Hayes kidnapping and murder just before she picked them up. Flood retrieved the Lincoln Continental from the garage, and Marshall followed Flood to North Carolina, where Flood gave the Lincoln Continental to his parents.[21]

On January 30, 2002, less the one month after the Hayes kidnapping and murder, Lighty was involved in a drive-by shooting (the Afton Street Shooting) on Afton Street in Temple Hills, Maryland, which resulted in the death of Antoine Newbill.[22] According to the account Lighty provided to CW, two days before the Afton Street Shooting, Lighty and Wilson went to Afton Street and confronted a man known as "Boo-Boo." During the altercation, Lighty and Boo-Boo's friends drew firearms. Wilson encouraged Lighty to leave the scene, and, as the pair did, Wilson told Lighty that they would "see them later on." On the day of the shooting, Lighty drove Wilson and two other men to Afton Street in a Ford Taurus. Upon

---

[20]On August 31, 2001, Lighty's grandmother, Nancy Westfield, accompanied Lighty to the Branch Avenue Auto Auction. Westfield wrote a check for the purchase of the Lincoln Continental. Although the vehicle belonged to Lighty, she agreed to title the car in her name. A few months later, Lighty sold the Lincoln Continental to Flood.

[21]On February 11, 2003, law enforcement officers located the Lincoln Continental in the North Carolina home of the individual who had purchased it from Flood's parents. The Lincoln Continental was examined for forensic evidence. Through DNA testing, a blood spot found on the rear passenger side floor rug was identified as the blood of Hayes. Fibers from the rear passenger compartment and the trunk carpet matched those found on Hayes' clothing. There was no blood found in the trunk of the car.

[22]The district court admitted the Afton Street Shooting evidence over the objections Lighty made both prior to and during the trial. As Flood was not involved in the Afton Street Shooting, the evidence was admitted against Lighty only.

arriving, Wilson, who possessed a handgun given to him by Lighty, and the two other men, began shooting.

The government introduced evidence from Thomas Hart, one of the victims of the Afton Street Shooting. Hart, Newbill, and "Boo-Boo" were standing outside on the street when a Ford Taurus drove by and shots were fired at them from the front passenger side and the rear of the car. Boo-Boo was not injured. Hart was shot in the foot, the arm, and the chest, and Newbill died as a result of the gunshot wounds he received.[23]

The government also introduced evidence from Marlon Hines, who witnessed the aftermath of the Afton Street Shooting. Hines was in his home at the time of the shooting. After the gunshots were fired, Hart, Newbill, and Boo-Boo entered his home. Newbill told Hines that he could not catch his breath and that he thought he was shot.[24]

On the evening of January 31, 2002, Washington, D.C. police officers were conducting a vice operation on the 5900 block of East Capitol Street. During this operation, Officer Homer Littlejohn approached a car in which Lighty was a passenger. As Officer Littlejohn approached the car, he observed Lighty placing a .380 caliber handgun into his pants. Officer Littlejohn pulled Lighty from the car and then removed the handgun from Lighty's pants.

Brett Mills, an FBI firearms examiner, analyzed the two .380 caliber shell casings recovered from the Hayes murder scene, the .380 caliber shell casing recovered from the Afton Street Shooting scene, and the handgun seized from Lighty on

---

[23]At the scene of the Afton Street Shooting, a PGPD police officer recovered a .380 caliber shell casing.

[24]Hines also testified that a day or two before the Afton Street Shooting, he and Newbill were driving together on Afton Street when Hines observed Boo-Boo, Wilson, Lighty, and another man engaged in a heated argument.

January 31, 2002. Based on his analysis, Mills was able to conclude that the shell casing recovered from the Afton Street Shooting was fired by Lighty's .380 caliber handgun (to the exclusion of all other firearms). Mills further concluded that the two .380 caliber shell casings recovered from the Hayes murder scene had numerous rifling characteristics in common with the shell casing recovered from the Afton Street Shooting scene and the test fire shell casing from Lighty's .380 caliber handgun. The two .380 caliber shell casings from the Hayes murder scene, however, lacked sufficient microscopic markings to allow Mills to make a definitive identification or non-identification.

Mills also examined the bullets that were recovered from Hayes during the autopsy. Mills concluded that the bullets recovered from Hayes had the same rifling characteristics as the test-fired bullets from Lighty's handgun. However, as a result of mutilation and fragmentation, the bullets recovered from Hayes lacked sufficient microscopic marks to make a definitive identification (or non-identification) that they were fired from Lighty's handgun.[25]

Dr. Laron Locke, a medical examiner, examined Lighty's .380 caliber handgun and concluded that one of the abrasions found on Hayes matched the barrel portion of Lighty's handgun and that another patterned abrasion matched the clip release of the handgun. Dr. Locke concluded these abrasions were consistent with Hayes being struck by Lighty's .380 caliber handgun.

B

Under the FDPA, a death sentence may be sought for "any [federal] offense for which a sentence of death is provided."

---

[25]Mills conceded that it was possible that as many as twenty-five to thirty handgun manufacturers made handguns that produce similar rifling characteristics as the handgun recovered from Lighty.

Case 8:03-cr-00457-BAH    Document 384-1    Filed 08/11/10    Page 15 of 83

18 U.S.C. § 3591(a)(2). During the guilt phase of the defendant's trial, the defendant must either be found guilty of, or plead guilty to, a federal crime punishable by death. *Id.* § 3593(b). At the sentencing phase of the trial, the sentencer must determine whether a death sentence should be imposed.

The FDPA requires the government to notify the defendant of the intent to seek the death penalty within a reasonable time before trial or before the district court accepts a guilty plea. *Id.* § 3593(a)(1). This notice must include the aggravating factors that the government plans to offer at the sentencing hearing. *Id.* § 3593(a)(2). The sentencing hearing may be held before the jury that determined the defendant's guilt or before a separate jury impaneled specifically for sentencing purposes. 18 U.S.C. §§ 3593(b)(1) and (2). Alternatively, upon request by the defendant, and with approval of the government, the sentencing hearing may be held "before the [district] court alone." *Id.* § 3593(b)(3).

At the sentencing hearing, any information relevant to the sentencing may be presented to the jury, regardless of its admissibility under the Federal Rules of Evidence, except that information "may be excluded if its probative value is outweighed by the danger of creating unfair prejudice, confusing the issues, or misleading the jury." *Id.* § 3593(c). The government may present only information relevant to aggravating factors for which the defendant was given pre-trial notice, and the government must prove the existence of any aggravating factor beyond a reasonable doubt. *Id.* There are sixteen defined statutory aggravating factors for cases involving homicide, *id.* §§ 3592(c)(1)-(16), but the FDPA "allows the government to allege other aggravating factors ('non-statutory aggravating factors')." *United States v. Caro*, 597 F.3d 608, 612 (4th Cir. 2010); *see also* 18 U.S.C. § 3592(c) (noting that the sentencer "may consider whether any other aggravating factor for which notice has been given exists"). In response, the defendant may present any evidence relevant to any mitigating factor, and bears only the burden of proving the exis-

16                    UNITED STATES v. LIGHTY

tence of any such factor by a preponderance of the evidence. *Id.* § 3593(c). Section 3592(a) provides a list of mitigating factors, including a catch-all mitigating factor covering any relevant mitigating circumstance. *Id.* §§ 3592(a)(1)-(8).

With regard to offenses involving homicides, the jury must initially find beyond a reasonable doubt that the defendant acted within one of four mental states of criminal intent: (1) intentionally killing the victim; (2) intentionally inflicting serious bodily injury that resulted in death; (3) intentionally participating in an act, contemplating that the life of a person would be taken or intending that lethal force would be used in connection with a person, other than one of the participants in the offense, and the victim died as a direct result of the act; and (4) intentionally engaging in an act of violence knowing such act created a grave risk of death to a person, other than one of the participants in the offense, such that participation in the act constituted a reckless disregard for human life and the victim died as a result of the act. *Id.* §§ 3591(a)(2)(A)-(D). The jury must next find the existence of at least one of the statutory aggravating factors defined in § 3592(c) beyond a reasonable doubt. *Id.* § 3593(d). Upon a unanimous finding of both the required criminal intent and aggravating factor(s), the jury must then determine whether all the statutory and non-statutory aggravating factors outweigh any mitigating factors so as to justify a sentence of death. *Id.*

C

On October 8, 2003, a grand jury in the District of Maryland returned an indictment charging Lighty, Flood, and Wilson with kidnapping resulting in the death of Eric Hayes, and aiding and abetting the same, 18 U.S.C. §§ 1201(a) and 2 (Count One), conspiracy to kidnap, and aiding and abetting the same, *id.* §§ 1201(c) and 2 (Count Two), and three counts of using a firearm in furtherance of a crime of violence, and aiding and abetting the same, *id.* §§ 924(c) and 2 (Counts Three, Four, and Five). On December 28, 2004, pursuant to

Case 8:03-cr-00457-BAH    Document 384-1    Filed 08/11/10    Page 17 of 83

UNITED STATES V. LIGHTY                    17

§ 3593(a) of the FDPA, the government filed a notice of intent to seek the death sentence on Count One against Lighty only. The government's notice listed all four of the mental states of criminal intent listed in § 3591(a)(2), the statutory aggravating factor of death during the commission of another crime, *id.* § 3592(c)(1), and four non-statutory aggravating factors: (1) victim impact evidence; (2) lack of remorse; (3) commission of other acts of violence, including the Afton Street Shooting; and (4) commission of a capital offense while on probation.

Flood and Lighty's joint trial commenced on September 6, 2005.[26] During the trial, the government called twenty-five witnesses in its case-in-chief and one witness in rebuttal. As part of his defense at the guilt phase, Lighty called three witnesses. Latasha Massey, a girlfriend whom Mathis occasionally lived with, testified that Mathis received a phone call from Flood on the day of the Hayes kidnapping and murder. According to Massey, after the call, Mathis left the house wearing a camouflage "army fatigue sweat suit with a black hat" and entered Flood's car. Massey testified that, when Mathis returned home, he had blood on the bottom of his pants and boots.[27]

Lighty also called Dr. John Adams, a pathologist. Dr. Adams agreed with Dr. Locke's opinion that each of the gunshots to the head would have prevented Hayes from holding himself in a kneeling position and that each gunshot would have independently caused immediate unconsciousness.

Lighty's final witness was William Welch, a forensic firearms and tool marks examiner. Welch testified that, based upon his examination of the bullets found inside Hayes, one of the bullets was different than the other two found in Hayes.

---

[26]As noted above, Wilson's case was severed because he had made pretrial statements to law enforcement implicating Lighty and Flood.

[27]Of note, Mathis was murdered in February 2006.

18                    UNITED STATES V. LIGHTY

According to Welch, two of the bullets had a "lead core with a copper jacket," while the third bullet just had a lead core; therefore, he opined that two guns were used in the shooting.[28] Welch further testified that there were at least twenty-seven manufacturers who made .380 caliber handguns producing the same rifling characteristics as the .380 caliber handgun recovered from Lighty on January 31, 2002.

On October 21, 2005, Lighty and Flood were convicted of all counts charged. The case moved on to the sentencing phase of the trial, where the same jury decided Lighty's sentence on the kidnapping resulting in death count.

D

For its case in aggravation at the sentencing phase of Lighty's trial, the government principally relied upon the evidence presented during the guilt phase of the trial. However, the government did introduce testimony from seven witnesses in its case-in-chief and two in rebuttal.

A probation officer (Victoria Edwards) testified that, at the time of the Hayes kidnapping and murder, Lighty was on probation for a Maryland state drug offense. Debra Gates, the owner of Gates Bail Bonds, testified that, at the time of the Hayes kidnapping and murder, Lighty was on bond awaiting trial for a Maryland state robbery charge, to which he subsequently pleaded guilty.

Sean Chaney, a detective with the PGPD, testified concerning the Afton Street Shooting. He testified that there were at least six people present during the shooting, including Newbill, Hart, and Hines, and three other people in a nearby car.

---

[28]This testimony was refuted by Mills, who opined that there was no evidence from which to conclude that Lighty's handgun "could not have fired all three bullets." According to Mills, the lead bullet could have been fired from a different (*e.g.*, "reloaded") cartridge.

Case 8.03-cr-00457-BAH   Document 384-1   Filed 08/11/10   Page 19 of 83

Detective Chaney indicated that, in addition to Newbill and Hart, one of the individuals in the car was also shot.

FBI Special Agent Joseph Bradley presented photographs of an individual in the trunk of the Lincoln Continental used in the kidnapping to demonstrate the conditions in which Hayes was likely held when he was alive in the trunk. Agent Bradley also testified about the absence of light inside the trunk and the ability of a person inside to hear voices outside of the trunk.

Finally, the government called three witnesses to discuss the impact of Hayes' death upon his family. Hayes' girlfriend, Capricia Yarborough, testified about Hayes' character and the effect of his death on their child, who was born after Hayes' murder. Hayes' parents, Rochelle Hayes and Eric Hayes Sr., also testified about Hayes' life and the impact of his death on their lives and family.

As part of his case in mitigation, Lighty called Dr. Mark Cunningham, a clinical and forensic psychologist, who testified concerning certain risk factors that make it more likely that a juvenile or young adult will commit a crime. A clinical social worker, Lori James-Monroe, provided a life history of Lighty based upon her interviews with him, his grandmother (who raised him), numerous other family members and friends, and a minister. She also examined Lighty's school, medical, and jail records, as well as some of his family members' records.

During her testimony detailing Lighty's life history, James-Monroe, among other things, described Lighty's parents' alleged involvement in criminal activity and drugs, the death of his father prior to his birth, drug abuse by his mother during pregnancy, the death of his mother, the criminal activity of his uncles, Lighty's difficulties in school, his own use of drugs, and his good behavior while incarcerated. James-Monroe additionally testified about various "red flags" in

20                    UNITED STATES V. LIGHTY

Lighty's history that corresponded directly to the risk factors described by Dr. Cunningham.

Lighty presented evidence from family members and friends setting forth his troubled background and the obstacles he faced in life, but indicating an overall good character. In addition, Lighty presented evidence to support his theory that an equally culpable participant, Mathis, would not be sentenced to death. Lighty called Agent Bradley and Detective Chaney to testify about statements made by Wilson and Mathis. Detective Chaney read Wilson's written statement to the jury[29] verbatim:

> I, Lorenzo Anthony Wilson, am providing a statement about the murder of Eric Hayes. As far as I can remember, I recall it being in the evening time. I can't recall the day, but it was evening time.
>
> And I saw Kenny walking down the street and I asked him where he was going, and he told me down on 26th, where June Bug be at. June Bug is James Flood. So I walked down there with him.
>
> And when he got down, they were down there drinking, so we started drinking with them. And when I say "them," I'm referring to Tony, June Bug and about six or seven more dudes. So we're all sitting up there laughing and joking and drinking.
>
> While all this is going on, June Bug, James Flood, was sitting away from everybody else by some dude th[ey] called Yoge or Yogi. So then June came back over there where we were standing and he was all

---

[29]As more fully described in our opinion in *Wilson*, Wilson made this statement to civilian investigators in the summer of 2003, while he was on active duty in the United States Army in Hawaii and prior to his indictment and arrest.

