**REVISED OPINION**

**PUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

LORENZO ANTHONY WILSON, a/k/a
Baby Ann,

*Defendant-Appellant.*

No. 06-4180

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

LORENZO ANTHONY WILSON, a/k/a
Baby Ann,

*Defendant-Appellant.*

No. 09-4573

Appeals from the United States District Court
for the District of Maryland, at Greenbelt.
Peter J. Messitte, Senior District Judge.
(8:03-cr-00457-PJM-2)

Argued: May 13, 2010

Decided: August 11, 2010
Revised Opinion Filed: September 8, 2010

Before MOTZ and AGEE, Circuit Judges, and
HAMILTON, Senior Circuit Judge.

Case 8.03-cr-00457-BAH   Document 389-1   Filed 09/08/10   Page 2 of 37

2          UNITED STATES V. WILSON

Affirmed by published opinion. Judge Agee wrote the opinion, in which Judge Motz and Senior Judge Hamilton joined.

---

**COUNSEL**

**ARGUED:** Robert Kelsey Kry, MOLOLAMKEN, LLP, Washington, D.C., for Appellant. Sandra Wilkinson, OFFICE OF THE UNITED STATES ATTORNEY, Greenbelt, Maryland, for Appellee. **ON BRIEF:** Mary Elizabeth Davis, DAVIS & DAVIS, Washington, D.C.; Paul F. Enzinna, BAKER BOTTS LLP, Washington, D.C., for Appellant. Rod J. Rosenstein, United States Attorney, Baltimore, Maryland, Deborah Johnston, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Greenbelt, Maryland, for Appellee.

---

**OPINION**

AGEE, Circuit Judge:

Lorenzo A. Wilson appeals from his conviction for conspiracy to kidnap, in violation of 18 U.S.C. § 1201(c) and § 2, his sentence of life imprisonment for that offense, and the district court's order denying his post-sentencing motions for a new trial. For the reasons set forth below, we affirm.

I.

Wilson, Kenneth Jamal Lighty, and James Everett Flood, III, were charged in a five-count bill of indictment with kidnapping resulting in the death of Eric Hayes, and aiding and abetting the same, in violation of 18 U.S.C. § 1201(a) and § 2 ("Count I"), conspiracy to kidnap, and aiding and abetting the same, in violation of 18 U.S.C. § 1201(c) and § 2 ("Count II"), and three counts of using a firearm in furtherance of a

Case 8:03-cr-00457-BAH    Document 389-1    Filed 09/08/10    Page 3 of 37

crime of violence, and aiding and abetting the same, in violation of 18 U.S.C. § 924(c) and § 2 ("Counts III, IV, and V," respectively).

Wilson's case was severed from the joint trial of Lighty and Flood because of statements Wilson made implicating them. Following a jury trial, Wilson was convicted of Count II, conspiracy to kidnap, but acquitted of the other charges. Wilson was sentenced to life imprisonment. In their separate trial, Lighty and Flood were found guilty on all counts. Flood was sentenced to life imprisonment on the kidnapping conviction and a sixty-five year consecutive sentence on the remaining counts, while Lighty received the death penalty for the kidnapping conviction and a consecutive fifty-five year sentence on the remaining counts.[1] The parties noted separate, timely appeals, which were subsequently placed in abeyance pending the district court's resolution of motions by Wilson and Lighty for a new trial. After a joint evidentiary hearing, the district court denied those motions, and both Wilson and Lighty noted timely appeals from those orders as well.[2]

Because the cases of Wilson, Lighty, and Flood overlap in significant respects, not only in the underlying facts and evidence presented at the respective trials, but also in two of the legal issues raised, this opinion refers to or quotes without citation from our decision in Lighty and Flood's appeal, *United States v. Lighty*, No. 06-6 and 09-0006. A more detailed factual summary is contained in *Lighty*. Briefly, though, the evidence adduced at Wilson's trial showed the following.

On the evening of January 3, 2002, Eric Hayes (also known

---

[1] The Government sought the death penalty against Lighty only.

[2] We heard argument in all three cases seriatim on May 13, 2010. Lighty and Flood's cases were consolidated for decision, and the opinions in the three appeals are being released on the same date.

4                      UNITED STATES v. WILSON

as "Eazy"[3]) and his friend, Antoine Forrest, were on Eighth Street, S.E., Washington D.C., when two men in a dark Lincoln Continental exited the vehicle and asked if they could purchase drugs. Hayes walked with the men toward an alley in order to complete the transaction. After several minutes, Forrest approached the alley and observed that one of the men from the Lincoln was holding Hayes at gunpoint over the front hood of the vehicle. The second man from the vehicle approached Forrest, brandishing a firearm. Forrest fled the scene, and when he returned a short time later, Hayes, the other two men, and the Lincoln were gone.

At approximately 8:30 p.m. the same evening, Michael Davis and Robert Smith, Jr., who both lived in the 12800 block of Hillcrest Parkway in Temple Hills, Maryland, observed a dark Lincoln Continental parked at the end of that street adjacent to vacant land. Davis saw the front passenger and rear passenger exit the vehicle and forcibly pull a man, later identified as Hayes, out of the back passenger area of the vehicle. Hayes was protesting "no" or "don't" while on his knees, and then fell over after Davis heard what sounded like two gunshots. Davis testified that after the shots were fired, the passengers of the vehicle reentered the vehicle on the passenger side and the vehicle departed. Smith also testified that he saw Hayes being shot that evening. Smith was located further away from the vehicle than Davis' location. Smith saw two individuals exit from the passenger side of the vehicle, and heard gunshots, after which one person reentered the vehicle on the passenger side. Smith and Davis separately approached the area where Hayes' body lay, and placed 911 calls to report the incident. Telephone records introduced into evidence showed a 911 call placed at 8:50 p.m. reporting Hayes' body. Police subsequently retrieved two .380 caliber shell casings from the scene.

---

[3]Throughout the record in this case, Hayes' nickname is spelled as "Eazy," which we use in this opinion. We note, however, that the nickname is spelled "Easy" in *Lighty*, consistent with how it is spelled in that record.

Case 8:03-cr-00457-BAH   Document 389-1   Filed 09/08/10    Page 5 of 37

UNITED STATES V. WILSON                              5

Between 8:43 p.m. and 9:03 p.m., Wilson — who did not own a cell phone — used Flood's cell phone at least seven times to communicate with his girlfriend, Krystal Phauls. Wilson instructed Phauls to meet him on Iverson Street in Hillcrest Heights, a location less than two miles from where Hayes was shot. Phauls and her friend Melissa Coles drove to Iverson Street in Phauls' vehicle, and picked up Wilson, Lighty, and Flood[4] as the final telephone call between Flood and Phauls' cell phones ended (approximately 9:03 p.m.).

The three men sat in the back seat of Phauls' vehicle. Lighty, seated in the middle, held a pair of Nike shoes and had blood on his T-shirt. The men talked about having "done something bad or killed someone." At their direction, Phauls drove to the 2500 block of Keating Street. There, the men got out of the vehicle, looked at the ground, and one of them said "something about blood." Phauls then dropped Lighty off at an apartment complex in Hillcrest Heights and returned to her home.[5] Coles departed, and Phauls and Wilson went to dinner.

On returning to Phauls' home after dinner, Wilson told Phauls that he had driven Flood's vehicle when he, Lighty, and Flood "grabbed" "the boy" "Eazy" on 8th Street. Wilson assured Phauls he had not killed "the boy," and said Lighty had shot him. As Phauls and Wilson spoke, a two-way black pager went off. Wilson looked at it, said, "the guy wasn't lying, his name is Eazy," and Phauls saw that the screen said "Eazy" on it.[6] (J.A. 189-96.)

---

[4]Neither Phauls nor Coles knew Flood, who was introduced to them by his nickname "Junebug."

[5]Neither Phauls nor Coles could recall whether Flood got back into the vehicle after stopping at Keating Street. However, they both agreed that Flood was not in the vehicle when they arrived back at Phauls' home.

