```
 1                    UNITED STATES DISTRICT COURT
                     FOR THE DISTRICT OF MARYLAND
 2                         SOUTHERN DIVISION

 3

 4   UNITED STATES OF AMERICA  :  Criminal Action No.

 5       v.                    :  PJM 03-457

 6   KENNETH LIGHTY, et al.,   :  Greenbelt, Maryland

 7           Defendant.        :  Friday, August 12, 2005

 8   _____/

 9


10            TRANSCRIPT OF TELEPHONE CONFERENCE
          BEFORE THE HONORABLE PETER J. MESSITTE
11               UNITED STATES DISTRICT JUDGE

12   APPEARANCES:

13   FOR THE GOVERNMENT:   ROBERT HARDING, ESQUIRE
                           Office of the U.S. Attorney
14                         6500 Cherrywood Lane, Suite 400
                           Greenbelt, Maryland    20770
15                         301-344-4433

16

17

18   FOR THE DEFENDANT:    JEFFREY B. O'TOOLE, ESQUIRE
                           DANYA ARIEL DAYSON, ESQUIRE
19                         O'Toole, Rothwell, Nassau & Steinbach
                           1350 Connecticut Avenue, NW, Suite 200
20                         Washington, D.C  20036
                           202-775-1550
21

22

23

24   OFFICIAL COURT REPORTER:  LINDA C. MARSHALL,(301) 344-3229

25          COMPUTER-AIDED TRANSCRIPTION OF STENOTYPE NOTES
```

```
 1                    P-R-O-C-E-E-D-I-N-G-S
 2          THE COURT:  Counsel, Judge Messitte here.
 3          MR. HARDING:  Judge, Robert Harding from the United
 4  States Attorneys office.
 5          DR. SHAPIRO:  This is Dr. Shapiro, Judge.
 6          MR. O'TOOLE:  Your Honor, this is Jeff O'Toole and
 7  Danya Dayson.
 8          DR. O'CONNELL:  And this is Dr. Michael O'Connell.
 9          THE COURT:  All right.  I have a court reporter here.
10  So, Mr. O'Toole, I guess I'll hear from you.
11          MR. O'TOOLE:  Your Honor, thank you for taking the
12  time to do this.
13          THE COURT:  Okay.
14          MR. O'TOOLE:  We submitted, as you know, a notice, but
15  the testing -- and perhaps the Court has our notice before you.
16          THE COURT:  Right.
17          MR. O'TOOLE:  We also, there's also an order that you
18  signed talking about what the parameters of the government's
19  testing can be if the notice is given by defense.
20          Also, we have a proposed testing by the government,
21  which includes not only tests which would be trying to rebut our
22  testing, but also testing that goes considerably beyond that
23  personality testing and looking for diagnoses, and in general,
24  going far beyond rebuttal.
25          I don't know if the Court has the notice that Mr.
```

1    Harding sent to us, but it's clear to us and clear to our expert

2    that the testing that they propose goes far beyond rebuttal

3    testing.  It's clear that the order that you signed and in

4    particular --

5              THE COURT:  Wait a minute, Mr. O'Toole.

6              Did the government send something?

7              MR. HARDING:  Yes, Your Honor, I sent a notice to my

8    adversary and to my experts, but I didn't copy the Court.

9              THE COURT:  Okay.  I'm not finding what you're talking

10   about.

11             MR. HARDING:  It's a letter I wrote of August 9th that

12   simply identifies the two government experts and list a number

13   of tests that one of the experts, Dr. Shapiro, who is on the

14   line right now, proposes to give in rebuttal to the defense

15   notice.

16             THE COURT:  Well, do I need that document in front of

17   me to decide this matter?

18             MR. HARDING:  Well, Your Honor, you only need it to

19   the extent that it's clear from reading the testing that they

20   propose that it goes far beyond what you in your order and what

21   12.2 demands, and the case law states shall at all, states what

22   can be done by the government by way of testing that judging by

23   the government is framed by the notice that is prepared by the

24   defense.

