IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

2011 DEC 12 P 3: 55

CLERK'S OFFICE
AT BALTIMORE

UNITED STATES,

  **Respondent**    **v.**   **Crim. No. 8:-03-cr-00457-PJM-3**

             **Civil No.**

             PJM11CV3563

**JAMES EVERETT FLOOD, II,**
 **Petitioner**

**MEMORANDUM IN SUPPORT OF MOTION TO**
**VACATE, SET ASIDE OR CORRECT A SENTENCE PURSUANT TO 28 U.S.C. §2255**

**INTRODUCTION**

 On October 8, 2003, James Everett Flood, III, was indicted along with Kenneth Lighty and

Lorenzo Wilson for the kidnaping and murder of Eric Hayes.[2]  As the kidnaping of Mr. Hayes

ultimately resulted in his death, the defendants were exposed to the death penalty, and each was

appointed two attorneys: one with proper death penalty experience and one second-chair.  Mr.

Flood's death-qualified counsel was Harry Trainor. This Court appointed John McKenna as second-

chair.  Ultimately, the Department of Justice elected not to seek the death penalty against Mr. Flood,

and on January 7, 2005, Mr. Trainor withdrew from representing Mr. Flood and the Court appointed

Michael Lawlor in his stead.

 As the record would ultimately reveal, McKenna and Lawlor were presented with substantial

and seemingly incontrovertible circumstantial evidence implicating their client:  his car, in which

he was seen just prior to Mr. Hayes' abduction was linked to the crime via DNA evidence; his phone

---

 [2]Specifically, the men were charged with Kidnaping and Conspiracy to Commit
Kidnaping in violation of 18 U.S.C. §1201(a)(1) and three counts of using or carrying a firearm
during and in relation to a crime of violence in violation of 18 U.S.C. §924(c).

was used by one of his co-defendants to call a woman to come pick up Lighty, Wilson, and Flood just after the time of the crime, and Mr. Flood disposed of his car in North Carolina, about which he lied to the grand jury. Although Mr. Flood was interested in pursuing a guilty plea, and although a guilty plea represented the only remotely possible way to avoid a life sentence for Mr. Flood, McKenna and Lawlor proceeded to trial.

Neither attorney had significant experience in federal felony trials - in fact this was the very first for Mr. Lawlor. This Court's frustration with the pair's inexperience is clear from the record. The Court was displeased both by counsel's choice to argue their client's innocence (as opposed to the Government's inability to prove his guilt) as well as by counsel's lack of familiarity with certain Federal Rules of Evidence. The Court repeatedly admonished counsel to study and review particular points of law. *See e.g.* Tr. 9/29/05 at 155 ("Well, let's parenthetically have you go back and visit very carefully the argument that you made, which was, my man is innocent, he wasn't there, he didn't do it. Now, that's not the same as saying the Government hasn't proved it. That's a very important distinction, and I want you to go back and study the law on that point."); Tr. 9/30/05 at 222 ("I recommend, you in particular, Mr. Lawlor, to read this rule over the next several days so that you don't shake your head while I'm making my rulings.")

Ultimately, the pair's inexperience resulted in their conceding evidence sufficient to result in a finding of guilt of an offense carrying a mandatory life sentence. In addition, they failed to make several potentially game-changing objections. In numerous instances, and cumulatively, counsel's performance fell below an objective standard of reasonableness. But for counsel's substandard representation, there is a substantial likelihood that the outcome of Mr. Flood's trial and sentencing would have been different. *Strickland v. Washington*, 466 U.S. 688 (1984).

**CLAIMS FOR RELIEF**

I.     Counsel Rendered Constitutionally Ineffective Assistance by Failing to Resolve this Case
       with Plea Agreement

The Sixth Amendment guarantees a criminal defendant the right to the effective assistance

of counsel. *Strickland*, 466 U.S. 668. Effective assistance of counsel is not limited to counsel's

performance at trial, but encompasses the entirety of counsel's representation. "[P]erhaps the most

critical period of the proceedings … [is] the time of …arraignment until the beginning of …trial."

*Powell v. Alabama*, 287 U.S. 45, 57 (1932). One of the most, if not the most, critical aspect of

counsel's pretrial representation is the duty to explore the possibility of a guilty plea in order to

obtain a more favorable sentencing outcome for the client than he would obtain if he was convicted

at trial. *See Padilla v. Kentucky*, 130 S. Ct. 1473, 1481 (2010) (quoting *McMann v. Richardson*,

397 U.S. 759, 771(1970)) ("Before deciding whether to plead guilty, a defendant is entitled to 'the

effective assistance of competent counsel.'"). Counsel failed to discharge this very basic duty to Mr.

Flood. Had they done so, there is a reasonable probability that the outcome of his case would have

been different. *Strickland*, 466 U.S. at 694.

     *A.     The vast majority of federal criminal cases resolve via guilty plea*

The vast majority of federal criminal cases resolve via plea of guilty. In 2005, the year in

which Mr. Flood was tried, of the 77,859 defendants whose cases were not dismissed, 74,024 entered

guilty pleas. See Attachment A. Those numbers reveal that over 95% of attorneys negotiated and

obtained pleas for their clients. This number should come as no surprise to competent federal

practitioners who know that in their federal criminal cases that go to trial, losing is more than likely.

Only 11.9% of those federal defendants who faced a jury in 2005 were acquitted. In murder cases,

such as Mr. Flood's, a jury trial is even more likely to result in conviction. Of those defendants in the 2003-2004 fiscal year who faced a jury for murder, only 3.8% were acquitted. Attachment B. Moreover, the average sentence for a violent crime in the same time period in a case resolved by plea was roughly *half* of what it was following trial.

