IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | **Civil No. PJM 11-3563** |
| | : | **Criminal No. PJM 03-457** |
| JAMES EVERETT FLOOD, II | : | |
| Defendant. | : | |

**\*\*\*\*\*\*\***

GOVERNMENT'S RESPONSE TO PETITIONER'S
MOTION UNDER 28 U.S.C. § 2255 TO VACATE SENTENCE

TABLE OF CONTENTS

I.     PROCEDURAL HISTORY.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.    BACKGROUND/FACTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    A.    The Kidnapping. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    B.    The Murder. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

    C.    Events Immediately After the Murder. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

    D.    Flood's Obstructive Conduct and Discovery of the Lincoln. . . . . . . . . . . . . . . . 6

    E.    Lighty's Statements to His Friend, Charles Whitley. . . . . . . . . . . . . . . . . . . . . 7

III.   ISSUES PRESENTED.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

IV.   ARGUMENT.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

    A.    Legal Standard: Ineffective Assistance of Counsel. . . . . . . . . . . . . . . . . . . . . . 8

    B.    Discussion. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

        1.    Failure to Resolve with a Plea Agreement.. . . . . . . . . . . . . . . . . . . . . 9

        2.    Failure to Move for Joinder with Lorenzo Wilson. . . . . . . . . . . . . . . . 15

        3.    Failure to Move to Dismiss the Indictment as Multiplicitous. . . . . . . . . 17

4.    Failure to Object to the Government's Use of its
      Peremptory Strikes to Remove Women From the
      Jury in Violation of the Equal Protection Clause of
      the Fifth Amendment. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

5.    Promised Evidence of Mr. Flood's Innocence and
      Good Character and then Failed to Provide It. . . . . . . . . . . . . . . . . . . . . 20

6.    Concession that Evidence Supported Guilty Verdict. . . . . . . . . . . . . . . . . 23

7.    Failed to Request a Limiting Instruction Following
      the Government's Cross-Examination of Latasha
      Massey. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

8.    When Considered Together, All Failures by Trial
      Counsel Undermined any Confidence in the Verdict
      and Sentence in this Case. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

UNITED STATES OF AMERICA  :
:
    v.  :  **Civil No. PJM 11-3563**
:  **Criminal No. PJM 03-457**
JAMES EVERETT FLOOD, II  :
    Defendant.  :
*******

**GOVERNMENT'S RESPONSE TO PETITIONER'S
MOTION UNDER 28 U.S.C. § 2255 TO VACATE SENTENCE**

The United States of America, by and through undersigned counsel, hereby files its Response

to James Everett Flood, II's Motion under 28 U.S.C. § 2255 to Vacate  Sentence.

**I.**    **PROCEDURAL HISTORY**

On October 8, 2003, a grand jury in the District of Maryland returned an indictment charging

James Everett Flood, III,  Kenneth Jamal Lighty and Lorenzo Anthony Wilson. JA 4 with kidnapping

resulting in death, in violation of 18 U.S.C. § 1201(a) (Count One); conspiracy to kidnap, in

violation of 18 U.S.C. § 1201(c); and three counts of use of a firearm in furtherance of a crime of

violence, in violation of 18 U.S.C. § 924(c) (Counts Three, Four and Five). JA 4, 14-19.  A notice

of intent to seek a death sentence was filed against Kenneth Jamal Lighty only. As Wilson had made

statements to law enforcement and a friend in which he implicated Flood and Lighty as the

perpetrators of the crime, the government consent to a severance of his case.  Flood and Lighty also

moved for separate trials.  The district court denied their  motions, and later denied Lighty's motion

to reconsider the denial. [1] JA 6-7.  Flood and Lighty's joint trial commenced on September  6, 2006.

The jury found both defendants guilty of  all counts on October 21, 2005.  JA 12.  After denying

_____

[1]  The "JA" citations throughout this Response are to the Joint Appendix from the direct
appeal of this case which is available to the Court upon request.

Flood's motion for a new trial, the district court on January 11, 2006 sentenced Flood to life imprisonment on Count One and the following consecutive terms of imprisonment on the remaining counts: ten years on Count Two, five years on Count Three, and 25 years on Counts Four and Five. JA 651.  Flood timely appealed.  The Fourth Circuit affirmed Floods' conviction and sentence on November 19, 2001. United States v. Lighty, et al., 616 F.3d 321 (4th Cir. 2010)(hereinafter "Lighty.").  The Supreme Court denied certiorari on December 17, 2010.    Flood timely filed the pending Motion on December 12, 2011.

## II.    BACKGROUND/FACTS

The facts below are derived from the Government's Brief in the direct appeal of this matter.

### A.    The Kidnapping

On January 3, 2002, at approximately 8:15 p.m., Eric Hayes and a friend, Antoine Forrest, were sitting in an apartment building stairwell in the vicinity of the 3200 block of Eighth Street, S.E., in Washington, D.C.  They observed a dark blue Lincoln, later identified as Petitioner James Flood's (hereinafter "Flood") vehicle, driving in the alley. JA 82-83. Two individuals exited the vehicle and inquired about buying some marijuana cigarettes laced with PCP ("dippers").  JA 84-85.  Over Forrest's objections, Hayes left the building and went into the alley to conduct the drug sale.  JA 86. A few minutes later, when Hayes had not returned, Forrest went to check on him.  JA 87.

Forrest observed the driver of the Lincoln holding Hayes at gunpoint over the hood of the Lincoln. JA 88.  The driver instructed the passenger sitting in the front passenger seat of the vehicle to grab Forrest. JA 130.    Armed with a revolver, the front passenger approached Forrest, who knocked the revolver out of the front passenger's hand and fled.  Forrest went to a nearby apartment and notified Hayes' cousins.  When they returned moments later the Lincoln was gone.  JA 88-90.

Forrest and the cousins entered a vehicle and went looking for the blue Lincoln. Approximately 20 to 30 minutes later, they returned and called the police to report the abduction.  JA 90-91.

### B.    The Murder

During the abduction, as Forrest fled from the alley to the apartment, Hayes was forced into the trunk of the Lincoln.    The defendants drove the Lincoln across the District of Columbia/Maryland border to Keating Street in the Hillcrest Heights area of Prince George's County, Maryland, approximately 3.7 miles from the abduction scene with a travel time of seven minutes and 15 seconds.  JA 496-98 (testimony of FBI Special Agent Joseph Bradley).  Eugene Scott ("Yogi"), a friend of Flood's and native of Hillcrest Heights, testified that  his car had been stolen at approximately 6:00 p.m. that same evening in the same city block as the Hayes' kidnaping.  After reporting the theft, Scott went to Keating Street in Hillcrest Heights, Maryland to hang out with some of his friends.  At approximately 8:30 p.m, Scott observed a speeding dark-colored sedan heading up to Keating Street.  Scott turned his back and started walking away but heard the car screech to a halt and a voice yell words to the effect of, "Is this the guy Yogi?" – an apparent reference to the person who stole Scott's vehicle.  Scott did not respond and left the area.  Scott's car  was located and the thief identified the next day in Virginia. Trial Tr. 10/6/05 at 132-37.

