| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | **Criminal Case No. 03-cr-00457-PJM** |
| | ) | **Civil Case No. 11-cv-3563-PJM** |
| **v.** | ) | |
| | ) | |
| **JAMES EVERETT FLOOD, II,** | ) | |
| *Defendant.* | ) | |

**\*\*\*\*\*\***

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | **Criminal Case No. 03-cr-00457-PJM** |
| | ) | **Civil Case No. 12-cv3065-PJM** |
| **v.** | ) | |
| | ) | |
| **KENNETH JAMAL LIGHTY,** | ) | |
| *Defendant.* | ) | |

**\*\*\*\*\*\***

**MEMORANDUM OF LAW IN SUPPORT OF PETITIONERS' JOINT MOTION
FOR DISCOVERY REGARDING THE ALLEGATIONS OF IMPERMISSIBLE
DISCRIMINATION IN JURY SELECTION MADE
IN THEIR MOTIONS FOR RELIEF UNDER 28 U.S.C. § 2255**

Pursuant to Rule 6 of the Rules on Motion Attacking Sentence Under Section 2255, the

Federal Rules of Civil Procedure, the Federal Rules of Criminal Procedure, the due process

clause of the Fifth Amendment, the Eighth Amendment, and this Court's Order dated November

19, 2012 (ECF No. 449), Petitioners Kenneth Jamal Lighty and James Flood have

contemporaneously filed a Motion for Discovery Regarding the Allegations of Impermissible

Discrimination in Jury Selection Made in Their Motions for Relief Under 28 U.S.C. § 2255

("Motion").  As set forth below, Mr. Lighty and Mr. Flood have good cause for each of the discovery requests made in the Motion.

**INTRODUCTION**

Mr. Lighty and Mr. Flood have filed separate Motions to Vacate, Set Aside or Correct Sentence and for a New Trial Pursuant to 28 U.S.C. § 2255.  Today, pursuant to the Court's Order dated November 19, 2012 (ECF No. 449), Mr. Lighty is filing an Amended Motion to Vacate, Set Aside or Correct Sentence and for a New Trial Pursuant to 28 U.S.C. § 2255.  Claim I in Mr. Lighty's Amended Motion and Claim IV in Mr. Flood's Motion allege that the Government impermissibly exercised its peremptory challenges against prospective female venire members on the basis of their gender and their race.  The facts supporting these claims make out a compelling *prima facie* case of discrimination.  They show, *inter alia,* that:

(i)   Because of the Government's striking behavior, the jury had only one woman (5%) and no African-American women (0%) among 18 seated jurors and alternates, despite the fact that the qualified pool of 64 jurors was 47% women and 17% African-American women;

(ii)   The Government used 82% of its exercised strikes (18 of 22) and 78% of its available strikes (18 of 23) against women, who made up 47% of the pool of 64 qualified jurors (30 of 64), and only 18% of its exercised strikes (4 of 22) and 17% of its available strikes (4 of 23) against men, who made up 53% of the pool of 64. These rates are highly statistically significant and show that the Government was four-to-five times more likely to strike a woman than a man;

(iii)   The Government removed the first 8 female jurors from the list of 64 qualified jurors, dramatically diminishing the chances the seated jury of 12 would include women.  This preliminary striking sequence is statistically significant;

(iv)   The Government used its strikes to remove 82% of the African-American women (9 of 11) from the qualified pool of 64, which was 17% African-American women.  This rate is very highly statistically significant and shows that the Government was 21.6 times more likely to strike an African-American woman than a juror who was not an African-American woman;

(v)   The male jurors whom the Government accepted expressed views regarding both law enforcement and the death penalty that were at the very least similar to, and in

most cases less favorable than, the views expressed by the women, including the African-American women, whom the Government struck;

(viii)    In the death penalty case that the prosecutors tried before this case, *United States v. Higgs,* they engaged in similar striking patterns, obtaining a seated jury of 12 that was all male and a combined panel of seated and alternate jurors with 16 men, 2 women and no African-American women.  They obtained this jury, which returned a death sentence, only a few months after separately trying Higgs' co-defendant, who was given a life sentence by a jury that included both women and African-American women.

Because this evidence amply establishes a *prima facie* case of unlawful discrimination under *J.E.B. v. Alabama, Batson v. Kentucky* and their progeny ("Step 1"), the burden shifts to the Government to explain its strikes ("Step 2").   If the Government offers colorable explanations, Mr. Lighty and Mr. Flood may come forward with evidence rebutting the explanations, as well as any other evidence that, together with the evidence establishing the *prima facie* case, will inform the Court's determination of whether the Government engaged in purposeful discrimination ("Step 3").

All of the discovery requests that Mr. Lighty and Mr. Flood propose are relevant to either Step 2 or Step 3 of the *Batson* determination. The requests seek the Government's explanations for its strikes, contemporaneous documents that shed light on the Government's strikes, and information about the Government's striking behavior in other capital cases.[1]  Having made a *prima facie* showing of discrimination that now obligates the Government to produce and the Court to consider such information, Mr. Lighty and Mr. Flood necessarily have established good cause for obtaining discovery.  Their Motion should be granted.

---

[1]      To the extent the Court does not believe Mr. Lighty and Mr. Flood have provided sufficient evidence to establish a *prima facie* case, the discovery requests seek information that is also relevant to establishing the *prima facie* case, including information regarding the prosecutors' striking behavior in other cases.

**STATEMENT OF FACTS**

The Court utilized a simultaneous blind striking procedure to select the jury in Mr. Lighty's case. At the conclusion of voir dire, the Court provided each side with the same list of 64 qualified prospective jurors,[2] allowing each side to exercise its strikes simultaneously, without the other side knowing which jurors it was striking. When each side finished, it furnished the Court with its list – again, without the other side knowing which jurors it struck. The Court then went down the list in order, populating the petit jury with the first 12 jurors on the list whom neither side struck and the alternate pool with the next six jurors on the list whom neither side struck.

The evidence gleaned from the record, including the strike lists that the Jurors' Office recently made available, shows that the Government used its peremptory challenges with the intent to exclude women from Petitioners' jury. The evidence also shows that the Government used its peremptory challenges with the intent to exclude African-American women in particular from Petitioners' jury. The evidence is as follows:

---

[2]    Each side was given 20 strikes to select the 12 jurors who would presumptively decide the case, meaning that the Court needed a maximum of 52 qualified prospective jurors to seat those 12 jurors (40 total strikes allotted + 12 accepted jurors = 52 qualified prospective jurors needed). Each side was also given 3 strikes to select six alternates, meaning that the Court needed an additional 12 qualified prospective jurors to seat the alternates (6 total alternate strikes allotted + 6 accepted alternates = 12 additional qualified prospective jurors needed). Accordingly, to seat the jury of 12 with six alternates, the Court needed a total of 64 qualified prospective jurors.

To ensure that it would have 64 qualified jurors by the time the parties exercised their peremptory strikes, the Court actually qualified 70 jurors during voir dire. Four of the 70 dropped out before striking began, leaving 66 at the time of selection. Because the Court required a maximum of 64, the last 2 jurors on the list were not needed.

### Statistical Evidence

#### Women

1.      Because of the Government's discriminatory use of peremptory strikes in this case, Petitioners' petit jury consisted of 11 men and 1 woman. All 6 of the alternates were also men. Accordingly, while 47% of the qualified pool of 64 jurors was female (30 of 64), just 8% of the seated jurors (1 of 12) and 5% of the seated jurors and alternates combined (1 of 18) were female. Conversely, while 53% of the qualified pool of 64 jurors was male (34 of 64), 92% of the seated jurors (11 of 12) and 95% of the seated jurors and alternates combined (17 of 18) were male. Similarly, while 44% of the pool of the 52 qualified prospective jurors required to obtain 12 seated jurors was female (23 of 52), just 8% of the seated jurors were female (1 of 12). Conversely, 56% of the pool of 52 jurors was male (29 of 52), but 92% of the seated jurors were male (11 of 12).

2.      Statistical comparisons demonstrate that the Government obtained such a disproportionately male jury by striking women on the basis of their gender.

3.      The Government used 82% of the strikes it exercised (18 of 22) against women, who made up 47% of the qualified pool of 64 (30 of 64), and only 18% (4 of 22) against men, who made up 53% of the qualified pool of 64 (34 of 64). Similarly, among the first 52 qualified prospective jurors required to seat 12 jurors, the Government used 79% of its strikes (15 of 19) against women, who made up 44% of the pool of 52 (23 of 52), and 21% of its strikes against men (4 of 19), who made up 56% of the pool (29 of 52).

