# EXHIBIT 3

KL108439

1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MARYLAND

IN RE:                          *      UNITED STATES

                                *      SPECIAL GRAND JURY

KENNETH LIGHTY                  *      PROCEEDINGS

                  *      *      *      *      *

JULY 2003 TERM

OCTOBER 1, 2003

Room 280-B
United States Federal Courthouse
6500 Cherrywood Lane
Greenbelt, Maryland   20770

WITNESS:          **JOYCE TANISHA FLOOD**

APPEARANCE:       DEBORAH JOHNSTON, ESQUIRE
                  Assistant United States Attorney

Reported by:

Susanne Bergling, RMR

For The Record, Inc.
Waldorf, Maryland
(301) 870-8025

KL108440

2

PROCEEDINGS

(10:40 a.m.)

Whereupon,

JOYCE TANISHA FLOOD

was called as a witness, and having been first duly sworn by the Foreperson of the Grand Jury, was examined and testified as follows:

EXAMINATION

BY MS. JOHNSTON:

Q.   Ma'am, please state in a loud, clear voice your full name.

A.   Joyce Tanisha Flood.

Q.   And your current address?

A.

                          J.

Q.   What's your telephone number at home?

A.

Q.   And how long have you lived at that address?

A.   About two years now.

Q.   Before I ask you any further questions, do you understand this Grand Jury is investigating a kidnapping that resulted in death that occurred in 2002, January -- on or about January 3rd, 2002, and you've been subpoenaed to testify as a witness before

KL108441

3

the Grand Jury?

Have you appeared before the Grand Jury on a prior occasion?

A.   Yes.

Q.   Okay.  And that would have been in this very room.  Is that correct?

A.   Yes.

Q.   And that would have been on or about January 22nd, 2003?

A.   Yes.

Q.   All right.  Well, let me again -- at that time I went over with you the nature of the Grand Jury proceeding and your rights, but let me go over them again since it has been many months since you were last here.

You have been placed under oath.  That means you must answer all questions posed to you truthfully and completely.  If you were to intentionally lie, leave out information or mislead the Grand Jury, you could be charged with a crime such as perjury, making a false statement or obstruction of justice, and if convicted of such a crime, you could be sentenced to a term of imprisonment and/or fined.

Do you understand that?

KL108442

4

A.    Yes.

Q.    Also understand that you don't have the right to refuse to appear before the Grand Jury when you have been properly served with a subpoena; however, you always maintain your right to refuse to answer a question if your response to that question would tend to prove that you yourself committed a crime.

Do you understand that right?

A.    Yes.

Q.    If you decide that one of the answers might tend to prove that you committed a crime, you can invoke your right against self-incrimination. What that means is you can refuse to answer the question and say I want to refuse to answer the question, okay?

If you did that, then we would go see a judge, and the judge would decide whether or not you, in fact, had a right against self-incrimination in regards to whatever question it was you refused to answer, and the judge would decide whether or not you should be compelled to answer the question.

Do you understand those rights?

A.    Yes.

Q.    Also, you don't have a right to have a

5

lawyer present inside the Grand Jury.  As with any legal matter, you always have the right to consult with a lawyer, either before, during or even after your Grand Jury testimony.

Do you have a lawyer at this time?

A.  No.

Q.  Are you willing to proceed with your testimony now without an attorney?

A.  Yes.

Q.  Okay.  If at any point during your testimony you change your mind and decide that you would like to have an attorney or you would like to speak with an attorney, we will stop your testimony, reschedule your testimony and allow you either to hire your own attorney, if you can afford one, or we would have the Court appoint qualified counsel to represent you.

Do you understand that?

A.  Yes.

Q.  Any questions about any of those rights?

A.  No.

Q.  Who lives with you at your current address?

A.  Lamont Burke.

Q.  Is Lamont Burke related to you?

A.  My cousin.

6

Q. Who are his parents?

A. Gloria Jean Burke and William R. Burke.

Q. Is that B U R K E, Burke?

A. Yeah.

Q. And where do Lamont's parents live?

A. His father live in              .  I don't know where his mother live at.

Q. Do you know his father's telephone number in

A. Un-huh.

Q. You have to say yes or no, please.

A. No, no.

Q. Do you have it written down someplace at home?

A. No.

Q. How long has Lamont Burke lived with you?

A. The whole time I been there, two years.

Q. Does Lamont work?

A. Yeah.

Q. Where does he work?

A.

Q. And do you know what particular department at the              :?

A. Whoever -- whatever department put the TVs up.

Q. Okay. So, he installs televisions?

A. He connects the TV I guess when the patient comes in.

Q. And how long has he worked there?

A. Maybe five or more years.

Q. Excuse me, I didn't hear you.

A. Five or more years.

Q. Always doing the same thing?

A. Yeah.

Q. Do you know where his father lives in North Carolina?

A. No.

Q. You are currently employed. Is that correct?

A. Yeah.

Q. Where do you work?

A.

Q. How long have you worked there?

A. Eleven years.

Q. What's your telephone number at work?

A. 20

Q. Do you have a cell phone?

A. No.

Q. Have you ever had a cell phone?

A. Yeah.

8

Q.    When was the last time you had a cell phone?

A.    Last year.

Q.    That would be in 2002?

A.    Yeah.

Q.    What was that cell phone number?

A.    I don't know.

Q.    That's okay.

A.    To be honest with you, I don't know.

Q.    Okay.  Do you have any bills left at home from that cell phone?

A.    I probably do.  Yeah, I probably do.

Q.    Okay.  Would you be willing to provide them to Detective Chaney or Special Agent Bradley rather than return to the Grand Jury next week with copies of those bills?

