Declaration

I, Deborah Ann Johnston, depose and state:

1.      I am an attorney admitted to practice law in the state of Maryland and before the United States District Court for the District of Maryland and the United States Court of Appeals for the Fourth Circuit.

2.      From November 1994 to the present, I have been employed by the United States Department of Justice as an Assistant United States Attorney (AUSA) in the District of Maryland. Since November 2003, I have been Senior Litigation Counsel for the U.S. Attorney's Office. Between August 2010 and September 2011, I was detailed to the Office of the Deputy Attorney General where I served as an Associate Deputy Attorney General. Prior to my current position, I was employed by the State's Attorney's Office for Prince George's County, Maryland, where I served as an Assistant State's Attorney, Chief of the Homicide/Narcotics Division, and as Deputy State's Attorney. During my time in that office, I conducted over 100 jury trials, including death penalty cases.

3.      AUSA Sandra Wilkinson and I and were assigned responsibility for the prosecution of *United States v. Kenneth Lighty and James Flood*, Criminal Case No. PJM-03-0457 (*"Lighty/Flood"*). I was lead counsel in the trial and, with AUSA Wilkinson, handled the selection of the jury.

4.      Jury selection for the *Lighty/Flood* trial commenced on September 6, 2005. Prior to that date, prospective jurors submitted a written questionnaire. Jurors also completed a supplemental questionnaire regarding the death penalty. The Court conducted voir dire in a two-stage process. Prospective jurors were asked general voir dire questions as a group. Any affirmative responses were noted. Following the general group voir dire, each prospective juror was brought into the courtroom for individual voir dire. Initially, the Court asked the prospective jurors follow-up questions based upon responses to the questionnaires and the in-court general voir dire. If the venireman was not excused for cause, the Court proceeded to question the juror about the death penalty. As a general rule, the attorneys were not permitted to question prospective jurors. However, if an attorney wanted further questioning, a request was made to the Court and, if granted, the Court asked additional questions. On occasion, attorneys were granted limited opportunities to ask follow up questions. At the conclusion of individual voir dire, the Court entertained motions to excuse the questioned juror for cause. If a motion to excuse for cause was forgone or denied, the venireman was deemed qualified. The voir dire process concluded when the court qualified 70 jurors. (Trial Transcript Sept. 22, p.6)

6.      On September 27, 2005, the qualified veniremen reported to court. The Court conducted additional questioning of six jurors on hardship issues. All parties agreed to excuse four of the jurors: Jurors 10, 45, 153 and 164. Each party was given 20 peremptory challenges to be used against the pool of veniremen and three additional strikes to use against the alternate

1

pool. However, the Court told the parties that the first 18 veniremen who were not stricken would be seated as the jury and six alternates. As a result, each party's 20 challenges were to be exercised against the first 52 veniremen, ending with Juror 211 and the three alternate challenges against the next 12 veniremen, which ended with Juror 261.

7.    Based upon a review of the Court's juror list, the first 52 jurors consisted of 23 females and 29 males. The government exercised only 19 of its peremptory challenges. The government exercised those 19 challenges to strike 15 females and 4 males. After the government exercised its challenges, eight female jurors remained in the pool. However, not including two duplicate strikes, the defendant elected to strike seven of the eight remaining female jurors. Based upon the location of the parties' strikes, the 12 jurors were selected from the first 37 jurors. In this group of 37 there were five female jurors (95, 110, 114, 120 and 128 (three Caucasians, one African American and one Asian)) who were not struck by the government and would have served on the jury but for the defense strikes. The alternate pool consisted of 7 females, including the first five jurors, and five males. The government struck three female jurors from the alternate pool and the defendant struck two females and one male. The jury was selected and consisted of eleven men and one woman with six male alternates.

8.    At the conclusion of jury selection, counsel for Lighty and Flood voiced their satisfaction with the jury responding "Satisfied" to the court's inquiry.

9.    During voir dire, government counsel assessed not only each venireman's verbal responses, but the manner in which each venireman answered, including but not limited to any hesitation in responses, nervousness, reluctance, the tone of their voice, and the general demeanor of the juror. Government counsel also made a determination of the likelihood each venireman would convict the defendants and vote to impose the death penalty. Government counsel met over the weekend that fell between the end of voir dire and the beginning of jury selection and worked together to try to identify prospective jurors who were likely to convict and would actually impose a death sentence. Government counsel did not identify any prospective jurors for peremptory strikes on the basis of race or gender.

