| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| | ) Criminal Case 03-cr-00457-PJM |
| | ) Civil Case 11-cv-3065-PJM |
| | ) Civil Case 11-cv-3563-PJM |
| v. | ) |
| | ) |
| | ) |
| KENNETH JAMAL LIGHTY AND JAMES | ) |
| EVERETT FLOOD, | ) |
| | ) |
| *Defendants*. | ) |

### PETITIONERS' REPLY IN SUPPORT OF JOINT MOTION FOR DISCOVERY REGARDING THE ALLEGATIONS OF IMPERMISSIBLE DISCRIMINATION IN JURY SELECTION MADE IN THEIR MOTIONS FOR RELIEF UNDER 28 U.S.C. § 2255

Petitioners Kenneth Jamal Lighty and James Flood respectfully submit this reply in support of their Joint Motion for Discovery Regarding the Allegations of Impermissible Discrimination in Jury Selection Made in Their Motions for Relief Under 28 U.S.C. § 2255 ("Motion"). ECF Nos. 453 & 454.

### INTRODUCTION

Mr. Lighty and Mr. Flood have made an overwhelming *prima facie* showing that the Government exercised its peremptory strikes on the basis of gender and a combination of gender and race. ECF No. 454. The Government's Omnibus Response to Defendants' 28 U.S.C. § 2255 Motion, *Batson/J.E.B.* Claims, and Discovery Requests ("Opposition") does nothing to rebut this showing. ECF No. 466 at 10-13. It is silent regarding the comparative analysis demonstrating that many of the male jurors the Government accepted were more ambivalent

1

about the death penalty and law enforcement than the female jurors it struck. It is similarly silent regarding the prosecutors' striking pattern in *Higgs*. As to the powerful statistical evidence of discrimination, the Government tries to counter it by asserting merely that it accepted several female jurors who would have been seated but for the defense's strikes. But the law is clear: the Government's acceptance of certain female jurors in no way demonstrates that the Government did not rely on impermissible gender and gender/race stereotypes to exclude the many other women it removed (particularly when the numbers dictated that it would have to accept some women). *See, e.g., Batson v. Kentucky*, 476 U.S. 79, 95 (1986) ("A single invidiously discriminatory governmental act is not immunized by the absence of such discrimination in the making of other comparable decisions.") (internal citation omitted); *Jones v. Plaster*, 57 F.3d 417, 421 (4th Cir. 1995) ("Although the district court was entitled to consider the fact that the final jury included black citizens, it was not entitled to allow the presence or absence of other black jurors to resolve the question of whether Thompson was motivated by race in the exercise of a particular strike.") (*citing United States v. Joe*, 928 F.2d 99, 103 (4th Cir. 1991) (internal citations omitted)); *infra*, Argument § I.A (citing cases).

Having established a *prima facie* case of discrimination, Petitioners necessarily have demonstrated "good cause" to conduct discovery related to steps 2 and 3 of the *J.E.B.-Batson* analysis. ECF No. 454 at 39-41. In fact, because the Government has proffered reasons for its strikes, ECF Nos. 466 at 13-18 & 466-1, there is now even *greater* justification for discovery, as the Government's proffer moots the *prima facie* case requirement and *obligates* the Court to engage in a step 2-3 analysis. *See, e.g., Johnson v. Love*, 40 F.3d 658, 665 (3d Cir. 1994). To facilitate the Court's task, Section 2255 Rule 6 entitles Petitioners to discover available evidence bearing on the persuasiveness of the reasons the Government has given for its strikes. Rule 6

also entitles Petitioners to obtain information regarding jury selection in other capital cases recently tried by the prosecutors in this case and by other prosecutors from the U.S. Attorney's Office in Maryland. By requesting this very specific information relevant to the step 3 inquiry, the Motion is the antithesis of the "fishing expedition" that the Government accuses Petitioners of seeking to undertake. ECF No. 466 at 27. As the evidence shows, Petitioners are not asking to "explore their case in search of its existence," *id.* at 26, 30; rather, consistent with the purpose of Rule 6, they are asking for the opportunity to discover additional evidence relevant to their already substantial claim.

Even if the Court were to determine that evidence necessitating a step 3 inquiry is not enough to justify discovery, Petitioners nevertheless have good cause for discovery because, as explained below, the justifications the Government has furnished for its strikes of women and African-American women are pretextual, inherently discriminatory or both. The proffered justifications would apply equally, or with even more force, to the male jurors the Government accepted. Some of the justifications are also unsupported by the record. And several justifications are themselves proxies for race. Moreover, the justifications the Government has offered for some of its strikes betray discrimination on the basis of religion, which is no less offensive to the Constitution than discrimination on the basis of gender and race.[1] *See, e.g., United States v. Brown,* 352 F.3d 654, 666-69 (2d Cir. 2003); *Davis v. Minnesota*, 511 U.S. 1115 (1994) (Thomas, J., joined by Scalia, J., dissenting from denial of certiorari). Therefore, even if a preliminary step 3 analysis were required to determine whether "good cause" exists, the totality of the evidence – the statistical analysis, the juror-by-juror comparisons, the pretextual

---

[1] These religion-based justifications require amendments to the Petitioners' § 2255 Motions.

3

justifications, the justifications that are proxies for race, the striking pattern in *Higgs*, and the evidence of religious discrimination – would be more than sufficient to warrant discovery.

Finally, the Government's effort to convert Petitioners' Motion into a full merits proceeding must fail. First, it is inconsistent with the scheduling order in this case – an order that the parties negotiated and agreed upon and that the Court approved. The scheduling order establishes that the motions for discovery will be addressed first, followed by merits briefing (and any evidentiary hearing). ECF No. 449. Second, the Government's suggestion is based on the inaccurate premise that the opening memorandum is, "in essence," a comprehensive merits brief. ECF No. 466 at 2. It is not. If the Court deviates from the previously agreed-upon scheduling order and converts the discovery motion process into a merits proceeding, then Petitioners request the opportunity to fully brief the merits of their *J.E.B.-Batson* and related ineffective assistance of counsel claims, including the Government's assertion that the *J.E.B.-Batson* claim is procedurally defaulted and may be considered only through the medium of their ineffectiveness claims. ECF No. 466 at 4-7. Petitioners also wish to make clear that, even without the benefit of discovery, the evidence set forth in their opening Memorandum and this reply warrants an evidentiary hearing under 28 U.S.C. § 2255(b), and they hereby expressly reiterate their request for one.

**ARGUMENT**

**I.      PETITIONERS ARE ENTITLED TO DISCOVERY.**

**A.      Petitioners' *Prima Facie* Case of Discrimination in Jury Selection Constitutes Good Cause for Discovery.**

The standard set forth in Rule 6 of the Rules on Motion Attacking Sentence Under Section 2255 "is not a demanding one." *United States ex rel. Pecoraro v. Page*, 97C5361, 1998 WL 708856, at *1 (N.D. Ill. Sept. 30, 1998) (citing *Gaitan-Campanioni v. Thornburgh*, 777 F.

4

Supp. 1355, 1356 (E.D. Tex. 1991)). A petitioner need not prove his claim in his discovery motion, "something he will be required to do when [the Court] adjudicates his petition." *Id.* at *2. Instead, Rule 6 requires only that a petitioner "demonstrate that he *may* be entitled to relief if the facts are fully developed." *Id.* at *2 (emphasis in original). Accordingly, "'good cause' for discovery exists when a petition for habeas corpus establishes a prima facie case for relief." *United States v. Roane*, 378 F.3d 382, 402-03 (4th Cir. 2004) (citation omitted).

Here, Petitioners have amply established a *prima facie* case of discrimination. ECF No. 454 at 34-37. As set forth in Petitioners' opening Memorandum, the following facts show that the Government struck women because of their gender and African-American women because of a combination of their gender and race:

- The extremely low percentage of women on the jury compared to their representation in the pool of qualified jurors;

- The complete absence of African-American women on the jury compared to their representation in the qualified pool;

- The highly statistically significant percentage of both utilized and available strikes the Government exercised against women in the qualified pool;

- The Government's removal of a highly statistically significant percentage of both the women and the African-American women in the qualified pool;

- The Government's removal of the first eight women and the first four African-American women from the qualified pool;

- The fact that the male jurors whom the Government accepted expressed views regarding both law enforcement and the death penalty that were at the very least similar to, and in many cases more ambivalent than, the views expressed by the women, including the African-American women, whom the Government struck; and

- The prosecution's use of a similar striking pattern in *United States v. Higgs,* which resulted in an all-male jury and a combined panel of seated and alternate jurors with 16 men, 2 women, and no African-American women.

ECF No. 454 at 2-27.

The Government does nothing to rebut this *prima facie* evidence of discrimination.  ECF No. 466 at 10-13.  It does not even address the evidence showing that many of the male jurors it accepted expressed greater ambivalence about the death penalty and law enforcement than the female jurors it struck.  ECF No. 454 at 10-25.  Nor does it address the evidence of its striking pattern in *Higgs,* which produced an all-male jury.  *Id.* at 25-27.  Rather, the Government trains its attention on the powerful statistical evidence of discrimination.  ECF No. 466 at 11-13.  It cannot, however, cogently defend against this evidence – particularly at step 1 of the *J.E.B.- Batson* inquiry, which requires proof of only a "suspicion" of discrimination.  ECF No. 454 at 30 (citing *Johnson v. California*, 545 U.S. 162, 170 (2005)).

