# EXHIBIT 1

# EXPERT REPORT OF DR. JOHN LAMBERTH

**United States**

**v.**

**Kenneth Lighty and James Flood**

**CASE NO. 8:03-cr-457-PJM**
**THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
**Southern Division**

## TABLE OF CONTENTS

EXPERT QUALIFICATIONS ................................................................................................ 1

SCOPE OF OPINION........................................................................................................... 1

MATERIALS AND INFORMATION RELIED UPON ........................................................ 2

METHODOLOGY................................................................................................................. 3

RESULTS .............................................................................................................................. 4

CONCLUSION...................................................................................................................... 8

ATTACHMENT 1:  CURRICULUM VITAE

## EXPERT QUALIFICATIONS

I served on the faculty at Temple University from 1973 until my retirement in 2002. Since that time I have headed Lamberth Consulting, a firm which provides profiling services to police departments, local Governments, civil rights groups and law firms and continues to provide jury services for litigation.

My Ph. D. in Social/Personality Psychology included rigorous scientific training in statistics, surveying and methodology. For two decades I was heavily involved in utilizing scientific principles in jury selection, jury composition challenges, change of venue motions and, after the *Batson* decision was issued, I assisted attorneys in evaluating whether peremptory challenges were being used based on race and/or other characteristics deemed improper. In one or more of these capacities, I have been involved in more than 30 death penalty cases.

In the 1990s I worked with the Capital Jury Project, which has a continuing research program that involves interviewing jurors who have served on capital juries. The primary aim of this research is to ascertain the bases upon which capital jurors make their sentencing decisions. I was responsible for the interviews of jurors from Philadelphia.

## SCOPE OF OPINION

I analyzed the Government's peremptory challenges in *United States v. Lighty and Flood*, tried in 2005 in the District of Maryland, to make a probabilistic statistical determination about whether the prosecutors were making their striking decisions based upon gender and/or a combination of gender and race.

1

## MATERIALS AND INFORMATION RELIED UPON

To perform my analysis, I relied on the following materials and information:

1. A spreadsheet, provided by counsel, that indicates the following: the gender and race of the 70 jurors qualified for service in the case; which qualified jurors were seated; which qualified jurors were struck and by whom; and which qualified jurors were either removed before striking began or were not struck because the court obtained a full panel of 12 jurors and six alternates before their names came up on the list. The spreadsheet was created from the jury strike lists and related material obtained from the United States District Court for the District of Maryland.

2. Information provided by counsel, derived from the transcript of jury selection, showing that:

    a. The Court utilized a simultaneous blind striking procedure to select the jury. At the conclusion of voir dire, the Court provided each side with the same list of 64 qualified prospective jurors, allowing each side to exercise its strikes simultaneously, without the other side knowing which jurors it was striking. When each side finished, it furnished the Court with its list – again, without the other side knowing which jurors it struck. The Court then went down the list in order, populating the petit jury with the first 12 jurors on the list whom neither side struck and the alternate pool with the next six jurors on the list whom neither side struck.

    b. Each side was given 20 strikes to select the 12 jurors who comprise the petit jury. As a result, the Court needed a maximum of 52 qualified prospective jurors to

2

seat those 12 jurors (40 total strikes allotted + 12 accepted jurors = 52 qualified prospective jurors needed). Each side was also given 3 strikes to select six alternates, meaning that the Court needed an additional 12 qualified prospective jurors to seat the alternates (6 total alternate strikes allotted + 6 accepted alternates = 12 additional qualified prospective jurors needed). Accordingly, to seat the jury of 12 with six alternates, the Court needed a total of 64 qualified prospective jurors.

c.  To ensure that it would have 64 qualified jurors by the time the parties exercised their peremptory strikes, the Court actually qualified 70 jurors during voir dire. Four potential jurors were struck for cause on the day that the actual seating of the jury occurred. Because the Court required a maximum of 64, the last two jurors on the list were not needed.

## METHODLOGY

To determine whether the strikes by the Government were made without the influence of gender or gender/race, it is necessary to compare the actual strikes made by the Government to the pool that was available to be struck after the jurors were qualified. Given the procedure that the Court utilized for jury selection (simultaneous blind procedure), it is possible to track the Government's strikes without any influence from the strike behavior of the defense. The procedure requires the prosecution to make an affirmative decision for each and every juror. This is in contrast to the seriatim method of jury selection, which allows, and provides an incentive for, the prosecutor to announce "accept" following a defense strike of a juror whom the prosecutor would have otherwise rejected. The value of the blind procedure to the statistician is

3

that it gives the statistician a complete and accurate picture of the prosecutor's intent with respect to jurors the prosecutor wishes to accept or reject.

