**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
**(Greenbelt Division)**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| *Plaintiff*, | ) | **Case No. 03-cr-00457-PJM** |
| | ) | |
| **v.** | ) | |
| | ) | |
| **KENNETH JAMAL LIGHTY,** | ) | |
| | ) | |
| *Defendant*. | ) | |

**PETITIONER'S MOTION TO SUPPLEMENT**
**AMENDED MOTION FOR RELIEF UNDER 28 U.S.C. § 2255**

Movant Kenneth Jamal Lighty respectfully moves to supplement his Amended Motion

for Relief under 28 U.S.C. § 2255 ("Motion") (ECF No. 451), pursuant to Fed. R. Civ. P. 15(d).

Mr. Lighty seeks to supplement Claim I of his Motion, the *J.E.B./Batson* claim of

unconstitutional discrimination in the Government's use of peremptory strikes, with additional

information disclosed by the Government in its Omnibus Response (ECF No. 466) to Mr.

Lighty's Claim and his pending Motion for Discovery (ECF No. 453) filed jointly with Co-

Defendant James Flood.

In support of this Motion, undersigned counsel state:

1.      Mr. Lighty filed his Amended Motion before this Court on December 20, 2012

(ECF No. 451).  On the same date, he also filed Petitioners' Joint Motion for Discovery

Regarding the Allegations of Impermissible Discrimination in Jury Selection Made in Their

Motions for Relief under 28 U.S.C. § 2255  (ECF No. 453).  On March 11, 2013, the

Government filed its Omnibus Response to Defendants' 28 U.S.C. § 2255 Motion, *Batson/J.E.B.* Claims, and Discovery Requests (ECF No. 466).

2.　　Attached to the Government's Omnibus Response was the Declaration of Deborah Ann Johnston (ECF No. 466-1).  In the Declaration, AUSA Johnston set forth the Government's proffer of its reasons for exercising peremptory strikes against the prospective jurors that it struck at Mr. Lighty's trial.　The Declaration revealed, for the first time, that the Government had unconstitutionally discriminated against individual potential jurors on the basis of religion.  The Declaration also revealed, again for the first time, that the Government had unconstitutionally exercised strikes against individual potential jurors for reasons that were proxies for race.

3.　　Fed. R. Civ. P. 15(d) authorizes a court, "on motion and reasonable notice" and "on just terms, [to] permit a party to serve a supplemental pleading setting out any transaction, occurrence, or event that happened after the date of the pleading to be supplemented."  The information with which Mr. Lighty seeks to supplement his Motion falls within the scope of this rule.  The information contained in the Government's Omnibus Response was revealed for the first time on March 11, 2013, and was previously unavailable to Mr. Lighty.

4.　　Mr. Lighty respectfully submits the following Supplement, to follow paragraph 34 in Claim I of his Amended Motion (ECF No. 451 at 31).

* * * *

Strikes Based Upon Religious Affiliation

35.　　The Government's invocation of religious affiliation with respect to its strikes of jurors 124 and 241, and also with respect to its strikes of Jurors 84, 121 and 196, separately violated the Constitution.  While a strike based upon religious beliefs that could prevent a juror

from voting for conviction or a death sentence is permissible, a strike based solely on the juror's religious affiliation, and the stereotypical assumption that that affiliation will cause the juror to vote a certain way, is unconstitutional discrimination on the basis of religion.

