**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
**(Greenbelt Division)**

| | |
|---|---|
| **UNITED STATES OF AMERICA** ) | |
| ) | |
| ) | **Criminal Case  03-cr-00457-PJM** |
| **v.** ) | **Civil Case  11-cv-3065-PJM** |
| ) | **Civil Case  11-cv-3563-PJM** |
| ) | |
| **KENNETH JAMAL LIGHTY AND** ) | |
| **JAMES EVERETT FLOOD,** ) | |
| ) | |
| *Defendants*. ) | |

**PETITIONERS' SECOND SUPPLEMENTAL BRIEF IN SUPPORT OF JOINT**
**MOTION FOR DISCOVERY REGARDING THE ALLEGATIONS OF**
**IMPERMISSIBLE DISCRIMINATION IN JURY SELECTION**
**MADE IN THEIR MOTIONS FOR RELIEF UNDER 28 U.S.C. § 2255**

Petitioners Kenneth Jamal Lighty and James Flood respectfully submit this second

supplemental brief in support of their Joint Motion for Discovery Regarding the Allegations of

Impermissible Discrimination in Jury Selection Made in Their Motions for Relief Under 28

U.S.C. § 2255 ("Joint Motion").  ECF Nos. 453, 454 & 471.

At a hearing on the Joint Motion held on September 23, 2013, the Court ordered the

parties to submit supplemental briefing on two issues:  (1) whether the requested discovery

should be denied on the ground that the underlying *J.E.B./Batson* claim is barred by the doctrine

of procedural default; and (2) whether other courts have granted the type of discovery that

Petitioners seek.  The Court directed Petitioners to jointly file their brief within 60 days, the

Government to file its brief within 30 days of receipt of Petitioners' brief and Petitioners to file

their reply within 15 days of receipt of the Government's brief.  ECF. No. 482.  Petitioners duly

filed their Supplemental Brief on November 22, 2013.  ECF No. 485.   The Government,

however, filed no brief.  Instead, it appeared at the most recent hearing on the Joint Motion, held

1

on May 12, 2014, armed with case law and arguments that it had given Petitioners no opportunity to review or address.  Petitioners respectfully submit this second supplemental brief in reply to the Government's arguments.

## I.      THE THIRD CIRCUIT'S OPINION IN *ABU-JAMAL v. HORN* IS INAPPOSITE.

At the May 12 hearing, the Government cited and submitted to the Court *Abu-Jamal v. Horn*, 520 F.3d 272 (3rd Cir. 2008), to support its position that Petitioners' discovery requests should be denied.  The Government claimed *Abu-Jamal* demonstrates that Petitioners have failed to state a prima facie case on their *J.E.B./Batson* claims.[1]  *Abu-Jamal*, however, is procedurally and factually worlds away from the instant case and in no way supports the Government's position.

First, the opinion in *Abu-Jamal* is a review of the denial of habeas corpus relief from a state-imposed conviction and death sentence under 28 U.S.C. § 2254.  The initial post-conviction review was the responsibility of the state courts, not the federal district court.  The Pennsylvania state courts thus had adjudicated Abu-Jamal's *Batson* claim, both on direct appeal and in state post-conviction proceedings, before the issue ever reached the federal courts.  *Id.* at 276-77.  As a result, the Third Circuit's review of Abu-Jamal's *Batson* claim was strictly limited to a determination of whether the decisions of the state courts denying relief were "'contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States'" or were "'based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." *Id.* at 278-79 (quoting 28 U.S.C. § 2254(d)(1) & (2)).  In other words, "'the question [was] not whether [the] federal court believe[d] the state court's determination was incorrect but whether that determination was

---

[1]      If Petitioners have stated a prima facie case—which they have—then the requisite good cause for discovery is *ipso facto* established.  ECF No. 454 at 28-41; *United States v. Roane*, 378 F.3d 382, 402-03 (4th Cir. 2004).

unreasonable – a substantially higher threshold." *Id.* at 279 (quoting *Schriro v. Landrigan*, 127 S. Ct. 1933, 1939 (2007)).   Thus, unlike the Court here, which is responsible for the initial, *de novo* post-conviction review of Petitioners' *J.E.B.-Batson* claims, *see infra*, the district court and Third Circuit in *Abu-Jamal* were barred from rendering their own judgments on the question of whether Abu-Jamal had in fact established a prima facie case of a *Batson* violation.

