**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
**(Greenbelt Division)**

|  |  |  |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| | ) | |
| | ) | **Criminal Case  03-cr-00457-PJM** |
| **v.** | ) | **Civil Case  11-cv-3065-PJM** |
| | ) | **Civil Case  11-cv-3563-PJM** |
| | ) | |
| **KENNETH JAMAL LIGHTY AND** | ) | |
| **JAMES EVERETT FLOOD,** | ) | |
| | ) | |
| *Defendants*. | ) | |

**PETITIONERS' MEMORANDUM OF POINTS AND AUTHORITIES IN**
**SUPPORT OF THEIR CLAIMS OF IMPERMISSIBLE DISCRIMINATION IN**
**JURY SELECTION IN THEIR MOTIONS FOR RELIEF UNDER 28 U.S.C. § 2255**

Petitioners Kenneth Lighty and James Flood submit this brief in support of their claims

that the government impermissibly exercised peremptory strikes to remove prospective jurors on

the basis of (i) gender, (ii) a combination of race and gender, (iii) religious affiliation and (iv)

reasons that are proxies for race in violation of the Fourteenth Amendment's Equal Protection

Clause and, as to their gender- and race/gender-based claims, that trial counsel was ineffective

under the Sixth Amendment for failing to challenge the government's gender- and gender/race-

based strikes.  ECF No. 396 at 15-16; ECF No. 451 at 5-31, 54; ECF No. 455 (granted at ECF

No. 476); ECF No. 478.  Petitioners previously engaged in considerable substantive briefing on

these claims in connection with certain discovery requests.  ECF Nos. 454, 471, 485, 501.

Accordingly, this brief, where appropriate, will concisely summarize and cross-reference

1

evidence and argument contained in the earlier briefing to avoid unnecessary repetition.  This brief otherwise fully incorporates ECF Nos. 454, 471, 485 and 501.[1]

### INTRODUCTION

The government struck Jurors 1, 83, 90, 117 and 124 based on their gender.[2]  The following evidence supports this conclusion:  the government's use of a vastly disproportionate number of its strikes to remove women from Petitioners' jury; the government's decision to strike the first eight women in a row from the list of qualified jurors; the composition of the jury, which included only one woman among 18 jurors and alternates; the government's use of a vastly disproportionate number of its strikes to remove women from the jury in a prior capital case, *United States v. Higgs*, which was tried by the same prosecutors who tried this case; the government's use of a vastly disproportionate number of its strikes against women in this case and *Higgs* combined; and individual juror analysis, which shows that the reasons the government gives for its strikes of Jurors 1, 83, 90, 117 and 124 are unsupported by the record, apply equally or with more force to male jurors the government accepted, or both.  Although the Court has ruled that Petitioners' *J.E.B.* claims are procedurally defaulted, trial counsel's ineffectiveness in failing to raise them—established by, *inter alia*, declarations from trial counsel themselves—furnishes cause-and-prejudice to excuse the default and independently establishes grounds for

---

[1]    Attached as **Exhibit 1** (under seal) are the questionnaires of all jurors included on the final list of 64 qualified jurors needed to seat a jury of twelve with six alternates.  For ease of reference, the questionnaires are in order by juror number.  Where cited in this brief, the questionnaires will not be identified by exhibit number, but rather by "Juror ___ Quest." or "Juror __ Supp. Quest.," followed by a page cite.  Excerpts from the transcript of jury selection are not attached as exhibits, as they are already part of the record and available to the Court.  Citations to the transcript are provided by date and page numbers, *e.g.*, "9/14/05 Tr. at 5."

[2]    Petitioners hereby incorporate into the record the jury strike lists in the possession of the jury clerk.  The Court permitted counsel to view the lists and take notes, but did not permit counsel to copy them.  ECF No. 450.

relief under the Sixth Amendment.  To prove ineffective assistance of counsel, Petitioners are entitled to an evidentiary hearing under 28 U.S.C. § 2255(b).

The government also struck Jurors 83, 90, 117 and 124 because they were African-American women.  The evidence supporting this conclusion is similar to the evidence supporting the conclusion that the government impermissibly struck these jurors and Juror 1 based on gender alone.  It includes:  the government's exclusion of an extraordinarily high percentage of African-American women from the qualified jury pool; the government's decision to strike the first four African-American women in a row from the list of qualified jurors; the composition of the jury, which included no African-American women among 18 jurors and alternates; the government's exclusion of an extraordinarily high percentage of African-American women from the qualified jury pool in *Higgs*; the government's exclusion of an extraordinarily high percentage of the African-American women from the combined qualified jury pools in this case and *Higgs*; and individual juror analysis.  As with Petitioners' purely gender-based claim, trial counsel's ineffectiveness excuses Petitioners' failure to raise their claim of race/gender discrimination at trial, and 28 U.S.C. § 2255(b) entitles Petitioners to an evidentiary hearing to prove it.

In addition to its exclusion of prospective jurors based on gender and a combination of race and gender, the government impermissibly excluded jurors based on religion and on reasons that are proxies for race.  Specifically, the government excluded Jurors 84, 121, 124, 196 and 241 based on religion and Jurors 90, 124, 201 and 241 based on race proxies.  These claims are not defaulted because the government has not argued default and because, in any event, the evidentiary basis for these claims was not in the record, could not have been deduced from the

3

composition of the seated jury, and was unavailable until the government furnished the reasons for its strikes in these proceedings.

**ARGUMENT**

**I.    THE GOVERNMENT IMPERMISSLY DISCRIMINATED AGAINST PROSPECTIVE JURORS BASED ON THEIR GENDER.**

The Court has concluded that Petitioners' claim that the government discriminated against prospective jurors based on their gender is procedurally defaulted because Petitioners failed to raise it at trial. ECF No. 508 at 10. There is, however, cause to excuse the default because trial counsel rendered ineffective assistance in failing to challenge the government's strikes of Jurors 1, 83, 90, 117 and 124 as impermissibly gender-based. Petitioners are entitled to an evidentiary hearing under 28 U.S.C. § 2255(b) to prove ineffective assistance. Moreover, prejudice is presumed from impermissible discrimination in jury selection. Able to establish both cause-and-prejudice, Petitioners are entitled to relief on their claims on the merits.[3]

**A.    There Is Cause to Excuse the Default.**

There is cause to excuse Petitioners' failure to bring *J.E.B.* challenges to the exclusion of Jurors 1, 83, 90, 117 and 124 because Petitioners had meritorious challenges to the exclusion of these jurors and, by negligently failing to raise them, Petitioners' counsel furnished representation that fell below an objective standard of reasonableness. These facts also satisfy

---

[3]    Petitioners also bring a Sixth Amendment claim of ineffective assistance of trial counsel based on trial counsel's failure to challenge the government's gender-based strikes. ECF No. 451 at 31, 54; ECF No. 455. For the same reason trial counsel's deficient performance in failing to raise Petitioners' Equal Protection claims furnishes cause and prejudice to overcome a procedural default and entitles Petitioners to relief on the merits of those claims, *see infra* at 27-29, 32, it establishes entitlement to relief under the Sixth Amendment's right-to-the-effective-assistance-of-counsel guarantee. That is, trial counsel's failure to challenge the government's strikes of Jurors 1, 83, 90, 117 and 124 as impermissibly gender-based fell below an objective standard of reasonableness and constituted deficient performance under *Strickland v. Washington*, 466 U.S. 668 (1984), *see infra* at 27-29, and because prejudice is presumed from *Batson* and *J.E.B.* violations, *id.* at 32, *Strickland's* prejudice requirement is also satisfied.

4

the deficient performance requirement of Petitioners' Sixth Amendment ineffective assistance of counsel claim under *Strickland*.

