# EXHIBIT 1

## (FILED UNDER SEAL)

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

UNITED STATES OF AMERICA      *

         **vs.**      *      **Case No.** 03-cr-00457-PJM

KENNETH JAMAL LIGHTY      *

         *******

## NOTICE OF FILING OF DOCUMENT UNDER SEAL

*Check one:*

☑    Exhibit 1_____, which is an attachment to Petitioner's Memorandum of Points and Authorities In Support of Their Claims of Impermissible Discrimination in Jury Selection In Their Motions for Relief will be filed with the Clerk's Office in PDF format within 24 hours of the filing of this Notice so that it may be electronically filed under seal.

☐    _____

(title of document)

will be filed with the Clerk's Office in PDF format within 24 hours of the filing of this Notice so that it may be electronically filed under seal.

I certify that at the same time I am filing this Notice, I will serve copies of the document identified above by December 16, 2014_____

/s/
_____
*Signature*

December 15, 2014_____
*Date*

Seth A. Rosenthal  # 10780____
*Printed Name and Bar Number*

VENABLE LLP - 575 7th Street NW
*Address*

Washington DC  20004_____
*City/State/Zip*

(202) 344-4741_____
*Phone No.*

(202) 344-8300_____
*Fax No.*

U.S. District Court (03/2011) Notice of Filing of Sealed Document

# EXHIBIT 2

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
(Greenbelt Division)

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| *Plaintiff,* | ) | Case No. 03-cr-00457-PJM |
| | ) | |
| v. | ) | |
| | ) | |
| KENNETH JAMAL LIGHTY, | ) | |
| | ) | |
| *Defendant.* | ) | |

### DECLARATION OF JEFFREY B. O'TOOLE

I, Jeffrey B. O'Toole, hereby declare:

1.      I am a partner at Bonner Kiernan Trebach & Crociata LLP. I am over 18 years of age and have personal knowledge of the following facts and could and would competently testify to them if called to do so.

2.      I previously submitted a declaration pertaining to the jury selection conducted in the above-captioned case, in which I served as trial counsel for Kenneth Lighty, along with Danya Dayson. I reaffirm what I stated in that declaration, dated April 24, 2013.

3.      As I stated in my prior declaration, our failure to make a *J.E.B.* or *Batson* challenge at the time of jury selection in Mr. Lighty's case was not a strategic decision. It was an oversight. The Court employed a blind striking procedure. I had never picked a jury using this procedure before, and while I believed at the time that I understood the procedure, I did not in fact adequately educate myself about it before trial. I did not, for instance, seek information about the procedure from any other lawyer who had picked a jury using it in this court. As a result, at the time we picked the jury in Mr. Lighty's case, we did not appreciate the careful steps that needed to be taken to recognize and lodge a *J.E.B.*-*Batson* challenge in the face of over 20 peremptory challenges simultaneously and confidentially exercised by the prosecution; and as the transcript of jury selection shows, we did not take the time or obtain the information needed to lodge one.

4.      As I stated in my prior declaration, we also did not learn until after Mr. Lighty's trial that an all-male jury was selected in *Higgs*. Had we known this at the time Mr. Lighty's jury was chosen, we would have been sensitive to the real possibility of gender discrimination in the selection of Mr. Lighty's jury. As it turned out, we were not. In fact, while I was quite familiar with the practice of challenging prosecution strikes based on race under *Batson* at the time of the *Lighty* trial, and previously had exercised race-based challenges on numerous occasions, I did not at that time have experience lodging challenges based on gender under

*J.E.B.*, and I was not particularly attentive to or on the lookout for the possibility of gender-based striking patterns.

5.     We did not deliberately refrain from raising a *J.E.B.-Batson* challenge so that, if Mr. Lighty were convicted, he could raise such a challenge in post-conviction proceedings. As a criminal lawyer who has handled both trials and appeals, I know that the best opportunity to prevail in a case is at trial. And to maximize the chances of a favorable outcome at trial, my strategy is always to select what I feel will be the most favorable jury possible for my client. For the government to skew the composition of the jury panel by striking potential jurors based on their gender or race is contrary to my client's interests, as well as his constitutional rights. I would never consciously fail to object to such conduct for any reason, and certainly not in an attempt to create a potential claim for relief in post-conviction in the event of a guilty verdict in a death penalty case. The formidable procedural obstacles that often stand in the way of winning in post-conviction are too great to justify failing to maximize my client's chances of prevailing at trial. Therefore, had I realized that both women and African-American women were systematically excluded from Mr. Lighty's jury, I would have objected and moved to reseat those who were impermissibly struck.

