# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | \* | |
| | \* | |
| **v.** | \* | Civil No. **PJM 12-3065** |
| | \* | Crim. No. **PJM 03-0457-1** |
| **KENNETH JAMAL LIGHTY** | \* | |
| | \* | |
| Petitioner-Defendant. | \* | |
| | \* | |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | \* | |
| | \* | |
| **v.** | \* | Civil No. **PJM 11-3563** |
| | \* | Crim. No. **PJM 03-0457-3** |
| **JAMES EVERETT FLOOD, III** | \* | |
| | \* | |
| Petitioner-Defendant. | \* | |
| | \* | |

## <u>MEMORANDUM OPINION</u>

Kenneth Jamal Lighty and James Everett Flood, III ("Petitioners") have filed separate Motions to Vacate, Set Aside, or Correct Sentence under 28 U.S.C. § 2255, but in a joint Amended Motion to Vacate are allied as to one claim--*viz.* they assert that they should be granted relief on the ground the Government used its peremptory strikes at trial in a discriminatory manner in violation of *Batson v. Kentucky*, 476 U.S. 79, 106 S. Ct. 171, 290 L.Ed.2d 69 (1986) and *J.E.B. v. Alabama*, 511 U.S. 127, 114 S. Ct. 1419, 128 L.Ed.2d 89 (1994). Am. Mot. Vacate, ECF No. 451. For the reasons that follow, the Court will **DENY** the Amended Motion to Vacate as to Petitioners' claims brought pursuant to *Batson-J.E.B*, reserving for a later time

1

consideration of the other grounds for relief raised in Petitioners' respective Section 2255 Motions.[1]

## I.  Procedural Background

A federal grand jury indicted Lighty and Flood (along with co-defendant Lorenzo Wilson) on five counts of criminal activity: kidnapping, aiding and abetting; conspiracy to kidnap, aiding and abetting; and three counts of use of a handgun during a crime of violence, aiding and abetting.  The Government filed a notice of intent to seek the death penalty with respect to Lighty only.  In the guilt phase of that trial, Lighty and Flood were tried together, and a petit jury found them both guilty on all counts.

At the close of penalty phase in Lighty's case, which began a few weeks later after its finding of guilt, the jury returned a verdict of death.

The Court thereafter sentenced Lighty to death on the conviction of kidnapping resulting in death, to life imprisonment on the conviction of conspiracy to kidnap, and to three consecutive sentences totaling 55 years on the three firearms convictions. *See* Judgment and Order, Mar. 10, 2006, ECF No. 248; Judgment and Commitment Order, Mar. 10, 2006, ECF No. 249.  Flood received life imprisonment and consecutive sentences of ten years, twenty-five years, twenty-five years, and five years on the same respective counts. *See* Judgment and Commitment Order, Jan. 13, 2006, ECF No. 234.

The Fourth Circuit affirmed the convictions and sentences of both Petitioners on appeal, *see United States v. Lighty*, 616 F.3d 321 (4th Cir. 2010), and the U.S. Supreme Court denied the petitions of both for writs of certiorari.  *See Lighty v. United States*, 132 S. Ct. 451 (2011); *Flood v. United States*, 131 S. Ct. 846 (2010).

---

[1] By Memorandum Opinion and Order dated October 30, 2014, the Court denied Petitioners' Motion for Discovery in connection with the *Batson-J.E.B.* claims.  *See* Memo. Op. and Order, ECF Nos. 508, 509.

In their original Motions to Vacate, Set Aside, or Correct Sentence and for New Trial Pursuant to 28 U.S.C. § 2255, ECF Nos. 434 and 396, Lighty and Flood allege, among other things, that the Government used its peremptory strikes at trial in a discriminatory manner in violation of *Batson v. Kentucky*, 476 U.S. 79, 106 S. Ct. 171, 290 L.Ed.2d 69 (1986) and *J.E.B. v. Alabama*, 511 U.S. 127, 114 S. Ct. 1419, 128 L.Ed.2d 89 (1994).  Lighty makes his *Batson-J.E.B.* claim as a denial of his "rights to due process, a fair trial, a fair and impartial jury and to be free from cruel and unusual punishment," and of his equal protection rights, as well as through two collateral ineffective assistance of counsel claims involving both trial and appellate counsel.  Flood raises his claim collaterally, as one of ineffective assistance of counsel based on his trial counsel's failure to raise the *Batson-J.E.B.* challenge.

Because both Motions raise *Batson-J.E.B.* claims, the Court determined that it would consider the claims together, separately from Lighty's and Flood's other Section 2255 claims. *See* Letter Order, October 23, 2012, ECF No. 436.  As a lead-in to their Motions, the Court granted Lighty's Consent Motion for Access to Juror Strike Lists, ECF No. 446, as a result of which counsel for both Petitioners and the Government had an opportunity to review those lists in a conference room of the Court.  After counsel reviewed the Strike Lists, they submitted a joint proposed schedule for further briefing, which the Court approved.  In its Scheduling Order, ECF No. 449, the Court permitted Lighty to file an Amended Motion to Vacate and a Motion for Discovery as to the *Batson-J.E.B.* Claims, and permitted Flood to join in the Motion for Discovery.

The Court's briefing schedule indicated that the issue of discovery with respect to the *Batson-J.E.B.* claims would be briefed and decided first.  Accordingly, on December 20, 2012, Lighty and Flood filed a Joint Motion for Discovery Regarding the Allegations of Impermissible

Discrimination in Jury Selection.  ECF No. 453.  On the same day, Lighty filed an Amended Motion to Vacate, ECF No. 451, and Flood filed his own Motion to Amend, seeking to adopt as his own Lighty's Amended Motion to Vacate.  ECF No. 455.  The Court granted Flood's Motion to Amend on May 30, 2013.  ECF No. 476.

Thereafter, the Court held a hearing on the Joint Motion for Discovery and ordered supplemental briefing.  Lighty and Flood filed a supplemental brief; the Government filed none.  The Court then held a second hearing on the Joint Motion, and took the matter under advisement.  Following the second hearing, Lighty and Flood submitted yet another brief, ECF No. 501; again the Government filed none.

On October 30, 2014, the Court issued a Memorandum Opinion and Order denying the Joint Motion for Discovery.  Memo. Op. and Order, ECF Nos. 508, 509.  The Court noted that a habeas petitioner may be granted discovery if good cause is shown: *i.e.*, if the petitioner makes specific allegations that give reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he is entitled to relief.  *See* Memo. Op. at 6, ECF No. 508 (citing *Bracy v. Gramley*, 520 U.S. 899, 908-09, 117 S. Ct. 1793, 138 L.Ed.2d 97 (1997)).  The Court reasoned that whether a petitioner has shown good cause necessarily involves to a considerable extent an inquiry into the merits of the claim, and proceeded to analyze whether Petitioners in this case had procedurally defaulted on their claims. The Court concluded that Petitioners had procedurally defaulted as to any direct *Batson-J.E.B.* claim because they had failed to raise it at trial or on appeal. The Court recognized, however, that the *Batson-J.E.B.* claim could still be raised as an ineffective assistance of counsel claim not subject to procedural default, and that a successful claim for ineffective assistance of counsel could establish "cause" to overcome the procedural default.  *See id.* at 10.

While the Court reserved deciding whether the performance of Petitioners' counsel, at trial or on appeal, fell below an objective standard of reasonableness, nevertheless, upon preliminary review for purposes of the Joint Motion for Discovery, the Court concluded that it did not. *See id.* at 11. The Court determined that Petitioners' proffered evidence fell short of demonstrating ineffective assistance of counsel such that—even if facts were further developed in discovery—Petitioners would still not be entitled to relief. In particular, the Court concluded that Petitioners' juror strike statistics, juror-to-juror comparisons, and allegations of a history of discriminatory strikes by the same prosecutors in one other case in this Court failed to satisfy the requirement of "specific allegations" justifying entitlement to relief. *See id.* at 13-16. The Court, however, allowed that it would undertake a more detailed review of the record when it addressed the merits of Petitioners' *Batson-J.E.B.* claim, and granted the parties leave to submit further briefing on the issue.

The parties consented to a briefing schedule, and on December 15, 2014 Petitioners filed a Memorandum of Points and Authorities summarizing evidence and argument contained in their voluminous prior briefing. Pet'rs' Br., ECF No. 513. On March 11, 2015, the Government advised the Court that it did not intend to file a response to the Petitioners' latest briefing, and would instead rely upon its previous responses in the case. ECF No. 520.

## II. Procedural Posture

The Court begins by considering the procedural posture of the *Batson-J.E.B.* claims, which Petitioners argue arise in two forms: (A) a *Batson-J.E.B.* claim that is procedurally defaulted, as to which Petitioners seek to establish cause to set aside the default by showing that counsel was ineffective for failing to make the *Batson-J.E.B.* challenge, and (B) an ineffective

5

assistance of counsel claim on the merits, based on counsel's failure to make the *Batson-J.E.B.* challenge.  *See* Pet'rs' Br. at 4 & n.3, ECF No. 513.

Accordingly, under either approach, the Court must determine whether Petitioners' counsel rendered constitutionally ineffective assistance by failing to challenge the Government's peremptory strikes under *Batson-J.E.B.*

### A.  Procedurally Defaulted *Batson-J.E.B.* Claim

Petitioners' claim in this regard is that the Government unconstitutionally exercised its peremptory challenges against female venire persons on the basis of their gender and their race. *See* Am. Mot. Vacate at 7, ECF No. 451; Pet'rs' Br. at 2-3, ECF No. 513.

As the Court noted in its opinion dated October 30, 2014, the *Batson-J.E.B.* claim was not raised at trial or on direct appeal, and is therefore procedurally defaulted.  A claim which could have been but was not made on a petitioner's direct appeal may not be raised in a Section 2255 petition unless there is demonstrable cause for the petitioner's failure to raise the claim at an earlier time, and unless actual prejudice is shown to have resulted from the alleged error.  *See Massaro v. United States*, 538 U.S. 500, 504, 123 S. Ct. 1690, 155 L.Ed.2d 714 (2003); *Bousley v. United States*, 523 U.S. 614, 621-22, 118 S. Ct. 1604, 140 L.Ed.2d 828 (1998); *United States v. Frady*, 456 U.S. 152, 167-68, 102 S. Ct. 1584, 71 L.Ed.2d 816 (1982).  "The existence of cause for a procedural default must turn on something external to the defense, such as the novelty of the claim or a denial of effective assistance of counsel."  *United States v. Mikalajunas*, 186 F.3d 490, 493 (4th Cir. 1999) (citing *Murray v. Carrier*, 477 U.S. 478, 488, 106 S. Ct. 2639, 91 L.Ed.2d 397 (1986)).  Petitioners argue, and the Government does not dispute, that if Petitioners can establish that trial counsel rendered constitutionally ineffective assistance of counsel by failing to make a *Batson-J.E.B.* challenge to the Government's peremptory strikes at

6

trial, they will have established cause to excuse their procedural default.  *See* Pet'rs' Br. at 4, ECF No. 513; Gov't Resp. Opp'n at 7, ECF No. 466; *see also Hollis v. Davis*, 941 F.2d 1471, 1476-78 (11th Cir. 1991) (holding that because trial counsel rendered constitutionally ineffective assistance, there was cause for petitioner's procedural default of his claim raised under 28 U.S.C. § 2254(b) that African-American jurors were systematically excluded from the venire).

But, again, even assuming that can Petitioners establish cause for their procedural default through a successful ineffective assistance of counsel claim, their direct *Batson-J.E.B.* claim will still be procedurally defaulted unless they can also show actual prejudice as a result of the government's allegedly unconstitutional exercise of its peremptory challenges against female venire persons on the basis of their gender and their race.

### B. Ineffective Assistance of Counsel – Standard of Review

To establish cause for the procedural default, as well as for their substantive ineffective assistance of counsel claim, Petitioners first submit that counsel rendered constitutionally defective assistance by failing to challenge at trial or on appeal the Government's use of peremptory strikes to exclude women from Petitioners' jury on the basis of both their gender and race.  *See* Am. Mot. Vacate at 5, 54, ECF No. 451; Pet'rs' Br. at 4-5, 4 n.3, 33 n.7.  Because they have a meritorious *Batson-J.E.B.* claim, say Petitioners, counsel's failure to raise that claim both fell below an objective standard of reasonableness and prejudiced them.  *See id.*  The Government counters that because there were no meritorious *Batson-J.E.B.* claims to be made, Petitioners cannot satisfy either of the requirements of *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L.Ed.2d 674 (1984).  *See* Gov't Resp. Opp'n at 23, ECF No. 466.

Ineffective assistance of counsel claims are governed by the familiar two-part test first elucidated by the Supreme Court in *Strickland*:

> A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction or death sentence has two components. First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.

466 U.S. at 687, 104 S. Ct. at 2064.

These two elements are frequently referred to as the "performance" and "prejudice" components. *Fields v. Attorney Gen. of State of Md.*, 956 F.2d 1290, 1297 (4th Cir. 1992). As to the performance prong, counsel's performance is measured for reasonableness under prevailing professional norms. *See Strickland*, 466 U.S. at 688, 104 S. Ct. at 2065. For example, counsel are not ineffective for failing to anticipate changes in the law or for failing to pursue constitutional claims they reasonably believe to be of questionable merit. *See Jackson v. Herring*, 42 F.3d 1350, 1359 (11th Cir. 1995). On the prejudice prong, in the present case there are two possibilities as to what "prejudice" could refer to: (1) that the final outcome of the trial would have been different but for the failure of counsel to raise the *Batson-J.E.B.* challenge, or (2) that the trial court would have sustained a *Batson-J.E.B.* challenge, had one been raised at the appropriate time.

Since a petitioner bears the burden of proving both *Strickland* elements, he fails to satisfy his overall burden if he fails as to prove either. *See Strickland*, 466 U.S. at 697, 104 S. Ct. at 2069. As a result, the Court may properly begin its analysis with either the performance or the prejudice prong.

Considering first, then, the prejudice prong: the Court concludes that if it finds that—had a *Batson-J.E.B.* claim been raised at trial—there is a reasonable probability it would have been

8

successful, then the prejudice component of *Strickland* will have been satisfied.  Petitioners need not demonstrate a reasonable probability that the final outcome of the trial would have been different in order to satisfy the prejudice prong.

The Court reaches this conclusion based on the following analysis:[2]

Generally speaking, under *Strickland*, in order to satisfy the prejudice prong, Petitioners must show that there was a "reasonable probability" that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A "reasonable probability" is a probability sufficient to undermine confidence in the outcome. *See Strickland*, 466 U.S. at 694, 104 S. Ct. at 2068.  However, in the context of a *Batson-J.E.B.* challenge that was never raised, it has not yet been established, in the Fourth Circuit at least, exactly which "result[s] of the proceeding" would have to be different in order to satisfy the prejudice prong.

There are at least two possibilities:

The first is that the "result of the proceeding" may refer to the result of the *Batson-J.E.B.* challenge itself.   In the present context, Petitioners would need only show that there is a "reasonable probability" that, but for counsel's failure to make a *Batson-J.E.B.* challenge, the *Batson-J.E.B.* challenge would have been successful.  This approach has been endorsed by three federal Courts of Appeal.