Case 8:03-cr-00457-BAH    Document 384-1    Filed 08/11/10    Page 21 of 83

UNITED STATES V. LIGHTY                    21

stuttering and mumbling something I can't recall what. And all shaking and shit. So I asked him what is wrong with him. Because I don't trust him when he gets like that. When June Bug, James Flood, responded, he said, something is just on my mind, that's all.

So I walked over and started talking to Goat, better known as Kenneth Lighty. I was asking him, was the car still messed up? Because June had just brought it and then Kenny stated, Back with June Bug. Fixed it. So I said, Oh. Then he said, I could go and try it.

So I walked over to the car so I can try it. I started up the car and then I played around with the radio for a while. And then I saw June Bug, James Flood, get in the car. Once he got in the car, Tony and Kenny got in the car, and Tony said, let's go get some more liquor. So we went to Marlow Heights Liquor Store on Branch Avenue and got some more liquor.

Then on the way back June Bug, James Flood, was like, let's go up Eighth. So when he said that, I thought, like anyone would think, we going up Eighth to get some weed. So once we got up Eighth, it was not—no one up there, so we came back around Hillcrest to finish drinking. So we were all in the car drinking and driving around.

I saw Katina, this female I used to date, and I was getting out to go over and talk to her. And Kenny was, like, we going back up Eighth. And I was like, no, I'm about to go with her. So me and Katina went to my house. We were about to have sex, but she didn't want to. We were in there for about 25 minutes, then we came out.

Case: 06-6   Document: 190   Date Filed: 08/11/2010   Page: 22

22                      UNITED STATES V. LIGHTY

Katina went down 28th Avenue to Little Marlow, the apartments by St. Barnabas Road, and I went back on the street. And once I got down there, Tony, Kenny and June Bug, James Flood, was pulling back up and Tony jumped out of the car and began pulling Eric out of the car, and he was talking to June Bug saying he was a bitch.

So while Tony had Eric on the trunk of the car, it was about 15 people outside and Tony called Yogi over to the car and [asked] him, was this one of the guys that carjacked him, and Yogi just said, let him go.

And instead of letting him go, Tony shot one—shot him once or twice with a revolver, a 38 or 357. So June Bug and Kenny went and grabbed Eric and Kenny told me, pop the trunk. So I did and June told me to drive. So I did and June Bug gave me directions where to go.

So I did exactly that and then we ended up down 28th Parkway in one of those side streets and June Bug and Kenny got out, pulled Eric out of the trunk and June Bug shot Eric five or six times. Then Kenny and June Bug got back in the car and told me, drive down to Iverson Street, and that where one of his folks lived and I parked it in his folks' garage.

And then I called Crystal to come and pick me up and she did. I did not tell her anything right then, only to pick me up. So she did and she dropped June Bug and Kenny off, and I went home with her.

During the questions and answers which followed the writ-

Case 8:03-cr-00457-BAH    Document 384-1    Filed 08/11/10    Page 23 of 83

UNITED STATES V. LIGHTY                    23

ten statement, Wilson admitted that he told Phauls about the incident.[30]

Detective Chaney also testified about an interview he and Agent Bradley had with Mathis. During the interview, Mathis stated that he was on Keating Street when he saw Lighty, Flood, Wilson, and an individual known as "Ty" get out of the Lincoln Continental. He then saw Ty pull a male out of the car. Mathis walked away and heard one shot, but did not look back. Mathis also identified other people who were at the scene and stated that the motive for the murder may have been related to a previous robbery of Scott.

During the government's rebuttal case, Michael Straughan, a detective with the PGPD, read verbatim from a written statement CW gave on May 2, 2002. Through this testimony, the jury was provided with CW's prior statements, including a statement that Lighty, Flood, Wilson, and Mathis had been involved in the kidnapping. Detective Straughan also testified concerning a statement CW made to another PGPD detective. In that statement, CW implied that Wilson had told him that Lighty shot Hayes.

E

On November 10, 2005, the jury returned a verdict of death for Lighty on Count One. The jury unanimously found that all four of the mental states of criminal intent alleged in the government's pre-trial notice were proven beyond a reasonable doubt. The jury also unanimously found that all of the aggravating factors alleged in the government's pre-trial notice

---

[30]On cross-examination, Detective Chaney explained why he did not find Wilson's written statement credible. First, Wilson's statement was inconsistent with the physical evidence, as it was unlikely Hayes was shot before he was placed in the trunk of the Lincoln Continental because no blood was discovered in the trunk. Second, Wilson's statement was inconsistent with the medical examiner's opinion that any one of the three gunshot wounds to Hayes' head would have rendered him unconscious.

24                 UNITED STATES V. LIGHTY

were proven beyond a reasonable doubt. Nine jurors found
that the statutory mitigating factor of equally culpable defen-
dants, *id.* § 3592(a)(4), was proven by a preponderance of the
evidence, and eleven of the jurors found that the catch-all mit-
igation factor was proven as well. Some of the jurors also
found some non-statutory mitigating factors. Eleven of the
jurors found that "[a]ll life has value," and the same number
found the "effect of the sentence" on Lighty's grandmother as
a mitigating factor. A "[p]oor defense" was found as a miti-
gating factor by three of the jurors.

On February 28, 2006, the district court sentenced Lighty
to death on Count One, a concurrent life sentence on Count
Two, and a consecutive sentence totaling fifty-five years on
the remaining counts. Flood was sentenced to life imprison-
ment on Count One. He also received a consecutive sentence
totaling sixty-five years on the remaining counts. As noted
earlier, Wilson was tried separately and found guilty of Count
Two and not guilty of the remaining counts. Wilson was sen-
tenced to life imprisonment.

Lighty, Flood, and Wilson filed timely notices of appeal,
raising numerous assignments of error. While the appeals
were pending, Lighty and Wilson sought new trials in the dis-
trict court. Lighty also moved for a new sentencing hearing.
Consequently, we held all three appeals in abeyance pending
a decision in the district court. The district court held an evi-
dentiary hearing, at the conclusion of which the district court
denied the motions. Lighty and Wilson filed timely notices of
appeal concerning this ruling.

We heard argument in all three cases on May 13, 2010.
Lighty's and Flood's cases were consolidated for decision on
August 10, 2010. Our decision in Wilson's appeal is being
issued at the same time as our decision in this consolidated
appeal.

## II

## A

Prior to trial, Lighty moved to have his trial severed from Flood's trial. The district court denied the motion, and now Lighty challenges this ruling on several grounds. First, he contends that severance was required because he and Flood presented antagonistic defenses.[31] Second, he contends he was unfairly prejudiced by the district court's ruling which prohibited CW from referring to Mathis as one of the participants in the Hayes kidnapping and murder. Finally, he contends that the refusal to grant severance violated his right to individualized sentencing under the Eighth Amendment.

We review a district court's denial of a motion for severance for an abuse of discretion. *United States v. Khan*, 461 F.3d 477, 490 (4th Cir. 2006). Two or more defendants may be charged in the same indictment if they are alleged to have "participated in the same act or transaction, or in the same series of acts or transactions, constituting an offense or offenses." Fed. R. Crim. P. 8(b). Generally, we adhere to the principle that defendants indicted together should be tried together, and a defendant must show that he was prejudiced by the denial of a severance motion in order to establish that the district court abused its broad discretion in that regard. *United States v. Strickland*, 245 F.3d 368, 384 (4th Cir. 2001); *see also Zafiro v. United States*, 506 U.S. 534, 539 (1993) (noting that courts should grant severance "only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence); *United States v. Harris*, 498 F.3d 278, 291 (4th Cir. 2007) (noting

---

[31]Lighty also raised his antagonistic defense contention following the testimony of the government's third witness, Metropolitan Police Department Officer James Savage. Consistent with its earlier ruling denying severance, the district court rejected this contention.

Case: 06-6   Document: 190   Date Filed: 08/11/2010   Page: 26

that a district court abuses its discretion "only where the trial court's decision to deny a severance deprives the defendants of a fair trial and results in a miscarriage of justice") (citation and internal quotation marks omitted); Fed. R. Crim P. 14(a) ("If the joinder of offenses or defendants in an indictment, an information, or a consolidation for trial appears to prejudice a defendant or the government, the court may order separate trials of counts, sever the defendants' trials, or provide any other relief that justice requires."). Moreover, a defendant is not entitled to severance merely because he might have had a better chance of acquittal in a separate trial. *Zafiro*, 506 U.S. at 540.

1

The presence of conflicting or antagonistic defenses alone does not require severance under Rule 14(a). *Id.* at 538. "The mere presence of hostility among defendants . . . or the desire of one to exculpate himself by inculpating another [are] insufficient grounds to require separate trials." *United States v. Spitler*, 800 F.2d 1267, 1271 (4th Cir. 1986) (citation, alterations, and internal quotation marks omitted). The antagonistic defenses must involve more than "finger pointing." *United States v. Najjar*, 300 F.3d 466, 474 (4th Cir. 2002). Instead, "[t]here must be such a stark contrast presented by the defenses that the jury is presented with the proposition that to believe the core of one defense it must disbelieve the core of the other, . . . or that the jury will unjustifiably infer that this conflict alone demonstrates that both are guilty." *Id.* (citation and internal quotation marks omitted).

Flood's defense at trial was that he did not participate in the Hayes kidnapping and murder. This defense was premised on the argument that there were only two individuals involved in the Hayes kidnapping and murder and that Lighty and Wilson were those two individuals. Although this defense largely ignored all of the circumstantial evidence linking Flood to the crimes, Flood's counsel emphasized that no witness positively

Case 8:03-cr-00457-BAH   Document 384-1   Filed 08/11/10   Page 27 of 83

identified Flood as a participant, that Forrest only saw two people on Eighth Street, and that Davis only saw two people on the 12800 block of Hillcrest Parkway.

Lighty's defense also centered on a denial of participation in the Hayes kidnapping and murder. In closing argument, counsel for Lighty gave the jury twelve "reasonable doubts," that is, twelve points that provided a reasonable doubt in the case. These twelve points largely attacked the credibility of the government's witnesses, in particular, CW, Davis, Miller, Scott, Phauls, Coles, and Mills. One of these points involved Mathis, in which counsel argued to the jury that the "two kidnappers could just as easily [have been] Mr. Flood and Mr. Mathis." Counsel emphasized that, according to Massey, Mathis met Flood on the day of the murder wearing camouflage clothing and returned home with blood on his pants and boots.

In our view, Lighty's and Flood's defenses, while conflicting on certain points, were not mutually antagonistic to the point where the jury was required to believe the core of one defense and disbelieve the core of the other. In order to convict Lighty, the jury was not required to believe Flood's defense that he was not a participant in the Hayes kidnapping and murder. Moreover, the jury was not required to believe Flood's alternative defense that Lighty and Wilson were responsible in order to convict Lighty. Rather, to convict Lighty, the jury was required to find that he aided and abetted the kidnapping, murder, and the possession of the firearms. Such convictions did not rest on the jury's acceptance of Flood's defense(s). In other words, the jury was free to disbelieve both Lighty's and Flood's versions of the events and conclude they both participated in the Hayes kidnapping and murder. Such a conclusion did not rest on the belief of one defendant's defense and the disbelief of the other defendant's defense. *See id.* at 474 (noting that defenses were not mutually antagonistic where defendant's guilt was not dictated by the asserted innocence of his co-defendants); *cf. United States*

28                    UNITED STATES V. LIGHTY

*v. Ortiz*, 315 F.3d 873, 898 (8th Cir. 2002) ("Mr. Tello and
Mr. Ortiz each claimed that the other shot Mr. Molina. While
only one man committed that act, the government's theory of
the case did not require the jury to decide who shot Mr.
Molina. The indictment charged defendants with crimes,
including conspiracy and aiding and abetting, that did not
require jurors to choose a particular defendant as the
shooter."); *United States v. Tootick*, 952 F.2d 1078, 1081 (9th
Cir. 1991) (finding mutual antagonistic defenses where two
defendants charged with assault both defended themselves by
arguing the other committed the assault alone). Finally, there
simply is nothing in the record to suggest that the jury, from
the conflict in the defenses, unjustifiably inferred that both
Lighty and Flood were guilty. The district court repeatedly
instructed the jury that it was required to assess the evidence
against each defendant separately, and the government,
through the relevant evidence it introduced at trial (summa-
rized in Part IIB1), overwhelmingly established each defen-
dant's guilt on each count beyond a reasonable doubt. *Cf.
Ortiz*, 315 F.3d at 898-99 ("These instructions, combined with
the ample evidence of guilt the government introduced at trial,
persuade us that there is not an appreciable chance that
[defendants] would not have been convicted had separate tri-
als been granted.") (citation and internal quotation marks
omitted). The verdicts give every indication that the jury
faithfully applied the district court's instructions. In short, in
this case, "it is not so much that the defenses were antagonis-
tic to each other as it is that the evidence was antagonistic to
those defenses." *United States v. Frazier*, 394 F.2d 258, 261
(4th Cir. 1968).

2

Lighty also contends that severance was required because
he was unfairly prejudiced by the district court's ruling which
prohibited CW from referring to Mathis as one of the partici-
pants in the Hayes kidnapping. In *Bruton v. United States*,
391 U.S. 123 (1968), the Supreme Court held that admission

Case 8:03-cr-00457-BAH   Document 384-1   Filed 08/11/10   Page 29 of 83

UNITED STATES V. LIGHTY                                29

of a confession directly inculpating a co-defendant in a joint trial violated the co-defendant's Confrontation Clause rights. *Id.* at 126. To protect Flood's Confrontation Clause rights in this case, the district court refused to allow CW to refer to Flood, Wilson, and Mathis by name, but permitted CW to make reference to "three other people." "Such redactions are permissible so long as the redaction does not distort the statements' meaning, exclude substantially exculpatory information, or change the tenor of the utterance as a whole." *United States v. Yousef*, 327 F.3d 56, 150 (2d Cir. 2003) (citation and internal quotation marks omitted).

In this case, the district court's ruling did not distort the meaning of Lighty's original statement to CW, exclude exculpatory evidence, or change the tenor of the statement. The original statement's meaning and tenor simply was that Flood, Wilson, and Mathis accompanied Lighty to Eighth Street and that Lighty was the one that shot Hayes. CW's trial testimony conveys the same meaning—that three men accompanied Lighty during the kidnapping and that Lighty was the person that shot Hayes. Moreover, CW's trial testimony did not exclude exculpatory evidence because Lighty's original statement to CW does not suggest that Mathis shot Hayes, attribute any particular actions to Flood, Wilson, or Mathis, or otherwise lessen Lighty's culpability in any way.

3

Lighty argues that he was entitled to severance because both he and Flood were charged with the same offenses. As the argument goes, "Lighty's culpability was not determined individually as constitutionally required, but rather in comparison to Flood, whom the government already had decided was less culpable—and so informed the jury." Lighty's Br. at 59. We disagree.