[6]Phauls testified that Wilson did not own a pager at that time, and Forrest testified that Hayes owned a pager with a description consistent with the pager Phauls saw Wilson with that evening.

6                    UNITED STATES V. WILSON

The next day Wilson telephoned Phauls and told her to turn on the television. She did so, and the news was reporting Hayes' murder. Phauls asked Wilson if he had done it, and Wilson again told her he had only driven the vehicle, and that Lighty had shot Hayes.

Wilson also told his friend CW[7] that he had participated in the Hayes kidnapping. CW testified Wilson said he "was riding with [Lighty] and [Flood] and someone else [and that the men] road up 8th Street and [Lighty] got out [of] the car, [and] asked a guy for some drugs or something." "When the guy went and got the drugs or whatever, when he was coming back towards [Lighty], [Lighty] snatched him, pulled out his gun, made the dude get in the car, and they pulled off . . . ." (J.A. 415-20.)

On January 30, 2002, less than one month after the Hayes kidnapping and murder, Lighty and Wilson were involved in a drive-by shooting on Afton Street in Temple Hills, Maryland ("the Afton Street Shooting"), which resulted in the death of Antoine Newbill. Over Wilson's objection, the Government introduced evidence of the Afton Street shooting, including Wilson's confession to CW to having participated in the event, eyewitness testimony regarding the shooting, and ballistics evidence regarding the firearms used in the shooting. That evidence is described in greater detail below and in the *Lighty* opinion.

Lighty was arrested on the evening of January 31, 2002. At the time of his arrest, he was carrying a .380 caliber handgun. Phauls testified that Wilson told her of Lighty's arrest and that he said Lighty had been arrested with "the gun that he used to kill the two boys with." (J.A. 198.) CW also testified that after Lighty was arrested, Wilson told him the handgun Lighty had been arrested with had "a body or two on it" from "Afton [Street]" and "Eighth Street." (J.A. 415-16.)

───────────────

[7]CW is referred to herein pseudonymously.

UNITED STATES V. WILSON                                    7

Brett Mills, an FBI firearms examiner, analyzed the two
.380 caliber shell casings recovered from the Hayes murder
scene, a .380 caliber shell casing recovered from the Afton
Street Shooting scene, and the handgun seized from Lighty at
the time of his arrest. Based on his analysis, Mills was able
to conclude that the shell casing recovered from the Afton
Street Shooting was fired by Lighty's .380 caliber handgun
(to the exclusion of all other firearms). Mills also concluded
that the two .380 caliber shell casings recovered from the
Hayes murder scene shared numerous rifling characteristics in
common with shell casings from Lighty's .380 caliber hand-
gun. However, he could not conclude to the exclusion of all
other firearms that Lighty's handgun had fired the shell cas-
ings recovered from the Hayes murder scene. Similarly, while
bullets retrieved from Hayes' body were consistent with and
possessed similar rifling characteristics to bullets fired from
Lighty's gun, Mills could not make a definitive conclusion
that Lighty's handgun had fired those bullets.[8]

Dr. Laron Locke, a medical examiner, examined Lighty's
.380 caliber handgun and concluded that one of the abrasions
found on Hayes matched the barrel portion of Lighty's hand-
gun and that another patterned abrasion matched the clip
release of the handgun. Dr. Locke concluded these abrasions
were consistent with Hayes being struck by Lighty's .380 cal-
iber handgun.

II.

On appeal, Wilson raises four issues relating to the conduct
of his trial and sentencing hearing, three of which warrant dis-
cussion.[9] First, he asserts the district court erred in allowing

---

[8]On cross-examination, Mills conceded that it was possible that as many
as twenty-four handgun manufacturers made handguns that produce simi-
lar rifling characteristics as the one Lighty possessed at the time of his
arrest.

[9]Wilson also contends the district court erred in considering acquitted
conduct as part of its sentencing decision. He acknowledges, however, that

8                     UNITED STATES V. WILSON

the Government to introduce evidence of an unrelated crime
— the Afton Street Shooting — during the trial. Second, he
contends the Government violated his due process rights by
making certain prejudicial statements during closing argu-
ment. Third, Wilson claims he is entitled to a new sentencing
hearing because the district court improperly relied on a writ-
ten statement he made to investigators. We address each issue
in turn.

A.

Wilson first argues the district court erred in allowing the
Government to introduce evidence of the Afton Street Shoot-
ing, which he maintains should have been excluded under
Federal Rule of Evidence 404(b) as evidence of "other wrongs
or acts solely to prove [Wilson's] bad character." We review
the district court's admission of evidence for an abuse of dis-
cretion. *United States v. Basham*, 561 F.3d 302, 325 (4th Cir.
2009). "A district court abuses its discretion when it acts arbi-
trarily or irrationally, fails to consider recognized factors con-
straining its exercise of discretion, relies on erroneous factual
or legal premises, or commits an error of law." *United States
v. Delfino*, 510 F.3d 468, 470 (4th Cir. 2007).

1.

Prior to trial, Wilson moved in limine to exclude evidence
of the Afton Street Shooting. The district court denied the
motion without prejudice, concluding that Wilson's state-
ments that Lighty had been arrested with the firearm used in
both the Hayes and Afton Street Shootings was "enough to

_____

his argument is foreclosed by precedent of the Supreme Court and this
Circuit, and states that he is raising the issue only for preservation pur-
poses. (Appellant's Br. 43-44.) Because the Supreme Court rejected a sim-
ilar claim in *United States v. Watts*, 519 U.S. 148 (1997) (per curiam), and
*Watts* remains binding precedent on this Court, *United States v. Grubbs*,
585 F.3d 793, 798-99 (4th Cir. 2009), the district court did not err in rely-
ing on acquitted conduct when sentencing Wilson.

Case 8:03-cr-00457-BAH   Document 389-1   Filed 09/08/10   Page 9 of 37

get the [Afton Street Shooting evidence] in. And it's not even a 404(b) issue at that point. It's strictly a matter of an important part of the first crime being identified two, three weeks later in another context." (J.A. 126.)

As noted earlier, both Phauls and CW testified at trial that Wilson told them the .380 caliber handgun in Lighty's possession when he was arrested had been used to kill two males, one of whom was Hayes. During the course of CW's testimony, the Government elicited additional information regarding the Afton Street Shooting. CW testified that Wilson told him that he "and a couple of guys went [to Afton Street] and started shooting" "at a crowd of guys down there" in order to confront a man known as "Boo-Boo." According to what Wilson told CW, "they pulled up, [Wilson's] window was rolled down and . . . he started firing at Boo-Boo." Wilson claimed to have "two guns in his hand," and CW recalled that Wilson thought "one of them was probably a .25 or a .380, and the other one was probably a 9-millimeter." (J.A. 411-13.)

Thomas Hart, one of the Afton Street Shooting victims, then testified that he, Newbill, and a man known as "Boo-Boo" were standing on the street when a Ford Taurus drove by and shots were fired at them from the front passenger side and the rear of the car. Boo-Boo was not injured. Hart was shot in the foot, the arm, and the chest, and Newbill died as a result of gunshot wounds he received.

After CW and Hart's testimony, but before the introduction of other evidence regarding the Afton Street Shooting, Wilson renewed his objection to the admission of any evidence of the Afton Street Shooting. The district court again overruled the objection, but gave the following limiting instruction:

> You have heard testimony about the shooting of Anthony Newbill on Afton Street. You are instructed that Mr. Wilson, the defendant in this case, is not charged with that offense and you may not consider

Case 8:03-cr-00457-BAH    Document 389-1    Filed 09/08/10    Page 10 of 37

10                   UNITED STATES V. WILSON

> that evidence to indicate that Mr. Wilson has a pro-
> pensity to commit crimes or is otherwise a bad char-
> acter.
>
> The evidence of the Newbill murder may be con-
> sidered by you in this case only insofar as it may
> indicate Mr. Wilson's knowledge of the weapon
> used in the Hayes kidnapping and Mr. Wilson's
> presence and involvement in the Hayes kidnapping.