25             THE COURT:  Well, let me understand what the

1    government's position is before you go any further.

2              What is your position, Mr. Harding, about these tests?

3              MR. HARDING:  Our position -- and first, let me say

4    that I will fax a copy of my letter to your chambers immediately

5    after this conference call.  And for purposes of this

6    conversation, I will -- if Your Honor wants, I will simply read

7    the list of tests off to you, but I suspect that unless you have

8    a Ph.D in psychology, they won't mean a great deal to you.

9    They're just some standard names of some standard tests similar

10   to the standard tests and defense contend that they are

11   different.

12             The government's position is that the defense has

13   given us notice that includes a whole battery of

14   neuropsychological tests and we cannot replicate any of those

15   tests, because there is something called the practice effect

16   that prevents repeat of the same test for a substantial period

17   of time, because the repeat would be distorted by the fact that

18   the person had previously received the same test.  So, we can't

19   repeat their tests.

20             Dr. Shapiro, who is on the line and can explain this

21   in better detail than I can, maintains that his tests are all

22   neuropsychological tests; that there are some that delve into

23   personality issues, but that the defense tests also include

24   personality tests.  The anxiety inventory and depression

25   inventory too are tests that are mood test, but there is no way

1    to distinguish mood from personality, and that these tests also,

2    therefore, go into the area of personality.

3            As I understand it, Mr. O'Toole disputes only certain

4    ones of the government tests that he claims are personality test

5    that Dr. Shapiro is quite adamant that he cannot adequately

6    rebut what the defense tests are going to show without having a

7    full battery of tests available to him to perform.

8            And he will -- I will call on him to explain in better

9    detail than I can exactly why he says that, but our position is

10   that -- first thing, we cannot begin to guess what the defense

11   experts are going to say.  They've given us only the most broad

12   and vague description of the scope of the experts' testimony and

13   what their examinations are.

14           So, in order to rebut their case as we are bound to do

15   and allowed to do by this Court's order, we have to be able to

16   perform these tests.

17           Dr. Shapiro, can you explain in a layman's terms why

18   it is --

19           DR. SHAPIRO:  Sure, Mr. Harding.  Thank you.

20           Your Honor, I have some -- some of my concerns, let me

21   just try to summarize it.  When you perform a battery of

22   neuropsychological tests, the test are not like an x-ray or CAT

23   scan or MRI.  What they do is to point to various areas of

24   functioning that might be impaired.  The problem is unless you

25   have broader battery of test, you don't know what is causing

6

1  them.

2          So, in other words, things such as anxiety,

3  depression, presence of a mental illness, presence or absence of

4  motivation, those can all affect the neuropsychological test

5  results.  So, in the absence of doing all of those other tests,

6  you don't know what the meaning of those neuropsychological test

7  results are.

8          The neuropsychological tests, for instance,

9  themselves, they don't have any built-in index for measuring

10  motivation.  You know, the person may be faking the test

11  results.  And without me doing a broader battery of tests, you

12  don't know whether those tests results are valid.

13          And the other important thing is the personality test

14  will tell you what, what sort of behaviors a person is going to

15  manifest.  In other words, whether when they get emotionally

16  stirred up, whether they pull into themselves, whether they will

17  act in a violent manner.

18          So, even presuming that there is neuropsychological

19  impairment, the personality tests are the only thing that will

20  address what kinds of behaviors might come out as a result of

21  that impairment.  You can't get that information from the

22  neuropsychological test themselves.

23          MR. O'TOOLE:  Jeff O'Toole again, if I could.

24          THE COURT:  Go ahead.

25          MR. O'TOOLE:  Your Honor, the government's position

1   seems to be and with all due respect to Mr. Harding and Dr.

2   Shapiro, I think they're wrong.  Their position seems to be that

3   in every situation where there's 12.2 notice they want a

4   complete mental health evaluation.

5          Now, that is absolutely directly contrary to your

6   order signed in this case wherein it states that the testing

7   done by the government shall be testing only, simply and only to

8   rebut the testing done by the defense.