> B.       *The necessity of resolving the case by plea in this case was paramount.*

This case cried out for resolution by plea. Not only was Mr. Flood up against the same long odds as the average federal defendant, his case was even more likely to result in a conviction after a trial. The evidence against him, while circumstantial, was strong. The Government alleged that Mr. Flood along with Lorenzo Wilson and Kenneth Lighty kidnaped Eric Hayes at gunpoint in Washington, D.C. and drove him to Maryland, where Mr. Lighty shot him. Wilson then used Mr. Flood's phone to call his girlfriend, who, along with another woman, came and picked the three of them up. Wilson and Lighty introduced Mr. Flood to these women by his nickname, "June Bug." Mr. Flood then called his own girlfriend and had her drive him past the murder scene. The Government's evidence showed that Mr. Flood's car, in which he had been seen just prior to the murder of Eric Hayes, was tied to the victim by DNA evidence. Mr. Flood disposed of that car in North Carolina and subsequently lied to the grand jury about what had happened to the car.

In addition to the strength of the evidence, several other aspects of the case made Mr. Flood's prognosis in front of a jury even more bleak. First, he was joined with Kenneth Lighty, a co-defendant whom the Government believed was so evil he deserved to die. Flood was to be seated next to this person and associated with him in the jury's mind at trial. Second, because the Government was seeking the death penalty against Mr. Lighty, Flood would to be tried by a "death-qualified jury," which, according to all competent evidence is far more conviction-prone than an

4

ordinary jury. See *Lockhart v. McCree*, 476 U.S. 162, 173 (1986) (noting studies). Third, evidence

concerning a second murder committed by Mr. Lighty would be introduced, which even though

technically legally acceptable, would inevitably cause spillover prejudice to Mr. Flood.  Finally, as

was amply demonstrated at trial, Mr. Flood would face a second set of prosecutors in the form of Mr.

Lighty's counsel, whose defense theory involved implicating Mr. Flood.

> C.    *Counsel's failure to seek a resolution of this case under these circumstances constituted deficient performance*

In order to demonstrate a Sixth Amendment violation for ineffective assistance of counsel,

Mr. Flood must first demonstrate that counsel's performance "fell below an objective standard of

reasonableness." *Strickland*, 466 U.S. at 688.  In this case, counsel's failure to negotiate a plea

unquestionably did so.

The Supreme Court has determined that professional guidelines enunciating standards for

criminal defense practice are useful tools in determining the prevailing standard of care for counsel.

*Wiggins v. Smith*, 539 U.S. 510, 524 (2003); *Williams v. Taylor*, 529 U.S. 362, 396 (2000).  On the

topic of counsel's obligation to explore resolution of the case via plea, the guidelines speak clearly:

it is mandatory.   According to the commentary to the American Bar Association's Standards for

Criminal Justice, The Defense Function,

> [s]ince disposition by plea is mutually advantageous in many circumstances, involvement in plea discussions is a significant part of the duty of defense counsel . . . . Plea discussions should be considered the norm and failure to seek such discussion an exception unless defense counsel concludes that sound reasons exist for not doing so.

*See also*, National Legal Aid and Defenders Association Guideline 6.1(a) ("Counsel should explore

with the client the possibility and desirability of reaching a negotiated disposition of the charges

rather than proceeding to a trial and in doing so should fully explain the rights that would be waived by a decision to enter a plea and not to proceed to trial.")

Despite the fact that Mr. Flood's case was a runaway train headed for conviction and a mandatory life sentence, Mr. Flood's counsel inexplicably never asked their client if he would be interested in negotiating a plea and never approached the Government to explore the possibility. The first time the issue came up was after trial had already begun, when Government counsel asked (likely incredulously) why Mr. Flood was not entering a plea. Attachment C.[3] At that point, counsel agreed to a meeting with the Government to discuss the possibility. The Government asserted that Mr. Flood would have to provide a proffer before an offer was made. *Id.* Inexplicably, given what Mr. Flood was facing, counsel decided not to pursue the issue further. *Id.* Counsel did not inform Mr. Flood that the Government had expressed a willingness to resolve the case. Mr. Flood then went before the jury, was convicted, and sentenced to mandatory life imprisonment plus sixty five years..

1.    Counsel's decision was not supported by any reasonable strategy.

In order for a decision of trial counsel to be reasonable, it must be supported by a reasonable strategy. In this case, counsel's failure to seek a negotiated settlement for Mr. Flood was not so grounded.   As counsel now admit, their failure to seek a resolution was borne of nothing but inexperience. Counsel was faced with overwhelming evidence, all of which was known to them well in advance of trial. Although they claimed Mr. Flood was innocent, they had no strategy to explain away the use of his car and his phone at the time of this crime. In other words, they had no defense. Meanwhile, they had a client who was not alleged to have shot anybody and who had no significant criminal record, but who faced a mandatory life sentence if he lost at trial. These

---

[3]This attachment will be filed under separate cover.

were all things counsel needed to take into consideration when deciding whether to proceed to trial. See *Premo* v. *Moore*, 131 S. Ct. 733, 741 (2011) (noting that during plea negotiation process, counsel must "make careful strategic choices in balancing opportunities and risks"). *See also*, *Padilla*, 130 S. Ct. at 1495 (Scalia, J., dissenting) (competent advice is required with regard to "the sentence that the plea will produce, the higher sentence that conviction after trial might entail, and the chances of such a conviction") (internal quotation marks omitted). Simply put, this case is a textbook example of a case that should have pled.

> D.    *Had counsel performed as they should in seeking a resolution for a sentence less than life there is a reasonable probability the outcome of Mr. Flood's case would have been different.*

In order to demonstrate that counsel's performance actually deprived Mr. Flood of his Sixth Amendment right to counsel, he must demonstrate that but for counsel's deficiency there is a reasonable probability the outcome of his case would have been different. *Strickland*, 466 U.S. at 694. He does not need to prove to an absolute certainty that the outcome would have been different. *Harrington v. Richter*, 131 S. Ct. 770, 791-92 (2011)  (*Strickland* prejudice "does not require showing that counsel's actions more likely than not altered the outcome. . . ."(internal quotation marks and citations omitted)). In a case where counsel's deficient performance impacted the plea process, *Strickland*'s prejudice prong "focuses on whether counsel's constitutionally ineffective performance affected *the outcome of the plea process*." *Hill*, 474 U.S. at 59 (emphasis added). *See also Padilla*, 130 S. Ct. at 1480-81.  As such, Mr. Flood must demonstrate a reasonable probability that absent counsel's errors, the Government would have offered the possibility of a sentence less than life, and that Mr. Flood would have accepted such an offer. *See Sanders v. United States*, 341 F.3d 720, 722 (8th Cir. 2003) (requiring defendant alleging ineffectiveness to show that but for

counsel's advice he would have accepted an offer and not proceeded to trial).