Also at approximately 8:30 p.m., a homeowner, Michael Davis, saw an older car stopped next to an undeveloped lot adjacent to his residence in the 12800 block of Hillcrest Parkway, also in Hillcrest Heights. JA 137-38.  Davis observed the front passenger and rear right passenger forcibly remove Hayes from the rear passenger seat. JA 138.  Davis saw Hayes shot several times while he knelt begging for his life.  JA 143-44. The two men reentered the passenger side of the vehicle, which immediately pulled away from the scene. Davis called 911 to report the shooting.  JA 145-46.

The 12800 block of Hillcrest Parkway was one mile from Keating Street, with a travel time of two minutes and fifty seconds. JA 498.

Prince George's County Police received the 911 call at 8:51 p.m. At 8:53 p.m., the first officers arrived at the murder scene and discovered Hayes' body. Hayes was pronounced dead on the scene. Trial Tr. 9/30/05 at 64, 66. An autopsy revealed that he had suffered multiple gunshot wounds to the face and head, each of which was fatal, and had some evidence of close range firing. Hayes also suffered additional gunshot wounds to the hand and leg. Trial Tr. 10/12/05 at 58-63.

### C.      Events Immediately After the Murder

Shortly after Hayes was killed, Wilson used his cellular telephone to call his girlfriend, Krystal Phauls, and ask her drive to Iverson Street in Hillcrest Heights, approximately 1.7 miles from the murder scene, with a travel time of three minutes and 53 seconds. JA 186, 496-99. Using records for her cell phone and Flood's, Phauls identified Flood's number as the cell phone Wilson was using during the evening of the kidnaping and murder. JA 187, 524. Phauls and her girlfriend, who was sitting in the front passenger seat, arrived in the vicinity of 1902 Iverson Street and saw Wilson, Lighty and Flood – who was introduced to them by his nickname, "Junebug" – walking away from a single family home with a garage. JA 187. Phauls picked up the defendants approximately one minute after the last call from Wilson, which occurred at 9:04 p.m. The defendants entered the rear of her vehicle. JA 187. Lighty held a pair of unusual tennis shoes on his lap and had blood on his T-shirt. JA 188, 243.

At Wilson's direction, Phauls drove the defendants to the same location on Keating Street where, earlier in the evening, Scott had seen the dark vehicle pull up and had been asked "Is this the guy Yogi?" When Phauls stopped the vehicle, the three men got out, checked the street for blood,

and got back into the vehicle. JA 189.  Phauls dropped Flood and Lighty off in the Hillcrest Heights area and returned to her home with Wilson and her girlfriend.  The girlfriend departed.  Wilson and Phauls went inside her home.  Phauls saw Wilson in possession of a text pager in the name of Hayes' nickname, "Easy."  Both the text pager and unusual tennis shoes were taken from Hayes.

Flood's girlfriend at the time of the kidnapping, Tynika Marshall, lived in the same Hillcrest Heights area where the murder occurred. JA 287, 300.  On the evening of the kidnaping and murder, Marshall was on her way to the laundry mat when she observed Flood driving his dark blue Lincoln with another person in the front seat. JA 292, 302. Marshall did not know if anyone was in the rear passenger seat.  At approximately 9:18 p.m. and 9:22 p.m., there were calls between Marshall's cell phone and Flood's cell phone, during which Flood asked Marshall to pick him up.  JA 303, 525-26. She picked up Flood in the same Hillcrest Heights neighborhood.  JA 304. Flood directed Marshall to drive down Hillcrest Parkway, where they observed police at the murder scene. JA 305-07.

Special Agent Joseph Bradley testified regarding the approximate distances and travel time from the kidnaping scene in southeast Washington to the spot on Keating Street where the Lincoln was sighted and the defendants later checked for blood (3.7 miles; seven minutes and 15 seconds), from there to the murder scene on Hillcrest Parkway (one mile; two minutes and 15 seconds), and from there to the house on Iverson Place where the Lincoln was hidden (1.7 miles; three minutes and 53 seconds).  JA 496-99.  The result was a total approximate travel time of 13 minutes and 57 seconds from abduction scene to location where defendants were picked up and the Lincoln was stashed.

Flood's cell phone records showed contact with Wilson's home telephone at 6:24 p.m., followed by a call to the telephone number of another one of Wilson's girlfriends, Nicki Moten.  JA

5

516-18.  At 6:45 p.m. and 7:18 p.m., there were  calls to the telephone number of Ebony Miller, Lighty's girlfriend.  JA 518.  At 7:47 p.m. and 8:12 p.m., there were calls to Flood's cell phone from his girlfriend, Marshall. JA 519.  At 8:37 p.m., there was a call from Flood's cell phone to Lighty's girlfriend, Miller. JA 522. Between 8:51 p.m. and 9:04 p.m., there were five calls between Flood's cell phone and Wilson's girlfriend, Krystal Phauls.  JA 524.  At 9:18 and 9:22 p.m., there were calls between Flood's and Marshall's cell phones. JA 525-26.  These telephone records placed all three defendants using Flood's cell phone during the time of the kidnapping and shortly after the murder, which was reported to the Prince George's County Police at 8:51 p.m. on January 3, 2002.

### D.        Flood's Obstructive Conduct and Discovery of the Lincoln

Sometime in February 2002, the month after the murder, Flood asked Marshall to assist him in taking the dark blue Lincoln to North Carolina. Flood retrieved the Lincoln from a house on Iverson Place, the same house identified by Phauls as the location Wilson, Lighty and "Junebug." were walking from the night of the kidnaping.  JA 311-12.  Marshall followed Flood to North Carolina, where Flood gave the Lincoln to his parents. JA 314-15.