4.      Statistical analysis shows that it is extremely unlikely that the Government struck so many women by chance without regard to their gender. One way to determine the likelihood that the Government struck female jurors by chance without relying on their gender is to

compare the proportion of female jurors whom the Government removed with the strikes it exercised against the proportion of female jurors in the qualified pool of 64. Here, the likelihood of the Government using, without regard to gender, 82% of its exercised strikes against women from a pool of 64 that was 47% women would occur by chance only five times in 1,000. This result is highly statistically significant. By convention, statisticians generally agree that a result is statistically significant when it would occur by chance 5 times in 100. This level of significance is reached when the expected result (here, based on the proportion of women in the pool) differs from the observed result (here, the proportion of the Government's strikes exercised against women) by 1.96 standard deviations (SDs). The observed difference here is, by comparison, much greater: 2.85. (There is not a linear relationship between standard deviations and probabilities.)

5.      Another way of determining the statistical relevance of the Government's striking behavior is to compute what is known as the odds ratio. By using 18 of 22 exercised strikes against women with a jury pool that was 47% women, the odds of a woman being struck as compared to a man was 5.1:1, meaning that the Government was 5.1 times more likely to strike a woman than a man from the qualified pool of 64. This odds ratio bolsters the conclusion that the Government was striking women on account of their gender.

6.      Whereas the Government used 82% of its exercised strikes against women, it used 78% of the strikes it *could have* exercised against women (18 of 23[3]) to exclude women from the qualified pool of 64. Conversely, it used only 17% of the strikes it could have exercised against men (4 of 23) to exclude men from the qualified pool of 64. Additionally, the Government removed 75% of the women it could have removed from the pool of the first 52 qualified

---

3      Although there were 30 women in the pool of 64, the Government only had the ability to strike 23 of them, since the Government had a total allotment of 23 strikes.

prospective jurors from which the seated jury of 12 would be drawn (15 of 20[4]), and only 20% of the men it could have removed (4 of 20).

7.      The Government's use of 78% of its available strikes to exclude women from a pool of 64 that was 47% women is also highly statistically significant.  The difference between the Government removing 78% of the women with its allotment of strikes and a pool that was 47% women is 2.6 standard deviations, and would occur by chance only 9 times in 1,000.  Accordingly, it is extremely unlikely that the Government exercised its available strikes without regard to gender.

8.      Bolstering this conclusion, the odds that the Government would use its available strikes against a woman as compared to man was 4.1:1, meaning that the Government was 4.1 times more likely to use an available strike against a woman.

9.      The sequence of the Government's strikes further supports the conclusion that it was impermissibly relying upon gender in exercising its challenges.  The Government removed each of the first 8 female jurors from the list of qualified prospective jurors.  Because the Government knew that the jury would be selected from the list *seriatim,* from the beginning to the end, the Government understood that these initial strikes dramatically diminished the chances that women would be seated on the final panel of 12.  Indeed, it was not until the 23rd prospective juror on the strike list that the Government accepted a woman.  The probability that the Government would remove each of the first 8 female jurors from the list is .004, or four in 1,000, which is highly statistically significant.

---

[4]      The Government was allotted 20 strikes to select the petit jury of 12 from a maximum of 52 prospective jurors.

<u>African-American Women</u>

10.     There were 11 African-American women on the panel of 64, or 17%.  Yet because of the Government's discriminatory use of peremptory challenges, which removed 9 of the 11, there was not one African-American woman selected as a seated or alternate juror. Conversely, as set forth above, while 53% of the qualified pool of 64 jurors was male, 92% of the seated jurors and 95% of the seated jurors and alternates combined were male.  Similar figures obtained as to the pool of 52 qualified jurors from which the 12 seated jurors would be drawn:  17% consisted of African-American women (9 of 52) and 56% consisted of men (29 of 52), but the seated jury had no African-American women and 92% men.

11.     Statistical comparisons demonstrate that the Government obtained a jury that was completely devoid of African-American women by striking African-American women on the basis of their gender and race.

12.     The Government used 82% of the strikes it could have exercised against African-American women (9 of 11) to exclude African-American women from the qualified pool of 64, but  (i) only 18% of the strikes it could have exercised against men (4 of 23[5]) to exclude men from the qualified pool of 64 and (ii) only 9% of the strikes it could have exercised against white men (2 of 22[6]) to exclude white men from the qualified pool of 64.  Similarly, the Government used 89% of the strikes it could have exercised against African-American women within the pool of the first 52 qualified prospective jurors (8 of 9) to exclude African-American women, but (i) only 20% of the strikes it could have exercised against men (4 of 20) to exclude men from that

---

[5]     While there were 34 men in the pool of 64, the Government only had 23 strikes, so it could remove a maximum of 23 men.

[6]     There were 22 white men in the pool of 64.

pool and (ii) only 11% of the strikes it could have exercised against white men (2 of 19[7]) to exclude white men from that pool.

13. The likelihood of the Government excluding, without regard to gender and race, 82% of the African-American women it had the opportunity to exclude from a pool of 64 that was 17% African-American women would occur by chance only 5 times in 100,000. Accordingly, the difference between the proportion of African-American female jurors that the Government removed and the proportion of African-American female jurors in the qualified pool of 64 is very highly statistically significant. It is extraordinarily unlikely that the Government exercised its strikes against African-American women without regard to gender and race.

14. In addition, the odds of an African-American woman being struck as compared to a juror who was not black and female was 21.6:1, meaning that the Government was 21.6 times more likely to strike an African-American woman than a juror who was not black and female. This odds ratio is literally off the charts, and provides further evidence that the Government struck African-American women based on their gender and race.

15. The Government struck the first 4 African-American female jurors on the list of qualified prospective jurors and did not accept an African-American woman until the 26th prospective juror on the list. In her questionnaire answers and voir dire testimony, the 26th juror on the list, Juror No. 110, clearly indicated a bias in favor of law enforcement and the death penalty. The Government did not accept the only other African-American woman it accepted until the 62nd prospective juror on the list, which was almost at the end of the alternates list (numbers 53 – 64) and after the final alternate juror ended up being selected. The Government's pattern of striking African-American women dramatically diminished the chances that an

---

[7] There were 19 white men among the first 52 jurors on the list.

African-American woman would be seated on the final panel of 12 and even on the alternate panel of 6.

16.    Coupled with the fact that only 1 of 18 seated and alternate jurors was a woman, and none was an African-American woman, the Government's rates of striking women generally and African-American women in particular were grossly disproportionate to the representation of women and African-American women in the qualified pool and are strongly indicative of purposeful discrimination.  Happenstance is exceedingly unlikely to have produced a jury so heavily dominated by men and completely devoid of African-American women.

*Juror Comparison*

17.    The comparative characteristics of the male jurors whom the Government accepted and the female jurors, including the African-American female jurors, whom the Government struck provide additional proof that the Government sought to exclude women because of their gender and African-American women because of their gender and race.

18.    Of the strikes the Government used against women, the women excluded were qualified to serve and possessed characteristics that were either neutral or pro-prosecution.  The fact that the Government struck them, particularly when contrasted with the fact that the Government accepted a number of men with greater reservations about law enforcement and the death penalty, *see infra,* demonstrates that the Government relied on gender and mixed gender/race stereotypes in exercising its peremptory challenges.

a.    **First Strike.**  The Government's first strike of a female juror was against Juror No. 1, a white female.  Juror No. 1, a 60 year-old retiree was formerly employed as an administrative assistant in the FBI for 12 years and for 29 years thereafter in federal courts.  She stated that she had ambivalent feelings about the death penalty, without a fixed view either way,

but testified without hesitation that she would be able to follow the Court's instructions, weigh the aggravating and mitigating circumstances, make a decision based on the evidence, and impose a death sentence if appropriate, including in a case involving kidnapping resulting in death.

b.      **Second Strike.**  The Government's second strike of a female juror was against Juror No. 21, a black female.  Juror No. 21, a 42-year-old registered nurse paramedic, was at the time a supervisory nurse at the United States Government Printing Office.  She indicated in her questionnaire that she was "somewhat in favor of the death penalty" and that she was "for the death penalty if a life is taken and if it was under a reasonable doubt by the members of the jury that the person is guilty; otherwise I can't agree to it.  It has to be proven!"  Juror No. 21 further wrote that, while she would not automatically vote for the death penalty for certain kinds of murders and that it would depend on the evidence, she would always vote for the penalty "if [the defendant were] "guilty."  During voir dire, Juror No. 21 testified that her view on the death penalty is that "if a person is guilty and that's the penalty, then that's what they should [get]," unless the killing is in self-defense.  She reiterated several times, including during two separate rounds of follow-up questioning, that a killing in self-defense is the only kind of homicide that would not warrant the death penalty.  Juror No. 21 also stated in response to several different questions that a case involving kidnapping resulting in death is the kind of case in which she would always vote for the death penalty.  Although the Court posed a series of follow-up questions as to which Juror No. 21 finally responded that she would not automatically impose the death penalty and would instead consider all of the aggravating and mitigating circumstances, defense counsel believed that these answers were insufficient to establish her impartiality and, accordingly, moved to strike her for cause.