A.    Sure.  Do they have to be a specific date or time period for the bill?

Q.    We would like whatever bills you have.

A.    All of them?

Q.    Okay, whatever you have for your cell phone.

A.    Okay, okay.

Q.    Did you have a cell phone during the Christmas holidays, not this past Christmas, but the

9

Christmas before, December of 2001 into January of 2002?

A.    Yeah, I think so, yeah.

Q.    And do you remember what number that one was?

A.    It was two different cell phones, so...

Q.    Okay.  So, you had two different cell phones?

A.    Um-hum.

Q.    What company were they with?

A.    AT&T and VoiceStream.

Q.    AT&T and VoiceStream?

A.    Yes.

Q.    Which one did you have first?

A.    AT&T.

Q.    Did you have that phone in your name?

A.    Um-hum.

Q.    You have to, again, say yes or no.

A.    Yeah.

Q.    Thank you.

In January 2002, were you living on at time?

A.    Yes.

Q.    Who were you living with at the ?

For The Record, Inc.
Waldorf, Maryland
(301) 870-8025

KL108448

10

A.   Nikita Carter, Kia Salom, Little James and Kenisha Brown, which is my daughter.

Q.   Kenisha Brown is your daughter?

A.   Um-hum.

Q.   Let's back up for a minute.  Your mother's name is what?

A.   Joyce Flood.

Q.   Do you in terms of family and friends go by your first name, Joyce?

A.   No.

Q.   What name do people use when they talk to you?

A.   Tanisha.

Q.   Is that your middle name?

A.   Yes.

Q.   So, your family members and friends call you Tanisha and not Joyce?

A.   Right.

Q.   But the cell phone, the AT&T cell phone, would have been in your name?

A.   Yeah.  Both of them.

Q.   Both of them were in your name?

A.   Um-hum.

Q.   Now, if you were living there in January 2002 at the Pennsylvania Avenue address, do you know

about when you moved to your current address?

A. June.

Q. Of 2002?

A. Um-hum.

Q. Again, you have to say yes or no.

A. Yes.

Q. And in between January of 2002 and June of 2002, did you live anyplace other than the Pennsylvania Avenue address?

A. No.

Q. So, you moved directly from the Pennsylvania Avenue address to your current residence?

A. Uh-huh, yes.

Q. What about Nikita Carter, did she continue to live with you?

A. No, as of February of 2002, I put her out.

Q. Okay. So, who was living with you as of February 2002?

A. Just me and my daughter.

Q. So, you put out Nikita and someone else you said?

A. Kia, Kia Salom, and my little nephew.

Q. Who?

A. My nephew.

For The Record, Inc.
Waldorf, Maryland
(301)870-8025

Q. Okay. Nikita Carter?

A. And Kia Salom.

Q. Kia Salom?

A. Um-hum.

Q. Who was she?

A. Her girlfriend.

Q. And do you know where they moved to when you put them out?

A. No.

Q. Okay. Why did you put them out?

A. Because they stole my money.

Q. Did you report that to the police?

A. No.

Q. How much money was it?

A. A hundred dollars.

Q. Did you ever get it back?

A. No.

Q. Now, when you lived at the Pennsylvania Avenue apartment with Ms. Carter, whose name was the phone in for the house?

A. Hers.

MS. JOHNSTON: May I have this marked as Grand Jury Exhibit 1 for this witness, please.

(Grand Jury Exhibit No. 1

was marked for identification.)

For The Record, Inc.
Waldorf, Maryland
(301)870-8025

KL108451

13

BY MS. JOHNSTON:

Q. I want to show you what's been marked as Grand Jury Exhibit Number 1. Do you recognize that? Have you seen bills like that before?

A. Yeah.

Q. Okay. And are you familiar with the address that's listed there?

A. Yes.

Q. And whose address is that?

A. That was mine.

Q. Okay. And is that the address where you lived with Ms. Carter --

A. Yes.

Q. -- where you would have been living around January of 2002?

A. Yes.

Q. Okay. There's a telephone listed at the top, Do you recognize that number?

A. I mean, I don't recognize it, but I'm sure that's probably the -- the number.

Q. Okay, but you don't have any recollection of what your telephone number was there?

A. No.

Q. Other -- how many phones did you have coming into that apartment --

For The Record, Inc.
Waldorf, Maryland
(301)870-8025

KL108452

14

A. One.

Q. -- in January of 2002?

A. One.

Q. Okay. And was that bill in Ms. Carter's name?

A. Yes.

Q. And why was it in Ms. Carter's name?

A. Because I couldn't get a phone.

Q. But you had a cell phone at the time?

A. Yeah, but I couldn't get a Verizon phone because I owed Verizon money.

Q. And that was the only Verizon phone number in -- the only phone -- strike that.

This bill was for the only Verizon line that you had coming into the house?

A. Yeah.

Q. Now, do you know whether or not you spent the holidays, Christmas 2001, New Year's going into January 1 of 2002, so that would not be this past holiday season, but the one before that, were you at home then?

A. I don't know, because most of the Christmases since my parents moved to North Carolina, I been going down there.

Q. Well, if you could just give it some

15

thought. Did you ever spend New Year's in the apartment with Ms. Carter and her friend and the children?