10.    I do not believe that Lighty, in his Motion to Vacate, has established a prima facie case of discrimination as required by the *Batson* decision. Indeed, I believe that he defaulted the claim by failing to previously raise it. Assuming, arguendo, that this Court disagrees, and without any prejudice to all of the Government's asserted defenses to Lighty and Flood's claims, I offer the following explanations for the exercise of the government's peremptory strikes with regard to Lighty's claim and Flood and Lighty's ineffectiveness of counsel claims for failure to raise the *Batson/J.E.B.* claim:

Strike 1.    Juror 1 (WF)

The government struck this juror, who was very soft spoken, because she expressed ambivalence about the death penalty (using phrases as"I'd hoped, I'd never have to, but I would

2

be able to do it."). Her husband was a lawyer and she had a degree in psychology. Finally, her brother was homeless and involved in criminal conduct. For all these reasons, the government did not think she could vote to impose the death penalty.

### Strike 2.       Juror  21 (AAF)

The government excused this juror because she voted "not guilty" when she previously served as a juror in drug case. In addition, her nephew was in "very serious" trouble with the law and her sister passed away as a drug user.

### Strike 3.       Juror  40 (AAF)

The government struck this juror, the mother of a 17 year old son, because her brother was convicted of possession with intent to distribute drugs and served six years in prison. This juror stated she was against the death penalty in any circumstances and ranked her feelings at a 7 on a scale of 1 to 10. Juror 40 explained that she believed that the death sentence should not be imposed if a defendant has mental problems or is coerced by an older individual (such as the Washington area sniper). She also stated that the death sentence was handed down "too lightly" ("men and women are sentenced too soon without thinking everything through").

### Strike 4.       Juror 67 (AAM)

The government struck this juror because he was a practicing lawyer and was married to a lawyer. He stated he would reserve the death penalty only for the most heinous crimes.

### Strike 5.       Juror 77 (WF)

The government struck this juror because her stepson had a problem with drugs.  In addition, Juror 77  stated that the "death penalty should only be applied where a criminal is so violent as to pose a danger to society in general," and stated she would want proof of "future dangerousness" to vote for the death penalty. She stated "It's an extreme punishment to be applied in extreme cases." She believed that if there was "proof" the defendant would not be of future danger to society, he should not get the death penalty. The government had already made a strategic decision not to affirmatively put on evidence of future dangerousness and therefore viewed this juror as problematic on the death penalty.

### Strike 6.       Juror 83 (AAF)

Government counsel believed that Juror 83, the mother of one son, was arrogant and as a result, might not participate in jury deliberations well with other jurors. We particularly noted her arrogance as she described her job, and the fact that she went through the employment process to be a Special Agent with the FBI but did not get hired. Also, this case was investigated by the FBI with numerous FBI witnesses on the government's list to testify at trial. As a result,

we struck this juror.

### Strike 7.        Juror 84 (WF) (Also Defense Strike)

Juror 84, is the mother of an 18 year old son, and was struck because she expressed a preference for "hard labor" over the death penalty. She was a self-described member of the Catholic Church and acknowledged she had her own views on the subject and she expressed uncertainty stating for example "You know, I guess I believe you have to follow the law and what penalties go with the case as its going, so it is kind of following--."

### Strike 8.        Juror 88 (WF)

The government struck this juror because the juror previously sat on a criminal trial and returned a "not guilty" verdict.   She majored in criminal justice in school and had a previous DUI charge which was dropped.  She did not list her employment on the questionnaire.  She also stated that she wanted "positive physical evidence" which the government did not have in this case. With regard to the death penalty, she stated "If it has to be done, [she] might agree with it." The examples she gave were in "clear-cut cases of torture or the killing of a police officer or first responder."  In addition, the government considered the fact that the juror lived in Temple Hills which is where the murder occurred.

### Strike 9.        Juror 90 (AAF)

This juror was struck because she "limited" the death penalty to "horrendous crimes" (stating "I believe that there are some crimes that are so horrendous that the death penalty would probably be appropriate it.")   Her description of an appropriate crime was "when a child is kidnapped, raped and murdered."  She also stated that she was "conflicted" about the death penalty. Her husband was a retired probation officer, a job that inherently presumes release from prison and rehabilitation.  Based on all of these factors, the government concluded that she would be unlikely to vote for death penalty.