First, the Government contends that it "only exercised 19 of its 20 [panel] strikes," and that had it been "acting with a purposeful intent to exclude prospective jurors based upon gender or race, it would have used its remaining strike to exclude another female from the venire."  ECF No. 466 at 11-12.  But "a prosecutor's decision to pass and not use a peremptory challenge does not, standing alone, signal a mind that is free from discrimination."  *Little v. United States*, 613 A.2d 880, 887 (D.C. 1992).  Put differently, "[a] prosecutor may not avoid the *Batson* obligation . . . simply by forgoing the opportunity to use all of his challenges against minorities."  *United States v. Alvarado*, 923 F.2d 253, 256 (2d Cir. 1991); *cf. Batson*, 476 U.S. at 95 ("A single invidiously discriminatory governmental act is not immunized by the absence of such discrimination in the making of other comparable decisions.") (internal citation omitted).  This basic rule logically applies with even more force when the Government uses a high percentage of its strikes.  Here, the Government used 22 of 23 possible strikes, or 95.7%.

Contrary to the Government's contentions, its willingness to accept several women from the qualified pool similarly fails to negate an inference of discriminatory conduct.  That is

6

especially so inasmuch as the Government did not possess enough strikes to remove all 30 female jurors from the qualified pool and would have to accept at least some of them. ECF No. 454 at 38. A prosecutor who intentionally discriminates against a prospective juror on the basis of race or gender "can find no refuge in having accepted other[] venirepersons of that race [or gender] for the jury."[2] *Holloway v. Horn*, 355 F.3d 707, 720 (3d Cir. 2004). Consistent with other areas of civil rights law, the failure to exclude a member of a protected class simply does not mean that the exclusion of other members did not result from unlawful discrimination. *United States v. Harris*, 192 F.3d 580, 587 & n.1 (6th Cir. 1999). As the Eleventh Circuit has explained, "'[T]he striking of one black juror for a racial reason violates the Equal Protection Clause, even where other black jurors are seated, and even when valid reasons for the striking of some black jurors are shown.' Thus, the presence of blacks on the jury, while significant, does not preclude a finding of racial discrimination." *Eagle v. Linahan*, 279 F.3d 926, 942 (11th Cir. 2001) (citing *United States v. David*, 803 F.2d 1567, 1571 (11th Cir. 1986)); *see also Jones*, 57 F.3d at 421; *Lancaster v. Adams*, 324 F.3d 423, 434 (6th Cir. 2003) ("Where purposeful discrimination has occurred, to conclude that the subsequent selection of an African-American juror can somehow purge the taint of a prosecutor's impermissible use of a peremptory strike to exclude a venire member on the basis of race confounds the central teachings of *Batson*."); *Jones v. Ryan*, 987 F.2d 960, 971 (3d Cir. 1993) ("Although one black person was ultimately

---

[2]     For similar reasons, the Government's decision to strike some male jurors does not dispel an inference of discriminatory intent. *Holloway*, 355 F.3d at 722-23 (prosecutor's explanation that he had not used his peremptory challenges exclusively on African-Americans because he also struck a Caucasian woman "did nothing to dispel Holloway's suggestion that the prosecutor harbored a discriminatory intent in striking the seven prospective black jurors. A prosecutor cannot undermine a pattern of strikes that appears racially motivated by merely pointing to a lone juror of a different race whom he also found objectionable."); *see also Little*, 613 A.2d at 886 ("A single strike of a white juror can be a means to conceal (or attempt to conceal) a pattern of striking black jurors, or it simply may be unrelated to other strikes used discriminatorily.").

empaneled, the mere presence of a single black on the jury would not necessarily prevent a finding of a prima facie case.") (internal quotation omitted); *United States v. Battle*, 836 F.2d 1084, 1086 (8th Cir. 1987) ("[W]e emphasize that under *Batson*, the striking of a single black juror for racial reasons violates the equal protection clause, even though other black jurors are seated . . . ."); *Turner v. Marshall*, 121 F.3d 1248, 1254 n.3 (9th Cir. 1997) ("[T]he fact that the jury ultimately empaneled included several minority members does not mitigate the effect of a discriminatory challenge"); *Robinson v. United States*, 878 A.2d 1273, 1286-87 (D.C. 2005) ("It is fallacious to assume that a prosecutor's temporary willingness to 'risk' a single black female juror negates all the other indications of discriminatory intent.").

Because Petitioners have made out a *prima facie* case of discrimination, the burden shifts to the Government at step 2 to offer gender- and race-neutral explanations for its strikes. Once it does so, the Court must make the step 3 determination of whether, in light of all of the evidence, the Government engaged in intentional discrimination against one or more female jurors. By shifting the burden and requiring a step 3 analysis, Petitioners have necessarily established good cause to conduct the discovery they have requested. ECF No. 454 at 39-40. In fact, because the Government now has offered reasons for its strikes and necessitated a step 3 analysis, *see, e.g., Johnson,* 40 F.3d at 665 (proffer of justification for strike obviates *prima facie* case requirement and necessitates step 2-3 analysis); *United States v. Williams*, 264 F.3d 561, 571 (5th Cir. 2001) (same), Petitioners have *further* justification to discover additional evidence relevant to the Court's step 3 determination. Such evidence includes: the prosecutors' notes from jury selection in this case, as well as any materials on jurors that they independently collected; depositions or, alternatively, interrogatories of the prosecutors in this case; the strike lists and other jury materials maintained by the jury clerk's office in the other capital cases tried by the prosecutors

in this case; the prosecutors' materials from the jury selection in those other cases; and the strike lists and other jury selection materials maintained by the jury clerk's office in other capital cases recently tried by the office that prosecuted this case. ECF Nos. 453 & 454 at 39-40.

Contrary to the Government's contentions, Petitioners do not seek "to engage in broad fishing expeditions into the government's files." ECF No. 466 at 27. Rather, they have "made specific factual allegations and ha[ve] requested specific discovery items that [Petitioners] allege[] contain those facts . . . . In light of the potential of importance of such limited discovery, allowing it here would serve the ends of justice." *Figueroa v. United States*, 06-40007-FDS, 2011 WL 8844515, at *3 (D. Mass. Oct. 24, 2011) (granting petitioner's motion for discovery); *see also Bracy v. Gramley*, 520 U.S. 899 (1997) (approving discovery request because petitioner supported it with "specific allegations"); *Cornell v. United States*, 472 Fed. App'x 352, 354 (6th Cir. 2012) (holding that the district court abused its discretion when it denied discovery because petitioner established reason to believe that he "*may* be able to demonstrate entitlement to relief if the facts are fully developed"); *Gaitan-Campanioni*, 777 F. Supp. at 1356-61 (granting motion for discovery in § 2254 proceeding).

> **B. Even if Evidence Necessitating a Step 3 *J.E.B.-Batson* Inquiry Is Not Sufficient to Demonstrate Good Cause, Petitioners Are Nevertheless Entitled to Discovery Because, at Step 3, They Have Preliminarily Established that the Government Engaged in Purposeful Discrimination on the Basis of Gender, Gender/Race, and a Third Prohibited Ground, Religion.**

At step 3 of the *J.E.B.-Batson* inquiry, a court "must determine, 'in light of all the evidence with a bearing on it,' whether the defendant has proved intentional discrimination." *United States v. Barnette*, 644 F.3d 192, 204 (4th Cir. 2011) (citing *Miller-El v. Dretke*, 545 U.S. 231, 252 (2005) [hereinafter *Miller-El II*]; *Johnson*, 545 U.S. at 168). "The critical question . . . at step three is the persuasiveness of the [proponent's] justification for his peremptory strike."

9

*Miller-El v. Cockrell*, 537 U.S. 322, 338-39 (20030 [hereinafter *Miller-El I*]. Where the proffered justifications are pretextual and/or inherently discriminatory, the party challenging the strike proves purposeful discrimination, particularly where the *prima facie* evidence is strong. *See, e.g., Miller-El II*, 545 U.S. at 241, 244; *Purkett v. Elem*, 514 U.S. 765, 768 (1995); *see also* cases cited, *infra.*

In response to the instant Motion, the Government has proffered justifications for each of its strikes of female jurors. ECF No. 466-1. As explained below, the vast majority of these justifications are pretextual. They either apply equally to male jurors whom the Government accepted or find no support in the record. Some of the Government's justifications are also inherently discriminatory. They are either a proxy for racial considerations or betray unlawful bias on the basis of religion.

Because the reasons the Government has offered for striking women are pretextual and/or inherently discriminatory, and because of the strength of Petitioners' *prima facie* evidence, Petitioners at the very least have made a preliminary step 3 showing that the Government excluded prospective jurors on the basis of gender, a combination of gender and race, and religion. Accordingly, even if the Court were to hold that evidence necessitating a step 3 inquiry (whether through a *prima facie* showing or a Government proffer of reasons for its strikes) is insufficient to establish good cause for discovery, discovery is warranted.

1. ***The Reasons the Government Has Furnished for Striking Female Jurors Apply Equally, or with Even More Force, to the Male Jurors It Accepted.***

The Government's justifications for striking a number of female jurors are plainly pretextual in view of the fact that they apply equally, or with even more force, to male jurors that the Government accepted. Because such evidence of pretext ordinarily compels a step 3 finding of intentional discrimination, *Miller-El II,* 545 U.S. at 241 (where state's reasons apply "just as

well" to "otherwise-similar" seated jurors, "that is evidence tending to prove purposeful discrimination to be considered at *Batson*'s third step"); *Snyder v. Louisiana,* 552 U.S. 472, 479-86 (2008); *Holloway*, 355 F.3d at 724-25; *Riley v. Taylor*, 277 F.3d 261, 282 (3d Cir. 2001); *United States v. Hamilton,* 533 F.3d 269, 276-77 (5th Cir. 2008); *Ali v. Hickman*, 584 F.3d 1174, 1184-93, 1195-96 (9th Cir. 2009); *Kesser v. Cambra*, 465 F.3d 351, 361-71 (9th Cir. 2006); *Turner v. Marshall*, 121 F.3d 1248, 1251-55 (9th Cir. 1997) (same), it is plainly sufficient to warrant Rule 6 discovery.