An appropriate pool to consider for the purpose of analyzing whether the Government's strikes were made without regard to gender or gender/race is the group of 64 qualified jurors, which both sides had to consider as they made their strikes, both for the 12 who would comprise the petit jury and the 6 alternate jurors.

As I have been asked to determine whether the strikes by the Government would be consistent with the makeup of the jury pool of 64 with regard to gender and race, I will employ a methodology that compares the proportion of females in the pool to the proportion of females that were struck by the Government. Additionally, I will compare the proportion of jurors in the pool who were black and female to the proportion of jurors in the pool who were black, female and struck by the Government.

### RESULTS

My analysis of the jury's composition and the peremptory challenges exercised by the parties revealed the following:

#### Women

The petit jury consisted of 11 men and 1 woman. All 6 of the alternates were also men. Accordingly, while 46.9% of the qualified pool of 64 jurors was female (30 of 64), 8.3% of the seated jurors (1 of 12) and 5.6% of the seated jurors and alternates combined (1 of 18) were female. Conversely, while 53.1% of the qualified pool of 64 jurors was male (34 of 64), 91.7% of the seated jurors (11 of 12) and 94.4% of the seated jurors and alternates combined (17 of 18) were male.

4

The Government used 81.8% of the strikes it exercised (18 of 22) against women, who made up 46.9% of the qualified pool of 64 (30 of 64), and only 18.2% (4 of 22) against men, who made up 53.1% of the qualified pool of 64 (34 of 64).

Statistical analysis shows that it is extremely unlikely that the Government struck so many women by chance without regard to their gender. One way to determine the likelihood that the Government struck female jurors by chance without relying on their gender is to compare the proportion of female jurors whom the Government removed during the strike procedure against the proportion of female jurors in the qualified pool of 64. Here, the Government's use, without regard to gender, of 81.8% of its exercised strikes against women from a pool of 64 that was 46.9% women would occur by chance only five times in 1,000. This result is highly statistically significant. By convention, statisticians generally agree that a result is statistically significant when it would occur by chance 5 times in 100. This level of significance is reached when the expected result (here, based on the proportion of women in the pool) differs from the observed result (here, the proportion of the Government's strikes exercised against women) by 1.96 standard deviations (SDs). The observed difference here is, by comparison, much greater: 2.85. (There is not a linear relationship between standard deviations and probabilities.)

Another way of determining the statistical relevance of the Government's striking behavior is to compute what is known as the odds ratio, which reflects the magnitude of the difference between the proportion of women available to be struck and the proportion of women actually struck by the Government, and is termed the "effect size" of the result The odds ratio can best be understood by filling in the blank in the following statement: Women are

5

_____times more likely to be struck by the Government than are men. The theoretically equal value for the odds ratio is 1. By using 18 of 22 exercised strikes against women with a jury pool that was 46.9% women, the odds of a woman being struck as compared to a man was 5.1:1, meaning that the Government was 5.1 times more likely to strike a woman than a man from the qualified pool of 64. This odds ratio bolsters the conclusion that the Government was striking women mainly on account of their gender.

Whereas the Government used 81.8% of its exercised strikes against women, it used 78.3% of the strikes it *could have* exercised against women (18 of 23[1]) to exclude women from the qualified pool of 64. Conversely, it used only 17.4% of the strikes it could have exercised against men (4 of 23) to exclude men from the qualified pool of 64. By examining the number of strikes the Government could have exercised, I took into account the fact that the Government could have used one more strike than it did.

The Government's use of 78.3% of its available strikes to exclude women from a pool of 64 that was 46.9% women is also highly statistically significant. The Government's use, without regard to gender, of 78.3% of its available strikes against women from a pool of 64 that was 46.9% women would occur by chance only 9 times in 1,000. The observed result differs from the expected result by a standard deviation of 2.6. Accordingly, it is extremely unlikely that the Government exercised its available strikes without regard to gender.

Bolstering this conclusion, the odds ratio for these data was 4.1:1, meaning that the Government was 4.1 times more likely to strike a woman than a man.

---

[1] Although there were 30 women in the pool of 64, the Government only had the ability to strike 23 of them, since the Government had a total allotment of 23 strikes.

The sequence of the Government's strikes is also relevant to the question of whether the Government was relying upon gender in exercising its challenges. The Government removed each of the first 8 female jurors from the list of qualified prospective jurors. It was not until the 23rd prospective juror on the strike list that the Government accepted a woman. The probability that the Government would remove each of the first 8 female jurors from the list is .004, or four in 1,000, which is highly statistically significant. It is thus extremely unlikely that the first 8 female jurors were struck without regard to their gender.