36.     The Government's proffered reasons for striking Jurors 84, 121, 124, 196 and 241, set forth in its Declaration, ECF No. 466-1, betray impermissible discrimination on the basis of religion.

a.     **Juror 84**.  The Government claims it excluded Juror 84 in part because she "was a self-described member of the Catholic Church."  ECF No. 466-1 at 4.  However, the juror expressed no inability or unwillingness to impose a death sentence.  While she acknowledged during voir dire that "the Catholic Church has very strong beliefs about the death penalty," 9/13/05 Tr. 43, she stated that she herself was "[p]robably in the middle" on the issue and confirmed that she "could under some circumstances impose" a death sentence," *id.* at 34.  She firmly averred that her own beliefs would have no influence on her ability to deliberate in this case.  *Id.* at 43.  The Government's exercise of a peremptory strike against her was thus impermissibly driven by its assumption, based upon stereotype, that she would vote against the death penalty because she was Catholic.

b.     **Juror 121**.  The Government states that it struck Juror 121 in part because she looked "like a regular church goer."  ECF No. 466-1 at 5.  The Government, however, sought no follow up during voir dire to ascertain whether Juror 121 held any religious beliefs that would impede her ability to judge the defendants or impose the death penalty.  *See* 9/14/05 Tr. 111-21.  In fact, the juror's questionnaire responses and voir dire testimony made clear that she was in favor of the death penalty.  When the Court asked her if she could follow its instructions and impose a death sentence, she repeatedly agreed she could.  *Id.* at 114-21.  On follow up by

3

defense counsel, Juror 121 maintained that "if the State of Maryland [sic] has that as an option and they feel that is something we should consider, I certainly will consider it." *Id.* at 114-25. When the Government then chose to ask whether Juror 121 could impose death, she said, "I'm not going to tell you it wouldn't be a very, very hard decision to make. But, yes, I would make that [impose death] if I felt that was what was appropriate after I knew all the evidence . . . it would be a hard decision, but the answer would be yes." Id. at 125-26. The Government nevertheless relied upon stereotypes about Christians and unconstitutionally struck her.

c. **Juror 124**. As noted above, the Government claims that it struck Juror 124 in part because she "expressed an interest in gospel music," ECF No. 466-1 at 5, from which the Government extrapolated, based solely upon stereotype, "that she is devout, likely forgiving and would be reluctant to sentence a young man to death." Id. Also as noted above, however, the actual record suggests that the juror was extremely pro-death penalty. See Paragraph 21.k., *supra,* incorporated by reference as if fully set forth herein. The Government's perceived "reluctance" on the part of the juror to sentence a young man to death was a discriminatory stereotypical assumption.

d. **Juror 196**. The Government's reasons for striking Juror 196 include that she was a self-described "'minister of the gospel'" and had been in the ministry for 29 years. ECF No. 466-1 at 6. The Government expressly admits that it holds preconceived notions regarding the significance of these facts: "The government views extremely devout or religious individuals as unlikely to be able to impose the death penalty, particularly on a younger individual." *Id.* And the record reveals no basis whatsoever, aside from this impermissible stereotype, to believe that this was true of Juror 196. She indicated in her questionnaire that she did not belong to or participate in a religious organization that had a stated position either in favor of or against the

death penalty.  She further confirmed during voir dire that she held no views by reason of her church membership that would affect her views on the case or affect her ability to decide it fairly and impartially.  9/20/05 Tr. 23.   She stated that her views on the death penalty were neither religious nor moral, but rather "it's about the facts." *Id.* at 29.  Further, when, at the Government's urging, the Court asked her again if there was "anything in [her] religious background that would prevent [her] from imposing the death penalty in this case," she stated, "No, sir." *Id.* at 35-36.

e.  **Juror 241**.  As noted above, the Government claims that it struck Juror 241 in part because she "listened to spiritual music," based upon which the Government concluded that she may have "a reluctance to judge." ECF No. 466-1 at 7.  This conclusion was based purely on discriminatory stereotype – none of the juror's responses on her questionnaire or during voir dire indicated an unwillingness to judge. See Paragraph 21.r., *supra*, incorporated by reference as if fully set forth herein.  The Government asked no follow-up questions regarding the juror's religious beliefs, and unconstitutionally struck her based on her religious affiliation.