More fundamentally, the evidence that Abu-Jamal put forth to establish a prima facie case pales in comparison to the evidence Petitioners have offered.  The sole facts Abu-Jamal relied on were the racial makeup of the seated jury (nine white and three black) and the prosecutor's use of 15 of 20 available strikes to remove 10 potential black jurors.  *Id.* at 287. Abu-Jamal failed to present evidence of either the total number of potential jurors in the venire or the racial composition of the venire.  He thus omitted evidence key to assessing the significance of the prosecutor's strike rate—*i.e.,* the percentage of strikes used against black jurors compared to the percentage of black jurors in the venire.  *Id.* at 290.  This omission was fatal to his claim:  if, for example, black jurors had comprised only 5% of the venire, the fact that the prosecutor used 10 of 15 (66.7%) of his strikes against black jurors would have raised a strong inference of discrimination; but if the venire had been 66.7% black, the prosecutor's 66.7% strike rate would have raised no inference of discrimination.  As the Third Circuit noted, the Supreme Court has never found a prima facie case of a *Batson* violation in the absence of evidence of both the prosecutor's strike rate and the racial composition of the venire.  *Id.*  The circuit courts of appeal, too, have consistently held that no prima facie case can be established without evidence of the racial composition of the venire.  *Id.* at 290-91.  It comes as no surprise, then, that every court that considered Abu-Jamal's claim found that he had failed to establish a prima facie case.

In stark contrast, Petitioners have presented precise information regarding the composition of the venire as compared to the prosecution's striking pattern—and much more. *See* ECF No. 454 at 5-31; ECF No. 471 at 9-36. Petitioners' seated jury consisted of 11 men, one woman and no African American women. All six alternates were men. Men thus comprised 95% of the seated jurors and alternates, but only 53% of the qualified venire. Conversely, women comprised 5% of the seated jurors and alternates but 47% of the qualified venire, and African-American women comprised 0% of the seated jurors and alternates but 17% of the qualified venire. Moreover, the Government used 18 of the 22 strikes it exercised against women (82%) and 18 of its allotted total of 23 strikes against women (78%), even though the venire was only 47% women. Even more starkly, the Government removed nine of the 11 African-American women (or 82%) from a venire that included just 17% African-American women. Finally, the Government struck the first eight women and the first four African-American women on the venire.

Petitioners have also presented expert evidence regarding the statistical significance of these striking patterns. The evidence shows that the probability that the aforementioned results were obtained by chance, without regard to considerations of race or gender, is exceedingly low. The likelihood that the Government used, by happenstance, 18 of its 22 exercised strikes to remove women from a pool that was 47% women is five in 1,000, which is "highly statistically significant." The Government was over five times more likely to strike a female juror than a male juror. Similarly, the likelihood that the Government used, by happenstance, 18 of its allotted 23 strikes to remove women from the pool is a "highly statistically significant" nine times in 1,000, and the odds that the Government used its available strikes against a women as compared to a man was more than four-to-one.

The statistical likelihood that the Government removed, by chance, nine out of 11 African American women from a pool that was 17% African American women is five in 100,000—"literally off the charts," according to Petitioners' statistics expert—and the Government was 21.6 times more likely to strike an African American female juror than a juror who was neither African American nor female.

Petitioners have additionally presented an extensive and detailed comparative juror analysis, which reveals multiple instances in which the reasons that the Government proffered for striking female jurors applied with equal or greater force to male jurors whom it accepted. ECF No. 454 at 10-31; ECF No. 471 at 10-23. *See United States v. Barnette*, 644 F.3d 192, 201 (4th Cir. 2011) (recognizing that the Supreme Court's decision in *Miller-El v. Dretke* requires trial courts reviewing appellate and post-conviction *Batson* claims to engage in comparative juror analysis). Analysis of the voir dire also reveals that a number of the Government's proffered reasons for exercising strikes against women are unsupported by the record. ECF No. 471 at 23-32. It further shows that, only in the case of women who were manifestly and unequivocally pro-law enforcement and pro-death penalty did the Government refrain from relying on default gender stereotypes in deciding whether they should be seated.