> 1. *The Government Struck Jurors 1, 83, 90, 117 and 124 Based on their Gender.*

As the Court has observed, *J.E.B.* and *Batson* claims are usually subject to "a three-step inquiry: the court first determines whether the defendant has made a prima facie showing that the prosecutor exercised a peremptory challenge on the basis of—in this case—gender, (2) the prosecutor must then present a gender-neutral explanation for striking the juror in question, and (3) the court must then determine whether the defendant has carried his burden of proving purposeful discrimination. *Rice v. Collins,* 546 U.S. 333, 338 (2006)." ECF No. 508 at 6-7. However, whenever the prosecution furnishes an explanation for a challenged strike, the *prima facie* case requirement becomes moot, and the court must make the ultimate step three determination. The Supreme Court explained:

> The prosecutor defended his use of peremptory strikes without any prompting or inquiry from the trial court. As a result, the trial court had no occasion to rule that petitioner had or had not made a prima facie showing of intentional discrimination. This departure from the normal course of proceeding need not concern us. We explained in the context of employment discrimination litigation under Title VII of the Civil Rights Act of 1964 that "[w]here the defendant has done everything that would be required of him if the plaintiff had properly made out a prima facie case, whether the plaintiff really did so is no longer relevant." *United States Postal Service Bd. of Govs. v. Aikens,* 460 U.S. 711, 715, 103 S.Ct. 1478, 1482, 75 L.Ed.2d 403 (1983). The same principle applies under *Batson.*

*Hernandez v. New York*, 500 U.S. 352, 359 (1991). *See also* ECF No. 471 at 2, 8 (citing cases). The Fourth Circuit adhered to this rule even before *Hernandez* was decided and, of course, has followed it ever since. *Davis v. Baltimore Gas & Elec. Co.*, 160 F.3d 1023, 1027 (4th Cir. 1998) ("Fourth Circuit law endorses the Supreme Court's holding in *Hernandez.* Prior to the Court's pronouncement in *Hernandez,* the Fourth Circuit held that when racially neutral reasons are proffered, it is unnecessary to determine whether a prima facie case was actually demonstrated. .

. .   So, since Defendant volunteered racially neutral reasons for its strikes, the prima facie determination is moot. The court of appeals simply assumes the existence of a prima facie case.") (citations omitted); *Matthews v. Evatt*, 105 F.3d 907, 918 (4th Cir. 1997) ("Because the prosecutor offered a race-neutral explanation in response to [defendant's] objection, the preliminary issue of whether Matthews established a prima facie case of discrimination is moot.") (citing *Hernandez*); *United States v. McMillon*, 14 F.3d 948, 952 (4th Cir. 1994) ("This circuit has applied *Batson* on several occasions and elaborated its proof structure in a number of ways.  In *United States v. Lane*, 866 F.2d 103 (4th Cir. 1989), we stated that we will not examine whether the defendant has met his burden in establishing a *prima facie* case where the prosecutor articulates reasons for his strikes."); *U.S. v. Dinkins*, 691 F.3d 358, 380 n.17 (4th Cir. 2012) ("We assume, without deciding, that the defendants met their burden of establishing a *prima facie* case of discrimination at step one, because the government articulated the reasons for its peremptory challenge.") (citing *McMillon*).

Here, because the government voluntarily proffered reasons for all of its strikes, ECF Nos. 466 at 13-18 & 466-1, the Court should proceed directly to step three of the *J.E.B.-Batson* inquiry.  In making its determination, the Court should take into consideration all evidence bearing on the question of impermissible discrimination, including any evidence it would have considered at step one.  *Batson v. Kentucky*, 476 U.S. 79 93, 95 (1986) (courts must "undertake a sensitive inquiry into such circumstantial and direct evidence of intent as may be available") (citations and internal quotations omitted); *Hernandez,* 500 U.S. at 63 ("An invidious discriminatory purpose may often be inferred from the totality of the relevant facts."); *Miller-El II v. Dretke*, 545 U.S. 231, 240-66 (2005) ("*Miller-El II*"); *Snyder v. Louisiana*, 552 U.S. 472, 478 (2008) ("In *Miller-El* v. *Dretke*, the Court made it clear that in considering a *Batson*

objection, or in reviewing a ruling claimed to be *Batson* error, all of the circumstances that bear upon the issue of racial animosity must be consulted.").

Moreover, as the Court's articulation of the *J.E.B.-Batson* inquiry suggests, ECF No. 508 at 6-7, the Court's analysis should focus on *individual* jurors the government struck. ECF No. 485 at 4 n.2 (citing cases); *Snyder*, 552 U.S. at 478 ("[T]he Constitution forbids striking even a single prospective juror for a discriminatory purpose.'") (internal quotation marks and citations omitted). Here, Petitioners specifically contend that the government excluded Jurors 1, 83, 90, 117 and 124 based on their gender (and for the latter four, based on a combination of gender and race, *see* Section II, *infra*).

The evidence proving the government discriminated against these jurors in violation of *J.E.B.* is as follows:

a.    *Strike Rate.*  The government used 82% of its exercised strikes (18 of 22) and 78% of its available strikes (18 of 23) against women, who made up 47% of the pool of 64 qualified jurors (30 of 64). These rates are highly statistically significant, with respective chance occurrence probabilities of five and nine times in 1,000, and show that the government was four-to-five times more likely to strike a woman than a man. *See* ECF No. 454 at 2, 5-7, 32-33 (citing cases), 34-35; ECF No. 471 at 5; ECF No. 471-1 at 4-6, 8-9. Similarly, examining the pool of 52 jurors required to seat a full panel of twelve, the government used 79% of its exercised strikes (15 of 19) and 75% of its available strikes (15 of 20) against women, who made up 44% of the pool of 52. These rates are also statistically significant, with respective chance occurrence probabilities of five in 1,000 and less than two in 100, and present odds ratios of 4.72:1 and 3.79:1. ECF No. 454 at 5; ECF No. 479-1 at 3-4.

b.      *Striking Order.*  The government removed the first eight female jurors from the list of qualified jurors and did not accept a female juror until the 23rd juror on the list, which dramatically diminished the chances the seated jury of twelve would include women.  The government's preliminary striking sequence is highly statistically significant, with a chance occurrence probability of four times in 1,000.  *See* ECF No. 454 at 2, 7, 33 (citing cases), 35-36; ECF No. 471 at 5; ECF No. 471-1 at 7, 8-9; *Miller-El II*, 545 U.S. at 249-50 (the State's "late-stage decision to accept a black panel member willing to impose a death sentence does not . . . neutralize the early-stage decision to challenge a comparable venireman," because by the time the State accepted a black panel member, it had struck the first seven it had encountered, had exhausted 11 of its 15 strikes, and knew that at least three of the remaining panel members were "highly undesirable to the State").

c.      *Jury Composition.*  Because of the government's striking behavior, the jury had only one woman among 18 seated jurors and alternates, even though the panel of 64 qualified jurors was 47% women.  *See* ECF No. 454 at 2, 5, 31-32 (citing cases), 36-37; ECF No. 471 at 5.

d.      *Strike Rate in* <u>Higgs</u>.  In the death penalty case the prosecutors in this case tried before trying Petitioners' case, *United States v. Higgs*—which featured an all-male jury and four of six male alternates—they engaged in a similarly discriminatory striking pattern, exercising 70% of their strikes (14 of 20) against women from a pool of 52 qualified jurors that was 40% women.  *See* ECF No. 454 at 3, 25-27, 34, 37; ECF No. 471 at 5; ECF No. 479-1 at 4.  The statistically significant chance occurrence probability is 2.4 times in 100 and the odds ratio is 3.44:1.  ECF No. 479-1 at 4.

e.      *Combined Strike Rate in* <u>Lighty</u> *and* <u>Higgs</u>.  Combining the prosecutors' strikes as to the panels of 52 required to seat the juries in both *Higgs* and *Lighty* underscores the

conclusion that the prosecutors relied on gender stereotypes.  In *Higgs* and *Lighty* combined, the prosecutors used 74.4% of their exercised strikes (29 of 39) and 72.5% of their available strikes (29 of 40) against women, who made up 42.3% of the combined *Higgs* and *Lighty* panels of 52 qualified jurors.  These rates are highly statistically significant, with respective chance occurrence probabilities of six and twelve in 10,000, and show that the government was 3.5-4 times more likely to strike a woman than a man.  ECF No. 479-1 at 7.

f.      *Male-Female Juror Comparisons.*  The male jurors whom the government accepted generally expressed views regarding both law enforcement and the death penalty that were at the very least similar to, and in many cases more ambivalent than, the views expressed by the women whom the government struck.  ECF No. 454 at 10-25.

g.      *Individualized Juror Analysis.*  "The critical question . . . at step three is the persuasiveness of the [proponent's] justification for his peremptory strike."  *Miller-El v. Cockrell*, 537 U.S. 322, 338-39 (2003) ("*Miller-El I*").  Where the proffered justifications are shown to be pretextual, the party challenging the strike carries its burden of proving purposeful discrimination.  *Snyder*, 552 U.S. at 484-85; *Miller-El II,* 545 U.S. at 241, 244, 252, 277; *Purkett v. Elem*, 514 U.S. 765, 768 (1995).