6.     Our failure to make a *J.E.B.-Batson* challenge was not based on any judgment that the government's strikes were gender and race neutral. Having failed to obtain an accounting of or taken the time needed to analyze the government's strikes before the jury was sworn, we did not make, and could not possibly have made, informed judgments about whether the government's reasons for exercising their strikes were nondiscriminatory. We could not have even speculated about it. And now that I have had a chance to review the available evidence regarding the prosecution's strikes, I do *not* believe they were made without regard to gender or race. Had it occurred to us to obtain and meaningfully evaluate all of the available evidence before the jury was sworn, we would have challenged the prosecution's strikes of both women generally and African-American women in particular.

7.     In addition, our failure to make a *J.E.B.-Batson* challenge was not informed at all by the fact that the defense struck four female jurors whom the prosecution did not strike from the pool of jurors required to seat a panel of twelve. Given that we did not discuss lodging a challenge in the first place, we would not have considered reasons for not lodging one. Moreover, because we did not obtain an accounting of the prosecution's strikes, we would not even have known that the prosecution didn't strike these four jurors. And even if we had obtained and analyzed the prosecution's strikes, we would have raised a *J.E.B.-Batson* challenge regardless of the strikes we exercised. The fact that we struck the four women in question and the government didn't does not mean that the government's strikes of so many other women were not based on gender. In fact, I have lodged *Batson* challenges against the government in other cases where I have struck African-American jurors I thought would not be good for the defense, because in those cases, notwithstanding my own strikes, the evidence showed the government was exercising race-based strikes.

2

I declare under the penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed this 12th day of December, 2014.

Jeffrey B. O'Toole

# EXHIBIT 3

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
(Greenbelt Division)

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| *Plaintiff,* | ) | Case No. 03-cr-00457-PJM |
| | ) | |
| v. | ) | |
| | ) | |
| KENNETH JAMAL LIGHTY, | ) | |
| | ) | |
| *Defendant.* | ) | |

## DECLARATION OF DANYA A. DAYSON

I, Danya A. Dayson, hereby declare:

1. I am over 18 years of age, have personal knowledge of the following facts and can testify to them if called to do so.

2. I was formerly an attorney at the law firm of O'Toole, Rothwell, Nassau & Steinbach, where I principally litigated cases involving family and criminal law.

3. Together with Jeffrey O'Toole, I represented Kenneth Lighty at trial and on appeal in the above-captioned case.

4. I participated in jury selection in Mr. Lighty's case, which was my first capital case. While Mr. O'Toole took the lead role, I played an active role. I questioned prospective jurors, took notes, discussed prospective jurors with Mr. Toole, and conferred with Mr. O'Toole on the peremptory challenges we would exercise. In addition, like Mr. O'Toole, I conferred with

1

counsel for James Flood, Mr. Lighty's co-defendant, throughout the course of jury selection, because Mr. Lighty and Mr. Flood were collectively given a set number of peremptory challenges to exercise jointly (20 to seat the petit jury and three to seat alternates).

5.      Before Mr. Lighty's trial, I had never before picked a jury in the U.S. District Court for the District of Maryland and had never before picked a jury using a blind striking procedure. When blind striking is used, as it was in Mr. Lighty's case, each side privately marks down all of its strikes at once and then furnishes its list to the Court without the other side knowing which jurors it struck.  With the methods of jury selection I was familiar with, defense counsel has the opportunity to observe who the prosecution is striking one-by-one in real time. That was not the case here, where we did not observe the prosecution strikes as they were unfolding and did not obtain the list of the prosecution's strikes.  As a result, in Mr. Lighty's case, we could not ascertain, during the striking process itself, whether the prosecution was discriminating against prospective jurors on prohibited grounds, like race or gender.  The only way for us to have gauged whether unlawful discrimination was occurring would have been to obtain the government's strike list and assess the prosecution's strikes after the strikes were made but before the jury was sworn.  I did not appreciate this and we did not do this at the time we selected the jury in Mr. Lighty's case.