In *Carrera v. Ayers*, the Ninth Circuit held that in evaluating likelihood of success of the petitioner's hypothetical objection under a state law analogue to *Batson*, the petitioner had the burden under *Strickland* to show a "reasonable probability" that he would have prevailed on such

---

[2] While the Court recognizes that a consideration of the merits of Petitioners' *Batson-J.E.B.* claims is essential to the ineffective assistance of counsel inquiry, the Court pauses to emphasize that, at this point, it is not necessarily tasked with definitively resolving Petitioners' *Batson-J.E.B.* claims on the merits. Rather, the Court is tasked with determining, pursuant to *Strickland*, whether Petitioners' counsel rendered constitutionally ineffective assistance by failing to challenge the Government's peremptory strikes under *Batson-J.E.B.* for the purposes of excusing the procedural default.

a claim.  *See* 699 F.3d 1104, 1107-08 (9th Cir. 2012); *see also Doe v. Ayers*, 782 F.3d 425, 432-33 (9th Cir. 2015) (holding that petitioner has the burden to demonstrate prejudice by showing that there is a reasonable probability that the state law *Batson* analogue that counsel failed to raise at trial would have prevailed); *Mitcham v. Davis*, 103 F. Supp. 3d 1091, 1108-09 (N.D. Cal. 2015) (applying *Carrera* and finding a reasonable probability that petitioner would have prevailed on a challenge under the state law *Batson* analogue, had his counsel raised it at trial).

In *Eagle v. Linahan*, the Eleventh Circuit considered whether the failure of appellate counsel to raise a *Batson* claim resulted in prejudice: "To determine whether the failure to raise a claim on appeal resulted in prejudice, we review the merits of the omitted claim. If we conclude that the omitted claim would have had a reasonable probability of success, then counsel's performance was necessarily prejudicial because it affected the outcome of the appeal."  279 F.3d 926, 943 (11th Cir. 2001) (internal citations omitted).  The Eleventh Circuit concluded that had the *Batson* claim been presented on appeal, the state supreme court would "in all probability" have opted to grant the petitioner a new trial.  *See id.*  The Eleventh Circuit so concluded based on its earlier analysis that the petitioner—by the state trial judge's own admission—had established that the prosecution had struck jurors based on race, and that trial judge had erred in declining to find a *Batson* violation on that basis.  *See id.* at 941-42.

In *Drain v. Woods*, the Sixth Circuit affirmed the district court's finding that, but for the state trial counsel's failure to suggest the proper remedy for a *Batson* violation recognized by the trial court during voir dire, there was a "substantial probability" that the state trial court would have implemented the proper remedy by ordering a new panel of jurors. *See* 595 F. App'x 558, 583 (6th Cir. 2014).[3]

---

[3] *Drain* differs from the instant case, and from *Carrera* and *Eagle*, because the Sixth Circuit never had to analyze, under a *Strickland* "reasonable probability" standard, whether a *Batson* claim would have been

10

In sum, cases from the Ninth, Eleventh, and Sixth Circuits suggest that the "result of the proceeding" under *Strickland* refers to the reasonable probability that had the *Batson-J.E.B.* claim been raised, it would have been successful.

The second possibility is that the "result of the proceeding," under *Strickland*, means that but for counsel's failure to raise a *Batson-J.E.B.* claim, the "result" of the <u>entire</u> proceeding would have been different. Put another way, under this approach a petitioner whose counsel had failed to raise a *Batson-J.E.B.* challenge could only show the requisite prejudice under *Strickland* if it could be shown that there was a reasonable probability that, but for the failure to raise the *Batson-J.E.B.* claim, the petitioner would not have been convicted, or would have been convicted of a lesser charge. This approach was taken by a different panel of the Eleventh Circuit in *Jackson v. Herring*, 42 F.3d 1350 (11th Cir. 1995), which concluded that the use of racially discriminatory peremptory strikes by the prosecutor's office violated *Swain v. Alabama* (*Batson*'s predecessor), and that the performance of petitioner's counsel was constitutionally deficient. *See id.* at 1360–62 (citing *Swain v. Alabama*, 380 U.S. 202, 85 S. Ct. 824, 13 L.Ed.2d 759 (1965)). Nevertheless, the *Jackson* panel concluded that there was not a reasonable probability that, but for counsels' errors, the result of the proceeding would have been different. This was because "[t]he jury's verdict . . . was substantially supported by the evidence" and because "[n]othing in the record indicate[d] that a racially balanced jury would have been more likely to acquit or convict of a lesser charge than was the all-white jury in this case." *See id.* at 1362.

---

successful. This was because the state had failed to raise the defense of procedural default as to the direct *Batson* claim, so the Sixth Circuit resolved the direct *Batson* claim on the merits before reaching the ineffective assistance of counsel analysis. Nevertheless, the Sixth Circuit's approach—asking whether there was a substantial probability that a *Batson* remedy would have been implemented, if it had been raised—is consistent with the approaches of the Ninth and Eleventh Circuits.

Even so, as this Court signaled in its prior opinion denying discovery in the present case, it was and is not inclined to agree with the *Jackson* panel's approach. Indeed, the panel of the Eleventh Circuit in *Eagle* specifically criticized the *Jackson* panel:

> [W]e are troubled by the practical implication of that requirement when the alleged deficient performance is failure to raise a *Batson*-type claim at trial or on appeal. How can a petitioner ever demonstrate that the racial make-up of the jury that convicted him affected its verdict? Furthermore, in requiring a petitioner to make such a showing, we are asking that he convince us of the very conclusion that *Batson* prohibits: that the race of jurors affects their thinking as jurors . . . . [H]ow can a court, in attempting to give force to the Equal Protection Clause, ask a habeas corpus petitioner to prove, or itself conclude, that the bare factor of juror race, standing alone, affected the outcome of his trial?

*Eagle*, 279 F.3d at 943 n.22. While these comments by the *Eagle* panel may have been dicta, the panel did suggest that where counsel's constitutionally ineffective representation lets stand a structural error, such as a *Batson* violation, that infects the entire trial with an unconstitutional taint, the court should not require the defendant to prove actual prejudice in the final outcome of his trial. *See id.*; *see also Davis v. Sec'y for Dep't of Corr.*, 341 F.3d 1310, 1316 (11th Cir. 2003) (finding a reasonable probability that, had trial counsel preserved *Batson* challenges for appeal, a state appeals court would deem harmless error review inapplicable to such *Batson* challenges).

The approach of the *Eagle* case to the prejudice under *Strickland* is further supported by the view, adopted by some circuits, that a direct *Batson* claim constitutes a structural error, which is exempt from the harmless-error rule and requires automatic reversal. Indeed, the Supreme Court has stated that discrimination in grand jury selection is a structural error not subject to harmless error analysis. *See Vasquez v. Hillery*, 474 U.S. 254, 261-63, 106 S. Ct. 617, 88 L.Ed.2d 598 (1986). This is precisely the approach taken by the Sixth Circuit in *Drain*, which held that "[b]ecause a *Batson* violation constitutes a structural error, the failure to object and to

remedy the error constitutes error *per se*.  Where counsel's ineffective representation lets stand a structural error that infects the entire trial with an unconstitutional taint, there is no question that Petitioner and our system of justice suffered prejudice."  595 F. App'x at 583; *see also Davis*, 103 F. Supp. 3d at 1119-20.

The Fourth Circuit, which has not yet considered the issue, has nonetheless "eschew[ed] harmless error analysis" with respect to a direct *Batson* claim, noting that several other circuits have so held.[4]  *See United States v. Legrand*, 483 F. App'x 771, 777, n.2 (4th Cir. 2012) (citing *Winston v. Boatwright*, 649 F.3d 618, 627-28 (7th Cir. 2011); *Forrest v. Beloit Corp.*, 424 F.3d 344, 349 (3d Cir. 2005); *Tankleff v. Senkowski*, 135 F.3d 235, 248 (2d Cir. 1998); *Ford v. Norris*, 67 F.3d 162, 170-71 (8th Cir. 1995); *United States v. Thompson*, 827 F.2d 1254, 1261 (9th Cir. 1987)).  The Fourth Circuit has also suggested that for structural errors, prejudice may be presumed for the purpose of a *Strickland* ineffective assistance counsel claim. *See Bell v. Jarvis*, 236 F.3d 149, 165 (4th Cir. 2000) (en banc) (citing *McGurk v. Stenberg*, 163 F.3d 470, 473 (8th Cir. 1998)).

The Court adopts the *Carrera/Eagle/Drain* approach and rejects the *Jackson* approach. Accordingly, Petitioners need only show that there is a "reasonable probability" that, but for counsel's failure to make a *Batson-J.E.B.* challenge at trial, the *Batson-J.E.B.* challenge would have been successful. If Petitioners make such a showing, they will have established prejudice

---

[4] One case cited by the Fourth Circuit is *Winston v. Boatwright*, in which the Seventh Circuit took a slightly different approach that is nonetheless consistent with that of *Carrera/Eagle/Drain*. The court considered how the "structural error" present in a *Batson* violation interacts with prejudice under *Strickland*, which, of course, generally does not require automatic reversal.  649 F.3d 618, 632 (7th Cir. 2011). Thus, the court in *Winston* observed that, in the context of a *Batson* claim, the prejudice analysis under *Strickland* should factor in that "structural errors 'are so intrinsically harmful as to require automatic reversal.'"  *Winston*, 649 F.3d at 632 (quoting *Neder v. United States*, 527 U.S. 1, 7, 119 S. Ct. 1827, 144 L.Ed.2d 35 (1999)).   The court observed that, because such error inevitably undermine[s] confidence in the outcome of a proceeding," "[p]rejudice [under *Strickland*] . . . is automatically present when the selection of a petit jury has been infected with a violation of *Batson* or *J.E.B.*"  *Id.* (internal quotation marks and citations omitted).

for purposes of *Strickland*. Petitioners need not show that, but for counsel's failure to make a *Batson-J.E.B.* challenge at trial, they would not have been convicted, or would have been convicted of a lesser charge.[5]

### III.  Prejudice Prong: *Batson-J.E.B.* Claim

To determine whether Petitioners have shown a "reasonable probability" for purposes of prejudice under *Strickland* that Petitioners' *Batson-J.E.B.* challenge would have been successful had counsel asserted the challenge, the Court reviews the "essential elements" of a *Batson-J.E.B.* challenge.

The three-step burden-shifting inquiry of a *Batson-J.E.B.* challenge is well-established: (1) the defendant must first make a prima facie showing that the prosecutor exercised a peremptory challenge on the basis of the prospective juror's membership in a cognizable group, in this case women and African-American women in particular, (2) the prosecutor must then present a gender- and race-neutral explanation for striking the juror in question, and (3) the court must then determine whether the defendant has proven purposeful discrimination. *Foster v. Chatman*, 136 S. Ct. 1737, 1747 (2016) (citing *Snyder v. Louisiana*, 552 U.S. 472, 476-77, 128 S. Ct. 1203, 170 L.Ed.2d 175 (2008)).

---

[5] Prejudice for the purposes of overcoming procedural default is technically a distinct step for Petitioners that is separate from showing prejudice under *Strickland.* The Fourth Circuit has not established "whether the showing of prejudice required to excuse procedural default is identical to the showing of prejudice required to establish ineffective assistance of counsel, namely, that 'there is a reasonable probability that, but for the [errors], the result of the proceeding would have been different.'" *Richmond v. Polk*, 375 F.3d 309, 326 n.7 (4th Cir. 2004) (citing *Burket v. Angelone*, 208 F.3d 172, 189 n.17 (4th Cir. 2000)). At least one Circuit, in considering the structural error from the denial of a public trial, concluded that the two "showings of prejudice overlap," so the court could "resolve them simultaneously." *See Owens v. United States*, 483 F.3d 48, 64 (1st Cir. 2007) ("[A] defendant who is seeking to excuse a procedurally defaulted claim of structural error need not establish actual prejudice."). The Court agrees with the First Circuit that the two forms of prejudice require essentially the same the same inquiry, given that a *Batson* violation constitutes a structural error.

It is unconstitutional to strike "even a single prospective juror for a discriminatory purpose." *Foster*, 136 S. Ct. at 1747 (citing *Snyder*, 552 U.S. at 478, 128 S. Ct. 1203) (internal quotation marks omitted). While *Batson-J.E.B.* challenges were originally limited to discrimination claims regarding one's own race or gender, they have been expanded to allow defendants who are of a different cognizable group than the stricken jurors to establish a *prima facie* case. *See Powers v. Ohio*, 499 U.S. 400, 406, 111 S. Ct. 1364, 113 L.Ed.2d 411 (1991) (holding that racial identity between the objecting defendant and the excluded jurors does not constitute a relevant precondition for a *Batson* challenge).

In Step One of a *Batson-J.E.B.* challenge, a defendant satisfies his initial burden of demonstrating a *prima facie* case of discrimination by showing that: (1) the defendant was a member of a cognizable group, (2) the prosecution exercised peremptory challenges to remove from the venire members of the defendant's gender or race, and (3) other relevant facts and circumstances are present that give rise to an inference of discrimination. *Batson*, 476 U.S. at 96, 106 S. Ct. 1712; *J.E.B.*, 511 U.S. at 144-45, 114 S. Ct. 1419; *see United States v. Joe*, 928 F.2d 99, 102 (4th Cir. 1991). Because Lighty and Flood do not allege that members of their own gender, *i.e.* men, were improperly stricken from their jury, they must show that other relevant facts and circumstances give rise to an inference of discrimination against women. *See Higgs v. United States*, 711 F. Supp. 2d 479, 503-04 (D. Md. 2010).

Once a defendant has established a *prima facie* case in Step One, the court proceeds to Step Two: at this stage the burden of production shifts to the prosecutor to present a gender-neutral explanation for striking the juror in question. *Rice v. Collins*, 546 U.S. 333, 338, 126 S. Ct. 969, 163 L.Ed.2d 824 (2006). Although the prosecutor "must present a comprehensible reason, '[t]he second step of this process does not demand an explanation that is persuasive, or

15

even plausible'; so long as the reason is not inherently discriminatory, it suffices." *Rice*, 546

U.S. at 338, 126 S. Ct. 969 (alteration in original) (quoting *Purkett v. Elem*, 514 U.S. 765, 767-

68, 115 S. Ct. 1769, 131 L.Ed.2d 834 (1995) (per curiam)).

Petitioners submit that because the Government voluntarily proffered reasons for all its

strikes through a declaration submitted by one of the Government's trial attorneys, Gov't Resp.

Opp'n, Ex. 1, Johnston Decl., ECF No. 466-1, the Court should assume that Petitioners have met

their burden of establishing a *prima facie* case of discrimination at Step One, and should proceed

directly to Step Three of the *Batson-J.E.B.* inquiry.[6]  Petitioners find support for this argument in

Supreme Court and Fourth Circuit cases holding that when the prosecution voluntarily proffers

racially neutral reasons for peremptory strikes, it is unnecessary to determine whether the

defendant has actually demonstrated a *prima facie* case.  *See, e.g.*, *United States v. Dinkins*, 691

F.3d 358, 380 n.17 (4th Cir. 2012); *United States v. McMillon*, 14 F.3d 948, 952 (4th Cir. 1994);

*cf. Davis v. Baltimore Gas & Elec. Co.*, 160 F.3d 1023, 1027 (4th Cir. 1998) (raising *Batson*

claim in employment discrimination civil jury trial) (citing *Hernandez v. New York*, 500 U.S.