The Supreme Court has recognized a strong preference for trying defendants who are indicted together in joint trials. *See*

30                UNITED STATES v. LIGHTY

*Zafiro*, 506 U.S. at 537 ("There is a preference in the federal system for joint trials of defendants who are indicted together. Joint trials play a vital role in the criminal justice system.") (citation and internal quotation marks omitted); *see also Buchanan v. Kentucky*, 483 U.S. 402, 418 (1987) ("Underlying the Commonwealth's interest in a joint trial is a related interest in promoting the reliability and consistency of its judicial process, an interest that may benefit the non-capital defendant as well. In joint trials, the jury obtains a more complete view of all the acts underlying the charges than would be possible in separate trials. From such a perspective, it may be able to arrive more reliably at its conclusions regarding the guilt or innocence of a particular defendant and to assign fairly the respective responsibilities of each defendant in sentencing."). A *per se* rule requiring severance each time a capital defendant and a non-capital defendant are charged with the same crimes certainly would undermine this stated preference.

Moreover, the Supreme Court has rejected the argument that a non-capital defendant cannot receive a fair trial when tried jointly with a capital defendant. *Buchanan*, 483 U.S. at 418-19. In *Buchanan*, a non-capital defendant and a capital defendant were tried by the same death-qualified jury. *Id.* at 408. The Supreme Court concluded that the non-capital defendant could not demonstrate that being tried by a death-qualified jury violated either his right to a jury selected from a fair cross section of the community or his right to an impartial jury. *Id.* at 415-20. Although *Buchanan* did not involve the claim of a capital defendant, the Court's reasoning suggests that a joint trial of a capital defendant and a non-capital defendant does not run afoul of the Constitution. As the court in *Stanford v. Parker* noted in rejecting a similar claim, "[i]f anything, because of the exclusion of presumably more sympathetic jurors who could not be death-qualified, it would be far more plausible that the death-ineligible co-defendant would be prejudiced." 266 F.3d 442, 459 (6th Cir. 2001).

Finally, the district court's repeated instructions to the jury that it was required to assess the evidence against each defendant separately eliminated the risk that the jury would view Lighty more culpable than Flood, simply because Lighty was charged as a capital defendant. Moreover, the district court's sentencing phase instructions reminded the jury that its sentencing decision was to be guided by the district court's instructions and based on the evidence before the jury. In *United States v. Tipton*, 90 F.3d 861 (4th Cir. 1996), three capital defendants sought severance at the capital phase of their joint trial, contending that the denial of severance violated their right to an individualized sentencing determination under the Eighth Amendment. *Id.* at 892. We rejected the argument, relying in large part on the district court's repeated instructions to the jury to consider the evidence against each capital defendant individually. *Id.* at 892-93. Here, the district court's cautionary instructions at both phases of the trial similarly allowed the jury to compartmentalize the evidence against Lighty only and without regard to Flood, and we assume the jury followed these instructions. *Id.* at 893.

B

We review the district court's admission or exclusion of evidence for an abuse of discretion. *United States v. Young*, 248 F.3d 260, 266 (4th Cir. 2001).

1

Rule 404(b) of the Federal Rules of Evidence prohibits the admission of evidence of other wrongs or acts solely to prove a defendant's bad character. *United States v. Queen*, 132 F.3d 991, 994-95 (4th Cir. 1997).[32] Although not admissible to

_____

[32]Rule 404(b) states in relevant part:

    **Other Crimes, Wrongs, or Acts.**—Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a per-

prove the defendant's character, evidence of other wrongs may be admitted to prove "motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." Fed. R. Evid. 404(b). Rule 404(b) is an inclusionary rule, allowing evidence of other crimes or acts to be admitted, except that which tends to prove only criminal disposition. *Queen*, 132 F.3d at 994-95. For such evidence to be admissible, it must be "(1) relevant to an issue other than the general character of the defendant; (2) necessary to prove an element of the charged offense; and (3) reliable." *United States v. Hodge*, 354 F.3d 305, 312 (4th Cir. 2004). The last requirement in our Rule 404(b) analysis involves a Rule 403 determination, that is, the probative value of the evidence must not be substantially outweighed by its prejudicial effect. *Id.*[33]

Rule 404(b) limits only the admission of evidence of acts extrinsic to the one charged, but does not limit the admission of evidence of intrinsic acts. *United States v. Chin*, 83 F.3d 83, 87 (4th Cir. 1996). Other acts are intrinsic when they are "inextricably intertwined or both acts are part of a single criminal episode or the other acts were necessary preliminaries to the crime charged." *Id.* at 88 (citation and internal quotation marks omitted); *see also United States v. Cooper*, 482 F.3d 658, 663 (4th Cir. 2007) (noting that evidence is intrinsic if it is necessary to "provide context relevant to the criminal charges"). "[E]vidence is inextricably intertwined with the

---

son in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

Fed. R. Evid. 404(b).

[33]There is no distinction between "prior" bad acts and "subsequent" bad acts for the purposes of Rule 404(b), which speaks only of "other" bad acts. *See United States v. Hadaway*, 681 F.2d 214, 217-18 (4th Cir. 1982) ("[I]t is immaterial whether the instances are found occurring before or after the act charged.").

Case 8:03-cr-00457-BAH    Document 384-1    Filed 08/11/10    Page 33 of 83

UNITED STATES V. LIGHTY                    33

evidence regarding the charged offense if it forms an integral and natural part of the witness's accounts of the circumstances surrounding the offenses for which the defendant was indicted." *United States v. Edouard*, 485 F.3d 1324, 1344 (11th Cir. 2007) (citation and internal quotation marks omitted).

Prior to trial, the district court rejected Lighty's challenge to the admission of the Afton Street Shooting evidence,[34] after one of the AUSAs mistakenly told the district court that CW would testify that Lighty said the same handgun was used in both the Hayes murder and the Afton Street Shooting. Lighty never made such a statement to CW and no such testimony was given at trial.[35] According to the district court, if Lighty told CW that the same handgun was used in both shootings, CW's testimony about the handgun would be admissible either as intrinsic evidence or Rule 404(b) evidence.

At trial, before the admission of the Afton Street Shooting evidence, the district court gave the following cautionary instruction:

> [T]he government is going to make certain inquiry into what will be called the Newbill murder, another case which is not the subject of this prosecution. So, you are going to hear evidence from this witness regarding the shooting of Antoine Newbill on Afton Street. Mr. Lighty is not charged with that offense and you may not consider that Mr. Lighty has a propensity to commit crimes or is otherwise a bad char-

---

[34]In general, the Afton Street Shooting evidence consists of CW's testimony concerning Lighty's statements about the shooting, the testimony of Hart and Hines concerning the shooting itself and its aftermath, the ballistic evidence recovered at the scene, and Mills' expert testimony concerning the similarities between the casings found at the scene of the Afton Street Shooting and the Hayes murder ballistic evidence.

[35]We give the AUSA the benefit of the doubt here and assume that she made a misstatement as opposed to an affirmative misrepresentation.

34                    UNITED STATES V. LIGHTY

acter. The evidence of the Newbill murder may only
be considered by you in this case insofar as you may
determine that evidence in the Newbill murder case
is also evidence, something that connects the two, in
the present case, for example, indicating Mr.
Lighty's presence and involvement in the present
case.

During his testimony, CW never testified that Lighty told
him the same handgun was involved in both the Hayes murder
and the Afton Street Shooting. After Mills testified that he
could not conclude that the handgun used in the Afton Street
Shooting was the same handgun used in the Hayes murder,
Lighty sought to strike all of the Afton Street Shooting evi-
dence, but the district court denied the motion.[36]

Lighty challenges the admission, at the guilt phase of his
trial, of all of the Afton Street Shooting evidence.[37] The gov-

---

[36]In its brief, the government suggests that we should look unfavorably
on Lighty's failure to make contemporaneous objections to each portion
of the Afton Street Shooting evidence that was admitted at trial, especially
since one of the AUSAs, while discussing the appropriate limiting instruc-
tion for the admission of the Afton Street Shooting evidence, clarified in
passing that Lighty never told CW the same handgun was used in both the
Hayes murder and the Afton Street Shooting. This clarification made in
passing took place after several witnesses had testified at trial. The gov-
ernment's suggestion misses the mark. A motion *in limine* may preserve
an objection for appeal without any need to renew the objection at trial,
if the district court clearly and definitively rules on the motion. *United
States v. Williams*, 81 F.3d 1321, 1325 (4th Cir. 1996). If the district court
does not do so, and the party that brought the motion *in limine* does not
at trial either object to a ruling by the district court or at least renew his
request for a ruling, he waives for appeal the issue in the motion. *Id.* at
1326. Here, however, prior to trial, the district court clearly and defini-
tively ruled on the admissibility of the Afton Street Shooting evidence,
rejecting the precise claims Lighty now raises. Accordingly, Lighty's chal-
lenge to the admission of all of the Afton Street Shooting evidence is
properly preserved.

[37]Lighty does not challenge the admission of the Afton Street Shooting
evidence at the sentencing phase of his trial.

UNITED STATES V. LIGHTY                35

ernment counters that the Afton Street Shooting evidence was inextricably intertwined with the Hayes kidnapping and murder.[38] Alternatively, the government argues that the evidence was admissible under Rule 404(b).

With regard to the government's inextricably intertwined argument, the Afton Street Shooting evidence certainly was not an integral part of any witness's account of the circumstances surrounding the Hayes kidnapping and murder. CW's testimony concerning the Afton Street Shooting was not an integral part of his account of the Hayes kidnapping and murder and, of course, the testimony of Hart, Hines, and the law enforcement personnel was even more tangential to that of CW. There simply was no connection between the Afton Street Shooting and the Hayes kidnapping and murder; the events occurred at different times, at different places, and involved completely different motives, so there were no gaps in the government's case without the evidence. The events were not inextricably intertwined. *Cf. Chin*, 83 F.3d at 88 (holding that statements made concerning uncharged murder during exchange of heroin for cash was intrinsic part of drug trafficking charge).

Having rejected the government's inextricably intertwined argument, we turn to its extrinsic argument, that the Afton Street Shooting evidence was admissible under Rule 404(b) to prove Lighty's identity at the Hayes kidnapping and murder. According to the government, the Afton Street Shooting evi-

---

[38]For obvious reasons, the Hayes kidnapping and murder and the Afton Street Shooting were not part of a single criminal episode. They did not arise out of the same events, and the motives and the circumstances for both crimes were different. Moreover, given the timing of the two events, the government makes no argument that the Afton Street Shooting evidence was a necessary preliminary to any of the crimes charged in this case. Accordingly, the government's intrinsic argument rests on the proposition that the Afton Street Shooting evidence and the Hayes kidnapping and murder were inextricably intertwined.

36                    UNITED STATES V. LIGHTY

dence satisfies each of the four prongs of the test for admissibility of Rule 404(b) evidence outlined in *Queen*.

Assuming, without deciding, this evidence was relevant and reliable, it clearly fails under the necessity prong of our Rule 404(b) test for admissibility. Evidence is necessary where it is an "essential part of the crimes on trial, or where it furnishes part of the context of the crime." *Queen*, 132 F.3d at 998 (citation and internal quotation marks omitted); *see also Hodge*, 354 F.3d at 312 (noting that Rule 404(b) evidence must be necessary to prove an element of the crime charged). The necessity prong must be analyzed in "light of other evidence available to the government." *Queen*, 132 F.3d at 998 (citation and internal quotation marks omitted).[39] Because district courts must analyze the evidence available to the government, if the Rule 404(b) evidence is entirely cumulative to other non-Rule 404(b) evidence available to the government, the Rule 404(b) evidence may not meet the necessity prong. Moreover, as the quantum of other non-Rule 404(b) evidence available to prove an issue unrelated to character increases, the need for the Rule 404(b) evidence decreases. When the non-Rule 404(b) evidence renders the Rule 404(b)

---

[39]The necessity prong of the *Queen* test is similar to the Rule 403 prong, as both prongs require an examination of the probative value of the Rule 404(b) evidence. *See United States v. Williams*, 445 F.3d 724, 730 (4th Cir. 2006) (noting that evidence is unfairly prejudicial under Rule 403 when there is a genuine risk that the emotions of the jury will be excited to irrational behavior and the risk is disproportionate to the probative value of the other crimes evidence sought to be admitted under Rule 404(b)); *United States v. Gilbert*, 229 F.3d 15, 24 (1st Cir. 2000) (noting the government's "need" for the Rule 404(b) evidence as a factor to be considered in the Rule 403 analysis); 2 Weinstein, Federal Evidence, § 404.21 ("The availability of other, less prejudicial, evidence on the same point ordinarily reduces the probative value of a given item of extrinsic evidence."). There is, however, an important distinction between the two prongs. The necessity prong looks solely at the government's need to introduce the Rule 404(b) evidence, irrespective of the prejudicial effect of the evidence.

evidence unnecessary is a determination left to the sound discretion of the district court.

In this case, the necessity scales tip decidedly against admissibility. The government contends that it needed to introduce the Afton Street Shooting evidence to establish that Lighty "was found in possession of a gun that was consistent with the murder weapon." Appellee's Br. at 56-57. But this simply is not so. Other evidence established this link—more directly and more reliably. For the police recovered this very handgun *directly* from Lighty within four weeks of the Hayes murder. The introduction of the Afton Street Shooting evidence certainly did not make Lighty's possession of the asserted murder weapon any more probable than did the seizure by the police of that weapon directly from Lighty. Even at oral argument, the government never adequately explained why the Afton Street Shooting evidence properly added *anything* to its case.[40]

Moreover, the government had Lighty's confessions to CW and Miller admitting his participation in the Hayes kidnapping and murder and a host of other circumstantial evidence placing him at the scene of the kidnapping and murder. In light of the overwhelming admissible evidence connecting Lighty with the probable Hayes murder weapon and placing him at the scene of the Hayes kidnapping and murder, we are at a loss as to why the government viewed evidence as to an uncharged murder—the Afton Street Shooting evidence—as necessary. *Compare United States v. McCallum*, 584 F.3d 471, 477 (2d Cir. 2009) (finding other acts evidence unnecessary where government presented "extensive" physical and testimonial evidence on the same issue), *with United States v.*

---

[40]Despite the government's claims to the contrary, this case is a far cry from *United States v. Higgs*, 353 F.3d 281, 312 (4th Cir. 2003), in which we found prior shooting evidence necessary to establish the defendant's identity because, unlike in our case, the alleged murder weapon was never recovered.

*DiZenzo*, 500 F.2d 263, 266 (4th Cir. 1974) (finding other acts evidence necessary where that evidence "furnished more dependable proof" than "sparse" intrinsic evidence).

The record suggests that the government pushed for the admission of the Afton Street Shooting evidence under the misapprehension that CW would testify that Lighty told him the same handgun was used in both the Hayes kidnapping and murder and the Afton Street Shooting. Of course, such testimony would have been more probative of Lighty's identity than other evidence available to the government and, thus, necessary when compared to such evidence. The admission of the Afton Street Shooting evidence then would have turned on its reliability and the Rule 403 balancing. However, without such testimony from CW, the government's necessity bell rings hollow. In short, we conclude, under the facts of this case, the Afton Street Shooting evidence simply does not come close to meeting Rule 404(b)'s necessity prong, and, therefore, the admission of such evidence was an abuse of discretion.[41] In these circumstances, the protections of Rule 404(b)—"against juries trying defendants for prior acts rather than charged acts, and . . . against juries becoming confused by the purpose of the admitted acts and using the acts improperly in arriving at a verdict"–-disappear, and we must find error. *Queen*, 132 F.3d at 996.