(J.A. 520-21.)

The Government then called Marlon Hines, who lived off of Afton Street and was in his home the day of the shooting, as a witness. Hines described Hart, Newbill, and Boo-Boo entering his home after the gunshots were fired. Newbill told Hines he could not catch his breath and that he thought he was shot. Hines testified that Newbill died in his (Hines') home shortly thereafter. Hines also described an incident a day or two before the shooting. He and Newbill were driving together on Afton Street when Hines observed Boo-Boo, Wilson, Lighty, and another man engaged in a heated argument.

Mills, the FBI ballistics expert, testified concerning similarities between the .380 caliber shell casings retrieved from the scene of the Afton Street Shooting and the Hayes murder ballistic evidence. In addition, he testified that the .380 caliber handgun Lighty had on his person at the time of his arrest conclusively matched shell casings retrieved from the scene of the Afton Street Shooting.

During the final jury instructions, the district court reiterated its limiting instruction with regard to the Afton Street Shooting evidence:

> Now you've heard testimony about the shooting of
> Anthony Newbill on Afton Street. You are instructed
> that the defendant, Lorenzo Anthony Wilson, is not

charged with that offense in this case. You may not consider that evidence to indicate that Wilson has a propensity to commit crimes or is otherwise a bad character.

The evidence of the Newbill murder may be considered by you in this case only insofar as it may indicate the defendant's knowledge of the weapon that was used in the Eric Hayes kidnapping and insofar as it may indicate the defendant's presence at and involvement in Eric Hayes' kidnapping.

(J.A. 719-20.)

2.

Wilson challenges the admission of all of the Afton Street Shooting evidence at his trial.[10] He contends this evidence is "classic propensity evidence" and should have been excluded under Rule 404(b) and Rule 403. He asserts evidence of the Afton Street Shooting was not necessary to provide context to Wilson's statements connecting Lighty's .380 caliber handgun to the Afton Street Shooting and Hayes' shooting because those statements are only relevant to the extent they showed Wilson's knowledge of the firearm's use in Hayes' murder. Wilson further asserts that the Afton Street Shooting evidence was not necessary to establish identity because the identity of Hayes' shooter (Lighty) was not in dispute during Wilson's trial. Lastly, he contends the Afton Street Shooting evidence

---

[10]Wilson does not argue that the district court could not consider the Afton Street Shooting evidence at sentencing, and indeed would be foreclosed from arguing so under the precedent of the Supreme Court and this Circuit. *See Watts*, 519 U.S. at 157 (holding that uncharged conduct may be considered at sentencing when that conduct is proven by a preponderance of the evidence); *Grubbs*, 585 F.3d at 799 ("[A] sentencing court may consider uncharged . . . conduct in determining a sentence, as long as that conduct is proven by a preponderance of the evidence."). Our review is thus limited to its admission at trial.

Case 8:03-cr-00457-BAH   Document 389-1   Filed 09/08/10   Page 12 of 37

12                    UNITED STATES v. WILSON

was unfairly prejudicial because it placed Wilson at the center of a drive-by shooting wholly unrelated to the Hayes murder. Accordingly, he contends the evidence impermissibly "invited the jury to infer that Wilson was more likely" to have participated in the Hayes kidnapping based on his role in this other crime.

3.

Federal Rule of Evidence 404(b) states, in relevant part:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident . . . .

Importantly, Rule 404(b) is "an inclusive rule, admitting all evidence of other crimes or acts except that which tends to prove only criminal disposition." *United States v. Young*, 248 F.3d 260, 271-72 (4th Cir. 2001) (internal quotation marks omitted). We have adopted a four-prong test for assessing the admissibility of evidence under Rule 404(b): (1) it must be relevant to an issue other than character; (2) it must be necessary to prove an element of the crime charged; (3) it must be reliable; and (4) it must be admissible under Rule 403, in that the probative value of the evidence must not be substantially outweighed by its prejudicial effect. *United States v. Queen*, 132 F.3d 991, 995 (4th Cir. 1997); *see also United States v. Hines*, 717 F.2d 1481, 1489 (4th Cir. 1983) (test applies to acts occurring after the charged conduct).

Rule 404(b) does not limit the admission of evidence of acts intrinsic to the crime charged. *United States v. Chin*, 83 F.3d 83, 87 (4th Cir. 1996). "Other . . . acts are intrinsic when they are inextricably intertwined or both acts are part of a sin-

UNITED STATES V. WILSON                    13

gle criminal episode or the other acts were necessary pre-liminaries to the crime charged." *Id.* at 88 (citation and internal quotation marks omitted). "[E]vidence is inextricably intertwined with the evidence regarding the charged offense if it forms an integral and natural part of the witness's accounts of the circumstances surrounding the offenses for which the defendant was indicted." *United States v. Edouard*, 485 F.3d 1324, 1344 (11th Cir. 2007) (citation and internal quotation marks omitted).

The Afton Street Shooting evidence was not admissible as an intrinsic act because it was not inextricably intertwined to Hayes' kidnapping and murder.[11] That evidence was not an "integral and natural part of" any "witness's account[ ] of the circumstances surrounding" Hayes' kidnapping and murder. The only connection between the two shootings occurred in CW's testimony relating Wilson's statements that the .380 caliber handgun in Lighty's possession at his arrest had been used to kill two men, one of whom was Hayes.[12] Although some of the information regarding the Afton Street Shooting may have been a "natural" part of CW's explanation of what Wilson's statement meant, it was by no means an integral part of CW's testimony. The salient evidence at the trial was CW's testimony about Wilson's knowledge of what firearm had been used to shoot Hayes. CW's protracted explanation of the second shooting to which Wilson referred, which included Wilson's confession to participating in the Afton Street Shooting, a description of that event, and CW's identi-

---

[11]The Government does not contend, nor could it, that the Hayes kidnapping and shooting and the Afton Street Shooting were part of a single criminal episode or that the former was a necessary preliminary to the latter. Instead, the Government's argument that the Afton Street Shooting evidence constitutes an "intrinsic act" is limited to the contention that the incidents were inextricably intertwined.

[12]Although Phauls also testified that Wilson told her Lighty's .380 had been used to shoot "the two boys," her testimony was limited to the Hayes shooting and she did not provide any testimony about the Afton Street Shooting.

Case 8:03-cr-00457-BAH   Document 389-1   Filed 09/08/10   Page 14 of 37

14                   UNITED STATES V. WILSON

fication of the individuals involved in the earlier confronta-
tion, was not integral to his testimony regarding Wilson's
statements connecting Lighty's gun to the two shootings. Any
"integral" part of CW's testimony about the Afton Street
Shooting ended once he recited Wilson's statement that the
same gun was used in both instances.

The testimony of Hart, Hines, and the law enforcement per-
sonnel was even more tangential than CW's testimony. Their
testimony did not connect the Afton Street Shooting and the
Hayes kidnapping and murder because no connection existed.
The events occurred at different times, at different places, and
involved completely different motives. These witnesses pro-
vided absolutely no testimony about the Hayes kidnapping
and murder.

The Afton Street Shooting evidence was not inextricably
intertwined with the Government's case against Wilson for
the Hayes kidnapping and murder. *See United States v. Ste-
phens*, 571 F.3d 401, 409-10 (5th Cir. 2009) (holding that evi-
dence that co-defendants acted together to create and register
a website patterned after the official Red Cross website was
not intrinsic to the charged crimes of identity theft and wire
fraud stemming from the creation and use of a website pat-
terned after the official Salvation Army website); *United
States v. Eckhardt*, 466 F.3d 938, 946 n.4 (11th Cir. 2006)
(holding that evidence of uncharged threatening telephone
calls made during 2003 were not inextricably intertwined with
the charged offense of making threatening phone calls
between 1997 and 1999 because the defendant's "crime could
be fully presented via the interstate phone calls he made" dur-
ing the charged time frame).