9          What Dr. Shapiro says is absolutely wrong with respect

10   to malingering.  There is a test that was done by Dr. O'Connell

11   to test for malingering.

12          DR. SHAPIRO:  May I address that, sir?

13          THE COURT:  Let him finish his statement.

14          MR. O'TOOLE:  With respect to the defense tests that

15   we have suggested and we have conducted, it tests his mood with

16   respect to his ability to conduct the testing in his present

17   cognitive state, but it doesn't allow the government to go into

18   a full battery of testing to see what his mood is over the

19   course of time.

20          If what the government proposes to do, Judge, is

21   authorized, then why did they propose this order?  Why did they

22   propose the exact language, which very specifically was used by

23   you and by Judge Chasanow to limit directly the testing.  It

24   would make 12.2 meaningless and the case law meaningless.

25          What we would do is say, as soon as the defense says

1  we want to do testing of any sort and going to introduce any

2  evidence with respect to mental condition, the government can do

3  exactly what they want, including a full mental health

4  evaluation and we'll see what we get.  Everything can affect

5  everything.

6           If that were the argument, then your specific examples

7  that are put into your order at the bottom of Page 3 by way of

8  example, should the defense provide notice of its intent to

9  introduce expert evidence based upon a substance abuse

10  assessment, for instance, the government evaluation shall assess

11  substance abuse, not other matters --

12           MR. HARDING:  Judge, your order says --

13           MR. O'TOOLE:  If I can finish, Mr. Harding.

14           -- such as personality assessment, such as personality

15  functioning.  So, in the second one, Your Honor, similarly and I

16  think more importantly on point, if the defense gives notice of

17  an intent to rely upon neuropsychological testing, which we are,

18  a measure of function, the government may perform similar

19  testing.  The government may not use the defense notice as the

20  reason to perform an evaluation that reaches beyond that

21  necessary to rebut the defense experts.

22           Now, if Dr. Shapiro were seeking to treat my client,

23  perhaps this full medical assessment might be necessary.  The

24  government is seeking to execute our client.  That's a far

25  different situation.

1          So I think what the government is seeking to do, while

2     it may be interesting to Dr. Shapiro and Mr. Harding, is not in

3     the least consistent with your order on this case and Judge

4     Chasanow's order in the *Irvin* case.

5          THE COURT:  Well, let me go to the specific language

6     that both sides are relying on.  Let me start with you,

7     Mr. O'Toole.  Where is it in the order of June 10 that you are

8     saying that the government is precluded from doing what it

9     proposes to do?

10         MR. O'TOOLE:  Your Honor, I was reading directly from,

11    I was reading directly from paragraph seven which goes from Page

12    3 to Page 4.  And this, Your Honor, I would note is an order

13    that was proposed by the United States.  We had, as you know, in

14    our proposed order much more even.  We had this language and we

15    had additional language that we wanted.

16         We wanted somebody present during the testing and some

17    other matters, and Your Honor found that this was the wording

18    that was appropriate.  And this is not -- if the government now

19    is saying, we don't have enough information to make our testing

20    adequate, perhaps the time to have argued that was when we,

21    before we did our testing, before we submitted our notice and

22    before they submitted this order to the Court.

23         MR. HARDING:  Judge, may I respond?

24         THE COURT:  No, before you respond, let me -- what do

25    you understand to be the, the testing that you're relying on?

10

1    Are you talking about neuropsychological testing, Mr. O'Toole?

2            MR. O'TOOLE:  Your Honor, we have neuropsychological

3    testing which we, which we noticed in our 12.2 notice.  And we

4    have very specific testing as your order contemplated that we

5    give them notice of very specific testing.

6            I would note, as far as I can tell, the doctor chosen

7    by the government is not a neuropsychologist, he's a

8    psychologist.  I'm not sure of the import of that at the moment,

9    but he's not.

10           Their proposed order and their proposed testing, when

11   you get it, Your Honor, there are a series of test which we do

12   not object to because they are appropriately rebuttal designed

13   test is.