The numbers alone prove a *probability* that an offer would have been made had counsel sought one. Ninety five percent of cases at the time of Mr. Flood's trial pled out. There is no reason to think that Mr. Flood's case - particularly given his role in the crime and his record - would have been any different. In fact, Government counsel themselves obviously anticipated that the case would plead. *See Eismann v. Herbert*, 401 F.3d 102, 109 (2nd Cir. 2005) (*citing Burger v. Kemp*, 483 U.S. 776, 785-86 (1987)) (failure to plea case is not ineffective assistance where record does not contain evidence that Government was open to plea or would have made an offer). As William Purpura, an expert criminal defense attorney who has been practicing in this jurisdiction for thirty years notes, it is the "extremely rare" case in which no plea offer is made in federal prosecution. See Attachment D.

>  E.    *Mr. Flood must now be granted a new trial or be permitted to enter such a plea as he reasonably likely would have been offered absent counsel's deficient performance.*

The remedy for a constitutional violation "must closely fit the constitutional violation." *United States v. Virginia*, 518 U.S. 515, 547 (1996). Constitutional remedies are "necessarily designed, as all remedies are, to restore the victims of [constitutional violations] to the position they would have occupied in the absence of such conduct." *Milliken v. Bradley*, 418 U.S. 717, 746 (1974). In this case, the remedy can take one of two forms. This Court can consider testimony as to the range of offer the Government contemplated making, what range of offer competent counsel should have advised Mr. Flood to take, and what range of offer Mr. Flood would have been willing to agree to had counsel done their job. Or, the Court can simply order a new trial at which Mr. Flood would proceed with effective assistance. While neither remedy is a perfect fit, because the pretrial

8

proceedings as they once existed cannot be precisely reconstructed, that fact cannot be used to detour around the fact that Mr. Flood unquestionably had the right to effective assistance in the plea process. *United States* v. *Morrison*, 449 U.S. 361, 364 (1981) (remedies for Sixth Amendment violations "should be tailored to the injury suffered from the constitutional violation and should not unnecessarily infringe on competing interests."). *Kimmelman*, 477 U.S. at 379 ("… the Constitution constrains our ability to allocate as we see fit the costs of ineffective assistance. The Sixth Amendment mandates that the State bear the risk of constitutionally deficient assistance of counsel.")[4]

II.    Counsel Rendered Constitutionally Ineffective Assistance When They Failed to Move for Joinder with Lorenzo Wilson

Mr. Flood, Lorenzo Wilson, and Kenneth Lighty were indicted together. At some point prior to trial, Mr. Wilson's case was severed, due to the Government's intention to admit his out of court statements to his girlfriend implicating himself, Lighty, Flood, and one other man in the charged offenses. Flood remained joined with Lighty, against whom the Government was seeking the death penalty. Counsel unreasonably failed to move for severance from Lighty and joinder with Wilson.

The United States Supreme Court has implicitly acknowledged what numerous scholarly studies show: death qualified juries are more conviction-prone than other juries. *Lockhart v. McCree*, 476 U.S. 162, 173 (1986). *Buchanan v. Kentucky*, 408 U.S. 402, 415, n. 16 (1987). *See also*, *id.* at 426-427 ("The evidence is "overwhelming" that death-qualified juries are "substantially more likely to convict or to convict on more serious charges than juries on which unalterable

---

[4]The question of what remedy should be afforded a defendant who alleges ineffective assistance of counsel in the plea process is currently before the Supreme Court in *Laffler v. Cooper*, Docket No. 10-209, and *Missouri v. Frye*, 10-444.

opponents of capital punishment are permitted to serve.") 483 U.S. 402, 426-427 (Marshall, J., dissenting). Any competent practitioner would jump at almost any chance to have his non-death qualified client not be judged by a death-qualified jury.

Although counsel asked for severance from Mr. Lighty in order for Mr. Flood to have his own, third, trial, counsel apparently did not consider requesting that he simply be joined with Mr. Wilson. This would have been a sensible solution, and one presumably appealing to the Court. There still would only be two trials, and thus no additional resources would have had to be expended to accommodate the severance from Lighty and the joinder with Wilson. In fact, resources would have been saved by not having Flood's lawyers participate in protracted capital jury selection.

The statements of Krystal Phauls, the reason for the severance could have been redacted or amended in such a way as to meet the demands of Bruton. Ms. Phauls testified that Wilson told her that he and Lighty and Flood and another man were in the car, that Lighty and Flood sat in the back of the car two kidnaping victims and that "Kenny shot somebody and June Bug or Kenny shot somebody." Attachment E. These statements could have been redacted to refer to "two men" in the back, and "one or two of the men" shooting somebody. *See United States v. Akinkoye*, 185 F.3d 192, 198 (4th Cir. 1999) (Sixth Amendment permits general references to "another person" or "another individual"). It bears noting that a very similar statement was admitted at trial against Lighty and Flood from "CW," who stated that Lighty told him that at the scene of the kidnaping, Lighty was present with Flood, Wilson, and Tony Mathis. This Court held, (and the Fourth Circuit subsequently agreed) that the statement could be altered to read Lighty "and three others." Tr. 10/7/05 at 139. There is no reason to think that this Court would have ruled differently regarding a redaction of Phauls statements had counsel so requested. Thus, there was no reasonable strategy supporting

10

counsel's failure to make this request. *Strickland,* 466 U.S. at 690-691.