In January 2003, Flood was subpoenaed to the grand jury.  He repeatedly and specifically lied about the whereabouts of the car and how, when and why it was taken to North Carolina.  Flood also asked his uncle, Ernest Lassiter, to lie about the vehicle.  JA 274, 276-77.  In March 2003, law enforcement officers located the car in North Carolina, at the home of an innocent buyer. JA 264-65. The Lincoln was examined for forensic evidence.  Through DNA testing, a blood spot found on the rear passenger side floor rug was identified as that of Eric Hayes. JA 452.  Fibers from the passenger compartment  and the trunk carpet matched those found on Hayes' clothing. JA 416-17.

**E.**    **Lighty's Statements to His Friend, Charles Whitley**

After the kidnaping and murder, police were told by a man named Charles Whitley that Lighty had told him, following the kidnapping and murder of Eric Hayes, that he and "Bug [Flood] and Baby Ann [Lorenzo Wilson] and Tony [Mathis]," had committed the crimes and that Lighty described his involvement in the crimes. JA 379. During the trial, Whitley testified regarding Lighty's statements concerning Lighty's involvement in the abduction and murder. Specifically, Whitley testified that Lighty mentioned television reports about the killing of a policeman's son (Hayes) and explained that Lighty had gone to Eighth Street, walked up to Hayes and asked him for some PCP. Lighty told Whitley that when Hayes came to sell him the PCP, Lighty put a gun to him, threw him in the trunk of the car, took him back to the Maryland side, shot him in the head and took his Eddie Bauer jacket and his shoes (Nike foam posits) to make it look like a robbery. Trial Tr. 10/7/05 at 157-59.    The district court denied pretrial severance motions but, at trial, directed Whitley not to mention the names of accomplices that Lighty told him about, but instead to use the phrase "and others." JA 394. Lighty's counsel would be able to inquire into the number of accomplices; Whitley was instructed to answer by stating that Lighty had said that the crime involved himself "and three others." JA 395. On direct examination, Whitley did not testify that Lighty had said persons other than himself were involved in the kidnapping and murder. On cross-examination, counsel for Lighty questioned Whitley as follows:

> Q.    ... In that second statement Kenny [Lighty] didn't tell you
> that he was alone during the Hayes –
> A.    No.
> Q.    No? Okay.  How many other people did he tell you were there?
> A.    Three other people.
> Q.    Three other people, okay....

Trial Tr. 10/7/05 at 193. This short colloquy was the sum total of any mention by Lighty to Whitley

of "other people" being involved in the offense.

## III.   ISSUES PRESENTED

Flood's Petition pursuant to Title 28 U.S.C. § 2255, and the Memorandum filed in support

thereof, asserts  eight (8) grounds for relief (hereinafter referred to as "Petition" or "Pet."). All

grounds for relief allege that trial counsel rendered constitutionally ineffective assistance of counsel.

1.   Ground One: Failure to Resolve this Case with a Plea Agreement
2.   Ground Two:. Failure to Move for Joinder with Lorenzo Wilson
3.   Ground Three:  Failure to Move to Dismiss the Indictment as Multiplicitous
4.   Ground Four:  Failure to Object to the Government's Use of its Peremptory Strikes to Remove Women From the Jury in Violation of the Equal Protection Clause of the Fifth Amendment
5.   Ground Five: Promised Evidence of Mr. Flood's Innocence and Good Character and then Failed to Provide It.
6.   Ground Six: Conceded Evidence Sufficient to Support a Finding of Guilt Against Mr. Flood
7.   Ground Seven:  Failed to Request a Limiting Instruction Following the Government's Cross-Examination of Latasha Massey
8.   Ground Seven:  When Considered Together, All Failures by Trial Counsel Undermined Any Confidence in the Verdict and Sentence in this Case.

## IV.   ARGUMENT

### A.   Legal Standard:  Ineffective Assistance of Counsel

Under Strickland v. Washington, 466 U.S. 668 (1984), Flood must satisfy a two-part test to

establish ineffective assistance of counsel. He must first establish that his counsel's performance fell

below an "objective standard of reasonableness." Id. at 687-88. Then Flood must show that his

counsel's deficient performance prejudiced his defense to the extent that the result of the proceeding

would have been different had his counsel performed effectively. Id. at 687.  The Strickland standard

is a difficult standard for a defendant to meet and is not satisfied in this case due in large part to the

weight of the evidence against Flood and the fact that he was assisted in his defense by two experienced criminal defense attorneys.[2]

### B.    Discussion

As stated above, Flood asserts seven reasons why his trial counsel was ineffective and, last, contends that the cumulative effect of all seven reasons rendered the trial constitutionally defective. Each are without merit and are discussed separately herein:

### 1.    Failure to Resolve with a Plea Agreement

First, Flood claims that he received ineffective assistance of counsel pretrial  because his attorney should have tried to get a plea for a sentence less than life imprisonment.  His affidavit states: "I do not believe my chances of winning at trial was very good.  All I wanted to do was avoid getting a life sentence.  I was hoping I could get a plea and get a lower sentence.  As far as I know my lawyers never asked the government about the possibility of a plea before the trial." (Attachment F to Petition).  The Petition includes statistics about plea negotiations and an affidavit from a local defense attorney who opines that he could not "fathom" why an attorney would not seek a plea.  See Attachment D to Petition.  Lastly, Petitioner late filed the Affidavit of Michael Lawlor, Esq., one of the trial attorneys, who unilaterally asserts that he and his co-counsel, John McKenna (who did not file an affdavit) were "ineffective" for "failing to seek a pretrial resolution" of the case because "we didn't know better." See  Lawlor Affidavit at Paragraph 4.  Lawlor states that he failed to "permit

---

[2]  Because Flood was charged with a death-eligible crime, he was appointed two attorneys to represent him: John McKenna, a name partner in the firm of Brennan Sullivan & McKennan, and Michael Lawlor of Greenbelt, Maryland.  It should be noted that Mr. McKenna is a partner in one of the most reputable criminal defense firms in the state and has been practicing criminal law since 1994.

Mr. Flood to make an election about proffering" when the government allegedly [3] raised the issue during jury selection.   Where petitioner fails, of course, is to assert any factual basis to establish that the government would have offered a plea to "less than life" for a perjurer, who conspired in the murder of a policeman's son, who maintained his innocence throughout trial and who made no overtures to cooperate against his friends, co-defendants Lighty and Wilson.