c.   **Third Strike.**  The Government's third strike of a female juror was against Juror No. 40, a black female.  Juror No. 40 was a 35-year-old management analyst with Defense Information Systems Agency.  Juror No. 40 stated in her questionnaire that she was "somewhat opposed to the death penalty," but that the death penalty should be imposed if there is enough evidence to show that the defendant "willfully took someone's life" and should not be imposed if there is insufficient evidence to show that the defendant caused another person's death.  During voir dire, while Juror No. 40 asserted at one point that she was against the death penalty, she proceeded to testify repeatedly that her views would not interfere with her ability to follow the Court's instructions or to impose the death penalty, that she could impose the death penalty depending on the circumstances, and that she would not always vote for life imprisonment.

d.   **Fourth Strike.**  The Government's fourth strike of a female juror was against Juror No. 77, a white female.  Juror No. 77, a 55-year-old retired software specialist, had previously served as a juror in a criminal case in which the defendant was charged with assault with intent to maim.  In that case, the jury returned a guilty verdict.  Juror No. 77 wrote that she was "somewhat in favor of the death penalty" and that the death penalty is carried out about the right amount in that it appears reserved for murderers only "under special circumstances."  She similarly explained during voir dire that the death penalty "is necessary in some cases," that she is "pretty convinced that it's a necessity in some cases," and that she could impose either the death penalty or life in prison depending upon the evidence in the case, would consider both aggravating and mitigating factors prior to voting on penalty, and would not limit the death penalty to defendants who are sufficiently violent to pose a future danger to society.  During voir dire, Juror No. 77 expressed no reservations about her ability to impose the death penalty.

e. **Fifth Strike.** The Government's fifth strike of a female juror was against Juror No. 83, a black female. Juror No. 83 was an account examiner at a federal agency. She once had applied to become a special agent with the FBI. She indicated on her questionnaire that the death penalty should be imposed "only sparingly and when there is guilt beyond a reasonable doubt." During voir dire, she affirmed that she could impose the death penalty and was "neutral in the middle. Either way," and clarified that while she thought the death penalty was appropriate, she did not believe it should be imposed whenever the Government proved a defendant's guilt beyond a reasonable doubt. Juror No. 83 further testified that she would follow the Court's instructions, would never automatically vote for life or death, including in a case involving kidnapping resulting in death, and would always weigh the aggravators and mitigators before deciding on penalty. On voir dire, she expressed no reservations about her ability to return a death verdict.

f. **Sixth Strike.** The Government's sixth strike of a female juror was against Juror No. 84, a white female. Juror No. 84 was, among other things, a former administrative employee at the Department of Justice. She had several relatives and friends employed by law enforcement agencies, as well as a son attending the U.S. Air Force Academy. She informed the Court that she is "opposed gun control because I believe in the Second Amendment." She regularly listened to Rush Limbaugh, Sean Hannity and Tony Snow, subscribed to the *Washington Times*, and watched Fox News. Although she said during voir dire that she could set aside her personal views and fairly evaluate each witness's testimony, she plainly expressed her bias in favor of law enforcement in her questionnaire: "I grew up in a family with a large number of law enforcement officers (uncles, cousins) and I tend to support the views of law enforcement . . . . I believe a law enforcement officer, unless impeached, would be a more credible witness." She

13

reiterated this view on voir dire, even as she was being rehabilitated: "I tend to lean towards law enforcement." Juror No. 84 also favored the use of police informants as "a valuable tool to get to the truth." On her questionnaire, Juror No. 84 indicated that she was somewhat opposed to the death penalty and "would prefer a life of hard labor in prison," but affirmed in her questionnaire and on voir dire that her view on the death penalty was "probably in the middle," that she would consider it on a "case by case basis," and that she could impose it under appropriate circumstances. She felt that the death penalty would not be appropriate in cases of self-defense. On voir dire, she expressed no hesitation at all about her ability to return a death verdict. Because of the bias Juror No. 84 expressed in favor of law enforcement, defense counsel moved to strike her for cause.

g. **Seventh Strike.** The Government's seventh strike of a female juror was against Juror No. 88, a white female. Juror No. 88 indicated on her questionnaire that she supported the Fraternal Order of Police. She stated that she had no particular feelings about the death penalty and that it should be used in certain types of cases, such as torture or the murder of a police officer. Juror No. 88 affirmed on voir dire that she believed in the death penalty: "If it's something that has to be done, I agree with it. If it's something that doesn't have to be done, you know, I fight it." She also stated unequivocally that she could impose the death penalty. She further explained that she would always impose the death penalty for crimes involving "the brutal murder of a child," could impose the death penalty in a case alleging kidnapping resulting in death, and would consider all of the aggravating and mitigating circumstances before choosing to impose death or life in prison without the possibility of release.

h. **Eighth Strike.** The Government's eighth strike of a female juror was against Juror No. 90, a black female. Juror No. 90 was a self-employed consultant and retired federal

14

government employee. Her husband was a retired probation officer in the District of Columbia. Her brother was a murder victim. She indicated on her questionnaire and during voir dire that "some criminal acts are so horrendous that the death penalty is appropriate. However, as an African American, I am conflicted about the issue because it has been used disproportionately when sentencing minorities for the same crimes." During voir dire, Juror No. 90 testified without hesitation that she would follow the Court's instructions, would weigh aggravators and mitigators, and could impose the death penalty if appropriate under the law. Consistent with this testimony, she confirmed that, while she believed the death penalty had been applied disproportionately to minorities, she was "open-minded enough to look at all the evidence, whether the person was African-American or not. I think [the disproportionate use of the death penalty] is just a fact, a historical fact," and it would not affect her judgment.

i. **Ninth Strike.** The Government's ninth strike of a female juror was against Juror No. 117, a black female. Juror No. 117 was a 32-year-old full-time math and pre-algebra teacher for Prince George's County Public Schools. The Government prematurely attempted to remove Juror No. 117 from the venire. Upon learning her occupation, the Government immediately requested a bench conference and informed the Court that it believed she should have been excused with all other full-time teachers. Defense counsel correctly pointed out that "The Government seems to be asking to strike her for a hardship she hasn't asked for." When the Court questioned the juror, she confirmed that being seated on the jury would cause her no hardship. She had both a substitute teacher and another full-time teacher working with her and she had already discussed the situation with her principal. The Court accordingly denied the Government's request to excuse the juror. During voir dire, Juror No. 117 testified that she thought "it may be necessary for a person to get the death penalty depending upon their crime."

15

For her, whether to impose the death penalty depended upon the individual and the circumstances of the case. She repeatedly affirmed that she would consider the circumstances of the case when voting on the penalty. She also testified that signing a death verdict in open court would not affect her ability to impose a death sentence.

j.      **Tenth Strike.**  The Government's tenth strike of a female juror was against Juror No. 121, a white female. Juror No. 121 was a 59-year-old analyst and executive assistant at L-3 GSI, a division of a defense contractor that provides products and services for national security purposes. She testified that she had no strong opinions for or against the death penalty. On her questionnaire, she stated that the death penalty is acceptable if all jurors find the person guilty beyond a reasonable doubt of the crime of which he has been accused. During voir dire, Juror No. 121 affirmed that she would be able to impose the death penalty or life without the possibility of release, depending upon the evidence in the case. She stated that she "d[idn]'t think" she would automatically vote for death in a kidnapping resulting in death case and stated unequivocally that she would not automatically vote for life without parole. Further, she affirmed that she would consider all evidence presented, including both the aggravating and mitigating circumstances of the case, before imposing a sentence. Finally, she testified that signing a death verdict in open court would not affect her ability to impose a death sentence.

k.      **Eleventh Strike.**  The Government's eleventh strike of a female juror was against Juror No. 124, a black female. Juror No. 124 informed the Court that she strongly favored the death penalty "because I feel life for life." She testified that whether she would vote for life in prison or the death penalty would depend upon the circumstances; however, she would always vote for the death penalty under certain circumstances, including "murders for no reason." Because of her views on the death penalty, the defense moved to strike Juror No. 124 for cause.