A. Um-hum, yes.

Q. Okay. And how many New Year's did you live together?

A. Just one.

Q. So, you would have spent that New Year's at the apartment with her?

A. Yeah, I would have been home, um-hum.

Q. Now -- and that's the apartment on Pennsylvania Avenue?

A. Yeah.

Q. Is that the only apartment you ever shared with Ms. Carter?

A. Yeah.

Q. Now, do you recall whether or not you saw your brother, James, during that time period?

A. I could have.

Q. Excuse me?

A. Yes, I could have.

Q. Well, do you recall receiving any telephone calls from him late at night a couple of days after New Year's?

A. I don't remember.

16

Q. Do you recall whether or not your brother ever called you late at night and asked you to come pick him up?

A. Yeah, but I don't know -- I don't know if that was in January when he got robbed -- what I told you last time, he got carjacked on St. Barnabas Road.

Q. So, there was a carjacking incident with your brother?

A. Um-hum.

Q. You have to say yes or no.

A. Yes, yes.

Q. And do you recall what time of year that happened?

A. It was cold.

Q. It was cold?

A. Um-hum.

Q. So, if you told us last time in the Grand Jury that it was closer to the summertime, then you were mistaken then and it was cold?

A. I -- I guess.

Q. Okay. Well, here -- what are you recalling now? When did the car --

A. I just know he got car -- he called me, said he got carjacked, called me from a pay phone. Me and Kita went to go to the pay phone where he say

he was at at the gas station on St. Barnabas Road. He wasn't there. Then we went to his house, and he was walking, walking up to his steps with no shoes on, and I'm asking him where his shoes at, and he said they took his shoes and his car.

Q. Okay. Now, you said you got a call, and you and Kita went to pick him up.

A. Yes.

Q. Kita is Nikita Carter?

A. Yes.

Q. And was this during the time that she was living with you -- sharing the apartment with you?

A. Yes.

Q. And do you know how long or over what time period she shared the apartment?

A. From October to February.

Q. So, it had --

A. October 2001 to February 2002.

Q. So, it had to have been during that time period that the carjacking happened?

A. Yep -- yes.

Q. Did your brother report the carjacking to the police?

A. I don't know. The police was out there. They was talking to him.

For The Record, Inc.
Waldorf, Maryland
(301)870-8025

KL108456

18

Q.   Out where?

A.   Out in front of his building.

Q.   Which is -- where was his building then?

A.   Off of Southern Avenue.

Q.   And what was the address?

A.   I don't know.  I don't know the building number.  I just know how to get there and go to the door.

Q.   Was it in Maryland or in Washington, D.C., his apartment at that time?

A.   I think that's the Maryland side.

Q.   And do you know the name of the development?

A.   Shipley Terrace, something like that.  I think it's Shipley Terrace or something like that.

Q.   And how long did your brother live there?

A.   I don't know.  He was living with somebody.

Q.   Who was he living with?  Who was he --

A.   It wasn't his apartment.

Q.   Who was he staying with there?

A.   A guy, a friend of his that he knew.

Q.   What was his name?

A.   Ah, I want to say Mike.  That's what I want to say.  That's what I want to say.

Q.   Who was Mike?

KL108457

19

A.   One of his friends.

Q.   And had you known Mike for a number of years?

A.   No.

Q.   Do you know how your brother met Mike?

A.   Nope.

Q.   Do you know Mike's last name?

A.   Nope.

Q.   How long did your brother live there with this guy Mike?

A.   I'm not sure.

Q.   Now, in your family it's just you and your brother in terms of siblings?

A.   Yes.

Q.   Did your brother ever discuss with you what happened in the carjacking?

A.   Nope, he just said that they came up and asked him for his -- for his car and his shoes.

Q.   Did he tell you where that happened?

A.   At a gas station on St. Barnabas Road.

Q.   Whereabouts on St. Barnabas Road?

A.   Ah, it's -- it's like going to Rivertown, but it's just on St. Barnabas Road.  I don't know the street that crosses St. Barnabas Road.  It's -- where the gas station is, it's an intersection, and then

KL108458

20

you can go through the intersection or across the intersection.  I don't know the crossing street. It's on St. Barnabas Road.  It's on the corner of St. Barnabas Road.

Q.  What kind of gas station was it?

A.  I think it's a Shell.

Q.  And was there any other businesses close by?

A.  Jerry's Pizza over there, Pohanka is over there.

Q.  At the same intersection?

A.  Yeah, on the same side.

Q.  What kind of car did he have at that time?

A.  I think it was a Caprice, a white one, like a police car where the light sit out.

Q.  And did he report it stolen?

A.  I don't know.  Like I said, he talked -- he was talking to the police while we was out there, but I don't know.

Q.  Did he have a title for the car, do you know?

A.  I don't know.

Q.  All right.  Now -- he didn't discuss it with you any further?

A.  Nope.

KL108459

21

Q. Did he say whether the car was taken at gun point?

A. Yeah, he said they had a gun.

Q. Did he say how many people it was that took it?

A. There was two.

Q. Did he describe them?

A. No, he didn't.

Q. Did he say whether they were men or women?

A. They be guys.

Q. So, he said they were guys?

A. Yeah.

Q. Did he tell you what race they were?

A. No, he just said two guys, so I figured they was black.

Q. Now, on the -- let's go back now to January 3rd or a few days after New Year's Eve. Do you recall receiving telephone calls from your brother's cell phone that night?

A. He could have called. He could have called, but -- I don't know if he talked to me, but he could have called around that time that you asked me, but I don't know -- like I said, I don't know if he talked to me. I can't remember if I'm the one that he talked to or if he talked to whoever answered

22

the phone.