### Strike 10.        Juror 97 (WM) (Also Defense Strike)

Government counsel noted that Juror 97 was extremely nervous and did not seem quite right.   Moreover, he responded "yes" to the CSI question regarding the need for forensic or scientific evidence in order to find a defendant beyond a reasonable doubt. The juror also emphasized that "you just have to be sure" regarding imposition of the death penalty.

### Strike 11.        Juror 117 (AAF)

Government counsel struck this juror because she failed to disclose her employment as a school teacher which is particularly odd given the type of job that it is, requiring a commitment to the students that are being taught where a long time away could be a hardship.  Instead, the

juror spoke about her own education (she had a BS degree in sociology/child psychology) and stated that she was working on a master's degree in criminal justice with "courts and law was my major." We did not believe the juror was being candid in her answers and had a strong concern that she was too interested in being a juror to use her jury duty for her thesis project. In addition, her initial view of the death penalty was expressed in terms of perhaps they should receive the death penalty "where no other options are given."

### Strike 12.    Juror 121 (WF)

This juror looked to us like a regular church goer. We struck this juror because she stated she wanted proof "beyond a shadow of doubt" which is not the legal standard. Specifically she said "I'm not against it if the evidence suggested that was beyond a shadow of a doubt the correct punishment." She said the decision to impose death would be "very very hard" for her. In addition, she also seemed strangely aloof about having a pedophile break into her home and steal her child's diapers. We believed she was odd and may not participate well with other jurors during deliberation.

### Strike 13.    Juror 124 (AAF) (Also Defense Strike)

We struck this juror in part because she did not follow instructions and left a lot of the questions blank on the questionnaire. She also stated that she will "need scientific evidence." She expressed an interest in gospel music, an indication to us that she is devout, likely forgiving and would be reluctant to sentence a young man to death.

### Strike 14.    Juror 137 (WM)

The government struck this juror because, in our view, he was too much of a talker and would drive other jurors crazy during deliberations. He appeared to us to "over-think" everything. He stated that he and his wife are both "deeply interested in" and study/read history and the evolution of constitutional law and criminal procedure/due process.

### Strike 15.    Juror 145 (WF)

We struck this juror because she also previously served on a jury which returned a "not guilty" verdict. She also worked as a paralegal for 15 years. She indicated that she saw the film "Dead Man Walking" about the death penalty and even remembered the main character's name. Her voice cracked and she was tearful when responding to the death penalty questions. She hesitated and paused frequently. She initially thought the case involved a child and when she learned it was not, appeared to be even more ambivalent about the death penalty. The government did not believe she could impose the death penalty.

### Strike 16.    Juror 172 (WF)

5

Juror172  worked in the mental health field including at Clifton Perkins, the hospital for criminals found not criminally responsible due to mental disease. She stated she believed that "one needs to know all factions of a defendant's life and upbringing and psychiatric history to give him a fair trial." She did a lot of work with forensic psychiatric patients. She also thought the death penalty was imposed too often. She seemed to be hard of hearing and spoke of a problem with depression when she was younger. We believed she would not impose the death penalty and struck her.

### Strike 17.    Juror 193 (AAF)

We noted that this juror had difficulty staying awake during the voir dire. She repeatedly looked at the defendants, two young men, throughout the questioning. When asked about potential conflicts, this juror told the Court that she had a vacation planned for October 25 through October 30, 2005 but the defense objected to excusing her for cause. (In fact, the penalty phase in this continued into November 2005). In our experience, jurors who are concerned about their personal vacation schedules are often impatient with the government during the course of the trial and appear to be angry at any delays. In addition, this juror hesitated before saying she could impose the death penalty but had no hesitation before responding that she could impose life without parole.

### Strike 18.    Juror 196 (AAF)

The government struck Juror 196 who identified herself as "a minister of the gospel." The juror spent 29 years in the ministry.  The government views extremely devout or religious individuals as unlikely to be able to impose the death penalty, particularly on a younger individual. This juror also noted the kind of case where the death penalty could be warranted like a "serial killer". And she expressed concern that there have been times when there was missing proof that a person was not at the scene of a crime and someone came forth after the person was executed but it was "too late." This juror also worked as a volunteer in prisons; her son in law had been charged with a crime and her son had a pending case.