Here, the evidence of pretext revealed by juror comparisons is as follows:

a. <u>Purported ambivalence about the death penalty.</u>  The Government justifies its strikes of Jurors 1, 40, 84, 90, 145 and 193, in part, on the ground that each of them expressed ambivalence about the death penalty.   According to the Government:

- *Juror 1*, a white female, "expressed ambivalence about the death penalty (using phrases [such] as 'I'd hoped, I'd never have to, but I would be able to do it.')." ECF No. 466-1 at 2.

- *Juror 40*, an African-American female, "stated that she was against the death penalty in any circumstances," ranking her feelings at a 7 on a scale of 1 to 10, because the death penalty is handed down "too lightly." *Id.* at 3.

- *Juror 84*, a white female, "expressed uncertainty [about the death penalty] stating for example 'You know, I guess I believe you have to follow the law and what penalties go with the case as its going, so it is kind of following . . . ." *Id.* at 4.

- *Juror 90*, an African American female, "stated that she was 'conflicted' about the death penalty." *Id.* at 4.

- *Juror 145*, a white female, had seen the movie, Dead Man Walking; "[h]er voice cracked and she was tearful when responding to the death penalty questions; and, "[s]he hesitated and paused frequently." *Id.* at 5.

- *Juror 193*, an African-American female, "hesitated before saying she could impose the death penalty." *Id.* at 6.

However, the Government accepted a number of male jurors who expressed equally ambivalent views – and, in some cases, *more* ambivalent views – about the death penalty.

- *Juror 19* indicated on his questionnaire that he believed that the death penalty was imposed too often. He stated that many people had been convicted on the basis of insufficient evidence, many of whom were African American, and there were too many people sitting in jail awaiting execution unjustly. During voir dire, he explained that he had seen news accounts of African-American men being released from prison after they were convicted in the '60s and '70s, and he believed that those individuals were convicted on the basis of their race rather than on the basis of the evidence. 9/7/05 Tr. 146-47. He further believed that, in certain localities, race, religion and gender are factors in the death penalty process. *Id.* at 147. Juror 19 also stated that, although he believed that the death penalty may sometimes be necessary depending on the circumstances, "it may not be necessary in all crimes and all situations." *Id.* at 149.

- *Juror 28*, in voir dire, twice said that, in a case involving kidnapping resulting in death, he would always vote for life in prison without the possibility of release regardless of the circumstances. 9/8/05 Tr. 24-25. At the Government's request, the Court conducted follow-up questioning; only then did he agree that he could vote either way, depending on the circumstances. *Id.* at 25-30.

- *Juror 38* informed the Court in his questionnaire that his support for the death penalty had "decreased" because he had become concerned about the possibility of error in its imposition. On voir dire, Juror 38 expressly described his feelings about the death penalty as "ambivalent." 9/16/05 Tr. 125.

- *Juror 46* informed the Court that he is not strongly in favor of the death penalty, and is in fact somewhat opposed to it. He stated that he felt the death penalty has been carried out too often because recent cases have uncovered DNA that exonerated death row inmates; therefore, Juror 46 no longer felt the death penalty was "the best way to go" and found himself "leaning towards being against [it]." 9/8/05 Tr. 167. He further noted in his questionnaire that race plays a role in the death penalty process in this country, as evidenced by the number of black men who face the death sentence. When the Court asked him whether he would always vote for life in prison without release, regardless of the circumstances, Juror 46 replied "I think I would, judge, yes," *id.* at 170, before agreeing that he could consider all of the evidence and vote for death if the evidence established it was appropriate. *Id.* at 171-72.

- *Juror 86* wrote that the death penalty was imposed "too often." He explained, "I think Texas has been too aggressive in enforcing death penalties, because their percentages are very high relative to the national average." He felt that some states – and Texas in particular – enforce the death penalty too aggressively. 9/13/05 Tr. 66-67.

- ***Juror 157*** indicated reluctance to impose the death penalty. He stated that, although he could impose death if warranted, he would "probably vote for life without parole" without regard to the circumstances. Even on follow-up, he said, "I still vote – let him stay in prison with no release . . . let him rot in prison." 9/15/05 Tr. 90-91.

- ***Juror 158*** informed the Court that he had "reservations" about imposing the death penalty. 9/15/05 Tr. 208-10. He also told the Court that he had never been in a position to look someone in the eye and say, you deserve to die, and his "honest answer is I'm not sure I could do it [vote to impose death]." *Id.* Based on this juror's answers during voir dire, the Government moved to strike Juror 158 for cause because he was not sure he could vote to impose death. *Id.* at 211.

- ***Juror 177*** stated that he was in favor of the death penalty, but informed the Court that he would not want to impose the death penalty "personally," even though he thought "there are times it might be needed." 9/16/05 Tr. 78.

- ***Juror 178*** affirmed that he would be able to return a death verdict, but indicated some reservations about doing so in open court, stating, "I think anybody who said they didn't have any reservations would not be totally honest." *Id.* at 98.

- ***Juror 195***, in voir dire, stated that he had some reservations about imposing it given the possibility of wrongful convictions. 9/20/05 Tr. 10-12.

- ***Juror 248*** expressed concern in his questionnaire that the death penalty is carried out too often because "the criminal justice system is overwhelmed and mistakes are made. Too many times those who can't afford proper representation are falsely convicted and because of social injustices stereotypes lead to mistakes."

b. <u>Purported endorsement of a high standard for imposition of the death penalty, or purported willingness to impose the death penalty only for a narrow set of crimes.</u> The Government justifies its strikes of Jurors 40, 77, 88, 90, 117, 121 and 196 in part on the ground that these jurors would endorse a higher standard than the law provides for imposition of the death penalty or would only impose the death penalty for a narrow range of crimes. According to the Government:

- ***Juror 40***, an African-American female, "explained that she believed that the death sentence should not be imposed if a defendant has mental problems or is coerced by an older individual (such as the Washington area sniper)." ECF No. 466-1 at 3.

- ***Juror 77***, a white female, "stated that the 'death penalty should only be applied where a criminal is so violent as to pose a danger to society in general,' and stated she would want proof of 'future dangerousness' to vote for the death penalty." In addition, Juror 77 stated that the death penalty is "an extreme punishment to be applied in extreme cases." *Id.*

- ***Juror 88***, a white female, "stated 'If it has to be done, [she] might agree with it. The examples she gave were in clear-cut cases of torture or the killing of a police officer or first responder." *Id.* at 4.

- ***Juror 90***, an African-American female, "'limited' the death penalty to 'horrendous crimes' (stating 'I believe that there are some crimes that are so horrendous that the death penalty would probably be appropriate.') Her description of an appropriate crime was 'when a child is kidnapped, raped and murdered.'" *Id*. at 4.

- ***Juror 117***, an African-American female, was struck in part because "her initial view of the death penalty was expressed in terms of perhaps they should receive the death penalty 'where no other options are given.'" *Id.* at 5.

- ***Juror 121***, a white female, "stated she wanted proof 'beyond a shadow of doubt'" and further stated that "the decision to impose death would be 'very very hard' for her." *Id.* at 5.

- ***Juror 196***, an African-American female, "noted that the kind of case where the death penalty could be warranted like a 'serial killer.'" *Id.* at 6.

However, the Government accepted male jurors who expressed the same kind of "standards" for imposition of the death penalty, or who similarly stated that they would impose the death penalty for a limited set of crimes.

- ***Juror 22*** stated that the death penalty should always be imposed for the murder of a police officer. 9/7/05 Tr. 199. Juror 22 further stated that the death penalty would be appropriate for crimes such "[t]orture or rape, that kind of thing." *Id.* at 210.

- ***Juror 38*** had some concerns about the death penalty because, in the absence of DNA, he worried whether the right person had been convicted. 9/16/05 Tr. 125. Further, Juror 38 stated that, if the death penalty was involved, he would have to be "very, very convinced." *Id.*

- ***Juror 46*** informed the Court that he would be able to impose the death penalty if it were proven to him "beyond a shadow of a doubt" before accepting the Court's

14

instruction that the law requires the Government to prove guilt beyond a reasonable doubt. 9/8/05 Tr. 167, 176.

- ***Juror 56*** stated in his questionnaire that he "would be likely to support the death penalty for only the most heinous violent crimes." He confirmed during voir dire that he thought the death penalty was "probably only appropriate for the absolute most violent, you know, hate-filled crimes." 9/9/05 Tr. 56.

- ***Juror 178*** stated during voir dire that he felt strongly that he would need a "high degree of certainty" that the defendant is guilty to warrant imposition of the death penalty. 9/16/05 Tr. 93-95.

- ***Juror 195*** stated in his juror questionnaire that he would err on the side of leniency given the possibility of wrongful execution. He confirmed on voir dire that there might be some cases "heinous" enough for him to always vote to impose the death penalty, but he was "not entirely comfortable" with that notion. 9/20/05 Tr. 12.

- ***Juror 211*** stated that the death penalty is appropriate in the "worst of crimes." He expressed some concern that race is a factor in the imposition of the death penalty, as racism still exists in our society.

- ***Juror 260*** explained to the Court during voir dire that he was in favor of the death penalty for "heinous crimes." 9/22/05 Tr. 183.

c.  Purported religious affiliations.[3]  The Government justified its strikes of Jurors 84, 121, 124, 196 and 241, in part, on the basis of their religious affiliation or belief. According to the Government:

- ***Juror 84***, a white female, "was a self-described member of the Catholic Church." ECF No. 466-1 at 4.