### African-American Women

There were 11 African-American women on the panel of 64, or 17.2%. There was no African-American woman selected as a seated or alternate juror. By contrast, while 53.1% of the qualified pool of 64 jurors was male, 91.7% of the seated jurors and 94.4% of the seated jurors and alternates combined were male.

The Government used 81.8% of the strikes it could have exercised against African-American women (9 of 11) to exclude African-American women from the qualified pool of 64, but (i) only 17.4% of the strikes it could have exercised against men (4 of 23$^{2}$) to exclude men from the qualified pool of 64 and (ii) only 9.1% of the strikes it could have exercised against white men.

The Government's removal, without regard to gender and race, of 81.8% of the African-American women it had the opportunity to exclude from a pool of 64 that was 17.2% African-American women would occur by chance less than 6 times in 100,000. Accordingly, the difference between the proportion of African-American female jurors that the Government

---

2    While there were 34 men in the pool of 64, the Government only had 23 strikes, so it could remove a maximum of 23 men.

removed and the proportion of African-American female jurors in the qualified pool of 64 is very highly statistically significant. It is extraordinarily unlikely that the Government exercised its strikes against African-American women without regard to gender and race.

In addition, the odds of an African-American woman being struck as compared to a juror who was not black and female was 21.6:1, meaning that the Government was 21.6 times more likely to strike an African-American woman than a juror who was not black and female. This odds ratio is literally off the charts.

## CONCLUSION

The reported results are highly consistent with a striking pattern based on gender and gender/race. The results of statistical analyses must be considered both individually and in combination with each other. Individually, the statistical analyses demonstrate the following: 1) women were more likely to be struck by the Government than were men; 2) this is true even when I accounted for the fact that the Government did not use one of its strikes; 3) the Government did not allow a woman to sit on the jury until the 23rd juror was reached, which meant that the Government struck the first 8 women who appeared on the list; and 4) black women were struck at such a high rate that the odds ratio was literally off the charts. In combination, the statistical analyses exhibit a consistency in result. Therefore, the statistical analyses, both individually and in combination, support the conclusion that the Government targeted for removal women generally and black women in particular.

Traditional statistical analysis, i.e., statistical significance, is highly dependent upon sample size. Larger samples will show statistical significance with smaller mean differences. That is, as the sample size increases, statistical significance will be reached with a smaller mean

8

difference between the comparison groups. In this case, we are dealing with small samples; therefore, to reach statistical significance, the difference between the two groups must be larger. This is why I have analyzed and reported both the level of statistical significance and the "effect size" through the odds ratio. When both are considered, I am able to say to a high degree of statistical confidence that the results presented are highly consistent with the conclusion that the Government targeted women and black women with its peremptory challenges.

This Report is based on information available as of April 26, 2013. I reserve the right to modify or supplement these opinions if new or additional information is obtained through discovery or identified by reports produced by other parties in this litigation.

Signature:

_John Lamberth_
Dr. John Lamberth

_April 26, 2013_
Date

**ATTACHMENT 1**

**CURRICULUM VITAE**

**Name**:          John C. Lamberth, Ph.D.

**Address**:        Lamberth Consulting
20 W. Miner St., 3rd Floor
West Chester, PA 19382

**Phone**:          (610) 358-5700
**Fax**:            (610) 358-2890

**Education**:

| | | |
|---|---|---|
| Austin College B. A. In 1958 | 1954-1958 | |
| Harvard University B.D. in 1961 | 1958-1961 1958-1961 | |
| San Jose State University | 1966-1967 | |
| Texas University | 1967-1969 | |
| Purdue University M.S. in 1970 Ph. D. In 1970 | 1969-1970 | |

## I.  Fellowships and Scholarships Received

N.S.F. Summer Teaching
Assistant Traineeship          1968
N.I.M.H. Traineeship          1968-1969
N.I.M.H. Pre-doctoral
Research Fellowship          1969-1970

## II.  Postdoctoral Positions

Associate Professor
Temple University          1973-2002
Assistant Professor
University of Oklahoma          1970-1973

## III. Editorial Responsibilities

Ad Hoc Consultant For:
Journal of Personality
Journal of Research in Personality

<u>Personality and Social Psychology Bulletin</u>
<u>Journal of Personality and Social Psychology</u>
NSF (Social and Developmental Psychology Panel)

## IV. Research Interests

Racial Profiling; Capital Punishment; Jury Decision Making; Jury Composition; Publicity & Prejudice; Small Group Decision Processes; Interpersonal Attraction