Strikes Based on Proxies for Race

37.  The Government used four of its peremptory challenges to remove African American jurors on grounds that are unconstitutional proxies for race.  A reason for a strike is an unconstitutional racial proxy if it is based on the prosecutor's stereotypical views that the juror will hold certain beliefs or act in certain ways as a result of his or her race, rather than on a characteristic that is individual to the juror.  Reliance on any factor closely related to race, such as place of residence or aspects of the juror's culture, is an impermissible proxy for race unless the Government can show that the juror actually possessed the presumed bias associated with that factor.

39.     As part of its Response, ECF No. 466, to Mr. Lighty and Mr. Flood's motions for discovery on this Claim, ECF Nos. 453 & 454, the Government submitted the Declaration of Deborah Ann Johnston, ECF No. 466-1, in which Assistant United States Attorney Johnston sets forth the purported reasons for each of the Government's peremptory strikes.  The proffered reasons for the strikes against prospective jurors 90, 124, 241 and 201 are unconstitutional proxies for race.

a.     **Juror 90**.  The Government claims it excluded Juror 90 in part because she "stated that she was 'conflicted' about the death penalty," and it "concluded that she would be unlikely to vote" for death.  ECF No. 466-1 at 4.  In fact, what the juror said was:  "Well, I'm sort of conflicted because, as an African-American . . . I believe that there – that more African-Americans are sentenced to the death penalty for the same crimes that whites are, but they get the death penalty more often for the same crimes, I do believe that."  9/13/05 Tr. 133.   By relying on this statement to strike Juror 90, the Government was relying on a proxy for race.  The Government assumed Juror 90 would be unlikely to vote for a death sentence because of her awareness, as an African-American, of the disproportionate imposition of the death penalty on African-Americans.  Yet there was no basis for this assumption other than her race.  The juror went on to say, "I also believe that there are some crimes that are so horrendous that the death penalty would probably be appropriate," id. at 133-34, and assured the Court that "[w]hen I answered this, I was under oath to answer it, so I answered it honestly and that's what I feel; however, I do think that I am open-minded enough to look at all of the evidence presented, whether the person was African-American or not.  I just think that's a fact, a historical fact."  Id. at 143.  The Court continued:  "But it would not affect your judgment in this particular case; is

that a fair statement? [Juror]: I think that's a fair statement." Id. Her questionnaire answers were consistent.

b. **Juror 124**. The Government asserts that it struck Juror 124 in part because she "expressed an interest in gospel music, an indication to us that she is devout, likely forgiving and would be reluctant to sentence a young man to death." ECF No. 466-1 at 5. However, the record is devoid of evidence suggesting that Juror 124 would hesitate to impose the death penalty; to the contrary, it shows a clear readiness to do so. In her questionnaire, Juror 124 indicated that she "believes in the death penalty, because [she] feels life for life," is "strongly in favor of the death penalty," believes it is carried out "too seldom," and would always impose it for a defendant who is implicated in another homicide. On voir dire, she reiterated her willingness to impose death, because when the killer "stays behind bars for life . . . they're still living and this person is gone . . . [I]f they take a life, then a life should be given up." 9/14/05 Tr. 133. In response to questioning by the Court, the juror stated that this was a moral, and not a religious, view, and that it was one she held "[v]ery" strongly. Id. at 133-34. And although she ultimately agreed that she would consider all circumstances before making a sentencing decision, the Juror initially firmly stated that there were types of cases in which she would always vote for the death penalty. Id. at 147. In the case of a random shooting, for example, she admitted that she would "automatically" impose a death sentence. Indeed, Mr. Lighty's counsel moved to strike the juror for cause on the ground that she would automatically vote for death. Id. at 149. The Government simply assumed that a person who listens to gospel is unlikely to vote for a death sentence. Inasmuch as gospel music is closely associated with the African-American community, the Government's reliance on Juror 124's "interest in gospel music" to conclude that she would make an unfavorable juror is a proxy for reliance on race.