Finally, Petitioners have presented evidence that the Government engaged in a remarkably similar pattern of peremptory strikes in an earlier capital prosecution, *United States v. Higgs*. In that case, not a single woman, White or African American, was seated on the jury. An analysis of the Government's striking behavior in this case and *Higgs* combined increases *even further* the statistical improbability that the Government exercised its strikes in this case without regard to gender or a combination of gender and race. ECF No. 479-1.[2]

---

[2] The Court expressed concern about the implications of considering in this case the evidence of the prosecutors' striking patterns in *Higgs* at the May 12 hearing; specifically, the Court posed the question of whether such

In sum, there is simply no comparison between the paltry evidence presented in *Abu-Jamal* and the abundance of compelling facts that confront the Court in this case.

**II.    CASES IN WHICH FEDERAL COURTS HAVE GRANTED *J.E.B.-BATSON* DISCOVERY IN POST-CONVICTION PROCEEDINGS UNDER 28 U.S.C. § 2254 FAVOR PETITIONERS' REQUESTS FOR DISCOVERY EVEN *MORE* THAN THE GOVERNMENT'S HYPOTHETICAL "FEDERAL MURDER CASE" ARISING UNDER 28 U.S.C. § 2255.**

As noted above, the Court directed the parties to brief the question of whether other federal district courts have permitted the type of discovery Petitioners have requested. Petitioners responded with citations to and discussions of five different post-conviction cases. ECF No. 485 at 10-19. The Government has cited to no Section 2255 proceeding in which a federal district court has denied discovery after being presented with type of statistical evidence and comparative juror analysis Petitioners present here. In each of the cases cited by Petitioners, the petitioner was a state prisoner seeking federal post-conviction review under 28 U.S.C. § 2254. At the May 12 hearing, the Government argued repeatedly that this fact—*i.e.,* that the cases were not "federal murder cases" arising under Section 2255—somehow diminishes or even nullifies their force. The Government never actually articulated why this should be so, and as a matter of logic, it is impossible to understand why the fact that a case did or did not involve a

---

consideration would somehow force a reopening of the issue in Mr. Higgs's case. Mr. Higgs raised a *J.E.B.* claim in his Section 2255 proceeding before this Court, but the Court found no evidence of discrimination and denied relief. *Higgs v. United States*, 711 F. Supp.2d 479, 502-06 (2010). The fact of the matter is, the evidence that Petitioners have presented as to the striking patterns in *Higgs* is far more comprehensive than the evidence presented by Higgs himself. Higgs inexplicably failed to present a complete analysis of the prosecutors' strikes in his case and presented no expert statistical evidence regarding the significance of those strikes. Nor did he even raise a claim regarding the striking of African American women in particular, as distinct from the claim regarding the discrimination against women in general. As a result of his failure, any attempt to reopen this issue by Mr. Higgs would be barred by both the AEDPA statute of limitations, *see* 28 U.S.C. § 2255(f) (imposing one year statute of limitations on § 2255 motions), and its draconian restrictions upon the availability of second or successive § 2255 motions, *see* 28 U.S.C. § 2255(h) (restricting successive motions to those involving newly discovered evidence sufficient to establish by clear and convincing evidence that no reasonable factfinder would have found the petitioner guilty of the offense of conviction or those involving a new, retroactive rule of constitutional law handed down by the Supreme Court). Nevertheless, the evidence that Petitioners have presented regarding what occurred in *Higgs* is indisputably statistically relevant to the requisite determination of the Government's intent in *this* case.

charge of "murder" (although all but one of the cases cited by Petitioners did) or was brought by a state rather than a federal prisoner should reduce its authority regarding the prisoner's entitlement to discovery for post-conviction *Batson* claims under Rule 6 of the Rules on Motion Attacking Sentence under Section 2255.