Pretext may be demonstrated in different ways.  First, it may be demonstrated by establishing that one or more of the reasons given by the government is not supported by the record.  *Miller El II*, 454 U.S. at 244; *Snyder,* 552 U.S. at 479-83; *Purkett*, 514 U.S. at 768 ("At … stage [three], implausible or fantastic justifications may (and probably will) be found to be pretexts for purposeful discrimination"); *Johnson v. Vasquez*, 3 F.3d 1327, 1331 (9th Cir. 1993) ("When there is reason to believe that there is a racial motivation for the challenge, neither the trial courts nor we are bound to accept at face value a list of neutral reasons that are either

unsupported in the record or refuted by it. Any other approach leaves *Batson* a dead letter.”); *Splunge v. Clark*, 960 F.2d 705, 709 (7th Cir. 1992) (finding the prosecutor’s proffered race neutral reason “an obvious mask for a race-based challenge” where the record revealed no evidence to support it).  When the government offers a reason without record support, any other reason it offers necessarily becomes suspect.  *Ali v. Hickman*, 584 F.3d 1174, 1192 (9th Cir. 2009) (“That the other reasons were pretextual raises an inference that this final rationale is also make-weight”) (citing *Snyder*, 552 U.S. at 485); *Johnson,* 3 F.3d at 1331; *United States v. Chinchilla*, 874 F.2d 695, 699 (9th Cir. 1989) (“The fact that two of the four reasons do not hold up under judicial scrutiny militates against [the] sufficiency [of the remaining two reasons].”).

Second, pretext may be shown by establishing that the government’s reason for striking a member of a cognizable group applies equally or with even more force to a seated juror who is not a member of the cognizable group.  *Miller-El II,* 545 U.S. at 241 (where state’s reasons apply “just as well” to “otherwise-similar” seated jurors, “that is evidence tending to prove purposeful discrimination to be considered at *Batson*’s third step”); *Snyder*, 552 U.S. at 483-86; *United States v. Barnette*, 644 F.3d 192, 205 (4th Cir. 2011) (following *Miller-El II*, “proper analysis of a *Batson* claim requires that a court engage in comparative juror analysis”); *Holloway v. Horn*, 355 F.3d 707, 724-25 (3d Cir. 2004); *Riley v. Taylor*, 277 F.3d 261, 282 (3d Cir. 2001); *United States v. Hamilton,* 533 F.3d 269, 276-77 (5th Cir. 2008); *Ali v. Hickman*, 584 F.3d at 1184-93, 1195-96; *Kesser v. Cambra*, 465 F.3d 351, 361-71 (9th Cir. 2006); *Turner v. Marshall*, 121 F.3d 1248, 1251-55 (9th Cir. 1997).  Correspondingly, pretext may be shown where the prosecutor either questions a member of a protected class differently than non-members, *Miller-El II*, 545 U.S. at 261-63; *Snyder*, 552 U.S. at 484, or offers a reason for striking a protected class member having chosen not to ask further questions that would have established or refuted the basis of his

purported concern. *Snyder,* 552 U.S. at 481 (noting that, once juror addressed reason that purportedly motivated prosecution's strike, "the prosecution did not choose to question him more deeply about th[e] matter").

For the reasons set forth in ECF No. 471 at 10-26 and below, the justifications the government has offered for striking Jurors 1, 83, 90, 117 and 124 are pretextual.

(1)  Juror Number 1

Juror 1 was a 60 year-old white woman who had recently retired.  Juror 1 Quest. at 3. Prior to her retirement, she worked for 30 years as an administrative assistant with the United States Courts, *id.,* and before that was employed by the FBI for 14 years.  *Id.* at 5.  She testified on voir dire that she would be able to impose a death sentence if the evidence warranted it. 9/7/05 Tr. at 10.

The government states that it struck Juror 1 because it "did not think she could impose the death penalty." 466-1 at 2-3.  The government gave four reasons for its conclusion. However, three of the four—"she had a degree in psychology," "her husband was a lawyer," and "her brother was homeless and involved in criminal conduct"—are not supported by the record. Juror 1 did not have a psychology degree.  As she indicated on her questionnaire, her degree was in Business Management Information Systems.  Juror 1 Quest. at 4.  She had taken only two psychology courses in college.  *Id.* at 5.  As to her "husband's" profession, Juror 1 had no husband.  She was divorced.  *Id.* at 3.  Her *former* husband had been a lawyer at some point in time, *id.* at 4, though her questionnaire does not say when, and the government declined to ask despite being given the chance to do so.  9/7/05 Tr. at 14.  As to Juror 1's brother's alleged involvement in "criminal conduct," ECF No. 466-1, the record contradicts the government's assertion.  Juror 1 affirmatively represented in her questionnaire that *no* close friend or relative

had ever been arrested for or charged with a crime. Juror 1 Quest. at 13. And although Juror 1 stated on voir dire that her brother was a "homeless veteran from the Vietnam war," she *never* indicated that he had been convicted of or arrested for a crime. Rather, she testified that "he's just in and out of the family on occasion" and "I really [did not] know what [he was] involved in or not involved [in] for the last 40 years." 9/7/05 Tr. at 4. In any event, Juror 1's virtually non-existent relationship with her brother would not have affected her judgment. *Id.* at 4-5.

Even if there were any basis in the record for these purportedly disqualifying characteristics, numerous male jurors whom the government accepted shared the same characteristics. The government accepted: at least thirteen male jurors who had earned a degree in or studied psychology, worked in a related field, or had a spouse who did; ECF No. 471 at 21-22; nine male jurors who were lawyers, married to lawyers, or otherwise had experience in the field of law, *id.* at 19-21; and nine male jurors who reported that either they or a relative had been involved in or charged with criminal conduct. *Id.* at 16-17. Given the government accepted so many jurors who possessed these purportedly disqualifying characteristics, it is apparent the government itself held the common sense view that these characteristics do not in fact reflect a disinclination to vote for a death sentence.

The implausibility of three of the government's reasons for striking Juror 1 casts doubt on the validity of the final justification, namely her purported "ambivalence about the death penalty." *See, e.g., Ali*, 584 F.3d at 1192. Casting even more doubt on the final justification is the government's acceptance of at least eleven male jurors who expressed equal ambivalence— and in most cases *more* ambivalence—about the death penalty. ECF No. 471 at 12-13. Moreover, Juror 1 made it clear that whatever ambivalence she had did not affect her ability to vote for a death sentence in an appropriate case. *See, e.g.,* 9/7/05 Tr. at 9 ("I'd hoped I'd never

have to, but I would be able to do it."). In contrast, many of the eleven male jurors whom the government accepted suggested that their reservations *would* affect their sentencing decisions. *See, e.g.,* 9/8/05 Tr. at 24-30 (Juror 28 twice stating that in a case involving kidnapping resulting in death he would always vote for life); 9/8/05 Tr. at 170-72 (Juror 46 stating that he would always vote for life regardless of the circumstances); 9/15/05 Tr. at 90-91 (Juror 157 stating that, while he could impose death, he would "probably vote for life" without regard to the circumstances); 9/16/05 Tr. at 78 (Juror 177 stating that while he was in favor of the death penalty, he would not want to impose the death penalty "personally"). Juror 158's reservations about his ability to vote for death—"I'm not sure I could do it"—were so pronounced that the government moved to strike him for cause. 9/15/05 Tr. at 208-211. The government's later decision to accept Juror 158 and use a peremptory strike instead on Juror 1—a juror who clearly stated she *would* be able to impose death—is inexplicable, except as a decision based on gender.

 (2) <u>Juror Number 83</u>

 Juror 83 was a forty-one year old, married African-American woman with a long history of employment as an examiner/analyst with the federal government. Juror 83 Quest. at 1-3. She indicated a willingness to vote for the death penalty in an appropriate case, 9/20/05 Tr. at 94, including one like Petitioners' that involved a kidnapping resulting in death. *Id*. at 96.

 The government maintains it struck Juror 83 because she was "arrogant." ECF No. 466-1 at 3-4. It suggests that, because of her "arrogance," she "might not participate in jury deliberations," and "particularly noted her arrogance as she described her job, and the fact that she went through the employment process to be a Special Agent with the FBI but did not get hired." *Id*. This allegedly presented a concern because "this case was investigated by the FBI with numerous FBI witnesses on the government's list to testify at trial." *Id.*

13

An examination of Juror 83's questionnaire and the record of voir dire reveals the government's reasons to be pretexual. Nothing in Juror 83's responses suggested arrogance. Nor did anything in Juror 83's questionnaire or on voir dire suggest that she could not be impartial because she did not get a job with the FBI.

Juror 83 identified her employment in her questionnaire in response to a question seeking such information. Juror 83 Quest. at 3. In addition, she indicated "[f]ull time employment at major government agency which provides safety and soundness oversight to (2) major financial services organizations" as a reason why jury service would cause a hardship for her. *Id*. at 23. She also noted, in response to a direct question, that she had "sought employment" with the FBI. *Id*. at 8.