6.      We did not challenge any of the prosecution's strikes in Mr. Lighty's case as having been exercised for impermissibly discriminatory reasons.  This was not a strategic or tactical decision.  We simply failed to do it.   I never discussed with either Mr. O'Toole or Mr. Flood's lawyers the possibility of lodging a challenge before the jury was empaneled or taking

2

the steps required to assess whether such a challenge was warranted. We also did not consider or discuss the gender or racial composition of the seated jury before it was empaneled.

7.      Because we did not take the steps necessary to raise a *J.E.B.-Batson* challenge, we did not deliberately choose to bypass such a challenge in the hope that Mr. Lighty would be able to raise a challenge later in the event of a conviction. I did not consciously forgo this objection to a potential violation of my client's constitutional rights.

8.      We also did not refrain from making a *J.E.B.-Batson* challenge based on any belief that the prosecution's strikes were non-discriminatory. We did not form such a belief because we did not obtain and scrutinize the prosecution's strikes.

9.      We also did not refrain from making a *J.E.B.-Batson* challenge based on our having struck four female jurors whom the government accepted. We did not discuss raising a challenge in the first place; therefore, we did not consider reasons for not making a challenge. We also did not obtain and scrutinize a list of the prosecution's strikes, so we did not know whether the prosecution struck the same four jurors. And even if we had analyzed the prosecution's list and found that the prosecution had accepted the four female jurors we struck, it would not have prevented us from making a *J.E.B.-Batson* challenge on that basis alone since our strikes would have had no bearing on whether the government impermissibly took gender or race into account with its strikes.

10.      We knew that the same AUSAs who tried Mr. Lighty tried two other capital cases, *United States v. Haynes,* which resulted in a life sentence, and *United States v. Higgs,* which resulted in a death sentence. We did not know until after Mr. Lighty's trial that an all-male jury was selected in *Higgs.*

3

I declare under the penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed this 12th day of December, 2014.

Danya A. Dayson

4

# EXHIBIT 4

## SUPPLEMENTAL DECLARATION OF MICHAEL LAWLOR

I, Michael Lawlor, Esq., under penalty of perjury, affirm the following to be true and correct to the best of my recollection and belief:

1.     I served as second chair counsel for James Flood at trial and on direct appeal in the matter currently before the Court in proceedings under 28 U.S.C. §2255.

2.     I have reviewed the pleadings filed in this matter, regarding a joint claim raised by Mr. Flood and Kenneth Lighty, Mr. Flood's co-defendant, alleging that my co-counsel and I were ineffective in failing to challenge the Government's exercise of its peremptory challenges in a discriminatory manner.

3.     My recollection is that when I saw the empaneled jury, it did not seem right due to the large number of males. As I recall, however, I was largely deferring to Mr. Lighty's counsel on matters of jury selection, because their client was facing the death penalty and ours was not. When Mr. Lighty's counsel did not raise the issue, I did not contemplate making it on my own, nor did I bring my concerns to anyone's attention. In hindsight, I wish I had.

4.     Beyond my initial gut reaction to the seated jury, I did not make any considered analysis of why the jury might have looked the way it did. I did not try to figure out whom the Government struck and determine whether it would have had valid reasons for making those strikes. Nor did I consider making an objection to the composition of the jury and then decide not to make it so that a Batson/JEB claim could be made in post-conviction proceedings. I would simply never do that. Even at that early stage in my career, I knew that the chances of winning in a criminal case decrease at every stage of the process. I would never intentionally fail to make a meritorious objection in order to "save" it for later.

5.     Finally, I did not consider whether the strikes that the defense had made could have somehow resulted the panel as it was composed. I simply did not have the time or information available to me to have made those assessments even if I had thought of it.

Date: 12/15/14

Michael E. Lawlor