352, 359, 111 S. Ct. 1859, 114 L.Ed.2d 395 (1991)).  The Court notes, however, that each of the

cases cited by Petitioners appears to have involved the prosecution's voluntary proffer of the

reasons for its *strikes at the time of the trial court's* Batson *hearing* itself, rather than—as here—

the prosecution's voluntary proffer of the reasons for its strikes in the form of an affidavit from a

trial attorney authored some seven years after the peremptory strikes at issue should have taken

---

[6] In so arguing, Petitioners appear to concede *Batson* Step Two; *i.e.* that the Government has presented race and gender neutral explanations for striking each juror in question.  *See* Gov't Resp. Opp'n, Ex. 1, Johnston Decl., ECF No. 466-1.  In any event, the Court finds that the Government has in fact satisfied *Batson* Step Two. *Golphin v. Branker*, 519 F.3d 168, 179 (4th Cir. 2008) ("[U]nless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral.") (quoting *Hernandez,* 500 U.S. at 360, 111 S. Ct. 1859).  The Court will address *infra* Petitioners' argument that the Government has not satisfied *Batson* Step Two as to Petitioners' late-added claims of impermissible strikes based on racial proxies and religion.

place. Even so, the Court is not aware of any authority that would preclude skipping *Batson* Step One in the particular procedural posture of this case, and the Government has offered no argument why it should not do so. Accordingly, the Court assumes without deciding that the Petitioners have actually demonstrated a *prima facie* case of discrimination at *Batson* Step One, and since the Government has provided what it believes is a neutral explanation for its strikes, the Court proceeds directly to *Batson* Step Three.

At Step Three of the *Batson-J.E.B.* inquiry, the court determines whether the defendant has carried his burden of proving purposeful discrimination. *Rice*, 546 U.S. at 338, 126 S. Ct. 969 (citing *Batson*, 476 U.S. at 98, 106 S. Ct. at 1724). While this final step involves evaluating "the persuasiveness of the justification" proffered by the prosecutor, "the ultimate burden of persuasion regarding racial motivation rests with, and never shifts from, the opponent of the strike," which is to say, the defendant. *Id.* (quoting *Purkett*, 514 U.S. at 768, 115 S. Ct. 1769). The Fourth Circuit has held that this final step is "but a part of the larger inquiry by the court into whether the defendant has advanced evidence that meets its burden of proving that the prosecutor's strike was animated by a prohibited motivation." *United States v. McMillon*, 14 F.3d 948, 952 n.3 (4th Cir. 1994). Indeed, "simply showing that the reasons advanced are pretextual does not *automatically* compel a finding of intentional discrimination (although under the proper facts such a showing can be sufficient)." *Id.* (emphasis in original). Instead, the petitioner must show, "through all relevant circumstances, that the prosecutor intentionally exercised his strike because of racial [or other prohibited] concern." *Id.*

In *Miller-El v. Dretke*, 545 U.S. 231, 125 S. Ct. 2317, 162 L.Ed.2d 196 (2005) (*Miller-El II*), the Supreme Court identified six indicia of discrimination relevant to this determination: Where prosecutors: (1) struck a high percentage of venirepersons on the basis of their being part

17

of a cognizable group; (2) proffered reasons for striking the members of the cognizable group that applied equally to venirepersons who were not members of the cognizable group; (3) repeatedly "shuffled" potential jurors when confronted with eligible venirepersons who were part of the cognizable group; (4) used different scripts depending on whether the venirepersons were part of the cognizable group; (5) made written notes about the venirepersons being part of the cognizable group; and (6) were part of an office with a systematic policy of discrimination.

Petitioners submit that in this case the Government impermissibly discriminated against prospective female jurors and African-American women in particular.  They cite to three general types of evidence in support of their *Batson-J.E.B.* claim that track the indicia of discrimination highlighted in *Miller-El II*: (1) statistical evidence relating to the prosecutors' strikes; (2) purported historical evidence of discrimination (implying a systematic policy of discrimination); and (3) juror-to juror comparisons.[7]  Petitioners assert that the Government struck Jurors 1, 83, 90, 117 and 124 based on their gender (female), and that the Government struck Jurors 83, 90, 117 and 124 based on their race and gender (African-American and female).  Pet'rs' Br. at 5, 33, ECF No. 513.  Juror 1 was a white woman.  Jurors 83, 90, 117 and 124 were African-American women.  The Court reviews each alleged indicium of discrimination in turn.

### A.  Statistical Evidence

In selecting the jury in this case, the Court employed its usual method, what is known as the "struck jury-blind strike" method.  Under this method, the Court conducted voir dire on the venire as a whole by asking questions submitted by and previously discussed with counsel and

---

[7] The Court pauses to note the types of evidence highlighted in *Miller-El II* that Petitioners do *not* proffer. Petitioners do not argue that the Government asked different questions on *voir dire* depending on whether the prospective juror was a part of the cognizable group.  Nor do Petitioners argue that the Government employed a "jury shuffle" when confronted with eligible potential jurors who were part of the cognizable group.  Finally, Petitioners do not argue that the Government made written notes suggesting possible discrimination based on the potential jurors being part of the cognizable group.

allowing counsel to ask follow-up questions at the bench—during which time potential jurors were challenged and excused for cause.[8]   Then, as to those jurors who remained in the venire, rather than alternating peremptory strikes against individuals summoned into the jury box, each party, on separately distributed jury lists simultaneously and without disclosing them to the opposition, marked with an "x" the names of the prospective jurors they wished to strike. Counsel then presented their lists of peremptory challenges to the courtroom deputy.  This meant that the parties might exercise a peremptory challenge against the same juror. *See* George S. Cardona & Angela J. Davis, *Inside the Box*, 31 L.A. LAWYER 25, 26, 28 (Oct. 2008).

Under this method, if a party does not exercise all its allotted peremptory challenges or if counsel strike the same juror, the Court will be left with more than the number of jurors necessary to compose the petit jury as well as the alternate juror group.  Accordingly, the Court must select a method for selecting the petit jury and alternates from the remaining members of the array.  Courts generally apply one of two methods. First, the petit jury of twelve and the six alternates may be randomly drawn from the remaining array as a whole.  Second, the entire array may be numbered from the start, with the result that the petit jury of twelve will be empaneled in numerical order beginning with the remaining juror with the lowest (or, for the sake of variation, the highest) juror number, until the next eleven venirepersons in upward (or downward) numerical sequence are seated, followed by—in this case—six alternates consisting of the next six jurors in numerical order. *See id.* at 28.  In the present case, counsel were advised by the Court in advance of jury selection and received no objection that the first eighteen "clean

---

[8] Given the size of the original venire, the Court, with counsels' approval, also had prospective jurors complete an extensive questionnaire several weeks before the in-person voir dire.  In addition, based on the questionnaires, the Court excused in advance any juror whom the parties mutually agreed to strike, without the strike counting against their allotted peremptories.

names,"—i.e. those venirepersons remaining after the challenges for cause and peremptory strikes had been exercised—would be seated, the first twelve as jurors, the next six as alternates.[9]

Each potential juror had been assigned a juror number in advance by the Jury Commissioner's office. Beginning on September 6, 2005 and continuing until September 27, 2005, the Court conducted in person *voir dire*, dismissing some potential jurors by agreement of counsel or for cause. The pool from which the final jury was selected consisted of 64 qualified venirepersons.[10]  On September 27, 2005, the parties exercised their peremptory challenges, according to the procedure outlined above. Counsel for each side were given twenty peremptory strikes with respect to the "pool" of the first 52 qualified venirepersons (Jurors 1 through 211), and three additional strikes for the venirepersons in the "pool" of fourteen alternates (Jurors 220 through 344).  But the Court reiterated that it would seat the first eighteen "clean," *i.e.* unstruck, names.  *See* Sept. 27, 2005 Tr. 26:25-27:2.  In other words, once the twelve members of the petit jury were selected, the next six non-struck venirepersons would be seated as alternates, regardless of whether or not they were in the "pool" of 52 petit jurors (Jurors 1 through 211) or the "pool" of fourteen alternate jurors (Jurors 220 through 344).

The first 52 jurors consisted of 29 men and 23 women. The Government exercised 19 of its 20 strikes to exclude 4 men and 15 women. As a result of the Government's strikes, and before factoring in Petitioners' strikes, the jury pool consisted of of 25 men and 8 women— including one African-American woman and one Asian woman. Petitioners struck 11 men (one of whom was also struck by the Government) and 9 women (2 of whom were also struck by the Government).

---

[9] *See* Sept. 27, 2005, Trial Tr. 26:17-27:13. No objection was taken by either the Government or Petitioners to the Court's indication that it would follow this practice.

[10] Although Juror 337 and Juror 344 were present in the Courtroom during jury selection, the Court indicated and the parties agreed that Juror 261 was the last member of the alternate pool. Sept. 27, 2005 Tr. 26:21:22. Accordingly, Juror 337 and Juror 344 were not part of the final jury pool.

The 12 jurors in the alternate jury pool consisted of 7 women and 5 men. The Government exercised all three of its strikes to exclude three women from the alternate pool. As a result of the Government's strikes, and before factoring in Petitioners' strikes, the alternate pool consisted of four women and five men. Petitioners struck two women and one man from the alternate pool.

After the Court received the parties' strikes, the Court empaneled the jury and alternates. The final jury consisted of 11 men and 1 woman. Of the men on the jury, six were white, four were African-American, and one man's race was identified as "other." The female juror was Asian. The six alternates were all men, four of whom were white, and two of whom were African-American.

Courts have identified several types of statistical disparities that may support an inference of discrimination. In *Miller-El I* and *Miller-El II*, the Supreme Court highlighted three such disparities: (1) the percentage of members of the cognizable group serving on the jury, (2) the percentage of the prosecution's strikes exercised against the cognizable group, and (3) the percentage of members of the cognizable group in the venire excluded by reason of the prosecution's strikes. *Miller-El v. Cockrell*, 537 U.S. 322, 330-32, 342, 123 S. Ct. 1029, 154 L.Ed.2d 931 (2003) (*Miller-El I*) (noting that 10 of the prosecutors' 14 peremptory strikes were used against African-Americans, when African-Americans represented 11 out of 42 eligible venirepersons); *see Miller II*, 545 U.S. at 240–41, 125 S. Ct. 2317 (describing as "remarkable" that among the 11 eligible black members of a 42 member eligible venire, only one served; and that the prosecutors' peremptory strikes resulted in the exclusion 91% of the eligible African–American venire persons); *accord Aspen v. Bissonnette*, 480 F.3d 571, 577 (1st Cir. 2007) (collecting cases holding that "relevant numeric evidence" includes a comparison of the

percentage of a group's representation in the venire to its representation on the jury, the percentage of strikes directed against members of a particular group, and the percentage of a particular group removed from the venire by the challenged strikes).

Petitioners argue that the jury composition itself suggests that the Government struck female jurors and African-American female jurors for a discriminatory purpose. The panel of 64 qualified jurors was 47% women and 17% African-American women. Pet'rs' Br. at 7, 33-34, ECF No. 513. Petitioners' jury consisted of eleven men and one woman. The six alternate jurors were all men. There were no African-American women on the jury or among the alternates.

The Government responds by pointing out that there were four women who would have been seated on the jury if Petitioners themselves had not struck them. This, the Government says, would have resulted in a jury of seven men (58.3%) and five women (41.6%), a ratio consistent with the composition of the pool. Gov't Resp. Opp'n at 12, ECF No. 466.

In its previous opinion, the Court indicated that it did not find Petitioners' use of statistics especially persuasive in this regard. Petitioners, to be sure, respond to the Government's argument by asserting that a defendant's strikes "are irrelevant to the determination of whether the prosecutor has engaged in discrimination." *Holloway v. Horn*, 355 F.3d 707, 729 (3d Cir. 2004). But again, while this may be true, Petitioners are relying on the disproportionate make-up of the empaneled jury (17 men and 1 woman) to argue that the Government's pattern of strikes raises an inference of discrimination. Pet'rs' Br. Mot. Disc. at 31, ECF No. 454 (citing *Aspen*, 480 F.3d at 577 (holding that the comparison of the percentage of a cognizable group's representation in the venire to its representation on the jury is relevant evidence to a *Batson* claim)). Such statistics paint a misleading picture unless Petitioners' own strikes are considered; indeed, courts of appeal have held that the number of strikes by party raising a *Batson* claim can

be used to establish how the racial or ethnic makeup of the final jury was formed. *See United States v. Ochoa-Vasquez*, 428 F.3d 1015, 1047 n.47 (11th Cir. 2005); *Aspen*, 480 F.3d at 578. Accordingly, the Court finds that the disproportionate make-up of the empaneled jury does not in and of itself raise an inference of a discriminatory motive.[11]

Two of the Petitioners' other statistical arguments—*i.e.* the percentage of the Government's overall peremptory strikes directed against women and African American women, and the number of women and African American women struck compared to the total number of women and African American women in the venire—are no more persuasive.

First, Petitioners point out that the Government used 82% of its exercised strikes (18 of 22) and 78% of its available strikes (18 of 23) against women, who made up 47% of the pool of 64 qualified jurors (30 of 64), and only 18% of its exercised strikes (4 of 22) and 17% of its available strikes (4 of 23) against men, who made up 53% of the pool of 64. This, they say, shows that the Government was four to five times more likely to strike a woman than a man. Similarly, the Government used 41% of its exercised strikes (9 of 22) and 39% of its available strikes (9 of 23) against African-American women, who made up 17% of the pool of qualified jurors (11 of 64). Pet'rs' Br. at 7, 33-34, ECF No. 513; Pet'rs' Br. Mot. Disc. at 2, 5-9, 33, 35-

---

[11] Petitioners advance a corollary argument that suffers from the same deficiencies. They submit that the Government struck the first eight female venirepersons from the jury pool (i.e. the eight female venirepersons with the lowest juror numbers). Petitioners allege that in so doing, the Government drastically diminished the chances that the seated jury of twelve would include women. *See* Pet'rs' Br. at 8, ECF No. 513; Pet'rs' Br. Mot. Disc. at 2, 7, 33, 35-36, ECF No. 454; Pet'rs' Reply Mot. Disc. at 5, ECF No. 471; Ex. 1, Lamberth Exp. Report at 7-9, ECF No. 471-1. But here, too, the number and order of strikes by Petitioners themselves affected the chances that the seated jury of twelve would include women. The Government struck 8 women and 1 man out of the first 22 jurors (the 23rd juror was the first woman not struck by the Government). Out of the same first 22 jurors, the Petitioners largely kept pace with the Government's number of strikes, striking 6 men and 1 woman. The result was that 7 of 12 petit jurors were seated out of the first 22 venirepersons. The Court finds it virtually impossible to disentangle the comparative effect of the Petitioners' first 7 strikes on the composition of petit jurors selected *after* the 22nd juror (including Petitioners' strikes of 4 women) versus the effect of the Government's first 9 strikes on the composition of petit jurors selected *before* the 22nd juror.

36, ECF No. 454; Pet'rs' Reply Mot. Disc. at 4-5, ECF No. 471; Ex. 1, Lamberth Exp. Report at 7-9, ECF No. 471-1.

Second, Petitioners submit that Government used its strikes to remove 60% of the women in the pool of qualified jurors (18 of 30), but used its strikes to remove only 12% of the men in the pool of qualified jurors (4 of 34). Similarly, the Government used its strikes to remove 82% of the African-American women (9 of 11) from the qualified pool of jurors.  Pet'rs' Br. at 7, 33-34, ECF No. 513; Pet'rs' Br. Mot. Disc. at 2, 5-9, 33, 35-36, ECF No. 454; Pet'rs' Reply Mot. Disc. at 4-5, ECF No. 471; Ex. 1, Lamberth Exp. Report at 7-9, ECF No. 471-1.