The question becomes, then, whether the admission of the Afton Street Shooting evidence is harmless error. "Where error is founded on a violation of Rule 404(b), the test for harmlessness is 'whether we can say with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error.'" *United States v. Madden*, 38 F.3d 747,

---

[41]Because the Afton Street Shooting evidence was not necessary to prove an element of the charged offenses, we need not assess the reliability of the Afton Street Shooting evidence or engage in a Rule 403 balancing analysis.

Case 8:03-cr-00457-BAH    Document 384-1    Filed 08/11/10    Page 39 of 83

753 (4th Cir. 1994) (quoting *United States v. Nyman*, 649 F.2d 208, 211-12 (4th Cir. 1980)). "This inquiry is not whether, absent the improperly admitted evidence, sufficient evidence existed to convict." *Madden*, 38 F.3d at 753. Rather, the inquiry is "whether we can say that we believe it highly probable that the error did not affect the judgment." *Id.* (citation and internal quotation marks omitted).

In our view, the admission of the Afton Street Shooting evidence did not affect the judgment in Lighty's case. The evidence of guilt presented by the government was overwhelming. It is beyond dispute that the Lincoln Continental owned by Flood was involved in Hayes' kidnapping and murder, as confirmed by the testimony of Forrest and Davis and the physical evidence. Moreover, it is beyond dispute that a kidnapping took place on Eighth Street on the evening of January 3, 2002, and that Hayes' murder took place at approximately 8:30 p.m. on the same evening.

The evidence in this case demonstrates, overwhelmingly, that Lighty participated in the kidnapping and was the individual that shot Hayes. Lighty confessed to participating in the Hayes kidnapping and murder to two people, Miller and CW. Miller's testimony is consistent with CW's testimony, and their combined testimony is consistent with other evidence in the record.

Lighty told Miller twice on the evening of the murder that he had just "slumped" somebody, and admitted the following day that he killed Hayes because "[h]e shouldn't have tried to steal his man's car." Lighty indicated that Hayes used the phrase "on my mother," a phrase Miller testified that Hayes used frequently. Miller drove Lighty to Keating Street, and he showed her the blood on the street. The next stop was the 12800 block of Hillcrest Parkway, where, upon seeing just police tape at the scene, Lighty observed "that [the police] work fast[,] . . . they got him already."

40                    UNITED STATES v. LIGHTY

Lighty told CW that "he went down 8th Street [in the Lincoln Continental], kidnapped a dude or whatever, threw him in the trunk of the car and took him back on the Maryland side and shot him in the head." Lighty added that he asked Hayes to sell him some PCP, and that he did not kill Hayes on Eighth Street because police officers were nearby. These statements by CW were corroborated by Forrest's testimony. Lighty indicated that he was the one that shot Hayes and that he was the one who took Hayes' coat and Nike "[f]oam [p]osit[ ]" shoes off to make it appear that robbery was the motive for the killing. CW's description of the coat and shoes was corroborated by other testimony in the record describing these items.

Of course, the government's evidence did not end with Lighty's confessions. Phauls and Coles observed Lighty, Flood, and Wilson walking away from the house on Iverson Street soon after the murder. Lighty sat in the car and was observed with a pair of Nike shoes matching the descriptions of Hayes' Nike shoes. Lighty was also observed with blood on his T-shirt. While in the car, Lighty, Flood, and Wilson talked about having done "something to some boy," which Coles interpreted to mean that the trio had done "something bad" to some boy, "like killed him, hurt him, something like that." Phauls drove to the 2500 block of Keating Street where, earlier in the evening, Scott had seen an older model car pull up. When Phauls stopped the car, the three men got out and checked the street for blood. While inside Phauls' house, a text pager Wilson was carrying started to ring, "with [the message] 'Easy' going across it."

Lighty's connection to Flood was further bolstered by Marshall's testimony. After Flood was dropped off by Phauls, Marshall picked up Flood near Keating Street, where Lighty, Flood, and Wilson had examined the street for blood. Sometime in February 2002, Flood directed Marshall to the house on Iverson Street were Lighty, Flood, and Wilson stored the Lincoln Continental.

The government's ironclad case gets even stronger with Flood's cell phone records, which place Lighty, Flood, and Wilson together near the time of the crimes. Marshall and Flood spoke at 7:47 p.m. and 8:12 p.m. The 8:12 p.m. call placed Flood's car in the vicinity of Keating Street because Marshall testified that she saw Flood in his vehicle on Keating Street just prior to placing that call. Lighty later used Flood's cell phone to call Miller at 8:37 p.m. Calls between Flood's cell phone and Phauls' cell phone took place at 8:43, 8:44, 8:51, 8:54, 8:59, 9:02, and 9:03 p.m. The 9:03 p.m. call ended at the time Phauls met Lighty, Flood, and Wilson on Keating Street. The cell phone records are extremely damaging, especially when one considers that neither Phauls nor Miller knew Flood.

Finally, the physical evidence in the case supports Miller's and CW's testimony that Lighty shot Hayes. Most importantly, Lighty was found with a .38 caliber handgun on January 31, 2002. The test-fire casings from Lighty's handgun were forensically similar to the shell casings found at the Hayes murder scene and the bullets recovered from Hayes' body.

The district court's cautionary instruction and the government's comparatively limited use of the Afton Street Shooting evidence lend further support to the conclusion that the jury's guilty verdicts were not affected by the introduction of that evidence. The district court informed the jury in explicit terms that it could not infer from the Afton Street Shooting evidence that Lighty had "a propensity to commit crimes or is otherwise a bad character" and informed the jury that the evidence was relevant essentially to establish Lighty's identity at the Hayes kidnapping and murder. Moreover, the government mentioned "Afton Street" approximately six times in its closing arguments, which span almost sixty-five pages of trial transcript. Within its use of the Afton Street Shooting evidence, the AUSA reminded the jury that the evidence was not introduced to show that Lighty "might shoot one person."

Rather, the AUSA argued that the Afton Street Shooting evidence was necessary to show Lighty's "linkage to the gun that killed Mr. Hayes." Of course, as noted above, the government did not need the Afton Street Shooting evidence to establish this "linkage," and this point underscores the unimportance of the Afton Street Shooting evidence to the government's overall case.

We have recognized on several occasions that the admission of evidence of an uncharged murder is extremely prejudicial. *See, e.g.*, *Chin*, 83 F.3d at 88. In this case, the prejudicial nature of the Afton Street Shooting evidence is exacerbated by the testimony of Hart and Hines, because it strains credulity to conclude that the intricate details of the aftermath of the shooting were admissible. If the circumstances of this case were a little different, especially in terms of the strength of the government's case and the use of the Afton Street Shooting evidence by the government, we quite possibly could have a different result. However, given the government's limited and isolated use of the Afton Street Shooting evidence, the district court's cautionary instruction about the use of the Afton Street Shooting evidence, the non-critical nature of the Afton Street Shooting evidence, and the overwhelming evidence of guilt, we harbor no doubt that the erroneous introduction of the Afton Street Shooting evidence did not affect the jury's verdicts.

2

At trial, Lighty sought to introduce testimony from two witnesses, Tamika Hampton (the mother of Tony Mathis' child) and Latasha Massey (Mathis' girlfriend), concerning Mathis' alleged December 2001/January 2002 possession of a firearm. According to the proffer, Hampton (in December 2001) and Massey (either in December 2001 or in January 2002) each saw Mathis with a firearm that looked similar to the murder weapon. The district court refused to permit the testimony, noting that the proposed testimony was "just too tenuous."

Case 8:03-cr-00457-BAH   Document 384-1   Filed 08/11/10   Page 43 of 83

Lighty contends the district court's ruling prevented him from developing his defense—that Mathis kidnapped and murdered Hayes. According to Lighty, "[g]iven the government's efforts to establish that Lighty possessed the gun used to shoot Hayes, a crucial part of Lighty's defense was showing that it was Mathis who possessed the gun." Lighty's Br. at 77.

Whether grounded in the Sixth Amendment's guarantee of compulsory process or in the more general Fifth Amendment guarantee of due process, "the Constitution guarantees criminal defendants 'a meaningful opportunity to present a complete defense.'" *Holmes v. South Carolina*, 547 U.S. 319, 324 (2006) (quoting *Crane v. Kentucky*, 476 U.S. 683, 690 (1986)). This right includes, "at a minimum, . . . the right to put before a jury evidence that might influence the determination of guilt." *Pennsylvania v. Ritchie*, 480 U.S. 39, 56 (1987). Although a defendant has a constitutional right to present evidence in his favor, *United States v. Moussaoui*, 382 F.3d 453, 471 (4th Cir. 2004), "a defendant's right to present a defense is not absolute: criminal defendants do not have a right to present evidence that the district court, in its discretion, deems irrelevant or immaterial." *United States v. Prince-Oyibo*, 320 F.3d 494, 501 (4th Cir. 2003); *see also Crane*, 476 U.S. at 689-90 (noting that the "Constitution leaves to the judges who must make these decisions wide latitude to exclude evidence that is repetitive . . . , only marginally relevant or poses an undue risk of harassment, prejudice, [or] confusion of the issues") (citation and internal quotation marks omitted).

When determining whether evidence of an alternative perpetrator should be admitted at trial, courts have found that such evidence "is relevant, but there must be evidence" of a "connection between the other perpetrators and the crime, not mere speculation on the part of the defendant." *DiBenedetto v. Hall*, 272 F.3d 1, 8 (1st Cir. 2001); *see also United States v. Jordan*, 485 F.3d 1214, 1219 (10th Cir. 2007) (holding that there must be a nexus between the crime charged and the

44                    UNITED STATES V. LIGHTY

alleged alternative perpetrator). Alternative perpetrator cases
thus balance two evidentiary values: the admission of relevant
evidence probative of defendant's guilt or innocence under
Rule 401 with the exclusion of prejudicial, misleading, and
confusing evidence under Rule 403. *Jordan*, 485 F.3d at
1218.

In this case, the district court ruled that the proffered testi-
mony provided no nexus between Hayes' kidnapping and
murder and Mathis. Such a ruling was not an abuse of discre-
tion. If admitted, the proffered testimony would have caused
the jury to rankly speculate that the gun allegedly possessed
by Mathis was the gun used to kill Hayes, and Rule 403 is
designed to, among other things, prevent the jury from engag-
ing precisely in this type of speculation.

Neither Hampton nor Massey are experts in firearms, and
the proffer did not contain an inkling why these witnesses felt
there was a similarity between the firearm possessed by
Mathis and the murder weapon. Moreover, Mathis' alleged
possession did not occur in close temporal proximity to
Hayes' kidnapping and murder, and there is no evidence that
Mathis possessed a firearm on the day of the crimes. Finally,
the proffered testimony would have shed no light on what
transpired during Hayes' kidnapping and murder. *See id.* at
1221 (holding that evidence of alternative perpetrator's pos-
session of a weapon (similar to that possessed by the defen-
dant) months before stabbing was "suggestive" but
inadmissible because such evidence did not connect alterna-
tive perpetrator to the defendant's crime).

                              C

Near the conclusion of her direct testimony, Ebony Miller
was asked by one of the AUSAs whether she had any "doubt"
concerning the statements Lighty made to her on January 3,
2002, to which Miller responded, "no." Lighty contends that

Case 8:03-cr-00457-BAH    Document 384-1    Filed 08/11/10    Page 45 of 83

Miller's answer, admitted over his objection, constitutes improper bolstering.

We have held that it is error for the government to bolster or vouch for its own witnesses. *United States v. Samad*, 754 F.2d 1091, 1100 (4th Cir. 1984). Vouching occurs when the prosecutor's actions are such that a jury could reasonably believe that the prosecutor was indicating a personal belief in the credibility of the witness. *United States v. Lewis*, 10 F.3d 1086, 1089 (4th Cir. 1993). "Consequently, the prosecutor may not, among other things, make explicit personal assurances that a witness is trustworthy or implicitly bolster the witness by indicating that information not presented to the jury supports the testimony." *Id.*

In this case, there was no bolstering or vouching. The AUSA neither gave personal assurances that Miller was trustworthy nor indicated that information not presented to the jury supported Miller's testimony. The AUSA merely elicited testimony confirming that Miller was sure about what Lighty told her on January 3, 2002. The challenged question simply was not improper.

D

A prosecutor's improper closing argument may "so infect[ ] the trial with unfairness as to make the resulting conviction a denial of due process." *United States v. Wilson*, 135 F.3d 291, 297 (4th Cir. 1998) (citation and internal quotation marks omitted). In determining whether a defendant's due process rights were violated by a prosecutor's closing argument, we consider (1) whether the remarks were, in fact, improper, and, (2) if so, whether the improper remarks so prejudiced the defendant's substantial rights that the defendant was denied a fair trial. *Id.*

Lighty claims that, in closing argument at sentencing, the AUSA acted improperly when she argued to the jury that

Lighty had worn Hayes' shoes after he shot him, because the argument was not supported by the evidence. However, Lighty's argument ignores the fact that there was evidence to support the assertion that Lighty wore Hayes' shoes after the murder. During the sentencing phase of the trial, the government introduced a May 2, 2002 statement that CW made to a detective with the PGPD. In that statement, CW indicated that Lighty said "he wore the shoes for a while and then got rid of them."

Lighty also argues that the AUSA improperly argued at closing argument at sentencing that Wilson had told CW that Lighty had shot Hayes, again positing that the argument was not supported by the evidence. However, in one of CW's statements, he implied that Wilson had told him that Lighty shot Hayes.

Lighty also argues that the AUSA improperly argued to the jury at sentencing that Lighty "sprayed" bullets into a small crowd during the Afton Street Shooting, because the argument was unsupported by the facts. However, properly understood, the context of argument was that Lighty and others deliberately went to Afton Street and started shooting, just to "see who we would hit."

Lighty also challenges the AUSA's characterization of Dr. Mark Cunningham's mitigation testimony. During the sentencing phase of the trial, Dr. Cunningham testified regarding a Department of Justice (DOJ) study that identified certain risk and protective factors that relate to delinquency and violence. Although Dr. Cunningham was allowed to testify regarding the risk and protective factors that the DOJ study identified, he was prohibited from testifying about the specific risk factors that Lighty had and protective factors that Lighty lacked. The district court excluded this evidence because it held that Lighty's counsel failed to comply with the deadline to file notice of expert evidence relating to mental condition.

Lighty argues that the AUSA's characterization of Dr. Cunningham's testimony, specifically, that his testimony had nothing to do with Lighty, was unfair, because the government was aware that the district court had precluded Dr. Cunningham from testifying about Lighty directly. However, the AUSA's characterization was proper argument because the government was not required to accept Dr. Cunningham's opinions concerning the DOJ study. There was nothing improper about the AUSA pointing out to the jury that Dr. Cunningham's testimony bore no relevance to the issues that the jury needed to consider.