We now turn to whether the Afton Street Shooting evi-
dence was admissible into evidence under the four-part test
for Rule 404(b). *Cf. Queen*, 132 F.3d at 995. The Government
posits that the Afton Street Shooting evidence was relevant
and necessary because it explained and substantiated Wilson's

UNITED STATES V. WILSON                    15

"two bodies" statements to Phauls and CW, and thus showed Wilson's "knowledge, intent and identity as a participant" in the Hayes kidnapping and murder. Assuming, without deciding, that Wilson's statements make the Afton Street Shooting evidence relevant, we conclude that the admission of this evidence was not necessary to prove an element of the crime charged.[13] The admission of the Afton Street Shooting evidence was therefore error.

"Evidence is necessary where, considered in the light of other evidence available to the government, it is an essential part of the crimes on trial, or where it furnishes part of the context of the crime." *Id.* at 998 (internal citations and quotation marks omitted). The only information from the Afton Street Shooting evidence probative to Wilson's participation in the charged offenses was his knowledge that Lighty's .380 caliber handgun had been used to shoot Hayes. Wilson's knowledge that Lighty's weapon had also been used in an unrelated shooting does not add anything to that evidence. Moreover, because the Government had Lighty's .380 caliber handgun, it could — and did — introduce ballistics evidence supporting the conclusion that the firearm had indeed been used in the Hayes kidnapping.[14] And, as discussed below, the

---

[13]While portions of CW's testimony about the Afton Street Shooting were relevant to explaining Wilson's "two bodies" comment, the relevance of his remaining testimony, as well as the evidence provided by other witnesses, is less clear and, in some cases, non-existent. However, we need not analyze the relevance of each piece of evidence because of our conclusion regarding the necessity prong for admission under Rule 404(b).

[14]This fact distinguishes the situation in the case at bar from *United States v. Higgs*, 353 F.3d 281 (4th Cir. 2003). In the *Higgs* trial, the Government introduced evidence of a prior shooting involving a .38 caliber handgun with similar rifling characteristics to the same caliber weapon used in the kidnapping and murder of three women, but which was never recovered. *Id.* at 290-91, 294. The *Higgs* court held that evidence of the defendant's participation in the prior shooting was properly introduced under Rule 404(b) as a means to link the defendant to the same caliber handgun that a co-defendant testified the defendant owned and retrieved

16                    UNITED STATES V. WILSON

Government had Wilson's confessions to Phauls and CW admitting his participation in the Hayes kidnapping and murder, as well as a host of other circumstantial evidence showing that he participated in that offense. It cannot be said, then, that the Afton Street Shooting evidence was "necessary" to the Government's case against Wilson. There was simply nothing about the Afton Street Shooting evidence that was "an essential part of the crimes on trial," particularly in view of the mountains of non-Rule 404(b) evidence introduced at trial. *Compare United States v. McCallum*, 584 F.3d 471, 477 (2d Cir. 2009) (finding other acts evidence unnecessary where government presented "extensive" physical and testimonial evidence on the same issue), *with United States v. DiZenzo*, 500 F.2d 263, 266 (4th Cir. 1974) (finding other acts evidence necessary where that evidence "furnished more dependable proof" than "sparse" intrinsic evidence). Because the Afton Street Shooting evidence fails the "necessity" requirement for admissibility under Rule 404(b), we need not analyze the remaining requirements, as the district court abused its discretion as a matter of law in admitting the evidence.

However, whether this error requires reversal of the judgment depends upon whether admission of the Afton Street Shooting evidence was harmless error. "Where error is founded on a violation of Rule 404(b), the test for harmlessness is 'whether we can say with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error.'" *United States v. Madden*, 38 F.3d 747, 753 (4th Cir. 1994) (quoting *United States v. Nyman*, 639 F.2d 208, 211-12 (4th Cir. 1980)). "This inquiry is not

---

from his residence on the night of the charged murders. *Id.* at 312. In addition, because the gun used in the charged offense was never recovered, the evidence regarding the prior shooting "served the necessary function of proving [the defendant's] identity as one of the murderers and his use of the firearm in connection with the murders." *Id.*

whether, absent the improperly admitted evidence, sufficient evidence existed to convict." *Id.* Rather, the inquiry is "whether we can say that we believe it highly probable that the error did not affect the judgment." *Id.* (citation and internal quotation marks omitted).

Having reviewed the record of Wilson's trial, we conclude with fair assurance that the admission of the Afton Street Shooting evidence did not affect the judgment against him. The evidence of Wilson's participation in the conspiracy to kidnap Hayes was overwhelming. Wilson confessed to his role in the kidnapping to two individuals, Phauls and CW. Their testimony about Wilson's confession was substantially the same, and was consistent with other evidence in the record. Wilson admitted to Phauls and CW that he drove Flood's vehicle during the course of the kidnapping, which began when Lighty grabbed someone named "Eazy" on Eighth Street. During Wilson's confession to Phauls, a text pager started to ring, and Wilson — who did not own a pager — looked at it, said, "[T]he guy wasn't lying, his name is Eazy," and Phauls observed that the name "Eazy" was scrolling across the screen. Forrest corroborated that Hayes had been kidnapped off of Eighth Street, that Hayes' nickname was "Eazy," and that Hayes owned a two-way pager. Wilson said that Lighty shot Hayes, and that Lighty had been arrested with the firearm he used to shoot Hayes. Ballistics evidence indicated the .380 caliber handgun Lighty possessed at the time he was arrested shared numerous rifling characteristics with the firearm used to shoot Hayes.

In addition to testifying about Wilson's confession, Phauls also provided a first-hand account of Wilson's actions later on the evening of Hayes' death. Phauls and her friend Coles testified that Wilson called Phauls in the time frame of the kidnapping and asked her to pick him up off of Iverson Street. Wilson did not own a cell phone, and Phauls did not know Flood or recognize the calling number. Telephone records confirmed that numerous telephone calls were placed between

Case 8:03-cr-00457-BAH   Document 389-1   Filed 09/08/10   Page 18 of 37

18                     UNITED STATES v. WILSON

Phauls' and Flood's cell phones at 8:43, 8:44, 8:51, 8:54, 8:59, 9:02, and 9:03 p.m. on the night of the Hayes kidnapping and murder.[15]

Upon arriving at Iverson Street as the 9:03 p.m. call was ending, Phauls and Coles observed Lighty, Flood, and Wilson walking away from a house on Iverson Street.[16] Neither woman knew Flood, but he was introduced by his nickname "Junebug." The women observed that Lighty carried a pair of Nike shoes that matched the description of the shoes Hayes was wearing the evening of his murder; in addition, Lighty had blood on his T-shirt. While in the car, Lighty, Flood, and Wilson discussed having "done something bad or killed someone." At Wilson's direction, Phauls drove to the 2500 block of Keating Street. When Phauls stopped her vehicle, the three men exited the car and checked the ground for blood.

Against this evidence, we are confident Wilson's conviction "was not substantially swayed by" the errant admission of the Afton Street Shooting evidence. Two additional factors lend further support to this conclusion, the jury instructions and limited use of the evidence. The district court issued two cautionary instructions limiting how the jury was to use the Afton Street Shooting evidence. Those instructions expressly informed the jury that it could not infer from the Afton Street Shooting evidence that Wilson had "a propensity to commit crimes or is otherwise a bad character." In addition, the instructions informed the jury that the evidence was relevant only to establish Wilson's "presence and involvement in" Hayes' kidnapping and murder. During her closing argument, the Assistant United States Attorney ("AUSA") referred to the Afton Street Shooting on three separate, but brief, occasions

---

[15]Davis placed the 911 call reporting Hayes' shooting at 8:50 p.m.

[16]Flood's girlfriend at the time, Marshall, later accompanied Flood to that same house, where Flood retrieved his Lincoln Continental and drove it to his parent's home in North Carolina. Forensic evidence proved that Hayes had been in the trunk and back seat of Flood's Lincoln.

during a closing argument that spans almost sixty pages of trial transcript. And on two of those occasions, she reminded the jury of the limited context in which the jury should consider the Afton Street Shooting, connecting the evidence to Wilson's "two bodies" statement and the forensics evidence which tended to support the veracity of that statement. The Government's use of the Afton Street Shooting evidence was thus brief, and directed the jury's attention to a very narrow conclusion to be drawn from it.