14           THE COURT:  Is Dr. O'Connell there?

15           DR. O'CONNELL:  Yes.

16           THE COURT:  Let me hear from you.  What do you say

17   about all this?  And really, the issue is whether you think the

18   testing proposed by the government somehow goes unreasonably

19   beyond the scope of the testing that you performed.

20           DR. O'CONNELL:  Okay.  My position was when I, getting

21   back to the specific referral question, I was asked to perform a

22   neuropsychological evaluation to look at cognitive functioning

23   with the specific focus being on cognitive functioning, not on

24   personality.  I was asked not to include personality.

25           The referral question was to identify mitigating

1    factors that could help understand the defendant's thinking

2    which could then be incorporated into some of the other

3    evaluations that were going on; the developmental analysis and

4    he also underwent a neurological evaluation.  So it was not an

5    evaluation where the referral question was, is the person

6    competent or responsible or diminished capacity.

7          And I told and spoke with Mr. O'Toole and Ms. Dayson

8    that some of the limits of this would be that I would not be

9    able to offer a diagnosis in this condition, but that what I

10   would be doing would be to assess his current thinking and

11   whether that could be used as a mitigating factor.

12         I also did include measures of current mood and

13   effort, because I felt that those were necessary to have any

14   confidence in his performance on the test that I did administer.

15         THE COURT:  Well, let me ask you two questions.  Do

16   you agree with Dr. Shapiro about the practice effect?  And

17   secondly, is there some way in which your own testing would have

18   been more dependable if you had done more extensive related

19   testing?

20         DR. O'CONNELL:  Well, I do agree with Dr. Shapiro

21   about the practice effects.  And the -- and to answer your

22   second question, I think the uniqueness of the referral question

23   dictated what tests I felt were appropriate, and what tests I

24   felt, given that there was an interest in simply cognition and

25   not personality, that I could administer and those that I could

1    not administer.

2         So, to me it boils down to what, what is the purpose

3    of the testing, what is the referral question.

4         THE COURT:  Well, stay with that though for a minute.

5    I mean, is there something, how shall I put it, unduly

6    restrictive about the way in which the referral was made that

7    would somehow impede your ability to come to a meaningful

8    conclusion about the individual?

9         This is not something to be used against you.  I don't

10   see it that way.  I'm just trying to understand whether in fact

11   you're of such a narrow focus that there may be another way to

12   come at the same conclusion that's not necessarily in conflict

13   with yours.

14        DR. O'CONNELL:  I mean, I felt that it is limited what

15   I can say about the individual, but I viewed it as the goal

16   being simply identifying mitigating factors, and it could be as

17   benign as his behavior while he's being detained.  So I didn't

18   see that I'd be able to provide a meaningful diagnosis or even

19   really comment so much on how his impairments impact his

20   behavior or his alleged behavior, but more simply this is how

21   he's thinking now and that these test results could be used by

22   others who are doing the other evaluations that I mentioned.

23        THE COURT:  Well, in this context of this particular

24   case, is it reasonable to limit Dr. Shapiro to exactly the tests

25   that you performed given the practice effect?  And

1     alternatively, is there a way that reasonably Dr. Shapiro could

2     perform similar test, though not identical, that would not

3     unfairly advantage the government in this case?

4                MR. O'TOOLE:  Your Honor, if I might, before he

5     answers that, just for your information, there's only one test

6     that the government is claiming is running a muck of the

7     practice effect, and that was the WASI.

8                THE COURT:  Wechsler test.

9                MR. O'TOOLE:  Right.  The other tests are tests that

10    we don't object to and that they propose, tests that do get

11    around the practice effect.

12               MR. HARDING:  Judge, the government's problem was,

13    based on the practice effect is that we cannot perform any of

14    the nine tests that this list on Page 2 of their notice because

15    of the practice effect.