There is a reasonable likelihood that had Flood been joined with Wilson, the outcome of the trial would have been different. There was vastly more evidence tying Wilson to the crime than Flood: Wilson called his girlfriend to come pick him up after the crime. He had property belonging to the victim. He confessed his involvement to his girlfriend. Moreover, the Government presented evidence of his involvement in another shooting with Lighty. Nonetheless, Wilson's non-death-qualified jury convicted him only of Conspiracy to Commit a Kidnaping and *acquitted* him on the other counts. *United States v. Wilson,* 624 F. 3d 640, 641 (4th Cir. 2011). Given the entirely circumstantial case against Mr. Flood, there is a reasonable likelihood that had counsel moved for joinder with Wilson, the outcome of the trial would have been different.

III.   Counsel Rendered Constitutionally Ineffective Assistance When They Failed to Move to Dismiss the Indictment as Multiplicitious

Counsel unreasonably failed to move to dismiss the indictment in this case as multiplicitous. An indictment is multiplicitous if it charges the same offense in multiple counts. *United States v. Goodine,* 400 F.3d 202, 207 (4th Cir. 2005). When the Government charges a defendant in multiplicitous counts, the defendant is exposed to multiple convictions and sentences for the same offense. *Id.* .

In this case, the Indictment charged Mr. Flood with three counts of violating 18 U.S.C. §924(c): for using and carrying a firearm in the course of "the forcible placing of Eric Larry Hayes II at gunpoint into the vehicle" (Count 3); for using and carrying a firearm in the course of "their attempt to grab" Hayes' friend at the time of the abduction (Count 4) and using and carrying a firearm during and in relation to the "shooting of Eric Larry Hayes" (Count 5).

11

These counts state the same offense: the use and carrying of a firearm in the course of Counts

I and II.  During the course of committing one crime, a firearm can only be used and carried one time.

Were a different crime to be committed at each moment of a continuing offense, the number of counts

under §924(c) would be infinite.   A defendant could be charged with a violation of §924(c) for

carrying weapons at the moment the conspiracy was hatched, then using a weapon to subdue the

victim, then using a firearm to keep the victim from leaving the car, then using a weapon to shoot the

defendant in the leg, then using a weapon to shoot the victim in the arm, and on and on. *See United

States v. Godinez*, 998 F.2d 471, 473 (7th Cir. 1993) ("kidnaping is a single crime, rather than, say,

one crime per hour of detention."); *see also United States v. Towne*, 870 F.2d 880, 888-91 (2nd Cir.

1989) (kidnaping and sexual assault of victim counted as one offense for purposes of § 924(c)).  The

focus must be on the crime in which the gun was used and the enhanced penalty of use of the gun

appended to that crime.  Indeed, without that underlying crime, there is no offense, for it is no crime

to use a gun in the course of a non-violent crime, clearly indicating that the underlying crime is the

focus.

A.      *Counsel's failure to move for dismissal of multiplicitious counts was deficient performance*

Every court that had considered the issue at the time of Mr. Flood's trial had determined that

separate §924(c) charges arising out of the same underlying crime and affecting the same victim were

improper.  *United States v. Anderson*, 59 F.3d 1323 (D.C. Cir. 1995); *United States v. Finley*, 245

F.3d 199 (2nd Cir. 2001); *United States v. Baptiste*, 309 F.3d 274 (5th Cir. 2002); *United States v.

Taylor*, 13 F.3d 986, 993-994 (6th Cir. 1994).

Although not a multiplicity case, the leading case in the Fourth Circuit addressing the same

issue was *United States v. Camps*, 32 F.3d 102 (4th Cir. 1994). In *Camps*, the defendant appealed a forty-five year sentence for convictions on eight §924(c) counts for carrying a firearm in the course of eight separate narcotics transactions in the course of one charged conspiracy. The court concluded the sentences were proper, because Congress intended to punish each choice to commit a federal crime with a weapon. The court said, "a defendant who has engaged in numerous instances of the precise conduct Congress has outlawed has committed more than one criminal offense. A defendant who has "used" or "carried" a firearm on several separate *occasions* during the course of a single continuing offense, therefore has committed several section §924(c)(1) offenses." *Id*. at 106. There is nothing in *Camps* that should have dissuaded reasonable counsel from challenging the multiplicity in the indictment.  The Fourth Circuit plainly stated there that the gun uses were on separate occasions, in this case, the gun uses were only on one occasion.  Conceptually speaking, the defendant in *Camps* could have been charged with eight different counts of distribution of narcotics in that case - in other words, under the law he committed a separate federal crime on each of the eight occasions. Here, putting the victim on the hood of the car at gunpoint, brandishing a firearm at his friend, or even shooting and killing the victim are *not even federal crimes* unless and until they are done in the course of a federally prohibited crime, and here there was *one crime* - the kidnaping of Eric Hayes – that resulted in his death. Similarly, in *United States v. Higgs,* 353 F.3d 281 (4th Cir. 2003) and *United States v. Haynes,* 26 Fed. Appx. 123 (4th Cir. 2001)*,* where the defendants were convicted of three §924(c) counts, one for each homicide victim, each one of those murders could have been prosecuted as a separate federal crime, whereas the artificially conjured sections of the Hayes murder could not. It is plain that the *Camps* court relied on just such reasoning in reaching its result: referring to the Supreme Court's decision in *Blockberger* the court said,

13

'The test is whether the individual acts are prohibited, or the course of action which they constitute. If the former, then each act is punishable separately.'" Id. (quoting Wharton's Criminal Law, 11th ed., § 34). *Because the "individual acts" -- i.e. the sales -- were prohibited, each successive sale constituted a distinct offense and was separately punishable*. Just as the Harrison Act proscribed each separate drug sale, and not the business of selling drugs, so too section 924(c)(1) prohibits each separate act of firearm use or carriage, not violent crimes and drug trafficking with firearms. Each separate act of firearm use or carriage, therefore, is separately, and consecutively, punishable.