Undersigned counsel hereby represent and aver that the government (a) never made a formal plea offer to defense counsel and (b) would not have even contemplated a plea offer absent cooperation from Flood.   Indeed, the Lawlor Affidavit confirms that no formal plea offer was ever made by the government.   The most important aspect of Lawlor's affidavit coupled with Flood's affidavit is that nowhere is there a representation, either by Flood or Lawlor, that Flood would have admitted full responsibility for his role in the murder of Eric Hayes and what his cooperation could or would have been had, he in fact, been given an opportunity to proffer.   Flood's affidavit merely asserts that he was concerned about a lengthy sentence (as quoted in full above, Flood's exact words were: "All I wanted to do was avoid getting a life sentence, I was hoping I could get a plea and get a lower sentence."  See Attachment F to Petition)

Moreover, any cooperation credit for a defendant like Flood who perjured himself in grand jury and who waited until jury selection to come forward to cooperate and testify would have been a possible recommendation from the government of 2 levels off the offense level relevant to murder,

---

[3]  Undersigned counsel for the government have no specific recollection of the meeting Lawlor describes.  It is certainly true that counsel would not have even engaged in preliminary plea discussions without first receiving a a truthful proffer and full cooperation .  Whether or not the government raised the issue of proffering during a meeting one night during jury selection, however, is a fact not determinative here. The government will assume, for purposes of this memorandum, Lawlor's assertion of such a meeting is true.

with at least an enhancement for obstruction of justice, in addition to a 924(c) count. The government avers that, based on undersigned counsels' practices, it would certainly have been no less. Whether or not called "life", such a hefty sentence would have been close to life in any event and there is no assertion that such an "offer" if made, would have been palatable to Flood or Lawlor. Section 2255 relief is not premised so easily on a defense attorney that proverbially falls on his sword – claiming that if he knew now what he knew then such that he would have attempted to negotiate "less than life" plea. And a Petitioner cannot get Section 2255 relief by simply stating post-trial and sentencing that he wanted a sentence less than life. There must be some factual basis that Flood could have, and would have, been truthful about his and Lighty's role in the Hayes' murder and that Flood could have, and would have, testified at Lighty's trial and that the government could have, and would have, made a formal plea offer which would have been acceptable to the court and to Flood. Without same, there would have been no plea and no possibility of a sentence less than life. Moreover, even if Flood had proffered and been willing to testify against Lighty there is no evidence the government would have made a plea offer which Flood would have accepted. Again, even with Lawlor's affidavit (filed 5 months after the Petition was filed in this case) lamenting his representation of Flood, the heavy burden for relief has not been met here. The Supreme Court's recent rulings support the government's position.

Recently, in Missouri v. Frye, 566 U.S. ___ 132 S.Ct. 1399, 1402 (2012), the Supreme Court in a 5-4 decision held that, "as a general rule, defense counsel has the duty to communicate formal offers from the prosecution to accept a plea on terms and conditions that may be favorable to the accused." See also Lafler v. Cooper, 566 U.S.___, 131 S.Ct. 2011, (2012)(Discussing remedy for prisoner petition based on ineffective assistance of counsel in the context of rejection of a formal

plea offer).  The case is distinguishable here because there was no formal plea offer made to defense counsel.  This fact is undisputed.  More importantly, however, the Supreme Court also discussed the prejudice prong of the Strickland test as it applied to the facts presented in Frye.  The Court said that to show prejudice from ineffective assistance of counsel where a plea offer has lapsed or been rejected because of counsel's deficient performance, defendants must demonstrate a reasonable probability they would have accepted the earlier plea offer had they been afforded effective assistance of counsel.  Id. at 1409.  In Frye, the defendant accepted a less favorable plea offer which indicated that he would have accepted the earlier (and more favorable) offer had he been apprised of it.  There is no such indication of prejudice here from either Flood or Lawlor's representations now and the Supreme Court decision mandates denial of a Petition so lacking.

In Williams v. United States, 2012 WL 1116403, 6 (E.D.N.Y.2012), the district court succinctly identified the defendant's burden when his new lawyer claims, in a 2255 Motion that,  but for counsel's alleged ineffectiveness, the defendant would have entered a plea instead of going to trial.  Citing generally Pham v. United States, 317 F.3d 178, 182 (2d Cir.2003) (where defendant claims that counsel failed to convey to him the terms of a global plea offer, to demonstrate prejudice he had to show a reasonable probability that he would have accepted the plea).  The Court held:

> The focus of ....is prejudice under Strickland and the analysis of the merits typically intertwines with the question of whether a hearing is required. The Circuit has held that, "[w]ith respect to a claim that counsel's ineffective assistance led to the rejection of a plea offer that, properly informed [sic], would have been accepted, a petitioner seeking a hearing must proffer arguably credible evidence of a prima facie case that, but for counsel's improper advice, the petitioner would have accepted the plea offer." (Citation omitted).
>
> Prima facie evidence consists of (I) a sworn statement, in the defendant's own words, expressing his intention to have accepted the

> plea, and (ii), "in order for the statement to be sufficiently credible to justify a full hearing, ... some 'objective evidence,' such as a significant sentencing disparity" between the sentence offered in the rejected plea and the actual sentence imposed.

Id.. Neither prong is met here. As stated above, Flood has not expressed his intention to, in the first instance, proffer truthfully about his role in the murder, and second, accept the terms of a cooperation plea (including testifying against Lighty) - if one had been made. Moreover, there is no "objective evidence" of a significant sentencing disparity because no formal offer was ever made and, as set forth above, government counsel would not have made a lenient offer given the facts of the case – indeed, even a last minute cooperation plea would have yielded a sentence of significant years, arguably even life equivalent in the eyes of Flood, then a 28 year old man.

Indeed, Flood has presented no evidence that his counsel's performance with respect to failing to negotiate a plea bargain was deficient in any way. See e.g; McCrae v. United States 2008 WL 2713705, 5 -6 (E.D.Tenn.2008)(unpublished). First, Flood has not alleged that he instructed his counsel to explore a plea that would allow him a sentence less than life, he simply writes in his affidavit that he hoped to receive a lesser sentence.

Nor, as a final matter has Flood established that any constitutional right was at stake. See United States v. Gonzalez-Vazquez, 219 F.3d 37, 43 (1st Cir.2000) (" 'there is no constitutional right to plea bargain' ") (quoting Weatherford v. Bursey, 429 U.S. 545, 561 (1997)). "The successful negotiation of a plea agreement involves factors beyond the control of counsel ... including the cooperation of the prosecutor, who has no obligation to offer such an agreement." United States v. Hall, 212 F.2d 1016, 1022 (7th Cir.2000). The Sixth Circuit has held that "[t]he alleged denial of an opportunity to plea bargain does not permit collateral relief under § 2255." Anderson v. United

States, 2000 WL 1256902 *2 (6th Cir., July 11, 2000) (unpublished decision) (citing Weatherford v. Bursey ).