l.      **Twelfth Strike.** The Government's twelfth strike of a female juror was against Juror No. 145, a white female. During voir dire, Juror No. 145 testified that she had never formed an opinion wholly against the death penalty. Although she retreated from the position during voir dire, she indicated on her questionnaire that she believed the death penalty was applied too seldom. The juror was employed as a legal recruiter and had worked for several large national law firms. She testified that she believed in the law and in our judicial system wholeheartedly. On her questionnaire, Juror 145 noted that she was a supporter of the Fraternal Order of Police, Mothers Against Drunk Driving and the DARE program, which her daughter had completed. She admitted that she might be more inclined to credit the testimony of police officers because of their status. Juror 145 unhesitatingly agreed that she would be able to consider aggravating and mitigating evidence and impose the death penalty if the evidence established that a death sentence was appropriate. She affirmed several times that she would be able to follow the Court's instructions in all respects.

m.      **Thirteenth Strike.** The Government's thirteenth strike of a female juror was against Juror No. 172, a white female. Juror No. 172 expressed neutral views about the death penalty, stating that she was both somewhat in favor and somewhat opposed to it. She explained that she would need to hear the circumstances of the crime and "carefully weigh[]" whether the death penalty was appropriate. She also favored the use of informants. She testified that she could follow the instructions of the Court and consider evidence of the defendant's implication in another homicide during the penalty phase.

n.      **Fourteenth Strike.** The Government's fourteenth strike of a female juror was against Juror No. 193, a black female. Juror No. 193 was a neutral juror, without any hint of bias. She had four friends employed by law enforcement agencies. She stated that she had no

particular views on the death penalty because she had never really given it any thought. Without reservation, she informed the Court that she could follow its instructions, consider all of the evidence, including aggravating and mitigating circumstances, and impose the death penalty if warranted. Neither the Government nor defense counsel asked Juror No. 193 any follow-up questions.

o. **Fifteenth Strike.** The Government's fifteenth strike of a female juror was against Juror No. 196, a black female. Juror No. 196 identified herself as a "minister of the gospel." She formerly worked with female prisoners and "used to work to support victim's rights." She was herself the victim of a rape. Juror No. 196 identified three friends and/or family members employed by law enforcement agencies and informed the Court that she believed that gun control laws "hurt[] the innocent, but don't stop the criminals." She indicated that she was "somewhat in favor" of the death penalty and that, although she would have a hard time imposing the death penalty, she would follow the law and the Court's rules. She clarified for the Court that she would not limit imposing the death penalty to only those cases involving serial killers, and that she would be able to vote for death in a case alleging kidnapping resulting in death.

p. **Sixteenth Strike.** The Government's sixteenth strike of a female juror was against Juror No. 220, a white female. Juror No. 220 did not believe that the death penalty served as a deterrent to crime, but she was somewhat in favor of it. She stated that the death penalty "is reasonable in some cases, especially to protect society." She asserted that her support for the death penalty had decreased over time, but that she still believed that "there are people who are so dangerous that we must protect society from them." She also stated that she believed that minority defendants of lower economic status received the death penalty more often than other defendants.

q. **Seventeenth Strike.** The Government's seventeenth strike of a female juror was against Juror No. 235, a white female. Juror No. 235 informed the Court that she felt the death penalty should be imposed for "very serious violent crimes." She believed that the death penalty had not always been applied fairly based on race and wealth, but during voir dire, she expressed no reservations about her ability to impose a death sentence, including in a case involving kidnapping resulting in death.

r. **Eighteenth Strike.** The Government's eighteenth strike of a female juror was against Juror No. 241, a black female. Juror No. 241, a public school educator, stated that she was neither for nor against the death penalty, and that if the crime warranted death and the defendant's guilt was proven in court, the death penalty would be the proper punishment. She wrote that she did not believe in the death penalty in cases of self-defense or defense of others. During voir dire, Juror No. 241 reiterated that she had "no problem with the death penalty as long as it fits the crime, and it has been proven that the person did, indeed, do whatever it was." She testified that she could vote for death, and would not always vote for life in prison, in a case involving kidnapping resulting in death.

19. Many of the male jurors who were seated and whom the Government accepted expressed views, including views on the death penalty, that were no different than the female jurors whom the Government struck using its peremptory challenges. In fact, some of the male jurors who were seated and whom the Government accepted appeared more predisposed to a sentence of life without parole than the female jurors whom the Government struck. For instance:

a. **Juror No. 19** indicated on his questionnaire that he believed that the death penalty was imposed too often. He stated that many people had been convicted on the basis of

insufficient evidence, many of whom were African American, and there were too many people sitting in jail awaiting execution unjustly.  During voir dire, he explained that he had seen news accounts of African-American men being released from prison after they were convicted in the '60s and '70s, and he believed that those individuals were convicted on the basis of their race rather than on the basis of the evidence.  He further believed that, in certain localities, race, religion and gender are factors in the death penalty process.  Juror No. 19 also stated that, although he believed that the death penalty may sometimes be necessary depending on the circumstances of the crime, "it may not be necessary in all crimes and all situations."  He believed that every case is different and whether the death penalty should be imposed depended on the unique circumstances of each case.  The juror could not imagine a case in which he would never vote for life regardless of the mitigating circumstances, and confirmed that he could keep an open mind as to either the death penalty or life without parole and would consider all the circumstances in making his determination.

b.      **Juror No. 28**, who previously served on a jury in a murder case in New York, stated that he had no particular feelings about the death penalty.  He felt that, if the use of the death sentence was the will of the citizens of Maryland, then he had no problems with that personally.  He said he would be able to impose life in prison or the death penalty depending on the evidence in the case.  In fact, the juror twice said that, in a case involving kidnapping resulting in death, he would always vote for life in prison without the possibility of release regardless of the circumstances.  On follow-up questioning by the Court, he agreed that he could vote either way.  No further questioning was conducted to attempt to reconcile these differing positions.  On his questionnaire, Juror No. 28 was emphatic that he would not give any more weight to the testimony of a police officer than a civilian, stating that "we are all equal - law

officers are just citizens, not gods!!!" This response concerned the Government enough to ask the Court to follow up on it during voir dire, and the Court did so. The juror explained that, in 1992 in New York State, where he was then living, a local state trooper was found guilty of manufacturing evidence, demonstrating that we are all just human.

c. **Juror No. 46**, a retired police officer from New Jersey, expressed reservations about the death penalty. He stated, *inter alia*, "Now that I found out that this is a matter of the death sentence, I do feel that it's not that I couldn't render an honest opinion. It's just that I no longer truly feel that the death penalty is the best way to go. I come to find out that so many people now have been exonerated through DNA or other sources, and I'm kind of leaning towards being against the death penalty. A life sentence I have no problem with, but death penalties I do slightly feel that – " at which point he was interrupted by the Court. He later reiterated that his opposition to the death penalty was not based upon religion; rather, "[i]t's just a matter of the number of individuals who have been found to be not guilty of crimes who have faced life imprisonment or either death." On his questionnaire, Juror No. 46 characterized himself as "somewhat opposed to the death penalty," and stated his belief that the death penalty is carried out "too often." He further noted that race plays a role in the death penalty process in this country, as evidenced by the number of black men who face the death sentence. When the Court asked him for the first time whether he would always vote for life in prison without release, regardless of the circumstances, Juror No. 46 replied "I think I would judge, yes." Under further questioning, he then agreed that he would consider all of the evidence and that he could vote for death if the evidence established that it was appropriate under the law.

d. **Juror No. 56** stated, *inter alia*, that he did not have well-formed views on the death penalty but did think that "it's probably only appropriate for the absolute most violent, you

21

know, hate-filled crimes." On his questionnaire, the juror similarly stated that, if he were convinced of the defendant's guilt beyond a reasonable doubt, he would be likely to support the death penalty for only the most heinous violent crimes. He wrote that he believed that each case should be treated on its merits and that the death penalty should not be universally applied or excluded from any murder/homicide case. He said during voir dire that he would follow the court's instructions, would not always vote one way or the other and could impose either a life or death sentence. At the conclusion of the Court's voir dire, the Government was still unsatisfied by Juror No. 56's answers, believing him to have been unclear on whether he was for or against the death penalty. The Court repeated some of the questions it had previously asked, and Juror No. 56 reiterated that he would not always vote for life without parole in a death resulting from kidnapping case. Juror No. 56 had also had a bad experience with a police officer in Virginia who pulled him over for speeding and then proceeded to search his car and his person because he suspected that the juror and his companion were transporting drugs. Additionally, on his questionnaire Juror No. 56 also answered "yes" to the question, "Do you believe that there must be some forensic or scientific evidence, such as commonly depicted on the popular television shows <u>CSI</u> and <u>Law and Order</u>, in order to find the defendant guilty beyond a reasonable doubt?" On voir dire, when asked about this answer, he stated that he did not think that "circumstantial evidence . . . is as persuasive as physical proof."