Q. Well, do you recall any other time he called the house and maybe asked you to come pick him up?

A. Un-huh, because my brother always had a car. I'm the one who don't have a car. He the one that always have a car.

Q. But back around that time, do you recall whether or not he ever called you asking you to pick him up?

A. No, that's the only time he asked me to pick him up. Like I said, he always have -- always have a car.

Q. Are you familiar with Eddie Leonard's Carry-out?

A. Where at?

Q. In D.C.

A. On Marlboro Pike?

Q. No, it's in D.C., Washington, D.C. Are you familiar with that location?

A. Where in D.C.?

Q. Well, Washington, D.C., Southeast Washington, D.C., on Alabama Avenue.

A. Yeah, up the street from where he work at?

Q. I don't know where -- where does your

23

brother work?

A. At Douglass Mills Apartments.

Q. Does he work at Douglass Mills Apartments?

A. Yeah.

Q. Is he still working there?

A. Yeah.

Q. Where is he living now?

A. Ah, I don't know, because ever since you all been coming to his job -- I don't know where he live at.

Q. Well, is he still working at Douglass Mills Apartments?

A. Yeah, I do know that.

Q. Where was the last person -- place you knew he was living?

A. Where his baby mother -- with Nikita on -- off of I think it's Mississippi -- I think it's Mississippi Avenue.

Q. When was the last time you talked to your brother?

A. Ah, I talked to him Sunday.

Q. Did you tell him that you had been subpoenaed to the Grand Jury?

A. Yeah.

Q. What was your discussion with your brother

24

about your being subpoenaed to the Grand Jury?

A.    It really wasn't a discussion.  I said, you know, I got subpoenaed.  He was like, for what?  I said, for you.  And he was like, for what?  I said, I don't know.  So, he was like, oh, like that.  And I said, you know, they served me on my job.  And he was like, well, you got to go, because they will serve you a bench warrant.  And I was like, all right, like that, because like I said, it was Sunday -- he was at church on Sunday when I -- when I saw him.

Q.    Where, what church?

A.    It's on Branch Avenue.

Q.    Okay.  Well, where on Branch Avenue?

A.    I don't know the address, so if you give me directions where you want me to take you from to there, tell me that, but --

Q.    What's the name of the church?

A.    Spread the News.

Q.    Okay.  Now, if you were coming off the Beltway at Branch Avenue, how would you get there?

A.    Coming off the Beltway from Branch Avenue, come straight down Branch Avenue --

Q.    Do you go towards D.C. on Branch Avenue or towards Waldorf on Branch Avenue?

A.    No, towards D.C., come down Branch until

25

you get to -- I guess that's -- that's either Iverson or St. Barnabas, because once you come down off the Beltway, you can come from the dealerships on Branch Avenue, keep straight until you get to where the mall is. At that intersection where Iverson Mall is, you make a right, and I don't know, like I said, if that's Silver Hill Road or if it's Iverson Street.

Q. Okay.

A. And then you make a left -- I mean a right onto St. Barnabas, and there the church.

Q. Okay. And who were you there with?

A. I was there by myself, me and my youngest daughter, and he was getting a certificate for completing something at church.

Q. Who was?

A. My brother was getting a certificate that Sunday for completing an eight-week course or something.

Q. What course --

A. So, it was -- you know, I guess the church members that go to that church, me, him, some -- like I said, the people that go to the church.

Q. How many people were there?

A. One, two, three, four, five, six, seven, eight, nine -- about ten.

26

Q.   Okay.  And who were those people?

A.   Now, I don't know them people's name.

Q.   You don't know the people who --

A.   No.

Q.   You don't know any of the ten people at the church?

A.   Oh, my cousin that's the pastor, Duane Jones, and his wife.

Q.   Okay.  Who's the pastor?

A.   Duane Jones.

Q.   Duane Jones?

A.   Um-hum, and his wife, Isoline Jones.

Q.   Isoline?

A.   Isoline.

Q.   Can you spell her first name, please?

A.   I S O L I N E.

Q.   Jones?

A.   Um-hum.

Q.   And they're related to you?

A.   Yeah, Duane is my cousin.

Q.   Did you know any of the other people there?

A.   His daughter, Sharmaine Jones.

Q.   How old is she?

A.   Ten.  And the other members there, I don't know.  There was three other ladies.

KL108465

27

Q. And you didn't know any of them?

A. Un-huh.

Q. None of those were your friends?

A. No.

Q. Did James come by himself?

A. Yeah.

Q. And where do your cousins live?

A. In Clinton.

Q. Do you know their address?

A. No.

Q. How about their telephone number?

A. I don't have it here with me.

Q. Do you have it at home?

A. Yes.

Q. Would you give it -- are you willing to give it to Detective Chaney or Special Agent Bradley rather than come back next week?

A. Sure, sure.

Q. Thank you.

Did James come by himself?

A. Yes.

Q. What kind of car was he driving?

A. A black Nissan.

Q. Is it his car?

A. Yeah, that I know of it is.

KL108466

28

Q.   Does he have a current girlfriend?

A.   Not that I know of, no.  I think he still messing with Nikita.

Q.   Now, have you ever been to the Eddie Leonard Carry-out in D.C. off of Alabama Avenue?

A.   Yeah.

Q.   Do you know anyone who works there?

A.   Un huh.

Q.   You have to say yes or no.

A.   Oh, no, no.

Q.   Have you ever used the phone there?

A.   They don't have no phone.

Q.   Did your brother ever live with you?

A.   In the house where my parents used to live.

Q.   And where was that?

A.            Avenue.

Q.   And how long -- how long did you live there?

A.   Twelve to 15 years.

Q.   Did your brother go to high school?

A.   Um-hum, yes, he graduated.

Q.   And where did he graduate from?

A.   Potomac High School.

Q.   And do you know when that was?

A.   1996.

29

Q.    When you saw your brother Sunday and you told him you had to come to court over him, what did he say?

A.    He was like, for what? And I was like, for you. And he was like, you going? And I was like, I got to go. I got a subpoena. He was like, because if you don't go, they are going to give you a bench warrant, you better go. I was like, all right.