### Strike 19.    Juror 201 (AAM)

This juror was the same age as the defendant and lived previously in the Temple Hills area which is where the murder occurred. He mumbled in response to questions and was difficult to hear. Given his closeness in age to the defendant and his having resided in the Temple Hills area, the government concluded he might be sympathetic to the defendant and made a decision to strike him.

### Alternate Strike 1    Juror 220 (WF)

This juror was stricken because she expressed a need to have proof of future dangerousness to support a death sentence, wanting evidence of a complete inability to function

in society.

Alternate Strike 2       Juror 235 (WF)

This juror was stricken because she appeared to be a homebody who wanted to be on the jury because she didn't have anything else to do. The government had some concern about her mental status.

Alternate Strike 3       Juror 241 (AAF)

The government was concerned because this juror had no recollection of her prior jury service and she listened to spiritual music which may indicate a reluctance to judge.

10.    As described above, the government also struck four male jurors from this group of 52 prospective jurors for reasons similar to those that the government used peremptory strikes against female veniremen. For example, the government struck Juror 97 because he responded "yes" to the CSI question regarding the need for forensic or scientific evidence in order to find a defendant beyond a reasonable doubt and he emphasized that "you just have to be sure" regarding imposition of the death penalty.

11.    The government exercised each challenge in an effort to obtain those jurors who were most likely to convict and vote for a sentence of death. The government did not use its last strike, further demonstrating that the government was not seeking to strike jurors based upon their gender. As the Court called the jurors' numbers, government counsel were surprised to see a jury composed of 11 men and 1 female. After reviewing the record, it appears that in the wake of the government's challenges, five females remained in the pool of 37 jurors from which the first 12 were selected, and who would have been seated but for the defendant's strikes. The result would have been a jury of five women and seven men, but for the defendant's peremptory strikes.

12.    The defendant alleges a practice in this office of sexual discrimination in death penalty cases. The United States Attorney's Office has no such policy, nor do I. Each decision to exercise a peremptory challenge was based upon the totality of the circumstances of each individual juror. The defendants cite to the jury selection in *United States v. Dustin Higgs,* Criminal Case No. PJM 98-0520, where the jury was made up of twelve men. Based upon the strikes exercised in Higgs and the make up of the jury pool, the juror composition in *Higgs* was also unexpected. In fact, the government anticipated that the jury in Higgs would be no different than the death qualified jury selected in the co-defendant's trial (*United States v. Haynes*), which occurred within six months of Higgs's trial and which consisted of eight men and four women. Indeed but for the defendant's strikes the jury in Higgs would have included 4 female jurors. Further, the Court rejected similar complaints that the government violated *Batson* during jury selection in *Higgs. Higgs v. United States,* 711 F.Supp.2d 479 (D.Md. 2010)(Finding no evidence that government treated potential male and female jurors differently, and lack of women

on jury was partly due to strikes made by defendant.)

13.     The government did learned something from the non-verdict in the *Haynes* case. Specifically, the government asked the jury to find future dangerousness-- unanimously and beyond a reasonable doubt--as an aggravating factor to support a death sentence. Days of trial were spent proving Haynes' prior criminal conduct to support a future dangerousness finding. We concluded that in essence, we were asking the jury to predict Haynes' future conduct in order to return a death sentence. We believed that that factor coupled with the defendant's age (18 years) at the time of the offense and documented child neglect, were the reasons the jury did not sentence Haynes to death.  The information we had regarding the jury deliberations was derived from the completed verdict form.  Based upon the Haynes verdict, we dismissed the future dangerousness aggravator in the Higgs case and did not include a future dangerousness aggravator in the Lighty case.

14.     The lack of any practice of sexual discrimination or intent to discriminate by the office or myself and AUSA Wilkinson is further demonstrated by the government's opposition to defense motions to strike female jurors for cause.  For example, the defendant moved to strike Juror 124, an African American female and the government opposed the defendant's motion to excuse the juror for cause. If government counsel were seeking to eliminate female jurors based upon their gender, the government would have acquiesced to defendant's motions to strike female jurors for cause.

I certify under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Executed this 8 day of March, 2013.

Deborah A. Johnston
Assistant United States Attorney