- ***Juror 121***, a white female, "looked to [the Government] like a regular church goer." *Id*. at 5.

- ***Juror 124***, an African-American female, "expressed an interest in gospel music, an indication to [the Government] that she is devout, likely forgiving and would be reluctant to sentence a young man to death." *Id.* at 5.

- ***Juror 196***, an African-American female, identified herself as "a minister of the gospel," and the Government "views extremely devout or religious individuals as

---

[3] These justifications also violate the proscription against discrimination on the basis of religion. *See* Section I.B.4, *infra.*

unlikely to be able to impose the death penalty, particularly on a younger individual." *Id.* at 6.

- *Juror 241*, an African-American female, reported that "she listened to spiritual music," which the Government concluded "may indicate a reluctance to judge." *Id.* at 7.

However, the Government accepted male jurors who expressed similar affiliations.

- *Juror 19* self-identified as a Christian during voir dire. 9/7/05 Tr. 149.

- *Juror 47* reported that he belonged to the Catholic Church. 9/9/05 Tr. 10-11.

d.      Juror or the juror's relative involved in or accused of criminal conduct. The Government contends that it struck Jurors 1, 21, 40, 196 and 88 in part on the ground that they or a relative were involved in or accused of criminal conduct. According to the Government:

- *Juror 1*, a white female, had a brother who "was homeless and involved in criminal conduct." ECF No. 466-1 at 3.

- *Juror 21*, an African-American female, had a nephew "in 'very serious' trouble with the law." *Id.*

- *Juror 40*, an African-American female, was struck "because her brother was convicted of possession with intent to distribute drugs and served six years in prison." *Id.*

- *Juror 88*, a white female, "had a previous DUI charge which was dropped." *Id.* at 4.

- *Juror 196*, an African-American female, was struck because "her son in law had been charged with a crime and her son had a pending case." *Id.* at 6.

However, the Government accepted male jurors who similarly reported that either they or a relative had been involved in or charged with criminal conduct.

- *Juror 47* informed the Court that his father was convicted of a crime when he was a child and had been sent to prison twice; further, Juror 47's half-brother was convicted of armed robbery. 9/9/05 Tr. 6-7.

- *Juror 48* advised during voir dire that he had been arrested as a result of a fight. He explained that he was dissatisfied with the results of that charge because he

felt that the other participant in the fight should have been charged with a crime, but was not. *Id.* at 31-32.

- *Juror 56* reported that he had been pulled over for speeding and "harassed" by a police officer, who sought consent to search his car for illegal drugs. *Id.* at 52-53. Juror 56 explained to the Court that he thought he had been treated unfairly, went to court "to embarrass" the officer, and was satisfied when the court threw out the traffic charge. *Id.*

- *Juror 85* advised the Court in his questionnaire that he had been charged with DUI. Juror 85 pled guilty and was sentenced to probation, which included attending several classes. The Government asked no questions about this conviction during voir dire.

- *Juror 107* informed the Court that his brother was charged with trespassing as a teenager and that his brother-in-law had been charged with arson. 9/14/05 Tr. 30-31. Both were found not guilty. *Id.* When the Government asked the Court to inquire further about these incidents, Juror 107 explained that he felt his brother's trespassing charge was handled poorly by law enforcement because his brother should have been given a warning, rather than arrested, and that his brother-in-law was found not guilty of arson by reason of insanity. *Id.*

- *Juror 157* informed the Court that his father-in-law had been charged with molesting his stepdaughter. 9/15/05 Tr. 79.

- *Juror 177* had a nephew who had been convicted of a gun charge in Prince George's County several years before. 9/16/05 Tr. 77.

- *Juror 190* advised in his questionnaire that his brother had been charged with possession of heroin in approximately 1970 and skipped bail. Further, Juror 190 informed the Court that a college friend had been arrested and treated unfairly as a result of his participation in a campus demonstration or riot. *Id.* at 222-23.

- *Juror 254* informed the Court that he had been accused of a crime as a minor as the result of a fight. 9/22/05 Tr. 133. Juror 254 advised that this experience gave him a negative view of the criminal justice system. *Id.*

e.    <u>Drug or alcohol problem.</u> The Government contends that it struck Jurors 21 and 77 in part because they reported a relative's substance abuse. According to the Government:

- *Juror 21*, an African-American female, was struck in part because "her sister passed away as a drug user." ECF No. 466-1 at 3.

- *Juror 77*, a white female, was struck "because her stepson had a problem with drugs." *Id.*

However, the Government accepted the following male jurors, each of whom reported that either they or a relative had substance abuse problems.

- *Juror 22* indicated on his questionnaire that he or another person in his family had a drug or alcohol problem.

- *Juror 48* advised the Court that his brother was involved in drugs and had "dropped off the face of the earth." 9/9/05 Tr. 34.

- *Juror 126* responded affirmatively to the question on his juror questionnaire regarding whether he or anyone in his family had a drug or alcohol problem, and advised on voir dire that his brother died of cirrhosis of the liver as a result of alcohol. 9/6/05 Tr. 32.

- *Juror 190* advised that his deceased brother was at one time charged with possession of heroin and had a drug problem. 9/16/05 Tr. 223.

- *Juror 248* responded affirmatively to the question on his questionnaire regarding whether he or anyone in his family had a drug or alcohol problem. During voir dire, Juror 248 explained that his brother had a problem with drugs and alcohol and was "working" on it. 9/22/05 Tr. 82.

- *Juror 260* responded affirmatively to the question on his questionnaire regarding whether he or anyone in his family had a drug or alcohol problem and explained during voir dire that there is a history of alcoholism on his mother's side of the family. *Id.* at 182.

f.     Purported need to see CSI-type, "positive" evidence.  The Government contends that it struck Jurors 88 and 124, in part, on the ground that they required CSI-type or forensic evidence.  According to the Government:

- *Juror 88*, a white female, was struck because she "stated that she wanted 'positive physical evidence' which the government did not have in this case." ECF No. 466-1 at 4.

- *Juror 124*, an African-American female, was struck because she "stated that she will 'need scientific evidence.'" *Id.* at 5.

However, the Government accepted male jurors who also expressed a desire or need to see some sort of scientific evidence.

- *Juror 56* indicated in his questionnaire that he believed there must be some forensic or scientific evidence in order to find a defendant guilty beyond a reasonable doubt.

- *Juror 157* checked "yes" to the same question on his questionnaire and, when questioned about it on voir dire, initially indicated that he needed to know "exactly" what the facts are before deciding guilt. 9/15/05 Tr. 83-84.

- *Juror 166* checked "yes" to the same question on his questionnaire.

g.      Purported harboring of resentment against involved law enforcement agency because the agency previously rejected an employment application.  The Government contends that it struck Juror 83 in part because ten years earlier "she went through the employment process to be a Special Agent with the FBI but did not get hired.  Also, this case was investigated by the FBI with numerous FBI witnesses on the government's list to testify at trial." ECF No. 466-1 at 3-4.  However, the Government accepted Juror 155, a male, even though he indicated on his questionnaire and during voir dire, 9/15/05 Tr. 180, that he had unsuccessfully applied for a position with the Metropolitan Police Department, which, like the FBI, was an agency that investigated this case and employed witnesses who testified for the Government.

h.      Juror or spouse was a lawyer or worked in the field of law.  The Government contends that it struck female Jurors 1 and 145 in part because either the juror or the juror's spouse was a lawyer or worked in the field of law.  According to the Government:

- *Juror 1*, a white female, had a husband who was a lawyer.  ECF No. 466-1 at 3.

- *Juror 145*, a white female, "worked as a paralegal for 15 years." *Id*. at 5.

However, the Government accepted male jurors who were lawyers, married to lawyers, or otherwise had experience in the field of law – in some cases, significantly more experience than the female jurors the Government struck.

- *Juror 22*'s mother worked as a secretary at a law firm.

19

- *Juror 38* served as Assistant General Counsel of the FBI. He held a J.D. from the University of Texas and an L.L.M. in international law from George Washington University. 9/16/05 Tr. 118. He had practiced law for 32 years, and had spent approximately 10-11 years of that time serving as a Naval JAG officer. *Id.*

- *Juror 48* had been an intern for the Maryland State's Attorney General's Office, where he worked with victims of crime, and previously had worked for his father's law firm in Bethesda, Maryland.

- *Juror 182*'s sister served as an office manager at a law firm.

- *Juror 190* advised that either he or someone close to him worked as a debt collector for a law firm.

- *Juror 195* wrote in his questionnaire that someone close to him was the "lead attorney" at a law firm.

- *Juror 211* had performed litigation services for the Department of Justice.

- *Juror 248*'s wife was a lawyer.

- *Juror 260* practiced civil litigation, employment law counseling, and employment labor counseling with Wiley Rein LLP. 9/22/05 Tr. 179. He previously served as a summer legal clerk in the Criminal Division of the Department of Justice and as a law clerk to U.S. District Court Judge Ricardo Urbina. *Id.*

    i.    <u>Juror had a degree in, studied or worked in the field of psychology or criminal justice.</u> The Government contends that it struck Jurors 1, 88, 117 and 172, in part, because each had a degree in, or studied, psychology or criminal justice, worked in a related field, or had a spouse who did. According to the Government:

- *Juror 1*, a white female, had a degree in psychology. ECF No. 466-1 at 3.

- *Juror 88*, a white female, "majored in criminal justice in school." *Id.* at 4.