## V. Teaching Interests

Social and Personality Psychology
<u>Undergraduate Courses:</u>
Social Psychology, Theories of Personality,
Psychology and the Law, Research Methods
<u>Graduate Courses</u>
Social Psychology, Psychology and the Law

## VI. University Service

| | |
|---|---|
| Undergraduate Advisor (Psych. Dept.) | 1973-1976 |
| Coordinator of Intro Psych. | 1973-1980 |
| Director, Division of Social Psychology | 1982-1985 |
| Chair, Department of Psychology | 1989-1995 |

Committee Memberships
- Undergraduate Affairs (Dept)    1973-1980
- Research (Dept)    1978-1980
- College of Liberal Arts Computer Committee (College)    1977-1982
- Weiss Hall Media Services Committee (University)    1976-1982
- Graduate School Review Committee (Dept. Of Crim. Justice M.A.)    1981-1984
- Committee on Evaluation of Teaching (College)    1983-1986
- Committee on Social Responsibility (College)    1987-1989
- Budget Priorities (College)    1990-1991
- Merit Committee (College)    1991-1993
- Increased Compensation (College)    1993-1995
- Resource Allocation

2

Committee (Dept.)                         1996-1997
- Computer Committee (Dept.)      1996-1997
- Committee of Inquiry of History
Department (College)                    1996-1997
- Academic Technology
Committee(College)                       1998-2002
- Dean's Fellow for Technology (College) 2000-2002

Committee Chairmanships
(a)    Undergraduate Affairs (Dept)         1974-1977
(b)    College of Liberal Arts Computer
         Committee (College)                        1979-1982
(c)    Weiss Hall Media Services
         Committee (University)                     1977-1982
(d)    Graduate School Review
         Committee (Crim. Jus. M.A.)            1980-1984
(e)    College Merit Committee              1991-1992
(f)    Computer Committee (Dept.)         1996-1997
(g)    Committee of Inquiry in History
         Department                                       1996-1997
(h)    CLA Academic Technology Committee      1998-

## VII.    Grants and Consultant

Consultant to U.S Army for Modern Volunteer
Army,                                               1971-1972

Consultant to Police Assaults Study, Funded by Law
Enforcement Assistance Administration,     1972-1975

Grant from Brown & Furst to Support Graduate
Education in Psychology and Law,           1984

Consultant to N.J. Public Defender's Office in Composition Challenges in
Death Penalty Cases,
         State V. Ramseur        1982-1984
         State V. Long   1984-1986
         State V. Russo 1986-1988
         State V. Lewis 1985-1986
         State V. Dixon 1985-1986
         State V. Erazo  1989-1990
         State V. Bey    1990-1992
         State V. Wilson         1990-1991

3

State V. Pompey        1991-1993
State V. Thomas        1994-1995
State V. Cruz  1997-1998
State V. Premone       1998-1999

"Decision Making in Capital Jurors" Grant from NSF 1990-1993.

Consultant to Private attorneys and New Jersey Public Defender's Office in cases in which there were allegations of illegal profiling by State or Local Police or other state agencies

State V. Sprainis            1993
State V. Kennedy            1994
State V. Soto, et al.        1996
Wilkins V. Maryland State Police    1994
Morka V. New Jersey State Police    1999
State V. Maiolino            1999
Cutler V. City of Glenpool   1999
Rodriguez V. California
Highway Patrol              1999
United States V. Garcia      1999
State V. Joel Devers         2000
U. S. V. Barlow             2000
Arizona V. Foulkes, et al.   2000
Gerald V. Oklahoma Dept. of
Public Safety               2001
State V. Lewis              2003
Jackson V. NJSP                        2004
Maryland NAACP v. Maryland
 State Police                        2007
Commonwealth vs. Rosansky        2008
Major Tours, et al. v. New Jersey
Department of Transportation          2010

## VIII.  Professional Affiliations and Honors

American Psychological Association
    Member of Divisions 2, 8, & 41, Teaching of Psychology,
    Personality and Social, and Psychology-law Society
American Psychological Society, Founding Member
Eastern Psychological Association
Society of Experimental Social Psychology
Listed in American Men and Women of Science

4

## IX.    Articles Reprinted as Chapters

Byrne, D. Ervin, C.R., & Lamberth, J. The Continuity Between the Experimental Study of Attraction and "Real Life" Computer Dating. Reprinted In:
1. A. Snadowsky & S. Rosenberg (Eds.) Social Psychology: Research in Laboratory and Natural Settings. New York: Free Press, 1972
2. H. Kaufman & L.Z. Solomon (Eds.) Readings In Introductory Social Psychology.  New York: Holt, Rinehart & Winston, 1973.
3. S.W. Duck (Ed.) Theory and Practice in Interpersonal Attraction. New York: Academic Press, 1976
4. C. Mayo and M. La France (Eds.) Evaluating Research in Social Psychology. Belmont, Ca: Brooks/cole, 1977.
5. D. Byrne & L.A. Byrne (Eds.) Exploring Human Sexuality. New York: Harper & Row, 1977.