c.  **Juror 241**.  As with Juror 124, the Government says it struck Juror 241 because "she listened to spiritual music which may indicate a reluctance to judge."  ECF No. 466-1 at 7.  Again, the record contains no indication whatsoever that Juror 241 was reluctant to judge. On her questionnaire, she wrote "I am neither for nor against the death penalty. If the crime warrants the death penalty and is proven in court then I think that is the proper decision."  During voir dire, the juror noted that she was "a fairly religious person," but reiterated:  "I have no problem with the death penalty as long as it fits the crime, and it has been proven that the person did, indeed, do whatever it was and that is one [of] the punishments.  I have no problem with it."  9/22/05 Tr. 22-23.  When asked how strongly she felt about her position, she replied "I feel very strongly about that." *Id.* at 23. And when asked if she would impose death in a kidnapping case, she responded, "It would sure be one I would consider." *Id.* at 24. The juror's supposed reluctance to judge was merely a stereotypical assumption by the Government.  The Government's invocation of the juror's affinity for "spiritual" music reflects reliance on a proxy for race.

d.  **Juror 201**.  With respect to its 19th strike, exercised against prospective juror No. 201, the Government states that "[g]iven his closeness in age to the defendant and his having resided in the Temple Hills area [where the murder occurred], the government concluded he might be sympathetic to the defendant."  ECF No. 466-1 at 6.  The fact is that Juror 201 was not simply a young man, but a young African-American man who lived in a predominantly African-American neighborhood.  According to the 2010 census, the city of Temple Hills is 86.92% African-American and only 5% white.  See www.censusviewer.com/city/MD/Temple%20Hills. The Government's reliance on Juror 201's age and city of residence to justify its strike was a proxy for reliance on race.  Race, in other words, is what drove the Government's assumption

that Juror 201 would sympathize with Mr. Lighty, and its strike of the juror on this basis was therefore unconstitutional.

****

5.      In addition, Mr. Lighty supplements all other portions of Claim I in his Amended Petition to conform to the foregoing Supplement, such that any reference to impermissible discrimination in jury selection include not only the allegation that the Government discriminated against potential jurors on the basis of gender and a combination of gender and race, but also the allegation that it discriminated against potential jurors on the basis of religion and race.

WHEREFORE, for the foregoing reasons, Mr. Lighty respectfully requests that this Motion be granted and that he be permitted to supplement his Motion.

Dated:  September 11, 2013            Respectfully submitted,

/s/ Julie Brain
Julie Brain
JulieBrain1@yahoo.com
Attorney at Law
127 Church Street
2nd Floor
Philadelphia, PA 19106
(267) 639 0417

/s/ Karl Schwartz
Karl Schwartz
Karl_schwartz@fd.org
Jennifer Merrigan
Jenny.merrigan@fd.org
Capital Habeas Unit
Delaware Federal Defender Office
800 King Street
Suite 200
Wilmington, DE 19801
302-573-6010

/s/ Seth Rosenthal
Seth A. Rosenthal (D. Md. Bar No. 10780)
sarosenthal@venable.com
Molly T. Cusson (D. Md. Bar No. 18390)
mtcusson@venable.com
VENABLE LLP
575 7th Street, NW
Washington, DC 20004-1601
202-344-4000

*Counsel for Kenneth Jamal Lighty*

**CERTIFICATE OF SERVICE**

I hereby certify that on the 11th day of September, 2013, I caused the foregoing Motion to Supplement Amended Motion under 28 U.S.C. § 2255 to be filed via the Court's ECF system, a copy of which was mailed by U.S. mail, first class, postage pre-paid, to the following:

James Crowell, Esq.
Deborah A. Johnston, Esq.
Sandra Wilkinson, Esq.
Assistant United States Attorney
Office of the United States Attorney
400 United States Courthouse
6500 Cherrywood Lane
Greenbelt, MD 20770-1249

/s/
Seth A. Rosenthal, Esq.