Indeed, contrary to what the Government has argued, the fact that the cited cases involved Section 2254 proceedings actually provides *more* justification for allowing the requested discovery here. As noted above, federal court review of state-imposed convictions and sentences is subject to stringent limitations that Congress introduced with the passage of the AEDPA in 1996. A federal court may not grant relief on any claim that was adjudicated on the merits by a state court unless it finds that the decision of the state court denying relief was "'contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States'" or was "'based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." *Abu-Jamal,* 520 F.3d. at 278-79 (quoting 28 U.S.C. § 2254(d)(1) & (2)). A Section 2254 petitioner thus faces a significantly higher hurdle in establishing his entitlement to relief than a Section 2255 petitioner. The result is that, under Rule 6, it is appreciably more difficult for a Section 2254 petitioner to establish good cause for permitting discovery than a federal prisoner proceeding under Section 2255.

Under Section 2255, in contrast to Section 2254, a federal district court's review of a petitioner's claim for relief is *de novo*. The principles of comity and federalism that counsel restraint in federal court review of state court judgments are inapplicable in Section 2255 proceedings. Accordingly, there are far fewer procedural barriers to the availability of relief. Furthermore, unlike in Section 2254 proceedings, a federal district court's review of a federal

conviction and sentence under Section 2255 will be the only time any trial court reviews the conviction and sentence post-conviction, and it will present the post-conviction petitioner his only opportunity for developing facts outside the trial court record in support of claims of constitutional error.  Therefore, if discovery is required in connection with a *J.E.B.* or *Batson* claim in a Section 2254 proceeding, as the federal courts held in the cases Petitioners cited, then there is even *greater* justification for requiring discovery in a Section 2255 proceeding.

**III.   THE OPINIONS OF THE DISTRICT COURT AND THE FOURTH CIRCUIT IN *UNITED STATES v. BARNETTE* AFFIRMATIVELY SUPPORT PETITIONERS' DISCOVERY REQUESTS.**

At the May 12 hearing, the Government submitted copies of three opinions of the U.S. District Court for the Western District of North Carolina in *United States v. Barnette*, a federal capital case involving a *Batson* claim.  The Government argued that these opinions demonstrate Petitioners' non-entitlement to discovery in this case.  To the contrary, these district court opinions, together with the related Fourth Circuit opinion that the Government did not include, strongly suggest that Fourth Circuit law requires that Petitioners be granted access to the materials they seek.

**A.   The District Court in *Barnette* Was Faced with a Case in a Very Different Procedural Posture than the Case Before This Court.**

It is critically important to recognize that the defendant in *Barnette* raised and fully and contemporaneously litigated a *Batson* challenge at his trial in 2002.  *United States v. Barnette*, 390 F.3d 775, 794-5 (4th Cir. 2004).[3]  He then timely raised the denial of his challenge on direct appeal.  The Fourth Circuit denied relief, relying on circuit law that rejected the significance of

---

[3]  The 2002 proceeding was a trial on sentencing alone.  While the Fourth Circuit had affirmed Barnette's convictions on direct appeal, it ordered a new sentencing hearing due to the erroneous exclusion of certain rebuttal evidence.  *See United States v. Barnette*, 211 F.3d 803, 821-26 (4th Cir. 2000).  At the conclusion of the resentencing proceeding Mr. Barnette was again sentenced to death.  A new direct appeal followed.

8

comparative juror analysis in the determination of *Batson* challenges. *Id*. at 796 (quoting

*Howard v. Moore*, 131 F.3d 399, 408 (4th Cir. 1997) (*en banc*) and *Matthews v. Evatt*, 105 F.3d

907, 918 (4th Cir. 1997)) ("'*Batson* is not violated whenever two veniremen of different races

provide the same responses and one is excluded and the other is not.'"). Not long thereafter, the

Supreme Court issued its decision in *Miller-El v. Dretke*, 545 U.S. 231 (2005), in which it made

clear that comparative juror analysis is indeed a critical part of any *Batson* analysis. The

Supreme Court then granted certiorari in Barnette's case, vacated the judgment of the Fourth

Circuit and remanded the matter for further consideration in light of *Miller-El*. *United States v.*

*Barnette*, 546 U.S. 803 (2005). The Fourth Circuit in turn remanded the case to the district court

for additional review of Barnette's *Batson* challenge. *United States v. Barnette*, No. 02-20-CR-

97-23-V (4th Cir., Sept. 21, 2007).