On voir dire, most of the questions asked of Juror 83 called for yes or no answers, so most of her answers were simply "yes" or "no." 9/20/05 Tr. at 91-103. None of them were accompanied by further comment, and each indicated suitability for service on a capital jury. The only questions that yielded more than simple "yes" or "no" answers, together with the answers, are set forth in their entirety below. They fall into two categories: the death penalty and employment.

As to the death penalty, the following exchange took place:

Q:      [W]ould you state what your view of the death penalty is?
A:      I think it – probably, I guess, the harshest punishment there is, and I feel it needs to be used sparingly, and all the facts, you know, should be laid out so there's no reasonable doubt.
Q:      Are you saying there would be circumstances where you'd be prepared to vote for the death penalty?
A:      Yes.
Q:      All right. And is this a religious view, moral view, other?
A:      It's moral, other.
Q:      How strongly do you feel about it?
A:      I'm not – I guess I'm probably neutral in the middle. Either way.
            .        .        .

14

Q:      Are there some cases where you'd never vote for the death penalty regardless of the aggravating factors?

A:      Yes.

Q:      Like what?

A:      I would think that if it was in self-defense.

Q:      Is a case alleging kidnapping resulting in death the kind of case where you'd always vote for the death penalty?

A:      I would have to say depending on the circumstances.

9/20/05 Tr. at 94-96.

As to the juror's employment, the following exchange took place:

Q:      What agency are you working for?

A:      Office or (sic) Federal Housing Enterprise Oversight.

Q:      What do you do there?

A:      I'm a senior account examiner. I provide accounting, I work for the chief accountant's office.

Q:      Well, you understand you might be called for jury duty in this case?

A:      Yes.

Q:      All right. If you'll go to Question 27 in your application, which appears at the bottom of Page 7 and the top of Page 8, you indicated that you sought employment at the FBI. Is that right or am I –

A:      Yes, I did.

Q:      And when was that?

A:      Probably – approximately in 1995.

Q:      What kind of employment were you seeking there?

A:      It was a special agent.

Q:      Okay. Did you go through some process and –

A:      I went through –

Q:      -- or change your mind or not be selected or what?

A:      I went through the written test, the interview process, a couple processes, then I wasn't selected.

Q:      Anything about that experience that might leave you dissatisfied with the system?

A:      No, it wasn't.

Q:      You think you could still fairly judge this case?

A:      Yes.

Q:      You wouldn't hold it against FBI witnesses because of your own experience there?

A:      No I wouldn't.

*Id*. at 92-93.

Given the foregoing, the reasons the government gives for striking Juror 83 are not supported by the record.  None of the responses on the questionnaire or during voir dire contain a

15

hint of arrogance.  Arrogance is demonstrated by a person "making claims or pretensions to superior importance or rights."  *See Dictionary.com*, http://www.dictionary.com (last visited December 12, 2014).  Nothing about the juror's responses demonstrated this trait.  They reveal a willingness to provide necessary information in a concise and direct way without extraneous commentary evincing pretentiousness or superiority.  Nor does the government offer any observations relating to the juror's non-verbal conduct or manner suggestive of arrogance.  "Arrogance" is a nebulous descriptor that, when advanced without any observable basis in the record, is presumptively pretextual.  Indeed, because "arrogance" fits a stereotype often ascribed to successful African-American women,[4] it is an inherently suspect justification for striking Juror 83.  *See McGahee v. Alabama Dept. of Corrections*, 560 F.3d 1252, 1265 (11th Cir. 2009) ("[T]he State's claim that several African-Americans were of 'low intelligence' is a particularly suspicious explanation given the role that the claim of 'low intelligence' has played in the history of racial discrimination from juries.").

The implausibility of the government's justification is reinforced by the prosecutor's acceptance of Juror 38, a white male who, in contrast to Juror 83, gave specific responses that *actually* demonstrated arrogance.  Unlike Juror 83, Juror 38 expressly described others as not measuring up, and characterized himself as possessing a high degree of importance. In describing special agents of the FBI with whom he had worked, Juror 38 volunteered, "They

---

[4]    *See, e.g.,* Ella Louise Bell, "Myths, Stereotypes and Realities of Black Women: A Personal Reflection," *The Journal of Applied Behavioral Science,* Vol. 40, no. 2, June 2004, at 152-53 ("*Myth 4*:  Successful Black women are arrogant, hard, controlling, self-centered and uppity.  *Reality.* Black women have been accused historically of being difficult, castrating and overbearing (Collins, 1990; Davis, 1981; hooks, 1981, 1984; King, 1988).") (available at http://jab.sagepub.com/content/40/2/146.short); Lillie M. Fears & Sheena Terrell, "The Meaning of 'Angry Black Woman' in Print Media Coverage of First Lady Michelle Obama," *Journal of Research on Women and Gender*, Vol. 6, March 2013 (available at https://www.academia.edu/3377165/The_Meaning_of_Angry_Black_Woman_in_Print_Media_Coverage_of_First_Lady_Michelle_Obama).

ain't really all that special."   9/16/05 Tr. at 133.   In addressing in his questionnaire his availability for jury service, he responded, "We're trying to apprehend Osama Bin Laden . . . kinda busy."   Juror 38 Quest. at 23.  Petitioners do not contend that these answers rendered Juror 83 unfit for jury service.  They do contend, however, that these answers were far more indicative of "arrogance" than the responses Juror 83 provided.[5]

The government's purported concern over Juror 83's decade-old job application to the FBI similarly demonstrates pretext.  Following the questioning of Juror 83 regarding her FBI application, the Court asked all counsel—at three different points—if they had any further questions.  *Id.* at 93, 99, 103.  The government did not.  The government earlier had raised the job application issue and asked the Court to inquire whether "anything about that experience would affect her here." *Id.* at 91.  When Juror 83 confirmed that it would not, the government abandoned that line of inquiry and requested no further voir dire.  The prosecutor's failure to ask additional questions after the juror indicated that the experience would not impair her ability to fairly judge the case indicates that, if the prosecutor had such a concern, it had been alleviated.  It is also simply implausible that a juror who did not get a job with the FBI a full decade before would hold it against the prosecution at trial.

The government's acceptance of Juror 155, a man who indicated that he had unsuccessfully applied for a position with the Metropolitan Police Department, Juror 155 Quest. at 8, buttresses the conclusion that the government struck Juror 83 on impermissible grounds.  Like the FBI, the MPD was involved in the investigation of this case, and members of the MPD

---

[5]   Additionally, Juror 38 expressed "very ambivalent feelings" about the death penalty, concerns about its use based on recent DNA-based exonerations, and the need to be "very, very strongly convinced" about the propriety of its imposition.  9/16/05 Tr. at 124-25.  The government cited similar testimony—and even less ambivalent testimony—as a reason for striking numerous female jurors.  ECF No. 471 at 11-15.  Juror 83 expressed no such ambivalence.

testified at trial.  While the FBI's involvement purportedly provided the government a basis for asking questions of Juror 83 and later for striking her, the MPD's involvement gave rise to no similar concern as to Juror 155.  The government did not request that the Court ask Juror 155 about his unsuccessful MPD application, and it did not strike him.

(3)  <u>Juror Number 90</u>

Juror 90 was a 62 year old African-American woman who had been employed as an administrative officer with the federal government from 1990 until her retirement in 2002, and as a consultant since 2003. Juror 90 Quest. at 1-3.  She expressed a willingness to impose the death penalty in an appropriate case.  9/13/05 Tr. at 134-37.

None of the reasons the government advanced for exercising a peremptory strike against Juror 90 are supported by the record.

The government states that it struck Juror 90 because she "limited' the death penalty to 'horrendous crimes.'" ECF No. 466 at 4.  The government placed quotations around the word "limited," presumably to suggest that Juror 90 actually stated she would limit the death penalty only to horrendous crimes.  She never did.  Nor did she use a word or phrase approximating the term "limited."  Her uncontroversial statement that "there are some crimes that are so horrendous that the death penalty would probably be appropriate," 9/13/05 Tr. at 133-34, confirmed only that the "horrendous" nature of a crime could, in and of itself, warrant death.  Far from being a statement of limitation, Juror 90's testimony confirmed her willingness to consider death as an appropriate sentence and identified her as a more death-qualified juror than, for instance, Juror 56, an accepted white male juror who in fact said he would limit the death penalty to the most heinous crimes.  *See, e.g.,* 9/9//05 Tr. at 56 (Juror 56 stating the death penalty was "probably only appropriate for the absolute most violent, you know, hate-filled crimes").