The parties have provided the Court with citations to cases in which various courts—using similar percentages of struck jurors—have accepted or rejected defendants' contentions that such percentages support an inference of discrimination.  *See, e.g.*, *Miller-El II*, 545 U.S. at 240-41, 125 S. Ct. 2317 (striking 10 of 11 African-American jurors in the qualified pool raised inference of discrimination); *Johnson v. California*, 545 U.S. 162, 164, 169-71, 125 S. Ct. 2410, 2414, 2416-18, 162 L.Ed.2d 129 (2005) (excluding all of the African-American jurors in the pool established a *prima facie* case); *Paulino v. Castro*, 371 F.3d 1083, 1090-91 (9th Cir. 2004) (finding that petitioner raised an inference of discrimination by alleging that the prosecutor excluded over 83% of potential African-American jurors); *Keel v. French*, 162 F.3d 263, 271-72 (4th Cir. 1998) (defendant failed to establish even a *prima facie* case based where almost 70% of the state's peremptory strikes were used against African-American venirepersons); *Stanley v. Maryland*, 313 Md. 50, 72-73, 542 A.2d 1267, 1278 (Md. 1988) (finding a *prima facie* case where the state used 80% its peremptory strikes to exclude African-American jurors, who constituted only 25% of the venire).[12]

---

[12] Such cases appear more relevant to strikes based on gender alone than both gender and race.  All of the cases cited above involved striking both male and female African-Americans, while here one-third of the

The most the Court can discern from these cases is that no bright line rule exists. Indeed, the Fourth Circuit has held that such statistical arguments are only one of the three factors identified by the Supreme Court in *Batson*. *See, e.g.*, *Barnette*, 644 F.3d at 205; *Keel*, 162 F.3d at 271 n.8. In the Court's view, to this point Petitioners have not established, based on statistics alone, that the Government's strikes were animated by a prohibited motivation on the basis of gender, or race and gender. On the other hand, it remains possible that such statistics, combined with the other, more persuasive indicia recognized by *Miller-El II*, could support Petitioners' burden of proving that the Government's strikes were animated by an impermissible motive.

### B.  Historical Evidence of Discrimination

Petitioners next propose that there is historical evidence of discrimination against female jurors in capital cases by the two female prosecutors in this case, and possibly by the entire U.S. Attorney's Office in Maryland. *See Miller–El*, 545 U.S. at 263–66, 125 S. Ct. 2317 (finding that the county prosecutor's office had a decades-old systematic policy of discrimination). They invite attention to the strike rates in *United States v. Dustin Higgs*, Crim. No. PJM-98-0520, a death penalty case in which the same two female prosecutors participated and at which, as it happens, this member of the Court presided. *See United States v. Higgs*, 353 F.3d 281, 289, 294-95 (4th Cir. 2003) (affirming convictions and sentences of death). In *Higgs*, the pool of 52 eligible jurors consisted of 40% women. Pet'rs' Br. at 8, ECF No. 513. The petit jury was composed of 12 men, and 4 of the 6 alternates were men. Petitioners claim that the prosecutors also engaged in a discriminatory striking pattern in *Higgs*, given that 70% of their strikes (14 out of 20) were used against female venirepersons. Further, say Petitioners, the Government used

---

jury (4 out of 12) and one-third of the alternates (2 out 6) were African-American men. Out of the 64 jurors in the pool, 9 were African-American men (as well as one Cameroonian man who identified as "other"), which is 14% (or 15.6%) of the jury pool. The Government exercised strikes against 2 of the 9 African-American men.

strikes against 75% (6 out of 8) of the African-American women in the pool of the first 43 qualified jurors from which the petit jury was seated. *See* Pet'rs' Br. Mot. Disc. at 3, 25-27, 34, 37, ECF No. 454; Pet'rs' Reply Mot. Disc. at 5, ECF No. 471; Pet'rs' Suppl. Lamberth Exp. Report at 4, ECF No. 479-1; Pet'rs' Br. at 8, ECF No. 513.

When the statistical evidence from *Higgs* and *Lighty* are combined, Petitioners argue, the strike rates remain highly statistically significant. The combined use of exercised peremptory strikes against women was 74.4% (29 out of 39), where women made up 42.3% of the combined pools of 52 qualified jurors from *Higgs* and *Lighty.* This, they claim, demonstrates that the Government was 3.5-4 times more likely to strike a woman than a man. *See* Pet'rs' Suppl. Lamberth Exp. Report at 5-7, ECF No. 479-1; Pet'rs' Br. at 8-9, ECF No. 513.

Petitioners suggest that the female two prosecutors were motivated to exercise peremptory strikes in a discriminatory manner in *Higgs* because they had previously failed to obtain a death sentence in the trial of Willis Haynes, Higgs' co-defendant, in *United States v. Willis Mark Haynes*, Crim. No. PJM-98-0520. *See* Pet'rs' Br. Mot. Disc. at 25-27, ECF No. 454. The jury in *Haynes*, which was made up of eight men and four women, convicted Haynes of three counts of first-degree murder, among other counts, but was unable to reach a unanimous consensus as to the death penalty. Haynes was thus sentenced to life imprisonment without the possibility of release. *See also United States v. Haynes*, 26 F. App'x 123, 128 (4th Cir. 2001) (affirming Haynes' convictions and sentences).

The Government, needless to say, vigorously denies discriminating against female jurors in either *Higgs* or *Lighty*. The Government submits that it did, in fact, make one key change in strategy that it believes accounted for the death sentence verdict in *Higgs* but not *Haynes*: it ceased asking the jury to find the defendant's future dangerousness to be an aggravating factor

26

supporting a death sentence. *See* Johnston Decl. at 7-8, ECF No. 466-1. Instead, says the Government, the prosecutors sought other aggravating factors that resulted in death sentences in both *Higgs* and *Lighty*. *See id.*

There is a short answer with respect to the juror evidence from *Higgs*: the Court has already decided Higgs' *Batson-J.E.B.* claim, finding that the Government engaged in no impermissible use of strikes. *See Higgs*, 711 F. Supp. 2d at 503-06. As in the present case, in which gender breakdown of the jury would have been representative but-for the Petitioners' own peremptory strikes against four female jurors, the composition of Higgs' jury was also strongly affected by the defendant's own strikes. In *Higgs*, the defendant's strikes eliminated four eligible female jurors who otherwise would have been seated on the petit jury. *See* Johnston Decl. at 7-8, ECF No. 466-1. The petit jury would then have been one-third female—fairly comparable to the pool of 52 that was 40% female.

That the jury in *Haynes* included four women also tends to undermine Petitioners' theory that the two prosecutors or the U.S. Attorney's office engaged in a *historic* pattern of discrimination against women. The *Haynes* trial took place just a few months prior to the *Higgs* trial. This fact may have prompted Petitioners' theory that the *Haynes* sentence of life without release somehow resulted in the two prosecutors concocting a discriminatory plan to strike women in order to achieve a death sentence for Higgs, and later for Lighty. But this speculation hardly amounts to what *Miller-El II* regarded as "historical evidence of discrimination." *Miller-El II*, 545 U.S. at 263, 125 S. Ct. 2317 ("[F]or decades leading up to the time this case was tried prosecutors in the Dallas County office had followed a specific policy of systemically excluding blacks from juries . . . .").

Without the presence of more persuasive indicia of the type recognized in *Miller-El II*, to this point Petitioners still fail to carry their burden.

### C.  Juror-to-Juror Comparisons

Petitioners' case, in the Court's view, ultimately turns on whether they can persuade, based on a review of the strikes of individual jurors and comparative juror analysis, that the female prosecutors in this case engaged in intentional discrimination against women and African-American women in particular.

In considering the Step Three of a *Batson* inquiry, "the defendants must show that the government's proffered [gender- or] race-neutral reasons were 'merely pretextual,' and that the government exercised the particular peremptory challenge on the basis of [gender or] race." *Dinkins*, 691 F.3d at 380 (citing *McMillon*, 14 F.3d at 953).  Although at *Batson* Step Two the Government's explanations need not be persuasive or even plausible, at *Batson* Step Three, the Court must evaluate the "the persuasiveness of the justification." *Rice*, 546 U.S. at 338, 126 S. Ct. 969 (quoting *Purkett*, 514 U.S. at 768, 115 S. Ct. 1769).  To assess whether the proffered explanation is implausible, the court considers whether that reason is supported by the record. *See Miller El II*, 454 U.S. at 244-45, 125 S. Ct. 2317.

In addition, the court is required to "engage in a carefully calibrated comparative juror analysis," which *Miller-El* established as a critical element in Step Three of a *Batson* claim.  *See Barnette,* 644 F.3d at 205 (citing *Miller-El II*, 545 U.S. at 241, 247, 125 S. Ct. 2317).  As explained by the Fourth Circuit in *Barnette*, "*Miller–El* had one profound effect on this circuit's *Batson* jurisprudence" by "holding that proper analysis of a *Batson* claim requires that a court engage in comparative juror analysis. . . ." *Id.*  Given that a defendant must demonstrate that the government's proffered gender- or race-neutral reasons for the strike were merely pretextual,

side-by-side comparisons of jurors are "more powerful than [] bare statistics." *Miller-El II*, 545 U.S. at 241, 125 S. Ct. 2317.  If the Government proffers a gender-neutral reason for the peremptory strike of a female panelist that equally applies to a similarly-situated male panelist who the Government permits to serve, such evidence would tend to prove purposeful discrimination.  *See Foster*, 136 S. Ct. at 1754 (citing *Miller-El II,* 545 U.S. at 241, 125 S. Ct. 2317).  While the court should compare similarly-situated jurors, the jurors need not be identical in all respects, given that "potential jurors are not products of a set of cookie cutters."  *Golphin v. Branker*, 519 F.3d 168, 180 (4th Cir. 2008) (quoting *Miller–El II,* 545 U.S. at 247 n.6, 125 S. Ct. 2317).

In assessing the credibility of the Government's proffered reason for exercising the strike, the court may not "develop alternative reasons to justify the strikes, . . . [as] a *Batson* challenge must stand on the prosecution's stated reasons."  *Barnette,* 644 F.3d at 205 (citing *Batson*, 476 U.S. at 252, 106 S. Ct. 1712).  Instead, the court should assess "how reasonable, or how improbable, the explanations are [ ] and . . . whether the proffered rationale has some basis in accepted trial strategy." *Golphin*, 519 F.3d at 180 (alteration in original) (quoting *Miller-El II*, 545 U.S. at 247, 125 S. Ct. 2317).  Nevertheless, "the ultimate burden of persuasion regarding racial motivation rests with, and never shifts from, the opponent of the strike." *Rice*, 546 U.S. at 338, 126 S. Ct. 969 (quoting *Purkett*, 514 U.S. at 768, 115 S. Ct. 1769).[13]

Petitioners submit that the Government's proffered neutral explanations for exercising peremptory strikes against Jurors 1, 83, 90, 117, and 124 were merely a pretext for discrimination on the basis of gender.  In the cases of Jurors 83, 90, 117, and 124, Petitioners go

---

[13] The Government was permitted to reconstruct its reasons for the strikes many years after the fact based on its notes and recollections. *See Crittenden v. Ayers*, 624 F.3d 943, 957-58 (9th Cir. 2010) ("Where . . . time has passed and the prosecutor no longer has a present recollection of his or her reasons for striking the juror, the state may offer an explanation based on circumstantial evidence.").

further, arguing that the Government engaged in purposeful discrimination against them as African-American women—i.e. for impermissible reasons of race and gender.

The Court assesses the persuasiveness of the Government's justifications for exercising peremptory strikes against each of these jurors based on the underlying record and through comparative juror analysis.

### Juror 1

Juror 1 was a white female, approximately 60 years old, retired from working as an administrative assistant in the U.S. Courts. Juror 1 Quest. at 3. The Government, in its Declaration, proffered the following reason for striking her:

> The government struck this juror who was very soft spoken, because she expressed ambivalence about the death penalty (using phrases as "I'd hoped, I'd never have to, but I would be able to do it."). Her husband was a lawyer and she had a degree in psychology. Finally, her brother was homeless and involved in criminal conduct. For all these reasons, the government did not think she could vote to impose the death penalty.

Gov't Resp. Opp'n, Ex. 1, Johnston Decl. at 2-3, ECF No. 466-1.

Petitioners insist that the Government's proffered reasons for striking Juror 1 were merely a pretext for discrimination on the basis of gender. Pet'rs' Br. at 11-13, ECF No. 513. They claim that three of the Government's reasons are simply not supported by the record. Juror 1 had a degree in Management Information Systems rather than in psychology; she had only taken two psychology courses. Juror 1 Quest. at 4. Her *former* husband, from whom she was divorced, was a lawyer, although it was not clear whether he was practicing at the time of the voir dire. Pet'rs' Br. at 11-12, ECF No. 513. While her brother was homeless, she did not state that he was involved in criminal conduct and instead said, "I really [did not] know what [he was] involved in or not involved [in] for the last 40 years." Sept. 7, 2005 Tr. at 4. Petitioners propose a number of male comparators for each of these characteristics whom the Government did not

30

strike, including thirteen male jurors who had studied psychology, nine who were in the legal field or had spouses in the legal field, and nine male jurors who reported that either they or a relative had been involved in or charged with criminal conduct.  Pet'rs' Br. at 12, ECF No. 513; Pet'rs' Reply Mot. Disc. at 16-17, 19-22, Pet'rs' Reply Mot. Disc. at 16-17, 19-22, ECF No. 471.

After considering the male comparators, whom Petitioners present with minimal analysis, *see id.*, the Court declines to accept any of them as similarly situated to Juror 1, without serious consideration given to their positions on the death penalty.  The core of the Government's stated reasons for striking Juror 1 was that "the government did not think that she could vote to impose the death penalty."  Johnston Decl. at 3, ECF No. 466-1.  While the Government's misreading of the record as to some of Juror 1's characteristics is concerning, the Court nonetheless judges any pretext for discrimination based on the plausibility that the Government may have decided to strike this particular juror because she "expressed ambivalence about the death penalty." Johnston Decl. at 2-3, ECF No. 466-1.

Petitioners argue that Juror 1 clarified that any ambivalence she might have would not affect her ability to vote for a death sentence.  *See, e.g.*, Sept. 7, 2005 Tr. at 9 ("I'd hoped I'd never have to, but I would be able to do it.").  They further offer five male comparators whom the Government did not strike—Jurors 28, 46, 157, 158, and 177—as similarly situated to Juror 1, and who were equally or more ambivalent about the death penalty than she.  This, they claim, is clear evidence that the Government's strike of Juror 1 was not, in fact, based on her view of the death penalty, but instead was a result of impermissible discrimination on the basis of her gender.  Pet'rs' Br. at 11-13, ECF No. 513.

The Court is not convinced.