Lighty also argues that the AUSA improperly argued to the jury at sentencing that it could not consider mercy. *See Higgs*, 353 F.3d at 331 (holding that "the jury is empowered to show mercy to reject a death sentence"). However, the AUSA never argued to the jury that it could not consider mercy. Rather, the AUSA argued:

> Counsel ended his closing argument by asking you for mercy. What he's asking you to do is feel sorry for, feel sorry for Mr. Lighty, and in some way use that sympathy to not do what the law in this case requires you to do, and that is to determine and answer that question, does a sentence—is a sentence of death justified? Do the—are the aggravating factors sufficiently outweighing the mitigating factors?

The AUSA's argument fairly responded to Lighty's request for mercy.

Twice during closing argument at the sentencing phase, the AUSA informed the jury that Hayes' family was asking the jury to impose the death penalty. On the first occasion, which involved a more subtle request than the second, the AUSA stated: "And let there be no doubt what the United States is asking you to do in this case, on behalf of the Hayes family and with the law in support, to impose the only justifiable sen-

Case 8:03-cr-00457-BAH    Document 384-1    Filed 08/11/10    Page 48 of 83

48                    UNITED STATES v. LIGHTY

tence in this case and that is a sentence of death." On the sec-
ond occasion, the AUSA stated:

> And with that evidence to guide you and with the
> law to guide you, you will do what the Hayes family
> asks you to do, what the Government tells you to do,
> in connection with the facts and the law of this case,
> and that is to impose the only sentence, the only sen-
> tence that is justified for these facts for the execution
> of this young man. And that is the death sentence.

Lighty moved for a mistrial, which the district court denied.
The district court did, however, tender a curative instruction,
which instructed the jury to disregard "what the Hayes family
was asking for" and reinforced to the jury that it was the gov-
ernment that was "asking for the death penalty in this case."

Lighty contends that the AUSA's two statements concern-
ing the desires of Hayes' family were both improper and prej-
udicial, such that he was deprived of a fair trial. The
government does not suggest that either statement was proper,
choosing instead to argue that Lighty was not prejudiced by
the statements.

With regard to the propriety of the AUSA's statements,
there is little doubt that the statements were improper. First,
there was no evidence in the record concerning whether
Hayes' family was, in fact, asking for the death penalty. Thus,
the AUSA was not at liberty to comment on facts not in evi-
dence. By going outside the evidence, the AUSA "violated the
fundamental rule, known to every lawyer, that argument is
limited to the facts in evidence." *United States ex rel. Shaw
v. De Robertis*, 755 F.2d 1279, 1281 (7th Cir. 1985).

Second, the AUSA's statements advanced an argument that
was based on inadmissible victim impact evidence (the sen-
tencing desires of the Hayes family). We have expressly rec-
ognized that the Eighth Amendment prohibits the admission

of this type of victim impact evidence. *See Humphries v. Ozmint*, 397 F.3d 206, 217 (4th Cir. 2005) (*en banc*) (noting that the portion of the holding in *Booth v. Maryland*, 482 U.S. 496 (1987), prohibiting family members of a victim from stating characterizations and opinions about the crime, the defendant, and the appropriate sentence during the penalty phase of a capital trial survived the Supreme Court's decision in *Payne v. Tennessee*, 501 U.S. 808 (1991)). Under *Ozmint*, the AUSA was not permitted to advance an argument based on inadmissible victim impact evidence.

This brings us to the second prong of the test—whether Lighty's substantial rights were prejudiced to the point of denying him a fair trial. Several factors are relevant to the determination of prejudice, including: "(1) the degree to which the prosecutor's remarks have a tendency to mislead the jury and to prejudice the accused; (2) whether the remarks were isolated or extensive; (3) absent the remarks, the strength of competent proof introduced to establish the guilt of the accused; and (4) whether the comments were deliberately placed before the jury to divert attention to extraneous matters." *United States v. Adam*, 70 F.3d 776, 780 (4th Cir. 1995) (citation and internal quotation marks omitted). We also consider (5) whether the prosecutor's remarks were invited by improper conduct of defense counsel, *United States v. Young*, 470 U.S. 1, 12-13 (1985), and (6) whether curative instructions were given to the jury, *United States v. Harrison*, 716 F.2d 1050, 1053 (4th Cir. 1983). These factors are examined in the context of the entire trial, and no one factor is dispositive. *Wilson*, 135 F.3d at 299.

First, the remarks did not have a tendency to mislead the jury. There was no evidence concerning what penalty the Hayes family thought was appropriate, so it is likely the jury simply disregarded the improper statements. Moreover, most of the AUSA's closing argument dealt with the consideration of aggravating and mitigating circumstances, and the AUSA never encouraged the jury to consider the desires of the Hayes

Case 8:03-cr-00457-BAH    Document 384-1    Filed 08/11/10    Page 50 of 83

family during its consideration of such circumstances; thus, it is highly unlikely the improper statements entered the sentencing calculus. It is also highly unlikely that the jury was mislead because the district court instructed the jury that the arguments of counsel were not evidence.

Second, the AUSA's two improper statements were isolated. They comprise but a few lines in a closing argument that spans twenty-seven pages of trial transcript.

Third, as noted, the evidence of Lighty's guilt during the guilt phase of the trial was overwhelming. Lighty confessed his participation in the crimes to two individuals and a mountain of circumstantial evidence ties him to these crimes. More importantly, the strength of the evidence supporting the aggravating factors was very strong and the mitigation case was weak. As noted in the jury's special verdict sheet, the jury found all of the alleged aggravating factors unanimously and beyond a reasonable doubt, but were unable to agree unanimously on any of the mitigating factors. There simply is no doubt that the jury would have returned a sentence of death absent the improper remarks.

Fourth, other than Lighty's rank speculation, the record does not suggest that the improper statements were deliberately placed before the jury to divert attention to extraneous matters. As noted above, most of the AUSA's closing argument dealt with the jury's consideration of the aggravating and mitigating factors.

Finally, while the AUSA's statements were not invited by the defense, the district court gave a curative instruction that reminded the jury that it was the government that was seeking the death penalty and instructed the jury not to consider the desires of the Hayes family.

In sum, weighing all of the relevant factors, we find that the AUSA's two improper statements did not affect Lighty's substantial rights.

## E

Under the FDPA, in the sentencing phase of the trial, mitigating evidence is "admissible regardless of its admissibility under the rules governing admission of evidence at criminal trials." 18 U.S.C. § 3593(c). This lenient standard affords a defendant the opportunity to present mitigating evidence consistent with the Supreme Court's directive that in capital cases the jury must "'not be precluded from considering, as a *mitigating factor*, any aspect of a defendant's character or record and any circumstances of the offense that the defendant proffers as a basis for a sentence less than death.'" *Eddings v. Oklahoma*, 455 U.S. 104, 110 (1982) (quoting *Lockett v. Ohio*, 438 U.S. 586, 604 (1978) (plurality opinion) (emphasis in original); *see also United States v. Basham*, 561 F.3d 302, 331 (4th Cir. 2009), *cert. denied*, 2010 WL 2160795 (U.S. June 1, 2010) (noting that the FDPA "'erects very low barriers'" of admissibility given that "'the need to regulate the scope of testimony is less at the penalty phase than at the guilt phase.'" (quoting *United States v. Lee*, 274 F.3d 485, 494 (8th Cir. 2001)).

This wide berth for the admission of mitigating evidence, however, "does not mean that the defense has *carte blanche* to introduce any and all evidence that it wishes." *United States v. Purkey*, 428 F.3d 738, 756 (8th Cir. 2005). The district court has the authority "to exclude, as irrelevant, evidence not bearing on the defendant's character, prior record, or the circumstances of his offense." *Lockett*, 438 U.S. at 604 n.12. Moreover, under the FDPA, the district court has the authority to exclude probative information during the penalty phase if "its probative value is outweighed by the danger of creating unfair prejudice, confusing the issues, or misleading the jury." 18 U.S.C. § 3593(c).

We review evidentiary rulings at the sentencing phase of a capital trial for an abuse of discretion. *Basham*, 561 F.3d at 330. However, if evidence was erroneously admitted during

52            UNITED STATES V. LIGHTY

this phase of the trial, reversal is not required if the govern-
ment can show beyond a reasonable doubt that the error was
harmless. *Id.*; *see also* 18 U.S.C. § 3595(c)(2)(C) (noting, for
"any other legal error requiring reversal . . . that was properly
preserved . . . [t]he court of appeals shall not reverse or vacate
a sentence of death on account of any error which can be
harmless").

1

At the sentencing phase of the trial, the district court pro-
hibited the introduction into evidence of a baby book written
by Lighty's mother, in which she wrote about her drug use
during her pregnancy with Lighty. At the time Lighty sought
to introduce the baby book, the government was unaware of
its existence because the baby book was not listed on Lighty's
exhibit list, nor produced pursuant to the district court's pre-
sentencing order requiring the parties to produce all exhibits
they would use at sentencing. In the district court's view, the
baby book was not admissible because it was not produced
pursuant to its earlier order.

Even if the district court erred in refusing to admit the baby
book, any error was harmless beyond a reasonable doubt. The
district court permitted James-Monroe to testify extensively
about information obtained from numerous individuals,
including Lighty himself and others who were never called to
testify, about Lighty's mother's drug abuse and criminal his-
tory. Thus, the jury was not precluded from considering
Lighty's mother's drug use as a potential mitigating factor; it
was merely precluded from considering cumulative evidence
of such use. Considering the minimal probative value of the
baby book and the overwhelming evidence and jury findings
of serious aggravating factors, any error concerning the baby
book's exclusion was harmless error. We are confident that
the jury would have reached the same sentence that it did
even if the district court had admitted the baby book. *Cf.
Jones v. United States*, 527 U.S. 373, 402 (1999) ("Harmless-

Case 8:03-cr-00457-BAH    Document 384-1    Filed 08/11/10    Page 53 of 83

error review of a death sentence may be performed in at least two different ways. An appellate court may choose to consider whether absent an invalid factor, the jury would have reached the same verdict or it may choose instead to consider whether the result would have been the same had the invalid aggravating factor been precisely defined.").

2

During his mitigation case, Lighty called his uncle, Randy Lighty, as a witness. With the exception of ten months in 1995, Randy Lighty had been in prison his entire adult life. He testified about his love for Lighty's mother and how she used to bring Lighty to visit him in prison. He also described how, during his ten months of freedom, he took Lighty along with him when he conducted drug deals, disciplined people who stole his drugs, and robbed drug dealers, and that he arranged for Lighty to have sex with a prostitute. According to Randy Lighty, he wanted Lighty to see these things because it "would be essential for his upbringing, his survival in the community."

Near the conclusion of Randy Lighty's testimony, Lighty sought to elicit Randy Lighty's opinion about whether Lighty could have a positive influence on others in prison. The district court sustained an objection to this question, stating that defense counsel could elicit testimony from Randy Lighty about "his own experience, his own relationship, his own evaluation of this man's character, but to ask him to extrapolate, saying how he will get along in prison if he gets life imprisonment is not a proper question."

In *Skipper v. South Carolina*, 476 U.S. 1 (1986), the Supreme Court held that it was error to exclude the non-opinion testimony from two jailors and a visitor that the defendant had made a good adjustment to prison life during the seven and one-half months that he was incarcerated before his trial. *Id.* at 3. The Court emphasized that "a defendant's

54                    UNITED STATES V. LIGHTY

disposition to make a well-behaved and peaceful adjustment to life in prison is itself an aspect of his character that is by its nature relevant to the sentencing determination." *Id.* at 7.

In this case, Randy Lighty's testimony bore no resemblance to the kind of testimony that was excluded in *Skipper*. Unlike the jailors and visitor in *Skipper*, Randy Lighty was not asked about his observations of Lighty's adjustment to prison life prior to his trial. Instead, the question posed of Randy Lighty, whether he believed Lighty would have a positive impact on those in jail, called for no more than rank speculation about how Lighty would adjust to life in prison. The exclusion of such evidence was not an abuse of discretion.[42]

3

As the verdict during the guilt phase of the trial was being taken, Lighty wrote the following letter to his grandmother:

> Ma, I know it's very hard to do, but please try not to upset yourself. Know that I will always be all right. No matter what, thank you for everything you have done for me. Through it all, when the smoke clear[s], it was only you. I put myself in this situation and it is I who has to deal with it. Please don't worry yourself. I love you with all my heart and soul, and I will miss you dearly. We put up a good fight. It just wasn't good enough. Try to call the family and—something, is it—tell everyone I love them. Tell Rich thanks for being a father to me, a very good and loving father. And stay strong, also. Love you baby, Kenny.

---

[42]Lighty also challenges the district court's exclusion of the prison adaptability evidence he sought to introduce through the testimony of his cousin, Jubarlo Thompson. For the reasons stated in this part of the opinion, we reject this argument as well.

Lighty attempted to introduce this letter during the sentencing phase of the trial, arguing that the letter was relevant to his character, but the district court excluded it, finding that the letter constituted an effort by Lighty to allocute to the jury or to present himself as tenderhearted, without subjecting himself to cross-examination.

Lighty argues that the district court erred in excluding the letter. More specifically, he argues that the letter was admissible because it was relevant to his character and because it refuted the lack of remorse non-statutory aggravating factor.

With regard to Lighty's lack of remorse argument, he is raising it for the first time on appeal, so our review is for plain error. *See United States v. Moussaoui*, 591 F.3d 263, 295 (4th Cir. 2010) (holding that claims raised for the first time on appeal are reviewed for plain error). Lighty must therefore establish (1) error, (2) that is plain, and (3) that affects his substantial rights. *United States v. Olano*, 507 U.S. 725, 731-32 (1993). Even then, we will not "correct the forfeited error . . . unless [it] seriously affect[s] the fairness, integrity or public reputation of judicial proceedings." *Id.* at 731-32 (citation and internal quotation marks omitted).

Here, even if Lighty tendered the letter in an effort to rebut the lack of remorse aggravating factor, the district court would not have abused its discretion in refusing to admit the letter, as the letter itself did not express remorse. There is no admission of guilt or expression of remorse for the death of Hayes. Rather, the letter expresses concern for Lighty's family and gratitude for the support they gave him throughout the trial. As such, it was not admissible on the basis that it rebutted the lack of remorse aggravating factor.[43]

---

[43]In a related argument, Lighty contends the exclusion of the letter rendered the lack of remorse aggravating factor unconstitutional because it forced him into a Hobson's Choice: testify or forego rebutting the aggravating factor. We reject this argument on several grounds. First, as noted, the letter did not express remorse for the Hayes killing or tender an admission of guilt. Moreover, as noted, *infra*, Lighty was able to introduce remorse evidence, rendering the letter cumulative.

Case 8:03-cr-00457-BAH   Document 384-1   Filed 08/11/10   Page 56 of 83

56                  UNITED STATES V. LIGHTY

With regard to Lighty's character argument, this presents a closer question. On the one hand, the letter demonstrates a certain level of love for family, loyalty to family, and gratitude to family, all of which are relevant to Lighty's character. On the other hand, the attempted admission of the letter certainly was designed as a way to avoid putting Lighty on the stand and to make an end-run around this court's precedent holding that a defendant does not have a constitutional right to allocution before the jury in a capital sentencing hearing. *United States v. Barnette*, 211 F.3d 803, 820 (4th Cir. 2000).