As we recognized and cautioned with regard to Lighty, the admission of evidence of an uncharged murder is undoubtedly prejudicial. *See, e.g.*, *Chin*, 83 F.3d at 88. Even assuming some information about the Afton Street Shooting was relevant or provided context to CW's testimony, the testimony of Hart and Hines, which detailed the Afton Street Shooting and its aftermath, was not. Moreover, none of the Afton Street Shooting evidence was necessary to prove an element of the charged crime. However, given the strength of the Government's case and the extensive evidence of Wilson's guilt, the AUSA's limited use of the evidence during the trial, and the court's cautionary instructions to the jury, we are satisfied that the erroneous introduction of the Afton Street Shooting did not affect the jury's verdict.[17]

## B.

Wilson next contends the district court erred in allowing the Government to make improper statements during closing argument, and thereby denied him a fair trial. He points to three statements made by the AUSA that he asserts misstated

---

[17]As in *Lighty*, the AUSAs exercised poor judgment in putting the Afton Street Shooting evidence before the jury in the guilt phase of Wilson's trial. We explained above that such evidence was not necessary and its use pointlessly introduced error into the case. In different circumstances, such a misjudgment by the prosecutors could lead to the reversal of an otherwise valid conviction. We caution the U.S. Attorney's office to exercise more prudent judgment in the future.

20                   UNITED STATES V. WILSON

the law of conspiracy: In describing what Wilson did "to help make this crime succeed," the AUSA recounted Phauls' testimony from Wilson "in the minutes, seconds of" Hayes' death "to get him with his co-conspirators out of there." (J.A. 749.) The AUSA also noted that "[c]o-conspirators are agents of one another," and explained that was "why [the jury] hear[d] all the testimony about the acts of the other people in this case. You heard about Mr. Flood's acts. What did he do afterward? He drove by the crime scene, according to Tynika Marshall, right?" (J.A. 748.) And in rebuttal, the AUSA described Phauls' and Coles' testimony that they picked up Lighty, Flood, and Wilson and that one of the men directed them to Keating Street. Acknowledging that Coles' testimony as to which man directed Phauls to drive to Keating Street differed during the trial and at the Grand Jury, the AUSA argued "[i]t doesn't matter. They [Lighty, Flood, and Wilson] are co-conspirators." (J.A. 825.) Wilson argues these statements wrongly suggested that he could be convicted of conspiracy to kidnap based on actions that occurred after Hayes had been killed and thus misstated the law of conspiracy, thereby depriving him of substantive due process and his right to a fair trial.[18]

Consistent with Supreme Court precedent, we have recognized that a prosecutor's improper argument may "so infect[ ] the trial with unfairness as to make the resulting conviction a denial of due process." *United States v. Wilson*, 135 F.3d 291,

---

[18]In *Grunewald v. United States*, 353 U.S. 391 (1957), the Supreme Court noted, "a vital distinction must be made between acts of concealment done in furtherance of the main criminal objectives of the conspiracy, and acts of concealment done after these central objectives have been attained, for the purpose only of covering up the crime." *Id.* at 405. The latter demonstrates "nothing more than that the conspirators do not wish to be apprehended," and are not actions done in furtherance of the conspiracy. *Id.* at 406. Wilson thus maintains that acts occurring after Hayes' death were committed after the "main objective of the conspiracy" to kidnap ended and therefore could not be used as proof that Wilson participated in the conspiracy.

Case 8:03-cr-00457-BAH   Document 389-1   Filed 09/08/10   Page 21 of 37

UNITED STATES V. WILSON                              21

297 (4th Cir. 1998) (internal quotation marks omitted). In determining whether remarks by the prosecutor during closing argument violate a defendant's due process rights, the court must consider whether the remarks were, in fact, improper, and, if so, whether the improper remarks so prejudiced the defendant's substantial rights that the defendant was denied a fair trial. *Id.* An assessment of prejudice requires the court to consider: (1) the degree to which the prosecutor's remarks have a tendency to mislead the jury and to prejudice the accused; (2) whether the remarks were isolated or extensive; (3) absent the remarks, the strength of competent proof introduced to establish the guilt of the accused; (4) whether the comments were deliberately placed before the jury to divert attention to extraneous matters; (5) whether the prosecutor's remarks were invited by improper conduct of defense counsel; and (6) whether curative instructions were given to the jury. *United States v. Scheetz*, 293 F.3d 175, 186 (4th Cir. 2002).

Read in context, the AUSA's statements do not satisfy this high burden and did not deny Wilson a fair trial. Wilson's argument takes these statements out of context, isolating them not only from the AUSA's surrounding remarks, but also from the other crimes for which Wilson was being tried. Although Wilson was only convicted of conspiracy to kidnap, he was tried on four additional charges, all of which were substantive criminal offenses. Indeed, the first two of the foregoing statements Wilson challenges occurred while the AUSA was reviewing theories of liability (the *Pinkerton* doctrine[19] and "aiding and abetting") relevant to the substantive, *i.e.*, non-conspiracy charges. The AUSA's statements were not misstatements as to the law of conspiracy because they did not address how Wilson could be held liable for participating in the conspiracy. In describing the *Pinkerton* theory, the

---

[19]The theory of *Pinkerton* liability permits fellow conspirators to be held liable for *substantive* offenses committed by a co-conspirator in furtherance of the conspiracy. *Pinkerton v. United States*, 328 U.S. 640, 646-47 (1946).

22                    UNITED STATES V. WILSON

Prosecutor noted that the doctrine made sense because "[c]o-conspirators are agents of one another" and that was why the jury heard evidence about what the other members of the conspiracy did. (J.A. 747-48.) Next, the AUSA addressed liability as "an aider and abettor," and described that under that theory Wilson could be convicted of a substantive offense committed by a principal if he had "willfully and knowingly [sought] by some act to make the crime succeed." The crime the AUSA referred to was not conspiracy, but rather the substantive offenses delineated in Counts I, III, IV, and V. In fact, the AUSA specifically excluded the conspiracy charge from her description, noting her reference was "not the conspiracy [charge], because that's kind of a different legal concept . . . ." (J.A. 749.) Contrary to Wilson's argument, the AUSA did not assert that post-conspiracy events were sufficient to convict Wilson of the conspiracy to kidnap.[20]

The third statement Wilson challenges is the AUSA's explanation for a purported inconsistency in the testimony about which passenger told Phauls to drive to Keating Street. The AUSA stated that it did not matter which man told Phauls where to drive because the men were "co-conspirators." (J.A. 824-25.) The comment does not, as Wilson contends, improperly argue that he could be guilty of conspiracy based on events after Hayes' death. Rather, the AUSA's statement responded to Wilson's closing argument drawing attention to the inconsistency and suggested a reason short of fabricated testimony to explain it. The AUSA's fleeting mention of the men being "co-conspirators" was not the focus of her discussion at that time, as she immediately turned to an explanation of how individuals often recollect details of the same events differently.

---

[20]We further note that these statements regarding theories of liability for the substantive offenses were not prejudicial to Wilson because the jury did not convict him of any substantive criminal offense; he was acquitted of all those charges.

Case 8:03-cr-00457-BAH    Document 389-1    Filed 09/08/10    Page 23 of 37

The AUSA's closing arguments did not misstate the law of conspiracy or otherwise mislead the jury, nor did it prejudice Wilson's trial so as to deny him due process. Accordingly, there was no error by the district court.

C.