16               MR. O'TOOLE:  You don't have to though, Rob.  You

17    don't have to do that.  You can do other test that you propose

18    --

19               THE COURT:  Who is speaking now?

20               MR. O'TOOLE:  This is Jeff O'Toole, Your Honor.

21               THE COURT:  Okay, go ahead.

22               MR. O'TOOLE:  There are tests that they have suggested

23    which are appropriate.  The only one that the government has

24    claimed runs a muck of the practice effect was the WASI.

25               MR. HARDING:  I don't know what you mean, Mr. O'Toole.

1    That's not the government's position.  I really have to object.

2    We cannot perform, according to Dr. Shapiro, any of the nine

3    tests that appear on Page 2 of your notice.

4              THE COURT:  Well, stop.

5              Dr. Shapiro, do you concur with that?

6              DR. SHAPIRO:  Well, I would certainly agree that the

7    Wechsler is the one most subject to it, but I think that the

8    other neuropsychological tests as well would be subject to a

9    practice effect.

10             THE COURT:  The others, meaning eight others?

11             DR. SHAPIRO:  Yeah, not to the same extent as the

12   Wechsler, but it would be practice effect involved.

13             THE COURT:  Well, let me go back to this question

14   again and Mr. O'Toole sort of intervened before I could get a

15   response.

16             MR. O'TOOLE:  Apologize, Judge.

17             THE COURT:  Dr. O'Connell, I really need to hear your

18   view as to whether you think should Dr. Shapiro go forward as he

19   proposes, does that give him what, a larger spectrum of view of

20   this individual than you had?  Does it give the government some

21   sort of unfair advantage in the way they look at this individual

22   that you really are not in the position to rebut, for example?

23   I mean, that's where I need to get some guidance from you.

24             DR. O'CONNELL:  Well, maybe to go to the first point,

25   there are the battery of test that I administered, but the

1  question I think is are there alternate versions, alternative

2  versions that measure the same domain that could be administered

3  whereby there wouldn't be such concern of the practice effect.

4        THE COURT:  Right.  What's the answer to that?

5        DR. O'CONNELL:  I mean, that's -- I feel that is the

6  case, that there are alternative versions.

7        THE COURT:  Well, are they proposing them?  I don't

8  have the government's notice.

9        DR. O'CONNELL:  They are proposing a battery of test

10  that I assume that they feel comfortable with them.

11        THE COURT:  Well, do you recognize the tests as being

12  roughly comparable?

13        THE COURT:  Some of them are, yes.  Some I'm not sure

14  would be, you know, my first choice, but --

15        THE COURT:  Well, question really is, do you think

16  that the test that they propose somehow goes beyond the same

17  kinds of information you were trying to get at whereas you were

18  limited in getting at them by the tests that you chose?

19        DR. O'CONNELL:  Other than the tests that look at

20  personality and psychiatric symptoms, those are test that I did

21  not administer and those are included in the battery that they

22  propose.

23        THE COURT:  And you say that that would give them a

24  what, how should I put it, a broader view of the --

25        DR. O'CONNELL:  They're examining domains that I

16

1    specifically under instruction did not examine.

2              THE COURT:  Now, I guess I go back to a question I

3    asked earlier though.  Does it really only make sense to

4    understand the domains that you examined, to also have examined

5    those domains that?  And I think that's what Dr. Shapiro said in

6    his opening remarks.  What is your view on that, Dr. O'Connell?

7              DR. O'CONNELL:  Judge, I'm sorry.  Could you say that

8    one more time?

9              THE COURT:  Does it only make sense to have the

10   personality tests in order to really interpret the results of

11   the other tests, which is what I think Dr. Shapiro was

12   suggesting in his opening remarks?

13             DR. O'CONNELL:  I think it is helpful in developing a

14   comprehensive assessment.  The challenge is, if you don't want

15   to assess personality in the 12.2 notice, you do not want to

16   assess certain things.  It is then challenging to come up with a

17   battery of tests that excludes a certain domain, and that's what

18   I attempted do.

19             I would also say, though, that not every situation

20   where you administer an IQ test or neuro-psyche test that you

21   have to also administer personality.  I think it helps give a

22   holistically picture of the individual and answers certain

23   questions, but I didn't feel that for the specific question that

24   I was asked --

25             In fact, I was -- one of the parts of the question

17

 1   that I was asked, the instruction was not to assess personality.