*Camps*, 32 F.3d at 108. In this case, the artificial breakdown of the kidnaping of Eric Hayes in to

separate events does not render those events separate crimes.[5]

B.    *Counsel's Failure to Move to Dismiss the Multiplicitous Counts Prejudiced Mr. Flood at Trial and at Sentencing.*

There is a reasonable probability that had counsel moved to dismiss the two of the three

§924(c) charges in this case that they would have been successful, and that Mr. Flood would have

been charged with one count of §924(c) as opposed to three. If this were the only prejudice, this

Court would be required to vacate his convictions on two of the three §924(c) counts. *Rutledge v.*

*United States*, 517 U.S. 292, 301-02 (1996) (where multiplicitous convictions are found, "the only

remedy . . . is . . . to vacate one of the underlying convictions as well as the . . . sentence based upon

it.").

The prejudice suffered by Mr. Flood is not, however, limited to the improper convictions

themselves, but extended to the entirely of the prosecution. A multiplicitous indictment may

---

[5]In rejecting Mr. Flood's appeal of the imposition of consecutive sentences on the three §924(c) counts, the Fourth Circuit simply cited *Camps* and said these counts represented three different uses. This reading of *Camps* expanded it vastly beyond its own borders and places the Fourth Circuit well outside the law of all the other circuits to address the issue. Had counsel moved to dismiss the counts as multiplicitous, there is a reasonable probability the court would have granted it under the state of the law at the time.

14

prejudice a jury by suggesting that a defendant has committed several crimes--not one." *United States v. Langford*, 946 F.2d 798, 802 (11th Cir. 1991). That is exactly what happened here. Although the Government only had jurisdiction to prosecute Mr. Flood for one crime - the kidnaping of Mr. Hayes - the jury was led to believe there were in fact five separate crimes, which there were not. A new trial is required.

IV.    Counsel Provided Constitutionally Ineffective Assistance of Counsel When They Failed to Object to the Government's Use of its Peremptory Strikes to Remove Women From the Jury in Violation of the Equal Protection Clause of the Fifth Amendment

The Equal Protection Clause of the Fifth Amendment precludes the exercise of peremptory challenges to strike jurors based on race, *Batson v. Kentucky,* 476 U.S. 79, 89, (1986) or based on gender. *J.E.B. v. Alabama*, 511 U.S. 127, 128–29 (1994). The Supreme Court has repeatedly articulated the three-part test for demonstrating an Equal Protection violation resulting from racial discrimination in jury selection.

> ❶The defendant must make out a *prima facie* case of discriminatory jury selection by showing that the totality of the circumstances raises an inference of discriminatory purpose.

*Johnson v. California*, 546 U.S. 162, 169 (2005) (citing *Batson*, 476 U.S. at 94, 96). Circumstances supporting a *prima facie* case can include, among other things, a pattern of strikes against the targeted class, or the prosecutor's questions and statements during *voir dire. Batson,* 476 U.S. at 97. This burden is not meant to be "onerous." *Johnson*, 546 U.S. at 169.

If the defendant demonstrates a *prima facie* case of discrimination,

> ❷[t]he burden shifts to the prosecutor to provide a racially neutral explanation for challenging jurors 'within an arguably targeted class.' The prosecutor must give a 'clear and reasonably specific explanation of his reasons for exercising the challenge.

*Miller-El v. Dretke,* 545 U.S. 231, 239 (2005) (quoting *Batson*, 476 U.S. at 97-98). This is an

enormously easy burden for the state to shoulder, as the Supreme Court has held that the reasons

offered need not be persuasive or even plausible. *Purkett v. Elem*, 514 U.S. 765, 768 (1995) (per

curiam). The reason given by the state need only be race neutral on its face. *Hernandez v. New York*,

500 U.S. 352, 358-59 (1991) (O'Connor, J., concurring).

> Finally,

> ❸the trial court must then determine if the defendant has established
> purposeful discrimination.

*Miller-El*, 545 U.S. at 239 (quoting *Batson*, 476 U.S. at 96-97). In other words, the court must decide

if the reasons offered by the prosecutor were mere pretexts for discrimination. *Purkett*, 514 U.S. at

768, because, as the Supreme Court recently noted, "some stated reasons are false." *Miller-El*, 545

U.S. at 240. At this point in the inquiry, "implausible or fantastic justifications may (and probably

will) be exposed." *Miller-El v. Cockrell*, 537 U.S. 322, 329 (2004) (quoting *Purkett* 514 U.S. at 768).

The final panel seated in James Flood's case was comprised of eleven men and one woman.

Despite what should have been clear to counsel - that this disparity resulted from the Government's

targeted use of its strikes to remove women from the jury – counsel failed to object and demonstrate

a prima facie case of an Equal Protection violation under *J.E.B.* Counsel's failure to make this

obvious objection was unreasonable. *Strickland*, 466 U.S. at 688. Had counsel objected, there is a

reasonable probability their objection would have been successful. *Id.* at 694. Of fifty one qualified

jurors, twenty, or almost forty percent were women. Yet the jury that tried Mr. Flood was ninety-one

percent male. This statistical disparity was sufficient to satisfy Batson's first prong. *See, e.g.,*

*Howard v. Moore*, 131 F.3d 399, 407 (4th Cir.1997) (*en banc* ) ("prosecutor's striking of six out of

the seven black prospective jurors"—without more—"constituted a *prima facie* case of discrimination"); *Allen v. Lee,* 366 F.3d 319, 359 (4th Cir.2004) ("When determining whether a *prima facie* case of discrimination has been shown, the district court may consider the proportion of black jurors stricken compared with the composition of the venire."). Mr. Flood contends that the Government could not have come up with sufficient gender neutral reasons for it strikes. It is Mr. Flood's information and belief that the Government used ten of its twelve peremptory strikes to remove women from the pool. *See United States v. Higgs*, 711 F.Supp.2d 499, 506 (D.Md. 2010). These factors, combined with the Government's similar pattern in Higgs would have satisfied Mr. Flood's burden under *J.E.B. See Miller-El*, 537 U.S. at 347; *Swain v. Alabama*, 380 U.S. 202, 224 (1965).

V.    Counsel Rendered Constitutionally Ineffective Assistance when they Promised Evidence of Mr. Flood's Innocence and Good Character and then Failed to Provide It.