Simply put, there is not a shred of evidence that the government would have offered such a plea – particularly absent some offer of full and truthful cooperation, a fact Flood does not mention at all in his plea. Nor does Flood or Lawlor aver that Flood would have cooperated.  In short, there is no evidence the government would have entertained a plea agreement in this case under the terms Flood was "hoping for."   In fact, Flood has not alleged, even in a conclusory fashion, that but for the alleged ineffective assistance of counsel, he even would have pled guilty, that is, accepted full responsibility for his crimes and not gone to trial.  Nowhere does Flood even admit in his petition that he was guilty of the offenses he was found convicted of.  He does not offer his guilt as the reason why he should have pled guilty.  It is hard to fathom how Flood meets the burden under Section 2255 absent a representation that he was, in fact, guilty. Indeed, Flood's defense at trial was that he did not participate in the Hayes' kidnapping and murder.  Thus how or why he would plea guilty (if such an offer were even made to him) in light of his protestations of innocence is incredible.  Given that Flood has no constitutional right to a plea bargain, nor can he demonstrate any prejudice, his claim of ineffective assistance of counsel for failure to negotiate a plea agreement lacks merit.

Last, if Flood's arguments were accepted here – i.e., that his lawyers were ineffective because they should have persuaded the government to let him to plead guilty, and that he would have then pled guilty –  it would turn the criminal justice on its head.  As noted by the district judge in United States v. Castro, 188 F.R.D. 173, 176 (D.Me.,1999) faced with a similar argument involving a defendant who claimed his attorney was  ineffective based on his contention that, even though he

14

told counsel he did not commit the crime and was innocent, his counsel should have investigated more thoroughly so as to argue him out of his position of innocence and persuade him to plead guilty to receive a reduced sentence.  The Court opined:

> if the defendant's arguments were accepted, the criminal justice system would be subject to endless manipulation. Here, the defendant went to trial, received a fair trial, and was convicted. The defendant appealed, and the United States Court of Appeals for the First Circuit affirmed his conviction. .....It was certainly no part of his argument then that "guilty" was the only proper outcome. Having lost that appeal, he now turns around to attack his sentence and to argue that his lawyer should have persuaded him to plead guilty in the first place, and that on the basis of such an assertion he is entitled to an evidentiary hearing on the issue. If this argument were successful, every defendant incarcerated after a trial conviction would be able to insist that the Bureau of Prisons return him to the venue of his conviction for a later evidentiary hearing to assess such a claim.

Flood's argument regarding a possible plea resolution should be soundly rejected here.

### 2.     Failure to Move for Joinder with Lorenzo Wilson

Flood asserts now that his trial counsel "unreasonably failed to move for severance from Lighty and joinder with Wilson."  As his petition acknowledges, Flood did seek a severance from Lighty, which was appropriately denied and the district court's decision was affirmed on appeal. Lighty, supra., 616 F.3d at 349 ("In our view, Lighty's and Flood's defenses, while conflicting on certain points, were not mutually antagonistic to the point where the jury was required to believe the core of one defense and disbelieve the core of the other. In order to convict Lighty, the jury was not required to believe Flood's defense that he was not a participant in the Hayes' kidnapping and murder. Moreover, the jury was not required to believe Flood's alternative defense that Lighty and Wilson were responsible in order to convict Lighty.")

Flood now contends trial counsel erred when he asked for a stand-alone trial with Flood alone in his severance motion rather than request "that he simply be joined with Mr. Wilson."   The argument has no merit under Strickland either.

Flood cannot show how a joint trial with Wilson would have resulted in any different verdict than the trial he had with Lighty. The evidence in both trials was essentially the same – the only material difference being the statements Lighty and Wilson made to their respective girlfriends. Except for Flood's general allegations that a co-defendant not facing death is prejudiced by a "death eligible" jury, Flood has not, and can not, make such an argument of how he was prejudiced by the joint trial with Lighty.  Moreover, the Supreme Court has rejected the argument that a non-capital defendant cannot receive a fair trial when tried jointly with a capital defendant. Buchanan, 483 U.S. at 418-19.

Flood claims that the Bruton issues identified by the government in its decision to sever Wilson from the Lighty/Flood trial could have been resolved by redacting Wilson's statements so that Flood could have been tried with Wilson.  Flood neglects to note that it is government counsel who determines whether or not to seek a joint trial when it intends to introduce a statement against one defendant that may implicate another defendant under Bruton.  In other words, the government sought a separate trial of Wilson because it intended to introduce all of Krystal Phauls' statements against Wilson - and did not wish to have the statement redacted.  Flood cannot force a joint trial with one co-defendant and then force the government to redact an otherwise fully admissible statement and he cites no authority for this proposition now.  It is boilerplate that a petitioner cannot claim ineffectiveness where a proffered argument would have failed in the first instance.

16

### 3.    Failure to Move to Dismiss the Indictment as Multiplicitous

Flood claims that the three Section 924(c) convictions were multiplicitous and his attorneys were ineffective in failing to challenge the convictions. Flood acknowledges that the argument he now makes is directly contrary to Fourth Circuit law at the time of the trial and, more importantly, an argument specifically rejected by the Fourth Circuit in the direct appeal of this very case. Lighty also unsuccessfully challenged the consecutive terms of his imprisonment on the firearm convictions. The Court wrote:

> In United States v. Camps, 32 F.3d 102 (4th Cir.1994), we addressed the question of whether multiple consecutive sentences could be imposed under § 924(c)(1) if those convictions arose out of the events of a single predicate offense—in Camps' case, a drug conspiracy. Id. at 106–09. We answered that question in the affirmative, noting that multiple, consecutive sentences under § 924(c)(1) are appropriate whenever there have been multiple, separate acts of firearm use or carriage, even when all of those acts relate to a single predicate offense. Id.; id. at 108 (noting that, if "multiple uses of ... weapons ... could not be punished with multiple consecutive sentences, there would be little deterrence against armed drug dealers using those weapons repeatedly during a lengthy drug conspiracy").
>
> In this case, there were three separate uses of a firearm: (1) the brandishing of a firearm at Hayes during his initial seizure; (2) the brandishing of a firearm at Forrest; and (3) the shooting of Hayes. Because we have three separate uses during and in relation to a crime of violence, the district court did not err when it imposed the twenty-five year consecutive sentences on Counts Four and Five.

616 F.3d at 370. Moreover, the district court sentenced Flood to life on the conspiracy count alone.

The consecutive convictions on the firearms count make no difference here.