e. **Juror No. 85** described *the* death penalty as "a necessary evil" and a "very terrible thing." He stated that he was "somewhat against it." but believes "it's a necessary thing in our society." At one point, he told the Court that he would not be able to impose the death penalty. Ultimately, however, Juror No. 85 confirmed that he could set aside his personal views, could follow the court's instructions, would not always vote for life in prison, would not always

vote for life without parole in a case alleging kidnapping resulting in death and would consider both aggravating and mitigating factors.

f.  **Juror No. 86** stated on his questionnaire that he is member of the American Civil Liberties Union (an organization opposed to the death penalty).  He indicated that he believed the death penalty was imposed "too often."  In explaining his position, he wrote "I think Texas has been too aggressive in enforcing death penalties, because their percentages are very high relative to the national average."  He also answered "yes" to the question asking whether he had views about whether an individual defendant's race, religion, gender, or other factor plays any role in the death penalty process in this country.  Explaining his answer, he wrote "I have read that African-Americans are more likely to receive the death penalty."  During voir dire, he stated that although there are some crimes "gross enough to deserve a death penalty, and so I'm not opposed to it. . . . I'm not really, you know, like Texas, wanting to apply it to everything either, so."  He described himself as "somewhere in the middle." Juror No. 86 asserted that he could set aside his own views and follow the Court's instructions, could vote to impose either the death penalty or life without release if the evidence established that either was the appropriate sentence, and would consider all of the circumstances, including all aggravating and mitigating factors.

g.  **Juror No. 107**, when describing his position on the death penalty, stated that although *he* could impose either the death penalty or life without parole depending on the circumstances, he "would not say an eye for an eye." He maintained that he would consider all of the circumstances in reaching a decision.

h.  **Juror No. 126** answered on his questionnaire that he thought the death penalty was carried out too often. During voir dire, he affirmed that he did not have a bias against

23

imposing the death penalty, expressed no views that were either demonstrably pro- or anti-death penalty, and said he could impose either the death penalty or life in prison and would listen to all the evidence, including aggravating and mitigating circumstances.

i. **Juror No. 155** did not express any views that were demonstrably in favor of either the death penalty or life without parole. He said he would consider all of the circumstances and could impose either sentence.

j. **Juror No. 157** wrote in his questionnaire that he was "somewhat opposed to the death penalty." He acknowledged, however, that there are circumstances where it may be appropriate. He said he would always vote for death in cases involving "killing and slaughtering people, like a whole family," and he would never vote for death in cases of accident. To him, a case involving kidnapping resulting in death is the kind of case in which what he decided would depend on the circumstances. In the instant case, however, Juror No. 157 said that he would probably vote for life in prison without release, without regard to the circumstances. This prompted the Court to ask, "*[s]*o it wouldn't matter to you whether there were aggravating circumstances that were put in by the -- evidence that was put in by the Government, you would still vote for life in prison without release?," Juror No. 157 answered, "I still vote – let him stay in prison for no release." Although the Court was subsequently able to rehabilitate Juror No. 157, he maintained, even after rehabilitation, that if given the choice he "would more go to life in prison without release." He also answered "yes" to the question, "Do you believe that there must be some forensic or scientific evidence, such as commonly depicted on the popular television shows <u>CSI</u> and <u>Law and Order</u>, in order to find the defendant guilty beyond a reasonable doubt?"

k. **Juror No. 158** said he believed the death penalty is justified in certain cases, and depends on the circumstances. He maintained that he would always vote for the death penalty in

cases like the September 11 crimes or the Oklahoma City bombing and would be able to vote for the death penalty in this case if the evidence were to establish that it was the appropriate sentence; however, he asserted *on voir dire* that that he had reservations about imposing a death sentence: "I guess my explanation is, you know, it's easy to say, you know, I could impose the death penalty in certain cases and, you know, following the law, but to sit in a room and look across the room and look someone else in the eye and say that you individually deserve to die, I've never been in that circumstance. My honest answer is I'm not sure I could do it." In follow up questioning, Juror No. 158 said he could evaluate the case on the merits, follow the Court's instructions and impose the death penalty if the circumstances warranted it.

*Jury Selection in Prior Capital Prosecutions*

20. In December 1999, a federal grand jury in the District of Maryland indicted Willis Mark Haynes and Dustin John Higgs on charges of first-degree murder, kidnapping and using a firearm during and in relation to a crime of violence. The Government filed a notice of intent to seek the death penalty as to both defendants, who were tried separately. The same prosecutors who tried Mr. Lighty tried the cases against Haynes and Higgs. *United States of America v. Willis Mark Haynes*, PJM-98-0520 (D. Md.); *United States of America v. Dustin John Higgs*, PJM-98-0520 (D. Md.).

21. The Haynes trial took place in May 2000. Upon information and belief, a jury that included both men and women, including African-American women, convicted Haynes of three counts of first-degree murder, three counts of kidnapping and three counts of using a firearm during and in relating to a crime of violence. However, the mixed male-female jury was unable to agree unanimously on the death penalty for Haynes. Haynes therefore received a

25

sentence of concurrent life terms for the first-degree murder and kidnapping counts, and received a forty-five year consecutive sentence for the firearm counts.

22. Four months later, in September 2000, the Government tried Higgs. In contrast to the jury selection in *Haynes,* which produced a mixed jury of men and women, the jury selection in *Higgs* produced an all-male jury and a combination of seated and alternate jurors that consisted of 16 men, two women and no African-American women.

23. The evidence suggests that the Government exercised its peremptory strikes in *Higgs* to exclude women because the *Haynes* jury, which consisted of several women, including African-American women, had not returned a death sentence. By time the Court in *Higgs* was able to seat the petit jury of 12 using the above-described simultaneous blind striking procedure, it had gone through the first 43 jurors on the list of qualified prospective jurors.[8] At that point on the list, the Government had used 18 of its allotted strikes. The Government used 72% of those strikes against women (13 of 18), who made up 40% of the pool of 43 (17 of 43); by contrast, the Government used 28% of those 18 strikes against men (5 of 18), who made up 60% of the pool of 43 (26 of 43). Additionally, the Government used its strikes to exclude 76% of the female jurors it was able to exclude from the pool of 43 (13 of 17), but only 20% of the male jurors it was able to exclude (4 of 20 (20 being the number of strikes the Government had to select the panel of 12)). Finally, the Government used its strikes to remove 75% of the African-American women in the pool of 43 (6 of 8).

24. Whereas the mixed male-female jury in *Haynes* returned a life sentence, the all-male jury in *Higgs* recommended that Higgs receive nine death sentences, one for each of the six murder and three kidnapping-resulting-in-death counts.

---

[8] Counsel have not obtained a copy of the strike lists from *Higgs.* They are seeking those lists in this Motion.

25.    The evidence suggests that the Government sought to select an all-male or male-dominated jury in this case based upon its experiences in *Haynes* and *Higgs*.

**ARGUMENT**

**I.    Petitioners Are Entitled to Discovery upon a Showing of Good Cause.**

Rule 6 of the Rules on Motion Attacking Sentence Under Section 2255 permits the Court to authorize discovery for good cause under the Federal Rules of Criminal or Civil Procedure. Section 2255 Rule 6(a). It specifically contemplates document requests, interrogatories and depositions. *See* Section 2255 Rule 6(b) ("The request must … include proposed interrogatories … and must specify any requested documents") & 6(c) (addressing deposition expenses).

"Good cause" exists "when a petition for habeas corpus establishes a prima facie case for relief. Specifically, discovery is warranted, 'where specific allegations before the court show reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he is  . . . entitled to relief.'" *United States v. Roane*, 378 F.3d 382, 402-03 (4th Cir. 2004) (quoting *Bracy v. Gramley*, 520 U.S. 899, 908-09 (1997) (citing *Harris v. Nelson*, 394 U.S. 286, 299 (1969)); *Quesinberry v. Taylor*, 162 F.3d 273, 279 (4th Cir. 1998) ("Good cause is shown if the petitioner makes a specific allegation that shows reason to believe that the petitioner may be able to demonstrate that he is entitled to relief."). When a petitioner establishes good cause, the Court must permit discovery. *McDaniel v. United States Dist. Ct.*, 127 F.3d 886, 888 (9th Cir. 1997) (where the petitioner has "presented specific allegations . . . [he] is entitled to discovery"). That is the purpose of Rule 6:

> [H]istory makes clear that [Rule 6's] purpose is to ensure that the facts underlying a habeas corpus claim are adequately developed, and that it is a court's obligation to allow discovery in cases in which a petitioner has provided a sufficient basis for believing that discovery may be necessary to adequately explore a petitioner's claim for relief. . . . a court may not deny a habeas corpus petitioner's motion for leave to conduct discovery if there is a sound basis for concluding that the

27

requested discovery might allow him to demonstrate that he has been confined illegally.