Q.    Did you tell him -- did you have any discussion further than to say it was over him?

A.    No, that's it.

Q.    You didn't ask him why you had to keep going to court?

A.    No.

Q.    Were you angry with him because you had to go to court?

A.    Yeah, yeah, yeah, yeah.

Q.    Okay. When you got angry with him, what did you -- what kinds of things were you saying to him?

A.    I don't know why you got to go, I don't know what's going on.

Q.    That's what he told you?

A.    I was like, all right, whatever, and I went to the church.

KL108468

30

Q. Now, after you were here in the Grand Jury the last time in January --

A. Um-hum, um-hum, yes.

Q. -- you had discussions with your parents about James?

A. Did I have discussions about my --

Q. Yeah.

A. Yeah, I think so, yeah.

Q. Okay. And you had discussions about them having to come up here?

A. Yes.

Q. Well, what were the discussions that you and your family had?

A. Well, me and my parents -- I don't know what he had with my parents, but they just wanted to know what was going on, why did they have to come, and like I -- like I told them, I don't know. I had to go, too. I was the first one that had to come. And I don't know why they have to come.

Q. Okay. Well, after your parents were here, did you talk to James about what happened?

A. After I left here, no, because I was kind of upset once I left here.

Q. Well, after you were here, then later your parents came up from North Carolina. Is that

KL108469

31

correct?

A.   Um-hum, yes, because they had to come here.

Q.   Did you discuss -- and you had discussions with them about them having to come here?

A.   After or before?

Q.   Let's start with before.

A.   Before they came here, they asked me do I know why they have to come.

Q.   And what did you tell them?

A.   And I told them no, I had to go, too.  And she asked me, for what?  I said, I don't know, they kept asking me questions about certain dates and certain calls, I don't know, and I said they asked me for your information and your telephone number, and I said that was it.  So, she was like, I don't know why I'm coming up there.  I have to take off my job to come up there.  And she just kept going on about how she don't get paid, blah-blah-blah and so on.  And I was like, I don't know either.  I had to take off my job, too.

So, once they got here and came in front of the Grand Jury, she was all upset.  My father was kind of upset, but he didn't really say too much.  He was just saying that he had to get home, get to work, and she was just going on and all hysterical and

32

yelling.

Q.   Why was your mother upset?

A.   Because she said you all were trying to make her say something that she don't know nothing about it.

Q.   Did you have a discussion with your mother about the blue Lincoln that James took down to them in North Carolina?

A.   No, she just said she sold the car.

Q.   Did you have a discussion with -- did she tell you that James brought the car to North Carolina?

A.   She said my -- that he brought my father a car and that they had to get work done to it, and she didn't want to keep paying the money to get the work done to it, so she sold the car.

Q.   Okay.  Did she tell you that James brought that car down to North Carolina?

A.   No, she just said that Junior brought a car for your daddy.

Q.   Well, after she was here in the Grand Jury, according to you, you talked to your mother and she was upset.

A.   Okay.

Q.   Is that right?

A.   Yeah.   After she left, she was upset.

Q.   Okay.   Were you present when she talked to your brother?

A.   After the Grand Jury?

Q.   Yes.

A.   Ah, I don't know.   I could have been there when she talked to him, because he worked at Douglass Mills and I lived down the street.   So, she had to wait until he get off work, because he wasn't here the day that they had to come.   I was.   I was here with them.   So, not unless she went to his job after they had came -- after we got home and she left back out to go tell him what happened here or whatever, but other than that, I can't remember if he was --

Q.   Did you hear a conversation between your mother and your brother --

A.   About?

Q.   -- about her having to be here?

A.   If I did, she probably just asked Junior why did she have to come, why did she have to come all the way up here to go in front of a Grand Jury.

Q.   And what did he tell her?

A.   He probably told her the same thing that he tells me, he don't know.   He don't know why.

Q.   Did you talk to your brother after your

parents were up here about why your parents had to be involved in this?

A. After they came, he -- he really -- he really don't communicate like he used to after my parents had to come up here, after my mother got all hyped and everything about being here. So, he really don't -- he really don't say too much anymore.

Q. What do you mean by that, he doesn't communicate like he used to?

A. He just -- stuff that he say, I mean, he -- if he got to tell you something, he will tell you, then that's it. It's not like he'll talk and just keep having just general conversation and then throw in something and then we might talk about that and then he go to something else. It's -- if he's saying I'm coming over there, I be there Sunday, that's it, or so and so says that, that's it. It's nothing for you to like respond, because he just say what he got to say, and then that's it.

Q. Well, what did he have to say to you when you confronted him about dragging your parents into his problems?

A. He said he don't know why they have to come. He don't know why you all subpoenaed them. That's what he said. That's what he said to me, too,

KL108473

35

when I asked him why did I have to come.

Q. And after your parents were here, you talked with them. Isn't that right?

A. I talked to my parents because I was the one that drove them here.

Q. Okay. And they told you about the questions that were asked. Is that right?

A. Well, she only dwelled on one question, and that's -- she said that -- I don't know the detective's name, but that -- she said that you all kept telling her that she was lying, that she better get an attorney, and she kept saying that she couldn't afford an attorney, but you all kept telling her that she was lying about something that she don't know about.