- *Juror 90*, an African-American female, had a "husband [who] was a retired probation officer, a job that inherently presumes release from prison and rehabilitation." *Id.*

- *Juror 117*, an African-American female, "spoke about her own education (she had a BS degree in sociology/child psychology) and stated that she was working on a master's degree in criminal justice with 'courts and law was my major.'" *Id.* at 5.

- ***Juror 172***, a white female, "worked in the mental health field including at Clifton Perkins, the hospital for criminals found not criminally responsible due to mental disease." *Id.* at 6.

However, the Government accepted male jurors who had earned a degree in, or studied, psychology or criminal justice, worked in a related field, or had a spouse who did.

- ***Juror 38*** minored in psychology in college. In addition, Juror 38, a lawyer, had read law review articles and cases discussing the death penalty for continuing legal education programs, and had also taken a criminal law class with Charles Alan Wright at the time when Wright argued a death penalty case before the Supreme Court.

- ***Juror 48*** took psychology classes as part of his undergraduate program. Further, his sister-in-law worked as a psychologist for the City of Rockville, MD, and had worked in a drug or alcohol program.

- ***Juror 56*** took psychology 101 as an undergraduate.

- ***Juror 85*** took psychology classes as an undergraduate.

- ***Juror 86*** took introductory psychology classes in college, and also expressed an interest in, and took introductory courses in, constitutional and criminal law.

- ***Juror 158*** minored in psychology in college.

- ***Juror 166*** took several psychology courses in college, including general psychology courses and courses in infant and women's psychology.

- ***Juror 178***, a federal prosecutor, was interested in criminal and constitutional law and had taken some psychology classes. In addition, his wife worked as a research psychologist for USUHS, and had previously worked for a drug abuse and counseling organization.

- ***Juror 190*** took two or three psychology courses in college. He held a position at NIH that required him to work with mental health professionals.

- ***Juror 195***'s wife was a former social worker who held a BA in psychology and a master's degree in social work. His wife had taken many psychology classes, was at the time volunteering with a Jewish social services agency, and had formerly worked as a social worker in an emergency room in a Philadelphia hospital.

- ***Juror 245*** took one psychology class in college. In addition, his wife worked for "multiple professionals" in the mental health field.

- ***Juror 248*** informed the Court that both he and his spouse had studied behavioral psychology.

- ***Juror 260*** took basic psychology courses in college. He advised the Court that, as a lawyer, he had studied constitutional and criminal law, as well as worked on legal matters involving the same. Juror 260 also worked with psychiatrists as expert witnesses as part of his legal practice.

j.  Juror did not answer question(s) on questionnaire.  The Government contends that it struck Jurors 88, 117, and 124 in part because they left parts of their juror questionnaires blank. According to the Government:

- ***Juror 88***, a white female, "did not list her employment on the questionnaire." ECF No. 466-1 at 4.

- ***Juror 117***, an African-American female, "failed to disclose her employment as a school teacher." *Id.*

- ***Juror 124***, an African-American female, "left a lot of the questions blank on the questionnaire." *Id.* at 5.

However, the Government accepted male jurors who also did not answer all questions on their questionnaires.

- ***Juror 19*** failed to answer questions 44 and 45 on his initial questionnaire regarding whether he or any family members had any biases or prejudices for or against prosecutors or law enforcement or criminal defense attorneys, and failed to follow instructions and explain his opinion on gun control.

- ***Juror 22*** failed to answer questions on his supplemental questionnaire requiring explication of his views on the death penalty. 9/7/05 Tr. 194, 206 (observing failure to answer questions).

- ***Juror 126*** failed to answer question 1 on the supplemental questionnaire (perhaps the most salient question of all), which asked him to explain his general view on the death penalty, and failed to follow instructions and explain why he felt the death penalty was carried out too often.

- ***Juror 155*** failed to identify his employment (prompting the Government to inquire further, 9/15/05 Tr. 177), failed to identify the verdict rendered in a previous case on which he served as a juror (also prompting the Government to inquire further, *id.* at 178), failed answer question 21 regarding whether he had

22

taken any psychology courses and failed to answer question 40 about whether he or a friend or relative was ever treated unfairly by law enforcement.

- *Juror 157* failed to answer question 1 on the supplemental questionnaire asking for his general view on the death penalty, failed to answer question 32 on the initial questionnaire regarding whether he, a relative or a friend had ever been represented by the Federal Public Defender in either D.C. or Maryland, and failed to answer questions 33 and 34 on the initial questionnaire, which asked whether the juror knew Mr. Lighty, Mr. Flood or the Court.

- *Juror 158* left blank question 2 on the supplemental questionnaire regarding whether he strongly or somewhat favors or opposes the death penalty.

- *Juror 177* omitted all biographical information sought on page 2 of his initial juror questionnaire, including all questions regarding his residence and employment.

- *Juror 254* failed to identify where he was employed; failed to give any description of his employment history for the prior seven years; failed to explain why he answered "yes" to question 43, which asked whether he was disappointed with any prior juror service; and failed to explain, in response to question 5 on the supplemental questionnaire, what types of discussions he had had about the death penalty.

    **2.**    *The Government's Justifications for Striking Certain Female Jurors Are Not Supported by the Record.*

In addition to offering reasons for its strikes of female jurors that apply equally to male jurors it accepted, the Government has proffered justifications for striking certain female jurors that, even standing on their own, cannot withstand scrutiny. These justifications, which are unsupported by the record, provide further proof of purposeful discrimination and thus support a finding of "good cause." *See, e.g., Miller-El II,* 545 U.S. at 244; *Purkett*, 514 U.S. at 768 ("At … stage [three], implausible or fantastic justifications may (and probably will) be found to be pretexts for purposeful discrimination"); *Johnson v. Vasquez*, 3 F.3d 1327, 1331 (9th Cir. 1993) ("When there is reason to believe that there is a racial motivation for the challenge, neither the trial courts nor we are bound to accept at face value a list of neutral reasons that are either unsupported in the record or refuted by it. Any other approach leaves *Batson* a dead letter.");

*Splunge v. Clark*, 960 F.2d 705, 709 (7th Cir. 1992) (finding the prosecutor's proffered race-neutral reason "an obvious mask for a race-based challenge" where the record revealed no evidence to support it).

*Juror 1 (white female).* The Government contends that "her husband was a lawyer and she had a degree in psychology." ECF No. 466-1 at 2-3. In fact, Juror 1 stated on her questionnaire that she was divorced, had taken only two undergraduate psychology courses, and held a degree in Business Management/Information Systems, not psychology. Moreover, while the Government professes concern that Juror 1 had a brother "who was homeless and involved in criminal conduct," the record demonstrates that Juror 1's relationship with her brother was distant. Juror 1 did not know what her brother had been involved with in the last 40 years because he showed up in her life only "every once in a while." 9/7/05 Tr. 4-5. Thus, as she confirmed for the Court, her relationship with her brother would not affect her judgment. *Id.*

*Juror 83 (African-American female).* The Government asserts that "Government counsel believed that Juror 83 . . . was arrogant and as a result, might not participate in jury deliberations well with other jurors. We particularly noted her arrogance as she described her job…" ECF No. 466-1 at 3. The juror discussed her employment on two occasions. The first was in her questionnaire, in which she wrote simply: "Full time employment at at [sic] major government agency which provides safety and soundness oversight to (2) major financial services organizations" as a reason why jury service would cause a hardship for her. And then during voir dire the juror stated: "I work for the Office of Federal Housing Enterprise Oversight. I am a senior account examiner. I provide accounting, I work for the chief accountant's office." 9/20/05 Tr. 92. These innocuous, descriptive statements represent the sum total of the juror's

comments regarding her work. A review of the remainder of the questionnaire and voir dire transcript similarly reveals nothing that could be construed as "arrogant."[4]

*Juror 84 (white female).* The Government claims it struck Juror 84 "because she expressed a preference for 'hard labor' over the death penalty" and "expressed uncertainty" on the subject. ECF No. 466-1 at 4. A review of Juror 84's statements in her questionnaire and voir dire, however, reveal that, despite her preference, she felt that the death penalty was imposed "about right;" that she was neither for nor against the death penalty but rather "in the middle;" and that she could impose it in an appropriate case and would strictly follow the court's instructions. 9/13/05 Tr. 34-35, 44. Tellingly, when counsel for Mr. Flood moved to excuse the juror for cause based on her extraordinarily strong ties to, and affinity with, law enforcement, the Government stated: "The Government would oppose that motion. This juror has said she recognizes that she has that personal feeling, that she could set it aside and follow the Court's instructions. We think she could follow the Court's instructions." *Id.* at 45-46.