Lamberth, J. & Knight, M. An Embarrassment of Riches: Effectively Motivating and Teaching Large Introductory Psychology Courses. Reprinted In:
Daniel, R.S., Benjamin, L., Jr., & Brewer, C. (Eds.), Teaching Introductory Psychology. Earlbaum, 1986.

## X.  Books

Lamberth, J., Mccullers, J.C., & Mellgren, R. Foundations of Psychology. New York, Harper & Row, 1976.

Lamberth, J., Rappaport, H., & Rappaport, M. Personality: an Introduction. New York: Alfred A. Knopf, 1978.

Lamberth, J. Social Psychology. New York, Macmillan, 1980.

Lamberth, J. Psicologia Social. Madrid, Spain: Ediciones Piramide, S.a., 1982.

Lamberth, J. Psicologia Social. (2nd Ed.) Madrid, Spain, Ediciones Piramide, S.a., 1986.

5

Lamberth, J. Psicologia Social. (3rd Ed.) Madrid,
Spain, Ediciones Piramide, S.a., 1989.

## XI.    Book Chapters

Byrne, D. & Lamberth, J. The Effect of Erotic
        Stimuli on Sex Arousal, Evaluative Responses, and
Subsequent Behavior. Technical Reports on the
Commission on Obscenity and Pornography, Vol 8,
Washington, D.C., U.S. Gov. Printing Office, 1970.

Byrne, D. & Lamberth, J. Reinforcement Theories And Cognitive
Theories as Complementary Approaches To the Study of Attraction.  In
B.I. Murstein (Ed) Theories of Attraction and Love. New York: Springer,
1971.

Lamberth, J., & Kimmel, A.J. the Application of Scientific Knowledge:
Ethical Issues and Responsibilities in the Behavioral Sciences. In A.J.
Kimmel (Ed.) New Directions for Methodology Of Social and Behavioral
Science: Ethics for
Human-subjects Research. San Francisco: Josey-Bass, 1981.

## XII.    Articles and Reports

Byrne, D., Lamberth, J., Palmer, J., & London, O.  Sequential Effects as a
Function of Explicit and Implicit Interpolated Attraction Responses.
Journal of Personality and Social Psychology, 1969, 13, 70-78.

Byrne, D., Ervin, C.R., & Lamberth, J. The Continuity Between the Study
of Attraction and "Real Life" Computer Dating.  Journal of Person-
Ality and Social Psychology, 1970, 15, 157-165.

Lamberth, J., & Craig, L. Differential Magnitude Of Reward and
Magnitude Shifts Using Attitudinal Stimuli.  Journal of Experimental
Research in
Personality, 1970, 4, 281-285.

Gouaux, V.C., & Lamberth, J. The Effect on Interpersonal Attraction of
Successive and Simultaneous Presentation of Strangers. Psychonomic
Science, 1970, 21, 337-338.

Byrne, D., Gouaux, C., Griffitt, W., Lamberth, J.,
Murakawa, N., Prasad, M.B., Prasad, A., & Ramiriz,
M., Iii. The Ubiquitous Relationship: Attitude

Similarity and Attraction. Human Relations, 1971, 24, 201-207.
Lamberth, J. Sequential Variables as Determinants   Of Human
Performance with Attitudinal Reinforcements. Psychonomic Science,
1971, 22, 350-352.

Lamberth, J., & Byrne, D. Similarity-attraction or Demand
Characteristics?  Personality: an International Journal, 1971, 2, 77-91.

Gouaux, V.C., & Lamberth, J. Interpersonal Attraction as a Function of
Izard's Firs Evaluation and Affective States. Personality: an International
Journal, 1971, 2, 289-297.

Gouaux, C., Lamberth, J., & Frederich, G. Affect
And Interpersonal Attraction: a Comparison of
Trait and State Measures. Journal of Personality And Social Psychology,
1972, 24, 53-58.

Lamberth, J. Gay, R.A., & Dyck, D.G. Differential
Reward Magnitude and Human Conditioning.
Psychonomic Science, 1972, 28, 231-233.

Lamberth, J., Gouaux, C., & Davis, J. Agreeing
Attitudinal Statements as Positive Reinforcers in
Instrumental Conditioning.  Psychonomic Science,
1972, 29, 247-249.