It was at this juncture that the district court considered Mr. Barnette's first application for

discovery. *See United States v. Barnette*, 2009 WL 2105752 (W.D.N.C.) (Govt. Binder Tab 16).

The court began by defining the scope of its mandate. It made clear that its mandate did not

include conducting a brand new *Batson* inquiry. *Id.* at [Westlaw Cite]. The court determined—

and the Fourth Circuit later agreed—that, because it had previously conducted a full *Batson*

hearing at trial, its mandate was strictly limited to "reconsider[ing] its opinion as to whether

Barnette proved purposeful discrimination at his *Batson* hearing in light of the law set forth in

*Miller-El." Id.* at *1. *See also United States v. Barnette*, 2010 WL 2085312 at *7-9 (W.D.N.C.)

(Memorandum Opinion) (Govt. Binder Tab 17). Accordingly, the district court denied

Barnette's requests to discover historical evidence of the prosecutors' striking practices,

including their striking patterns from other cases and training materials to which they had been

exposed. *Id.* at *6. Additionally, the district court denied Barnette's requests for the notes the

prosecutors made during jury selection, including those made on the government's copies of the juror questionnaires. *Id.* at \*5.  Importantly, however, before denying the requests for the notes, the court reviewed the notes *in camera* and satisfied itself that they "displayed no discriminatory intent on the part of prosecutors." *Id.* [4]

In this case, in contrast to *Barnette*, there has never been a *Batson/J.E.B.* hearing. Petitioners have made a prima facie showing that the failure to raise and request a hearing on a *J.E.B.* or *Batson* challenge was not their fault; rather, it was the result of a separate violation of their constitutional right to the effective assistance of counsel in their defense.[5]  Given that it is in the position of adjudicating *Batson/J.E.B.* claims for the first time after nine years have elapsed due to prior counsel's asserted failures, this Court should have the benefit of all available evidence bearing upon the key question of the Government's intent in exercising its strikes.   The requested discovery of the notes the prosecutors took and the juror-related materials they might have gathered during jury selection should therefore be permitted.  Contemporaneously made, these materials should provide the best evidence of the reasons for the Government's strikes.  As the Eastern District of California observed in *Johnson v. Finn*, one of the cases Petitioners cited in their prior submission, "[d]ue to the passage of time and fading of recollection, as well as the difficulty inherent in ferreting out charges of discrimination," the prosecutor's contemporaneous

---

[4]   The second time that the district court had occasion to adjudicate Mr. Barnette's request for discovery related to his *Batson* claim was in a subsequent § 2255 post-conviction proceeding.  *See United States v. Barnette*, 2014 WL 234817 (W.D.N.C.) (Govt. Binder Tab 2).  However, the *Batson* claim that Mr. Barnette brought in his § 2255 motion was simply a restatement of his complaints about the district court's remand procedure that had been raised and decided against him on appeal in 2011.  *Id*. at \*5.  Therefore, the district court inevitably found, it was plain on the face of the record that the claim failed as a matter of law and no good cause for discovery existed.  *Id.*

[5]   That Petitioners have established a prima facie case of ineffective assistance of counsel, through the sworn declarations of trial counsel, readily distinguishes this case from *Barnette* and requires the requested discovery.  Of course, when the facts are fully developed and the Court addresses the merits of Petitioners' claims, the Court will be required to assess the credibility of the various witnesses and make its own determination of whether trial counsel in fact rendered ineffective assistance of counsel in violation of the Constitution.

notes "may be the most direct evidence available to demonstrate the prosecutor's actual reasons for exercising peremptory challenges." *Johnson v. Finn*, 2007 U.S. Dist. LEXIS 101185 at *9 (E.D. Cal., Oct. 30, 2007).   It is manifestly appropriate to allow the parties to marshal such evidence through pertinent discovery.