In a further attempt to demonstrate that Juror 90 would unduly limit the use of the death penalty, the government states she indicated the death penalty was appropriate for crimes like "when a child is kidnapped, raped and murdered." ECF 466-1 at 4. But the government takes this testimony entirely out of context and, in doing so, robs it of its meaning. Juror 90 made this statement in response to the Court's question about whether "there [are] certain kinds of murders [] for which a defendant should *always* receive the death sentence?" 9/13/05 Tr. at 144 (emphasis added). Juror 90's response in no way indicated she would limit imposition of the death penalty in the manner the government suggests.

The spuriousness of the government's justification is buttressed by the government's acceptance of male jurors who similarly indicated that they would always impose the death penalty for certain kinds of aggravated crimes. *See, e.g.,* 9/15/05 Tr. at 204 (Juror 158 would always impose death upon "the terrorists for 9/11, the Oklahoma City bombings"); 9/7/05 Tr. 199 (Juror 22 would always impose death for the murder of a police officer). It is buttressed even further by the government's acceptance of a white male juror who in fact held the belief— incorrectly ascribed to Juror 90—that the death penalty was appropriate only for heinous crimes. 9/9//05 Tr. at 56 (Juror 56 stating that the death penalty was "probably only appropriate for the absolute most violent, you know, hate-filled crimes").

The government also seizes on Juror 90's statement that she was "conflicted" about the death penalty. ECF 466-1 at 4. Yet the government presents this comment entirely devoid of its context. Juror 90 testified that she was "conflicted" about the death penalty for a reason: because, in this country's history, it has been applied disproportionately to African-Americans. 9/13/05 Tr. at 133-34. As discussed in Petitioners' previous briefing, however, Juror 90 made clear that she viewed this purely as an "historical fact" that would not affect her ability to impose

a death sentence and that certain crimes warranted the death penalty regardless of the fact that African-Americans had been disproportionately sentenced to death. *Id.* at 133-43; ECF No. 471 at 26. Moreover, when presented in proper context, Juror 90's testimony was no different than— and actually expressed a more favorable inclination toward the imposition of death than—the testimony of Jurors 19, 46 and 211, male jurors the government accepted notwithstanding their articulated concerns about the racially-freighted history of capital punishment. ECF No. 471 at 12-15.

The government's final reason for claiming that Juror 90 "would be unlikely to vote for the death penalty," has nothing to do with whether or not she would vote for death. The government states that the juror's husband was a retired probation officer, which "presumes release from prison and rehabilitation." ECF 466-1 at 4. As discussed in Petitioners' previous briefing, Juror 90's *husband* was a probation officer, not her; a probation officer is a law enforcement officer, hardly a line of work that presumes a bias against the prosecution or capital punishment; the government never questioned Juror 90 to determine whether her husband's former job implied anything about her *own* views on capital punishment; and it was the defense, not the government, that asked for follow-up regarding her husband's career. ECF No. 471 at 26. Additionally, while a probation officer supervises individuals who are out prison and is charged with aiding in their rehabilitation, those duties do not logically suggest either a reluctance to impose the death penalty or a tendency toward leniency for those convicted of capital murder. It is the court, not the probation officer, who releases the offender. The government doubtlessly knows that probation officers often recommend severe punishment for offenders and probationers, and often those recommendations are more severe than the court imposes. Concluding that a probation officer—much less his *wife*—is anti-death penalty because

his clientele is out of custody is akin to concluding that a prison warden is opposed to capital punishment because his clientele has been permitted to live. It is a quintessential pretextual rationale.

(4) Juror Number 117

Juror 117 was a 32 year old African-American woman. Juror 117 Quest. at 1. She was employed as a school teacher. 9/14/05 Tr. at 66. She stated that she would not have a problem imposing the death penalty in an appropriate case. 9/14/05 Tr. at 86-87.

None of the government's reasons for striking Juror 117 are legitimate. The government first states that it struck Juror 117 because she did not disclose her employment as a school teacher on her questionnaire. ECF 466-1 at 4. But as set forth in Petitioners' previous briefing, Juror 117's questionnaire omission was nothing more than an oversight: she disclosed that she had been employed by the same employer for five years, disclosed her prior employment, and identified her membership in the state teachers' association. ECF No. 471 at 26-27; Juror 117 Quest. at 2-3, 19. Moreover, when asked about her employment, Juror 117 readily volunteered all of the requested information. 9/14/05 Tr. at 66. The government accepted numerous male jurors who failed to answer every question on their questionnaires. ECF No. 471 at 22-23.

The government proceeds to make a series of completely unsupported ad hominem attacks upon Juror 117. First, the government suggests that, as a teacher, Juror 117 failed in her "commitment to the students that are being taught where a long time away could be a hardship." ECF 466-1 at 4. This is a remarkable statement, presumably disqualifying all teachers willing to serve instead of asking to be excused for "hardship." And Juror 117 had good reason not to claim hardship: her school not only had a substitute teacher available to fill in for her, but another full-time teacher already teaching alongside of her because the class was a multilevel

21

one.  9/14/05 Tr. at 67.  Accordingly, when she checked with her principal, her principal fully cleared her for jury service.  *Id.*  The Court thus declined to excuse Juror 117 on the ground that she was a teacher, and in fact expressed its appreciation for her having made arrangements to serve.  *See id.*

Second, the government claims that "[w]e did not believe the juror was being candid in her answers." ECF 466-1 at 5.  The government, however, cites no record or even extra-record facts supporting its attack on Juror 117's candor.  It points to no particular answer that it deemed incredible or even unlikely, no instance in which the juror contradicted herself or gave inconsistent answers, and nothing about her demeanor that it interpreted as indicative of deception.  A careful review of Juror 90's voir dire and questionnaires reveals why the government was unable to proffer a single fact in support of its attack on her credibility:  there was none.

Third, the government allegedly "had a strong concern that [the juror] was too interested in being a juror to use her jury duty for her thesis project." ECF 466-1 at 5.  But as Petitioners previously explained, ECF No. 471 at 27, the government cannot point to one fact to support this alleged "strong concern."  Juror 90 clearly indicated that she would not and was not looking to use jury service in this case to inform her thesis.  9/14/05 Tr. at 81.  Indeed, the topic of that thesis was school violence, a subject that is wholly unrelated to this case.  *Id.*  There is thus no basis in the record for concluding that Juror 90 might have wanted to write about her jury experience in her thesis, and no basis for crediting that the government struck her for that reason.

Lastly, the government points to Juror 117's initial statement on her questionnaire that she favored the death penalty "where no other options are given," Juror 117 Supp. Quest. at 4, and implies Juror 117 was reluctant to impose a death sentence in cases where other options were

22

available.  The government, however, fails to mention that, when asked about that statement during voir dire, Juror 117 very clearly explained that that is not at all what she meant.  She said that when she filled out the questionnaire, she was under the impression that as a juror she could be faced with a situation in which she had no other choice but to impose a death sentence; she therefore interpreted the question as asking her whether, if she found herself in that situation, she would have a problem imposing a death sentence; and her answer was no.  9/14/05 Tr. at 84 ("what I meant by this question was, if there was no other option given, if the death penalty was the only choice that the person had, not the death penalty as well as well as they can get life in prison or perhaps be charged with a lesser crime, if that was the only choice that could be made, I would not have a problem making that choice if they were found guilty.")  After the Court explained to Juror 117 that, in fact, a second option of life without parole would be available in this case, she stated unequivocally that she would also vote for the death penalty in that situation in the appropriate case.  *Id.* at 84-85 ("Q: So you would not automatically find – A: No – Q: either the death penalty or life in prison without release?  A: Right. Q: You would listen to the evidence? A. Right.").  On follow-up questioning from the government, Juror 117 then reiterated both how she understood the question on the questionnaire, *id.* at 86, and her willingness to impose the death penalty where other options are given.  *Id.* at 86-87 ("Q: Because there are other options, would you now have a problem with saying someone should get the death penalty? A:  No, I don't have a problem with it."); *id.* at 87 ("Q: So you're not – if  I could just ask, so you're not limiting the application of the death penalty to those situations where there's no other option?  A: No.").  Therefore, as set forth in Petitioners' prior briefing, ECF No. 471 at 27, Juror 117's voir dire testimony made absolutely clear that she could and would impose the death penalty.  9/14/05 Tr. at 74-77, 83-86.  And, having heard Juror 117's explanation for her

23

questionnaire answer, the Court was satisfied regarding her willingness to vote for the death penalty and declined to allow any further questioning on the topic.  ECF No. 471 at 27; 9/14/05 Tr. at 87 ("Let's not labor it any more.  I think she's made it clear that she would be able to have an open mind on the point.").  Indeed, Juror 117's willingness to serve in a case where a conviction would *mandate* the death penalty hardly suggests reticence about the death penalty.  Here again, the government takes a comment out of context in an attempt to justify an impermissible strike.