31

Juror 1's ambivalence about the death penalty is clear from the record.  She had indicated in her questionnaire that she was "somewhat opposed to the death penalty."  Juror 1 Supp. Quest. at 4.  She wrote: "My views on the death penalty are somewhat ambivalent and not completely formed. Since it is so final, I had hoped I would never have to decide to put someone to death; however if proven beyond a reasonable doubt, I think I could follow the law."  *Id.*  When questioned by the Court, she reiterated, "I'm really ambivalent.  Over the years it's wobbled back and forth," and "I don't know for sure which is right."  Sept. 7, 2005 Tr. 6:10-20.  When asked whether she could temporarily set aside these views, Juror 1 responded, "I'd hoped I'd never have to, but I would be able to."  The Government also indicates in its Declaration that Juror 1 was "very soft spoken," which apparently added to its concern about her ambivalence.  Johnston Decl. at 2-3, ECF No. 466-1.  While record evidence of the demeanor of a particular juror is often lacking, in this case the record indicates that Juror 1 nodded at least once rather than articulating a verbal response, and responded several times with "Mm-hmm."   Sept. 7, 2005 Tr. 10:10, 12:1-13.

The Court considers whether Juror 1 is similarly situated to male Jurors 28, 46, 157, 158, and 177, and whether the record bears out Petitioners' claim that these male jurors were equally or more ambivalent about the death penalty.  Petitioners attempt to minimize Juror 1's ambivalence, noting that she clarified that she could weigh all the evidence and vote for the death penalty, if appropriate.  That said, the Court would note the rather obvious point that Juror 1 almost certainly shared this characteristic in common with all 64 members of the jury pool. Indeed, much of the voir dire was spent determining whether each and every potential juror would be able to set aside any potential bias related to capital punishment, weigh all relevant factors, and follow the Court's instructions with regard to consideration of the death penalty.

Any juror who the Court was not satisfied could do so was stricken for cause. Juror 1, as well as Jurors 28, 46, 157, 158, and 177, were all deemed eligible, notwithstanding any possible reservations they expressed regarding the death penalty. But the Government was still entitled to exercise a peremptory strike against a juror who, although eligible, the Government might have believed was less likely than other jurors to impose the death penalty. The question is whether the Government could have plausibly believed that Juror 1 was less likely to impose the death penalty than Jurors 28, 46, 157, 158, and 177.

Male comparator Jurors 28, 46, 157, and 177 are easily dispensed with. Petitioners assert that Juror 28, a white male, was ambivalent towards the death penalty because he "twice stat[ed] that in a case involving kidnapping resulting in death he would always vote for life." Pet'rs' Br. at 13, ECF No. 513 (citing Sept. 8, 2005 Tr. at 24-30). Here Petitioners cite to a portion of the voir dire in which the Court asked whether the juror would, in certain circumstances, "always vote for life" or "always vote for the death penalty"—to which jurors answered "yes" or "no." Both parties noted throughout voir dire that many jurors experienced confusion over this set of questions.[14] More indicative of ambivalence than citation to a "yes" or "no" answer would be the juror's own articulation of his or her ambivalent views of the death penalty, both in the juror's questionnaire and when questioned by the Court. The record shows that Juror 28 may have been confused by the question of whether he would "always vote for life," but when the Court clarified the matter, he stated that he could "vote either way" on the death penalty or life without parole "depending on the circumstances." Sept. 8, 2005 Tr. 27:11-30:25. Further, compared to Juror 1, who more or less consistently volunteered that she felt ambivalent, Juror 28 noted in his questionnaire that he had "no particular feelings about the death penalty," Juror 28

---

[14] For example, although Juror 1 otherwise affirmed that she could follow the Court's instructions and could impose the death penalty, she also showed considerable confusion regarding the questions, noting at times that she got lost and did not follow the question. *See* Sept. 7, 2005 Tr. 10:2-13:25.

Supp. Quest. at 4, and that he would always vote for the death penalty when a police officer was killed. *Id.* at 8. He had also previously served on two juries that returned guilty verdicts, including one involving murder. Juror 28 Quest. at 15. The Court has no difficulty finding that the Government could have reasonably concluded that Juror 1 would be deemed more hesitant to impose than death penalty than Juror 28.

The record also shows that Juror 157, a white male, could reasonably have been viewed as less ambivalent towards the death penalty than Juror 1. Petitioners submit that Juror 157 stated that, while he could impose death, he would "probably vote for life" without regard to the circumstances. Pet'rs' Br. at 13, ECF No. 513 (citing Sept. 15, 2005 Tr. at 90-91). However, as in the case of Juror 28, it appears that it took some time for the Court to clarify the questions with this juror, and as a result, selected quotes are not representative of the entire record. For example, Juror 157 also answered in the affirmative when the Court asked him if he would "always vote for the death penalty." Sept. 15, 2005 Tr. 88:25-89:4. Although, like Juror 1, Juror 157 indicated on his questionnaire that he was "somewhat opposed to the death penalty," he did not show similar hesitancy when first asked for his position at the bench. Instead, he appeared to be in favor of the death penalty: "my views are, if the person did do what he did originally and there is a death, he did cause death to somebody else, I do think they should have the death penalty." He then added that this "depends on the circumstances." *Id.* 84:24-85:8. It is plausible that the Government could have found Juror 157 to be less ambivalent towards the death penalty than Juror 1.

Petitioners next cite Juror 46, an African-American male who had worked in law enforcement for 24 years in Trenton, NJ—17 years as a patrolman and later as the Chief of Security. Juror 46, say Petitioners, was equally or more ambivalent about the death penalty than

34

Juror 1.  They assert that Juror 46 stated that "he would always vote for life regardless of the circumstances."  Pet'rs' Br. at 13, ECF No. 513 (citing Sept. 8, 2005 Tr. at 170-72).  However, as indicated with respect to the previous male comparators, the Court's inquiry regarding whether Juror 46 would *always* impose a life sentence or the death penalty was not fairly reflective of what he said as a whole.  When the Court asked the juror to clarify his position, he responded that he could impose the death penalty "if it was proven beyond a reasonable doubt"—a response which even gave defense counsel pause because Juror 46 might have been saying he would *always* vote in favor of the death penalty if the defendant were convicted.  Sept. 8, 2005 Tr. 170:14-174:20, 175:6-11.  What is perhaps more instructive about Juror 46's true position is that he expressed concern that "so many people now have been exonerated through DNA or other sources."  Sept. 8, 2005 Tr. 167:3-11.  The Government asked Juror 46 whether he would require DNA evidence for a death sentence, to which he responded, "If DNA evidence was available, yes. If it's not available, no."  Sept. 8, 2005, Tr. 176:2-21.

It is perfectly plausible that the Government might have considered Juror 46's position on the death penalty less concerning than that of Juror 1.  Juror 1 did not pinpoint the source of her hesitancy, but simply described her views as "ambivalent," "not completely formed," and "wobbl[ing]."  Juror 1, Supp. Quest. at 4; Sept. 7, 2005 Tr. 6:10-20.  In contrast, Juror 46 emphasized that his concerns arose from possible exoneration based on DNA evidence but, upon Government questioning, he concluded that it would not influence his consideration of the case. In light of Juror 46's professional experience with homicide investigations and testifying as a witness, *see* Sept. 8, 2005 Tr. 165:22-166:25, it would have been reasonable for the Government to judge that he would be objective in considering the death penalty. If he were convinced of the defendant's guilty beyond a reasonable doubt, one would not expect him to have concerns that

the defendant could be exonerated through DNA evidence. Accordingly, the Court is satisfied that the two jurors were not similarly situated, given that Juror 28's career in law enforcement and Juror 1's indeterminate discomfort with the death penalty have could reasonably distinguished the two of them.

Juror 177, an African-American male, can in no way be considered ambivalent towards the death penalty. Petitioners assert that, while Juror 177 stated that he "was in favor of the death penalty," he would not want to impose the death penalty "personally." This assertion mischaracterizes the record. Juror 177 told the Court: "I'm in favor of the death penalty." He went on to explain, "I have a concealed handgun permit for the State of Virginia and the State of Florida . . . I feel that I have a need to defend myself so, in essence, you know, I might have to *deliver the death penalty in defense* of myself." The Court: "All right. How strong do you feel about this?" Juror: "Well, it's something that I wouldn't want to do – personally, I wouldn't want to do it. I wouldn't want to, you know, deliver a death sentence to anyone, but it's times where that, you know, might be needed." Sept. 16, 2005 Tr. at 78 (emphasis added). Read in context, Juror 177 seems more likely to be saying that he might not want to execute someone "personally" in self-defense. Equating this statement with ambivalence towards the death penalty—which Juror 177 indicated on his questionnaire was carried out "too seldom"—bends the truth. *See* Juror 177 Supp. Quest. at 6.

The Court concludes that the Government could reasonably have concluded that Juror 1 would be more hesitant to impose than death penalty than Jurors 28, 46, 157 or 177, and therefore those jurors were not similarly situated to her.

Finally, Petitioners propose that Juror 158, a white male, was a similarly situated male comparator for Juror 1 who was more ambivalent about the death penalty than she.[15]  Petitioners submit that his "reservations about his ability to vote for death—'I'm not sure I could do it'— were so pronounced that the government moved to strike him for cause."  Pet'rs' Br. at 13, ECF No. 513 (citing Sept. 15, 2005 Tr. at 208-211).  However, Juror 158 at first appeared to have a fairly neutral view of the death penalty.  He stated that he believed that the death penalty was "justified in certain cases, not all, and depends on the circumstances."  Sept. 15, 2005 Tr. 203:15-16.  He then stated he would not always vote for life in prison, but confirmed that he would always vote for the death penalty in certain types of cases, such as "the terrorists for 9/11, the Oklahoma City bombings."  *Id.* 204:12-23.  When asked whether he would vote for the death penalty when appropriate under law for a case of kidnapping resulting in death, he said "I believe so."  To be sure, Juror 158 expressed some reservation.  *Id.* 208:5-209:15.  "[I]t's easy to say, you know, I could impose the death penalty in certain cases and you know, following the law, but to sit in a room and look across the room and look someone else in the eye and say that you individually deserve to die, I've never been in that circumstance. My honest answer is I'm not sure I could do it."  *Id.* 209:9-15.

When the Court asked for clarification of his position, Juror 158 responded in the affirmative that he could evaluate the case on its own merits and vote to impose a penalty.  *Id.* 210:8-24.  In response, it was defense counsel (Ms. Dayson on behalf of Lighty) who asked for a bench conference, noting, "I wasn't clear if Your Honor was inclined to strike this juror or not."  When the Court indicated that it had not heard a motion, the Government volunteered that it "was going to make a motion to strike the juror."  *Id.* 211:6-24.  When the Government did so

---

[15] Juror 158 was trapped in a courthouse elevator just prior to being questioned by the Court, *see* Sept. 15, 2005 Tr. at 194:1-3, and was apparently "a bit shaken up" at the time. *Id.* at 201:20.

move, the Court denied the motion to strike the juror for cause.  Then, when the Government pointedly asked whether the Juror 158 could "sign the death verdict, and then . . . orally affirm your sentence of death in front of all the parties," he responded, "I believe so."  When the prosecutor asked him directly whether he could vote to sentence the defendant to death, he said "yes."  *Id.* 212:8-21.

The Court finds it plausible that, after inquiring further of Juror 158, the Government could have entertained greater lingering concerns about Juror 1 than Juror 158.  Both Juror 1 and Juror 158 expressed hesitation as to whether they could impose the death penalty personally.  *See* Juror 158, Sept. 15, 2005 Tr. 209:15 ("I'm not sure I could do it"); Juror 1, Sept. 7, 2005 Tr. 9:11 ("I'd hoped I'd never have to").  However, only Juror 1 appeared to express ambivalence as to whether the death penalty was permissible as a moral or ethical matter, noting that she had "wobbled back and forth," and that "I just don't know which is right."  Sept. 7, 2005 Tr. 6:10-20.  By comparison, Juror 158 consistently expressed the ethical view that the death penalty is "justified in certain cases, not all, and depends on the circumstances."  Sept. 15, 2005 Tr. 203:15-16; *see also* Juror 158 Supp. Quest. at 4 ("I feel that the death penalty is justified depending on the severity of the crime.").  Given that his reservation pertained to having to personally "look someone else in the eye" rather than to the death penalty as an ethical matter, *id*. 209:9-15, the Government could have been satisfied, upon further reflection, that Juror 158 could in fact "sign the death verdict."  *Id*. 212:8-21.  The wavering of Juror 1 as to whether the death penalty was morally right and whether she could personally impose it, as well as her soft spoken demeanor, could have left the Government with greater preoccupation as to her ability to impose the death penalty than it had with Juror 158.

The Court is satisfied that the Government's proffered reason for striking Juror 1 based on her ambivalence about the death penalty was plausible and not a pretext for discrimination. Petitioners have failed to persuade, based on a comparison with Jurors 28, 46, 157, 158, and 177, that the Government's strike of Juror 1 was due to discrimination on the basis of gender.

### Juror 90

Juror 90 was a 62 year-old African-American woman who worked as a consultant after retiring as an administrative officer with the federal government. The Government proffered the following reason for striking Juror 90:

> This juror was struck because she "limited" the death penalty to "horrendous crimes" (stating "I believe that there are some crimes that are so horrendous that the death penalty would probably be appropriate [sic]"). Her description of an appropriate crime was "when a child is kidnapped, raped and murdered." She also stated that she was "conflicted" about the death penalty. Her husband was a retired probation officer, a job that inherently presumes release from prison and rehabilitation. Based on all these factors, the government concluded that she would be unlikely to vote for death penalty.

Johnston Decl. at 4, ECF No. 466-1.

Petitioners challenge all these grounds, asserting that they were a pretext for discrimination on the basis of both gender and race. They cite both white male and African-American male comparators as similarly situated—presumably arguing gender and racial discrimination when comparing Juror 90 to white male comparators and gender bias only when comparing Juror 90 to African-American male comparators. Petitioners argue that Juror 90 did not actually state she would "limit" the death penalty to a horrendous crime, whereas Juror 56, a white male juror whom the Government did not strike, did say the death penalty should be limited to such crimes. Pet'rs' Br. at 18-19, ECF No. 513 (citing Sept. 13, 2005 Tr. at 133-34). Further, say Petitioners, Juror 90 said she felt "conflicted" about the death penalty because it has been disproportionately applied to African-Americans, but stated that she viewed this as a

"historical fact" that would not influence her decision.  Pet'rs' Br. at 19-20, ECF No. 513 (citing

Sept. 13, 2005 Tr. at 133-34); Pet'rs' Reply Mot. Disc. at 26, ECF No. 471.   Petitioners cite

male Jurors 19, 46 and 211 as comparators, who were accepted by the Government despite their

concerns about the racialized history of capital punishment.   Pet'rs' Br. at 10-20, ECF No. 513;

Pet'rs' Reply Mot. Disc. at 12-15, ECF No. 471.   Finally, Petitioners argue that Juror 90's

husband's career as a probation officer—a law enforcement official—did not justify a

presumption of bias on Juror 90's part *against* the prosecution or the death penalty and is

therefore pretextual.  Pet'rs' Br. at 20-21, ECF No. 513.

Although it may be somewhat counterintuitive that Juror 90's husband's career as a

probation officer would lead her to oppose the death penalty, ultimately the record as a whole

shows that she felt conflicted about the death penalty, which was the Government's overarching

proffered explanation for striking her.