We need not decide if the letter was admissible character evidence because any error here is harmless. Essentially, the same information contained in Lighty's letter was presented to the jury through James-Monroe, who testified that Lighty had concerns about his grandmother and her well-being, as well as about himself and his family, and that Lighty had felt badly about what happened to Hayes. Given that the letter would be, at best, cumulative, any error in its exclusion was harmless. In short, we harbor no doubt that the jury would have reached the same sentence that it did even if the district court had admitted the letter.

4

Lighty also argues the district court improperly limited the testimony of Dr. Cunningham. As noted earlier, during the sentencing phase of the trial, Dr. Cunningham testified regarding a DOJ study that identified certain risk and protective factors that relate to delinquency and violence.

Here, to the extent that any error was committed, it was harmless. The evidence that the district court did not permit Dr. Cunningham to provide was presented to the jury during the testimony of James-Monroe, who testified about the presence of these risk factors in Lighty's background. Using the term red flags, James-Monroe went through the list of risk factors presented by Dr. Cunningham, identified each one that

Lighty exhibited, and detailed the information from various sources that supported her conclusion. Among others, she identified the following risk factors in Lighty: prenatal difficulties, his mother's drug use and depression, the family history of criminal behavior, family members' substance abuse, family management issues, family conflict, parental attitudes, economic deprivation, community disorganization, transitions and mobility, availability of firearms, antisocial behavior, juvenile delinquency, academic failure, lack of commitment to school, and alienation and rebelliousness. As a result, the additional opinion evidence from Dr. Cunningham that the district court decided to exclude was, at best, cumulative of the evidence presented to the jury though James-Monroe.

F

"We review the district court's decision to give or refuse to give a jury instruction for abuse of discretion." *United States v. Passaro*, 577 F.3d 207, 221 (4th Cir. 2009), *cert. denied*, 130 S. Ct. 1551 (2010). "A district court commits reversible error in refusing to provide a proffered jury instruction only when the instruction (1) was correct; (2) was not substantially covered by the court's charge to the jury; and (3) dealt with some point in the trial so important, that failure to give the requested instruction seriously impaired the defendant's ability to conduct his defense." *Id.* (internal quotation marks omitted). "Moreover, we do not view a single instruction in isolation; rather we consider whether taken as a whole and in the context of the entire charge, the instructions accurately and fairly state the controlling law." *Id.* (internal quotation marks omitted).

Prior to the delivery of the district court's jury instructions at sentencing, Lighty proposed an instruction related to the jury's consideration of aggravating and mitigating circumstances. His proposed instruction contained the following language: "Regardless of your findings with regard to aggravating and mitigating factors, you are never required to

58                    UNITED STATES V. LIGHTY

impose a sentence of death." The district court's instructions
to the jury at sentencing did not contain this language, and
Lighty took exception to this omission at the conclusion of the
instructions. In response to Lighty's exception, the district
court refused to supplement its instructions, opining that the
proposed language did not set forth a correct statement of the
law.

Under the FDPA, a death-eligible defendant "shall be sen-
tenced to death if, after consideration of the factors set forth
in section 3592 . . . [,] it is determined that imposition of a
sentence of death is justified." 18 U.S.C. § 3591. Section
3593(e) states as follows:

> [T]he jury . . . shall consider whether all the aggra-
> vating factor or factors found to exist sufficiently
> outweigh all the mitigating factor or factors found to
> exist to justify a sentence of death, or, in the absence
> of a mitigating factor, whether the aggravating factor
> or factors alone are sufficient to justify a sentence of
> death. Based upon this consideration, the jury by
> unanimous vote . . . shall recommend whether the
> defendant should be sentenced to death, to life
> imprisonment without possibility of release or some
> other lesser sentence.

*Id.* at § 3593(e).

In *Caro*, the defendant proposed an instruction which indi-
cated that mercy alone could justify a life sentence:

> [W]hatever findings you make with respect to the
> aggravating and mitigating factors, you are never
> required to impose a sentence of death. . . . More-
> over, even when a sentence of death is fully sup-
> ported by the evidence, Congress has nevertheless
> given each of you the discretion to temper justice
> with mercy. Any one of you is free to decide that a

> death sentence should not be imposed in this case for
> any reason that you see fit.

597 F.3d at 631. The district court in *Caro* refused to give this instruction "because it would have told the jury that it could base its determination on factors not specified in the FDPA." *Id.* at 631-32 (citation and internal quotation marks omitted). According to the *Caro* district court, the jury could consider mercy while weighing the aggravating and mitigating factors, but could not find a death sentence justified under § 3591 and thereafter refuse to impose the death penalty. *Id.* at 632.

On appeal, the defendant challenged the district court's refusal to give his proposed mercy instruction, arguing that § 3593(e)'s two-sentence structure created a two-step process whereby "(1) the death penalty might be found justified, with aggravating factors sufficiently outweighing mitigating factors, but (2) the jury might nonetheless impose a lesser sentence out of mercy." *Id.* We rejected the defendant's argument as unpersuasive for two reasons. First, we observed that the opening clause of § 3593(e)'s second sentence ("Based upon this consideration") referred back to the preceding sentence, thereby implying that when selecting a sentence the jury may consider only whether the death penalty is justified. *Id.* Second, we observed that "'§ 3591 states plainly that an eligible defendant shall be sentenced to death if . . . it is determined that imposition of a sentence of death is justified,'" *Id.* at 632-33 (quoting 18 U.S.C. § 3591), and that we are required to read "§§ 3591 and 3593(e) in harmony." *Id.* at 633.

In our case, Lighty's challenge to the district court's refusal to instruct the jury that it was never required to impose the death penalty regardless of its findings with regard to aggravating and mitigating factors is foreclosed by *Caro*. Lighty's proposed language would have allowed the jury to impose a life sentence after it found the death sentence justified under § 3591. However, under *Caro*, once the jury concludes a

60                    United States v. Lighty

death sentence is justified under § 3591, it must impose the death penalty.

G

We review the legal sufficiency of an indictment *de novo*. *United States v. Bolden*, 325 F.3d 471, 486 (4th Cir. 2003).

Prior to trial, the government provided notice (albeit not in the indictment) of its intent to prove four non-statutory factors: (1) Lighty caused injury, harm, and loss to Hayes' family and friends; (2) Lighty's lack of remorse; (3) Lighty committed other criminal acts of violence, including the Afton Street Shooting; and (4) Lighty committed the offenses charged while under court-ordered supervision for previous offenses.

Lighty argues that the government was required to allege in the indictment the non-statutory aggravating factor concerning the Afton Street Shooting. We disagree.

In *Higgs*, we soundly rejected the argument that non-statutory aggravating factors must be alleged in the indictment, observing:

> The finding of a nonstatutory aggravator alone will not support imposition of the death penalty. Rather, the purpose of nonstatutory aggravators is to aid the factfinder in selecting the appropriate sentence from the available options, *i.e.*, death or life imprisonment. Thus, the sentencer determines whether a defendant eligible for the death penalty should in fact receive that sentence. What is important at the selection stage is an individualized determination on the basis of the character of the individual and the circumstances of the crime. . . . Because nonstatutory aggravating factors do not increase the available punishment to which a defendant might be subjected, they are not required to be alleged in the indictment.

Case 8:03-cr-00457-BAH    Document 384-1    Filed 08/11/10    Page 61 of 83

353 F.3d at 298-99 (internal quotation marks omitted). Cases from other circuits are consistent with *Higgs*. *See, e.g.*, *Purkey*, 428 F.3d at 749-50; *United States v. Bourgeois*, 423 F.3d 501, 507-08 (5th Cir. 2005).

Lighty contends that *Higgs* is no longer good law because it was decided before *Blakely v. Washington*, 542 U.S. 296 (2004). However, *Higgs* is consistent with *Blakely* because a non-statutory aggravating factor does not allow for the imposition of a more severe sentence than could have been imposed without the presence of the factor. *See id.* at 303-04 ("In other words, the relevant 'statutory maximum' is not the maximum sentence a judge may impose after finding additional facts, but the maximum he may impose without any additional findings. When a judge inflicts punishment that the jury's verdict alone does not allow, the jury has not found all the facts which the law makes essential to the punishment, . . . and the judge exceeds his proper authority.") (citation and internal quotation marks omitted). Thus, a non-statutory aggravating factor is not one of those "facts legally essential to the punishment" that must be included within the indictment. *See id.* at 313 ("As *Apprendi* held, every defendant has the right to insist that the prosecutor prove to a jury all facts legally essential to the punishment."). Moreover, we note that several courts have upheld the omission of non-statutory aggravating factors post-*Blakely*. *See Purkey*, 428 F.3d at 749-50; *Bourgeois*, 423 F.3d at 507-08.[44]

---

[44]Lighty also argues that his sentence was constitutionally infirm because the sole statutory aggravating factor alleged by the government (death during the commission of another crime under § 3592(c)(1)) failed to sufficiently narrow the class of persons eligible for the death penalty as required by the Eighth Amendment. *See Lowenfield v. Phelps*, 484 U.S. 231, 244 (1988) ("To pass constitutional muster, a capital sentencing scheme must 'genuinely narrow the class of persons eligible for the death penalty and must reasonably justify the imposition of a more severe sentence on the defendant compared to others found guilty of murder.'" (quoting *Zant*, 462 U.S. at 877). We reject this argument for the simple reason that the criminal intent factors in § 3591(a)(2) and the § 3592(c)

62                    UNITED STATES v. LIGHTY

### H

The FDPA requires us to "consider whether the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor," 18 U.S.C. § 3595(c)(1), in violation of the Fifth, Sixth, and Eighth Amendments. In undertaking this duty, "we look to the record to see if these factors motivated the jury's recommendation of the death penalty, including an analysis of the aggravating factors to see if the jury had an abundance of evidence to support imposition of the death penalty." *Higgs*, 353 F.3d at 332.

Lighty argues that numerous trial errors infected the proceedings such that his death sentence is invalid under § 3595(c)(1). We disagree. We find no basis upon which to conclude that the jury imposed the death penalty under improper influence. "[W]hile [death penalty] proceedings must be free from passion, prejudice, and other arbitrary factors, a death penalty case will not be emotionless." *Id.* at 333 (citation and internal quotation marks omitted). Here, we find no indication that the jury was swayed by emotion rather than reason in deciding to impose Lighty's death sentence. Indeed, the district court properly instructed the jury not to rely on any arbitrary factors, and the government's evidence supporting the death penalty was unquestionably strong. *Cf. United States v. Paul*, 217 F.3d 989, 1005 (8th Cir. 2000) ("In light of the substantial evidence supporting the aggravating factors found by the jury, we cannot say that the sentence of death

---

aggravating factors sufficiently narrow the class of persons eligible for the death penalty in homicide cases to pass muster under the Eighth Amendment. *See United States v. Hall*, 152 F.3d 381, 417 (5th Cir. 1998) (holding that, with respect to the charge of kidnapping resulting in death, the § 3592(c)(1) aggravating factor and the criminal intent factors in § 3591(a)(2) performed the necessary narrowing function under the Eighth Amendment), *abrogated on other grounds* by *United States v. Martinez-Salazar*, 528 U.S. 304 (2000).

was imposed under the influence of passion, prejudice, or any other arbitrary factor.").

## I

Lighty argues that the district court erred in denying him discovery on his selective-prosecution claim, which alleged that the death penalty was not being pursued against non-African Americans who had committed crimes similar to those allegedly committed by Lighty.[45] In particular, Lighty claims that discovery is warranted because of the particularized need he demonstrated below. His evidence supporting his discovery request consisted of the following: (1) as of January 26, 2004, of the 312 federal death penalty prosecutions, 52% of the defendants were African-Americans; (2) as of January 26, 2004, eighteen of the twenty-six inmates on federal death row were African-Americans; (3) as of January 26, 2004, African-Americans accounted for roughly 12% of the country's total population, 40% of the federal prisoners, 22% of the federal defendants convicted of murder, and 21.6% of federal defendants charged with violent offenses; and (4) between 1995 and April 1, 2005, all sixteen of the federal defendants that faced the death penalty in the District of Maryland were African-Americans.

A selective-prosecution claim asks a court to exercise judicial power over a special province of the Executive Branch and, accordingly, must pass a high threshold in order to succeed. *United States v. Armstrong*, 517 U.S. 456, 464 (1996). The Executive's discretion is not, however, limitless. Equal protection demands that "the decision whether to prosecute may not be based on an unjustifiable standard such as race, religion, or other arbitrary classification." *Id.* (internal quotation marks omitted). In addition, "[a] defendant may demonstrate that the administration of a criminal law is directed so exclusively against a particular class of persons . . . with a

---

[45]Lighty is an African-American.

Case 8.03-cr-00457-BAH   Document 384-1   Filed 08/11/10   Page 64 of 83

mind so unequal and oppressive that the system of prosecution amounts to a practical denial of equal protection of the law." *Id.* at 464-65 (internal quotation marks omitted).

In order to obtain discovery on a selective-prosecution claim, a defendant must make "a credible showing of different treatment of similarly situated persons." *Id.* at 470. This showing "should itself be a significant barrier to the litigation of insubstantial claims." *Id.* at 464. In deference to executive discretion, we have held that "defendants are similarly situated when their circumstances present no distinguishable legitimate prosecutorial factors that might justify making different prosecutorial decisions with respect to them." *United States v. Olvis*, 97 F.3d 739, 744 (4th Cir. 1996). Finally, "when we review a district court's discovery order in support of a selective-prosecution claim, we are determining the legal adequacy of the evidence. We review the legal adequacy of evidence *de novo*." *Id.* at 743.

In this case, Lighty made no showing that he was similarly situated to non-African-Americans who were not facing the death penalty for engaging in similar conduct engaged in by him. The lack of such evidence is fatal to his attempt to obtain discovery because such evidence is necessary to show that there were no "distinguishable legitimate prosecutorial factors" that would justify a "different prosecutorial decision[ ]." *Id.* at 744; *id.* (noting that prosecutorial decisions may be based on "such factors as the strength of the evidence against a particular defendant, the defendant's role in the crime, whether the defendant is being prosecuted by state authorities, the defendant's candor and willingness to plead guilty, the amount of resources required to convict a defendant, the extent of prosecutorial resources, the potential impact of a prosecution on related investigations and prosecutions, and prosecutorial priorities for addressing specific types of illegal conduct"). Accordingly, the district court did not err in denying discovery on Lighty's selective-prosecution claim.

J

Lighty also argues that the death penalty is *per se* cruel and unusual punishment under the Eighth Amendment. This argument is foreclosed by both Supreme Court and circuit precedent. *Gregg v. Georgia*, 428 U.S. 153, 187 (1976); *Higgs*, 353 F.3d at 333.