Wilson next contends that his sentence should be vacated and the case remanded for resentencing because his sentence was based, in part, on what he contends was an involuntary, and therefore inadmissible, statement he made to civilian investigators. Approximately eighteen months after the Hayes kidnapping, FBI Agent G. Joseph Bradley and Prince George's County Police Department detectives Sean Chaney and Michael Straughan, questioned Wilson at Schofield Barracks, Honolulu, Hawaii, where Wilson was then stationed with the United States Army. Prior to interrogating him, the investigators read aloud to Wilson an Advice of Rights form that informed Wilson, *inter alia*, of his right to remain silent. They then had Wilson read aloud the paragraph describing "waiver of rights" in order to ascertain that Wilson read and understood English. Wilson signed the form indicating that he understood his rights; he then proceeded to answer the investigators' questions and set forth his account of the Hayes kidnapping and murder in a hand-written statement ("written statement" or "statement").

Prior to trial, Wilson moved to suppress the written statement, arguing it was involuntarily made. After an evidentiary hearing, the district court held that the statement was voluntarily made and admissible at trial. Despite the court's ruling, the Government elected not to introduce the written statement into evidence against Wilson at trial based on its belief that portions of the statement were untruthful.[21]

---

[21]Part of the written statement was consistent with the evidence ultimately presented against Wilson at trial, and portions of the statement are inconsistent. (J.A. 48-49, 110-11.)

24                    UNITED STATES v. WILSON

During the sentencing hearing, the parties disputed what offense level the conspiracy conviction constituted under the Sentencing Guidelines. If Wilson was held responsible for a conspiracy to kidnap resulting in Hayes' death the offense level would be higher than if he was simply held responsible for a conspiracy to kidnap. The parties disagreed as to the extent of Wilson's role in the conspiracy to kidnap and what evidence the district court could consider in resolving this dispute. Both the Government and Wilson referred to the written statement in order to bolster their respective positions, with the Government contending it showed Wilson's involvement throughout the conspiracy, and Wilson contending it showed he only played a limited role late in the course of the conspiracy.

The district court referred to the written statement as part of its explanation for concluding Wilson could be held responsible for Hayes' death and that the offense level should be set at the higher level. The court observed that it did not "accept everything the defendant says [in the written statement] as gospel on this. The things that are clearly incriminating to him, I'm inclined to accept. The other items in which I find him incriminated are really supplied by other people." (J.A. 881-82.) Expounding on this view, the Court stated:

> I think [Wilson] clearly was trying to position himself to be out of the murder when he gave the statement, but he was — as the Government says, he stepped directly into the conspiracy when he did that . . . but the reality is that all these people are telling different stories. . . . I mean they're all trying to pass the buck here in terms of where they are.

(J.A. 882.)

Wilson asserts the district court erred in relying on the written statement during sentencing because it was involuntarily made as a matter of law. He contends he could not waive his

right to remain silent, as he was under a direct military order to answer the investigators' questions. Relying on two United States Court of Military Appeals cases — *United States v. Dohle*, 1 M.J. 223 (1975), and *United States v. Duga*, 10 M.J. 206 (1981) — he asserts that when a superior commands a subordinate to answer a question, the subordinate "may rightly be regarded as [having been] deprived of his freedom to answer or to remain silent." He further contends the civilian investigators' separate warning of Wilson's constitutional rights had no effect on that military order requiring him to make a statement because a civilian cannot countermand a military order.

We review the district court's factual findings underlying a motion to suppress for clear error and its legal determinations de novo. *United States v. Perkins*, 363 F.3d 317, 320 (4th Cir. 2004).

Wilson's argument lacks merit. The two cases he relies on, *Dohle* and *Duga*, are inapposite, addressing a military accused's rights under Article 31 of the Code of Military Justice rather than his constitutional right to remain silent. Moreover, they involve the rights of a military accused when he is questioned by other members of the military rather than when he is questioned by non-military investigators, as occurred here. *Dohle*, 1 M.J. at 226 ("[W]e hold that where a person subject to the Code interrogates — questions — or requests a statement from an accused or suspect over whom the questioner has some position of authority of which the accused or suspect is aware, the accused or suspect must be advised in accordance with Article 31."); *Duga*, 10 M.J. at 208-12. Neither case supports the broad proposition Wilson advances regarding the legal capacity of a member of the military to waive his constitutional right to silence in questioning by civilian authority. Wilson does not cite to — nor did we find — any other authority that would support the broad proposition he advances.

26                    UNITED STATES V. WILSON

The record supports the district court's conclusion that Wilson's statement was voluntarily made after the civilian authorities informed Wilson of his constitutional right to remain silent. At the hearing on the motion to suppress, Wilson testified that he "believe[d] [he was] being ordered to speak to the men that were in that room that day." However, the district court concluded that Wilson's testimony was not credible, and its determination was not clearly erroneous. No other evidence in the record supports Wilson's self-serving testimony or the conclusion that Wilson's commanding officer ordered him not just to "show up" at the interview, but also specifically to provide a statement to the investigators.

Moreover, the circumstances surrounding the interview show that the civilian authorities informed Wilson of his right to remain silent, and he voluntarily waived that right. Agent Bradley and Officer Chaney testified that Wilson was not handcuffed prior to or during the interview; no military personnel were present during the interview. Both described Wilson as being "eager" to tell his side of the story, and that Agent Bradley had to stop Wilson from speaking in order to Mirandize him prior to speaking with him. Agent Bradley read Wilson "the FBI's version of the Advice of Rights" "word for word." (J.A. 52.) In addition, at Agent Bradley's request, Wilson read the Waiver of Rights paragraph aloud. Wilson then signed the Advice of Rights form, spoke with the investigators, and provided the written statement. On this record, the district court did not err in determining Wilson knowingly and voluntarily waived his right to remain silent. Accordingly, the written statement was admissible, and the district court did not err in using it in determining Wilson's sentence.

                              III.

Wilson contends the district court erred in denying his motion for a new trial based on newly-discovered evidence

Case 8:03-cr-00457-BAH    Document 389-1    Filed 09/08/10    Page 27 of 37

and a separate alleged *Brady*[22] violation. Federal Rule of Criminal Procedure 33 authorizes motions for a new trial based on such evidence, permitting district courts to "vacate any judgment and grant a new trial if the interest of justice so requires." Such motions should be awarded, "sparingly," as "a jury verdict is not to be overturned except in the rare circumstance when the evidence 'weighs heavily' against it." *United States v. Smith*, 451 F.3d 209, 217 (4th Cir. 2006) (quoting *United States v. Perry*, 335 F.3d 316, 320 (4th Cir. 2003)).

We review the district court's denial of a motion for a new trial under an abuse of discretion standard. *Perry*, 335 F.3d at 320. In so doing, we "may not substitute [our] judgment for that of the district court; rather, we must determine whether the court's exercise of discretion, considering the law and the facts, was arbitrary or capricious." *United States v. Fulcher*, 250 F.3d 244, 249 (4th Cir. 2000) (quoting *United States v. Mason*, 52 F.3d 1286, 1289 (4th Cir. 1995)).

A.

Wilson moved for a new trial based on an alleged *Brady* violation. He asserts the Government unlawfully withheld a copy of police notes summarizing Lighty's statements to the police following his January 31, 2002 arrest.[23] At the time of his arrest, Lighty was in possession of a .380 firearm; the police notes indicate that Lighty stated he "shot the [.380] one time in the air" during the Newbill shooting. Wilson posits that he was entitled to the police notes as *Brady* material because Lighty's statement contradicted CW's testimony that Wilson told him he had shot the .380 during the Newbill Shooting. Wilson asserts that in addition to using the statement to impeach CW's testimony, he could have used

---

[22]*Brady v. Maryland*, 373 U.S. 83 (1963).

[23]Although Wilson received a description of this document prior to trial, he did not learn of Lighty's actual statements until after his initial appeal had been filed.

Case 8:03-cr-00457-BAH  Document 389-1  Filed 09/08/10  Page 28 of 37

Lighty's statement to argue against the admission of ballistics evidence connecting the .380 to the Newbill and Hayes shootings. He contends that Lighty's statement takes the .380 out of Wilson's hands and without being able to make that connection, the Government would not have been able to introduce evidence that the .380 was used during the Newbill shooting and was consistent with the weapon used during the Hayes kidnapping.