 2           THE COURT:  All right.  Dr. Shapiro, if you were not

 3   to do the personality tests; that is, you do some of the

 4   ultimate tests that Dr. O'Connell feels are fairly similar, but

 5   avoid the one or two domains that are dissimilar, can you still

 6   come up with some sort of meaningful opinion?

 7           DR. SHAPIRO:  Well, yes and no, Your Honor, if I can

 8   explain this.  One of the, one of the points is Dr. O'Connell

 9   did a very comprehensive neuropsychological assessment.  There

10   are really no other test batteries from a neurological point of

11   view that would give that comprehensive an assessment.

12           The things that I was left and that I proposed are

13   merely what are called neuropsychological screening tests, so

14   that they really wouldn't, you know, have the import nor the

15   comprehensiveness of the kinds of stuff that Dr. O'Connell did.

16   From a neuropsychological and cognitive point of view, they

17   would be much more limited, because he's already, you know, done

18   the comprehensive battery and it can't be repeated.

19           And I would still go back to my initial point, is that

20   even if those tests show impairment, you don't know what that

21   impairment means in terms of the person's behavior unless you

22   pushed in the broader context of the personality.

23           THE COURT:  Well, let me put it very bluntly to you,

24   Dr. Shapiro.  Can you live with -- maybe not happily, not

25   professionally outside this case -- with doing the identical

1    tests that he did or similar test not including the personality

2    inquiry?

3            DR. SHAPIRO:  Well, as long as, as long as I were

4    free -- you know, first of all, they would be limited by the

5    fact that they are just screening as opposed to comprehensive

6    tests.

7            THE COURT:  Understood.

8            DR. SHAPIRO:  And the second thing is, as long as part

9    of that battery I would be able to use the tests that assess

10   motivation, then I could live with it.

11           Mr. O'Toole did say that he did do the test of memory

12   malingering, which is true, but memory is only one aspect of

13   cognition and there are several other kinds of test that assess

14   motivation in a broader picture.

15           THE COURT:  Dr. O'Connell, what about the motivational

16   test?  Is that a new wrinkle that somehow changes the game?

17           DR. O'CONNELL:  No, I think that is one of the things

18   that I was trying to also get at is Mr. Lighty's effort during

19   the testing, so I do think that's a very salient issue.

20           MR. O'TOOLE:  Your Honor, could we find out what

21   testing specifically they're talking about, because they listed

22   in their notice a short term interview of reported symptoms,

23   which I understand to be a psychiatric symptoms malingering

24   test.  So, I would like to know a broader, broader scope of

25   malingering or did he try to assess some new tests.  So I'd like

1    to know what test Dr. Shapiro is suggesting.

2              DR. SHAPIRO:  As His Honor says, you know, I would not

3    be happy with it, but I could restrict it.  I would not have to

4    do the structured interview of reported symptoms, but I would

5    want to do the validity indicator profile, which is a test for

6    assessment of motivation on cognitive tests.

7              THE COURT:  Dr. McConnell, is that something that you

8    find acceptable?

9              DR. O'CONNELL:  It is acceptable.  And it's O'Connell,

10   Judge.

11             THE COURT:  Oh, I'm sorry.  O'Connell, sorry.

12             DR. O'CONNELL:  That's fine.

13             THE COURT:  All right.  Well, let me tell you where I

14   am on this.  I mean, this is always an interesting issue, but

15   we're not really here in a pure setting of trying to get the

16   best psychological profile of an individual.

17             The reality is that the defendant may have opted to do

18   no psychological testing at all.  And whereas the psychological

19   status of the individual would be extremely interesting to

20   people determining whether or not to put this gentleman to

21   death, it doesn't go in because the defendant opts for it not to

22   go in.  It's his choice.