    *A.    Relevant Facts*

In their opening statement, counsel conceded that the perpetrators of the kidnaping and murder of Eric Hayes used Mr. Flood's phone and his car, and that Mr. Flood lied about the latter to the grand jury. Nonetheless, the defense contended, the evidence would show that Mr. Flood was not present at the crime scene, and was, in fact, innocent. The defense also argued that they would demonstrate that Mr. Flood was hard-working man of good character.

Specifically, the opening statement was as follows: first the defense asserted the evidence would demonstrate Mr. Flood's innocence. Counsel reiterated this assertion several times:

> We are here today, all of us are here today because Kenneth Lighty, and his very good friend, Lorenzo Wilson, kidnaped and killed Eric Hayes. Wilson and Lighty kidnaped and killed Eric Hayes. That's what the evidence is going to show.

Tr. 9/29/05 at 50.

> James Flood was not present at the kidnaping, had no part in it and James Flood had no part in the death of Eric Hayes. That's also what the evidence is going to show.

*Id*. at 51.

> ... he was not in the car when they killed Eric Hayes. He was not in the car at that time.

*Id.* at 58.

> In tandem with these assertions, counsel conceded critical circumstantial evidence against Mr.

Flood:

> I'm going to save you some time. The car was his. He had purchased that car from Kenneth Lighty just days before this crime took place, but that vehicle was his, no two ways about it. And the Government is absolutely correct, he lied about the car being his before the Grand Jury.

*Id.* at 57. Counsel contended, however, that the evidence would demonstrate Mr. Flood's innocence

despite these seemingly damning facts.

> The reason that James Flood is here is because the people that committed this crime used his car and used his cell phone. It's not because he committed any kidnaping or any murder, it's because they used his car and they used his cell phone, that's why he's here, and because he lied about it before the Grand Jury. And far from being free from blame, and I'm not suggesting he was, he liked before the Grand Jury and there's no doubt about it, and he kept silent about this, but as far as the murder of Eric Hayes and the kidnaping of Eric Hayes, he is absolutely innocent of those charges.

*Id.* at 60. In that passage, counsel basically assured the jury that the use of Mr. Flood's phone and

car in the crime could be explained. Later, counsel told the jury of other evidence they would hear

from the defense.

> Now, during this trial, you're also going to hear about some of the good aspects of James Flood, the real James Flood. And you're going to hear that around January 2002, a long time before and long time after, he was a hard-working young man, worked every day, worked as a custodian for the Douglas Knoll's Apartments, he

worked every day. And you're going to hear from people who know all aspects of his life. And they're going to tell you he's a hard-working guy and he's not a violent man. So you're going to hear some things about James Flood during this trial as well, and I think that's very important.

*Id.* at 60-61.

Following counsel's opening statement, the Government contended, and this Court agreed, that  counsel's proclamations of Mr. Flood's innocence indicated an intention to call Mr. Flood or present other affirmative evidence in his defense.

Johnston:  "...if counsel's going to proceed with his defense as he argued in an opening statement, he's going to have to call Mr. Flood to say he wasn't there..... so certainly if Mr. Flood is going to say he didn't do it, then it's going to have to come from Mr. Flood..... The only way he can prove that he wasn't there, that they had his car and his keys, but he wasn't there, is for Mr. Flood to get on the stand and say it.

*Id.* at 149-150.

Court:  I'm afraid that's right. I mean, I don't know how you argue he didn't do it. It's a very different proposition to say that the Government hasn't proved it. But to say he didn't do it, no one's established that he didn't do it.

*Id.* at 150.  *See also id.* at 153 ( "Johnston: "Now, as I said to the Court before, this defense that Mr. Flood has put forth in his opening statement requires Mr. Flood to get on the stand and say he gave them the car and he wasn't there...." )  In short, the Court admonished counsel, "Mr. McKenna, we have your words. We'll see what your evidence does. *You're going to have to deliver on what you've said.*" *Id.* at 162.  Counsel did not deliver.

   B.    *Relevant Legal Principles and Argument*

Counsel provides ineffective assistance when he promises the jury critical evidence and then does not provide it. In fact, "there is little more damaging than to fail to produce important evidence that had been promised in an opening." *Anderson v. Butler*, 858 F.2d 16, 17 (1st Cir. 1998). As with

other decisions, failing to produce evidence promised in opening may, in some cases, be grounded

in sound trial strategy, if unforeseeable changes occur during the trial that make the presentation of

the evidence unwise. *Ouber v. Guarino*, 293 F.3d 19, 29 (1st Cir. 2002). There was, of course, no

such strategy here. Counsel were well aware they were not going to present the testimony of Mr.

Flood or any other exculpatory evidence. Moreover, they had plenty of fodder for an opening

statement without making such reckless offers. Counsel could simply have focused (as they did to

a small extent) on the fact that the Government had no eyewitnesses placing Mr. Flood at the scene,

the Government had no inculpatory statements by Mr. Flood, the Government had no physical

evidence of the victim on Mr. Flood or tying Mr. Flood's person to the crime scene, and the

Government could link no weapon to Mr. Flood.

That Mr. Flood was prejudiced by counsel's deficient performance cannot be understated.

Counsel conceded powerful circumstantial evidence – including evidence suggesting consciousness

of guilt – at the very beginning, but then told the jury essentially that these things could be explained

consistent with Mr. Flood's innocence. As the Government and the Court agreed, this gave the clear

impression that Mr. Flood was going to testify and explain how his car and phone came to be in the

possession of the perpetrators and why he lied about the disposal of his car to the grand jury. This

testimony never came, perforce leaving the jury with the impression that no such alternative story

existed.

> Promising a particular type of testimony creates an expectation in the minds of jurors,
> and when defense counsel without explanation fails to keep that promise, the jury may
> well infer that the testimony would have been  adverse to his client and may also
> question the attorney's credibility. In no sense does it serve the defendant's interest.