17

**4.      Failure to Object to the Government's Use of its Peremptory Strikes to Remove Women From the Jury in Violation of the Equal Protection Clause of the Fifth Amendment**

Flood claims his trial attorneys should have challenged the government's exercise of its peremptory strikes during jury selection against women. Specifically, he states that his counsel did not make a Batson challenge after "the Government's use of its peremptory strikes to remove women from the jury." In Batson v. Kentucky,  476 U.S. 79, 89 (1986), the Supreme Court held that a prosecutor may not use peremptory challenges to discriminate against potential jurors along racial lines. "[T]he Equal Protection Clause forbids the prosecutor to challenge potential jurors solely on account of their race or on the assumption that black jurors as a group will be unable impartially to consider the State's case against a black defendant." 476 U.S. at 89. However, the Court in Batson also reaffirmed that a criminal defendant had no right to a jury solely or predominately composed of his own race. Batson v. Kentucky, supra, 476 U.S. at 85; see also Taylor v. Louisiana, 419 U.S. 522, 538 (1975) ("Defendants are not entitled to a jury of any particular composition ...."). The teachings of Batson apply, of course, with equal force to gender as a protected class.

The Batson Court formulated a three-part test "for assessing a prima facie case under the Equal Protection Clause." Batson v. Kentucky, supra, 476 U.S. at 93. First, a trial court must decide whether the party challenging the strike has made a prima facie showing that the circumstances give rise to an inference that a member of the venire was struck for a discriminatory reason; in this case, gender. Such a prima facie case may be established, for example, by showing a pattern of strikes against a cognizable group (women). Id. at 97. If the party making the Batson challenge establishes a prima facie case, the trial court must require the party whose peremptory challenges are being examined, to proffer a gender-neutral explanation for striking the potential juror. Id. at 97. This

18

second step does not require the non-moving party to give an explanation that is persuasive or even plausible. Purkett v. Elem, 514 U.S. 765, 768 (1995). Finally, if the non-moving party proffers a gender-neutral explanation, the trial court must determine whether the party questioning the peremptory challenge has carried his burden of proving that the strike was motivated by purposeful discrimination. Batson, 476 U.S. at 98.

The only factual allegation underlying Flood's Batson allegation is that there were 51 qualified jurors and 40 % were women; yet Flood's jury was "ninety-one percent male." Pet. Memo at 16. Statistical evidence, without more, may, under certain circumstances, give rise to a question of whether the prosecution struck prospective jurors because of their gender, thus satisfying a defendant's burden of establishing a prima facie case. Miller-El v. Cockrell, 537 U.S. 322, 342 (2003) (statistical evidence alone may support a prima facie Batson claim even when the prosecution does not attempt to strike every member of a racial group from the jury) but here, Flood has offered nothing more than sweeping accusations. Thus, Flood cannot meet his burden of a prima facie showing of a Batson challenge. Flood has not and cannot show that jurors were struck on the basis of purposeful discrimination. For example, he does not include any facts from the record regarding the jury selection processor explain how the statistics he now proffers are affected by his own attorneys strikes against potential women jurors as well. Counsel cannot be ineffective for failing to make a Batson challenge when there was no factual grounds to do so and where such an objection would be futile.

While the government is confident it would easily be able to demonstrate gender-neutral reasons for its strikes, it should not be required at this stage where, even assuming arguendo that Flood's trial attorneys were objectively deficient, Flood cannot show a reasonable probability that

19

his trial's outcome would have been different if his counsel had persisted in a <u>Batson</u> challenge. In fact, the Petition merely makes a conclusory statement that "Counsel's failure to make this obvious objection was unreasonable...had counsel objected, there is a reasonable probability their objection would have been successful." (Pet. Memo in Support at 16).   Flood misses the point, though, because at this stage the burden is on the petitioner to show the court that but for his counsel's ineffectiveness, there is a reasonable probability that his trial's result would have been different. Specifically, there is no showing  - nor even an allegation – of how the failure to persist in a Batson challenge prejudiced his trial.  <u>See</u> <u>e.g.</u> <u>Ruiz v. United States</u>, 221 F.Supp.2d 66, 85 -86 (D.Mass. 2002).

### 5.      Promised Evidence of Mr. Flood's Innocence and Good Character and then Failed to Provide It.

Flood now states his trial attorney's promised evidence of his innocence and good character but failed to prove it.   He does not provide any facts in support of his allegations in his affidavit. Instead, Flood cites cases where defense attorneys promised their client's testimony but did not deliver it.  This is not what happened in this case.  At no time, did counsel promise Flood would testify.

As the court will recall, Flood's trial attorneys asserted a defense that was reasonable trial strategy given the state of the evidence.  At trial Flood, claimed that there only two individuals involved in the kidnapping and murder of the victim and therefore that Flood was "absolutely innocent." Because Flood perjured himself in grand jury before he was represented by counsel, and because there was evidence regarding Flood that simply could not be challenged (such as the use of his cell phone), certain facts had to be embraced by trial counsel.  Here, the trial attorneys exercised

reasonable trial strategy by conceding facts that could not be contested yet were not contrary to the defense that Flood was not present during the kidnapping or murder.

Flood also claims that his attorney promised character evidence in his opening statement and failed to deliver it. The mere failure to keep a promise made in opening statements does not constitute ineffective assistance of counsel. It is far from uncommon - and some experienced attorneys might say it is even common - that defense attorneys improperly interject character-like evidence as "background" about the defendant in opening statements without ever calling a single witness to substantiate the fact or facts provided. It can hardly be deemed ineffective to try to put good information about a defendant charged with such a serious crime but for whom unlikely real character evidence is available before a jury by simply telling the jury about the defendant as they did here (e.g. "He's a hard-working guy and he's not a violent man.") Indeed, the jury heard that Flood had a job (check) and the government never asserted he was the shooter in this case. Thus, these factual assertions in counsel's opening were not so implausible as to constitute constitutionally ineffective counsel.

Moreover, it is equally plausible from the state of the record in this case, that defense counsel had character evidence at the time of opening (for example, from family members) but then reasonably concluded that the so-called character evidence would not be compelling if presented at trial. An attorney reasonably could also fear that character evidence might, in fact, be counterproductive: it might provoke harmful cross-examination and rebuttal witnesses. Paragraph 5(d) of the late-filed Affidavit of Michael Lawlor so reflects. Misgivings about hurtful cross-examination and rebuttal witnesses have been decisive to the Supreme Court when it determined that counsel was effective amidst such allegations. See, e.g., Burger v. Kemp, 483 U.S.