*Johnston v. Love*, 165 F.R.D. 444, 445 (E.D. Pa. 1996)*; see also Gaitan-Campanioni v. Thornburgh*, 777 F. Supp. 1355, 1356 (E.D. Tex. 1991) ("Although discovery is permitted only by leave of court, the court should not hesitate to allow discovery, where it will help illuminate the issues underlying the applicant's claim."). Rule 6's command that discovery be granted upon a showing of good cause carries particular force in a capital case, where a court's "duty to search for constitutional error with painstaking care is never more exacting." *Kyles v. Whitley*, 514 U.S. 419, 422 (1995).

**II.    Petitioners Have Established Good Cause for Their Discovery Requests.**

Mr. Lighty and Mr. Flood have established good cause for each of his discovery requests. They have placed before the Court specific allegations that the Government unconstitutionally exercised its peremptory challenges by striking otherwise qualified jurors on account of their gender and race. These allegations, at the very least, make out a *prima facie* case of discrimination. In so doing, they shift the burden to the Government to explain the reasons for its strikes, and provide Petitioners the opportunity to rebut the Government's explanations and adduce any other evidence in support of his claim. Accordingly, by making out a *prima facie* case of discrimination, Petitioners necessarily have established good cause to obtain discovery regarding the reasons for the Government's strikes, any evidence that might rebut those reasons, and any additional evidence that might prove discriminatory purpose. Because that is precisely what Petitioners' discovery requests seek, the Motion should be granted.

A. *The Burden for Establishing a Prima Facie Case of Discrimination in Jury Selection Is Not Onerous.*

Gender- and race-based discrimination in jury selection violates the Equal Protection guarantee of the Fifth and Fourteenth Amendments because it "causes harm to the litigants, the community, and the individual jurors who are wrongfully excluded from participation in the judicial process." *J.E.B. v. Alabama ex rel. T.B.*, 511 U.S. 127, 140 (1994); *Batson v. Kentucky*, 476 U.S. 79, 85-86 (1986). Discrimination in jury selection harms defendants because it "compromises the right of trial by impartial jury." *Miller-El v. Dretke*, 545 U.S. 231, 237 (2005) [*Miller-El II*]. It also harms prospective jurors because it excludes otherwise qualified individuals from participation in our democratic system. *J.E.B.*, 511 U.S. at 145-46 ("Equal opportunity to participate in the fair administration of justice is fundamental to our democratic system."). Moreover, "[w]hen the government's choice of jurors is tainted with racial [or gender-based] bias, that 'overt wrong . . . casts doubt over the obligations of the parties, the jury, and indeed the court to adhere to the law throughout the trial . . . .'" *Miller-El II*, 545 U.S. at 238 (quoting *Powers v. Ohio*, 499 U.S. 400, 412 (1991)). Gender- and race-based discrimination in jury selection jeopardizes "the very integrity of the courts," and "undermines public confidence in adjudication." *Id.*

To protect against these harms, the Supreme Court established a three-step test for ferreting out whether a peremptory challenge was exercised with discriminatory intent. *Batson*, 476 U.S. at 95-98. First, the defendant must make a *prima facie* showing that raises "an inference" that the prosecutor exercised a peremptory challenge on the basis of race and/or gender. Second, if he does so, the burden shifts to the Government to come forward with a race- and/or gender-neutral explanation for its strike. Third, the court must consider all of the

evidence and determine whether the defendant ultimately has carried his burden of proving purposeful discrimination. *J.E.B*, 511 U.S. at 144-46; *Batson*, 476 U.S. at 95-98.

Satisfying the first step of *Batson* – *i.e.,* establishing a *prima facie* case – is not onerous and does not require persuasive proof that discrimination occurred. *Johnson v. California*, 545 U.S. 162, 170 (2005) ("We did not intend the first step to be so onerous that a defendant would have to persuade the judge – on the basis of all the facts, some of which are impossible for the defendant to know with certainty – that the challenge was more likely than not the product of purposeful discrimination."). Rather, a *prima facie* case is established if there is even a "suspicion" of discrimination. *Id*. at 170; *see also Price v. Cain*, 560 F.3d 284, 287 (5th Cir. 2009) ("*Batson* intended for a *prima facie* case to be simple and without frills."); *see also United States v. Joe*, 928 F.2d 99, 102 (4th Cir. 1999) (to establish a *prima facie* case, "[a] defendant may rely upon the fact that the nature of peremptory strikes permits those who are inclined to discriminate to do so").

Because a petitioner establishes a *prima facie* case simply by raising an "inference" or "suspicion" of discrimination, it follows that "a *prima facie* case may be made out based on a single factor." *Brinson v. Vaughn*, 398 F.3d 225, 235 (3d Cir. 2005) (finding that the "stark pattern" here – the government's use of 13 of 14 peremptory challenges to strike African American jurors – was sufficient to establish a prima facie case). Nevertheless, a court should consider all relevant circumstances to decide whether a defendant has made the showing required to establish a *prima facie* case of discrimination. *Batson*, 476 U.S. at 96-97; *Johnson,* 545 U.S. at 169 (a defendant may offer "a wide variety of evidence, so long as the sum of the proffered facts gives 'rise to an inference of discriminatory purpose'") (quoting *Batson*, 476 U.S. at 94) (internal citation omitted); *J.E.B.*, 511 U.S. at 144-45.

"[A] defendant can make a *prima facie* showing based on statistical disparity alone." *Williams v. Runnels*, 432 F.3d 1102, 1107 (9th Cir. 2006) (concluding that the prosecutor's use of three of his first four peremptory strikes to remove African Americans from the jury, where only four of the first forty-nine jurors were African American, "present[s] a statistical disparity"); *see also Price*, 560 F.3d at 287 (holding that the state's use of six of twelve peremptory challenges to strike African Americans from the venire, resulting in an all-white jury, was sufficient to draw an inference of discrimination); *Paulino v. Castro*, 371 F.3d 1083, 1090-91 (9th Cir. 2004) (finding that petitioner raised an inference of discrimination by alleging that the prosecutor excluded over 83% of potential African American jurors and used 83% of his strikes against potential African-American jurors); *United States v. Allen*, 666 F. Supp. 847, 853 (E.D. Va. 1987) (finding a *prima facie* case where the defendant showed that the prosecutor exercised five of six peremptory challenges against black veniremen); *cf. Higgs v. United States*, 711 F. Supp. 2d 479, 504 (D. Md. 2010) ("The Court is not prepared to say that statistics alone can never suffice to establish a *prima facie Batson* violation.").

Consistent with *Batson,* which found that a pattern of exclusion of members of a protected class may support an inference of discrimination, *Batson*, 476 U.S. at 96-97, courts have identified several different kinds of statistical disparities that furnish evidence of discrimination. *See, e.g., Aspen v. Bissonnette*, 480 F.3d 571, 577 (1st Cir. 2007) (identifying three kinds of "[r]elevant numeric evidence"). One is where the Government's strikes produce a jury in which the percentage of members of a protected class within the pool of qualified jurors is disproportionately greater than the percentage of members of the protected class seated on the jury. *Id.* at 577 ("Relevant numeric evidence includes . . . a comparison of the percentage of a group's representation in the venire to its representation on the jury."); *Price*, 560 F.3d at 287;

*United States v. Sangineto-Miranda*, 859 F.2d at 1521-22 (6th Cir. 1988) ("If, after the jury selection process has ended, the final jury sworn has a percentage of minority members that is significantly less than the percentage in the group originally drawn for the jury (or in the whole jury pool or in the district), then that would be a factor pointing toward an inference of discrimination."); *compare Allen v. Lee*, 366 F.3d 319, 330 (4th Cir. 2004) (*en banc*) (percentage of African-Americans seated on the jury, 58%, exceeded the percentage of African-Americans on the venire, 37%, and in the population, 48%)**.**

The Government's use of a disproportionate share of its strikes against the members of a protected class, particularly as compared to the percentage of the jury pool that consists of members of that class, is a second kind of relevant statistical disparity. *See, e.g., Jones v. West*, 555 F.3d 90, 98 (2d Cir. 2009) ("Discriminatory purpose may be inferred when a party exercises a disproportionate share of its total peremptory strikes against members of a cognizable racial group compared to the percentage of that racial group in the venire."); *Aspen*, 480 F.3d at 577 ("Relevant numeric evidence includes the percentage of strikes directed against members of a particular group . . . ."); *Holloway v. Horn*, 355 F.3d 707, 721-23 (3d Cir. 2004) (finding that "[t]he most striking factor in this case is the prosecutor's pattern of strikes," where the prosecutor used eleven of twelve strikes to remove African Americans); *Williams*, 432 F.3d at 1107; *Paulino*, 371 F.3d at 1090-91 (finding that the prosecutor used five out of six, or over 83% of his peremptory challenges, to strike African American jurors, which supports an inference of bias); *Fernandez v. Roe*, 286 F.3d 1073, 1078 (9th Cir. 2002) (finding that "while Hispanics constituted only about 12% of the venire, 21% (four out of nineteen) of the prospective juror challenges were made against Hispanics"); *Stanley v. Maryland*, 542 A.2d 1267, 1278 (Md. 1988) (finding enough evidence to establish a prima facie case where the state used 80 percent of

its peremptory strikes to exclude African-American jurors, who constituted only 25% of the venire).