Q. Okay.

A. That's what she kept saying the whole ride home. My father didn't say nothing.

Q. After they were here in the Grand Jury, you had a discussion with them about the blue Lincoln that your brother gave to your parents.

A. I do not recall that conversation.

Q. You don't recall it?

A. No, I don't.

Q. You don't recall them telling you that's

KL108474

36

why they were here?

A. They said that they got subpoenaed. They didn't know why. Once my uncle got subpoenaed, then that's when they said something about the blue car, but before then, no.

Q. All right. So, let's go to your uncle. Who's your uncle?

A. The one that you subpoenaed, Ernest Lassiter.

Q. How do -- where does he live?

A. Same place my mother live at. They're on the same lane.

Q. After you found out he got subpoenaed, did you talk to him?

A. No.

Q. Were you present when your parents talked to him?

A. No.

Q. Were you -- you never had any conversation with him?

A. No.

Q. Well, how did you find out it was about the blue Lincoln after your uncle was subpoenaed?

A. Because my mother told me, like I said. That's the only time the blue Lincoln came up, is

when my uncle had to get subpoenaed, and evidently, he told them why he got subpoenaed, and that's when she said something to me, but before then, like I told you, no.

Q. What did your mother tell you about the blue Lincoln?

A. That my uncle had to come up here, something about him driving a car up here or it had to do with somebody getting killed in the car.

Q. Who's your best friend?

A. Sherry Bryant.

Q. What's her address?

A. I don't know her new address. She moved.

Q. When was the last time you talked to Ms. Bryant?

A. The day that she told me she had a subpoena, whatever day that she came here.

Q. Okay. What did you discuss with her?

A. She asked me do I know anything about it. I said no. She said they served her at her parents' house. And that was it.

Q. Who's your next best friend?

A. That's my only best friend.

Q. Okay. Well, who are the other females that you talk to?

KL108476

38

A. At work, they're my co-workers.

Q. What are their names?

A. Other than that, I don't have no other friends that I talk to.

Q. What are your co-workers' names?

A. Demia Stennard.

Q. Excuse me?

A. Demia Stennard.

Q. Who else?

A. Angela Overton, Meckia Jackson, and Judy Ackpan (all phonetic).

Q. Have any of them met your brother?

A. No.

Q. Do you have any friends from high school that you talk to occasionally?

A. No.

Q. How about relatives?

A. From -- that I talk to?

Q. Um-hum, on a regular basis.

A. I talk to my cousin Loretta.

Q. Who else?

A. That's it.

Q. Do you talk to Lamont?

A. Sometimes.

Q. He lives with you?

KL108477

39

A.    Huh?

Q.    Lamont lives with you?

A.    Uh-huh.

Q.    You have to say yes or no.

A.    Yes.

Q.    Is Lamont close to your brother?

A.    They first cousins, yes.

Q.    Well, do they talk to each other on a regular basis?

A.    Ah, I don't know.  I don't know what they do.  I don't know.

Q.    Well, do you see them together?

A.    No, I sure don't.

Q.    Does your brother come over to your house?

A.    Every now and then.

Q.    And does he talk to Lamont when he's over there?

A.    Most of the time when he come in, Lamont is not there.

Q.    So, he comes to see you?

A.    Sometimes, or just come to sit.

Q.    And who are your brother's friends?

A.    Now, you're throwing that out there.  I don't know.  I don't know my brother's friends like that.

Q.   Well, if you --

A.   If I see them, then that's another thing, but as far as telling you their names, I don't know his friends like that.

Q.   Who's DeJuan Beaver?

A.   Who?

Q.   DeJuan Beaver was a name you provided in the previous --

A.   DeJuan Beaver?

Q.   Uh-huh.

A.   That's my cousin.

Q.   DeJuan Beaver is a cousin?  Okay, where does DeJuan Beaver live?

A.                          t.

Q.   Where on .

A.   I don't know his door number.  I can get you there, that's about it.  I don't -- I'm not good with stuff like that.

Q.   Are you willing to show the detectives how to get there?

A.   I don't know about all that.

Q.   Okay.  Well, do you have his address written down at home?

A.   I can call and provide that for you, but me taking you there, no, I'm not doing that.

KL108479

41

Q. Okay. Do you have his telephone number at home?

A. I have his mother's number at home, but I don't, per se, talk to DeJuan like that.

Q. What's his mother's number?

A. Ah --

Q. Her name and her number.

A. Her name is Jacqueline Jacobs.

Q. And her telephone number?

A.

Q. And how would you get to DeJuan's house?

A. I would -- from where?

Q. From wherever you want to start.

A. But how do I know you all know where that is?

Q. Well, just give me a start and the officers will figure that out.

A. Well, he's off of                    Come down off -- turn left off of Street, make a right, and there go his street.

Q. I

A. Um-hum, go down to the stop sign, make a right.

Q. And then what?

A. And then that's his apartment complex.

42

Q. Okay. Well, what do you do when you get to the apartment complex?

A. I turn left into the alley, and there go the door. There go his building right there, and his door is the only entrance. He don't have to go into the building to their house.

Q. Is this building --

A. No, it's an apartment, but they have their own door.

Q. And it's the first door once you go in the alley?

A. Um-hum.

Q. And it's on your right or left when you go in?

A. It's on the left.

Q. Do you ever see your brother with any drugs?

A. No. I told you that last time. No.

Q. Have you seen him since the last time with any drugs?

A. No.

Q. How about a gun?

A. No.

Q. Did you have a conversation about Mr. Flood with your -- strike that.

KL108481

43

Have you had a conversation with your brother about the Lincoln?