*Juror 90 (African-American female).* The Government justifies striking Juror 90 on the ground that she "'limited' the death penalty to 'horrendous crimes'" like "'when a child is kidnapped, raped and murdered.'" But Juror 90 never indicated that imposition of the death penalty ought to be "limited" in this fashion. "Limited" is, in fact, the Government's word, not Juror 90's. 9/13/05 Tr. 133-34. And Juror 90's statement about applying the death penalty in

---

[4] This was not the only juror as to whom the Government invokes a demeanor- or conduct-based justification for its strike. It also relies on demeanor, in part, to explain its strikes of Jurors 97 ("nervous"), 121 ("odd" and "strangely aloof" when talking about a home invasion), 172 ("hard of hearing") and 193 ("asleep;" repeatedly looked at Petitioners during voir dire). *See infra.* The danger in accepting these kinds of justifications on their face without any record support, especially in a case where the numbers supporting an inference of discrimination are so high, is the ease with which they can be proffered. *Batson,* 476 U.S. at 106 (Marshall, J., concurring). The recurrence of these non-record, demeanor- and conduct-based rationales further supports the need to discover how the prosecutors divined them, including by examining the prosecutors' contemporaneous notes.

cases of child rape-murder was in response to the Court's question about whether there were cases in which she would *always* impose the death penalty, *id.* at 144, which is plainly different than describing the cases in which she would *only* impose the death penalty. Juror 90 simply never "limited" imposition of the death penalty and, importantly, the Government did not otherwise ask the Court to follow up with her to see if she would. Moreover, while the Government also said it had concerns that Juror 90 was "conflicted" about the death penalty because she believed it had been applied disproportionately to African Americans, she made crystal clear that she viewed this as purely a "historical fact," that it would not affect her ability to impose a death sentence, and that certain crimes warranted the death penalty regardless whether African-Americans had been disproportionately sentenced to death.[5] *Id.* at 133-43. Finally, the Government's explanation that Juror 90's husband was "a probation officer, a job that inherently presumes release from prison and rehabilitation," is spurious. Her husband was the probation officer, not her; a probation officer is in law enforcement and thus presumably pro-prosecution, not anti-prosecution; the Government never questioned Juror 90 to determine whether her husband's former job implied anything regarding *her* views on capital punishment and it was the defense, not the Government, that asked for follow-up regarding her questionnaire answer about her husband's career. *Id.* at 128-29.

*Juror 117 (African-American female).* The Government says it struck Juror 117 because she did not "candid[ly]" disclose her employment as a school teacher on her questionnaire and instead focused on her education. But Juror 117's failure to list her current employment was

---

[5] The Government also accepted a male juror, Juror 19, who wrote and spoke far more extensively about the disproportionate – and erroneous – application of the death penalty against African-Americans and who, unlike Juror 90, stated that the death penalty was imposed too often. *See* p. 12, *supra*.

plainly an oversight. In her questionnaire, which she filled out diligently, Juror 117 indicated she had been employed full time for five years by the same employer, specifically identified her *prior* employment, and then indicated that she was a member of the "Maryland State Teachers Association." Subsequently, in voir dire, she unhesitatingly disclosed her position as a math teacher with the Prince George's County Schools.[6] Contrary to the Government's insinuation, there is no suggestion that Juror 117 was trying to hide or downplay her employment. The Government's stated suspicion that Juror 117 wanted to use her jury service to inform her masters' thesis is similarly groundless. Juror 117 clearly indicated that she would not and was not looking to use jury service for her thesis (which, in any event, addressed "school violence" and was thus unrelated to this case or her jury service). 9/14/05 Tr. 81. Finally, voir dire fully resolved the Government's purported concern that, on Juror 117's questionnaire, one of her answers suggested she would only impose the death penalty "where no other options are given." *Id.* at 74-77. Indeed, when the Government pressed the issue, saying Juror 117 was being "inconsistent," the Court itself suggested the Government was conjuring up reasons to find fault: "No, I think it's consistent. I have no problem following what she said at all. . . . Let's not labor it any more. I think she's made it clear she would be able to have an open mind on [being able to impose the death penalty when life without parole is an option]." *Id.* at 87.

*Juror 121 (white female).* The Government claims it struck Juror 121 because "she looked to us like a regular church goer." ECF No. 466-1 at 5. This justification violates the proscription against striking jurors based on their religion, *see infra*, and does not logically show that the juror would be unfavorable to the Government in any event. Even more fundamentally, there is no record support for it. Nothing in either Juror 121's questionnaires or voir dire

---

[6] The Government tried to strike her for cause on the ground that she was a teacher. 9/14/05 Tr. 66-67.

testimony speaks to her religious affiliation or her attendance at religious services. In addition, the Government's assertion that Juror 121 appeared "odd" and "strangely aloof about having a pedophile break into her home and steal her child's diapers" is not at all apparent from the record, nor did the Government contemporaneously note it on the record. On its face, her discussion of the incident appears perfectly normal, 9/14/05 Tr. 112, and the Government did not request follow up with her to explore the matter further.

Finally, as to the Government's contention that Juror 121 "is not against [the death penalty] if the evidence suggested that was beyond the shadow of a doubt the correct punishment" and that imposing death would be "very, very hard" wrenches her statements from their context. Her questionnaire responses and voir dire testimony made clear that she had not formed any opinions about the death penalty because she had never given it much thought. 9/14/05 Tr. 114. When the Court asked her if she could follow its instructions and impose a death sentence, she repeatedly agreed she could. *Id.* at 114-21. The Government initially had no follow up questions. *Id.* at 121. On follow up by defense counsel, Juror 121 maintained that "if the State of Maryland [sic] has that as an option and they feel that is something we should consider, I certainly will consider it." *Id.* at 114-25. When the Government then chose to ask whether Juror 121 could impose death, she said, "I'm not going to tell you it wouldn't be a very, very hard decision to make. But, yes, I would make that [impose death] if I felt that was what was appropriate after I knew all the evidence . . . it would be a hard decision, but the answer would be yes." *Id.* at 125-26. To the extent this testimony conveyed any ambivalence at all about Juror's ability to impose the the death penalty – which is dubious – it exhibited far less ambivalence than numerous male jurors the Government accepted. *See* p. 12-13, *supra* (*e.g.,*

28

Juror 158 ("my honest answer is I'm not sure I could do it," prompting Government motion to strike for cause, 9/15/05 Tr. 208-11)).

*Juror 124 (African-American female).* The Government's contention that Juror 124 "did not follow instructions and left a lot of questions blank on the questionnaire" is inaccurate. But for omitting answers to questions two, four and thirteen on the questionnaire, which sought general biographical information, Juror 124 answered every question on both the questionnaire and supplemental questionnaire. In fact, when this juror came across one particular question that she did not understand, rather than attempting to answer it, she took care to place a question mark next to the question. During voir dire, the juror was cooperative when the Court asked questions two, four and thirteen and fully answered them.

The Government's position that, because Juror 124 "expressed an interest in gospel music" she "would be reluctant to sentence a young man to death," is a *non sequitur* and alone is powerful evidence of pretext. The Government's "gospel" rationale also is based on a single, isolated – and completely unexplored – reference in the questionnaire that, of the three radio stations which Juror 124 listened to regularly, one was a gospel station. Finally, Juror 124's questionnaire and voir dire answers made clear what is otherwise obvious: interest in gospel has nothing to do with a disinclination to impose the death penalty. In her questionnaire, Juror 124 indicated that she "believes in the death penalty, because [she] feels life for life," is "strongly in favor of the death penalty," believes it is carried out "too seldom," and would always impose it for a defendant who is implicated in another homicide. On voir dire, she reiterated her willingness to impose death, because when the killer "stays behind bars for life, it doesn't bring back the other person. . . . [W]hen they take a life, a life should be given up." 9/14/05 Tr. 133.

The Government's suggestion that Juror 124 "stated" she "would need scientific evidence" also misstates what she said. Asked about the imperative of scientific evidence, she answered "[y]es, *somewhat*," and then conclusively assured the court that she would be able to evaluate the evidence without insisting on a particular kind of test or investigation. *Id.* at 131-32.

*Juror 193 (African-American female).* The Government struck Juror 193 in part because she purportedly "told the Court that she had a vacation planned" during trial and "[i]n our experience, jurors who are concerned about their personal vacation schedules are often impatient with the government during the course of trial and appear angry at any delays." ECF No. 466-1 at 6. The record, however, is devoid of <u>any</u> reference to vacation plans. Juror 193 answered "none" to the question on her questionnaire asking whether there was any reason she could not be available for an eight week trial, and there is no discussion about any planned vacation or any other aspect of her schedule during voir dire. 9/16/05 Tr. 239-48. The Government's purported observations regarding Juror 193's conduct during voir dire are similarly absent from the record. The record contains no indication regarding her alleged "difficulty staying awake," "look[ing] at the defendants," and "hesita[tion] before saying she could impose the death penalty." Nor did the Government choose to ask the Court to follow up with Juror 193 about these purported concerns. *Id.* at 248.

*Juror 220 (white female).* The Government justifies its strike of Juror 220 by claiming that she "expressed a need to have proof of future dangerousness to support a death sentence, wanting evidence of a complete inability to function in society." In fact, Juror 220's answers reflected that she would not restrict imposition of the death penalty in such a manner. She wrote in her questionnaire: "I do not believe the death penalty is a deterrent to crime but I do believe it is reasonable in some cases especially to protect society," and "[I am] somewhat in favor of the

30

death penalty." On voir dire, she said, "Well, as I said in the questionnaire, I do not believe the death penalty is a deterrent to crime, but I do think in some instances it could be the correct decision to protect society from someone who has shown complete inability to function in society." 9/20/05 Tr. 155. She also said: "Every case is individual and should be treated that way. . . . I have seen certain individuals over the years who I felt justly received the death penalty. I'm also aware that there have been instances from time to time where someone was sentenced to death and turned out not to be guilty. So I mean, I think it's each case on the merits." *Id.* At all other points during voir dire, Juror 220 re-affirmed her ability to follow the Court's instructions and impose the death penalty. *Id.* at 155-63. Thus, Juror 220 never said she required evidence of future dangerousness, and there is no basis upon which to conclude that she would have required anything other than proof that a defendant had committed murder in order to conclude that he had demonstrated an inability to function in society.

*Juror 235 (white female).* The Government first states that it struck Juror 235 because she "appeared to be a homebody who wanted to be on the jury because she had nothing better to do." However, there is nothing in the record to indicate that this juror was a "homebody." On her questionnaire, Juror 235 reported that she was a single woman who had earned a BS in Broadcasting and was employed full time outside of the home as a programmer for American Life. No other information was elicited about her work, home, or social life, and the Government did not seek any follow up about it. 9/21/05 Tr. 155. Nor is there any record support for the Government's statement that it "had some concern about [Juror 235's] mental status." To the contrary, Juror 235 fully and cogently answered the questionnaires and furnished coherent testimony on voir dire, and the Government did not previously voice concern about her "mental status."