Lamberth, J., & Padd, W. Student's Attitudes and
Absenteeism: a Possible Link. Psychological
Reports, 1972, 31, 35-40.

Lamberth, J., & Dyck, D.G. Reward Magnitude and
Sequence of Magnitudes as Determinants of Resistance to Extinction in
Humans. Journal of Experimental Psychology, 1972, 96, 280-286.

Byrne, D., Cherry, F., Lamberth, J., & Mitchell, H. Husband-wife
Similarity in Response to Erotic Stimuli. Journal of Personality, 1973, 41,
385-394.

Byrne, D., Clore, G.L., Griffitt, W. Lamberth, J., & Mitchell, H. When
Research Paradigms Converge: Confrontation or Integration. Journal of
Personality and Social Psychology. 1973, 28, 313-320.

Byrne, D., Clore, G.L., Griffitt, W., Lamberth, J.
Mitchell, H. One More Time. Journal of Personality And Social

7

Psychology, 1973, 28, 323-324.

Lamberth, J., Gouaux, C., & Padd, W. The Affective        Eliciting and Reducing Properties of Attraction Stimuli. Social Behavior and Personality, 1973, 1,  95-107.

Byrne, D., Fisher, J.D., Lamberth, J., & Mitchell, H.E. Evaluations of Erotica: Facts or Feelings. Journal of Personality and Social Psychology, 1974, 29, 111-116.

Nation, J.R., Knight, J.M., Lamberth, J., & Dyck, D.G. Programmed Student Achievement: a Test of the Avoidance Hypothesis. The Journal of Experimental Education, 1974, 42, 57-61.

Davis, J., & Lamberth, J. Enerigization Properties Of Positive and Negative Stimuli. Journal of  Experimental Psychology, 1974, 103, 196-200.

Lamberth, J., Rataj, G.W., & Padd, W. An Evaluation of Differential Topic Importance, Population Homogeneity, and Relatedness of Attitudinal Stimuli in Attraction Research. Journal of Representative Research in Social Psychology, 1974, 5, 84-92.

Lamberth, J., & Knight, J.M. an Embarrassment of Riches: Effectively Teaching and Motivating Large Introductory Psychology Sections. Teaching of Psychology, 1974, 1, 16-20.

Lamberth, J., & Knight, J.M. to Curve or Not to Curve: the Defense. Teaching of Psychology, 1975, 2, 82-83.

Byrne, D., Lamberth, J., Mitchell, H.E., & Winslow, L. Sex Differences in Attraction: Response to the Needs of the Opposite Sex. Journal Of Social and Economic Studies, 1976, 2,

Lamberth, J., & Kosteski, D. Mastery Teaching with And Without Incentives for Repeating Quizzes. Teaching of Psychology, 1979, 6, 71-74.

Lamberth, J., & Kosteski, D. Student Evaluations: An Assessment of Validity. Teaching of Psychology, 1981. 8, 8-11.

Lamberth, J., & Kosteski, D. Using TA Ratings to

8

Validate Evaluations: the Important Issues.
Teaching of Psychology, 1982, 9, 102.

Lamberth, J., Kreiger, E., & Shay, S. Juror Decision-making: a Case of Attitude Change Mediated by Authoritarianism. Journal of Research In Personality, 1982, 16, 419-434.

Lamberth, J. Driving While Black. Washington Post, August 16, 1998, C1.

Buckman, W.H., & Lamberth, J. Challenging Racial Profiles: Attacking Jim Crow on the Interstate. The Champion, Sept./October, 1999.

Cole, D., & Lamberth, J. The Fallacy of Racial Profiling. New York Times, May 13, 2001.

Lamberth, J. A Multi-jurisdictional Assessment of Traffic Enforcement and Data Collection in Kansas. Printed for the Office of the Governor in the State of Kansas. Fall, 2003.

Lamberth, J. Racial Profiling Data Analysis Study. Final Report for the San Antonio Police Department. Printed for the San Antonio Police Department, December, 2003.

Lamberth, J. Ann Arbor Police Department Traffic Stop Data Collection Methods and Analysis Study. Printed for the City of Ann Arbor. February, 2004.

Lamberth, J Grand Rapids Police Department Traffic Stop Data Collection Program: Report for the City of Grand Rapids. Printed for the City of Grand Rapids. May, 2004.

Lamberth, J. Interim Report for the Montgomery County Police Department's Traffic Stop and Data Collection Project. A report for the Montgomery County Police Department. May, 2006.

Lamberth, J Methodological Consultant. Ethnic Profiling in the Moscow Metro by the Open Society Justice Initiative. Summer, 2006.