The requested discovery relating to historical practices of discrimination in jury selection—namely the strike lists and questionnaires in *United States v. Higgs* and *United States v. Haynes* and the strike lists in *United States v. Taylor, Argueta, Dinkins and Byers*, all of which maintained by the jury clerk—should also be permitted because, absent the constitutionally ineffective assistance of trial counsel, Petitioners would have sought and been granted the materials in discovery at the time of trial.  *Barnette*, 2009 WL 2105752 at *6 (noting that "nothing prevented Barnette from bringing evidence of [historical discrimination in jury selection] to the attention of the District Court prior to trial and seeking discovery at that point"). *See also Miller-El*, 545 U.S. at 264 (noting the relevance of evidence of the prosecution's historical practice of discrimination in jury selection and fact that defense presented it at the time of trial).

### B. The Fourth Circuit's 2011 Decision in *Barnette* Affirmatively Supports Petitioner's Position.

The Fourth Circuit affirmed the above-described rulings of the district court in *Barnette*. *United States v. Barnette*, 644 F.3d 192 (4th Cir. 2011).  Its opinion, which the Government did not include in its submission to the Court, provides substantial support for Petitioners' position. In it, the court unequivocally reaffirmed its previous holding that "'the important rights guaranteed by *Batson* deserve the full protection of the adversarial process except where compelling reasons requiring secrecy are shown . . . thus 'the government must make a substantial showing of necessity to justify excluding the defendant from this important stage of

11

the prosecution.'" *Id.* at 209 (quoting *United States v. Garrison*, 849 F.2d 103, 107 (4th Cir. 1988). It also reiterated that, in retrospective *Batson* hearings, absent extraordinary circumstances, the notes prosecutors take during jury selection should be made available to the defense and not simply reviewed by the court *in camera*. *Id.* ("We . . . repeat that the district court should rarely if ever resort to *in camera*, ex parte examination of evidence or conduct such proceedings.").

The Fourth Circuit in *Barnette* discussed two previous cases in which it had addressed a district court's *in camera* review of the prosecutor's jury selection notes. Both involved retrospective *Batson* hearings. The defendant in each case had been tried and was pursuing his direct appeal when the Supreme Court decided *Batson* and remanded to the trial court for a *Batson* determination. *Id.* at 205. In *Garrison*, the Fourth Circuit openly disapproved of the lower court's decision to withhold the notes from the defense and review them *in camera*, declining to reverse only because both the district court and the circuit court itself had reviewed the notes and determined that "they 'neither contradicted nor added anything of substance to the government's explanations offered and debated at length in open court.'" *Barnette*, 644 F.3d at 209-210 (quoting *Garrison*, 849 F.2d at 107). In *Tindle*, which reaffirmed the holding in *Garrison*, the Fourth Circuit also declined to reverse because it found that there were compelling circumstances to justify the failure to disclose the notes to the defense. *Barnette*, 644 F.3d at 210 (quoting *United States v. Tindle*, 860 F.2d 125, 131-32 (4th Cir. 1988)). *See also Tindle*, 860 F.2d at 128, 131 (noting that notes included "extremely sensitive" materials that government asserted could, if made public, embarrass and endanger individuals, including some venire persons).

The Fourth Circuit went on to distinguish *Garrison* and *Tindle* on the ground that, because of its unique procedural posture, *Barnette* did not involve a retrospective *Batson* hearing, but rather a simple reconsideration of the original, contemporaneous record of the reasons for the Government's strikes in light of the law set forth in the *Miller-El* decision. *Barnette*, 644 F.3d at 210 ("Important to our conclusion here is the plain fact that except for the comparative juror analysis discussed *infra*, the remand proceedings before the district court amounted essentially to a 'do-over' from the 2002 sentencing hearing, in which the parties and the district court revisited ground already covered during Barnette's vigorous *Batson* challenge at the time of the 2002 sentencing hearing."). As a result, the court held, the reasons for the prosecutor's strikes were "fully aired in open court and on the record during voir dire," and recourse to the prosecutor's notes was unnecessary. *Id.* at 210 n.1. In contrast, the Fourth Circuit noted, retrospective hearings, such as those in *Garrison* and *Tindle*, "required courts and lawyers to 'reconstruct' that which never really happened in the first place," and therefore required "genuine innovation," which included (or should have) disclosure of the prosecutor's notes to the defense. *Id.* Further noting that the district court had expressly found that the withheld notes "displayed no discriminatory intent on the part of the prosecutors" in any event, the Fourth Circuit declined to reverse the district court's decision. *Id.* at 210.