(5)  Juror 124

Juror 124 was a 55 year old African-American woman who had been employed by the Prince George's County Government for 35 years.  Juror 124 Quest. at 1-3.  She indicated that she would be able to impose the death penalty in an appropriate case.  9/14/05 Tr. at 151-52.

The government states it struck Juror 124 because she left "a lot of the questions blank on her questionnaire," said she would "need scientific evidence," and "expressed an "interest in gospel music."  ECF 466-1 at 5.  Each of these reasons is pretextual.

As set forth in Petitioners' prior briefing, Juror 124 did not leave "a lot" of questions blank on her questionnaires.  ECF. No 471 at 29.  She omitted answers to three questions on the first questionnaire (2, 4 and 13), filled out the second questionnaire completely, and furnished ready answers to the unanswered questions from the first questionnaire in voir dire.  9/14/05 Tr. at 129-30.  The failure to answer every question on the questionnaires posed no issue for the government as to at least eight male jurors it accepted.  ECF No. 471 at 22-23.

As to Juror 124's purported need for scientific evidence, what Juror 124 actually said in response the Court's questions about whether "there must be some forensic or scientific evidence to support guilt" was "[y]es, somewhat." 9/14/05 Tr. at 131.  Then, when informed that scientific

evidence was not required, Juror 124 conclusively stated that she could credit the government's case without it. *Id.* at 131-32. The government had no trouble accepting several male jurors who expressed a more pressing need to see scientific evidence. ECF No. 471 at 18-19.

The final reason the government gives for striking Juror 124 is that "she expressed an interest in gospel music, an indication to us that she is devout, likely forgiving and would be reluctant to sentence a young man to death." ECF No. 466-1 at 5. Apart from the fact this justification betrays both impermissible discrimination based on religion and impermissible discrimination based on a proxy for race, *see* Sections III and IV, *infra*, it is based on a single, isolated and *completely unexplored* response in Juror 124's questionnaire that, of the three radio stations she listened to regularly, one was a gospel station. ECF No. 471 at 29; Juror 124 Quest. at 20. The government asked Juror 124 no questions at all about her interest in gospel music. Moreover, as Juror 124's questionnaire answers and testimony plainly indicated, the government's proffered justification was entirely illogical: her interest in gospel music bore no relationship whatsoever to her willingness to impose the death penalty. Juror 124 indicated in her questionnaire that she "believes in the death penalty, because [she] feels life for life," is "strongly in favor of the death penalty," believes it is carried out "too seldom," and would always impose it for a defendant who is implicated in another homicide. Juror 124 Supp. Quest. at 4, 6, 8. On voir dire, she reiterated her willingness to impose death, because when the killer "stays behind bars for life, it doesn't bring back the other person. . . . [W]hen they take a life, a life should be given up." 9/14/05 Tr. 133. Juror 124's beliefs show that listening to gospel music does not imply a reluctance to impose a death sentence. Even being "devout" has no such implication. There are many religions and religious texts that support the death penalty, and

many religious people, like Juror 124, who advocate its use.  The government's assertion that it struck Juror 124 because of her interest in gospel music is a powerful indication of pretext.

*                              *                              *

To date, the government's response to all of this evidence has been that it did not discriminate on the basis of gender because it ultimately accepted four women who would have been seated as petit jurors had the defense not struck them.  ECF No. 466 at 12; *see also* ECF No. 508 at 14-15.  For the reasons set forth in Petitioners' earlier briefs, this argument is meritless.  ECF No. 471 at 6-8.[6]  The acceptance of some women does not mean the government did not reject others based on their gender.  ECF No. 471 at 6-8 (citing cases).  This is especially so here:  the government could not strike, and *had to accept*, three female jurors from the pool of 52 required to seat the panel of twelve, because the pool of 52 included 23 women and the government only had 20 strikes.  And despite the fact it had to accept at least some female jurors, the government did not accept a female juror until the 23rd juror on the list, which substantially diminished the chances that there would be a woman on the panel of twelve.  Add to this the irrefutable evidence that the four female jurors in question demonstrably defied the government's default stereotypes about typical women jurors, ECF No. 454 at 37-39, and the fact the jury would have included four additional women but for the defense's strikes does not come close to rebutting the stark inference of discrimination that the government's vastly disproportionate striking of women created.  ECF No. 471 at 7-8.

---

[6]     The government also suggests the statistical evidence is unpersuasive because it did not use one of its 23 strikes.  ECF No. 466 at 11-12.  That argument is similarly without merit.  ECF No. 474 at 6 (citing cases).

2.      *Trial Counsel Rendered Ineffective Assistance in Failing to Challenge the Government's Strikes of Jurors 1, 83, 90, 117 and 124.*

Petitioners' counsel rendered ineffective assistance by failing to lodge *J.E.B.* challenges to the government's strikes of Jurors 1, 83, 90, 117 and 124.  ECF No. 485 at 4-6.  Petitioners previously submitted declarations from trial counsel, Mr. O'Toole and Mr. Lawlor, establishing that trial counsel negligently failed to challenge any of the government's strikes for having been exercised based on gender.  ECF No. 406 (Lawlor declaration); ECF No. 471-2 (O'Toole declaration).  In their declarations, Mr. O'Toole and Mr. Lawlor explained that their failure was neither strategic nor tactical.  *Id.*  As Mr. O'Toole explained, they failed to consider and failed to assemble the information needed to make *J.E.B.* challenges under a blind striking procedure involving a very large number of peremptory strikes (23 per side).  ECF No. 471-2.

Mr. O'Toole and Mr. Lawlor, as well as Mr. Lighty's other trial counsel, Danya Dayson, have now supplemented these earlier declarations to explain, *inter alia*, that they never would have made a strategic decision to waive a potentially meritorious constitutional claim, like Petitioners' *J.E.B.* claim, so that in the event of a conviction, Petitioners would be able to raise it in post-conviction proceedings.  *See* O'Toole Declaration, attached as **Exhibit 2**; Dayson Declaration, attached as **Exhibit 3**; Lawlor Declaration, attached as **Exhibit 4.**  Moreover, they state that, because they neither discussed raising a *J.E.B.-Batson* challenge nor learned who the prosecution struck at the time of jury selection, they did not refrain from making a *J.E.B.* challenge based on some belief that the prosecution's strikes were non-discriminatory.  They never formed and, given their lack of information, never could have formed any such belief.  *Id.*  For the same reasons, prior counsel did not refrain from making challenges based on their having struck four female jurors themselves.  They did not think about, much less know, whether the government had struck or accepted the same jurors.  *Id.*

The trial transcript confirms trial counsel's failure to grasp how blind striking affected *J.E.B.-Batson* considerations in the face of forty-six (46) potential peremptory challenges. Shortly before the parties exercised their strikes, the government proposed deviating from the Court's standard blind striking process. 9/27/05 Tr. at 5. It suggested that, rather than seating the non-struck jurors after each side delivered its respective strike lists privately to the clerk without disclosing its strikes to the other side, the Court should have each side exchange strike lists so that everyone would know which party was striking which jurors and the Court could entertain challenges *before* the jurors were seated in the box. *Id.* When the Court asked the defense whether it would agree to this procedure, the defense demurred. Its rationale, however, made no sense and betrayed a misapprehension of the striking process the Court used. Mr. O'Toole stated, "I think we'd prefer to seat the jurors in the box. It will be the last time for us to see them, and I'd prefer to see them there *before we exercise any strikes*." *Id.* at 6 (emphasis added). Mr. Flood's attorney, Mr. McKenna, agreed. *Id.* But under the Court's procedure, the lawyers would *not* get to see the jurors in the box before they exercised their strikes. Because the Court populated the box with the jurors that neither side struck from the list of qualified jurors, the lawyers would only get to see the jurors in the box *afterward*. And as the transcript shows, once the jurors were seated, neither Mr. Lighty's nor Mr. Flood's lawyers took any time at all to deduce the government's strikes. *Id.* at 35-37. Trial counsel simply did not appreciate the full implications of the Court's blind striking procedure or the deliberate, methodical measures it required them to take to evaluate and lodge *J.E.B.-Batson* challenges in a capital case involving a large number of strikes (23 per side).

3.   *28 U.S.C. § 2255(b) Entitles Petitioners to an Evidentiary Hearing to Prove There Is Cause to Excuse any Default.*

As explained in ECF No. 471 at 4, 37-39, 28 U.S.C. § 2255(b) entitles Petitioners to an evidentiary hearing on whether trial counsel were ineffective for failing to challenge the government's strikes of Jurors 1, 83, 90, 117 and 124.  The hearing would include, *inter alia*, testimony from Petitioners' statistics expert, Dr. John Lamberth, and Petitioners' prior counsel, and evidence regarding the government's striking pattern in *United States v. Higgs*.  *Id.* at 38-39.