In response to the Court's questions about her views of the death penalty, Juror 90 stated

that "I'm sort of conflicted because as an African-American . . . I believe that there—that more

African-Americans are sentenced to the death penalty for the same crimes [than] whites are. . . . I

also believe that there are some crimes that are so horrendous that the death penalty would

probably be appropriate."  Sept. 13, 2005 Tr. 133:19-134:1.  She wrote precisely the same

answer in her questionnaire: "there are some criminal acts that are so heinous that the death

penalty is appropriate. However, as an African American I am conflicted about this issue because

it has been used disproportionally when sentencing non-minorities for the same crimes."  Juror

90 Supp. Quest. at 4.  While Petitioners are correct that Juror 90 never explicitly used the word

"limited," it would certainly be a reasonable interpretation of this statement that the death

penalty *should be limited* to heinous criminal acts.  As a result, when Juror 90 volunteered an

example of a heinous crime, Sept. 13, 2005 Tr. 144:10-14 ("when a child is kidnapped, raped and murdered"), it was reasonable for the Government to take this answer into consideration as to whether she would be willing to impose the death penalty under the circumstances of this particular case.[16]

Petitioners next present Juror 56 as a white male comparator, who they assert said that the death penalty was "only appropriate" for the most violent crimes—whereas Juror 90 did not limit the death penalty in this way. Pet'rs' Br. at 19, ECF No. 513 (citing Sept. 9, 2005 Tr. at 56:19-20) (emphasis added). But here Petitioners focus on one narrow quote from each juror. The Court accepts that, in isolation, a comparison of these limited quotes makes the two jurors sound more or less equally conflicted about the death penalty. However, the record as a whole shows that Juror 56 had a less well-formed opinion on the death penalty than Juror 90, who appeared to have given the issue careful consideration. In context, Juror 56 stated: "I don't have well-formed views. It's not an issue I've given a lot of thought to. I don't have any information on statistics or how often it's used, but I do think that it's probably only appropriate for the absolute most violent, you know, hate-filled crimes." Sept. 9, 2005 Tr. 56:16-20. He wrote an almost identical statement on his questionnaire, and indicated he had "no particular feelings about the death penalty." Juror 56 Supp. Quest. at 4. In contrast, Juror 90 indicated that she was "somewhat opposed to the death penalty," Juror 90 Supp. Quest. at 4, and expressed clearly articulated

---

[16] Petitioners argue that Juror 90 was giving an example of a crime for which she would *always* vote for the death penalty rather than stating a *limit*. Both interpretations of the record are reasonable. Although the Court asked Juror 90 whether there was a kind of crime that should *always* receive a death sentence, she referred back to her answer that appeared to *limit* the death penalty ("some criminal acts that are so heinous that the death penalty is appropriate," Juror 90 Supp. Quest. at 4) and stated, "that's the kind of crime I had in mind." *See* Sept. 13, 2005 Tr. 144:7-14. Because either interpretation of the record is defensible, the Court sees no reason to engage in an in-depth comparison of Jurors 22 and 158, which Petitioners cite as examples of male jurors who stated they would *always* impose the death penalty under certain circumstances. Pet'rs' Br. at 19-21, ECF No. 513 (citing Juror 158, Sept. 15, 2005 Tr. at 204; Juror 22, Sept. 7, 2005 Tr. at 199).

concerns about the racially discriminatory nature of its imposition. The Court finds that the Government could have reasonably considered Juror 56 more open to imposing the death penalty than Juror 90.

Next, the Petitioners submit that male Jurors 19, 46, and 211 were similarly situated to Juror 90 in that they also articulated concerns about the racially-skewed history of capital punishment.  Pet'rs' Reply Mot. Disc. at 12-15, ECF No. 471.  But the degree of the jurors' concern over this matter, as well as other distinguishing characteristics, invalidate Petitioners' claim that the Government's strike of Juror 90 was pretextual.[17]  *See Barnette*, 644 F.3d at 215 (4th Cir. 2011) (affirming district court's holding that government's strike of a juror was permissible where she expressed "uncertainty about whether she could be fair in light of her belief that the death penalty was applied based upon socioeconomic, race, and age factors").

Juror 46, an African-American male retired from Trenton, New Jersey law enforcement (discussed above), did not volunteer race as a concern when asked generally about his views of the death penalty.[18]  In response to the question whether he believed "race, religion, or gender" are factors in the death penalty, he wrote on his questionnaire, "The number of black[s] who face the death penalty."  Juror 46 Supp. Quest. at 9.  When the Court gave Juror 46 the opportunity to discuss his views, he focused his concern about exoneration through DNA evidence rather than on racial disparities in imposition.  Sept. 8, 2005 Tr. 167:3-11.  But even if Juror 46 and Juror 90

---

[17] Petitioners argue that Government is using Juror 90's concern that the death penalty is disproportionately imposed against African-Americans as an impermissible race-based proxy.  Pet'rs' Br. at 36, ECF No. 513; Pet'rs' Reply Mot. Disc. at 32-34, ECF No. 471.  Petitioners also reference Juror 211, a white male, as being similarly situated to Juror 90 because he shared her concerns.  But, as a white male, Juror 211 actually tends to undermine Petitioners' assertion that such reservation about the death penalty is a race-specific view.  If, for example, Juror 90 had not stated her view explicitly, but the Government nonetheless assumed she held that specific view regarding racial disparities, such an assumption could be deemed a race-based proxy.  But Juror 90's expressed conflicted view on the death penalty was a race-neutral reason for the strike.

[18] As an African-American male, Juror 46 would only be relevant to Petitioners' claim for discrimination on the basis of gender, rather than both gender and race.

were deemed equally conflicted about the death penalty, it was reasonable for the Government to have believed that Juror 46's extensive professional background in criminal investigations would make him more likely to set aside his concerns with respect to the racialized history of capital punishment.

Juror 211, a white male, provided neutral answers about capital punishment on his questionnaire and indicated that he had "no particular feelings about the death penalty." Juror 211 Supp. Quest. at 4. In response to whether "race, religion, or gender" are factors in the death penalty, he wrote that "there is still a certain amount of racism in our country, and that race can be a negative factor to some in the application of the death penalty." *Id.* at 9. This statement appears to be more of an observation of historical fact rather than one of personal concern. It does not approach the depth of concern expressed by Juror 90, who clearly appeared more conflicted in her responses than Juror 211. *See* Sept. 13, 2005 Tr. 133:19-134:1; Juror 90 Supp. Quest. at 4. As a result, Juror 211 could be deemed not to have been similarly situated to Juror 90 in his position on the death penalty.

Finally, Juror 19, an African-American male, wrote on his questionnaire that "there are many people who have been convicted for crimes with insufficient evidence, many of whom are African-American, and are in prison awaiting execution unjustly."[19]  Juror 19 Supp. Quest. at 7. However, unlike Juror 90, Juror 19 did not appear to feel conflicted about this issue, indicating that he was "strongly in favor of the death penalty," albeit with a question mark. *Id.* at 4. When the Court requested that Juror 19 clarify why he wrote a question mark, he explained, "For me, it's just a yes or no. You're for it or against it." Sept. 7, 2005 Tr. 140:20-141:3. Juror 19 then stated that his judgment would not be influenced by his view that African-Americans "are in

---

[19] As an African-American male, Juror 19 would only be relevant to Petitioners' claim for discrimination on the basis of gender, rather than both gender and race.

prison awaiting execution unjustly," Juror 19 Supp. Quest. at 7, because "there were a couple of court cases just recently where people, African-Americans were released from jail, but they were convicted like back in the 60's or 70's[.]"  Sept. 7, 2005 Tr. 146:23-147:5.  Given that Juror 19 otherwise indicated that he was in favor of the death penalty, it was reasonable for the Government to have harbored fewer reservations about his ability to impose the death penalty than it had as to Juror 90.

In sum, Juror 90's expressed conflict over whether she could impose the death penalty was marked, much more so than the attitude of the male jurors, including white male jurors, adduced as her comparators.  The Court is not persuaded that the Government exercised a peremptory strike on the basis of Juror 90's race and gender.

### Juror 83

Juror 83, an African-American woman, age 41, worked as a senior financial analyst for a federal agency.  The Government proffered the following reasons for striking her:

> Government counsel believed that Juror 83, the mother of one son, was arrogant and as a result, might not participate in jury deliberations well with other jurors.  We particularly noted her arrogance as she described her job, and the fact that she went through the employment process to be a Special Agent with the FBI but did not get hired. Also, this case was investigated by the FBI with numerous FBI witnesses on the government's list to testify at trial. As a result, we struck this juror.

Johnston Decl. at 3-4, ECF No. 466-1.

Petitioners attack the Government's reasons for striking Juror 83 as pretextual on the basis of gender and race.  Petitioners submit that the record does not support that Juror 83 was "arrogant."  Pet'rs' Br. at 13-16, ECF No. 513.  Arrogance is a presumptively pretextual reason, Petitioners argue, given that it is a "nebulous descriptor . . . advanced without any observable basis in the record."  Pet'rs' Br. at 16, ECF No. 513.  As to her employment, Juror 83 wrote on her questionnaire about potential hardship at serving on the jury: "Full time employment at a[]

44

major government agency which provides safety and soundness oversight to (2) major financial services organizations." Juror 83 Quest. at 23. When the Court asked about her about employment, she explained that she worked at the Office for Federal Housing Enterprise Oversight and stated, "I'm a senior account examiner. I provide accounting, I work for the chief accountant's office." Sept. 20, 2005 Tr. 92:5-13. Regarding Juror 83's experience with the FBI, she explained that she sought employment as a special agent in about 1995, and "went through the written test, the interview process, a couple processes, then I wasn't selected." *Id*. 92:14-93:14.[20]

To begin, Juror 83's rejection by the FBI, especially when FBI employees were listed as possible Government witnesses, could certainly have given the Government reasonable pause as to question her impartiality. Petitioners submit that Juror 155, an African-American male, was similarly situated to Juror 83, because he indicated that he had unsuccessfully applied for a position with the Metropolitan Police Department, which, like the FBI, was involved in the investigation in this case. Pet'rs' Br. at 17-18, ECF No. 513 (citing Juror 155 Quest. at 8). However, the record demonstrates that defense counsel, at least, thought that Juror 155's questionnaire indicated that he had *served* on the police force. Sept. 15, 2005 Tr. 177:24-178:1. AUSA Johnston stated that "there's no employment listed" so it was unclear whether "the juror [was] currently retired." *Id.* 177:19-21. This confusion as to Juror 155's employment situation may explain why the Government inquired after Juror 83's failure to be hired by the FBI, but not after Juror 155's unsuccessful police application.

─────────────

[20] Petitioners further argue that "arrogance" is a proxy for race: because it fits a stereotype often ascribed to successful African-American women, it is an inherently suspect justification for striking Juror 83. *See McGahee v. Alabama Dept. of Corrections*, 560 F.3d 1252, 1265 (11th Cir. 2009) ("[T]he State's claim that several African-Americans were of 'low intelligence' is a particularly suspicious explanation given the role that the claim of 'low intelligence' has played in the history of racial discrimination from juries."). The Court agrees that, while not proving pretext, a proffered explanation of arrogance in the case of an African-American female juror unquestionably ought to be viewed with some suspicion.

As for Juror 83's demeanor, it is not, of course, the Court's role to determine whether Juror 83 was, in fact, arrogant—but instead to assess the plausibility of whether the Government could have reasonably believed her to be so.  Here the Government could have entertained that opinion.  Juror 83's reference to her job at a "major government agency which provides . . . oversight to (2) major financial services organizations" as a ground for why she should not serve could plausibly be read to have supported the Government's position.  Such a statement could be taken as reflecting self-importance, given that the Office for Federal Housing Enterprise Oversight is probably not widely perceived as a "major government agency," nor would Juror 83's work there as a senior account examiner likely be deemed critical to its operation.  But Juror 83 cited those aspects of her job as a reason to excuse her from serving on the jury.  While tone and demeanor often provide critical context, on this point the Supreme Court has provided explicit guidance: the Government's demeanor-based reasons, even if not reflected in the record, are considered legitimate and not necessarily pretextual, as Petitioners argue.  *See United States v. Barnette*, 644 F.3d at 214-15 (noting that *Batson* did not hold "that a demeanor-based explanation for a peremptory challenge must be rejected unless the judge personally observed and recalls the relevant aspect of the prospective juror's demeanor.") (citing *Thaler v. Haynes*, 559 U.S. 43, 49, 130 S. Ct. 1171, 175 L.Ed.2d 1003 (2010) (per curiam)).

Further, the Court notes that the Government used demeanor-based reasons to strike male and female jurors alike. Out of the Government's 22 exercised peremptory strikes, the Government only offered a demeanor-based reason for striking five other jurors, two of whom were men.[21]  For example, the Government used a strike against Juror 97, a white male, because he "was extremely nervous and did not seem quite right" and against Juror 137, a white male,

---

[21] The Government also struck three female jurors, at least in part, for demeanor-based reasons: Juror 117 over concerns about her candor; Juror 121 for being "strangely aloof" and "odd"; and Juror 235 over concerns about her "mental status."  Johnston Decl. at 4-5, 7, ECF No. 466-1.

because he was "too much of a talker and would drive other jurors crazy during deliberations." Johnston Decl. at 4-5, ECF No. 466-1. Similarly, the Government's concern as to Juror 83's demeanor was that she "might not participate in jury deliberations well with other jurors." *Id.* at 3-4.

Petitioners invite attention to Juror 38, a white male, as a comparator who they claim demonstrated greater arrogance than Juror 83—yet was not struck by the Government. However, Juror 38 was employed as an Assistant General Counsel for the FBI. Although he certainly did make statements with a touch of arrogance (*e.g.*, "We're trying to apprehend Osama Bin Laden…kinda busy," Juror 38 Quest. at 23), Juror 38, after all, was in a legal position with FBI, again, the Government's natural ally. Juror 83 and Juror 38 were hardly comparable from the Government's perspective.

The Court is satisfied that the Government's proffered reasons for striking Juror 83 were not pretextual on the basis of gender and race.

### Juror 117

Juror 117 was an African-American woman, age 32, who worked as a teacher. Juror 117 Quest. at 1; Sept. 14, 2005 Tr. at 66. The Government proffered the following reason for striking her:

> Government counsel struck this juror because she failed to disclose her employment as a school teacher which is particularly odd given the type of job that it is, requiring a commitment to the students that are being taught where a long time away could be a hardship. Instead, the juror spoke about her own education (she had a BS degree in sociology/child psychology) and stated that she was working on a master's degree in criminal justice with "courts and law was my major." We did not believe the juror was being candid in her answers and had a strong concern that she was too interested in being a juror to use her jury duty for her thesis project. In addition, her initial view of the death penalty was expressed in term of perhaps they should receive the death penalty "where no other options are given."

47

Johnston Decl. at 4-5, ECF No. 466-1.

Petitioners claim the Government's proffered reasons were a pretext for discrimination on the basis of gender and race, relying primarily on the purported lack of evidentiary support in the record rather than on a comparison to a specific male juror. *See* Pet'rs' Br. at 21-24, ECF No. 513. They submit that Juror 117's omission that she was a teacher appeared to be an oversight, given that she disclosed her prior employment and membership in the state teachers' association.[22] Pet'rs' Br. at 21 (citing Juror 117 Quest. at 2-3, 19); Pet'rs' Reply Mot. Disc. at 26-27, ECF No. 471. Further, the Court declined to strike her on hardship grounds because she taught with another fulltime teacher and had made arrangements for a substitute teacher. *See* Pet'rs' Br. ECF at 21, No. 513 (citing Sept. 14, 2005 Tr. at 67). Petitioners assert that the Government provides no evidence of a lack of candor in Juror 117's answers, e.g. there are no examples of contradictions or descriptions of her demeanor. The juror indicated that she was not interested in using her jury service to inform her thesis, which dealt with school violence and was unrelated to the case. *See id.* at 22 (citing Sept. 14, 2005 Tr. at 81). Finally, Petitioners argue that, regarding Juror 117's answer that she favored the death penalty "where no other options are given," she stated that she misunderstood the question and thought there could be a situation where the death penalty was the only choice. *See id.* at 22-23 (citing Sept. 14, 2005 Tr. at 84).