K

We review *de novo* Lighty's challenge to the consecutive terms of imprisonment imposed for his § 924(c) firearm convictions on Counts Four and Five. *Higgs*, 353 F.3d at 333. The district court imposed consecutive sentences of five years' imprisonment, twenty-five years' imprisonment, and twenty-five years' imprisonment, respectively, on Count Three (forcibly placing Hayes at gunpoint inside the Lincoln Continental during and in relation to the kidnapping of Hayes and during and in relation to the conspiracy to kidnap Hayes), Count Four (pointing a firearm at Forrest during and in relation to the conspiracy to kidnap Hayes), and Count Five (the shooting of Hayes during and in relation to the kidnapping of Hayes and during and in relation to the conspiracy to kidnap Hayes). The twenty-five year sentences were imposed pursuant to § 924(c)'s requirement of such enhanced penalties for all "second or subsequent" convictions. 18 U.S.C. § 924(c)(1).

Lighty challenges the two twenty-five year consecutive sentences, arguing that they were not "second or subsequent" within the meaning of § 924(c)(1) because all three counts arose from "one criminal occurrence" and because they were "based on the same predicate offense." Lighty's Br. at 146.

In *United States v. Camps*, 32 F.3d 102 (4th Cir. 1994), we addressed the question of whether multiple consecutive sentences could be imposed under § 924(c)(1) if those convictions arose out of the events of a single predicate offense—in Camps' case, a drug conspiracy. *Id.* at 106-09. We answered

that question in the affirmative, noting that multiple, consecutive sentences under § 924(c)(1) are appropriate whenever there have been multiple, separate acts of firearm use or carriage, even when all of those acts relate to a single predicate offense. *Id.*; *id.* at 108 (noting that, if "multiple uses of . . . weapons . . . could not be punished with multiple consecutive sentences, there would be little deterrence against armed drug dealers using those weapons repeatedly during a lengthy drug conspiracy").

In this case, there were three separate uses of a firearm: (1) the brandishing of a firearm at Hayes during his initial seizure; (2) the brandishing of a firearm at Forrest; and (3) the shooting of Hayes. Because we have three separate uses during and in relation to a crime of violence, the district court did not err when it imposed the twenty-five year consecutive sentences on Counts Four and Five.

L

"Pursuant to the cumulative error doctrine, the cumulative effect of two or more individually harmless errors has the potential to prejudice a defendant to the same extent as a single reversible error." *Basham*, 561 F.3d at 330 (citation, alterations, and internal quotation marks omitted). "To satisfy this requirement, such errors must so fatally infect the trial that they violated the trial's fundamental fairness." *Id.* (citation and internal quotation marks omitted).

In this case, although we recognized (and assumed) a few harmless errors, they were not widespread or prejudicial enough to have fatally infected Lighty's trial or sentencing hearing. The proceeding below adhered to fundamental fairness. There is overwhelming evidence of guilt in the record and any possible error did not play a role in the outcome of either phase of Lighty's trial. Moreover, each aggravating factor (both statutory and non-statutory) determined by the jury was well supported by the record. Finally, we cannot see how

Case 8.03-cr-00457-BAH    Document 384-1    Filed 08/11/10    Page 67 of 83

cumulative error could have caused the jury to weigh the relevant sentencing factors any differently.

## M

Lighty argues that the district court erred by denying his request for a new trial or, in the alternative, a new sentencing hearing. We disagree.

## 1

On July 23, 2006, approximately five months after Lighty was sentenced, JM was arrested on felony gun charges.[46] He was interviewed by law enforcement officers from the Washington, D.C. police department and the PGPD. During his interview, JM made statements concerning the Hayes kidnapping and murder and the role that Mathis played in those crimes. In a letter dated March 29, 2007, the government informed Lighty, Flood, and Wilson that JM provided information concerning the Hayes kidnapping and murder. The letter summarized the information JM provided as follows:

> Tony Mathis was killed because of the murder of the MPDC officer's son [Hayes] who was abducted from D.C., thrown in the trunk of a vehicle and shot in PG County by Tony, Slug and Bud [(Flood)]. [JM] advised that Tony Mathis was the shooter. "Bud" and "Slug" were also involved. [JM] further stated that after the murder, they kept the victim in the trunk and Tony drove around and showed his body to drug dealers in the Iverson Street area. Tony shot him because the victim had approached Tony's baby's mother and tried to get her telephone number. According to [JM], Tony was killed because he and Slug were out of prison and Bud received three life sentences, even though Tony was the shooter. [JM]

---

[46]Like CW, JM is referred to herein pseudonymously.

68                    UNITED STATES v. LIGHTY

also said Tony was killed because he was out there robbing people.

In December 2007, Lighty filed a motion for new trial based on this newly discovered evidence. Prior to the evidentiary hearing, Lighty added a new claim, premised on CW's recantation of his trial testimony.

At the evidentiary hearing, JM testified that, on the evening of January 3, 2002, he and his friend "Smoke" started walking down Iverson Street when they came across a few people in a parking lot standing by a car with its trunk open. JM identified the people present in the parking lot as Mathis, "Dog Face," "Fats," "Slug," "Bug," and "Domino." He did not see Lighty or Wilson in the parking lot. As they approached Mathis, Smoke said "whoa" and then JM saw there was a body in the trunk. Not wanting to be involved, JM and Smoke immediately left. JM and Smoke told friends a short time later about what they had seen, and one of their friends responded, "that's Tony just being Tony."

Days after seeing Mathis in the parking lot, JM encountered Mathis again, this time arguing with his baby's mother (Hampton) in front of her house. Mathis left the house and started walking with JM. JM told Mathis that he had been "acting stupid" and "wilding out," apparently referring to the fact that JM had seen Mathis displaying a body in the trunk of a car. Mathis responded, "You know, niggers think it's sweet. They think they can just holler at [a baby's mother] and get away with it." According to JM, he understood Tony to be upset about Hayes "trying to holler at [Hampton], so he set him up and killed him." In another portion of his testimony, however, JM acknowledged that Mathis never told him he kidnapped or murdered Hayes.

On February 14, 2009, CW was interviewed by counsel for Lighty and signed a declaration recanting parts of his trial testimony. In his declaration, CW admitted that he was lying

when he testified at Lighty's trial that Lighty confessed to shooting Hayes. He acknowledged that he also lied about Lighty taking Hayes' shoes and coat. He explained that, when he gave the statements to the police in 2002, he was under arrest and facing serious charges. Facing this pressure, CW lied to the police officers by telling them that Lighty had admitted to killing Hayes.

In his declaration, CW also indicated that Mathis was the person who confessed to him about shooting Hayes. He further indicated that Mathis warned him that he (Mathis) "was still on the street."

Because CW asserted his Fifth Amendment right and refused to testify at the evidentiary hearing, Lighty's investigator, George Steel, who was present during CW's interview, testified regarding CW's statements. Steel testified concerning CW's motivations to recant his trial testimony. Steel stated that CW thought "his life would be negatively impacted by coming forward and saying this, but he had to do it because it was the right thing to do, and he felt very bad about Mr. Lighty getting the death penalty based on the statements he had said that weren't right." Steel also testified that CW specifically said that he was not recanting his testimony because of the threats he had received. Steel acknowledged that CW knew there were "people out there" who were "angry at [him] for having testified and snitched."

After hearing the argument of counsel, the district court denied Lighty's motion. In reaching its decision, the district court recognized that it "should and must consider the credibility of the defendant's new witnesses as well as the credibility of all witnesses and the trial evidence in order to determine whether or not the new evidence would probably lead to an acquittal in the event of a retrial."

With regard to JM's testimony, the district court concluded that, at most, JM said

70                    UNITED STATES V. LIGHTY

> he saw Tony Mathis at about the time he believed
> was the murder of Hayes where Mathis had a body
> in the car, and he did not say I killed this man as
> was—as is represented, has been represented by
> defense counsel throughout the argument, but simply
> that words to the effect that someone who messes
> with your baby's mother needs to know they can't
> get away with it or words to that effect. And from
> that, the inference is offered that Mathis was sug-
> gesting that he had killed that person in the car,
> which was inferred to by [JM] to be Hayes, and that
> this was the reason that Hayes was being killed.

The district court found that there were a "lot of reasons to doubt[ ]" JM's testimony. First, the district court observed that JM had waited years before he came forward to say any-thing about this case. It determined that JM's testimony was not credible because "he's consciously telling an untruth or because he's confused." It further observed that JM had previ-ously provided information to detectives about another mur-der in which the motive was that the victim was involved with the suspect's baby's mother, and suggested that JM may have confused the incidents. The district court concluded that "there is no real credibility to what, to what he said in that cir-cumstance." By contrast, the district court found the trial evi-dence, which contradicted JM's statements, to be far more reliable. Based on all of this information, the district court concluded that JM's testimony would not have made a differ-ence in the outcome of the trial.

With regard to CW's recantation, the district court deter-mined that CW had given extensive prior statements—before the grand jury, at two separate trials, and in written statements to the police—that were "corroborated by a number of other statements and evidence in the trial." In reaching its credibil-ity determination, the district court also considered the fact that CW had been threatened by members of the community because he testified against Lighty and the delay between

Case: 06-6    Document: 190    Date Filed: 08/11/2010    Page: 71

CW's testimony and his recantation which occurred years later.

The district court concluded:

> I don't find any credibility at all to [CW]'s so-called recantation. I simply do not. I think the statements that he made, although there were some errors in the statements that he made, were essentially corroborated by other facts in the case. I don't know that he had—he certainly was under pressure to say something helpful to himself, but that's the situation that every cooperating witness finds himself in in order to make a deal. It doesn't make him more or less credible. There was other evidence that I think buttressed his credibility, and I find that under the circumstances, to the extent that he recanted, he was doing that because he was trying to make amends for having fingered somebody who was part of this community in the face of some real community concern, and he was hoping to salvage himself, particularly by pointing out that Mr. Mathis no longer with us would not be able to respond. Easy enough to designate Mr. Mathis as the shooter in this case instead of Mr. Lighty, and then it becomes a very convenient package.

The district court reiterated its credibility assessment stating:

> Again, [it] makes no difference as far as [CW is] concerned because I think [CW] was threatened, and I think he was brought in, and I think he changed his testimony because he was trying to salvage a bad situation, but I think that there's [sic] his credibility, frankly, under all the circumstances is just nil.

### 2

A district court's order granting or denying a motion for new trial under Rule 33 is reviewed for abuse of discretion.

Case 8:03-cr-00457-BAH    Document 384-1    Filed 08/11/10    Page 72 of 83

72                    UNITED STATES v. LIGHTY

*United States v. Fulcher*, 250 F.3d 244, 249 (4th Cir. 2001). Under Rule 33 of the Federal Rules of Criminal Procedure, "[u]pon the defendant's motion, the court may . . . grant a new trial . . . if the interest of justice so requires." Fed. R. Crim. P. 33. To receive a new trial based on newly discovered evidence under Rule 33, a defendant must demonstrate: (1) the evidence is newly discovered; (2) he has been diligent in uncovering it; (3) it is not merely cumulative or impeaching; (4) it is material to the issues involved; and (5) it would probably produce an acquittal. *Fulcher*, 250 F.3d at 249.

With regard to the fifth prong, the "district court is required to make a credibility determination as part of its probability-of-acquittal inquiry." *United States v. Kelly*, 539 F.3d 172, 189 (3d Cir. 2008); *see also United States v. Grey Bear*, 116 F.3d 349, 350 (8th Cir. 1997) ("It is the job of the district court, either on affidavits or after an evidentiary hearing (as was the case here), to decide whether the newly discovered evidence is credible, . . . and, if so, whether it would probably produce an acquittal if a new trial were held."); *United States v. Gantt*, 298 F.2d 21, 23 (4th Cir. 1962) (noting the district court's fact-finding role where the credibility of the newly discovered evidence is in question). In making this credibility determination, a district court should focus on whether a jury probably would reach a different result upon hearing the new evidence. *Kelly*, 539 F.3d at 189. Of course, if the district court does not find a witness credible, it follows that the district court would not find the witness sufficiently persuasive to enable the district court to conclude that the witness's testimony would probably produce an acquittal at a new trial. *Id.*; at 189 n.14; *Grey Bear*, 116 F.3d at 351. "To make a determination under this standard, the district court cannot view the proffered testimony in a vacuum; it must weigh the testimony against all of the other evidence in the record, including the evidence already weighed and considered by the jury in the defendant's first trial." *Kelly*, 539 F.3d at 189.

When a witness recants testimony given at trial, a new trial should be granted only when: (1) the court is reasonably satis-

UNITED STATES V. LIGHTY                73

fied that the testimony given by a material witness is false; (2) without the evidence a jury might have reached a different conclusion; and (3) the party seeking the new trial was taken by surprise when the false testimony was given and was unable to meet it or did not know of its falsity until after the trial. *United States v. Wallace*, 528 F.2d 863, 866 (4th Cir. 1976); *see also United States v. Carmichael*, 726 F.2d 158, 160 (4th Cir. 1984) (noting the "[f]indings of the district court made on a motion for a new trial based on newly discovered evidence should not be disturbed except for most extraordinary circumstances"). The failure to meet any one of the *Wallace* test's three prongs is fatal. *Carmichael*, 726 F.2d at 159. Post-trial recantations of testimony are "looked upon with the utmost suspicion." *United States v. Johnson*, 487 F.2d 1278, 1279 (4th Cir. 1973) (citation and internal quotation marks omitted).

3

With regard to JM's testimony, the district court properly found that JM's testimony was not credible. There were numerous inconsistencies between his testimony at the evidentiary hearing and earlier statements he made to investigators. Moreover, the timing of JM's testimony, and his motives for making such testimony, undermine the testimony's credibility. For example, in his initial statement to police, JM stated that Mathis shot Hayes and then drove around with Hayes' body in the trunk of his car as he showed it to drug dealers in the Iverson Street area. In a later interview with Agent Bradley, JM placed the murder in the wrong season, stating that it was summer of 2003 or 2004 because the temperature was warm, and he claimed to have seen Hayes' body in the trunk of a light brown vehicle. Moreover, JM had been a police informant for several years prior to telling the police that he knew anything about Hayes' murder, but he waited until 2006 to come forward about what he purported to know. And, of course, JM did not provide his statement implicating

74                    UNITED STATES V. LIGHTY

Mathis as Hayes' shooter until after Mathis had been murdered.

After finding JM not credible, the district court properly turned to the question of whether JM's testimony would probably have produced an acquittal. The district court considered all of the trial evidence, including Ebony Miller's testimony that Lighty confessed within hours of the murder and provided details of the kidnapping and murder. Those details included the fact that Lighty had picked Hayes up off Alabama Avenue and brought him back to Keating Street to face allegations that he had tried to steal Scott's car. Lighty directed her to a location on Keating Street where he said he forced the victim to face his friends, and the location where Hayes was found by the PGPD. Phauls identified the same location as the place where she was directed to stop her car so Lighty, Flood, and Wilson could check the street for blood, and Scott identified that location as the place where an older model car pulled up and a voice asked words to the effect of, "Yogi, was this him?" Moreover, there was plenty of flimsy evidence concerning Mathis' role in the crimes before the jury, which the jury understandably rejected, and JM's testimony simply would have added to this flimsiness.