The district court denied Wilson's motion for a new trial, explaining that Lighty's statement did "not exculpate Wilson in any way" and was "not favorable to him in the Brady sense. It doesn't tend to show that he's not guilty" of conspiracy to kidnap. (Supp. J.A. 157-58.) In addition, the court noted there were "no corroborating circumstances of the trustworthiness of [Lighty's statement" and the "result would not have been different" "had this statement been made available to Wilson at his trial." (Supp. J.A. 158-59.)

The district court did not abuse its discretion in denying Wilson's motion.[24] In *Brady*, the Supreme Court held "that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. at 87. In order to prove that the Government's failure to tender certain

---

[24]In his reply brief, Wilson argues that because *Brady* violations are reviewed de novo, the Court should review the district court's denial of his motion for a new trial based on an alleged *Brady* violation de novo instead of for abuse of discretion. This argument is superfluous. Consistent with *United States v. Stokes*, 261 F.3d 496, 502 (4th Cir. 2001), motions for a new trial based on an alleged *Brady* violation are reviewed for abuse of discretion. It is an abuse of discretion for the district court to commit a legal error — such as improperly determining whether there was a *Brady* violation — and that underlying legal determination is reviewed de novo. *See United States v. Llamas*, 599 F.3d 381, 391 (4th Cir. 2010) (quoting *United States v. Delfino*, 510 F.3d 468, 470 (4th Cir. 2007) ("A district court abuses its discretion when it commits an error of law.")).

Case 8:03-cr-00457-BAH    Document 389-1    Filed 09/08/10    Page 29 of 37

evidence constitutes a *Brady* violation, the burden rested on Wilson to show that the undisclosed evidence was (1) favorable to him either because it is exculpatory, or because it is impeaching; (2) material to the defense, *i.e.*, "prejudice must have ensued"; and (3) that the prosecution had materials and failed to disclose them. *United States v. Stokes*, 261 F.3d 496, 502 (4th Cir. 2001).

Lighty's statement is not *Brady* material because it is neither exculpatory nor material.[25] Evidence is "exculpatory" and "favorable" if it "may make the difference between conviction and acquittal" had it been "disclosed and used effectively." *United States v. Bagley*, 473 U.S. 667, 676 (1985). Evidence is "material" if it is "likely to have changed the verdict." *Moseley v. Branker*, 550 F.3d 312, 318 (4th Cir. 2008).

Lighty's statement fails on both fronts because it has no bearing on Wilson's participation in the Hayes kidnapping and therefore provides no information relevant to the offense Wilson was convicted of committing — conspiracy to kidnap Hayes. The statement does not contradict any of the evidence introduced to prove Wilson's participation in the Hayes conspiracy. Moreover, Lighty's statement does not diminish the relevance of CW's testimony that Wilson stated the .380 caliber handgun had "two bodies" on it, thereby establishing Wilson's knowledge that this firearm had been used in both the Newbill and Hayes shootings. At most, Lighty's statement places the .380 in Lighty's hands at some point during the Newbill shooting.[26] That evidence is not inconsistent with

---

[25]The Government contends that Wilson also failed to satisfy the third requirement, because it did disclose the statement to Wilson. The district court did not address this component or make any factual findings regarding the sufficiency of what the Government did disclose to Wilson regarding Lighty's statements to the police. In light of our conclusion that the other two requirements are not meant, we do not need to address this issue and decline to do so.

[26]Even if Lighty fired a shot in the air at the Afton Street Shooting, that does not preclude Wilson from having fired shots as well.

30                    UNITED STATES v. WILSON

Wilson's participation in the conspiracy to kidnap Hayes. And it is also consistent with CW's testimony about Wilson's confession regarding the Newbill shooting because CW's testimony on who shot which firearm was equivocal, "*From what I recall*, *I think* one of [the two guns CW fired during the Newbill shooting] was *probably* a .25 or a .380, and the other one was probably a 9-millimeter." (J.A. 412-13 (emphasis added)). Even had Wilson possessed Lighty's statement at trial, it simply cannot be said that it would have effectively made a difference in the verdict against Wilson.

Accordingly, Lighty's statement was neither exculpatory nor material, and it does not constitute *Brady* material. For this reason, the district court did not abuse its discretion in denying Wilson's motion for a new trial based on the Government's failure to turn over the statement to Wilson prior to trial.

## B.

### 1.

Wilson also moved for a new trial on the basis of newly-discovered evidence in the form of testimony from JM[27] as well as CW's recantation of parts of his trial testimony regarding Lighty and Wilson. The district court held a joint evidentiary hearing to determine the nature of this evidence and consider both Lighty and Wilson's motions for a new trial. The evidence presented at that hearing is discussed in greater detail in the Court's opinion in *Lighty* at Section II.M.1.

Briefly synopsizing that testimony, in July 2006, JM was arrested on felony gun charges. JM was a frequent informant for law enforcement officials, and at the time of his arrest he made — for the first time — statements concerning the Hayes

---

[27]JM is referred to pseudonymously.

Case 8:03-cr-00457-BAH   Document 389-1   Filed 09/08/10   Page 31 of 37

UNITED STATES V. WILSON                    31

kidnapping and murder alleging that Tony Mathis (rather than Wilson, Lighty, and Flood) was the responsible party.[28] JM testified that on the evening of Hayes' murder he and a friend were walking down Iverson Street when they saw a few people standing by a vehicle with its trunk open. He identified Mathis and other individuals he recognized, but he did not see Lighty or Wilson, both of whom he knew. As he approached Mathis, JM saw there was a body in the trunk and decided to leave the area. A few days later, JM saw Mathis and confronted him about "acting stupid" and "wilding out" when he saw him the evening of January 3. Mathis responded by stating, "You know, niggers think it's sweet. They think they can just holler at [a baby's mother] and get away with it." JM took this to mean Mathis was upset about Hayes "trying to holler at [Mathis' baby's mother], so he set him up and killed him." JM acknowledged, however, that Mathis never told him he kidnapped or murdered Hayes. When questioned about Lighty and Wilson's participation, JM testified, "Your Honor, I'm not saying that Mr. Lighty or . . . Mr. Wilson wasn't a party to what ultimately happened. I just know what I saw that night. They weren't there. And I know that Tony Mathis had motive, all the motive in the world, to commit the crime."

In February 2009, CW was interviewed by Lighty's counsel and signed a declaration recanting parts of his trial testimony against Lighty. He claimed that he had lied about Lighty confessing to the shooting because he was facing serious charges. In the written statement CW signed at the time of this interview, he stated, "The only other person who was rumored to be involved in this case who spoke to me about it directly was Tony Mathis." Because CW asserted his Fifth Amendment rights, he did not testify at the evidentiary hearing. George Steel, a private investigator for Lighty's counsel, was present during CW's interview and testified regarding the

---

[28]Mathis was not indicted in Hayes' kidnapping and murder. Wilson, Lighty, and Flood argued as part of their respective defenses that Mathis and the other two co-indictees were culpable.

32                     UNITED STATES V. WILSON

circumstances surrounding the statements. Steel testified that CW said he was recanting because "it was the right thing to do" and not because of any threats he had received as a result of his trial testimony. When asked whether CW made any comments recanting the testimony he gave against Wilson, Steel stated, "I don't remember making that conclusion or asking any questions about that."

After considering this evidence and hearing the parties' arguments, the district court denied Wilson's motion. In reaching its decision, the district court reiterated the proper standard for a motion for a new trial and concluded that the new evidence did not satisfy Wilson's burden to meet that standard. The court noted many reasons to doubt JM's testimony, including the length of time that had passed before he came forward, the similarity between his testimony and previous testimony he had provided as an informant in unrelated cases, and discrepancies between JM's testimony and prior statements he had made regarding what he claimed to have seen. Moreover, in light of the overwhelming evidence against Wilson presented at trial, the district court concluded that JM's testimony would not have made a difference in the outcome of the trial.