23             And so, he really does control the extent to which

24   psychological testing gets done at all in this case.  And if he

25   gives you a somewhat stunted, and it sounds like that's the way

```
 1   it's being done here, referral, that's the way it gets done, and
 2   you do the best you can as docs in this case.
 3            So I think we will go with Mr. O'Toole's objections
 4   here, modified obviously by what Dr. O'Connell has said about
 5   what would be acceptable.  And specifically, Mr. O'Toole, if you
 6   want to state which are the tests that you do not want
 7   performed, you better state them because, again, I don't have
 8   any document in front of me.
 9            MR. O'TOOLE:  The test that I understand and, Dr.
10   O'Connell, if you can check me on this, I believe the first --
11   I'll just state what you asked for Judge, the ones that we don't
12   want.  MMPI, which is -- MMPI-II, which is the Minnesota
13   Multiphasic Personality Inventory, Rorschach.
14            THE COURT:  Rorschach.
15            MR. O'TOOLE:  Rorschach, the Trauma Symptom Inventory
16   that details assessment of post-traumatic test; the Structure
17   Interview of Reported Symptoms and the Personality Assessment
18   Inventory.  Those are the tests that we objected to and have
19   objected to to Mr. Harding over the last several days.
20            THE COURT:  Dr. O'Connell, do you concur with that?
21            DR. O'CONNELL:  Yes.
22            DR. SHAPIRO:  May I just ask one question, sir?  Then
23   is my using the abbreviated Wechsler okay then, the Wechsler
24   Abbreviated Scale of Intelligence?
25            MR. HARDING:  That was something I supplemented my
```

1   motion the next day with an additional test called the WASI

2   test, which is a revised version of the Wechsler test.  It's a

3   cognitive test; is it not, Doctor?

4           DR. SHAPIRO:  It is, but as it says, it's an

5   abbreviated version.  So again, it's not as comprehensive as the

6   tests that Dr. O'Connell --

7           MR. HARDING:  But since it's not a personality test, I

8   don't think it's precluded.

9           THE COURT:  All right.  Does that resolve it though?

10          DR. SHAPIRO:  Then it's okay for me to give that one

11  also?

12          THE COURT:  All right.

13          MR. HARDING:  And if I could ask while we're all still

14  on the line.  Doctor, you have stated that you need certain

15  tests to analyze Mr. Lighty's motivations, and you named the

16  validity indicator profile.  Are any of the other tests that

17  Mr. O'Toole just summarized ones that you think would be needed

18  also to understand motivation?  The Detailed Assessment of

19  Post-traumatic Stress, for example, or the Trauma Symptoms

20  Inventory.

21          DR. SHAPIRO:  Specifically for motivation, while not

22  each of them has a validity scale, you know, the scale for

23  motivation on them, but they do deal with motivation in terms of

24  interpretation of psychological as opposed to, you know,

25  neuropsychological symptoms.

1          So, if your -- if the Court's ruling is that I have to

2     restrict myself to exclusively cognitive things, then those

3     tests would not be relevant.

4          THE COURT:  Well, that's my ruling.  I think that's

5     where we come out.

6          DR. SHAPIRO:  Yeah, as I said, it just puts me in that

7     awkward position.  There may be some impairment there, but you

8     don't know what it means or what's causing it, but with that

9     understanding, you know --

10          THE COURT:  Teddy Roosevelt once said, do the best you

11     can with what you got where you are.

12          DR. SHAPIRO:  Okay.

13          THE COURT:  So that's really the resolution here.

14          All right.  Anything else?

15          MR. O'TOOLE:  No, Your Honor.  Thanks so much.

16          THE COURT:  Thanks a lot.

17       (Whereupon, the telephone conference was concluded.)

18

19

20

21

22

23

24

25

23

```
 1                  CERTIFICATE OF COURT REPORTER

 2       I, Linda C. Marshall, certify that the foregoing is a

 3   correct transcript from the record of proceedings in the

 4   above-entitled matter.

 5

 6

 7               /s/
                 _____
 8               Linda C. Marshall, RPR
                 Official Court Reporter
 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```