*United Ex Rel Hampton v. Leibach*, 347 F.3d 219, 260 (7th Cir. 2003). Unfulfilled offers of testimony

from the defendant are the most damaging kind. *See Ouber*, 293 F.3d at 28 ("When a jury is promised that it will hear the defendant's story from the defendant's own lips, and the defendant then reneges, common sense suggests that the court of trial may be profoundly altered. A broken promise of this magnitude taints both the lawyer who vouchsafed it and the client on whose behalf it was made.").

In this case, the prejudice from counsel's improper argument is compounded by the missing character witnesses. The failure to call these witnesses left the jury with the impression not only that Mr. Flood could not explain where he was whilst other people were using his phone and car in a kidnaping/murder, but that the people who were supposed to say such actions were inconsistent with his character obviously found themselves unable to make such statements under oath. There is a reasonable probability that but for counsel's deficient performance in opening statement that the jury would have focused on the deficiencies of the Government's case and not the deficiencies of the defense. *Strickland*, 466 U.S. at 497. A new trial is required.

VI.    Counsel rendered constitutionally ineffective assistance of counsel when they conceded evidence sufficient to support a finding of guilt against Mr. Flood

From the very outset of the trial in this case, James Flood's counsel conceded critical evidence against him. In his opening statement, counsel contended:

> James Flood is seated at that table right there, the defense table, because they used his car and they used his phone during the commission of that crime. What the Government told you is absolutely correct. They used his car. It was a car that he had bought off of Kenneth Lighty. So in that sense, they're correct.

Tr. 9/29/05 at 50.

> I'm going to save you some time. The car was his. He had purchased that car from Kenneth Lighty just days before this crime took place, but that vehicle was his, no two ways about it. And the Government is absolutely correct, he lied about the car being

21

> his before the Grand Jury. He lied about it several times, and we're not trying to
> controvert that. It was his car, no doubt about it... when the Government called him
> as their witness, he lied before the Grand Jury, he repeatedly lied before the Grand
> Jury, that much is absolutely true...[.]

Id. at 57. The evidence that counsel conceded comprised the bulk of the evidence that resulted in his

conviction. The only evidence offered by the Government in addition to that conceded by counsel

was that Mr. Flood's girlfriend had seen him in his car and talked to him on his phone prior the time

of the crime, and that she asked him to drive him past the crime scene later that evening. The

Government also offered evidence that a person introduced as "June Bug" was present with Lighty

and Wilson following the crime, when the group was talking about having done "something bad" to

"some boy." These bits of evidence do not move the ball that much further than the point at which

the defense had already spotted it through their own words.

Not surprisingly, the Government reiterated the conceded evidence over and over in closing

argument:

> What was Mr. Flood's role? He provided the phone, he provided the communication
> among the conspirators, he provided the way to get away, he provided the way to get
> there, and he was there, and at least one leg of the trip he was driving."

Tr. 10/20/05 at 41.

> Mr. Flood provided the car and the phone that made the commission of this crime
> possible from its inception. Without Mr. Flood's assistance, without his aid, that
> crime could have been successful because they needed his care to do it, they needed
> his phone."

Id. at 113.

Also not surprisingly, the Government pointed out that counsel's purported defense was

incomplete:

> There's no evidence before you, mind you, that he loaned his car to anyone or that he

22

> loaned his cell phone to anyone and he stayed someplace else.  There is no evidence
> of that before you. No evidence whatsoever.

*Id.* at 120.  The Government then pointed out what counsel should have known before it conceded

the key evidence against their client:  "You can infer someone has knowledge from circumstantial

evidence."  *Id.* at 121.  Indeed, it is well established in this Circuit that "Once it has been shown that

a conspiracy exists, the evidence need only establish a sLighty connection between the defendant and

the conspiracy to support conviction." *United States v. Brooks*, 957 F.2d 1138, 1147 (4th Cir. 1992).

Just as was the case here, a criminal conspiracy "can be shown by circumstantial evidence such as [the

defendant's] relationship with other members of the conspiracy, the length of th[e] association, his

attitude, conduct and the nature of the conspiracy." *United States v. Collazo*, 732 F.2d 1200, 1205 (4th

Cir. 1984), *see also, United States v. Kellam*, 568 F.3d 125, 139 (4th Cir. 2009) ("The existence of a

tacit or mutual understanding is sufficient to establish a conspiratorial agreement, and the proof of

an agreement need not be direct-it may be inferred from circumstantial evidence.").

Some concessions by counsel can be part of a reasonable strategy.  Counsel in a capital case

can concede overwhelming evidence in order to maintain credibility with the jury for sentencing.  *See,*

*e.g., Young v. Catoe,* 205 F.3d 750, 760 (4th Cir. 2000).  Counsel may in some cases concede guilt to

a lesser offense in order to defend against conviction of a greater one.  *See*, *e.g.*, *Lingar v. Bowersox*,

176 F.3d 453, 458 (8th Cir. 1999).  The import of these cases is that iif counsel is going to make

concessions, the conceded evidence must not be sufficient to warrant a finding of guilt on the most

serious offenses, and the concessions must be integrated with a larger defense strategy.  These

concessions were not part of any reasonable strategy at all.  Counsel was correct when it told the jury

that the evidence that Mr. Flood's car was used in this crime, that his phone was used following this

crime, and the evidence that he lied to the grand jury was fairly impenetrable. Counsel's position, however, was that Mr. Flood was not there, so it needed to weave these concessions into that explanation, not simply expect the jury to accept that evidence and figure out an explanation on their own. Here, there was absolutely nothing to be gained by conceding sufficient evidence to convict Mr. Flood, rather than simply remaining silent about it and/or focusing on the lack of physical evidence in the case.[6]

Moreover, in addition to having a strategy supporting concession, counsel must obtain the defendant's express consent before conceding. *Florida v. Nixon*, 543 U.S. 175 (2004). In this case, counsel did not. Mr. Flood would not have agreed with counsel's strategy had he been informed that only a "slight" connection was required to convict him of a conspiracy and therefore the substantive crime that carried a mandatory life sentence.