21

776 (1987) (concluding that failure to introduce character evidence was effective performance because witnesses could have been subjected to harmful cross-examination or invited other damaging evidence).  As the district court noted in Rollins v. United States,  2011 WL 3667522, 4 (S.D.Ill. 2011)  unfulfilled promises made in opening statements, is not ineffective assistance of counsel. Citing United States ex rel. Schlager v. Washington, 887 F.Supp. 1019, 1026–27 (N.D.Ill.1995)."

> .... unfulfilled promises made during opening statements....is a matter of a strategic decision. Strategy can and must adapt as a trial progresses, based upon the witnesses called, the effectiveness of the examinations, and the responses of the jury. A defense attorney may go into the trial with a sincere belief that particular evidence will be provided, but later circumstances may change that reality.....Ultimately, any alterations between the promises of opening statement and the reality of trial were a matter of reasonable trial strategy by defense counsel.

This case is similar to  Bhatia v. United States, 2009 WL 690810, 7 -8  (N.D.Cal. 2009) where the petitioner contended that  counsel provided ineffective assistance by promising a forensic expert's testimony, and then not calling her, and telling the jury in opening statement that the government's witnesses had threatened Movant's life, and not producing such evidence. In  closing arguments, the prosecutor pointed out both of these broken promises.  The Court found neither ineffectiveness nor prejudice:

> Movant presents no evidence indicating that [the expert] was available to testify and that her testimony would have been exculpatory.  Nor does he present evidence that counsel had no reason to believe that she would testify when he gave his opening statement. The Court can only presume that counsel's later decision not to call her was a tactical one.   .....  [in any event], the promised testimony would have been cumulative and would not have undermined the

> prosecution's evidence against Movant.   Therefore, this argument
> does not support the claim of ineffective assistance of counsel.

Id. Here, the facts are even less compelling than those in Bhatia and do not support an argument that he was prejudiced in any way by the failure to call a character witness.

Last, although Flood claims that he was prejudiced by his attorney's failure to deliver on good character evidence, he has not shown what the testimony would have been, (that his attorneys failed to elicit) that it would have been helpful or that it would have had a reasonable likelihood of affecting the result in this case.

### 6.      Concession that Evidence Supported Guilty Verdict

Similar to his allegations above, Flood claims that his trial counsel conceded "critical evidence against him." He states that his lawyers conceded the car used in the kidnapping was his and that he lied about the car in grand jury. These were facts that were important to the government's case but were not facts that rose to the level of a concession of guilt.

Certainly, an attorney's acknowledgment that a defendant is guilty of all charges can be deemed so egregious and may so undermine the adversarial process and confidence in the justness of the result that a presumption of prejudice is justified. See, e.g., Wiley v. Sowders, 647 F.2d 642, 650 (6th Cir.) ("Counsel's complete concession of petitioner's guilt nullified the adversarial quality of [the] fundamental issue [of his guilt or innocence].ature."), cert. denied, 454 U.S. 1091 (1981). Of course, that is not what happened in this case. Moreover, even concessions of guilt with respect to the actual charges does not amount to "ineffective assistance" if, under the circumstances, it can be viewed as a reasonable tactical maneuver. See, e.g., Bell v. Evatt, 72 F.3d 421, 430 (4th Cir.1995) (finding that counsel's actions were reasonable when, during guilt phase of trial, counsel conceded

23

guilt to kidnapping charge and pursued a verdict of guilty but mentally ill on kidnapping and murder charges in attempt to retain credibility with the jury and secure a lesser sentence), cert. denied, 518 U.S. 1009 (1996); Underwood v. Clark, 939 F.2d 473, 474 (7th Cir.1991) (finding that counsel's concession of guilt of lesser offense of criminal confinement with a deadly weapon in order to enhance credibility with jury and thus better contest rape charge was reasonable tactical maneuver that did not require prior consultation with client); United States v. Simone, 931 F.2d 1186, 1197 (7th Cir.) (finding that counsel's concession on drug distribution charges was reasonable trial strategy in light of counsel's vigorous contest of more serious conspiracy and continuing criminal enterprise charges), cert. denied, 502 U.S. 981 (1991).

Counsel's concession that the car used in the kidnapping was Flood's and that Flood lied about the car in the grand jury was a permissible "tactical decision," clearly designed to give credibility to the defense. Paragraph 5(e) of the Affidavit of Michael Lawlor is determinative here ("I do not agree that we conced[ed] [sic] the elements of the offense. Our position at trial was that Mr. Flood was neither present at nor aware of the kidnapping of the victim and did not participate in a conspiracy to commit the act or the substantive act. We conceded those things that we had to concede, the use of the car and cellphone, for example, while our [sic] theory when we could.") Flood's counsel were clearly following the evidence in making such a tactical decision because the evidence was overwhelming that the car belonged to him, and that he lied in grand jury about it. In other words, it was reasonable for counsel to choose a defense that would be consistent with the evidence but still allow for a not guilty verdict. Indeed, that is the very argument his attorneys made.

Under these circumstances, counsel's decision was not at all unreasonable. The evidence that was conceded was overwhelming. On the other hand, Flood's intent and the timing of his

24

involvement with respect to the kidnapping and first degree aspect of the murder charges was, at least, debatable and that is the defense his experienced trial attorneys proffered.

Accordingly, it was perfectly reasonable for counsel to attempt to establish credibility with the jury by conceding what they would have been very hard pressed to contest in the hope that it would strengthen the defendant's case with respect to the first degree murder and kidnapping charges.

In addition to not establishing that his counsel's performance was deficient, Flood has failed to satisfy the prejudice prong of the Strickland test because he has not demonstrated a reasonable probability that, but for counsel's concessions, the result would have been different. See Strickland, 466 U.S. at 694.  As already noted, the evidence on the matters conceded was overwhelming. Based upon the evidence presented, it is inconceivable that a jury could have found him not guilty of those charges even absent the concession in question had not been made.

Accordingly, Flood's sixth basis for contending trial counsel was ineffective on this ground should also be denied.

### 7. Failed to Request a Limiting Instruction Following the Government's Cross-Examination of Latasha Massey

Flood states that his trial attorneys should have sought a "limiting instruction" after the government cross-examined Lighty's defense witness, Latasha Massey.  Massey, a girlfriend whom Mathis occasionally lived with, testified that Mathis received a phone call from Flood on the day of the Hayes kidnapping and murder. According to Massey, after the call, Mathis left the house wearing a camouflage "army fatigue sweat suit with a black hat" and entered Flood's car. Massey testified that, when Mathis returned home, he had blood on the bottom of his pants and boots.  Lighty, 616

25

F.3d at 344. The government questioned Massey about the timing of her recollections because she did not tie her recollections to the Hayes' murder specifically and on direct, Lighty's attorneys incorporated the date of the Hayes' murder into their questions so as to leave an inference that she had. Thus, on cross-examination, she simply agreed that she did not know which murder she associated with the incident of seeing Mathis with blood on the bottom of his pants and boots but simply that she had heard about one in the news around the time she had made the observation. This is the sum total about which Flood now claims was an erroneous inference that he was involved in another murder. It is unclear what limiting instruction Flood now claims was warranted but he suggests that it should have been akin to a "prior criminal acts" type of instruction. Pet. at 25-26.