A third kind of relevant statistical disparity is where the Government uses its strikes to exclude a substantial percentage of the members of a protected class from the jury pool. *See, e.g., Johnson*, 545 U.S. at 164 (excluding all of the African-American jurors in the pool established a *prima facie* case); *Miller-El II*, 545 U.S. at 240-41 (striking 10 of 11 African-American jurors in the qualified pool raised inference of discrimination); *United States v. McAllister*, 693 F.3d 572, 578-79 (6th Cir. 2012) (*prima facie* case established because the prosecutor struck "both prospective African-American jurors[in the pool, which] raised the inference of racial discrimination"); *Aspen*, 480 F.3d at 577 ("Relevant numeric evidence includes . . . the percentage of a particular group removed from the venire by the challenged strikes . . . ."); *Jones*, 555 F.3d at 98 (contrasting "challenge rate" to "exclusion rate" and finding a "significant pattern of strikes" where the prosecutor excluded four out of five African-American venire members on the first panel); *Fernandez*, 286 F.3d at 1078 (striking "four out of seven (57%) Hispanics" supports an inference of discrimination).

Other facts also may help to establish a *prima facie* case of unlawful discrimination. These include, *inter alia*:

(i)     The order of the prosecution's strikes, *see, e.g., United States v. Lane*, 866 F.2d 103, 107 (4th Cir. 1989) ("[A] pattern of discrimination may be established by a prosecutor's successive use of peremptory challenges to strike black veniremen."); *Sangineto-Miranda*, 859 F.2d at 1520 (stating that "the order of strikes" is relevant to a determination of purposeful discrimination); *Miller-El II,* 545 U.S. at 249-50;

(ii) Side-by-side comparisons of the struck jurors and the jurors permitted to serve,[9] *Miller-El II*, 545 U.S. at 241; and

(iii) The Government's jury selection practices in other cases. *Id.* at 239-40, 263-64, 266; *Madison v. Comm'r, Ala. Dep't of Corr.*, 677 F.3d 1333, 1339 (11th Cir. 2012) (district attorney's prior discrimination in other cases relevant to *prima facie* showing); *Williams v. Woodford*, 396 F.3d 1059, 1062-65 (9th Cir. 2005) (same prosecutor's pattern and practice of exercising peremptory strikes in a discriminatory manner relevant *prima facie* showing); *California v. Howard*, 824 P.2d 1315, 1326 n.4 (Cal. 1992) (prosecutor's record of past peremptory challenges may be relevant to raise an inference of discrimination).

B. *Petitioners Have Made a Prima Facie Showing that the Government Exercised Its Peremptory Challenges on the Basis of Gender.*

A number of different facts establish that Mr. Lighty and Mr. Flood have made out a *prima facie* case of discrimination against prospective female jurors generally and prospective African-American female jurors in particular. Taken together, these facts provide compelling *prima facie* evidence that the Government relied on impermissible gender and gender/race stereotypes in exercising its peremptory strikes.

First, as set forth in greater detail above, the Government used a disproportionate number of the strikes it exercised against women: 82% with a pool of 64 that was 47% women, and 79%

---

[9] While juror comparisons are typically used at Step 3, rather than Step 1, of the *Batson* inquiry, *see Miller-El II*, 545 U.S. at 241, particularly because the burden of making a *prima facie* showing is not an onerous one, such comparisons are plainly among "the wide variety of evidence" and "the totality of the relevant facts" that may give rise to an inference of discriminatory purpose, *Johnson,* 545 U.S. at 169; *Batson*, 476 U.S. at 94, and they have been used in post-conviction proceedings to determine whether a habeas petitioner has made a *prima facie* showing of discrimination. *See, e.g., Crittenden v. Ayers,* 624 F.3d 943, 956 (9thCir. 2010).

with the pool of 52 needed to seat a jury of 12, which was 44% women.  The chances that the Government would exercise its strikes in this manner with the pool of 64 without regard to gender are 5 times in 1,000, which is highly statistically significant, and the Government was 5.1 times more likely to use its exercised strikes against a woman as compared to a man.  This evidence is, by itself, sufficient to establish a *prima facie* case of discrimination.  *See Williams*, 432 F.3d at 1107; *Paulino*, 371 F.3d at 1090-91; *Holloway*, 355 F.3d at 721-23; *Brinson*, 398 F.3d at 235; *Allen*, 666 F. Supp. at 853; *Fernandez*, 286 F.3d at 1078; *Stanley*, 542 A.2d at 1278.

Second, the Government excluded a disproportionate number of the women it was able to exclude.  With its 23 available strikes, it removed 78% of the women it was able to exclude from the pool of 64 (compared with its removal of only 17% of the men it could have removed); and with its available 20 strikes for the pool of 52 needed to seat a jury of 12, it removed 75% of the women it was able to exclude (compared with its removal of 20% of the men it could have removed).  The chances of the Government excluding, without regard to gender, 78% of the women it was able to exclude from a pool of 64 that was 47% women are 9 times in 1,000, which is highly statistically significant, and the Government was 4.1 times more likely to use its available strikes against a woman as compared to a man.  This evidence also helps to establish a *prima facie* case of discrimination.  *Johnson*, 545 U.S. at 164; *Jones*, 555 F.3d at 99; *McAllister*, 693 F.3d 572, 578-79; *Fernandez*, 286 F.3d at 1978.

Third, the Government struck the first 8 female jurors on the list, substantially diminishing the chances that women would be seated on the panel of 12.  The likelihood of the Government removing the first eight female jurors is four in 1,000, which is highly statistically significant, and bolsters the *prima facie* case of gender discrimination.  *See, e.g., Lane*, 866 F.2d at 107; *Sangineto-Miranda*, 859 F.2d at 1520; *see also Miller-El II*, 545 U.S. at 249-50 (finding

35

that the State's "late-stage decision to accept a black panel member ... does not ... neutralize the early-stage decision to challenge a comparable venireman," because by the time the State accepted a black panel member, it had struck the first seven it encountered, had exhausted 11 of its 15 strikes, and knew that at least three of the remaining panel members were "highly undesirable to the State").

Fourth, the Government used a vastly disproportionate number of the strikes it could have exercised against African-American women to remove African-American women from the jury. It excluded 82% (9 of 11) from the pool of 64, and 89% (8 of 9) from the pool of 52 needed to seat a jury of 12. The probability that the Government removed, without regard to gender and race, 9 of 11 African-American female jurors from a pool that was 17% African-American women is 5 times in 100,000, which is very highly statistically significant, and the Government was 21.6 times more likely to remove an African-American woman than a juror who was not black and female. Additionally, the Government struck the first four black women on the list of qualified jurors, did not accept a black woman until the 26th juror on the list (and she was plainly pro-law enforcement and pro-death penalty), and did not accept the only other black woman it accepted until the tail end of the pool of alternates. These facts establish a *prima facie* case of discrimination against African-American women. *Johnson*, 545 U.S. at 164; *Jones*, 555 F.3d at 99; *Fernandez*, 286 F.3d at 1978.

Fifth, because of the Government's strikes, the seated jury of 12 was 8% women, even though the pool of 52 needed to obtain the seated jury was 44% women, and a combination of the seated and alternate jurors was 5% women, even though the qualified pool of 64 was 47% women. Additionally, neither the seated jury of 12 nor a combination of the seated and alternate jurors included any African-American women at all, even though both the pool of 52 needed to

36

obtain the seated jury and the full qualified pool of 64 were 17% African-American women. These disparities give rise to a strong inference of discrimination against both women and African-American women. *See, e.g.*, *Price*, 560 F.3d at 287; *compare Allen*, 366 F.3d at 330.