A. No.

Q. About the car that he bought for your father?

A. No. The only thing, that he bought the car.

Q. Did he tell you he drove it to North Carolina?

A. No.

Q. Did he tell you about loaning the car to somebody else one night?

A. No.

Q. And having to get rid of it?

A. No.

Q. He didn't tell you anything like that?

A. No.

Q. Are you sure?

A. I'm positive.

Q. Okay. I want to show you a book and ask you if you can recognize anyone. The book's been previously marked as Grand Jury Exhibit Number 2, dated June 4th of 2003. I'm going to show you a series of photographs, and I want to know if you've ever seen any of these people before.

KL108482

44

A.   Okay, okay.

Q.   It doesn't matter whether you know their names or not, just if you've seen them anywhere, okay? Any questions about that?

A.   No.

Q.   Start with number 1.

A.   No, I haven't seen number 1.

Q.   Never seen him anyplace?

A.   No.

Q.   How about 2?

A.   No.

Q.   Number 3?

A.   No.

Q.   Number 4?

A.   No.

Q.   Number 5?

A.   No.

Q.   Number 6?

A.   That's my brother.

Q.   Number 7?

A.   No.

Q.   Number 8?

A.   No.

Q.   Number 9?

A.   No.

KL108483

45

Q. Number 10?

A. That's my brother.

Q. Okay. Different picture of your brother?

A. Yeah.

Q. Okay. Number 12 -- I don't think there's an 11, so go to number 12.

A. One person looks familiar, but I don't know if that's him.

Q. Which picture looks familiar -- which person?

A. In number 12.

Q. Number 12?

A. Um-hum.

Q. Which person in that group photograph looks familiar?

A. This person right here (indicating).

Q. And you're pointing to the second person from the -- standing from the left side --

A. Um-hum, yes.

Q. -- looking at the picture?

Who does he look like?

A. This guy named Tony.

Q. Okay. And what's Tony's last name?

A. Mathis, I think.

Q. How do you know Tony?

46

A.    My brother went to school with him.   I think that's his friend, I think.

Q.    He's a friend of your brother's?

A.    Um-hum.

Q.    Okay.  How about 13?

A.    No.  No, I don't know that person.

Q.    That's 14 you don't know?

A.    Um-hum.  I don't know 15.  I don't know 16, 17, 18.  I don't know 19.  I don't know 20, 21.  I don't know 22, 23.  That same person that I said that looked like Tony is in 24.

Q.    Looks like --

A.    He's in 24.

Q.    In picture 24?

A.    Um-hum.  He look like Tony right there.

Q.    Okay, and again, if you could, number 24, you're talking about the people standing in the last row.  Is that right?

A.    Yes.

Q.    And it would be the --

A.    Third from the --

Q.    -- the third person coming in from the right as you're looking at the picture.  Is that right?

A.    Um-hum.

47

Q.    Okay.  You have to say yes or no.

A.    Yes, yes.

Q.    Okay.  Number 25?

A.    Un-huh, no.  No.

Q.    Number 26?

A.    No.

Q.    Number 27?

A.    Nope.

Q.    Number 28?

A.    No, no.

Q.    Number 29?

A.    No.  Thirty, no.  Number 31, 32, no. Thirty-three, no.  Thirty-four, no.  Thirty-five, no. Thirty-six, no.  Thirty-seven, he look familiar.

Q.    Okay, familiar from where?

A.    Where we used to live at --

Q.    Okay.

A.    -- on            `.

Q.    What do you remember about him?

A.    He was always walking the streets.

Q.    Okay.

A.    And 38, no.  Number 39, no.  And that's Tony.

Q.    Which one is Tony?

A.    Forty.

Q. Okay. Tell me about Tony.

A. What about him?

Q. When was the last time you saw Tony?

A. Ah, I haven't seen Tony in a long time. He's locked up now.

Q. When was the last time you saw him? Did you see him this summer when you were back in your old neighborhood?

A. No. I saw him when I moved from Pennsylvania Avenue to where I live at now, because he helped move me.

Q. He helped move you?

A. Um-hum.

Q. Okay. Who else helped you move? That would have been June -- March or June --

A. June.

Q. -- June of 2002?

A. Um-hum.

Q. Who helped you move?

A. Tony, my brother, my mother, myself, my cousin from North Carolina came up with my mother, and myself. That's it.

Q. You didn't see -- you go back to the old neighborhood, don't you, on occasion?

A. Not really. To Park Berkshire?

49

Q.   No, to the neighborhood where you grew up in your parents' home.

A.   Unless Sherry's at her mother's house. That's the only time I go there is when Sherry at her mother's house.

Q.   Do you go back to the old neighborhood where you grew up with your parents?

A.   When Sherry is at her mother's house, that's my only reason for going over there.

Q.   So, you don't go over there for any other reason but to see Sherry?

A.   Exactly.

Q.   And that's Sherry Bryant?

A.   Yes.

Q.   And when was the last time you were over in the neighborhood?

A.   It's been a long -- it's been a -- been a while since I been around there.

Q.   Well, what is "a while"?

A.   Maybe a month or two.

Q.   Were you there since Labor Day?

A.   No, I didn't go over around there Labor Day, no.

Q.   Since then?

A.   Maybe in August or July I picked her

daughter up for her.