*Juror 241 (African-American female).* The Government first claims it struck Juror 241 because she had "no recollection of her prior jury service." But Juror 241 remembered having served on the jury and further recalled that the case took place 10-12 years ago and involved charges of drug distribution. 9/22/05 Tr. 21-22. The Government's other reason for striking Juror 241 – "she listened to spiritual music, which may indicate a reluctance to judge" – is similarly pretextual. While Juror 241 reported listening to spiritual music, none of her responses indicated an unwillingness to judge. Just the opposite is true. On her questionnaire, she wrote "I am neither for nor against the death penalty. If the crime warrants the death penalty and is proven in court then I think that is the proper decision." She further reported that she had no problem imposing the death penalty in the right circumstances, "I feel very strongly about that." *Id.* at 23. When asked if she would impose death in a kidnapping case, she responded, "It would sure be one I would consider." *Id.* at 24.

3. ***Some of the Government's Justifications for Its Strikes of Female Jurors Are Proxies for Race.***

Step 2 of the *J.E.B.-Batson* procedure requires the Government to furnish race- and gender-neutral explanations for their strikes. "A neutral explanation in the context of our analysis here means an explanation based on something other than the race of the juror." *Hernandez v. New York*, 500 U.S. 352, 360 (1991). If the explanation is based on a stereotypical view or intuition that a juror will hold certain beliefs or act in certain ways as a result of his or her race, the explanation is not race-neutral. *Johnson*, 40 F.3d at 668 (prosecutor's explanation that he believed an African American female juror would be more sympathetic to African-American defendant and less sympathetic to white victim was not race-neutral).

If a proffered explanation appears race-neutral on its face but in fact is merely a proxy for race, a court should infer that the Government has engaged in purposeful discrimination. *See,*

*e.g., United States v. Bishop*, 959 F.2d 820, 825-26 (9th Cir. 1992), overruled on other grounds by *United States v. Nevils*, 598 F.3d 1158 (9th Cir. 2010); *California v. Turner*, 90 Cal. App. 4th 413, 421 (2d Dist. 2001). An explanation is an unconstitutional racial proxy if it is based on "the prosecutor's personal stereotypical views" rather than a characteristic that is individual to the juror." *Turner*, 90 Cal. App. 4th at 420 (finding that justification based on assumption that people from the juror's predominantly African-American neighborhood have a different attitude toward the drug culture was impermissible proxy for race); *see also Bishop*, 959 F.2d at 825-26 (presumed attitudes of members of predominantly African-American community, which prosecutor cited as justification for strike, were impermissible proxy for race). Reliance on "place of residence, or any other factor closely related to race," is an illegitimate proxy for race unless the prosecution can show that juror "actually entertain[s] the bias underlying the use of that factor." *Bishop*, 959 F.2d at 823 n.5.

Here, the Government struck several jurors for reasons that are proxies for race.

- *Juror 90.* The Government claims it excluded Juror 90 in part because she "stated that she was 'conflicted' about the death penalty," and it "concluded that she would be unlikely to vote" for death. ECF No. 466-1 at 4. In fact, what the juror said was: "Well, I'm sort of conflicted because, as an African-American . . . I believe that there – that more African-Americans are sentenced to the death penalty for the same crimes that whites are, but they get the death penalty more often for the same crimes, I do believe that." 9/13/05 Tr. 133. By relying on this statement to strike Juror 90, the Government was relying on a proxy for race. The Government assumed Juror 90 would be unlikely to vote for a death sentence because of her awareness, as an African-American, of the disproportionate imposition of the death penalty on African-Americans. Yet there was no basis for this assumption other than her race. The juror went on to say, "I also believe that there are some crimes that are so horrendous that the death penalty would probably be appropriate," *id.* at 133-34, and assured the Court that "[w]hen I answered this, I was under oath to answer it, so I answered it honestly and that's what I feel; however, I do think that I am open-minded enough to look at all of the evidence presented, whether the person was African-American or not. I just think that's a fact, a historical fact." *Id.* at 143. The Court continued: "But it would not affect your judgment in this particular case; is that a fair statement? [Juror]: I think that's a fair statement." *Id.* Her questionnaire answers were consistent.

- *Juror 124.* The Government asserts that it struck Juror 124 in part because she "expressed an interest in gospel music, an indication to us that she is devout, likely forgiving and would be reluctant to sentence a young man to death." ECF No. 466-1 at 5. As explained above, the only reference to gospel music is Juror 124's identification of a gospel radio station as one of three to which she listened. Moreover, the record is devoid of evidence suggesting that Juror 124 would hesitate to impose the death penalty; to the contrary, it shows a clear readiness to do so. The Government simply assumed that a person who listens to gospel is unlikely to vote for a death sentence. Inasmuch as gospel music is closely associated with the African-American community, the Government's reliance on Juror 124's "interest in gospel music" to conclude that she would make an unfavorable juror is a proxy for reliance on race.

- *Juror 241.* As with Juror 124, the Government says it struck Juror 241 because "she listened to spiritual music which may indicate a reluctance to judge." ECF No. 466-1 at 7. Again, the record contains no indication whatsoever that Juror 241 was reluctant to judge. This was merely a stereotypical assumption by the Government. The Government's invocation of her affinity for "spiritual" music reflects reliance on a proxy for race.

- *Juror 201.* The Government states it struck Juror 201, an African-American male, because, "[g]iven his closeness in age to the defendant and his having resided in the Temple Hills area [where the murder occurred], the government concluded he might be sympathetic to the defendant." ECF No. 466-1 at 6. The fact is that Juror 201 was not simply a young man, but a young African-American man who lived in a predominantly African-American neighborhood. According to the 2010 census, the city of Temple Hills is 86.92% African-American and only 5% white. *See* www.censusviewer.com/city/MD/Temple%20Hills. The Government's reliance on Juror 201's age and city of residence to justify its strike was a proxy for reliance on race. Race, in other words, is what drove the Government's assumption that Juror 201 would sympathize with Petitioners. Although Juror 201 was male, the Government's race-based reasons for striking him constitute relevant circumstantial evidence supporting Petitioners' contention that the Government took race into account when striking African-American women.

The Government's invocation of proxies for race to justify these strikes further demonstrates that the Government engaged in impermissible discrimination in jury selection. Correspondingly, it further establishes good cause to grant Petitioners' requests for discovery.

### 4. *Some of the Government's Justifications for Its Strikes of Female Jurors Demonstrate Impermissible Discrimination on the Basis of Religion.*

"*Batson* must be read as not only prohibiting certain specific actions, but also as creating a broad standard or principle that the courts must, in reason, follow." *Overton v. Newton*, 295

F.3d 270, 278 (2d Cir. 2002).  Thus, federal courts have found that exercising a strike based on religious affiliation violates the Constitution.  *Brown*, 352 F.3d at 667-69; *United States v. DeJesus*, 347 F.3d 500, 511 (3d Cir. 2003) (holding that a strike motivated by religious beliefs that could prevent the juror from convicting the defendant is valid, but that a strike based on religious affiliation is not); *United States v. Stafford*, 136 F.3d 1109, 1114 (7th Cir. 1998) (it "would be improper and perhaps unconstitutional to strike a juror on the basis of his being Catholic, a Jew, a Muslim, etc."); *see also Davis*, 511 U.S. at 1115 (Thomas, J., joined by Scalia, J., dissenting from denial of certiorari).  Numerous state courts also have invalidated strikes based on religious affiliation.  *Brown*, 352 F.3d at 666-67 (citing *Arizona v. Purcell,* 18 P.3d 113, 120 (Ariz. Ct. App. 2001); *Connecticut v. Hodge,* 726 A.2d 531, 552–54 (Conn. 1999); *California v. Martin,* 75 Cal.Rptr.2d 147, 150–51 (Cal. Dist. Ct. 1998)).

Here, the Government's explanations for several of its strikes betray impermissible discrimination on the basis of religion.  Specifically, the Government contends that it struck Jurors 84, 121, 124, 196 and 241 on the basis of religious affiliation or observance.  Juror 84 "was a self-described member of the Catholic Church."  ECF No. 466-1 at 4.  Juror 121 "looked to [the Government] like a regular church goer."  *Id.* at 5.  Juror 124 "expressed an interest in gospel music, an indication that she is devout, likely forgiving and would be reluctant to sentence a young man to death."  *Id.*  Juror 196 was a self-described "minister of the gospel."  *Id.* at 6.  And Juror 241 "listened to spiritual music, which may indicate a reluctance to judge."  *Id.* at 7.

The Government, however, sought no follow up during voir dire to ascertain whether Jurors 121, 124 or 241 held religious *beliefs* that would impede their ability to judge the defendants or impose the death penalty.  *See* 9/14/05 Tr. 111-21; *id.* at 128-52; 9/22/05 Tr. 20-

31. Nor did any of these jurors express any inability or unwillingness to do so. *See supra.* Additionally, while Juror 84 identified herself on voir dire as a member of the Catholic church, she confirmed that "as a juror . . . [she would] have to follow what instruction is given and follow what the law determines as opposed to my personal beliefs," and that her membership in the Catholic church would not influence her ability to fairly consider the case. 9/13/05 Tr. 43. Juror No. 124 similarly described herself as "a fairly religious person," 9/22/05 Tr. 23, but informed the Court that she feels "very strongly" that the death penalty is appropriate "as long as it fits the crime, and it has been proven that the person did, indeed, do whatever it was and that is one [of] the punishments." *Id.* The Government asked no further questions about her religious beliefs. Finally, Juror 196 stated on voir dire that she did not belong to or participate in a religious organization that had a stated position either in favor of or against the death penalty, and that she held no views by reason of her church membership that would affect her views on the death penalty. Further, when, at the Government's urging, the Court asked her again if "there was anything in her religious background that would prevent [her] from imposing the death penalty," she stated, "No, sir." 9/20/05 Tr. 35-36.