Kadane, J.B. & Lamberth, J. In the Matter of the Study of State Police Stop Activity at the Southern end of the New Jersey Turnpike. Report prepared for the New Jersey ACLU and submitted to the Governor's Advisory Committee on Police Standards. 2007

9

Lamberth, J. Methodological Consultant. Ethnic Profiling in Paris.  Open Society Justice Initiative. 2008.

Kadane, J.B.  & Lamberth.  J. Are blacks egregious speeding violators at extraordinary rates in New Jersey?  Law, Probability & Risk,  2009.

## XIII.   Papers Read

"Sequential Effects in Responding to Attitudinal Stimuli," at the Psychonomic Society, St. Louis, October, 1968.

"Differential Magnitude of Reward and Magnitude Shifts Using Attitudinal Stimuli," at the South-Western Psychological Association, Austin, April, 1969.

"Differential Reward Magnitude Using a Performance Measure and Attitudinal Stimuli," at the Western Psychological Association, Vancouver, June 1969.

"The Effects of Continual Responding on the Contrast in Attraction Research," at the Psychonomic Society, St. Louis, November, 1969.

"Reinforcement Theories and Cognitive Theories as Complementary Approaches to the Study of Attraction," at a Symposium on Attraction Theory, Connecticut College, October, 1970.

"The Effect of Sequential Variables on Performance Using Attitudinal Stimuli," at the Psychonomic Society, San Antonio, November, 1970.

"Competence as a Variable in Interpersonal Attraction," at the Southwestern Psychological Association, Oklahoma City, April, 1972.

"Conditioning and Attraction: a Relationship," at
The Psychonomic Society, St. Louis, Nov., 1972.

"Stimulus Generalization: Affect and Attraction,"
At the Psychonomic Society, St. Louis, Nov., 1973.

"The Lawyer's Dilemma: Authoritarianism and Jury
Selection," at the Midwestern Psychological Association, Chicago, May,
1974.

"Jury Verdicts of Authoritarians and Equalitarians
In Simulated Criminal Trials," at the Psychonomic
Society, Denver, November, 1975.

"Deliberation: A Crucial Aspect of Jury Research,"
At the Psychonomic Society, St. Louis, Nov., 1976.

"Introductory Psychology-a Student's Perspective," At a Symposium
"Teaching Introductory Psychology: Issues, Innovation and Perspectives,"
at the American Psychological Association, Washington, D.C., August,
1976.

"Mastery Instructional Systems: Innovations, Problems, and Possibly
Some Solutions," as Part of A Symposium at the American Psychological
Association, San Francisco, August, 1977.

"Scientifically Selecting Juries."  Invited Address at the Camden County
Bar Association, Cherry Hill, N.J., March 1980.

"Jury Selection: a Psychological Approach." Invited Address at the
American Trial Lawyers Association-New Jersey, Moorestown, N.J., Jan.,
1981.

"The Ubiquitous and Mysterious Jury."   Invited Address at the American
Criminal Defense Lawyers-New Jersey Seminar on Experts, New
Brunswick, New Jersey, April, 1989.

"Juror Acceptance of Diminished Capacity in Capital Cases."  Invited
Address at the International Conference of Law and Society,
         Amsterdam, June, 1991.

"Selecting the Right Jury."  Invited Address at The New Jersey Institute
for Continuing Legal Education, New Brunswick, N. J., October, 1991.

"Systematic Jury Selection."  Invited Address at the Inn of Court,

11

Montclair, N.J., November, 1991.

"The Psychological Cost of Serving on a Capital Jury." Paper Presented at the Law and Society Convention, Philadelphia, May, 1992.

"How Juries Perceive Women Lawyers." Invited  Address at the Trial Lawyers of New Jersey Seminar On Women in Litigation, New Brunswick, N.j., October, 1992.

"In Their Own Words: Capital Jurors Thoughts about Serving on a Capital Jury." Discussant at the American Crimnologists Society, New Orleans, November, 1992.

"The Disappearing and Reappearing Penalty Trial." Paper Presented at the Law and Society Convention,        Chicago, May, 1992.

"Driving While Black." Invited Address at the Convention of the Congressional Black Caucus, Washington, D.C., September, 1998.

"Racial Profiling." Town Meeting in Norfolk, VA. Sponsored by "Citizens Opposed to Police Profiling Stops.  December, 1998.

"Racial Profiling." Guest on "It's Your Call", CN8, Comcast Network. March 3, 1999.
"Driving While Black." Guest on "It's Your Call", CN8, Comcast Network.  March 9, 1999.

"New Jersey and Maryland Racial Profiling." Testimony before the Black and Latino Legislative Caucus of the New Jersey Legislature.  April 20, 1999.