The instant case falls neatly into the space between *Garrison*, *Tindle* and *Barnette*. Unlike *Barnette*, this case necessarily involves a retrospective *Batson* determination, one even further removed from trial than those in *Tindle* and *Garrison*. Unlike *Tindle*, 860 F.2d at 132, there are no compelling circumstances to justify maintaining the secrecy of the prosecution's notes and refusing to disclose them to the defense. At the May 12, hearing, the Court directly asked the Government to identify the harm that would result if its notes were disclosed and the

13

Government was unable to provide any response beyond vague assertions of intrusiveness.[6]  And on the existing record, there is no basis upon which to conclude that there is nothing in the notes that either "display[s] discriminatory intent on the part of the prosecutors," *Barnette*, 644 F.3d at 210, or "contradict[s] or add[s] anything of substance to the government's explanations," *Garrison*, 849 F.2d at 107.  Thus, there is nothing about the facts of this case that allows the Government to avoid the full force of the general rule that withholding jury selection notes from the defense and considering them only *in camera* is error.

This is especially so in light of the Government's decision to affirmatively rely upon the notes to prepare a sworn declaration asserting that it exercised all of its peremptory strikes in this case for race- and gender-neutral reasons.  *See* ECF No. 466-1 (Declaration of AUSA Deborah Johnston).  *See United States v. Nobles*, 422 U.S. 225, 239-40 (1975) (holding that calling defense investigator as witness waived any work product privilege with respect to investigator's notes; "Respondent can no more advance the work-product doctrine to sustain a unilateral testimonial use of work-product materials than he could elect to testify in his own behalf and thereafter assert his Fifth Amendment privilege to resist cross-examination on matters reasonably related to those brought out in direct examination.");  *Wilson v. City of Philadelphia*, No. 04-5396 (E.D. Pa., March 25, 2014) (holding in Section 1983 action challenging *Batson* violation in plaintiff's criminal trial that, given defendant's intent to call individual prosecutors as witnesses to deny discriminatory intent in past cases, defendant must disclose in discovery all contemporaneous notes taken by prosecutors during jury selection).

---

[6]  In contrast, there is a substantial public interest in disclosure.  *See Tindle*, 860 F.2d at 133 (Murnaghan, J., dissenting) (noting that "the American justice system itself is on trial when a *Batson* challenge is raised," and arguing "that openness and candor are even more important in a *Batson*-type controversy than in most other situations.  Anyone denied access to purportedly exonerating materials cannot help suspecting the worst – the best intentions of government counsel and the district court notwithstanding – it is simply human nature to be suspicious when relevant data is withheld by a decisionmaker").

In sum, *Barnette* strongly suggests that, in this case, the Fourth Circuit would require that Petitioners be granted access to the prosecutors' notes.

Dated:  May 19, 2014

Respectfully submitted,


 /s/ Julie Brain
Julie Brain
Juliebrain1@yahoo.com
Attorney at Law
127 Church Street
2nd Floor
Philadelphia, PA 19106
(267) 639 0417

/s/ Karl Schwartz
Karl Schwartz
Karl_schwartz@fd.org
Capital Habeas Unit
Delaware Federal Defender Office
800 King Street
Suite 200
Wilmington, DE 19801
302-573-6010

/s/ Seth Rosenthal
Seth A. Rosenthal (D. Md. Bar No. 10780)
sarosenthal@venable.com
Molly T. Cusson (D. Md. Bar No. 18390)
mtcusson@venable.com
VENABLE LLP
575 7th Street, NW
Washington, DC 20004-1601
202-344-4000

*Counsel for Kenneth Jamal Lighty*