Under the plain text of Section 2255(b), there is a presumption in favor of holding an evidentiary hearing in a Section 2255 proceeding: "*Unless* the motion and the files and the records of the case *conclusively* show that the prisoner is entitled to no relief, the court *shall . . . grant a prompt hearing thereon . . .*" (emphasis added).  In fact, Congress intended the standard for obtaining an evidentiary hearing in a Section 2255 proceeding to be a liberal one.  Prior to the passage of the Anti-Terrorism and Effective Death Penalty Act ("AEDPA"), *Townsend v. Sain*, 372 U.S. 293, 312 (1963), established the standard for granting evidentiary hearings in federal court in both Section 2254 and Section 2255 proceedings: "Where the facts are in dispute, the federal court in habeas corpus *must* hold an evidentiary hearing if the habeas applicant did not receive a full and fair evidentiary hearing in a state court, either at the time of the trial or in a collateral proceeding." (emphasis added). When Congress passed AEDPA, it made revisions to both Section 2255 and Section 2254, but as to the standard governing evidentiary hearings, those revisions differed.  For Section 2254 proceedings, Congress modified the *Townsend* standard and severely limited a federal district court's discretion to grant an evidentiary hearing.  *See* 28 U.S.C. 2254(e). By contrast, Congress placed no such limitation on evidentiary hearings in Section 2255 proceedings.  Comparing the text of Section 2254(e) with the text of Section 2255(b) makes this evident.  *See, e.g., Stead v. United States*, 67 F. Supp. 2d 1064, 1074 n.5

29

(D.S.D. 1999) ("Although the AEDPA modified, to some extent, the *Townsend* standard for obtaining evidentiary hearings in 28 U.S.C. § 2254 cases, Congress made no parallel changes in § 2255 practice and evidently chose to leave intact the *Townsend* standard and to create a discrepancy between the right to a hearing in § 2254 and § 2255 cases.").

The liberal standard governing the availability of evidentiary hearings in Section 2255 proceedings makes sense. In Section 2254 proceedings, a habeas petitioner has already had an opportunity for a post-conviction evidentiary hearing in state court. For a Section 2255 petitioner, his first and only opportunity for an evidentiary hearing is in Section 2255 proceedings. And as the Supreme Court has recognized, a hearing in Section 2255 proceedings will frequently be necessary because the claim most often litigated in such proceedings is ineffective assistance of counsel—a claim that ordinarily cannot be resolved on the trial record because it relies on events that are outside the trial record. The Court explained in *Massaro v. United States*, 538 U.S. 500, 504-506 (2003):

> In light of the way our system has developed, in most cases a motion brought under § 2255 is preferable to direct appeal for deciding claims of ineffective-assistance. When an ineffective-assistance claim is brought on direct appeal, appellate counsel and the court must proceed on a trial record not developed precisely for the object of litigating or preserving the claim and thus often incomplete or inadequate for this purpose. Under *Strickland v. Washington*, 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052 (1984), a defendant claiming ineffective counsel must show that counsel's actions were not supported by a reasonable strategy and that the error was prejudicial. The evidence introduced at trial, however, will be devoted to issues of guilt or innocence, and the resulting record in many cases will not disclose the facts necessary to decide either prong of the *Strickland* analysis. If the alleged error is one of commission, the record may reflect the action taken by counsel but not the reasons for it. The appellate court may have no way of knowing whether a seemingly unusual or misguided action by counsel had a sound strategic motive or was taken because the counsel's alternatives were even worse. *See Guinan, supra*, at 473 (Easterbrook, J., concurring) ("No matter how odd or deficient trial counsel's performance may seem, that lawyer may have had a reason for acting as he did. . . . Or it may turn out that counsel's overall performance was sufficient despite a glaring omission . . ."). The trial record may contain no evidence of alleged errors of omission, much

less the reasons underlying them. And evidence of alleged conflicts of interest might be found only in attorney-client correspondence or other documents that, in the typical criminal trial, are not introduced. *See, e.g., Billy-Eko*, 8 F.3d at 114. Without additional factual development, moreover, an appellate court may not be able to ascertain whether the alleged error was prejudicial.

Under the rule we adopt today, ineffective-assistance claims ordinarily will be litigated in the first instance in the district court, the forum best suited to developing the facts necessary to determining the adequacy of representation during an entire trial. The court may take testimony from witnesses for the defendant and the prosecution and from the counsel alleged to have rendered the deficient performance. *See, e.g., Griffin, supra*, at 1109 (In a § 2255 proceeding, the defendant "has a full opportunity to prove facts establishing ineffectiveness of counsel, the government has a full opportunity to present evidence to the contrary, the district court hears spoken words we can see only in print and sees expressions we will never see, and a factual record bearing precisely on the issue is created"); *Beaulieu v. United States*, 930 F.2d 805 (CA10 1991) (partially rev'd on other grounds *United States v. Galloway, supra*). In addition, the § 2255 motion often will be ruled upon by the same district judge who presided at trial. The judge, having observed the earlier trial, should have an advantageous perspective for determining the effectiveness of counsel's conduct and whether any deficiencies were prejudicial.

In this case, Petitioners have established in their papers that (i) the government struck prospective jurors based on their gender and (ii) prior counsel's failure to challenge the government's strikes fell below an objective standard of reasonableness.  Because this evidence does not "conclusively show that [Petitioners] are entitled to no relief," Section 2255(b) requires an evidentiary hearing.  This is especially so insofar as Petitioners have presented a colorable claim of ineffectiveness whose resolution rests on both credibility determinations and disputed facts beyond the trial record.  ECF No. 471 at 37-39; *Massaro,* 538 U.S. at 504-06; *United States v. Blondeau*, 480 F. App'x 241, 242 (4th Cir. 2012) (citing *United States v. Witherspoon*, 231 F.3d 923, 925-27 (4th Cir. 2000)) ("An evidentiary hearing in open court is required when a movant presents a colorable Sixth Amendment claim showing disputed facts beyond the record or when a credibility determination is necessary.").

### B.      Prejudice Is Presumed.

A *J.E.B.* violation is a structural error.  Prejudice resulting from trial counsel's failure to raise a meritorious *J.E.B.* challenge is therefore presumed.  ECF No. 485 at 6-8.  Such prejudice satisfies both the prejudice requirement for overcoming any default of Petitioners' Equal Protection claims and the prejudice requirement for Petitioners' ineffective assistance of counsel claims under the Sixth Amendment.

### C.      Petitioners Are Entitled to Relief on the Merits.

The showing required to establish cause and prejudice resulting from trial counsel's failure to challenge the government's gender-based exclusion of Jurors 1, 83, 90, 117 and 124 necessitates proving the merits of Petitioners' *J.E.B.* claims.  *See infra.*  Because Petitioners can establish cause and prejudice to excuse any default, and because they can establish ineffective assistance of counsel under *Strickland*, they are entitled to relief on the merits.

## II.      THE GOVERNMENT IMPERMISSIBLY DISCRIMINATED AGAINST PROSPECTIVE JURORS BASED ON THEIR GENDER AND RACE.

The same reasons that excuse any default of Petitioners' claim that the government impermissibly excluded Jurors 1, 83, 90, 117 and 124 based on gender in violation of *J.E.B.* also excuse any default of Petitioners' claim that the government impermissibly excluded Jurors 83, 90, 117 and 124 based on a combination of race and gender in violation of *Batson* and *J.E.B.* There is cause to overcome the default because trial counsel rendered ineffective assistance in failing to challenge the government's strikes of Jurors 83, 90, 117 and 124 as impermissibly gender- and race-based.  As with their pure gender-based claims, Petitioners are entitled to an evidentiary hearing to prove the existence of cause.  There is also prejudice resulting from trial counsel's failures because, as with their pure gender-based claim, prejudice is presumed.  Able to

establish both cause and prejudice, Petitioners are entitled to relief on their claim of impermissible gender/race-based discrimination on the merits.[7]

### A. There Is Cause to Excuse the Default.

There is cause to excuse Petitioners' failure to bring *Batson-J.E.B.* challenges to the exclusion of Jurors 83, 90, 117 and 124 because Petitioners had meritorious challenges to the exclusion of these jurors and, by negligently failing to raise them, Petitioners' counsel furnished representation that fell below an objective standard of reasonableness. These facts also satisfy the deficient performance requirement of Petitioners' Sixth Amendment ineffective assistance of counsel claim under *Strickland*.