The Government's explanation for striking Juror 117 appears to boil down to essentially two reasons: (1) a belief that Juror 117 was not being candid, as evidenced by her responses to questions about her work and studies; and (2) her initial stated position that the death penalty should be imposed "where no other options are given."

---

[22] Petitioners note that a number of male jurors did not answer every question on the juror questionnaire. *See* Pet'rs' Reply Mot. Disc. at 22-23, ECF No. 471.

The Court agrees with Petitioners to this extent: Juror 117's failure to indicate on her questionnaire that she was a teacher may well have been an oversight. Nevertheless, it was not unreasonable for the Government to think it odd that a teacher would fail to list her employment as a possible hardship when she filed out the initial questionnaire in July. While she might have arranged for a substitute by the time of voir dire in September, it was an open question whether she would have been able to do that when she first submitted her questionnaire in July. Nor would it have seemed likely that she had permission to serve from the school principal at that initial stage. The Government's suggestion that Juror 117 should be "excused along with all the other teachers we have excused," raises no suspicion of discrimination since, as the Government correctly noted, "the Court's jury plan does call for excusing jurors who are teachers full time." Sept. 14, 2005 Tr. 66:15-67:23.

Further, despite Petitioners' effort to present Juror 117's job as a teacher and her thesis as separate issues, the Government could have fairly viewed these two issues as connected. As one of the prosecutors explained at the bench conference, "I'd like the Court to follow up and find out what her thesis is on. It seems—strikes me as somewhat unusual for a full-time teacher to want to be here and not with her students for a couple of months. And I'm concerned that this juror, who has made—getting her master's degree in criminology may have—be doing some research or something having to do with participating in a trial of this nature." *Id.* 78:2-15.

The Court asked Juror 117 a few questions on this issue, but they were largely phrased so that the juror could provide affirmative answers without comment. The Court's first question was more open: "What is the nature of the thesis you're working on for your master's?" Juror: "I just changed it to school violence." The Court: "Okay. Just out of curiosity, you have this background in criminology and so on and so forth, and I assume that's one of the reasons why

49

you're prepared to serve, among other things, in the case?"  Juror: "True."  The Court: "But you understand of course that this is not a research project—"  Juror: "Right."  The Court: "—this is one where you need to weigh the evidence carefully and make an appropriate decision?"  Juror: "Yes."  *See id.* 81:20-82:10.

It remains plausible that the Government's concerns were not sufficiently allayed by this exchange.  Again, assessments of "candor" require an examination of demeanor, for which the Government's explanation need not be reflected in the record.  *Barnette*, 644 F.3d at 214-15 (citing *Thaler*, 559 U.S. at 49, 130 S. Ct. 1171).  Although the Court has no personal recollection of Juror 117's demeanor, it did find the Government's expressed concerns sufficiently well-taken to prompt the Court to ask follow-up questions. From all that appears, it was plausible to conclude that this prospective juror, as a candidate for a master's degree in criminal justice (who agreed when the Court asked if she was interested in serving because of her background in criminology) and who was ready to forgo her teaching commitment for an extended period of time, may well have seemed to the Government to be too eager to serve.

Finally, Petitioners submit that the record fails to support the Government's assertion that Juror 117 expressed the view that the death penalty should be imposed "where no other options are given."[23]  When questioned by the Government, the Juror explained "[a]t the time when I was writing this, I didn't realize there was another possibility. I thought the only option was the death penalty. I didn't realize that there was the death penalty as well as life without parole." Sept. 14, 2005 Tr. 86:6-10.  The Government then informed the Court of its concern that her position "seems to be inconsistent."  *Id.* 87:4.  Although the Court did not accept that argument

---

[23] Juror 117's full response to the question "what are your views about the death penalty?" was: "I have not had to think about how I feel about the death penalty until today; however, if it is proven beyond a reasonable doubt that an individual committed a crime, particularly those who are being tried under circumstances where no other options are given, perhaps they should receive the death penalty." Juror 117 Supp. Quest. at 4 (emphasis added).

as a reason to excuse the juror for cause, it could nonetheless have constituted a valid, non-discriminatory reason for the Government to exercise a preemptory strike. If Juror 117 felt that "where no other options are given, perhaps [the defendant] should receive the death penalty," the Government could have plausibly concluded that this statement communicated hesitancy in the prospective juror's mind that would be heightened, rather than eliminated, by having the option of voting for a sentence of life without parole.

The Court concludes that Petitioners have failed to meet their burden of demonstrating that the Government's proffered reasons for striking Juror 117 were pretext for discrimination on the basis of gender and race.

### Juror 124

Juror 124, an African-American woman, age 55, worked for the government of Prince George's County as a supply manager. The Government gave the following reason for striking her:

> We struck this juror in part because she did not follow instructions and left a lot of the questions blank on the questionnaire. She also stated that she will "need scientific evidence." She expressed an interest in gospel music, an indication to us that she is devout, likely forgiving and would be reluctant to sentence a young man to death.

Johnston Decl. at 5, ECF No. 466-1.

Once again Petitioners assert that the Government's reasons for striking her were a pretext for discrimination on the basis of gender and race. Juror 124, they submit, only left three questions blank (numbers 2, 4, and 13) on the questionnaire and later provided answers to those questions during voir dire. *See* Sept. 14, 2005 Tr. at 129-30. In contrast, the Government accepted at least eight male jurors who failed to answer every question. Pet'rs' Reply Mot. Disc. at 22-23, ECF No. 471. In addition, when Juror 124 was informed that forensic or scientific evidence was not required, she conclusively stated that she could credit the Government's case

without it.  Sept. 14, 2005 Tr. at 131-32.  Again, in contrast, the Government is said to have failed to strike several male jurors who expressed a need to see scientific evidence. Pet'rs' Br. at 24-25, ECF No. 513; Pet'rs' Reply Mot. Disc. at 18-19, ECF No. 471.  Finally, Petitioners submit that the Government's suggestion that Juror 124's interest in gospel music would make her "reluctant to sentence a young man to death" was unsupported by the record, given that Juror 124 expressed clear support for the death penalty.[24]

As to the first proffered reason, Juror 124's failure to answer the questionnaire is more amply demonstrated in the record than Petitioners allow.  A review of her questionnaire indicates a notable lack of writing compared to those of other jurors.  While Petitioners are correct that only Question 2 (date of birth, age, place of birth), Question 4 (length of time at current address), and Question 13 (employment for past seven years) were *required* for everyone, as to other questions, Juror 124 either gave a partial answer (e.g. on Question 17, listed she had a son, but not his occupation), and she left blank several other questions that were required if applicable, without indicating "N/A" (e.g. Question 38, victim of or witness to a crime).  *See* Juror 124 Quest.  On the supplemental questionnaire, jurors were generally asked to check the box that represented their opinion related to a question on the death penalty (e.g. "yes" or "no"), and, depending on the answer, provide a written explanation.  Juror 124 provided no written explanation apart from one sentence on Question 1 (general views of the death penalty), where there was no box to check.  *See* Juror 124 Supp. Quest. at 4.  While the male jurors proposed by Petitioners as comparators may have also failed to answer certain questions, none provided so

---

[24] Petitioners further argue that striking Juror 124 on the basis of an interest in gospel music was an impermissible proxy for race, as well as discriminatory on the basis of religious affiliation.  *See infra* § III.D.  Petitioners also argue that, as with Juror 124, the Government has failed to state a neutral reason for striking Juror 241, also an African-American woman.  *See* Johnston Decl. at 7, ECF No. 466-1 ("[Juror 241] listened to spiritual music which may indicate a reluctance to judge.").  The Court finds that a strike based on an interest in gospel or spiritual music is not, in and of itself, facially discriminatory at *Batson* Step Two, but it is arguably relevant to analysis at Step Three.

little detail in their answers as Juror 124, particularly with regard to all of the questions in the supplementary questionnaire focusing primarily on the death penalty.[25]  Because Juror 124 failed to answer several required questions, and provided very little written information on her questionnaire, it was not unreasonable for the Government to be concerned over whether she also may have failed to answer optional questions that were in fact applicable to her.

As to the Government's concern that Juror 124 might require scientific evidence for a conviction, that concern is also clearly supported by the record.  Juror 124 listed "Law and Order" and "CSI" in response to a question asking for TV shows the juror watches regularly. Juror 124 Quest. at 20.  In her supplemental questionnaire, she put a question mark next to the question asking whether she would require forensic or scientific evidence to find the defendant guilty.   When the Court reread the question to her, ("Do you believe that there must be some forensic or scientific evidence such as that which is commonly depicted on popular TV shows like CSI or Law and Order in order to find the Defendant guilty beyond a reasonable doubt"?), she answered, "Yes, somewhat."  Sept. 14, 2005 Tr. 131:14-18.  Although Petitioners argue that she changed her answer once the Court explained that the Government was not required to provide forensic evidence, the same is true of the male jurors that Petitioners offer as comparators.[26]   Notably, the Government struck a white male juror, Juror 97, because he

---

[25] Petitioners submit that male Jurors 19, 22, 126, 155, 157, 158, 177, and 254 all failed to answer individual questions.  Juror 22 was perhaps the most similar to Juror 124, in that he also failed to provide written answers to many questions on his supplemental questionnaire about his views of the death penalty.  He did, however, provide one more written answer than Juror 124 on the written questionnaire, (i.e. he would always impose the death penalty for the "murder of police officer," Juror 22 Supp. Quest. at 8), and did not forgo any answer on the original questionnaire.

[26] Jurors 56, 157, and 166 all initially checked "yes" on the questionnaire as to whether forensic evidence was required to find a defendant guilty, but none felt strongly when questioned by the Court.  For example, Juror 157 did not appear tied to the *scientific* aspect of the evidence, as opposed to proof beyond a reasonable doubt, explaining "I have to see, know exactly what the fact is before I make my judgment." Sept. 15, 2005 Tr. 83:9-19.  Likewise, Juror 56 explained he thought, having never been on a jury, scientific evidence would be more persuasive, but agreed he could "absolutely" follow the Court's instruction in that regard. *See* Sept. 9, 2005 Tr. 54:3-55:16.  Juror 166 immediately agreed that he would

responded "yes" to requiring forensic or CSI evidence and stated, "you just have to be sure." Johnston Decl. at 7, ECF No. 466-1.

The Court gives close scrutiny to the Government's third proffered reason for striking Juror 124, namely, that her interest in gospel music was "indication to us that she is devout, likely forgiving and would be reluctant to sentence a young man to death." Johnston Decl. at 5, ECF No. 466-1. Petitioners are correct that Juror 124 indicated on her questionnaire that she was "strongly in favor of the death penalty," and explained during voir dire that she believes when a defendant "stays behind bars for life, it doesn't bring back the other person. . . . [W]hen they take a life, a life should be given up." Sept. 14, 2005 Tr. 133. There is really no record evidence for the proposition that Juror 124 would be "forgiving" or "reluctant to sentence a young man to death."[27]

But the dispositive point is this: Defense counsel themselves moved to strike Juror 124 for cause based on her views of the death penalty, and the Government actively opposed the motion. If the Government's real goal on voir dire was to discriminatorily remove women or specifically African-American women from list of potential jurors, defense counsel's motion to strike Juror 124 would have been a perfect opportunity for the Government to accede. If the prosecutors were genuinely engaged in intentional discrimination, one would have expected them to take advantage of any such an opportunity. Ironically, if the Court had agreed with defense counsel's motion to strike Juror 124, she would never have been raised as part of this *Batson-J.E.B.* claim.

---

not require any particular test and that nothing would impair his ability to follow the Court's instructions. *See* Sept. 16, 2005 Tr. 11:7-13:10.

[27] The only possible deviation from Juror 124's support for the death penalty came when one of the prosecutors requested that the Court follow up on an answer because "at one point she told you that she would—in a case involving kidnapping resulting in death, that she would never sentence the defendant to death. . . . She said yes and then I think she said no." Sept. 14, 2005 Tr. 139:3-9. Nevertheless, the record as a whole indicates that Juror 124 was a supporter of the death penalty.

Despite the Government's concern that Juror 124's interest in gospel music suggested that she might be "forgiving," the Government's other proffered reasons—her failure to fill out the questionnaire and her interest in scientific evidence—are clearly plausible reasons for the Government's use of a peremptory strike.  But more than anything else, the Government's opposition to defense counsel's request that Juror 124 be struck for cause fortifies its credibility that the reasons it proffered for the preemptory strike were not a pretext for intentional discrimination of any sort.

Bearing in mind that the *Batson-J.E.B.* challenge in this case is for a challenge that trial counsel never made and as to which the Government has been constrained to justify its peremptory strikes several years after the fact, and considering the totality of the relevant evidence, the Court finds that Petitioners have failed to satisfy their burden of demonstrating that the Government's proffered reasons for striking Juror 124 were merely a pretext for intentional discrimination against women or African-American women.

### D.  *Batson/J.E.B.* Claims Based on Racial Proxies and Religion

Petitioners have more or less recently sought to add further grounds in support of their *Batson-J.E.B.* challenge, arguing that certain of the Government's proffered reasons for strikes against certain women were also discriminatory racial proxies as well as discriminatory on the basis of religion.[28]  *See* Mot. Suppl. Am. Mot. to Vacate, ECF Nos. 478, 480.

---

[28] The Court grants Lighty's Motion to Supplement his Amended Motion to Vacate, ECF No. 478—which seeks to add claims based on racial proxies and religion—insofar as the Court will consider his Amended Motion to Vacate to be Amended accordingly.  Likewise, the Court grants Flood's Motion to Adopt Motion of Other Defendant Lighty, ECF No. 480, in that his Amended to Motion to Vacate is also amended accordingly.

Although Petitioners labor mightily to demonstrate that cause exists to excuse these procedurally defaulted arguments,[29] the Court is not convinced and finds it unnecessary to engage in an extended analysis as to whether the default would be, in fact, excused.[30] The Court will assume for the moment that Petitioners can demonstrate cause for their default in order to proceed directly to the merits of the arguments.