In sum, after presiding over Lighty's trial and listening to the proposed testimony of JM, the district court did not abuse its discretion when it determined JM's testimony was incredible and would not have probably resulted in an acquittal.

With regard to CW's recantation, the district court had ample opportunity to assess CW's credibility at trial. Although there were some inconsistencies in CW's trial testimony, the district court certainly was in the best position to determine if CW's trial testimony was credible. Moreover, CW's trial testimony was corroborated by the trial testimony of other witnesses, as well as physical evidence. With so much evidence corroborating CW's trial testimony and undercutting his post-trial recantation (*e.g.*, the timing of the recan-

UNITED STATES V. LIGHTY                          75

tation, community pressure), we cannot take issue with the district court's conclusion that the material portions of CW's trial testimony were not false.[47]

III

A

We review alleged Confrontation Clause violations under the *de novo* standard of review. *United States v. Rivera*, 412 F.3d 562, 566 (4th Cir. 2005).

At trial, CW testified concerning certain statements Lighty made to CW about Hayes' kidnapping and murder. Specifically, Lighty told CW that "he went down 8th Street [in the Lincoln Continental], kidnapped a dude or whatever, threw him in the trunk of the car and took him back on the Maryland side and shot him in the head." Lighty added that, as he approached the victim, he "asked him for some PCP." Lighty said that, after shooting Hayes, he took his coat and Nike shoes off to make it "look like a robbery." On cross-examination, when asked by Lighty's counsel "how many other people . . . were there [during the kidnapping]," CW said "three other people." The reference to "three other people" was a redacted version of the statement Lighty made to CW. In the non-redacted statement, Lighty told CW that Flood, Wilson, and Mathis "were with him when he went up on 8th Street." At trial, to protect Flood's Confrontation Clause rights, the district court refused to allow CW to refer to Flood, Wilson, and Mathis by name, but permitted CW to make reference to "three other people."

Flood argues that his rights under the Confrontation Clause

---

[47]Lighty also contends that his newly-discovered evidence entitles him to a new sentencing hearing. We reject this argument because the newly-discovered evidence was not credible and would not probably have resulted in a different sentence.

Case 8:03-cr-00457-BAH    Document 384-1    Filed 08/11/10    Page 76 of 83

76                    UNITED STATES V. LIGHTY

of the Sixth Amendment were violated when the district court permitted CW to testify that Lighty was accompanied by "three other people." According to Flood, it is clear from CW's testimony that the "'three others' Lighty was referring to were Flood, Wilson and Mathis." Flood's Br. at 17.

In *Bruton*, the Supreme Court held that, in certain circumstances, admission of a non-testifying co-defendant's confession that inculpates the defendant violates the Sixth Amendment's Confrontation Clause because the defendant has no opportunity for cross-examination. 391 U.S. at 126; *see also United States v. Campbell*, 935 F.2d 39, 43 (4th Cir. 1991) (holding that *Bruton* prohibits the admission of a statement of a non-testifying co-defendant "if it could be fairly understood to incriminate the accused"). However, if a non-testifying co-defendant's statement is redacted to eliminate any reference to the defendant, *Richardson v. Marsh*, 481 U.S. 200, 211 (1987), or if "the defendant's name is replaced by a symbol or neutral pronoun," *United States v. Vogt*, 910 F.2d 1184, 1191 (4th Cir. 1990), such statement is admissible. If a proffered statement of one non-testifying co-defendant becomes incriminating against another by virtue of an inference from other evidence at trial, the Confrontation Clause may not be offended if those statements are redacted and a proper limiting jury instruction is given. *Richardson*, 481 U.S. at 208-09.

On the other hand, redactions that obviously identify the defendant, even without naming him, effect a constitutional violation that cannot be cured by a jury instruction. *Gray v. Maryland*, 523 U.S. 185, 195-96 (1998). *Gray* differentiates between statements that incriminate by inference or only when linked with later evidence and those that obviously refer to a particular person or involve inferences a jury could make even without additional evidence. *Id.* at 196. Only in the latter instance does a constitutional violation occur. *Id.*

For example, in response to the question, "Who was in the group that beat [the victim]?," the response "Me, deleted,

deleted, and a few other guys" obviously incriminates two co-defendants of the crime of murdering the victim. *Id.* (internal quotation marks omitted). After *Gray*, however, we have continued to allow general references to "another person" or "another individual" in such statements, because "[t]he Supreme Court has strongly implied that such statements do not offend the Sixth Amendment." *United States v. Akinkoye*, 185 F.3d 192, 198 (4th Cir. 1999). The implication to which *Akinkoye* refers is the Supreme Court's explicit pondering in *Gray* about "[w]hy could the witness not, instead, have said: 'Question: Who was in the group that beat [the victim]? Answer: Me and a few other guys,'" suggesting that such a neutral response would have been acceptable. *Gray*, 523 U.S. at 196.

In *Akinkoye*, the non-testifying co-defendants' confessions were retyped, with the defendants' respective names replaced with the neutral phrase "another person" or "another individual," and the statements were read to the jury. 185 F.3d at 198. So redacted, neither confession facially implicated the other defendant. *Id.*

We find no constitutional violation in Flood's case. CW's testimony concerning the statements made by Lighty are like those in *Akinkoye* and unlike the offending statements in *Gray*. In *Gray*, the defendants' names were redacted in response to the direct question of who beat the victim. It was clear to the jury upon hearing the non-testifying co-defendant's response that the statement had been altered by the deletion of two names. *Gray*, 523 U.S. at 196. Here, as in *Akinkoye*, there was no way to facially identify the three other people without more information. Also, unlike in *Gray*, it would have been unclear to the jury that the statements had been altered at all. Indeed, only when Lighty's out-of-court statement to CW is linked with in-court testimony, which Flood had an opportunity to challenge through cross-examination, might one infer that the out-of-court statement refers to Flood.

78                    UNITED STATES V. LIGHTY

*Richardson* holds that where a non-testifying co-defendant's redacted out-of-court statement identifies the defendant by implication when linked with evidence at trial, such statement is admissible so long as a proper limiting jury instruction is given. 481 U.S. at 208-09. Here, the district court issued jury instructions admonishing jurors not to consider Lighty's out-of-court statements in the case against Flood. Accordingly, we find no violation of Flood's Confrontation Clause rights in this case.[48]

B

We review the decision of the district court to provide a particular jury instruction for an abuse of discretion. *United States v. Abbas*, 74 F.3d 506, 513 (4th Cir. 1996). A willful blindness instruction allows the jury to impute the element of knowledge of an illegal activity to the defendant. *United States v. Schnabel*, 939 F.2d 197, 203 (4th Cir. 1991). It is appropriate to give such an instruction when the defendant claims lack of guilty knowledge in the face of evidence supporting an inference of deliberate ignorance. *Abbas*, 74 F.3d at 513. A willful blindness instruction should be given only in "rare circumstances," *United States v. Ruhe*, 191 F.3d 376, 385 (4th Cir. 1999), because the instruction presents the danger of allowing the jury to convict based on an *ex post facto* theory (he should have been more careful) or to convict on a negligence theory (the defendant should have known his conduct was illegal). *United States v. Mancuso*, 42 F.3d 836, 846 (4th Cir. 1994).

At the government's request, the district court gave the following instruction on willful blindness:

You may infer that a defendant acted knowingly

---

[48]Because Flood's Confrontation Clause rights were not violated, we reject Flood's related argument that the admission of CW's testimony required severance.

UNITED STATES V. LIGHTY                    79

from circumstantial proof or from proof that a defendant deliberately closed his eyes to what would otherwise have been obvious to him. Stated another way, a defendant's knowledge of a fact may be inferred from . . . blindness to the existence of that fact. Willful blindness exists when a defendant whose suspicion has been aroused deliberately fails to make further inquiries. If you find that a defendant had a strong suspicion that someone withheld important facts—he has shut his eyes for fear what he would learn—you may conclude that that defendant acted knowingly. Actual knowledge and deliberate or conscious avoidance of knowledge are the same thing.

As part of its instructions on knowledge, the district court reminded the jury that: (1) a defendant acts knowingly if the defendant "acts intentionally and voluntarily, not because of ignorance, mistake, accident or carelessness"; and (2) a "defendant's acts must have been the product of his conscious, objective—must have been the product of his objective conscience rather than the product of a mistake or accident."

Flood contends that the district court erred when it gave the willful blindness instruction. We agree, as the government had no legitimate basis for asking for such an instruction.

All of the government's evidence tended to show that Flood was an active participant in the conspiracy to kidnap, the kidnapping resulting in murder, and the firearms charges. Indeed, the government argued to the jury that Flood "was an active participant in the conspiracy to kidnap Mr. Hayes, and, indeed, an active participant in the kidnapping." The government's argument was premised on its evidence showing that Flood "provided the car and the phone that made the commission of [the kidnapping resulting in murder] possible from its inception, . . . [and that] [w]ithout Flood's assistance, without his aid, that crime could not have been successful." There

80                UNITED STATES V. LIGHTY

simply was no evidence that Flood deliberately avoided, or closed his eyes to, Hayes' kidnapping and murder. Moreover, Flood's defense was not premised on the notion that he was unaware of what was transpiring around him. Rather, his defense was that he was not present at all during the kidnapping and murder of Hayes. Under such circumstances, a willful blindness instruction was not appropriate because the evidence did not suggest that Flood engaged in deliberate acts to avoid actual knowledge of the kidnapping resulting in murder, though the evidence did show that he denied knowledge of the operative fact of the kidnapping resulting in murder itself. *Mancuso*, 42 F.3d at 846-47 (holding that willful blindness was proper where defendant deliberately avoided learning about the fraudulent scheme).

When a district court errs in giving a willful blindness instruction, we must assess whether such error is harmless. Harmless error will be found where there is sufficient evidence in the record of actual knowledge on the defendant's part. *See Mattingly v. United States*, 924 F.2d 785, 792 (8th Cir. 1991) (holding that erroneous provision of willful blindness instruction was harmless where there was sufficient evidence to support actual knowledge); *see also United States v. Mari*, 47 F.3d 782, 785-86 (6th Cir. 1995) (holding that provision of a willful blindness instruction that is not supported by the record but that contains the proper legal standard is harmless as a matter of law because the jury "will consider the theory, and then dismiss it for what it is—mere surplusage, a theory of scienter that is insufficient to support the conviction"); *United States v. Sasser*, 974 F.2d 1544, 1553 (10th Cir. 1992) (holding "that when sufficient evidence of a defendant's guilt exists, the tendering of a 'willful blindness' instruction is harmless beyond a reasonable doubt even when the government does not introduce evidence to support such a theory").

In this case, the evidence overwhelmingly supports the conclusion that Flood had actual knowledge of, and participated

in, the kidnapping that resulted in Hayes' murder. Marshall saw Flood in his vehicle immediately before she called him at 8:12 p.m. Flood's car was used in the kidnapping and murder of Hayes, which occurred in the hour following that call. During the time frame of the kidnapping and murder, Flood used his cell phone to contact his girlfriend (Marshall), and his cell phone was used by Wilson to contact Wilson's girlfriend (Phauls), who was instructed to drive to the 1900 block of Iverson Street in Hillcrest Heights, which was approximately 1.7 miles from the murder scene, to pick up Lighty, Flood, and Wilson. Phauls drove to that location, accompanied by her girlfriend (Coles), who sat in the front passenger seat. Phauls and Coles observed Lighty, Flood, and Wilson walking away from a single-family home with a garage. The men entered the back seat of her car. Lighty held a pair of Nike shoes and had blood on his T-shirt. Lighty, Flood, and Wilson were heard talking all at once discussing that they had done something bad to someone. At Wilson's direction, Phauls drove to Keating Street, where the three men got out and checked the street for blood.

Sometime in February 2002, about a month after the murder, Flood retrieved the Lincoln Continental from the house on Iverson Street. Flood drove the Lincoln Continental to North Carolina and gave it to his parents. In February 2003, law enforcement officers located the car in North Carolina, at the home of an innocent buyer. Forensic technicians examined the Lincoln Continental for evidence. DNA testing determined that the only blood recovered from the car, a blood spot found on the rear passenger side floor rug, came from Hayes. Fibers from the passenger compartment and the trunk carpet matched those found on Hayes' clothing.

In view of this overwhelming evidence of Flood's actual knowledge of, and participation in, the Hayes kidnapping and murder, the error in giving the willful blindness instruction is harmless. We have no doubt that the jury ignored the willful blindness instruction for the simple reason that there was no

82                    UNITED STATES V. LIGHTY

evidence that Flood took deliberate acts to avoid learning about the kidnapping and murder; thus, there simply is no way that the jury rested its guilty verdicts on deliberate ignorance. Put another way, the jury either believed the government's view of the evidence (Flood was an active participant) or Flood's view of the evidence (he was not present) in deciding Flood's guilt or innocence. Here, the jury understandably accepted the government's view of the evidence.[49]

C

A district court's refusal to give a party's requested jury instruction is reviewed for an abuse of discretion. *Passaro*, 577 F.3d at 221. Flood argues that the district court erred when it did not instruct the jury on the definition of "reasonable doubt" after his counsel requested that it do so.

In this circuit, "although the district court may define reasonable doubt to a jury . . . the district court is not required to do so." *United States v. Walton*, 207 F.3d 694, 696-97 (4th Cir. 2000) (*en banc*); *see also United States v. Williams*, 152 F.3d 294, 298 (4th Cir. 1998) ("The trial court is not required to define reasonable doubt as a matter of course so long as the jury is instructed that a defendant's guilt must be proven beyond a reasonable doubt."). Moreover, even if the jury requests a reasonable-doubt instruction, "the final decision of whether to acquiesce to a jury's request and define reasonable doubt" is left to the district court's discretion. *Walton*, 207 F.3d at 699. Our reluctance to require instructions defining reasonable doubt stems from our belief that "attempting to explain the words 'beyond a reasonable doubt' is more dangerous than leaving a jury to wrestle with only the words themselves." *Id.* at 698.

---

[49]Flood also argues that the district court's willful blindness instruction did not accurately state the controlling legal standard for willful blindness. We reject this argument on the basis that the district court's willful blindness instruction is materially indistinguishable from the instruction upheld in *Mancuso*. 42 F.3d at 846.

Here, the district court followed our settled precedent when it declined counsel for Flood's invitation to define reasonable doubt for the jury. Obviously, we are bound by this settled precedent. *See Scotts Co. v. United Indus. Corp.*, 315 F.3d 264, 272 n.2 (4th Cir. 2002) (noting that a panel of this court cannot explicitly or implicitly overrule circuit precedent established by a prior panel; only the United States Supreme Court or the *en banc* court may do so).

### D

Flood also challenges the consecutive terms of imprisonment imposed for his § 924(c) convictions on Counts Four and Five, raising arguments similar to that raised by Lighty. For the reasons set forth in Part IIK of this opinion, we reject Flood's similar challenge to the sentences imposed on Counts Four and Five.[50]

### IV

The judgments of the district court are

*AFFIRMED*

---

[50]Flood also challenges the ten-year consecutive sentence imposed on Count Two. We have reviewed this challenge and find it to be without merit.