With regard to CW's recantation, the district court determined that CW's extensive prior statements had greater credibility and corroborating evidence than his current recantation. The court also noted threats CW had received as a result of his testimony at the trials and the significant fact that Mathis had died in the intervening period between CW's trial testimony and recantation.

2.

In determining whether a new trial should be granted on the basis of newly discovered evidence, the Court uses a five-part test:

> (a) the evidence must be, in fact, newly discovered, i.e., discovered since the trial; (b) facts must be alleged from which the court may infer diligence on the part of the movant; (c) the evidence relied on must not be merely cumulative or impeaching; (d) it must be material to the issues involved; and (e) it must be such, and of such nature, as that, on a new trial, the newly discovered evidence would probably produce an acquittal.

*Fulcher*, 250 F.3d at 249 (quoting *United States v. Curtis*, 988 F.2d 1355, 1359 (4th Cir. 1989)). "Without ruling out the possibility that a rare example might exist, [the Court has] never allowed a new trial unless all five elements were established." *Id.* (citing *United States v. Singh*, 54 F.3d 1182, 1190 (4th Cir. 1995)).

With regard to the fifth prong, the "district court is required to make a credibility determination as part of its probability-of-acquittal" determination. *United States v. Kelly*, 539 F.3d 172, 189 (3d Cir. 2008). In making this determination, a district court should focus on whether a jury probably would reach a different result upon hearing the new evidence. *Id.* at 189. Of course, if the district court does not find a witness credible, it follows that the district court would not find the witness sufficiently persuasive to enable the district court to conclude that witness testimony would probably produce an acquittal at a new trial. *Id.* at 189 n.14. "To make a determination under this standard, the district court cannot view the proffered testimony in a vacuum; it must weigh the testimony against all of the other evidence in the record, including the evidence already weighed and considered by the jury in the defendant's first trial." *Id.* at 189.

If a motion for a new trial is based on a witness' recantation of trial testimony, the motion should be granted only if the court is "reasonably well satisfied" (1) that the testimony given by a material witness was false; (2) the jury *might* have

34                  UNITED STATES V. WILSON

reached a different conclusion without the false evidence; and
(3) the party seeking the new trial was surprised by the false
testimony and was unable to meet it or did not know of its fal-
sity until after trial. *United States v. Lofton*, 233 F.3d 313, 318
(4th Cir. 2000) (citing *United States v. Wallace*, 528 F.2d 863,
866 (4th Cir. 1976)). The failure to meet any one of the three
prongs is fatal. *United States v. Carmichael*, 726 F.2d 158,
159 (4th Cir. 1984). Post-trial recantations are "looked upon
with the utmost suspicion." *United States v. Johnson*, 487
F.2d 1278, 1279 (4th Cir. 1973) (citation and internal quota-
tion marks omitted).

3.

Wilson asserts the district court erred in determining that
JM's testimony and CW's recantation lacked credibility and
therefore did not satisfy the fifth prong ("would probably pro-
duce an acquittal") of the standard for granting a new trial. He
contends the district court improperly limited the scope of its
review and weighed the proffered testimony in a vacuum
instead of considering it in light of the weak evidence pre-
sented against him at trial. Wilson also claims that the court
erred in refusing to evaluate whether the new evidence would
have affected the jury's determination regarding Phauls' cred-
ibility. And he asserts the court improperly disregarded the
incentive both Phauls and CW had to lie when it compared
their testimony at trial to the new evidence.

We disagree. In reviewing JM's testimony and CW's pur-
ported recantation, the district court properly found that nei-
ther was credible. As we observed when examining the
court's decision on this issue in *Lighty*, there were numerous
inconsistencies between JM's testimony at the evidentiary
hearing and earlier statements he made to investigators
regarding the events in question. Specifically, in a 2006 inter-
view with the police, JM stated "Tony Mathis was the
shooter" in Hayes' murder, and that "after the murder,
[Mathis] kept the victim in the trunk and drove around and

Case 8:03-cr-00457-BAH    Document 389-1    Filed 09/08/10    Page 35 of 37

showed his body to drug dealers in the Iverson Street Area." JM claimed Mathis shot Hayes "because the victim had approached Tony's baby's mother and tried to get her telephone number." (Supp. J.A. 47.) Later, in December 2007, FBI Agent Bradley interviewed JM regarding what he purported to know about Hayes' kidnapping and murder. During that interview, JM was "adamant" that the incident he described occurred in the summer of 2003 or 2004 because it was warm outside. JM claimed Mathis told him he killed Hayes because Hayes had been "messing with his girl." And JM described seeing Hayes' body in a tan-colored Buick. JM's statements at both of those prior interviews contradict his testimony at the evidentiary hearing, and undermine the credibility of the version of events he testified to at the hearing.

The timing of JM's initial statements to the police, and his motives for making them, also undermine his credibility. Although he had been a frequent confidential informant for law enforcement for several years, JM did not mention anything about Hayes' kidnapping and murder until many years after it occurred. JM's initial statement to police implicating Mathis in Hayes' murder occurred after Mathis had been murdered. He was facing serious charges at the time he provided his initial statement. Moreover, no physical or other evidence corroborates JM's version of events. All of these factors support the district court's basis for finding JM was not credible.

Contrary to Wilson's contention, the district court did not improperly limit the scope of its review or refuse to consider JM's testimony in the context of all the evidence adduced at trial. The record shows that after finding JM not credible, the court addressed whether JM's testimony would probably produce an acquittal and concluded it would not. In so doing, the court considered all of the trial evidence, including Phauls' testimony that she picked up Wilson, Lighty, and Flood on the evening of Hayes' murder and drove them to Keating Street, as well as Wilson's confessions to having participated in the

36                UNITED STATES v. WILSON

kidnapping. Whereas JM's testimony lacked corroborating evidence, the evidence adduced at trial was based on the testimony of multiple individuals, was supported by forensics evidence showing that Hayes was in Flood's vehicle and by telephone records indicating that Wilson had used Flood's cell phone to call Phauls multiple times around the time of Hayes' death, and included Wilson's confession to two individuals. For these reasons, the district court did not abuse its discretion when it determined JM's testimony was not credible and would not have probably resulted in an acquittal.

With regard to CW's recantation, we also conclude the district court had an adequate basis on which to find the recantation lacked credibility and would not have probably resulted in an acquittal.[29] The district court had ample opportunity to assess CW's credibility at trial, and was in the best position to determine whether that prior testimony was credible. As discussed above, CW's testimony was corroborated by the trial testimony of numerous other witnesses, as well as physical evidence. Of particular importance to Wilson's reliance on the recantation, CW did not explicitly recant his testimony against Wilson, save for the general statement that Mathis was the "only other person who was rumored to be involved in this case who spoke to me about it." Moreover, several reasons supported CW's incentive to lie by recanting his trial testimony, including community pressure to do so, threats CW had received as a result of his trial testimony, and the fact that CW did not recant and point the blame at Mathis until after Mathis was ever so conveniently dead. As we concluded with regard to Lighty, in light of the evidence corroborating CW's trial testimony and undercutting his post-trial recantation, we

---

[29]We note that the district court gave Wilson quite a bit of latitude to develop the arguments regarding the relative strength of the trial evidence, including questioning the veracity of Phauls' testimony and her motive to lie. That the district court did not agree with Wilson's conclusion does not mean that it failed in its duty to assess whether the new or recanted evidence would have probably resulted in an acquittal.

UNITED STATES V. WILSON 37

conclude the record supports the district court's conclusion that the material portions of CW's trial testimony were not false. Moreover, since the newly discovered evidence Wilson relies upon lacked credibility, it was not of such a nature that "would probably produce an acquittal" in a new trial. *Cf. Fulcher*, 250 F.3d at 249. Accordingly, the court did not abuse its discretion in denying Wilson's motion for a new trial.

## IV.

For the aforementioned reasons, we affirm Wilson's conviction for conspiracy to kidnap and his sentence of life imprisonment. We also affirm the district court's order denying Wilson's post-trial motions for a new trial.

*AFFIRMED*