VII.  Counsel rendered constitutionally ineffective assistance when they failed to request a limiting instruction following the Government's cross-examination of Latasha Massey

In their case in chief, Kenneth Lighty's counsel called Latasha Massey to testify that on or about the time of the crime in this case, her boyfriend, Tony Mathis, received a call from James Flood. Mathis was then picked up by someone driving a Blue Lincoln, and returned later with blood on his clothing. Tr. 10/29/05 at 35-37. The next day, Massey heard that a "kidnaping or something" had been committed in her neighborhood. *Id.* at 38. Lighty's counsel offered this testimony in order to help their argument that two people committed this murder and that those two people were Flood

---

[6]Counsel's stark inability to reconcile their chosen defense with the evidence was even remarked upon by the Fourth Circuit: "Flood's defense at trial was that he did not participate in the Hayes kidnaping and murder. This defense was premised on the argument that there were only two individuals involved in the Hayes kidnaping and murder that Lighty and Wilson were those two individuals. Although this defense largely ignored all of the circumstantial evidence linking Flood to the crimes...[.]" *United States v. Lighty*, 616 F. 3d 321, 349 (4th Cir. 2010).

and Mathis. There was a critical problem with Massey's testimony for Lighty's counsel, which was

that Massey particularly recalled that Flood's call came in after breakfast. *Id.* at 45-46. The crime

in this case took place at approximately 8pm.

On cross-examination, the Government suggested the problem in Ms. Massey's story pointed

to the possibility that Mr. Flood and Mr. Mathis must have been involved in some *other* murder.

Q.    Now you indicated that you remembered that incident because you remembered
      hearing about a murder or kidnaping or something on the news the next day; is that
      correct?

A.    Yes.

Q.    Now where you lived was  high crime area back then; isn't that correct?

A.    Yes.

Q.    And in fact, in January or February of 2002, there were several murders that happened
      in that neighborhood; isn't that fair to say?

A.    Uh-huh.  Yes.

Q.    And you're not sure which one in particular that you associated this event with; is that
      correct?

A.    Excuse me?

Q.    You don't know which particular murder your heard about that you associated this
      incident with, is that fair to say?

A.    Yes.

*Id.* at 49. This line of questioning left the jury an easy way to square Massey's story with the timeline

of the Hayes murder: that James Flood and Tony Massey conspired to murder someone else during

the same time period.

Counsel performed deficiently when they failed to object and request a limiting instruction

precluding the jury from using Massey's testimony on which to base an inference that Mr. Flood committed a second murder.[7]  The failure to request such an instruction was not the product of any reasonable trial strategy.  *Strickland*, 466 U.S. at 690-91.

There is a reasonable likelihood that the outcome of the trial would have been different had counsel requested an instruction.  This was a circumstantial case against Mr. Flood, but the Government's suggestion of the meaning of Massey's testimony was that Flood committed another murder using this same modus operandi - picking up the shooter and driving him around in his car.  *See United States v. Shepherd*, 739 F.2d at 513 (noting that "[e]vidence of prior criminal acts is almost always prejudicial to the defendant" and concluding that "evidence of other crimes was prejudicial and fraught with the possibility of diverting the jury's attention from the crucial issue").  Taken in this light, this evidence likely provided ample confirmation for the jury of Mr. Flood's guilt.  *See Breakiron v. Horn*, 642 F.3d 126, 147 (3rd Cir. 2011) (failure to ask for limiting instruction regarding similar crimes evidence prejudicial where evidence not overwhelming).

VIII    Counsel's Deficient Acts and Omissions When Considered Together Undermine Any Confidence in the Verdict and Sentence in this Case.

With regard to *Strickland* prejudice, counsel's actions must be looked at cumulatively.   In other words, a reviewing court must look at all the ways in which the prosecution's case would have been undermined – and the defense case enhanced –had counsel performed reasonably.  *Strickland*, 466 U.S. at 695 ("In making this [prejudice] determination, a court hearing an ineffectiveness claim must consider the totality of the evidence"));  *Williams v. Taylor*, 529 U.S. at 397 (in assessing

---

[7]Obviously, if the Government had offered evidence for such a purpose it it's case in chief, it would have had to provide notice under Federal Rule of Evidence 404(b).

prejudice flowing from deficient performance, reviewing court must consider "the totality of the available. . . both that adduced at trial, and the evidence adduced in the habeas proceeding. . ."); *Henry v. Scully*, 78 F.3d 51, 53 (2d Cir. 1996) ("aggregate effect of . . . three instances of inaction by defense counsel" prejudiced Petitioner; no need to determine "whether one or two of these errors would have constituted ineffective assistance").

But for counsel's performance in this case, Mr. Flood simply would not be serving a sentence of life plus sixty-five years. Plainly, this case never should have gone to trial. Mr. Flood was willing to pursue a plea in order to avoid spending his life in prison. Counsel's inexperience resulted instead in their appearing before a jury and conceding evidence sufficient to sustain convictions on all counts, all whilst implicitly promising the jury they would hear evidence of Mr. Flood's innocence, and failing to object to the Government's implication that he participated in another, similar murder. Counsel's deficient acts and omissions resulted in a breakdown of the adversarial process that renders the verdict and sentence unreliable. *Strickland*, 466 U.S. at 687. A new trial is required.

## CONCLUSION

For all the reasons stated above, Mr. Flood respectfully requests that this Court appoint the undersigned to represent him at an evidentiary hearing on this matter, and vacate his conviction and sentence.

Respectfully submitted,

Marta K. Kahn
The Law Office of Marta K. Kahn, LLC
8 E. Mulberry St.
Baltimore, MD 21209
(410) 299-6966
*Counsel for Mr. Flood*

<u>Verification</u>

**I DECLARE UNDER THE PENALTIES OF PERJURY THAT THE INFORMATION
ABOVE AND IN THE ACCOMPANYING MEMORANDUM IS TRUE AND CORRECT.
EXECUTED BY COUNSEL FOR PETITIONER ON DECEMBER 12, 2011**

Marta K. Kahn
Counsel for Petitioner

12 / 12 / 11
Date