As is transparent from the very colloquy cited by Flood in his petition, the government did not offer any evidence that Mathis and Flood were involved in another murder so as to warrant a Rule 404(b) (other type crimes evidence)-type of instruction. The government was simply establishing that Massey's recollection of the events upon which she saw blood was not tied directly to her recollection of the Hayes' murder per se. It is highly doubtful the Court would have provided a Rule 404(b)-type instruction even if counsel had asked for one because the government did not offer any evidence of a prior criminal act that would make such an instruction meaningful to the jury. As stated above, there can be no counsel error for failing to request some sort of relief from the Court, let alone one of constitutional dimension, when it would be futile to seek the relief because it is nonsensical and not applicable to the facts at hand.

26

**8.      When Considered Together, All Failures by Trial Counsel Undermined Any Confidence in the Verdict and Sentence in this Case.**

Flood's final allegation is that, when considered together, all counsels' errors merit relief.

As stated above, Flood makes claims of error that the Government vehemently disputes.

There is no evidence the government did or would have made a plea agreement to Flood, much less

that Flood would have entered into any such hypothetical plea, thus there is no error in failing to ask

for one. Counsel did not err in raising legal arguments that have no legal basis particularly in the

context of the direct appeal of his case. Last, there were clearly reasonably tactical trial strategies

employed by counsel that were neither unusual nor outrageous given the facts of the case.

However, even assuming any errors, arguendo, "(w)hen determining prejudice, ... consider

the errors of counsel in total against the totality of the evidence in the case." Stewart v.

Wolfenbarger, 468 F.3d 338, 361 (6th Cir.2006). The Fourth Circuit described the evidence in this

case, at the time of the direct appeal:

> **In this case, the evidence overwhelmingly supports the conclusion that Flood had actual knowledge of, and participated in, the kidnapping that resulted in Hayes' murder**. Marshall saw Flood in his vehicle immediately before she called him at 8:12 p.m. Flood's car was used in the kidnapping and murder of Hayes, which occurred in the hour following that call. During the time frame of the kidnapping and murder, Flood used his cell phone to contact his girlfriend (Marshall), and his cell phone was used by Wilson to contact Wilson's girlfriend (Phauls), who was instructed to drive to the 1900 block of Iverson Street in Hillcrest Heights, which was approximately 1.7 miles from the murder scene, to pick up Lighty, Flood, and Wilson. Phauls drove to that location, accompanied by her girlfriend (Coles), who sat in the front passenger seat. Phauls and Coles observed Lighty, Flood, and Wilson walking away from a single-family home with a garage. The men entered the back seat of her car. Lighty held a pair of Nike shoes and had blood on his T-shirt. Lighty, Flood, and Wilson were heard talking all at once discussing that they had done something bad to someone. At Wilson's direction,

27

Phauls drove to Keating Street, where the three men got out and checked the street for blood.

Sometime in February 2002, about a month after the murder, Flood retrieved the Lincoln Continental from the house on Iverson Street. Flood drove the Lincoln Continental to North Carolina and gave it to his parents. In February 2003, law enforcement officers located the car in North Carolina, at the home of an innocent buyer. Forensic technicians examined the Lincoln Continental for evidence. DNA testing determined that the only blood recovered from the car, a blood spot found on the rear passenger side floor rug, came from Hayes. Fibers from the passenger compartment and the trunk carpet matched those found on Hayes' clothing.

In view of this overwhelming evidence of Flood's actual knowledge of, and participation in, the Hayes' kidnapping and murder, the error in giving the willful blindness instruction is harmless. We have no doubt that the jury ignored the willful blindness instruction for the simple reason that there was no evidence that Flood took deliberate acts to avoid learning about the kidnapping and murder; thus, there simply is no way that the jury rested its guilty verdicts on deliberate ignorance. Put another way, the jury either believed the government's view of the evidence (Flood was an active participant) or Flood's view of the evidence (he was not present) in deciding Flood's guilt or innocence. Here, the jury understandably accepted the government's view of the evidence.

Lighty, 616 F.3d at 379 -380.

A Court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonably professional assistance. Strickland, 466 U.S. at 689–90. Moreover, there are no absolute rules in determining what is reasonable performance. See Hunt v. Nuth, 57 F.3d 1327, 1332 (4th Cir.1995) (counsel's representation is viewed on the facts of a particular case and at the time of counsel's conduct). Drew v. United States, 2011 WL 2173804, 10 (N.D.W.Va. 2011).

Simply put, the constitutional inquiry into ineffective assistance claims is highly deferential and there is a presumption that counsel offered reasonable professional assistance. Strickland, 466

28

U.S. at 697.  This deference is especially appropriate when reviewing decisions of trial tactics and strategy. Furthermore, in order to raise a valid ineffective assistance claim, Flood must show that any errors by counsel had an effect on the outcome of the trial. Id.  "Reviewing court[s] must remember that 'counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment.'" Wong v. Money, 142 F.3d 313, 319 (6th Cir.1998), quoting Strickland, 466 U.S. at 690. "An error of counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the [ultimate] judgment." Id. at 691. In his Petition, Flood utterly fails to show the trial would have been affected in any way by the complaints he now makes against his two trial attorneys.

## CONCLUSION

For the foregoing reasons, the Petitioner's motion to vacate should be denied.

Respectfully submitted,

Rod J. Rosenstein
United States Attorney


By:    _____/s/_____
Deborah A. Johnston
Sandra Wilkinson
Assistant United States Attorneys
United States Courthouse, Suite 400
6500 Cherrywood Lane
Greenbelt, Maryland 20770-1249
301-344-4433

29

**CERTIFICATE OF SERVICE**

I hereby certify that I caused a true and correct copy of the foregoing Government's Response to Petitioner's Motion under 28 U.S.C. § 2255 to Vacate Sentence to be mailed first class postage prepaid this 29th day of May, 2012, to counsel for the defendant.


_____/s/_____
Sandra Wilkinson