Sixth, as set forth in detail above, the Government excluded a number of prospective female jurors who expressed views either equally or less pre-disposed toward law enforcement and the Government's goal of obtaining a death sentence than the male jurors whom the Government agreed to seat. Such disparate treatment is highly probative of discriminatory intent. *See, e.g., Miller-El II*, 545 U.S. at 241-49; *Crittenden*, 624 F.3d at 956-57 (comparative juror analysis provided evidence from which court could draw an inference of discrimination).

Finally, in the capital case they tried before this one, *United States v. Higgs,* the prosecutors in this case engaged in a pattern of striking women, including African-American women, similar to the pattern in this case, obtaining a seated jury of 12 that was all-male and a combined panel of seated and alternate jurors with 16 men, 2 women and no African-American women. They obtained this jury, which returned a death sentence, just several months after separately trying Higgs' co-defendant, who was given a life sentence by a jury that included both women and African-American women. Such historical evidence is also relevant to the *prima facie* case determination. *See, e.g.*, *Madison*, 677 F.3d at 1337-1339; *Williams*, 396 F.3d at 1062-65.

The fact that the Government did not strike all of the women from the pool of 64, and removed 4 men from the pool of 64, does not undermine this voluminous *prima facie* evidence of impermissible discrimination. To the contrary, it bolsters such evidence, showing that the Government consistently relied on gender and gender/race stereotypes in exercising its strikes, unless confronted with a prospective juror who very clearly defied them.

The fact that the Government did not strike certain women, including 2 African-American women, within the pool of 64 does not come close to precluding Petitioners from raising the "inference" of discrimination needed to establish a *prima facie* case. First, because the pool of 64 contained 30 women and the Government had only 23 strikes, the Government could not strike, and had to accept, seven of the women in the pool. Second, as explained above, the Government did not accept a female juror until the 23rd juror on the list, and did not accept an African-American female juror until the 26th juror on the list, substantially diminishing the chances that there would be either women or African-American women on the seated jury of 12. Finally, the women whom the Government declined to strike expressed manifestly pro-law enforcement and pro-death penalty views, especially as compared to the four men whom the Government struck. Accordingly, as to these female jurors, the Government did not resort to default gender or gender/race stereotypes, as it did with the women it removed, to make its striking decisions. This is particularly true with respect to the first several female jurors, including an African-American female juror, whom the Government accepted, *i.e.,* those the Government knew would have been most likely to populate the seated panel of 12. *See, e.g., Miller-El II,* 545 U.S. at 249-50.

The four male jurors whom the Government struck expressed significant reservations about law enforcement and the death penalty. As a result, the Government could not rely on their default stereotypes when determining whether to accept them over prospective female jurors, particularly prospective female jurors who indicated a demonstrable bias in favor of law enforcement and the death penalty. **Juror No. 67**, an African-American male, worked for a criminal defense attorney in law school, served as a criminal a defense attorney in the JAG Corps, was once categorically opposed to the death penalty, continued to have serious

reservations about the death penalty because he believed it was used disproportionately against African-Americans in the South, and caused the Government openly to express "concern … about his opinion on the death penalty." **Juror No. 97** gave testimony suggesting that he would adhere to a higher burden of proof for a death sentence – "absolute certainty" – than the law imposes and twice gave answers to follow-up questioning on the subject that prompted the Government to ask for yet additional voir dire. **Juror No. 137** was critical of how the police handled the kidnapping and mutilation of his good friend, had friends and family who had expressed antipathy toward each one of the law enforcement agencies involved in this case, stated in his questionnaire and again on voir dire that "race has played a role in the over-prescription of the death penalty," divulged his hope that the death penalty was "rarely required or warranted," asserted that the death penalty had no deterrent effect and had been "wrongly imposed in the past," belonged to a religious congregation that opposed the death penalty, and furnished answers on the death penalty that twice prompted the Government to request follow-up questioning. **Juror No. 201** was, similar to Mr. Lighty, a 20 year old, African-American male who formerly lived in Temple Hills, where part of the charged crime occurred, and answered "not exactly" when the Court asked whether he would be prepared to vote for the death penalty, causing the Government to question openly whether he could do so.

C. *By Establishing a Prima Facie Case of Discrimination, Petitioners Necessarily Have Established Good Cause for the Requested Discovery.*

Because Mr. Lighty and Mr. Flood have made a *prima facie* showing that the Government exercised its peremptory challenges on the basis of gender and gender/race, the burden shifts to the Government to offer gender- and gender/race-neutral explanations for its strikes, and the Court must then determine whether Petitioners have carried their burden of proving purposeful discrimination. *J.E.B*, 511 U.S. at 144-46; *Batson*, 476 U.S. at 95-98. By

shifting the burden of production to the Government, Petitioners necessarily have established good cause to discover the reasons for the Government's strikes, as well as any other evidence bearing on the Court's determination. That is precisely the information Petitioners seek with their discovery requests.

- Request No. 6a seeks the opportunity to have the Government explain its strikes, which the Government must now do since Petitioners have made their *prima facie* showing.

- Request Nos. 2 and 3 seek documents that reflect the Government's contemporaneous thoughts about the jurors in the venire – *i.e.,* notes and materials it obtained independently. This information will bear on the veracity of the Government's explanations, which the Court must consider in making its final determination about whether Petitioners have proven intentional discrimination. *See, e.g., Miller-El II*, 545 U.S. at 246 ("It would be difficult to credit the State's new explanation, which reeks of afterthought.").

- Request Nos. 4, 5 and 6b seek information regarding jury selection in other federal capital cases tried by the prosecutors in this case. This information is also relevant to the Court's final determination. *Madison*, 677 F.3d at 1339; *Williams*, 396 F.3d at 1062-65; *Howard*, 824 P.2d at 1326 n.4.

- Request No. 7 seeks information about jury selection in other capital cases recently tried by the U.S. Attorney's Office in Maryland. This information, too, is relevant to the Court's final determination about whether the Government engaged in impermissible discrimination here. *Miller-El II*, 545 U.S. at 239-41.

Because each of Petitioners' discovery requests seeks information that is relevant to the analysis in which the Court must now engage, Petitioners have established good cause to proceed with discovery.

## CONCLUSION

Mr. Lighty and Mr. Flood have established good cause for each of their discovery requests because they have made a *prima facie* showing that the Government deliberately excluded women generally and African-American women in particular from the jury in this case. Indeed, having established a *prima facie* case, Petitioners "may, if the facts are fully developed, be able to demonstrate that [they are] . . . entitled to relief." *Bracy*, 520 U.S. at 908-09 (quoting *Harris*, 394 U.S. at 299). Accordingly, under Rule 6, Petitioners are entitled to discovery to prove their claim.

Dated: December 20, 2012     Respectfully submitted,

          /s/ Julie Brain
          Julie Brain
          JulieBrain1@yahoo.com
          Attorney at Law
          127 Church Street
          2nd Floor
          Philadelphia, PA 19106
          (267) 639 0417

          /s/ Karl Schwartz
          Karl Schwartz
          Karl_schwartz@fd.org
          Chief, Capital Habeas Unit
          Delaware Federal Defender Office
          800 King Street
          Suite 200
          Wilmington, DE 19801
          302-573-6010

/s/ Seth Rosenthal
Seth A. Rosenthal (D. Md. Bar No. 10780)
sarosenthal@venable.com
Molly T. Cusson (D. Md. Bar No. 18390)
mtcusson@venable.com
VENABLE LLP
575 7th Street, NW
Washington, DC  20004-1601
202-344-4000

*Counsel for Kenneth Jamal Lighty*


/s/ Marta K. Kahn
Marta K. Kahn
The Law Office of Marta K. Kahn, LLC
8 E. Mulberry St.
Baltimore, MD 21202
(410) 299-6966

*Counsel for James Flood*

**CERTIFICATE OF SERVICE**

I hereby certify that on the 20th day of December, 2012, I caused the foregoing

*Memorandum of Law in Support of Petitioners' Joint Motion for Discovery Regarding the*

*Allegations of Impermissible Discrimination in Jury Selection Made in Their Motions for Relief*

*Under 28 U.S.C. § 2255* to be filed via the Court's ECF system, a copy of which was mailed by

U.S. mail, first class, postage pre-paid, to the following:

Deborah A. Johnston, Esq.
Sandra Wilkinson, Esq.
Assistant United States Attorney
Office of the United States Attorney
400 United States Courthouse
6500 Cherrywood Lane
Greenbelt, MD 20770-1249


_____/s/_____
Seth A. Rosenthal, Esq.