Q. Did you see Sherry when you went over there in August or July?

A. No, I picked her daughter up from her mother's house for her. She was at home, and I -- she asked me could I pick her daughter up for her from her mother's house.

Q. Where does she live?

A. She used to live in

Q. Where does she live now?

A. I think                    . I'm not sure.

Q. You didn't see -- have you been to her new place at Iverson Towers?

A. No.

Q. Have you ever been over outside her new apartment at

A. No.

Q. So, the last time you went over to your old neighborhood where you grew up with your parents --

A. Um-hum, yes.

Q. -- you didn't see Ms. Bryant; you just picked up her daughter?

A. I just picked up her daughter. She was still living at              at that time. So, I picked

KL108489

51

up her daughter for her, because she does hair. She was doing somebody's hair and asked me could I pick her daughter up for her. So, I told her yeah and took her daughter back to her house.

Q. And when was the last time you saw Ms. Bryant?

A. I haven't. I was supposed to see her last week, but I didn't.

Q. Well, before then, when was the last time you saw her?

A. Probably when I picked her daughter up for her, because she was in the process of packing and all that so she could move, and then since we had the hurricane, I haven't seen her.

Q. When was the last time you saw Mr. Mathis? Not talked to him, just saw him, maybe walking down the street or shopping or something, anywhere.

A. Well, I haven't seen him since he helped me move.

Q. You haven't seen him since then?

A. Yeah, right, because I thought he was locked up.

Q. You're certain of that?

A. Yeah.

Q. Ever have a conversation with your brother

KL108490

52

about Mr. Mathis trying to get him into trouble?

A. No.

Q. Is Mr. Mathis trying to get your brother in trouble?

A. I don't know.

Q. You have no idea?

A. No.

Q. Do you know where Mr. Mathis lives?

A. No.

Q. Did you have a conversation with anyone about Mr. Mathis getting your brother in trouble?

A. No.

Q. What's your relationship with Mr. Mathis?

A. I don't have a relationship with him. That's my brother's friend. That's how I know him. I don't have a relationship with him at all.

Q. What's your brother's relationship with Mr. Mathis?

A. I'm assuming they friends.

Q. Ever see Mr. Mathis with a gun?

A. No.

Q. Ever hear about him committing any crimes?

A. Robbery.

Q. What robbery?

A. He robbed a jewelry store.

53

Q.   Other than that, you ever hear about him doing anything else?

A.   No.

Q.   Did you ever meet any of his girlfriends?

A.   His baby's mother.

Q.   Who's that?

A.   I don't know her last name.  Her name is Tamika.  That's all I know.

Q.   Where did you meet her?

A.   She was -- her grandmother used to live around where I used to live at.

Q.   Did your brother ever tell you that Tony was getting him into trouble?

A.   Nope.

Q.   Your brother ever say anything about loaning his Lincoln to anyone?

A.   Nope.

Q.   Loaning the car he gave your parents to anyone?

A.   Nope.

Q.   Tell you anything about why he was in trouble?

A.   No, he just said that you all trying to pin a murder on him, and he didn't kill nobody.

Q.   Did he tell you where he was the night of

KL108492

54

January 3rd?

A.   Nope.

Q.   Did he tell you where he was the night of whatever murder it was that we're trying to pin on him?

A.   Nope.

Q.   Do you know where he was that night?

A.   Nope.

Q.   Do you have any idea?

A.   No.

Q.   Was he with you that night?

A.   Nope.

Q.   And you don't recall talking to him over the telephone that night, the night of January 3rd, 2002?

A.   Nope.

Q.   And nobody's ever said anything to you about Tony trying to pin something on your brother?

A.   Nope.

Q.   Or get your brother in trouble for something he did?

A.   Nope.

Q.   You've never heard anything like that?

A.   No.

Q.   You never said anything like that?

KL108493

55

A.   No.

Q.   You're sure?

A.   I'm positive.

MS. JOHNSTON:  Okay, any Member of the Grand Jury have any questions?

(No response.)

BY MS. JOHNSTON:

Q.   Okay, Ms. Flood, your testimony is complete other than providing those phone bills to the officers as well as a telephone number for Duane Beaver.

A.   DeJuan Beaver?

Q.   DeJuan.  Could you spell his first name?

A.   I just call him JJ.

Q.   JJ, but it's DeJuan?

A.   Um-hum.

Q.   After providing that information to the officers, then your testimony is complete and you are free to go.

A.   Oh, okay.

Q.   If when you leave here you realize that you made a mistake or that something you said was wrong, because you're under oath and face potential penalties, you can come back and correct your testimony, but you would have to notify me -- and you

have my number --

A.   Okay.

Q.   -- so that we could schedule you to come back next Wednesday.  I must be notified by not later than October 7th, which is a week from yesterday.  Do you understand that?

A.   Yes.

Q.   All right, then you're free to go.

(The witness is excused.)

(Whereupon, at 11:33 a.m., the taking of the testimony in the above matter, before a full quorum of the Grand Jury, was concluded.)

-    -    -    -    -

57

## CERTIFICATE OF REPORTER

I, Susanne Bergling, the reporter for the United States Attorney's Office, do hereby certify that the witness whose testimony appears in the foregoing pages was first duly sworn by the Foreperson or the Deputy Foreperson of the Grand Jury when there was a full quorum of the Grand Jury present; that the testimony was taken by me, and thereafter, reduced to typewritten form; and that the transcript is a true record of the testimony given by said witness.

Susanne Bergling

Official Reporter

For The Record, Inc.
Waldorf, Maryland
(301) 870-8025