The record demonstrates that the Government struck each of these jurors based on an assumption, rooted in stereotypes, that their religious affiliation rendered them unsuitable for the prosecution. Such strikes are unconstitutional. *See, e.g., Brown*, 352 F.3d at 667-69; *Stafford*, 136 F.3d at 1114.

## II. PETITIONERS ARE ENTITLED TO FULL MERITS BRIEFING AND AN EVIDENTIARY HEARING.

The Government seeks to convert Petitioners' request for discovery into an adjudication of their entire claim for relief on the merits. As noted in the Introduction, its suggestion contravenes the mutually agreed-upon scheduling order, which establishes that merits briefing

36

will follow the Court's ruling on the Motion. ECF No. 449. Petitioners respectfully request that the Court reject the Government's suggestion and adhere to the scheduling order – that is, the Court should rule on the discovery motion before the time for merits briefing begins to run. Moreover, whether or not the Court adheres to the scheduling order, Petitioners request that they be given the opportunity to fully brief their *J.E.B.-Batson* claims, as well as their related ineffective assistance of counsel claims, on the merits. They wish to address, among other things, the Government's argument that their stand-alone *J.E.B.-Batson* claim – as distinguished from the claims of ineffective assistance of counsel – is procedurally defaulted because it was not raised on appeal.[7]

Whether or not the Court orders discovery, and whether or not it entertains the full merits briefing reflected in the scheduling order, Petitioners are entitled to an evidentiary hearing on their *J.E.B-Batson* and related ineffective assistance of counsel claims prior to any ruling on the merits. In § 2255 proceedings, "[u]nless the motion and the files and records of the case *conclusively* show that the petitioner is entitled to no relief, the court shall . . . grant a prompt hearing thereon, determine the issues and make findings of fact and conclusions of law with respect thereto." 28 U.S.C. § 2255(b) (emphasis added). Under this provision, "[a]n evidentiary

---

[7] In short, Petitioners' *J.E.B.-Batson* claim is not defaulted. Because it requires the presentation of substantial evidence outside the trial record – *e.g.,* the Government's justifications for its strikes and the striking pattern in *Higgs* – Petitioners could not have raised it on direct appeal and can only raise it in habeas proceedings under 28 U.S.C. § 2255. *See, e.g., Massaro v. United States,* 538 U.S. 500 (2003) (ineffective assistance of counsel claims ought to be litigated under § 2255 in the district court, "the forum best suited to developing the facts necessary to determining the adequacy of representation during an entire trial," because "[t]he court may take testimony from witnesses"); *United States v. DeFusco*, 949 F.2d 114, 120 (4th Cir. 1991) (defendant's challenge to the voluntariness of his guilty plea "is improperly raised on direct appeal," and "is more properly raised in a § 2255 habeas motion for collateral relief, where the petitioner will be able to 'establish an adequate record for resolution of the question,' and counsel will be 'afforded adequate opportunity to explain the reasons surrounding the action or inaction to which [petitioner] takes exception'") (quoting *United States v. Lurz*, 666 F.2d 69, 78 (4th Cir. 1981)).

hearing in open court is required when a movant presents a colorable Sixth Amendment claim showing disputed facts beyond the record or when a credibility determination is necessary in order to resolve the issue." *United States v. Blondeau*, 480 F. App'x 241, 242 (4th Cir. 2012) (citing *United States v. Witherspoon*, 231 F.3d 923, 925-27 (4th Cir. 2000)); *Raines v. United States*, 423 F.2d 526, 530 (4th Cir. 1970); *United States v. Whit*e, 366 F.3d 291, 302 (4th Cir. 2004) ("[W]here the ultimate resolution rests on a credibility determination, an evidentiary hearing is especially warranted.").

Here, Petitioners have made far more than a "colorable" claim that the Government violated the proscriptions of *J.E.B.-Batson* and that their trial counsel were ineffective in their failure to lodge *J.E.B.-Batson* challenges at the conclusion of jury selection. They have: (i) adduced powerful statistical evidence of discrimination, *see* Report of John Lamberth, attached as **Exhibit 1**; ECF No. 454; (ii) shown preliminarily that the male jurors whom the Government accepted expressed equal or greater ambivalence about the death penalty and law enforcement than the female jurors whom the Government struck; ECF No. 454 at 10-25; (iii) demonstrated that the prosecutors, in the wake of a life verdict in *Haynes*, which was decided by a mixed male-female jury, engaged in a similar striking pattern in *Higgs*, producing an all-male jury; (iv) demonstrated that the justifications for the Government's strikes, ECF No. 466-1, are pretextual and/or inherently discriminatory, *see supra*; and (v) presented declarations establishing that trial counsel rendered ineffective assistance in failing to challenge the Government's strikes, ECF No. 406 at ¶ 5(c) (Decl. of Michael E. Lawlor, Flood's trial counsel); Declaration of Jeffrey B. O'Toole, attached as **Exhibit 2** (Lighty's trial counsel). This evidence does *not* "conclusively show that [Petitioners are] entitled to no relief." 28 U.S.C. § 2255(b). Moreover, it "necessarily requires . . . credibility determination[s], or at least the receipt of evidence outside the present

record," insofar as the Court must, *inter alia,* take statistical evidence from Dr. Lamberth, *see* Ex. 1, weigh the veracity of the Government's justifications for its strikes, *see* ECF No. 466-1 and discussion *supra,* and take testimony from Petitioners' trial counsel. ECF No. 406; Ex. 2. *Blondeau*, 480 F. App'x at 243 (holding that district court abused its discretion by failing to hold § 2255 evidentiary hearing on issue of whether petitioner's counsel failed to consult with him regarding his desire to file an appeal); *see also United States v. O'Quinn*, 166 F. App'x 697, 698 (4th Cir. 2006) (vacating and remanding to district court for § 2255 evidentiary hearing on whether counsel discussed with petitioner his corrected plea agreement); *White*, 366 F.3d at 302 (vacating and remanding for § 2255 evidentiary hearing regarding whether the Government made an alleged oral promise that petitioner's plea would be conditional); *Witherspoon*, 231 F.3d at 927 (vacating and remanding to district court for § 2255 evidentiary hearing regarding whether petitioner expressed desire to appeal his sentence); *United States v. Magini*, 973 F.2d 261, 264 (4th Cir. 1992) (vacating and remanding to district court for § 2255 evidentiary hearing regarding whether petitioner's counsel had an actual conflict of interest). As a result, Petitioners' *J.E.B.-Batson* and corresponding ineffectiveness claims necessitate an evidentiary hearing.

<u>**CONCLUSION**</u>

For the foregoing reasons, and for the reasons explained in Petitioners' opening Memorandum, Petitioners have established good cause for each of their discovery requests. Accordingly, Petitioners respectfully request that the Court grant their Motion. Additionally, Petitioners respectfully request that, consistent with the Scheduling Order, they be given the opportunity to fully brief the merits of their *J.E.B.-Batson* and corresponding ineffectiveness claims. Finally, because Petitioners have easily met the threshold for an evidentiary hearing on

these claims, they respectfully request that, prior to ruling on the merits, the Court grant such an evidentiary hearing.

Dated: April 26, 2012                              Respectfully submitted,

 /s/ Julie Brain_____
Julie Brain
JulieBrain1@yahoo.com
Attorney at Law
127 Church Street, 2nd Floor
Philadelphia, PA 19106
(267) 639 0417

/s/ Karl Schwartz_____
Karl Schwartz
Karl_schwartz@fd.org
Chief, Capital Habeas Unit
Jennifer Merrigan
Jenny_merrigan@fd.org
Capital Habeas Unit
Delaware Federal Defender Office
800 King Street, Suite 200
Wilmington, DE 19801
302-573-6010

/s/ Seth Rosenthal_____
Seth A. Rosenthal (D. Md. Bar #10780)
sarosenthal@venable.com
Molly T. Cusson (D. Md. Bar #18390)
mtcusson@venable.com
VENABLE LLP
575 7th Street, NW
Washington, DC  20004-1601
202-344-4000

*Counsel for Kenneth Jamal Lighty*

/s/ Marta Kahn_____
Marta K. Kahn (D. Md. Bar #24992)
The Law Office of Marta K. Kahn, LLC
8 E. Mulberry St.
Baltimore, MD 21202
(410) 299-6066

*Counsel for James Flood*

**CERTIFICATE OF SERVICE**

I hereby certify that on the 26th day of April, 2013, I caused the foregoing *Petitioners'*

*Reply in Support of Their Joint Motion for Discovery Regarding the Allegations of Impermissible*

*Discrimination in Jury Selection Made in Their Motions for Relief Under 28 U.S.C. § 2255* to be

filed via the Court's ECF system, a copy of which was mailed by U.S. mail, first class, postage

pre-paid, to the following:

James Crowell, Esq.
Deborah A. Johnston, Esq.
Sandra Wilkinson, Esq.
Assistant United States Attorney
Office of the United States Attorney
400 United States Courthouse
6500 Cherrywood Lane
Greenbelt, MD 20770-1249


/s/
Seth A. Rosenthal, Esq.