"Racial Profiling." Guest on "Radio Times",  WHYY 91 FM, Philadelphia.  April, 1999.

"Profiling." Guest on "Due Process", New Jersey Network, April 30, 1999.

"Statistics on Racial Profiling." Testimony before the Pennsylvania House Democratic Policy Committee, May 27, 1999.

"Making Sense of the Numbers". Invited Address at the Martin Luther King Day Celebratory Seminar, Chicago, January 17,2000.

"Urban Benchmarks in Racial Profiling". Invited presentation at The Annual Conference on Criminal Justice Research and Evaluation. Washington, D.C., July 2000

12

"Benchmarks for Urban Areas".  Invited Presentation on Racial Profiling at The 11th Annual Regional Law Enforcement Executives Training Conference, St. Louis, August, 2000.

"Hit Rates for Searched Motorists and Pedestrians".  Invited Panelist on Racial Profiling at Conference on Race, Community and Police.  Harvard Law School, December, 2000.

"Proof Differences between Litigation and Peer Reviewed Research". Invited Panelist on Litigation Solutions at Conference on Race, Community and Police.  Harvard Law School, December, 2000.

"Best Practices: Collecting, Analyzing and Reporting Traffic Stop Data for Cities and Suburban Areas".  Invited Address at the 2001 National Traffic Stop and Racial Profiling Summit for Law Enforcement. Washington, D.C. July, 2001.

"Racial Profiling Data Collection and Analysis in Urban/Suburban Areas," Testimony before the Pennsylvania House Judiciary Committee's Subcommittee on Crime and Corrections.  October, 2001.

"Fallacious Reasoning: Minority Motorists are Not More Likely to be Carrying Contraband."  Invited Panelist at "Shaking the Foundations" Conference.  Stanford Law School, November, 2001.

"Data Collection and Analysis in Racial Profiling."  Invited Presentation at the Legal and Defenders Annual Meeting. Miami, November, 2001.

"Racial Profiling, Assessment and Evaluation".  Invited Lecture at the Conference on Racial Statistics and Public Policy.  University of Pennsylvania, March, 2002.

"Developing Appropriate Benchmarks for use in Analyzing Stop Data". Invited Presentation at the National Summit on Racial Profiling, Washington, D.C., March 2002.

"Data Collection and Analysis."  Invited Presentation at 2002 Training Series on Racial Profiling and Use of Force.  Alexandria, VA, August, 2002.

"Technical Presentation of 4 Case Studies of Racial Profiling Analysis." Invited Presentation at Confronting Racial Profiling in the 21st Century: Implications for Racial Justice conference.  Boston, MA, March, 2003.

"Risk Management," and "Observation Benchmarks."  Invited

13

Presentation at National Symposium on Racial Profiling. Rosemont, IL, November, 2003.

"Observation Benchmarking."  Invited Presentation at By the Numbers conference. Las Vegas, NV, July, 2004.

"Observation Benchmarking."  Invited Presentation at Addressing Ethnic Profiling and Discrimination in Policing in Europe conference.  Budapest, Hungary, January, 2005.

"Issues/Problems in the Statistical Proof of a Pattern or Practice of Racial Profiling".  Invited Presentation at Open Society Institute Summit on Systemic Racial Discrimination in The Criminal Justice System.  New York, September, 2008.

"The Effectiveness of Stop and Frisk in the United States.  Invited Address at the Roundtable on Current Debates, Research Agendas and Strategies to Address Racial Disparities in Police Initiated Stops in the UK and USA. John Jay College of Criminal Justice, New York, Aug. 2011.

## XIV.   Expert Testimony

Qualified as an Expert in Statistics, Surveying and Social Psychology for Change of Venue Motions, Jury Composition Challenges, Racial Profiling Cases or Other Motions Requiring Statistical Expertise in the Following Courts:

Federal Court: Newark Vicinage of the District of New Jersey, 1982.  Norfolk Division of the Eastern District of Virginia, 1983, District of Maryland, 1996, 2007, Trenton Vicinage of the District of New Jersey, 2005, Camden Vicinage of the District of New Jersey, 2011.

State Courts: Atlantic County, N. J. 1906, 1988, Camden County, N.J., 1986, Coconino County, AZ., 2000, Essex County, N.J., 1984 and 1990. Franklin County, Pa., 1986. Gloucester County, N.J., 1985, 1987, 1991, 1995, 1998. Hanover County, Va., 1986,  1990, Henrico Co., Va. 1986, Morris County, N. J., 1989, 1993. Richmond City, 1986, Suffolk Co., MA. 2008, Warren County, N.J., 1992 & 1

14