1. *The Government Struck Jurors 83, 90, 117 and 124 Based on Gender and Race*.

The following evidence establishes that the government struck Jurors 83, 90, 117 and 124 based on a combination of gender and race:

a. *Exclusion Rate.* The government used its strikes to remove 82% of the African-American women (9 of 11) from the full qualified pool of 64, which was 17% African-American women. This rate is highly statistically significant, with a chance occurrence probability of less than six times in 100,000, and shows that the government was 21.6 times more likely to strike an African-American woman from the pool of 64 than a juror who was not black and female—an

---

[7] Petitioners also bring a Sixth Amendment claim of ineffective assistance of trial counsel based on trial counsel's failure to challenge the government's race/gender-based strikes. ECF No. 451 at 31, 54; ECF No. 455. For the same reason trial counsel's deficient performance in failing to raise Petitioners' Equal Protection claims furnishes cause and prejudice to overcome a procedural default and entitles Petitioners to relief on the merits of those claims, *see infra* at 33-35, it establishes entitlement to relief under the Sixth Amendment's right-to-the-effective-assistance-of-counsel guarantee. That is, trial counsel's failure to challenge the government's strikes of Jurors 83, 90, 117 and 124 as impermissibly race- and gender-based fell below an objective standard of reasonableness and constituted deficient performance under *Strickland*, *see supra* at 33-35, and because prejudice is presumed from *Batson* and *J.E.B.* violations, *id.* at 35, *Strickland's* prejudice requirement is also satisfied.

odds ratio that is "literally off the charts."  ECF No. 454 at 2, 8-9, 33, 36; ECF No. 471 at 5; ECF No. 471-1 at 7-9.  Similarly, examining the pool of 52 jurors required to seat a full panel of twelve, the government used its strikes to remove 89% of the African-American women (8 of 9) from the pool of 52, which was 17% African-American women.  This rate is also highly statistically significant, with a chance occurrence probability of six times in 100,000, and shows that the government was 38 times more likely to strike an African-American woman from the pool of 52 than a juror who was not black and female.  ECF No. 454 at 8-9; ECF No. 479-1 at 4-5.

b.      *Striking Order.*  The government struck the first four African-American female jurors from the list of qualified jurors and did not accept an African-American woman until the 26th juror on the list.  ECF No. 454 at 9-10.

c.      *Jury Composition*.  Because of the government's striking behavior, the jury had no African-American women among 18 seated jurors and alternates, even though the panel of 64 qualified jurors was 17% African-American women.  *See* ECF No. 454 at 2, 8, 31-32, 36-37; ECF No. 471 at 5.

d.      *Exclusion Rate in Higgs*.  In *Higgs*—where neither the petit jury of twelve nor the six alternates included an African-American woman—the prosecutors engaged in a similarly discriminatory striking pattern, removing 71.4% of the African-American women (5 of 7) from the pool of 52, which was 13.5% African-American women.  This rate is highly statistically significant, with a chance occurrence probability of less than three times in 1,000, and shows that the government was 16 times more likely to strike an African-American woman than a juror who was neither black nor female.  ECF No. 479-1 at 5.

e. *Combined Exclusion Rate in Lighty and Higgs.* In *Higgs* and *Lighty* combined, the prosecutors removed total of 81.3% of the African-American women (13 of 16) from the two panels of 52, which consisted of 15.4% African-American women in total. This rate is highly statistically significant, with a chance occurrence probability of only 2.8 times in 1,000,000, and shows that the prosecutors were 23.8 times more likely to strike an African-American women from the two panels than a juror who was neither black nor female. ECF No. 479-1 at 7-8.

f. *Individual Juror Analysis.* *See* Section I.A.1.g., *supra*, for its exposition of the prosecution's pretextual reasons for striking Jurors 83, 90, 117 and 124, all of whom were African-American women.

2. *Trial Counsel Rendered Ineffective Assistance in Failing to Challenge the Government's Strikes of Jurors 83, 90, 117 and 124.*

*See* Section I.A.2., *supra*, for its discussion of the evidence showing prior counsel's ineffectiveness, which applies equally to prior counsel's failure to challenge the government's strikes of Jurors 83, 90, 117 and 124 as impermissibly race- and gender-based.

3. *28 U.S.C. § 2255(b) Entitles Petitioners to an Evidentiary Hearing to Prove There Is Cause to Excuse any Default.*

*See* Section I.A.3., *supra*, for its discussion of why the evidence adduced necessitates an evidentiary hearing.

**B.  Prejudice Is Presumed.**

*See* Section I.B., *supra*, and ECF No. 485 at 6-8, for their discussion of why prejudice is presumed from impermissible discrimination in jury selection. Again, such prejudice satisfies both the prejudice requirement for overcoming any default of Petitioners' Equal Protection claims and the prejudice requirement for Petitioners' ineffective assistance of counsel claims under the Sixth Amendment.

#### C.    Petitioners Are Entitled to Relief on the Merits.

Because Petitioners can establish cause for and prejudice resulting from their prior counsel's failure to challenge the government's race- and gender-based exclusion of Jurors 83, 90, 117 and 124 in violation of the Equal Protection Clause, and because they also can establish ineffective assistance of counsel under the Sixth Amendment and *Strickland*, they are entitled to relief on the merits.

### III.    THE GOVERNMENT IMPERMISSIBLY DISCRIMINATED AGAINST PROSPECTIVE JURORS BASED ON THEIR RELIGIOUS AFFILIATION.

The government expressly excluded Jurors 84, 121, 124, 196 and 241 on the impermissible basis of their religious affiliation.  *See* ECF No. 471 at 34-36.  As a result, the Court should not proceed to step three of the *Batson* inquiry; the government's facially discriminatory explanations for striking these jurors cannot survive step two.  *Id.*  Because the government has not alleged procedural default as to this claim and because there is no default, the Court should grant relief on the merits.  ECF No. 485 at 9-10.

### IV.    THE GOVERNMENT IMPERMISSIBLY DISCRIMINATED AGAINST PROSPECTIVE JURORS BASED ON REASONS THAT ARE PROXIES FOR RACE.

The government expressly excluded Jurors 90, 124, 201 and 241 based on impermissible reasons that are proxies for race.  ECF No. 471 at 32-34.  As with the government's impermissible religion-bases strikes, these reasons cannot survive step two of the *Batson* inquiry.  *Id.; see, e.g., United States v. Bishop,* 959 F.2d 820, 825-26 (9th Cir. 1992), overruled on other grounds by *United States v. Nevils,* 598 F.3d 1158 (9th Cir. 2010).  And again, because the government has not alleged procedural default and there is no default, the Court should grant relief on the merits.  ECF No. 485 at 9-10.

## CONCLUSION

For the foregoing reasons, Petitioners are entitled to an evidentiary hearing and to relief on their claims that (i) the government impermissibly excluded jurors based on gender, a combination of gender and race, religious affiliation and reasons that are proxies for race and (ii) trial counsel was ineffective for failing to challenge the government's gender- and race/gender-based strikes.

Respectfully submitted,

**/s/ Julie Brain**
Julie Brain
Juliebrain1@yahoo.com
Attorney at Law
216 South 2nd Street
Philadelphia, PA 19106
(267) 639 0417

**/s/ Karl Schwartz**
Karl Schwartz
Karl_schwartz@fd.org
Capital Habeas Unit, Delaware Federal Defender
800 King Street, Suite 200
Wilmington, DE 19801
302-573-6010

**/s/ Seth Rosenthal**
Seth A. Rosenthal (D. Md. Bar No. 10780)
sarosenthal@venable.com
Molly T. Cusson (D. Md. Bar No. 18390)
mtcusson@venable.com
VENABLE LLP
575 7th Street, NW
Washington, DC  20004-1601
202-344-4000

*Counsel for Kenneth Jamal Lighty*

**/s/ Marta Kahn**_____
Marta K. Kahn
mkkahn@yahoo.com
The Law Office of Marta K. Kahn, LLC
8 E. Mulberry St.
Baltimore, MD 21209
(410) 299-6966

*Counsel for James Flood*

## CERTIFICATE OF SERVICE

I hereby certify that, on the 15th day of December, 2014, I caused the foregoing to be filed via the Court's ECF system without the contents of exhibits filed under seal, and served a copy of the foregoing, together with all exhibits, including those filed under seal, by U.S. mail, first class, postage pre-paid, on the following:

James Crowell, Esq.
Deborah A. Johnston, Esq.
Sandra Wilkinson, Esq.
Assistant United States Attorney
Office of the United States Attorney
400 United States Courthouse
6500 Cherrywood Lane
Greenbelt, MD 20770-1249

/s/
Seth A. Rosenthal