### 1.  Racial Proxies

The Court need not tarry long on the Petitioners' claims of impermissible racial proxies. Petitioners submit that the Government failed at *Batson* Step Two to provide a neutral explanation for its strike of four jurors—Jurors 90, 124, 241, and 201—because its reasons were based on a stereotype or racial proxy.  Pet'rs' Reply Mot. Disc. at 32, ECF No. 471 (citing *Johnson v. Love*, 40 F.3d 658, 668 (3d Cir. 1994). Petitioners point to: Juror 90 (who felt "conflicted" because more African-Americans receive the death penalty); Juror 124 (who "expressed an interest in gospel" and was thus "likely forgiving"); Juror 241 (who "listened to spiritual music which may indicate a reluctance to judge");[31] and Juror 201, an African-

---

[29] Petitioners argue that these "claims" are not procedurally defaulted because they could not have reasonably discovered that the Government engaged in intentional discrimination on the bases of racial proxies and religion until the Government volunteered this information in the course the Section 2255 litigation.  Pet'rs' Br. at 36, ECF No. 513; Pet'rs' Reply Mot. Disc. at 32-36, ECF No. 471; Pet'rs' Supp. Br. Mot. Disc. at 9-10, ECF No. 485.  Petitioners cite several non-*Batson* cases which they claim support the proposition that cause to excuse procedural default exists where the trial record was insufficient to give rise to the claim.  *See, e.g.*, *United States v. Fell*, Case No. 2:01-cr-12, 2013 WL 1953322, at *2 (D. Vt. May 10, 2013) (juror bias and misconduct claims); *Ray v. United States*, Nos. 07-C-1072, 04-CR-71, 2010 WL 3120033 at *4 (E.D. Wis. Aug. 5, 2010) (giving leave to amend motion to vacate to add a *Brady* claim not raised on appeal); *Gholikhan v. United States*, No. 05-60238-CR, 2008 WL 2627715, at *2 (S.D. Fla. July 3, 2008) (finding cause for procedural default where petitioner's claim that her plea was not intelligent and voluntary where her claim required evidence outside of the district court record).

[30] If the Court were to find no cause for the procedural default, presumably these new *Batson* arguments would be presented as an ineffective assistance of counsel claim, just as the procedurally defaulted gender and race claims were.

[31] Juror 241 was not included among the five female jurors Petitioners cite as examples of racial and gender-based discrimination.  She was added in connection with the discussion of discrimination on the basis of racial proxies and religion. Pet'rs' Br. at 36, ECF No. 513.

American male (because of his "closeness in age to the defendant and his having resided in the Temple Hill area" where the murder occurred).  Pet'rs' Br. at 36, ECF No. 513; Pet'rs' Reply Mot. Disc. at 33-34, ECF No. 471  (quoting Johnston Decl. at 4-7).  Petitioners argue that the Court should infer purposeful discrimination by the Government because, while its proffered explanations appear neutral on their face, they were instead "based on the prosecutor's personal stereotypical views."  Pet'rs' Reply Mot. Disc. at 33, ECF No. 471 (quoting *People v. Turner*, 90 Cal. App. 4th 413, 420, 90 Cal. App. 4th 413 (Cal. Ct. App. 2001)); *see also United States v. Bishop*, 959 F.2d 820, 825-26 (9th Cir. 1992).

The short answer is that, in the foregoing section, the Court has already weighed and rejected those arguments during consideration of Jurors 90 and 124.[32]  Petitioners have added Juror 201, an African-American male who was struck by the Government, as "circumstantial evidence" of racial discrimination against African-American women.  But the Court is not persuaded that the strike of Juror 201 based on the fact that he was from Temple Hills (where the murder occurred) was an impermissible proxy for race.  Although Temple Hills may in fact have been predominantly African-American, the Government also struck Juror 88, a white woman, partially on the basis that she lived in Temple Hills.  *See* Johnston Decl. at 4, 6, ECF No. 466-1.

## 2.  Religion

Petitioners also argue that the Government impermissibly discriminated against certain jurors—all of whom were women—on the basis of religion.

The question of whether and to what extent *Batson-J.E.B.* applies to the protection of religion remains unresolved by the U.S. Supreme Court.  *See Davis v. Minnesota*, 511 U.S. 1115, 114 S. Ct. 2120, 128 L.Ed.2d 679 (1994) (denying a writ of certiorari in a case raising the issue);

---

[32] As to Juror 241, *see supra* n.24.

*cf. Foster*, 136 S. Ct. at 1752-53 (finding that the prosecutor's strike based on religious affiliation to be a pretext for discrimination on the basis of race, but without commenting whether religious affiliation is itself an impermissible ground for a strike).  Petitioners fail to cite any Fourth Circuit precedent that has extended *Batson-J.E.B.* to discrimination on the basis of religion.  In fact, the Fourth Circuit has concluded that a juror's "opposition to the death penalty based on her religious beliefs is a permissible race neutral reason[.]"  *United States v. Barnette*, 644 F.3d at 215 (citing *Brown v. Dixon*, 891 F.2d 490, 497–98 & 498 n.15 (4th Cir. 1989).

Petitioners, to be sure, cite cases from other courts, but those courts have largely made a distinction between a strike based on religious beliefs and one based purely on religious affiliation, the former being permitted, the latter not.  *See United States v. Brown*, 352 F.3d 654, 667-69 (2d Cir. 2003) (distinguishing between an eligible juror's religious activities and her membership in a Christian congregation); *United States v. DeJesus*, 347 F.3d 500, 511 (3d Cir. 2003) ("Because we affirm the District Court's finding that the government's strikes were based on the jurors' heightened religious involvement rather than their religious affiliation, we need not reach the issue of whether a peremptory strike based solely on religious affiliation would be unconstitutional."); *United States v. Stafford*, 136 F.3d 1109, 1114 (7th Cir. 1998) ("[It] would be improper and perhaps unconstitutional to strike a juror on the basis of his being Catholic, a Jew, a Muslim, etc.").  Petitioners also note that several state courts have invalidated strikes based on religious affiliation.  *See, e.g.*, *Arizona v. Purcell,* 199 Ariz. 319, 18 P.3d 113, 120 (Ariz. Ct. App. 2001); *Connecticut v. Hodge*, 248 Conn. 207, 726 A.2d 531, 552–54 (Conn. 1999); *People v. Martin*, 64 Cal. App. 4th 378, 75 Cal. Rptr. 2d 147, 150-51 (Cal. Ct. App. 1998).

Assuming without deciding that a strike based on religious affiliation alone is unconstitutional, the Court finds no evidence whatsoever that the Government struck any juror in this case solely on the basis of discrimination against the juror's religious *affiliation*, as opposed to the juror's religious *views*—such as on the death penalty, which unquestionably would have great relevance for the trial. Petitioners say that the Government failed in *Batson* Step Two to provide an explanation based on something other than the religion of the juror, specifically for Jurors 84, 121, 124, 196, and 241—all of whom appear to be Catholic or to have had some other Christian affiliation. Pet'rs' Reply Mot. Disc. at 34-36, ECF No. 471; Pet'rs' Br. at 36, ECF No. 513. However, it can hardly be argued that insofar as a person is affiliated with a particular religion and that person expresses "opposition to the death penalty based on [one's] religious beliefs," *Barnette*, 644 F.3d at 215, it would be impermissible to strike the juror based on juror's religious or moral beliefs. *See DeJesus*, 347 F.3d at 511 (distinguishing between "a strike motivated by religious beliefs and one motivated by religious affiliation").

As to all the jurors cited by Petitioners, the Government proffered reasons that appeared to be tied to the prospective juror's religious views regarding the death penalty, not based on his or her religious affiliation. In its Declaration, the Government explicitly noted that it "views extremely religious or devout individuals as being unlikely to impose the death penalty, particularly on a younger individual." Johnston Decl. at 6, ECF No. 466-1 (explanation for strike of Juror 196). Accordingly, the Court concludes that the Government effectively satisfied *Batson* Step Two by proffering neutral explanations for its strikes.

Further, as to all the jurors they cite, Petitioners have failed to persuade at *Batson* Step Three. Juror 84 identified as a Catholic but expressed opposition to the death penalty. Supp. Quest. at 4 (indicating she is "somewhat opposed to the death penalty" and is member of an

organization that has a stated position for or against the death penalty—the Catholic Church). Her opposition to the death penalty was a perfectly neutral reason for the Government to exercise a preemptory strike.  Similarly, Juror 121, answering the question whether she could impose the death penalty, stated that "it would be hard because I've never had to before."[33]  Sept. 14, 2005 Tr. 125:23-156:2.   The Government submits that it struck Juror 196, a self-described "minister of the gospel," for expressing reservations about the death penalty, including her concerns over cases where a witness "came forth [with exonerating evidence] after the person was executed but it was 'too late.'"  *See* Johnston Decl. at 6, ECF No. 466-1.

The Government stated that it struck Juror 241, as one of its three strikes of alternates, because she "had no recollection of her prior jury service and she listened to spiritual music which may indicate a reluctance to judge."  Johnston Decl. at 7, ECF No. 466-1.  Similarly, Juror 124, as discussed above, was struck in part because "she expressed an interest in gospel music," an indication that she was "likely forgiving."  *Id.* at 5.  Juror 241, for example, stated that she was "a fairly religious person" even as she expressed a neutral view of the death penalty.[34]  Sept. 22, 2005 Tr. 22:25-23:15. Juror 124, as discussed above, stated she was in favor of the death penalty.  While the link between spiritual or gospel music and a "forgiving" nature in a death penalty case is arguably somewhat tenuous, the fact is, that reason—attenuated though it may be—still amounts to a challenge based on religious views rather than on religious affiliation.

The Court, then, is not convinced that any of the Government's so-called religious-based strikes demonstrate discrimination on the basis of religious *affiliation*.   In fact, Petitioners

---

[33] Although it is not clear from the record why Juror 121 "looked to [the Government] like a regular church goer," the Government's stated reasons for striking her related to her reservations about the death penalty and that she was "odd." The Court finds both reasons to be neutral.  Johnston Decl. at 5, ECF No. 466-1.

[34] Juror 241 explained that "I have no problem with the death penalty as long as it fits the crime, and it has been proven that the person did, indeed, do whatever it was and that is one of the punishments." Sept. 22, 2005 Tr. 22:25-23:3.

themselves identify at least two male jurors who were not struck but who expressly stated their religious affiliation. *See* Pet'rs' Reply Mot. Disc. at 16, ECF No. 471.  Juror 19, an African-American male, identified himself as Christian, Sept. 7, 2005 Tr. 149, and Juror 47, a white male, volunteered he was a member of the Catholic Church.  Sept. 9, 2005, Tr. 10-11.  The fact that it did not strike these male jurors tends to diminish any argument that the Government discriminated against prospective jurors having a Catholic or Christian affiliation.

Petitioners have failed to meet their burden of demonstrating that the Government engaged in purposeful discrimination on the basis of religion in exercising peremptory strikes.

### E.

In all, the record as a whole fails to persuade the Court that Petitioners have satisfied their burden of showing that the Government engaged in purposeful discrimination against women or African-American women in exercising its peremptory strikes.  While the statistical evidence in this case indicates that the Government used a high percentage of strikes against women and African-American women among the venirepersons, this without more, does not clinch Petitioners' claim.  *See Golphin*, 519 F.3d at 187 ("Although [the Petitioner's] statistical evidence is certainly probative under *Miller–El II* . . . it alone cannot carry the day.").  Further, Petitioners' attempt to establish a history of Government's discrimination against women in general and African-American women in particular fails.  The Court, as the presiding judge in the Higgs trial, cited by Petitioners as "historical evidence," has already found no evidence of discrimination against women in that case.  Further, in the trial of Higgs's co-defendant Haynes, also presided over by this member of the Court, women were fairly well-represented on the jury, which consisted of four women and eight men.  These considerations effectively defeat the argument that, as to the two females who were prosecutors in this case and in the Higgs and

Haynes cases, or the U.S Attorney's Office in this district in general, there has been a historic practice of discrimination of the kind identified in *Miller-El II*. *See* 545 U.S. at 263, 125 S. Ct. 2317 ("[F]or decades leading up to the time this case was tried prosecutors in the Dallas County office had followed a specific policy of systemically excluding blacks from juries.").

The "critical element" of a *Batson-J.E.B.* claim remains the juror-to-juror comparison, which requires the court to "engage in a carefully calibrated comparative juror analysis." *Barnette*, 644 F.3d at 205. After carefully combing through record evidence pertaining to the strikes of all the female jurors—white and African-American—Petitioners adduced Jurors 1, 83, 90, 117, and 124 as those they believed to be the clearest examples of the Government's discriminatory animus. The Court, however, has not been convinced by these comparisons. The Government struck Jurors 1 and 90 based on their clearly expressed ambivalent or conflicted feelings about the death penalty. There was nothing improper about such strikes. The Government could fairly have believed that those jurors were more ambivalent than male jurors who also had some concerns. The Government struck Jurors 83 and 117 largely for demeanor-related reasons, which the Court found plausible based on the nature of their responses as reflected in the record. Demeanor-based reasons are considered legitimate, not necessarily pretextual, as Petitioners would have it. *See Barnette*, 644 F.3d at 214-15 (noting that *Batson* did not hold "that a demeanor-based explanation for a peremptory challenge must be rejected unless the judge personally observed and recalls the relevant aspect of the prospective juror's demeanor.") (citing *Thaler*, 559 U.S. at 49, 130 S. Ct. 1171). Finally, it was defense counsel's motion to strike Juror 124, an African-American woman, for cause, which the Government opposed that undermines the claims of discrimination. As much as anything else, this tends to

suggest that the Government's proffered reasons for striking women or African-American women in particular were not pretextual.

Petitioners have failed to carry their ultimate burden of proving purposeful discrimination. In *Strickland* terms, they have failed to establish a "reasonable probability" that any *Batson-J.E.B.* challenges made at trial would have been successful. Therefore, they have not satisfied the "prejudice" prong of an ineffective assistance of counsel claim.

Because Petitioners cannot demonstrate the requisite prejudice, the Court need not consider the performance prong of their ineffective assistance of counsel claim.[35]  *See Strickland*, 466 U.S. at 697 ("If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed.").

Finally, because Lighty's and Flood's direct *Batson-J.E.B.* claim was wholly dependent on the outcome of their ineffective assistance of counsel claim, they have necessarily failed to establish cause for their procedural default.

## VI. Conclusion

For the foregoing reasons, insofar as any of Petitioners' pending Motions raise *Batson/J.E.B.* claims under 28 U.S.C. § 2255 are **DENIED**.  The Court will take up Petitioners' remaining Section 2255 claims in a subsequent Opinion, pending further briefing.

---

[35] The Court denied Petitioners' request for an evidentiary hearing, during which Petitioners proposed to present testimony from their statistics expert, Dr. John Lamberth, and Petitioners' prior counsel, as well as evidence regarding the Government's striking pattern in *United States v. Higgs*.  Pet'rs' Br. at 29-30, ECF No. 513 (citing 28 U.S.C. § 2255(b).  The Court held two hearings at which Petitioners' counsel argued their *Batson-J.E.B.* claims, after which it issued the Opinion denying their Motion for Discovery.  Further, Petitioners' statistical argument was extensively briefed through paper submission, including two expert reports by Dr. Lamberth, Pet'rs' Reply, Ex. 1, Lamberth Rep., ECF No. 471-1; Suppl. Lamberth Report, ECF No. 479.  Petitioners do not appear to have additional evidence to develop as to the most critical portion of the *Batson* inquiry, the juror-to-juror comparisons, given that the relevant portion of the record is limited to the voir dire transcripts and juror questionnaires.  The Court determined that Petitioners' claim for ineffective assistance of counsel would not depend on "disputed facts beyond the record" or "a credibility determination."  *See United States v. Blondeau*, 480 F. App'x 241, 242 (4th Cir. 2012) (citing *United States v. Witherspoon*, 231 F.3d 923, 925-27 (4th Cir. 2000)).

A separate order will **ISSUE**.


                                            _____/s/_____
                                            **PETER J. MESSITTE**
                                            **UNITED STATES DISTRICT JUDGE**

**August 12, 2016**