UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
SOUTHERN DIVISION

UNITED STATES OF AMERICA  :  Criminal Action No.

    v.                    :  PJM 03-0457

KENNETH LIGHTY,           :  Greenbelt, Maryland

        Defendant.        :  Monday, January 29, 2018

_____/  2:15 P.M.

TRANSCRIPT OF MOTION PROCEEDINGS
BEFORE THE HONORABLE PETER J. MESSITTE
UNITED STATES DISTRICT JUDGE

APPEARANCES:

FOR THE GOVERNMENT:    SANDRA WILKINSON, ESQUIRE
                       ELLEN COBB, ESQUIRE
                       United States Attorneys Office
                       Southern Division
                       6500 Cherrywood Ln Ste 200
                       Greenbelt, Maryland 20770
                       301-344-4235


FOR THE DEFENDANT      SETH A. ROSENTHAL, Esquire
KENNETH LIGHTY:        Venable, LLP
                       575 Seventh Street, NW
                       Washington, D.C.  20004
                       202-344-4741

                       JULIE BRAIN, ESQUIRE
                       127 Church Street, 2nd Floor
                       Philadelphia, PA 19106
                       267-639-0417


OFFICIAL COURT REPORTER:  LINDA C. MARSHALL,(301) 344-3229

COMPUTER-AIDED TRANSCRIPTION OF STENOTYPE NOTES

**P-R-O-C-E-E-D-I-N-G-S**

THE DEPUTY CLERK:  The matter now pending before the Court is Criminal Case Number PJM-03-457, United States of America versus Kenneth Jamal Lighty.  The matter comes before this Court for a motions hearing.

THE COURT:  All right.  Counsel, identify yourselves first for the petitioner, Mr. Lighty or reverse --

MR. ROSENTHAL:  Good afternoon, Judge Messitte. Seth Rosenthal on behalf to Mr. Lighty, as well as my co-counsel, Julie Brain.

THE COURT:  For respondent.

MS. WILKINSON:  Good afternoon, Sandra Wilkinson and Ellen Cobb on behalf of the U.S. Attorneys office.

THE COURT:  All right.  Anything preliminarily you want to say or are we ready to jump right in?

MR. ROSENTHAL:  No thanks, Your Honor.

THE COURT:  All right.  Would it makes sense, perhaps, to go back and forth on requests per request or do you want to start with a general statement?  Perhaps, that's the way to do it.  You can make your, kind of, generic request and then if you want to go item by item, we can go back and forth on that rather than having the defendant/petitioner expound all his views and then hear all the government's.

So, perhaps, let's start that way with a general statement from you Mr. Rosenthal on why you think any sort of

discovery at this juncture is appropriate.

MR. ROSENTHAL:  Sure.  Thank you, Judge Messitte. Just preliminarily, I will be arguing our request for discovery that pertain to the guilt phase ineffectiveness of counsel claim, as well as the prosecutorial misconduct claim.  All of the evidence that we're seeking on those two claims are also relevant to our penalty phase ineffectiveness claim.

There is a portion of penalty phase ineffectiveness claim which pertains to mitigation evidence that we haven't been able to obtain on our own and would need Your Honor's assistance through the issuance of subpoena to get and Ms. Brain will argue our request for discovery of those item.

THE COURT:  All right.

MR. ROSENTHAL:  Okay.  So, I think the most important place to start, Judge, is with the standard under Rule 6 for discovery.  And I think that the parties agree on what the standard is.  It was announced in Supreme Court's case *Bracey v. Gramley* in the 1997 case.  And the standard is, has Mr. Lighty stated a prima facie case for relief in this 2255 petition?  Has he made specific allegations showing reason to believe that if the facts are fully developed, he would be entitled to relief?

Let's talk about what that standard is not.  That standard is not akin to a preliminary injunction standard in a civil case.  It does not mean that Mr. Lighty has to make a showing of a likelihood of success on the merits in order to

warrant discovery.  There is some suggestion in the government's briefing, albeit implicit, that that's what it means, but that is not what it means.  It's more akin to the Rule 12(b)6 standard on a Motion to Dismiss in a civil case.

You take the facts in the motion as true and you determine, do they state a claim for relief, a plausible claim for relief?  And then you take a look at the request for discovery and you ask, do those requests for discovery support that plausible claim for relief?

We submit to you, Your Honor, that that is exactly what our request for discovery do.  Each of these claims for which we're asking for discovery, guilt phase ineffectiveness, prosecutorial misconduct and penalty phase ineffectiveness, each of those claims in the motion plausibly entitle Mr. Lighty to relief on their face.

So then you ask, do the specific requests that we make for discovery, that Mr. Lighty makes for discovery support those claims?  And the answer is clearly, yes.

One other thing before I sit down and turn it over to Ms. Wilkinson.  And that is, although we're going to go back and forth, Your Honor, on particular items of discovery that we're seeking, it's important to note that for an ineffectiveness claim, whether it's a guilt phase ineffectiveness claim or a penalty phase ineffectiveness claim, the Court is obligated look at all of the evidence pertaining to that claim to determine

whether counsel, trial counsel was ineffective. Not just taking a look at each of those pieces of evidence in isolation.

So although we'll be talking about specific requests for discovery, the Court should take a look at that specific request for discovery in connection with the other requests for discovery, as well as all the other evidence we brought to bear or, at least, all the other allegations we brought to bear within the motion in determining whether Mr. Lighty is entitled to relief.

The Court should not look at each of these requests in isolation and say, okay, well, if you get that piece of evidence, would that in and of itself alone entitle Mr. Lighty to relief? We'd have to take a look at the whole picture to determine whether all the things we're asking for as well as all the allegations made in the complaint would entitle Mr. Lighty to relief under these claims.

THE COURT: All right. Ms. Wilkinson.

MR. ROSENTHAL: Thank you.

MS. WILKINSON: Your Honor, I don't think that there's any disagreement about what the appropriate standard is here. It is well-established in terms of the Court's discretion if the Court believes there's good cause, as well as the Supreme Court case Mr. Rosenthal cited.

I do disagree slightly with the notion that the materiality of what he -- they are requesting is not somehow

tied into the notion of what is there they're entitled to get discovery on, because you still have to look at the end of the day everything that they are asking for assuming that it's true and supports the arguments that they're stating, whether or not it would support a claim for relief under 2255.

That is both ineffectiveness and that it affected the jury's decision in an unconstitutional way.  And that's what government disagrees with, that counsel is getting into the weeds of issues that were litigated during the course of this trial.  And that's why I think it's important that the Court, as it suggested, go through it line-by-line the things that they are requesting here and how that did play out already at trial, and what they already have.  And for those reasons, Your Honor, we believe defense has not met their burden in this case and are happy to respond to the Court's questions --

THE COURT:  Well, just before we leave the opening proposition, Mr. Rosenthal said you have to look at all these alleged acts or omissions in totality to determine whether there's ineffective assistance.  Do you agree with that proposition?

MS. WILKINSON:  Well, Your Honor, I do think there's law that says the totality of a lawyer's conduct, I guess, could rise to the level of ineffectiveness of counsel, but I don't think that you can look at them -- you still have to look at them in isolation first to determine if there was ineffective on

each particular ground that they are arguing about, because then you can take a whole picture.

I mean, honestly, Your Honor, when we look at the end of the day, if Mr. O'Toole's representation of Mr. Lighty wasn't imperfect, he certainly was an aggressive, zealous counsel for his client and there just can be no dispute about that.

And although we have no evidence in the record right now about his strategy and what he actually knew and did in the course of this trial, there's none of that attached to this 2255 motion or the discovery requests.  I don't think we even need to get to that issue because Mr. O'Toole clearly worked hard for his client and there are so many decisions within what he did that are going to be strategic calls at the end of the day.

THE COURT:  Well, disabuse me of this notion, whether you can look at the totality of circumstances on a straightforward 2255 involving a representation by counsel and say, well, one alone doesn't make it, but all of them together do.  Is that a correct statement of the law?

MS. WILKINSON:  I don't know of any cases that says that it is, Your Honor, but I think that's --

THE COURT:  I thought it said the contrary, but you can -- I can be persuaded otherwise, but I never have had that argument prevail that no one individually makes the case, but all six together do.  I don't think the Fourth Circuit has said that.

MS. WILKINSON:  Yeah, because I think you have to look at every decision that was made and determine, because if its one standing alone, it's kind of --

THE COURT:  Yeah, one standing alone could theoretically make it.  But if there are six that don't quite, do you add them up and say, now together they all do?  I don't know that that's the correct statement of the law.

MS. WILKINSON:  I mean, I don't know of any case, but I do think that that's at the end of the day what they're trying to argue, that Mr O'Toole was just --

THE COURT:  I thought that that's what Mr. Rosenthal was saying.

MS. WILKINSON:  --  bad lawyer.

THE COURT:  Maybe, Mr. Rosenthal, you've got specific authority that tells me that that's the way I should look at it, but it seems to me you have to have one that is altogether dispositive and if you have some that are in the end could have been better, could have been better, could have been better, taken together it's ineffective assistance, I'm doubtful about that proposition.

MS. WILKINSON:  I think that's probably right, because could have been better is not the standard here.  Perfect representation is not what this is all about.

THE COURT:  All right.  Well, what is the -- I suggested that we go forward, kind of, point by point and

certainly you can tie the argument together, Mr. Rosenthal, when you're ready to do that.  But we have some specific requests that are made here and I don't know how else we deal with it. We I think we dealt with -- dealt with Claim I already, which was the jury claim, is that right, the discrimination claim?

MR. ROSENTHAL:  Yes, Your Honor.

THE COURT:  All right.  So we're into Claim II and this is failing to investigate and present evidence with respect to Tony Mathis, that he and not Mr. Lighty killed Eric Hayes, so that now the defendant, as I understand it, wants documents implicating Mathis, records of pretrial statements by Eugene Scott, a subpoena for Prince George's County Police Department records relating to the investigation of the murder of Tony Mathis.  In general, that's what you're seeking.

MR. ROSENTHAL:  Okay.

THE COURT:  Let me hear your argument on why you think you're entitled.

MR. ROSENTHAL:  Sure.  Your Honor, can I just go back to what you say is an absence of case law on taking a look at trial counsel's errors and omissions cumulatively, because we do have case law on that.

THE COURT:  All right.  What is the proposition you're floating or stating to me?  It can't be that -- and maybe you are saying this, that even if one doesn't -- even if no error makes it, five or six together could make it.  Is that the

correct statement of the law?

MR. ROSENTHAL:  That's exactly right, Your Honor, and I want to point you to pages 4 through 6 of our reply brief where we do cite a Fourth Circuit case and also cite cases from other circuits on that exact proposition.

The Fourth Circuit case that we cite is a 2011 case called *Elmore v. Ozmint*, which was a death penalty case, though by the time it got up to the Fourth Circuit, it was no longer a death penalty.

But there the Fourth Circuit took a look at a constellation of omissions by trial counsel.  Not just one omission in trial counsel's failure to challenge evidence, but a constellation of failures that the Fourth Circuit ruled, we got to look at all this together to determine whether the result would have been different if trial counsel had successfully challenged all of this stuff that post-conviction counsel has now brought to our attention.

There's additional case law from the Seventh Circuit, Tenth Circuit and the Eighth Circuit that we cite in that regard, Your Honor.  And if I could a draw an analogy, the Supreme Court has not specifically ruled in this particular issue, but what the Supreme Court has said in an analogous context, which is the *Brady* context, is that you need to take a look at -- in evaluating materiality for *Brady* violations, you need to take a look at all of the evidence that was withheld,

not just piece by piece. *Haus v. Whitley* says, you have to take a look at all the evidence that was withheld to determine whether there's a reasonable probability of a different result.

THE COURT: That was withheld, you're not alleging in Claim II that the government withheld that evidence. You may be saying in another claim. This is saying that the attorney did not investigate or present appropriate evidence.

MR. ROSENTHAL: I'm just analogizing the *Brady* context of the ineffectiveness context. The Supreme Court has very clearly and repeatedly said that when you're evaluating a *Brady* claim, you take a look of the totality of the evidence what was withheld, not just one piece of evidence, one piece of evidence, one piece of evidence. You take a look at all the evidence to determine whether the result might have been different.

The same is true and the Fourth Circuit in the *Elmore* case analyzed it. The same is true in the ineffective context. Perhaps one omission by trial counsel would not have been enough to make a difference, but you if you cumulate all of the errors and omissions of trial counsel in a guilt phase or if you cumulate all of the errors and omissions of trial counsel at the penalty phase, that could be enough to get to ineffective --

THE COURT: Well, give me the one or two cases you principally rely on. I don't have them in hand. I'll look at them in the course of the argument because I need to pull them.

The cases that you're relying on that say that the

cumulative or use the word, constellation of errors is enough to make the case, even though any one does not in and of itself make the case.

MR. ROSENTHAL: Sure. The one that we discussed at length in pages 1 through 4 of our brief *Elmore versus Ozmint*, which 661 F.3d 773.

THE COURT: All right.

MR. ROSENTHAL: The jump site is 868 to 871. And there's a case from the Tenth Circuit, *Hooks v. Workman*, 689 F.3d, 1148. The jump cite is 1188.

THE COURT: All right. Well, that's enough for starters. We'll get those.

Go ahead. Let me hear you on your argument though. Let's get to a claim and see how well we agree with the general proposition.

MR. ROSENTHAL: So let's start with the evidence for -- or our request for evidence that Tony Mathis was the principal doer in this case, rather than Mr. Lighty which was the government's theory.

The first thing that we're asking for discovery -- one of the things we're asking for the Court to allow us to do is subpoena the Prince George's County Police Department for two differ things. One is whether Tony Mathis was actually an informant for the Prince George's County Police Department. And the second is, documents relating to the murder of Tony Mathis,

which was in 2006, a little over a year after Mr. Lighty's trial.

With respect to that particular subpoena -- well, let's go back, Your Honor, because as you will recall, you know, and as is clear, I mean, if there was actually somebody who was the person who killed Eric Hayes, the victim in this case, that was not Mr. Lighty and it was Mr. Mathis, that obviously would be significant. And defense counsel's failure to investigate and put on that evidence would have been material to the result.

Now, you remember that trial counsel's theory was that Mr. Mathis, in fact, was the doer.

THE COURT: Right.

MR. ROSENTHAL: But the evidence that they came up, we would submit, was paltry and there was a lot of other evidence out there that they could have potentially investigated, found out and ultimately put on to support that theory. It's our argument that by putting on a very weak theory or weak evidence that Tony Mathis was the principal in this case, it actually undermined the defense's credibility even more because they put out this theory that they couldn't ultimately and didn't ultimately sustain. So that's the background here, Your Honor.

With respect to a foundation --

THE COURT: Tell me what you think there is to discovery. I hear what you want to discover. What do you think you're going to potentially find in all that.

MR. ROSENTHAL:  Okay.  So two things, Your Honor. With respect to the -- with respect to Tony Mathis' potential informant status, if he was an informant, potentially that explains why the government didn't ultimately prosecute him and that would be extremely relevant here that the government chose to prosecute and to point the finger at Mr. Lighty as being the one being who shot and killed Mr Hayes when it could have been somebody who was a government informant.

Our basis for believing that he might have been a government informant is two-fold.  One, there's a declaration from Julius Miller which says this in the papers that we submitted.  And the second is a 302 of an interview of Mr. Mathis shortly before the Indictment was handed up in this case, which if you take a look at that and it's Exhibit 1 to our reply brief, Your Honor, is passing strange that Mr. Mathis, basically, gives a version of events that is entirely consistent with a confession that Lorenzo -- or a statement that another defendant, Lorenzo Wilson had made.  But he takes himself out of it and he puts into it somebody named TY, Tony, TY.  But he says, he doesn't really know who that is, doesn't really know the guy at all, just know that he's got dreads.

He basically says that TY was the guy who yanked Eric Hayes out of the car on Keating Street and seemed to have been the guy who was really the doer.  So, it's weird that this is the last thing that we hear about Mr. Mathis.

To our knowledge, he wasn't put in the grand jury.  We know he wasn't prosecuted, but there you have it.  And so, it suggests to us that what Julius Miller is saying and word on the street that we've heard on our investigation as well, though I know we can't present that to you as evidence, Your Honor, is that Tony Mathis may have been a government informant.

So that's what informs our request for evidence from the Prince George's County Police Department that Tony Mathis might have been an informant.  And if he was an informant, then that might explain --

THE COURT:  And how would counsel at trial have gotten ahold of that evidence?  I mean, he would have asked for -- tell us all the informants in the case?  How would he have gotten it, how would he have used it?

MR. ROSENTHAL:  He would have gotten it, I suppose, in the same way that we're getting it, which is that -- I mean, it would be exculpatory evidence, it would be *Brady* evidence and therefore he would --

THE COURT:  Name of an informant?

MR. ROSENTHAL:  What's that?

THE COURT:  The name of an informant would be --

MR. ROSENTHAL:  The name of an informant, any information that the informant might have given.

THE COURT:  Could he automatically have gotten the name of an informant just by going to it without a request from

the Court.

MR. ROSENTHAL: No, not necessarily, but they did have the -- some point the 302 was disclosed. I don't know when in the course of discovery the 302 was disclosed.

THE COURT: I'm sorry. Whose 302 is that?

MR. ROSENTHAL: From this guy, Tony Mathis.

THE COURT: From Mathis?

MR. ROSENTHAL: From Mathis, correct.

MS. WILKINSON: Meaning FBI. I think he means, who wrote it?

MR. ROSENTHAL: Oh, who wrote it? The FBI wrote it. It was Agent Bradley that wrote the 302. So it was the case agent and it's the FBI case agent in this case. And in that interview was Detective Chaney who was the Prince George's County Police Department officer.

THE COURT: So just walking back to the trial without a request, simply saying to the government, we'd like the name of the informant as part of the exculpatory evidence, you wouldn't have gotten that without the request of the Court, would you?

MR. ROSENTHAL: Well, maybe not, but I mean, Your Honor --

THE COURT: You're arguing ineffective assistance, what he could or couldn't do. So, you're saying, well, maybe he should have asked the Court to disclose the name of an informant

on the grounds that it was *Brady*.

MR. ROSENTHAL:  Perhaps he could have asked the Court, but they already had Mathis' name.  They knew about Mathis, okay.  I mean, Mathis was the guy that they pointed the finger at at trial.

THE COURT:  So, are you suggesting then that the government had reason to believe that Mathis was the shooter, but they did not prosecute him or whatever because he was an informant and they didn't want to compromise that status.  Is that the implication of what you're saying?

MR. ROSENTHAL:  Potentially, yes, Your Honor.

THE COURT:  All right.  I'm just trying to walk it through with you.

MR. ROSENTHAL:  Yes, sure.

THE COURT:  And that this is something that counsel at trial should have understood?

MR. ROSENTHAL:  Should have explored further, correct.

THE COURT:  Explored in what sense?

MR. ROSENTHAL:  Explored in terms of doing investigation and making a specific *Brady* request of the government for the kind of cooperation that Tony Mathis might have provided.

THE COURT:  Do you know what he did or didn't do regarding Mathis?

MR. ROSENTHAL:  What who didn't do?

THE COURT: Well, he certainly was exploring the ways in which to potentially implicate Mathis, wasn't he? Wasn't the -- Mathis' girlfriend was called in the case and she tried to say that --

Well, I'm not sure. Why did he call Mathis' girlfriend, as I recall? I need to understand from you what counsel did or did not do, not would it have been a good idea to have had all of this, but whether he was ineffective in not doing certain things. And my specific question about getting information about the informant's status, I'm not sure he could have done that. I mean, that's where I'm --

MR. ROSENTHAL: But to be clear, it's not just getting information about the informant status. It's getting information about the cooperation that might have actually been provided by him and what if any -- what if anything he received in return and potentially did he receive in the turn some kind of non-prosecution agreement, whatever it was?

THE COURT: You have the 302 now?

MR. ROSENTHAL: Yes, Your Honor.

THE COURT: What does it stay in there that potentially raises what, that Mathis is the shooter? What does it say that you think you pin your argument on?

MR. ROSENTHAL: So, Your Honor, again this is Exhibit 1 to our reply brief and it's three pages long. I don't want to go through it all, but basically what he says is that he,

Mathis, was on Keating Street the night of Mr. Hayes' murder. He sees a car drive up with four people in it. He knew three of the people. He knew Baby Am, Lorenzo Wilson. He knew June Bug, James Flood. He knew Goat, Kenny Lighty. And then there was a fourth guy, TY, who he said he didn't really know, but he described him.

He said that TY dragged an unknown male out of the back of the Lincoln. June Bug was driving, that's Flood, and Lighty was the front passenger. Mathis advised that he had been driving in that same Lincoln earlier in the day with Lighty, with Flood and with Wilson when they went to a liquor store. They returned to Keating Street after going to the liquor store, drank beer and then Mathis happened to leave to catch the 7:00 p.m. bus back to his mother's place. But he said he missed the bus and came back to Keating Street, which is when he saw the Lincoln pull up with these four individuals and the one individual who was dragged from the car.

He says, he knew the three individuals who were masked were Lighty, Wilson and Flood, because I know them and I was just with them earlier. And he said that when he saw the unknown male pulled from the car, presumably the victim in this case, Hayes, I knew what was going to happen, so I just walked away. I heard one shot and I just kept walking. I didn't even look back.

Then he described some of the people he thought was

out on the scene at the time and then he describes why he thinks this happened.

And then he gives some very vague information about this unknown guy, TY, who is the man who dragged the unknown guy, presumably Hayes, from the car.

THE COURT:  Okay.  Now, how did you get this 302?

MR. ROSENTHAL:  This 302 was provided in discovery to counsel.

THE COURT:  Which counsel, to you?

MR. ROSENTHAL:  No, to trial counsel, pretrial.

THE COURT:  Okay.  And he should have known what as a result of that?

MR. ROSENTHAL:  Given the extraordinarily odd contents of that, which basically puts Mathis right there and suggest -- I mean, TY, Tony, I don't know, suggest that Mathis is the guy himself.  Should have made follow-up requests.

A, should have investigated, which he did some investigation, but should have investigated more extensively. But more importantly, should have explored the idea that Mathis was a cooperator and the reason that Mathis wasn't being prosecuted in this case is because he was a cooperator, which is evidence that obviously would have helped to bolster their theory in the case that Tony Mathis was the guy who actually did this.  He was the guy who pulled the trigger, not Mr. Lighty.

THE COURT:  All right.  So you want the records from

Prince George's County.

MR. ROSENTHAL:  Right, about his informant status.

THE COURT:  And secondly, about his murder?

MR. ROSENTHAL:  I'm sorry?

THE COURT:  And secondly, about his murder?

MR. ROSENTHAL:  Yes, and secondly --

THE COURT:  What will his murder tell us or what would it?

MR. ROSENTHAL:  Well, again, Julius Wilson in his declaration, which is an exhibit to our motion as well, Julius said he was, he being Mathis was murdered in retaliation for Mathis' cooperation in this case, in the case involving Mr. Hayes, the victim here.  And so, both of those request in a subpoena would be related because both have to do with Mathis' informant status or the information that Mathis may have given to the government and the consideration he may have received as a result.

THE COURT:  To what extent was Mathis' testimony used by the government?

MR. ROSENTHAL:  Mathis' testimony wasn't used at all.

THE COURT:  Okay.  So the theory being what then? That maybe it was being used, but the government didn't tell you about it?

MR. ROSENTHAL:  Well, I don't know.  I mean, you know, whether Tony Mathis -- we have no suggestion that he was called

to the Grand Jury.  We have no suggestion that he did anything other than give this statement in the 302.

THE COURT:  All right.  Let me hear from the government on this point.

MS. WILKINSON:  Well, Your Honor, the government is left a lot of times in responding to this as if we're giving them the answers to what they're asking for in their discovery. They're asking us, was Tony Mathis a cooperator?  It's almost kind of silly in this case, Your Honor, the idea that Ms. Johnson and I would prosecute this case and Mr. Mathis was a cooperator that we didn't tell the defense about, but then we didn't call him at the trial where we had no person that was talking about what actually happened at the events of that particular night.  In other words, it doesn't make any sense what they're asking for.

THE COURT:  Why wasn't Mathis called?

MS. WILKINSON:  Your Honor --

THE COURT:  I'm sorry?

MS. WILKINSON:  I think that it's clear from the record, Your Honor, that the government believed that Tony Mathis was possibly the fourth person involved in this event that night.

THE COURT:  Right.

MS. WILKINSON:  But that the concrete evidence, the evidence that the Fourth Circuit called ironclad that was

introduced before the jury was that three men were picked up minutes after the 911 call by the two girls, Crystal Falls and Melissa Coles, and they picked up Wilson, Lighty and Flood and they were tied to the car that Mr. Davis, the eyewitness had seen Mr. Hayes being pulled out of.

And all of the notion that Tony Mathis was the shooter is completely undermined by the fact that Mr. Hayes did not die at the site of Keating Street.  If the Court will recall, that was the argument to be made that somehow Mr. Mathis or I don't know, anybody else other than Mr. Lighty shot Mr. Hayes on Keating Street, threw his body into the trunk of a car where there was no blood that would be indicative of that kind of mortal wound, drove him to the dead end outside Mr. Davis' house and tossed his body out is completely belied by all the concrete evidence in this case.

And the problem with the speculation that defense wants now, we provided the information about Tony Mathis and Mr. O'Toole used it the best way he could to make some inferences about whether another dude did it, but it didn't happen, so the evidence wasn't very powerful of it.

But to request now documents, it's almost like I'm in a catch 22.  I don't know what they're asking for even exist, but certainly by just the history of this case and common sense that Mr. Mathis wasn't a cooperating witness that the government let walk knowing he was the shooter and yet, didn't call him

against the people we're trying to implicate.  That makes no sense.  And that's what Mr. Rosenthal is arguing here, that somehow the government -- because we interviewed Mr. Mathis and got his view.

And remember, a lot of people gave statements about what happened that night.  Mr. Wilson did, Mr. Whitley did.  Everybody said something slightly different pointing at somebody else.  And that's why the evidence of what truly happened is so compelling here.  From the testimony of the phone records and Mr. Davis and the girls who picked up them afterwards and all the corroboration of that.  And that's why these requests are so speculative.

We provided the information to Mr. O'Toole of Mr. Mathis' possibly being a fourth person involved.  Perhaps the government didn't prosecute him because we didn't get enough evidence to be able to prosecute him because he wasn't there at the time Crystal Falls and Melissa Cole picked them up minutes after the murder, after the 911 call.  I mean, the sequence of events was so powerful at trial.  And that's why I'm having trouble with responding to request that it's so speculative in nature that suggesting somehow that Mr. O'Toole should ask for something that doesn't even make sense.

I mean, if Mr. Mathis was the secret informant that the government was hiding so we could point -- falsely accuse another man of the shooting, there's just no evidence of that,

Your Honor.  That's outrageous.

And I don't even think that's what Mr. Rosenthal is saying.  He's saying that Mr. O'Toole should -- somehow should have mushed up the record a little bit more by asking more about Mr. Mathis.  There wasn't anything else.  We provided him what we had and that was the interview of Mr. Mathis in the 302, and what other people said about Mr. Mathis.

THE COURT:  The question would be whether based on what you gave them, which at this point only the 302 in timely fashion, what could he have reasonably have done with it that he didn't do with it?

MS. WILKINSON:  I don't know, Your Honor.  I think Mr. O'Toole did a good job trying to skew the evidence away and raise reasonable doubt.

THE COURT:  What more did he do besides call the girlfriend in terms of trying to make it look like maybe it was Mathis?

MS. WILKINSON:  It depends on the guilt or the innocence phase.  I think at the guilt phase t was only to call the girl.  Let me -- I'd have to go back and check.  There might have been one other thing that he argued as well with regard to the clothing he was wearing and whether she had seen him.  It could be that he just called her.  I'd have to go back and check the record, Your Honor, whether there was something else that he argued as well and there was cross-examination of other

witnesses.

THE COURT:  Could he have called Mathis?

MS. WILKINSON:  I suspect Mr. Mathis had a Fifth Amendment privilege.  Maybe he tried to, we don't know.  We don't know from this record because nobody has talked to Mr. O'Toole about what he did or didn't do.  I don't know.

THE COURT:  Have you talked to Mr. O'Toole, Mr. Rosenthal?  Do you know what he did or didn't do in this regard?  I mean, I'm sort of -- it's sort of a situation where he's not defending himself on what he did try to do.  It's always a problem in these infective assistance claims where the attorney has to come back to say, wait a minute, I did some stuff here.

MR. ROSENTHAL:  Sure, we've had discussions with Mr. O'Toole, but to be clear, at this point, Your Honor, the question is not, you know, did Mr. O'Toole and Ms. Dayson do this or didn't they do that.  The question is, have we in the pleadings that we've made raised a plausible allegation that they failed to do something.

THE COURT:  Well, that's what you say.  I mean, when you say somebody --

Wait a minute now.  You say somebody failed to investigate.  How do I do that without knowing what he did do or didn't do?

MR. ROSENTHAL:  Well, we've alleged because we believe

having conducted investigation prior to doing this motion that he did fail to follow up with -- on the Mathis angle in this regard or we wouldn't have made that allegation.

THE COURT:  Let's put a fine point on it here. Suppose he read the report and said, you know, I can't do anything with this.  What can I do?  I probably can't call Mathis because he may have a Fifth Amendment privilege.  Only thing I can say is he was there at Keating Street at the time and that doesn't really put him where the shooting takes place. And I've got a witness who can say somewhere in that day or so of the shooting, Mathis had blood on his shoe.  That's the best he could do.

But you say, he didn't investigate.  As far as I know, he read the report and can't use it, doesn't help.  And you say, had he got the report, he could have -- and you say, I'm not sure what.  He could have done something more.  He could have found out from the government whether Mathis was an informant or found out --

How long after the trial was Mathis murdered?

MR. ROSENTHAL:  It was the next year.  I don't know in terms of months.

MS. WILKINSON:  2006, Your Honor.  The trial was in 2005.

THE COURT:  On the grounds that, I mean, the ideas that although he doesn't figure into the trial and his testimony

is not used by the government in its case in chief, he might have been murdered because he, in fact, believably was cooperating.  That's kind of where we are.

MR. ROSENTHAL:  But, Your Honor, there's also the -- our principal claim with respect to this is that, you know, reading this report, he should have followed up and made request of otherwise investigating the possibility that Mathis was an informant and that's why there was no follow-up with Mathis in this case.

Now, do we know whether or not that's true, whether there's records to show that Mathis was an informant or not? No.  That's we why we're seeking discovery on this.  But if in fact those records exist and they would have been available to Mr. O'Toole and Ms. Dayson at trial, and they failed to investigate that angle and failed to obtain those records, that would mean that they were infective because they tried to suggest to the jury through one witness as Your Honor suggested, that Mathis was in fact the doer here and there was a lot -- there could have been a lot of other evidence out there.

I mean, that's the purpose of discovery, Your Honor. We can't sit here and tell, you know Mathis was an informant and therefore we know that these records exist and that O'Toole and Dayson didn't get them.  We can't sit here and say that.  That's why we're making the discovery request, but we have a good faith basis for making it which is the Julius Miller declaration and

Exhibit 2.

THE COURT:  Where is the Miller declaration?

MR. ROSENTHAL:  It's one of the exhibits to our motion, Your Honor.

MS. WILKINSON:  Your Honor, Mr. Miller's declaration was submitted in connection with the new trial motion in this case and the Court found that Mr. Miller's declaration was either confused or false.

THE COURT:  Oh, that was together with --  was that with Whitley's affidavit as well?

MS. WILKINSON:  Right, but during the recantation of Mr. Whitley, Mr. Miller -- so the Court has heard all about Mr. Miller's statement in the affidavits and there's nothing new that is added to this motion than the one the Court is already aware of in the context of those motion.

MR. ROSENTHAL:  It's Exhibit 4 to our opening brief, Your Honor.

MS. WILKINSON:  But, Your Honor, if the counsel and again, this is, you know, the kind of a weird posture that this is in, seeking discovery about Mr. Mathis, if Mr. O'Toole made requests for *Brady* information and the government said, you have everything here, Mr. O'Toole, and Mr. Rosenthal is suggesting that somehow if the government based on nothing except speculation that somehow we hid the fact that Mr. Mathis was given a break for his being a shooter against Mr. Hayes so we

could falsely implicate Mr. Lighty, that's the most outrageous *Brady* claim in the world.  And I guess he's suggesting he should get discovery to try to find out if that is possibly true.  And that just makes no sense.  This turns the whole systems on a head.

Mr. O'Toole did ask for *Brady* information.  We provided things like that 302 for him.  The reason why he came up with the defense that maybe perhaps another person did it is because we gave him that arguable *Brady* information.

And the idea that he's suggesting that there could be other stuff out there is what kind of turns this on -- there's no evidence of that, none.  And the fact that he's asking for something that could -- it's just an odd posture that we're in, Your Honor, because Mr. O'Toole did ask for *Brady* information.  Of course, he did.  And it was a very contentious, zealous representation he gave of Mr. Lighty.

And the reason why that 302 is provided isn't because Mr. Mathis was going be a witness.  It wasn't Jencks.  So, why did the government provide it?  We provided it was because it was possible *Brady* information and we gave it to him.  What else is there?

THE COURT:  All right.  I see also in Claim II there's some suggestion about the evidence that came in about Afton Street and that being that there was no appropriate investigation regarding Afton Street.  Is that on the -- that's

on the guilt phase still?

MR. ROSENTHAL:  That pertains -- I mean, just like all the stuff that we're talking about right now pertains to both guilt and penalty phase.  I mean, talking about the map as evidence, obviously, you know, if in fact there were credible evidence that somebody else did the shooting, yes, that plays into the guilt phase, but obviously it bleeds over into the penalty phase.

THE COURT:  Well, but you don't retry it in the penalty phase, right?  It's the same jury, right?  I mean, they heard it.

MR. ROSENTHAL:  Yes, but I mean if trial counsel failed to investigate and failed to put on credible evidence that Mr. Mathis was the one who shot Mr. Hayes, yes, that could be ineffectiveness in the guilt phase for sure, but it could also be ineffectiveness in the penalty phase.

THE COURT:  But the reverse is also true that if he wasn't ineffective on the guilt phase, he wasn't on that point ineffective on the penalty phase, because he --

MR. ROSENTHAL:  If there was no evidence that he --

THE COURT:  What he did or did not do, this is proposition the government is proposing, what he did or did not do regarding the role of -- possible role of Mathis as the shooter, if he did -- what he did was not substandard, was not substandard in the guilt phase, it was not substandard in the

penalty phase.  I mean, I see what you're saying.  If it was ineffective in the first instance, it would necessarily be in the second, but --

MR. ROSENTHAL:  Or, Your Honor, I mean to -- I mean, you could and this is just hypothetical, but you could have a failure to investigate and to prove that Mathis was the shooter.  It could be a guilt phase ineffective claim, but the government could say, well, he still could have been found guilty of, you know, murder of the course of the kidnapping, even if he wasn't the person who shot him, right.  And so, it may not have made a difference in the guilt phase, but it absolutely would have made a difference in the penalty phase because if he wasn't --

THE COURT:  I don't recall what he argued.  I'm not sure it would require new evidence, though, would it, in the penalty phase?

MR. ROSENTHAL:  It wouldn't have required new evidence, no, Your Honor.

THE COURT:  It would have been a matter of argument, I suppose, that was or wasn't made.

MR. ROSENTHAL:  Right, but all I'm saying is the evidence we're seeking pertains to the claims, two different claims, right, the guilt phase ineffectiveness claim and penalty phase ineffectiveness claim.

THE COURT:  What more do you want to say about the Afton Street shooting?  You asked for more information regarding

the Afton Street homicide shots --

MR. ROSENTHAL:  Before going to Afton, Your Honor, there are two other pieces of evidence that we are seeking with respect to Tony Mathis' role in this.  One is production of evidence by the government about the carjacking of James Flood, one of the co-defendants in this case that might have been the precipitating event for the murder of Mr. Hayes.

And the reason that that is potentially relevant here is because there is evidence in the pretrial record from Grand Jury testimony saying that -- showing that Flood was in fact carjacked just a little while before Mr. Hayes was killed.

Flood and Mathis, Tony Mathis were very close.  Lighty and Wilson were much younger than these guys and were not close with them.  So to the extent that the motive for killing Mr. Hayes could have been the carjacking of Mr. Flood and there's some evidence to suggest that the people who carjacked Mr. Flood were the cousins of Mr. Hayes and Mr. Hayes' drug supplier, that counsel would have been ineffective in failing to get that additional evidence.

THE COURT:  Because why?

MR. ROSENTHAL:  Because if they could show that the motive for the killing of Mr. Hayes was the carjacking of Mr. Mathis' close associate, Mr. Flood, then the defense's theory at trial that Mathis was the shooter would have been more credible.  That's why, Your Honor.

THE COURT:  You want to respond to that, Ms. Wilkinson?

MS. WILKINSON:  No, I don't -- again, Your Honor, a lot of this is just speculation about what Mr. O'Toole should have done and we don't know that he didn't consider those things.  And besides they were ridiculous in light of the evidence.

THE COURT:  I thought there was testimony, my recollection going back over papers and it's been a while was that there was some kind of retaliation against Hayes because of a carjacking.

MS. WILKINSON:  Yes, Your Honor.

THE COURT:  And I'm sure that came into evidence. Now, I don't know whether it was my cousins or whatever, but someone says, my man's car has been stolen or --

MS. WILKINSON:  There was testimony from Eugene Scott that --

THE COURT:  What's that?

MS. WILKINSON:  There was testimony that Mr. Hayes and his friend were approached by Mr. Lighty and the others because they were trying to find the people who stole Eugene Scott's car.  Eugene Scott was a witness at trial, Yogi.  And that somehow when they thought Mr. Hayes met the description, that he was the one taken to Yogi down on Keating Street who said, no, that's not him and he was shot anyway.

So the evidence that was at trial that the government produced was that was a possible motive for Mr. Hayes' murder was that he was believed to be involved wrongfully in some sort of car theft of Yogi.

THE COURT:  Mr. Rosenthal is saying -- is trying to tie it to Mathis, not Eugene Scott.  I don't know where that comes from candidly.

I guess, Mr. Rosenthal, I'm going to continue to be troubled by the fact that I don't know what O'Toole did or didn't do.  And you're saying, well, he could have done it and maybe he -- I don't know whether he did it, but if he had done it, this result.

MR. ROSENTHAL:  Your Honor, we have alleged that he didn't do it.

THE COURT:  I know you've alleged it.  You can allege anything.

MR. ROSENTHAL:  But, Your Honor, we are not in the merits right now.

THE COURT:  Wait a minute.  You don't just come into court in habeas corpus and allege anything and say, and therefore, I really want to open this case from ground zero. That's the implication of what you just said.

As in any case, there's got to be plausibility to what you say.  You haven't talked to -- apparently in any depth, if you talked to him at all, you haven't talked to O'Toole.  You

don't know what he did.  And so when it comes to that, is there a plausible basis for you to allege?

I don't buy the proposition that merely coming in here and alleging without even having a sound basis for knowing whether or not gets you through the gate to the next phase. That's what you're saying.

MR. ROSENTHAL:  No, it's not, Your Honor.  I take seriously and Ms. Brain takes seriously, and our co-counsel at Federal Defenders office take seriously our obligation --

THE COURT:  Of course you do.  I'm faulting you on your logic.  I'm not faulting you on --

MR. ROSENTHAL:  My logic is that we would not have alleged that Mr. O'Toole and Ms. Dayson failed to do these things unless we have a good faith reason to make that allegation.  So I am telling you we have a good faith reason to --

THE COURT:  And what is that?

MR. ROSENTHAL:  From investigation that we did, including talking to Mr. O'Toole and Ms. Dayson prior to filing our 2255.

THE COURT:  You say you talked to O'Toole and he concedes he didn't do any of these things?

MR. ROSENTHAL:  Your Honor, we have found no basis in the record to believe that they explored further the idea that James Flood, one of the co-defendants in this case and

Mr. Mathis' closest friend was carjacked potentially by Eric Hayes' cousins in the month or two before Mr. Hayes was killed.

THE COURT:  And that's why Hayes was killed by Lighty or Flood or Wilson, right?

MR. ROSENTHAL:  We would allege that they had an obligation to investigate that potential motive for the murder of Hayes, because that would tie the murder more closely to Flood and to Mathis than it would to our claim, Mr. Lighty.

THE COURT:  All right.  What else do you want to say under Claim II?

MR. ROSENTHAL:  So, the other piece of evidence on Mathis, Your Honor, actually goes to what you were alluding to before and what Ms. Wilkinson was talking about, which was Eugene Scott, who was the witness the government put up at trial to suggest a different motive in the case, which is that Mr. Scott's car had been stolen and for that reason the people who were defendants in this case and potentially Mr. Mathis would have wanted to seek vengeance on Mr. Hayes who they believe stole Mr. Scott's car.

That was the government's motive theory at trial. They didn't run with it that hard, but that was the motive theory at trial.

Mr. Scott, you know, based upon our investigation, you know, was interviewed by -- found by and interviewed by the government in support of this motive theory shortly before

trial.  There was no *Jencks*, there was no *Brady* disclosed to defense counsel in advance of Mr. Scott's testimony.  Mr. Scott just testified.

So what we're asking for is evidence that -- evidence of pretrial statements that Scott gave to either the FBI or Prince George's County Police Department when he was interviewed before the trial.  We know that O'Toole and -- we know that O'Toole's investigator talked to Mr. Scott before trial, presumably after being told by the government that Mr. Scott was going to be a witness in the case.  And Mr. Scott told them, I gave statements to the government in advance of, you know, saying that I guess I would have to show up in response to a subpoena.  But as best we can tell, Mr. O'Toole and Ms. Dayson never asked the government directly for those statements once they found out from Mr. Scott that he had made statements to the government prior to testifying.

And in the absence of receiving *Jencks* or *Brady* material from the government after hearing from Mr. Scott, we allege that they should have found out what it was that Mr. Scott told the government exactly in the government's view before Mr. Scott testifies so that he can material to impeach him with.

THE COURT:  Ms. Wilkinson, what do you say about that?

MS. WILKINSON:  Your Honor, I do recall Mr. Scott was a late discovered witness.  And again, Mr. O'Toole did ask us

for *Jencks* and *Brady*.  I don't know what Mr. Rosenthal thinks exist that the government didn't provide.  If we didn't provide his grand jury testimony, it's because he didn't testify in the grand jury.  And if he -- there wasn't a memo because he was a witness that came forward late and that his statement was his oral statement that he provided.

I don't recall the specifics of it, but Mr. -- we obviously provided *Jencks* and *Giglio* information to all of the government's witnesses.  And Mr. O'Toole asked for *Jencks* and *Giglio* for all of government's witnesses.  And if it didn't get provided, it's because it didn't exist.  Does that make sense, Your Honor?

THE COURT:  Again, what would you expect, Mr. Rosenthal, might have been revealed in this Scott statements that would have helped your case?

MS. WILKINSON:  There's no allegation it was inconsistent with what he testified to.

THE COURT:  Well, I mean, is there something about his background, criminal history, plea bargains, is that what you're looking for?

MR. ROSENTHAL:  Yes.  So, well, the defense investigator's memo we included as an exhibit to our motion, Your Honor.

THE COURT:  Where is that?

MR. ROSENTHAL:  It is -- give me a second, Your Honor.

I'm sorry.

It's Exhibit 3. And there in the last paragraph on page 2, it says, "Scott met with the detective and the detective gave him the subpoena to appear in criminal court. Scott went to court. He met with the prosecutors and the FBI. When Scott met with them, he denied he had been on Keating Street. The agent said that they had several people who placed Scott at the scene. If Scott testified on the stand that he had not been there that night, they would charge him with perjury and he would get five years in jail.

The agents also said that they had spoken with individuals who said that Scott had sold them crack cocaine. Scott said these threats were made when the prosecutors were outside of the room. Scott said he finally admitted that he had been on Keating Street when the boxy car came up suddenly upon him."

So, Your Honor, I mean, perhaps it was that no 302 was created. Seems to us that the detective or the case agent must have made some notes or something to that effect that defense counsel should have followed up with the government on in advance of Mr. Scott's testimony so they actually had what in the government's view Mr. Scott told them, which would have been inconsistent with what Mr. Scott testified to at trial.

So there would have been additional impeachment evidence of Mr. Scott that the government failed to obtain --

I'm sorry, defense counsel, trial counsel failed to obtain from the government in advance of Mr. Scott's testimony.

And I grant that all of this is happening in a concentrated period of time.  Mr. Scott testified on October 6, 2005.  Defense investigator was able to run him down on October 5th.  So there wouldn't have been a whole lot of time to make the request of the government for any notes that the detective or the case agent might have made with respect to these interviews with Mr. Scott, but it seems there's reason to believe that there must be something there even if it was in the form of a 302 from the FBI or a formal investigative report from the Prince George's County Police Department.

MS. WILKINSON:  Your Honor, I guess I'm confused because Mr. O'Toole did everything that he was supposed to do.  He sent an investigator out to interview Mr. Scott.  I mean, it's right here.  Again, I don't know what the allegation is that he didn't do.

THE COURT:  This is O'Toole's investigator?

MS. WILKINSON:  Yes.

THE COURT:  And he said he was pressured by the --

MS. WILKINSON:  He had whatever information he needed to --

THE COURT:  I don't have the transcript of the -- was he crossed on this?

MS. WILKINSON:  I don't recall one way or the other.

THE COURT: Do you have the transcript on this as to whether he was crossed on this?

MR. ROSENTHAL: I do -- I mean, yes, of course we have the transcript. I don't have it handy, Your Honor.

THE COURT: Well, wouldn't that be relevant? If he's got this information the next day about being pressured to testify, being potentially charged with perjury --

MR. ROSENTHAL: We don't know what we don't know, Your Honor, because I mean, we don't know what the government's notes say about what Mr. Scott said. We have Mr. Scott's rendition to the defense investigator, but it could be that the government's notes say something different, something more, something that would have given Mr. O'Toole and Ms. Dayson more grounds for cross-examination.

THE COURT: So you want handwritten notes of the government that did not become a 302 rendered, I guess what, the day before?

MR. ROSENTHAL: We're not sure exactly when it was that the government tracked down Mr. Scott. I mean, we're just -- the defense investigator tracked him down the day before he testified. Obviously, the government tracked him down some time before that, a week or two before that?

THE COURT: Okay. Let's go back to the relevance of Scott. Scott is relevant not because it's his car he says or -- that's potentially carjacked, but Mathis' car is potentially --

MR. ROSENTHAL:  No, he says it was his car.

THE COURT:  But you want to probe Scott to see whether in fact maybe it was Mathis' car that was --

MR. ROSENTHAL:  No, not --

THE COURT:  Not used in the burglary, but was used in the carjacking sometime prior.

MR. ROSENTHAL:  No, the idea is that the government put on Mr. Scott as a witness in order to try to establish the motive for the killing.  If there were grounds for impeaching Mr. Scott and the --

THE COURT:  Beyond what was discovered by the investigator the next day?

MR. ROSENTHAL:  Yeah, beyond what was discovered by the investigator the next day.  And they were in the government's possession and defense counsel failed to ask for those notes, which they had reason to believe existed based on what their investigator found out, they could have been ineffective.

Again, we don't know what the notes say, because we don't have them.  So whether the notes say anything more that could have given Mr. O'Toole and Ms. Dayson grounds for additional cross-examination and additional impeachment of Mr. Scott, we don't know.

THE COURT:  All right.  Are we done with Claim II or is there more to say?

Whitley I think is also in Count Two and I dealt with Whitley before. There was a feeling that Whitley was changing his mind years after the fact, but you're back on Whitley again. I think you want to depose him even, right?

MR. ROSENTHAL: Yes, Your Honor.

THE COURT: Why am I revisiting that?

MR. ROSENTHAL: Here's why you're revisiting that, Your Honor. In the arrest warrant affidavit for Lorenzo Wilson, one of the co-defendants who was tried separately in front of you, there is a statement -- and, again, this is an exhibit -- Exhibit 5, I think. Yeah, Exhibit 5 to our memo in which it says, the witness has previously -- and the witness here is undoubtedly Mr. Whitley.

"The witness has previously provided detailed information regarding other crimes of violence and narcotics trafficking that has been corroborated by other sources."

So you have in a sworn affidavit by a Prince George's County Police detective a statement saying that Whitley provided cooperation and was an informant in other cases. This was not evidence that was disclosed to the defense. It is not evidence that the defense sought to obtain from the government, even though it had this Arrest Warrant Affidavit and clear evidence that Whitley had provided cooperation -- provided information in other cases before.

This is completely different than the stuff you've

heard about Whitley before, Your Honor.  This stuff would be additional impeachment information of Whitley and this is -- this goes to two things.

A, it goes to potential ineffectiveness because the defense had this in its possession, this arrest warrant affidavit for Wilson in its possession and further to specifically follow up with the government to obtain any information regarding Whitley's history of cooperation, number one.

And it's also the one thing that we're seeking in connection with our *Brady* claim, which is that the government had an independent obligation to disclose this evidence of Whitley's history as a cooperator and failed to do so.

THE COURT:  But you knew extensively that he was inquired extensively about his criminal history?

MR. ROSENTHAL:  His criminal history, sure, but not his history of cooperation and parlaying information to the government so that he could get consideration in the cases that he had against him.

Yes, there was -- there was information provided about the benefits he got for his cooperation in this particular case, but these other cases, these other crimes of violence and these narcotics offenses that he supposedly gave information to the government about, presumably to the Prince George's County Police Department about, not the FBI, there was no information

provided on that, Your Honor, that history of cooperation. Nor was there a specific defense request or follow-up with the government to obtain information about that extensive history -- apparently extensive history of cooperation.

THE COURT: And that would have suggested what, beyond the fact that he clearly was, I gather, cooperating in this case?

MR. ROSENTHAL: Charles Whitley was the key witness in this case.

THE COURT: Yeah.

MR. ROSENTHAL: And, yes, defense had evidence, information about the benefits he received for cooperating in this case. But if he has a history of cooperation, Your Honor, that's obviously additional impeachment material that could have had a greater impact on the jury's consideration of Mr. Whitley's credibility.

THE COURT: Could have cut the other way too, couldn't it? I mean, this guy is making deals left and right. Why should you believe him now?

MR. ROSENTHAL: We don't know until we know, Your Honor.

THE COURT: Well, the question is whether on this record, is it sub-standard if there was potentially a judgment call made. You know, most ineffective assistance claims do not go to the kind of discovery that you're seeking here.

Basically, with all respect and you're doing your job, you're opening up this entire case. You are second-guessing every decision that was and wasn't made by counsel here, including Whitley who has already been rejected by this Court as having any credibility. I mean, that's --

And you're saying, it's on this record, let us go, Judge. Let us open it all up again. I'm not persuaded, candidly, that that's the right approach in the case.

MR. ROSENTHAL: There are two things about this evidence regarding Whitley's cooperation, Your Honor. First, put aside the ineffectiveness claim. It's also evidence that we're seeking in support of a *Brady* claim, okay. So the next claim in the case, because it's clearly exculpatory impeaching information that should have been disclosed and wasn't.

But the second thing is, you were suggesting that Mr. O'Toole and Ms. Dayson made a strategic decision to not seek this additional evidence impeaching Mr. Whitley. And there's no evidence to suggest they made a strategic decision not to seek the --

THE COURT: No, I think you're -- maybe I didn't make myself clear on my point. To suggest that this man may have been charged in the past and he was, and it sounded like he was getting a deal maybe now from these other events, you want to say that in addition, he was a cooperator and somehow having been a cooperator in the past undercuts his credibility in this

case.

I'm not sure that's a correct statement.  The implication could be that this guy cuts deals left and right.  He's not to be believed at all or is to be, whatever.  That would be the way the cross-examination would go.

MR. ROSENTHAL:  Your Honor, as you well know there is a long memorable line of case law that suggest that a witness' history of cooperation is impeachment evidence that must be explored by defense counsel and must be turned over by the government.

Yes, it's possible the jury could have viewed it that way, but it's also very possible the jury could have said, Charles Whitley is not at all a credible witness.  And to the extent that he is the only one who says that Mr. Lighty was the shooter in this case, because he was the only one who said that Mr. Lighty was the shooter in this case based on an admission that he claims Mr. Lighty made to him, which he subsequently recanted, the jury may have not -- may not have believed that.  And certainly may not believe that for purposes of the penalty phase, Your Honor, where Mr. Lighty's life was hanging in the balance.

And that's something that's really important to continue to consider here, which is that if the jury were to believe that Mr. Lighty wasn't the shooter, but was involved, they may well have convicted him at the guilt phase, but they

may well have not sentenced him to death.

And so, evidence that somebody else was the shooter, that Tony Mathis was the shooter, that Charles Whitley was a totally incredible witness in suggesting that Mr. Lighty was the shooter, that is relevant to the ineffectiveness claim in the penalty phase, Your Honor.

THE COURT:  I'm looking at Mr. Whitley's trial statement.  This is -- I went back to that in particular, October 7th, 2005.  This is at page -- redirect by Ms. Wilkinson starting at page 198.

"Question:  Mr. Whitley, problems you had in March of 2002 involved your girlfriend, correct?

"Answer:  Yes.

"Question:  Do you know whether or not your girlfriend ever showed up to court on those charges?

"Answer:  I don't think so."

Dropping down.

"And do you know whether or not the police lifted a finger for you on those charges?

"Answer:  I don't know.

"After that, Mr. Whitley, did you testify in the Grand Jury about what you told the jury today?

"Answer:  Yes.

"And did you testify under oath?

"Yes.

"And did you provide the same information you're telling the jury here today?

"Yes.

"And at that time, your girlfriend had already not shown up for court?

"Correct."

Line 20 at page 199, did I tell you to say that Mr. Lighty told you about the Foamposite Nike shoes?

"Answer:  No.

"Question:  Who first told the police about the fact that Mr. Lighty told you about the Foamposite, Foamposite, whatever tennis shoes?

"I did.

"Question:  Where did you get that information?

"Answer:  Mr. Lighty.

"Question:  Did the police put those words in your mouth?

"No.

"Question:  Did the police ever say it's important for us to tell you that it was a Foamposite tennis shoes.

"Answer:  No."

I'm then dropping down to line 20 at page 200.

"Did I ever offer you anything for your testimony here today, Mr. Whitley?

"Answer:  No.

"Question:  Did I actually have you arrested to come here today and testify at one point?

"Answer:  Yes."

Page 202, line 2.

"Did you tell the police the truth on March 27th and March 28th, 2002?

"Answer:  Yes."

And then statements are shown to him, et cetera. So, I guess, are you saying that there's some doubt about the bona fides of the government with respect to the *Brady* production?  Is that part of your submission, because maybe they did have something on Whitley that they didn't -- when he answered her questions under oath at trial, maybe she was covering up or what?

MR. ROSENTHAL:  Your Honor, those questions that I think I heard you read were specifically about cooperation in this case and benefits in this case.  What we're suggesting is that, A, Mr. O'Toole and Ms. Dayson failed to follow up on what's in this arrest warrant affidavit suggesting that there's a history of cooperation by Whitley, not just in this case, but in other cases, number one.

And number two, that the government, in particular the Prince George's County Police Department, I have no idea whether they gave this history of cooperation over to the prosecutors or not.  I'm not suggesting they did, but it looks like the Prince

George's County Police Department has a record of Mr. Whitley's cooperation that wasn't ultimately disclosed and that is a *Brady* question.

THE COURT:  Let me pose the question to you this way: Suppose that Mr. O'Toole could have said, okay, maybe we could find out about whether Whitley was a cooperator in the past, but frankly, I don't think it would add anything to the case right now whether he cooperated in prior crimes or not, because the issue here is did he cooperate here now and he said he wasn't a cooperator.

And suppose that was his thinking.  Suppose it could have been his thinking.  Well, I don't think it's going to add much to talk about his cooperation in past cases.  In fact, I can perhaps see myself saying, depending on how far that went, is this really relevant to the trial to talk about whether he cooperated in two, three, four, five other cases?  Are we going to talk about those cases now or are we going to talk about the Hayes murder?

I mean, I'm just posing for you when I say, is it necessarily substandard on this record when that could have been the scenario.

MR. ROSENTHAL:  You don't know until you investigate, Your Honor.  I mean, that is what the long line of Supreme Court cases on ineffectiveness, from *Whitney v. Smith* to *Rompilla v. Beard* and so on say is that you can't possibly make a

determination about counsel's ineffectiveness based on a strategic decision not to investigate.  If they don't investigate and if investigation would have produced evidence that was material to the outcome, you have ineffectiveness.  You can't say a strategic decision not to investigate is okay and it passes the *Strickland* test.  You can't do that.

So again, we don't know what we don't know.  Perhaps Mr. O'Toole said it.  I can pretty much guarantee you he didn't say that because I think he was looking for everything possible to impeach Mr. Whitley and, you know, overlooked what this arrest warrant affidavit said.

But if what you say is, in fact, what happened and again, I'm almost certain it didn't happened, but if what you say is what happen, again, you can't make a call -- one cannot make a call now, Judge, about whether or not that was ineffective because you have to determine what the evidence was that he made a supposedly strategic decision not to investigate. You can't make a strategic decision not to investigate without knowing what the evidence is.

THE COURT:  All right.  You want to move to another claim at this point.  I think we perhaps should.

MR. ROSENTHAL:  Your Honor, you did raise the Afton Street evidence before which is the last piece of the ineffective assistance of counsel claims on both the guilt phase and the penalty phase.

THE COURT:  I understand you want to depose Detective Chaney in the Prince George's County Police Department.

MR. ROSENTHAL:  No, Your Honor.  That's pretty limited stuff that we're looking for in Afton Street.  So we filed Public Information Act request with the Prince George's County Police Department.  We got a bunch of notes, but a lot of those notes are heavily redacted.  And what we're asking for is to be able to issue a subpoena to the department for unredacted copies of those notes.

THE COURT:  As related to what?

MR. ROSENTHAL:  As related to a couple of things.  The government --

Just taking a step back.  The government's presentation of Afton Street at trial, both in guilt and in innocence was that it was a cold-blooded, completely unprovoked killing that Mr. Lighty was involved in.  And that showed essentially Mr. Lighty was, in the penalty phase was a super predator who deserved to die.

Evidence in our investigation has shown that it was a lot more complicated than that and this was not evidence that Mr. O'Toole and Ms. Dayson sought to develop.  They simply sought to keep out evidence of the Afton Street incident, Your Honor.

They didn't actually seek to mitigate that evidence and we have come up with very substantial mitigation to show

exactly what happened.  There was a shooting of -- there was a shooting by folks that lived on Afton Street of the neighborhood in Marlow Heights, which is where Mr. Lighty and Mr. Wilson lived the night before the Afton Street killing.  We've gotten that from the Public Information Act requests.

One of the sets of notes that we have gotten talks about the shooting that prior evening, okay, but everything -- there's a lot of redactions in those notes and we contend that we are entitled to see what those notes -- I mean, what the redactions in those notes say because they might provide additional mitigation of what occurred on Afton Street or might lead to witnesses who would provide additional mitigation of what occurred on Afton Street.

And again, the *Rompilla* case, it speaks directly to counsel's obligation not simply to try to keep out prejudicial 404(b) evidence, Your Honor, but to actually mitigate it in the event that it came in.  Here, defense counsel did absolutely nothing to mitigate the evidence of the Afton Street incident that the government introduced which was particularly problematic at the penalty phase.

So, that's the first thing we're looking for, Your Honor, is unredacted versions of those notes regarding the shooting of Mr. Lighty, Mr. Wilson and others in Marlow Heights the night before the Afton Street homicide.

The second thing that we're looking for are unredacted

notes from the Prince George's County Police Department about return shots that were fired, shots that were actually fired at the car that the government alleged Mr. Lighty was in during the Afton Street homicide.

And there is forensic evidence to support the idea that there were return shots fired and we now have testimonial evidence to suggest that there were return shots fired as well, so that this wasn't just a one-sided, kind of, cold-blooded, super predator type deal here.

And again, the notes that we received about the return shots fired were heavily redacted.  We'd like to get from the Prince George's County Police Department the unredacted copy of those notes because, A, it may show additional mitigation; or B, it may show the names of witnesses who might provide additional mitigation with respect to Afton Street.  So that's the second thing.

And these are both limited requests.  We have the documents, we just don't have them in unredacted form, Your Honor.

And the third thing, Your Honor, is documents from the Prince George's County Police Department about the arrest of an individual named Robert Colbert for possession of a .22 just shortly after the Afton Street homicide.

The reason that's significant is because we now have reason to believe based on our own investigation that

Mr. Colbert was the person who shot at the car the government alleged Mr. Lighty was in. And there was an arrest of Mr. Colbert for possession of a .22. There were shell casings -- I'm sorry. There were shell casings of a .22 found at the scene at Afton Street. And so, we want to see the Prince George's County Police Department investigative file regarding the arrest of Robert Colbert.

THE COURT: Again, the possible showing is what?

MR. ROSENTHAL: Again, if Roberto Colbert was arrested two weeks after the Afton Street incident with a .22 and there were -- and there's eyewitness testimony to suggest that Robert Colbert actually shot at the car in which Mr. Lighty was alleged to have been riding --

THE COURT: Then what, then what?

MR. ROSENTHAL: Then it shows that -- then it suggest the fact -- I mean, the forensic evidence would suggest that Robert Colbert was the one who was shooting at them. And again, this mitigates the effect of the way that the government -- mangling my words here, but it sort of mitigates the government's presentation of the Afton Street homicide as being a completely one-sided, coldblooded killing by associates of Mr. Lighty and Mr. Lighty.

It suggest there was ongoing feud between people on Afton Street and people in Marlow Heights, and that both side were -- and that Mr. Lighty was fearing for his life. It wasn't

just --

THE COURT:  I'll have to let Ms. Wilkinson argue the point.  I thought there was evidence connecting the actual -- was it the bullet or the weapon that was used in Afton Street with Lighty.  I thought that was the purpose of it.  It wasn't 404(b).  It was tying it in directly to the Hayes murder.

Maybe you better answer this, Ms. Wilkinson.

MR. ROSENTHAL:  Your Honor, the Fourth Circuit, as you recall, found this to be erroneous, the admission of this entire bit of evidence to be erroneous.  They ultimately found it to be harmless, but the Fourth Circuit thought it was error to admit this under 404(b).

THE COURT:  I'm not sure it came in as 404(b), but in any event, what do I do with that.  The Fourth Circuit says it's harmless, how do I go back and revisit that on a ineffective assistance claim?  You're saying it wouldn't have come in, so what's the point?  I don't have the Fourth Circuit opinion in front of me, frankly.

MR. ROSENTHAL:  Because if that incident didn't actually unfold in the way that the government portrayed it unfolding, it unfolded in a way that was more sympathetic to Mr. Lighty than the government portrayed.  It could have had an effect at the guilt phase, but more importantly it could have had an effect at the penalty phase where the government essentially used what happened on Afton Street as Exhibit A

about which -- why Mr. Lighty was a super predator.

THE COURT:  All right.  Let me hear from the government.

MS. WILKINSON:  Your Honor, a couple things.  First of all, just to refresh the Court's recollection, Mr. Lighty was found in possession of a gun in January of 2002 and that gun -- the reason why the Fourth Circuit determined that we shouldn't have introduced evidence of the Afton Street murder during the guilt phase of the trial because they found we didn't need it because the evidence was so powerful because Mr. Lighty had the type of gun and the bullet from the Hayes murder, although it couldn't match exactly, had the same rifling characteristics and because of the fact that he had the same type of gun together with all the other evidence.

Where the Afton Street murder came in is that those bullets were matched beyond any doubt to Mr. Lighty's gun and the bullets that were found matched --

THE COURT:  I'm sorry.  I don't recall what the Fourth Circuit said about that.  They excluded the whole Afton Street matter?

MS. WILKINSON:  They said that it was harmless error to exclude evidence of the Afton Street murder under 404(b) or even directly intertwined --

THE COURT:  Not sure it would have come in under 404(b).  It would have come in as directly linked, but --

MS. WILKINSON:  Well, they said we didn't need it and it was prejudicial because that gun that we found on Mr. Lighty was linked in another way, which is that the pattern abrasion on Mr. Hayes' head matched, according to the forensic expert, the butt of Mr. Lighty's gun that was in his possession in January.

So, in other words, the pattern injury that Mr. Hayes had --

THE COURT:  Well, in any event, you're saying the Fourth Circuit said, shouldn't have come in at all.  What does that do to the ineffective assistance claim?

MS. WILKINSON:  So, I think that what counsel is arguing is that at the penalty phase that because it was evidence of another shooting that Mr. Lighty was involved in, that if Mr. O'Toole had done more in some way, he could have litigated that shooting in front the penalty phase jury and made it sound more sympathetic or less aggravating.

And if the Court will recall, the evidence at the penalty phase was not that Mr. Lighty fired the bullet that killed the man who died in the Afton Street shooting, that was Mr. Wilson, but was simply that he was participating in a aggravated act; that is, one that caused a risk of harm to people and that he was involved in a drive-by shooting.  That's undisputed here, completely undisputed here.

Mr. Lighty does not contend here in his petition or otherwise that he wasn't involved in that.  What Mr. Rosenthal

is suggesting is that there might have been other people shooting too or that there was another reason for that drive-by shooting and somehow that makes it less aggravating in front of the jury.

Again, we don't know what Mr. O'Toole decided in terms of what evidence he wanted to argue as mitigating in front of the jury.  Spent a long time really involved more in Mr. Lighty's background and characteristics as a human being than fighting about the Afton Street murder, which really was uncontested, because we had forensic evidence that linked Mr. Lighty's gun to that shooting.  And so, what Mr. Rosenthal is suggesting is that there was some other reason for that shooting and that's why he's entitled to all this discovery because somehow Mr. O'Toole should have explored that more.

Of course, we don't know if he did or he didn't because we don't have his view here, but the idea that he would have presented a different view of that shooting even though there's no doubt that Mr. Lighty was involved in that shooting and it was a drive-by shooting that resulted in the death of a person and he was with Mr. Wilson both at the time of the Afton Street shooting and the Hayes murder.  So how that all plays out --

THE COURT:  Giving the benefit of the doubts of the argument to Mr. Rosenthal, I think he's saying, the jury doesn't know that the Fourth Circuit is going to eventually say this is

harmless error.

MS. WILKINSON:  Right.

THE COURT:  So the jury may have thought in the penalty phase, this guy shoots left and right, and --

MS. WILKINSON:  Well, there is evidence that he --

THE COURT:  What's that?

MS. WILKINSON:  That is true.  He was the shooter in the Hayes murder and he shot his --

THE COURT:  But if the whole Afton Street murder shouldn't have been in the case, I think --

MS. WILKINSON:  It would have come in in the penalty phase no doubt.  No doubt it would have came in there because it came in independently in the penalty phase for them to consider because of his involvement in uncharged crimes of violence.  He was not charged as the murder, but it would have come in no matter --

THE COURT:  I don't remember how it came in or how it was contested there.  What was the problem --

MS. WILKINSON:  It came in as a non-statutory aggravator, I'm almost positive, Your Honor, in another uncharged act of violence.

THE COURT:  What was the defense?

MS. WILKINSON:  The defense in the penalty phase?

THE COURT:  Yeah.

MS. WILKINSON:  Probably that Mr. Wilson was the one

that he didn't kill anybody in all of it.  I think he focused more on the other statutory and non-statutory mitigating factors.  I don't really recall what his response to was because at the same time, it was a undisputed fact that Mr. Lighty was there during the Afton Street shooting.  He was in the car with the person that resulted in the death of another person.  He did fire a weapon.  He had that weapon, you know, soon thereafter because he was arrested with it and that gun was -- matched to the exclusion of all others to the bullets that were found in the Afton Street murder.  So, it would have come in no matter what the penalty phase.

I think and I don't want to put words in Mr. Rosenthal's mouth, what he's saying is that Mr. O'Toole should have made it seem less bad at the penalty phase, that there was other reasons why young men would be driving around shooting at each other in street shootings, that there could be a less egregious reason for it.

And I don't know, even speaking out loud, it shows the lack really of materiality of it, but I think that's what he's suggesting.

THE COURT:  All right.  You want to say anything more in response to that, Mr. Rosenthal?

MR. ROSENTHAL:  Your Honor, the government got up in closing during the penalty phase and said with respect to Afton Street, Mr. Lighty found somebody else to shoot.  That's the way

they portrayed this, okay.

Now, Ms. Wilkinson's point, this is just an aside. You know, the government's evidence was that Wilson was the one who shot, not that Mr. Lighty shot. The government's evidence was that Lighty was the driver and didn't shoot a gun.

But in any event, the point is exactly, I think, the way Ms. Wilkinson put it, which is that defense counsel did nothing, zero in the penalty phase to try to blunt the effect of the evidence of the Afton Street homicide, nothing. They just let it be.

What we're telling you, Your Honor, is that there is evidence out there, substantial evidence to suggest that it wasn't simply a cold-blooded, one-sided drive-by shooting that was instigated by some minor verbal slight. There was a lot more to it than that and the jury never heard that because the defense didn't do the investigation.

Prince George's County Police Department has evidence to support that theory. Unredacted notes that it's provided us only in redacted form and evidence regarding the arrest for possession of the .22 of one of the people who we believe was actually involved in the back and forth. And that's evidence that we think the defense should have gotten, evidence that Prince George's County Police Department has and evidence that we would like to discover with the assistance of the subpoena.

THE COURT: All right. How much -- I was going to

hear from Ms. Brain, I think, or maybe we're into the penalty phase, but it's about time to take a short break.  Is that what we're left to talk about, the penalty phrase or is there more?

MR. ROSENTHAL:  I think I'm done with the guilt phrase evidence and the guilt -- I mean, guilt phase request that we're making and the guilt phrase request that pertain also to the penalty phrase.

THE COURT:  All right.  And do you have anything more to say on that, Ms. Wilkinson?

MS. WILKINSON:  No, sir.

THE COURT:  All right.  Let's take a seven or eight minutes break and then we'll hear from Ms. Brain.

(Brief recess.)

THE COURT:  All right, Ms. Brain.

MS. BRAIN:  Your Honor, our request for discovery with respect to the penalty phase ineffective assistance of counsel claim essentially boils down to five subpoenas.  They're subpoenas for records that are specifically identified.  They're limited to only those that we've tried, in some instances on multiple occasions, to get with informal means but have been unsuccessful and that's why we resorted to the Court.

And also with respect to all five categories of information, we made clear the relevance that they have for the various parts of the mitigation case that we say that trial counsel should have investigated and presented.  And so we

really went through as carefully as we could and with almost --

not to blur -- precision identifying those pieces of evidence

that we just couldn't get in any other way.  And not only are

they strictly limited and narrowly drawn, they're also in each

instance involve evidence that the ABA guidelines for defense

counsel in death penalty cases require that counsel get as a

matter of routine in every death penalty case.

So, it's not the case as the government suggest that

we are faulting trial counsel for not pulling up every weed or

turning over every stone.  To the contrary, we're faulting them

for not complying with even basic constitutional minimum that

the ABA guidelines subscribes should be --

THE COURT:  I'm not sure what you're asking for.  I

have a note here that you're asking for the defendant's deceased

maternal great grandfather.  That sounds like a reach to me.

MS. BRAIN:  The death certificate, Your Honor?

THE COURT:  Yeah.

MS. BRAIN:  That's part of what our expert will be

talking about is the multi-generational patterns of dysfunction,

abuse, trauma and mental illness being passed down through this

family.

THE COURT:  Birth certificate will tell you that?

MS. BRAIN:  Birth certificates will establish --

THE COURT:  Maybe you better tell me what you're

looking for.  I've got more than five subpoenas written down

here under Claim VI, but maybe tell me what you're asking for. Why don't you summarize now today what you're looking for?

MS. BRAIN:  With respect to the vital records, Your Honor, there are three of those and they are to establish the familial link to prove there is genetic connections between these individuals.

THE COURT:  Who are you talking about; the mother, maternal uncles and so on?

MS. BRAIN:  Those are the juvenile records, Your Honor.  There's two vital records.  I misspoke, I said three. One is the great uncle who drank himself to death at an early age.  He's genetically related to Mr. Lighty.  It's just one tiny --

THE COURT:  Well, you say, District of Columbia Family Court Juvenile and Neglect Branch for any and all records maintained between the court and then you list four different individuals, including his diseased mother and three, I gather, deceased uncles, maternal uncles.  How is that just a little bit -- what's it going to tell you?

MS. BRAIN:  I think that those records could tell us a tremendous amount about what it was like in the household that Mr. Lighty grew up in.  Those are all individual -- his mother who died when he was young, but she was his primary caretaker for the first four years of his life, critical as our experts will explain -- critically important times in a child's

development.

The uncles were all around -- Anthony Lighty was around his entire life, Mr. Lighty's entire life as was George Lighty, Junior in the house, lived in the house with him. Randy Lighty was there for a shorter time.

THE COURT: What are you starting from, though? You're saying that there was no testimony about any of his childhood or it was not as far as it could have gone? I mean, what are you saying was ineffective here?

MS. BRAIN: There were materially important aspects of his childhood, his childhood experiences. And what the science tells us about the significance of those experiences for child development, for the neurobiological response to stress and all the things that Ms. Lighty had going on.

THE COURT: What did Mr. O'Toole do or not do?

MS. BRAIN: Mr. O'Toole failed to investigate these aspects -- he didn't get these files, first of all.

THE COURT: But what did he do? What did he do as far as -- you're not really saying, he didn't submit any evidence about the upbringing of Mr. Lighty, are you?

MS. BRAIN: Oh, no. Oh, no, absolutely not, Your Honor, absolutely not, but that's not the claim. Just because somebody -- trial counsel does some kind of investigation, puts on some kind of evidence, even evidence that might be -- doesn't look too terrible on its face, the fact of the matter is if they

fail to investigate, fail to uncover more compelling evidence, evidence that would have with reasonable likelihood persuaded the jury to vote for a sentence less than death, they are ineffective.

That's what the lessons of *Sears versus Upton*, from *Rompilla versus Beard*, which we cite in our pleadings. Just because they do something, even something that looks plausibly okay, if they missed something much better and much bigger that was reasonably available and they didn't do it because they didn't know to do it or for whatever reason, then they're ineffective. Just because they put some evidence on --

THE COURT: Let's start with your first subpoena of all these -- you've said all family court records. You've not asked for any specific one. You want all contacts. So, let's sort of surmise. You could be talking about child abuse, you could be talking about child neglect, you could be talking domestic peace orders. How far do we go with all these four individuals in the hope that they might turn something up to show that he had a turbulent childhood?

MS. BRAIN: Well, they will turn something up, because we know from our investigation that each one of these individuals was involved in the juvenile system. We're actually focused on delinquency because that's what we know exist. If there were, in fact, neglect cases or other --

THE COURT: You want their delinquency records?

MS. BRAIN:  Yes, Your Honor.

THE COURT:  And you think they may have them from what, 50 years ago?

MS. BRAIN:  In some cases, yes.  Randy Lighty is one of the older ones.  They are old, but they contain an absolute goldmine of information of what was going on with these individuals who not only were around Mr. Lighty his entire childhood, they were also -- they're his uncles.  He was raised by his grandma, so they were raised by the same person that he was.

So to the extent that we were and we certainly are bringing up and discussing the challenges that his primary parent had in trying to parent him and to deal with the trauma that he was getting elsewhere, such as from the loss of his mother, the effect -- the job that she did or was able to do with these guys, which are all four of her kids is directly relevant and corroborative of what we're saying went wrong when Mr. Lighty then came along.

What this will be in Juvenile Court in D.C. is delinquency files, which is just usually the charge, what the child is accused of doing and the disposition.  But what D.C. also has is what's called a social file and that travels with the kid through any number of adjudications.  And that's what is going to contain psychological reports, social history investigations, school records in some instances, supervision

records.  It can tell us a whole lot about the challenges and issues, health issues, other things that have genetic component that are passed down from generation to generation.

So we know those records are there.  They just can't find them and they were -- they could potentially just give us tremendous amount of information about who was raising Kenny Lighty, because these uncles were a very big part of that.

The second one is Mr. Lighty's own records from D.C. General.  Your Honor will recall that trial counsel tried to raise at trial the fact that Mr. Lighty's biological mother had been using substances and alcohol while she was pregnant, which has demonstrable and very well-documented effects on fetal development and subsequent childhood and adult functioning.  But because they didn't have sufficient evidence, they couldn't actually concretely prove that.

It was attacked legitimately by the government at trial and so ultimately it went nowhere.  But we believe there's a file in D.C. General that's now maintained by this other agency that would document that he was -- spent ten days, the first ten days of his life in D.C. General receiving treatment because of the in utero exposure to drug and alcohol.

So we desperately want those records and trial counsel should have desperately wanted them too, because that would have given proof positive that what they trying to allege about Mr. Lighty's start in life was absolutely true.

The vitals is just two from South Carolina.  Usually we can get vitals.  For some reason, South Carolina said, we need the subpoena.  Again, that's establishing the genetic link between his great uncle, which is his grandma's brother which is not that far removed at all and Mattie Smith who is --

THE COURT:  You skipped one.  I thought you wanted subpoena for the -- from the Maryland Division of Corrections on Mr. Lighty's unredacted file for all of his incarcerations.

MS. BRAIN:  Actually, it's the most recent incarceration.  That actually is a slight overstatement, because we do have the prior ones because they came in at trial, but this is for his most recent one.  Again, it's one of those types of documents that the ABA --

THE COURT:  You're talking about the one in connection with this case?

MS. BRAIN:  Yes.

THE COURT:  And what will that show?

MS. BRAIN:  Well, again, it's one of the types of documents the ABA says should be gathered routinely in absolutely every case.

THE COURT:  I know they tell you that, but you tell me why it's a good idea.

MS. BRAIN:  Because it's so very likely to contain information that may be relevant to mitigation.  Again, there's medical reports, mental health evaluations, potentially

psychological records.  Of course, we don't know exactly what's going to be there because we haven't seen it.

THE COURT:  Wait a minute.  We're focusing, are we not, on what Mr. O'Toole should have done as of the date of trial.  What are you going to tell me between then and 2018 that's going to be relevant to what he should have discovered?

MS. BRAIN:  Oh, no, Your Honor, it wouldn't be.  Your Honor is quite correct.  I was referring to Mr. Lighty's pretrial incarceration up until the time of trial, not subsequent to that.  It's Maryland Department of Corrections, not the federal.

And then I skipped over another vital record which is John Henry Smith.  Again, trying to establish the genetic -- the family tree, for better words, because we have evidence that there were patterns, repeating patterns of family issues, mental illness issues.

THE COURT:  Okay.  Now, we're talking about the birth certificate of John Henry Smith?

MS. BRAIN:  Yes, Your Honor.

THE COURT:  And what would that show?  That would show mental illness?

MS. BRAIN:  That will show -- no, no.

Well, actually, it might.  I have had them depending on the jurisdiction how much information there is on them.  And John Willie Smith's death certificate shows clearly he died of

sclerosis of the liver due to chronic alcoholism.

THE COURT:  Well, that's not when he was born.

MS. BRAIN:  Right, but the birth certificate more than anything else is really -- it does give a lot of information that can be helpful in compiling information such as parents, workplaces, addresses where they lived, all that kind of thing. But principally, the reason why we need it is to establish the genetic -- to establish the family tree, to establish the genetic connection between John Henry Smith where he is the father of the woman who raised our client.  And so that we can tie in all the information we found out about him and his life and his mental health problems, substance abuse problems.

THE COURT:  You think a birth certificate does that? You've asked for two deceased great uncles of the mother.

MS. BRAIN:  Great uncle, yes.

THE COURT:  John Willie Smith and Mattie Smith.

MS. BRAIN:  Mattie Smith is a aunt.

THE COURT:  I'm sorry, a aunt, I misspoke.  What does that show?

MS. BRAIN:  There are two siblings knowingly raised our client.  We know John Willie had really terrible substance abuse history, addiction problems that led to his death.  Her sister, Mattie Smith had a history of incredibly erratic behavior that is highly suggestive of mental illness.  So again, we just need those birth certificates to establish the genetic

link and there may well be other information in there, there often is, but principally it's the genetic link that we're --

THE COURT: So, wait a minute though. So you would argue -- okay, I've got the birth certificate which would not necessarily show who the siblings were, should show who the parents were.

MS. BRAIN: Right.

THE COURT: And then you go back up to the parent and then you go back down on another birth certificate to say that same person is the parent of the woman who raised him?

MS. BRAIN: Yes, it would be --

THE COURT: And that way -- let me just spin this out though.

MS. BRAIN: Beg your pardon.

THE COURT: And then from the birth certificates you want to get to alcohol and substance abuse during the lifetime, is that right?

MS. BRAIN: Yes.

THE COURT: How do you do that?

MS. BRAIN: Well, like, Your Honor, if our expert were on the stand at the hearing, for example, and our expert was talking about --

COURT REPORTER: I'm sorry. I didn't understand what you just said.

THE COURT: Slow down a little bit.

MS. BRAIN:  I'm sorry, I do that.  Stop me whenever you need to.

If our expert was on the stand at the evidentiary hearing, for example, and she said, you know what --

THE COURT:  Slow down a bit, slow down a bit.

MS. BRAIN:  -- Mr. Lighty's family history is loaded with, obviously, genetically-related mental illness, substance abuse disorders.

THE COURT:  Okay, but stop there.  How does the birth certificate tell you that?  Somebody has got to talk about mental illness and alcohol and drug abuse.  That's not on the birth certificate, is it?

MS. BRAIN:  No, it's not, Your Honor.  We have that. We don't need to come to court for that.  We've got plenty of that because --

THE COURT:  Isn't that all you need to make your argument?

MS. BRAIN:  Then our expert says, well, here's an example of an occurrence of alcohol dependence early on or schizophrenia early on.  And the government says, who is this person?  Are they related?  I mean, our expert as a scientist has to be able to say, yes, I have the family tree; I have the vital records; I know who he's related to.

THE COURT:  Well, let me ask you a question, Ms. Wilkinson.  Maybe we shortcut this.  Is there any dispute about

who his mother was and who his grandfather was and who his uncles were?

MS. WILKINSON:  No, of course not, Your Honor.  And we didn't dispute it when Ms. James-Monroe testified extensively about the family history during the course of the penalty phase.

THE COURT:  You're not going to get an objection on whether they're related.  The guts of the testimony is that they were drug abusers or alcohol abusers, I suppose.  I think that's where you are and that's not based on the document, I think.

MS. BRAIN:  No, no.  Your Honor is absolutely correct about that, but it's just that I don't know any responsible expert who would get up and testify about a family history of clinically important, significant background factors and not know who is related to who just because I told them.

THE COURT:  You know who is related to who, I gather.  You put it down here.  You identified who people are.  I don't think there's a dispute.  I don't think the government is going to say, these people, we don't know whether they're related or not.

MS. BRAIN:  I don't think, Your Honor, we can get our expert to take the stand and say --

THE COURT:  If it's stipulated?  If it's stipulated that these are the relatives?  I mean, you're asking -- you want to dig down and get what, from the State of Georgia somebody who must have been what, born in 1900, 1890 or --

MS. BRAIN:  1920's.

THE COURT:  1920, I'm getting old myself.  But in any event, that's what you're asking for.  And the answer is, we don't dispute that.  I think that's what the government is saying.

MS. BRAIN:  If the government is willing to stipulate to the family relationship, the parents and the mother and the father.

THE COURT:  Are you, Ms. Wilkinson, seems to me that's what she's talking about.

MS. WILKINSON:  Your Honor, I can't see why I wouldn't, but at the same time what I'm saying here is a lot of this was already introduced uncontested during the penalty phrase by Ms. Lori James-Monroe who gave a very detailed --

THE COURT:  You know, I don't have the transcript in front of me of the penalty case.

MS. WILKINSON:  I don't either, but we definitely did not cross-examine her about whether or not this person was his uncle or not, or whether this person was a family member or not.  It was all about what difference did it make.  That was the government's theory, but it was a very long and powerful mitigation case that Mr. O'Toole put on through his clinical social worker and several family members who testified at length about drug abuse of his mother during pregnancy, the death of his father.

THE COURT:  That's really starting point, Ms. Brain. If he did all this stuff and mentioned all these people, and you want to back and fill and say, let's see whether they really are related.

MS. BRAIN:  No, no, no.  I mean, it's a very, very tiny -- tiny pieces of our case.  We have all kinds of expert evidence and lay witness testimony that presents a very different picture of Mr. Lighty's childhood than that which was presented at trial.  What was presented at trial was -- there was a lot of witness, there was a lot of folk and there were expert witnesses.  Expert witnesses like Mark Cunningham who was on the stand for I don't know how many hours whose essential point was that there are certain things that -- risks that make people at risk for becoming a violent criminal.

Well, to the extent that the jury just found Mr. Lighty guilty of a capital homicide, they weren't needing any schooling on whether or not he was a violent criminal.  What they needed to know was, why, and what were the factors in his background that might have contributed --

THE COURT:  I don't have, what's her name, Ms. Rowe?

MS. WILKINSON:  Yes, Lori James-Monroe.  She was the clinical social worker.

THE COURT:  Monroe, I'm sorry.

MS. BRAIN:  James-Monroe.

MS. WILKINSON:  Yeah, Lori James hyphen Monroe.  She

was the clinical social worker who testified about Mr. Lighty's life history.

THE COURT:  Do you have her report?

MS. BRAIN:  Absolutely, yes.  It's about this thin.  We've got boxes of information.

THE COURT:  Well, I'd like to look at it.  You haven't really quoted it to me, have you, about --

MS. BRAIN:  In our petition, we said at length how ineffective the testimony was from her.  Also from --

THE COURT:  Well, I need to read it.  I mean, I need to see it.  Do you have a trial transcript as well?

MS. BRAIN:  Yes, she was on the transcript.

THE COURT:  Well, I haven't read that either.  I mean, these things where you're positing that trial counsel was ineffective constitutionally.  My start point is, what did he do or what didn't he do?  And that includes who he called as a witness and what they said.  And then to come in and say, we can use it, well, that's interesting if you are working from a clean slate.  But now I need to evaluate whether what he did, even if it could have been better, was constitutionally deficient.  I mean, that's my standard here.

MS. BRAIN:  I understand that, Your Honor, but it's not -- it's not a question of whether -- what did they do.  We know they didn't do the things that we are alleging.  We know they didn't hire an expert in trauma.  They didn't put before

the jury evidence of the neurobiological effects, the generational effects of exposure to trauma, the whole other piece, huge piece of Mr. Lighty's background that never got presented and the significance of it particularly with expert evidence.

THE COURT:  Well, the short answer is, you've asked for subpoenas of relatives, when they were born and where.  I don't think you're going to find alcohol or drug abuse there.  Unlikely to find, very unlikely to find evidence of mental illness if the person was born with a mental deficiency and that's all the birth certificate is going to tell you.

What you need to say -- you say you've got a lot of evidence on and your expert can talk about.  You say, I think, that your expert will be loathed to make a statement if he didn't know they were related, but that's the kind of point that, you know, at a trial or whatever, the court would say, can't we just move this along?  Can you just maybe stipulate to this so we don't spend a lot of time proving an essentially undisputed point?  That's what you're asking for.

Look, it's always a measure of what is reasonably necessary to discover.  Some things are marginally necessary.  This sounds like it's totally unnecessary if the government agrees, totally unnecessary.

MS. BRAIN:  I can see with respect to the three instances which were simply wishing to establish a genetic link,

if the government would stipulate to the parents and how they are all related, then I'm sure our expert would be comfortable relying on that too.

THE COURT:  Well, I don't see why you shouldn't do that, Ms. Wilkinson.  I just don't know what is gained by that.

MS. WILKINSON:  I'm pretty sure Ms. Westfield probably described it.

MS. BRAIN:  She didn't, no.  She didn't go back this far.  And it's not that far, because you have to remember that Mr. Lighty was raised by his grandmother and so, these are her siblings.

THE COURT:  Well, I'm not saying all her testimony will be relevant, but in terms of these particular facts, I think we can get by.

MS. BRAIN:  And part of the problem too, I submit, why her testimony was rejected along with Mark Cunningham's is that --

THE COURT:  Why her testimony was rejected?  It may have been fully accepted.  You know, it's entirely possible that the jury -- in fact, probably likely that the jury listened and said, this guy had a very difficult childhood.

MS. WILKINSON:  They did, they checked a lot of the non-statutory mitigators.

THE COURT:  It was a terrible influence.

MS. BRAIN:  But nobody told them why it mattered.

THE COURT:  What is that?

MS. BRAIN:  Nobody told them why it mattered.  All they did was to come in with a litany of --

THE COURT:  It wasn't argued by counsel that these are factors that should mitigate the punishment that you're going to vote for this man?

MS. BRAIN:  They argued as mitigated -- it was a problem, because of course it was a 12.2 violation that saved Dr. Cunningham was -- was asked to recount all these risk factors for becoming a violent criminal, but he wasn't allowed to say whether or not Mr. Lighty had any, so that made that pretty much meaningless to the jury.

THE COURT:  Well, maybe that was the Court's error.  I don't know whether it was or not.  Was that raised on direct appeal?

MS. BRAIN:  I believe so.  I don't believe it was Court error at all.

THE COURT:  Was it raised on appeal?

MS. BRAIN:  I want to say, Your Honor, that it was.

THE COURT:  And then why am I revisiting it?

MS. BRAIN:  You're not, you're not.  Just simply looking at what the evidence is that was presenting and whether it was effective or not.  It wasn't --

THE COURT:  You said the jury didn't buy it and I think my response to your statement was, maybe they did buy it,

but it didn't excuse the severity of the crime.  I mean, that happens all the time.  They specifically consider mitigating circumstances and they reject them, and they reject by -- I forget what the calculus is anymore, but you, I guess, reject them in the end by what, by beyond a reasonable doubt?  I can't remember how it all works.

MS. BRAIN:  Not with the non-statutory.

THE COURT:  Whatever it is, it's non-statutory versus each individual factor.

MS. WILKINSON:  The government has to prove them beyond a reasonable doubt, but the defense just has to prove --

THE COURT:  Right, but then when you add them all up, what?  What's the standard?

MS. WILKINSON:  Oh, aggravating factor substantially outweigh the mitigating factors.  So require a sentence of --

THE COURT:  So, it's not the same as saying, the jury didn't buy it.

MS. BRAIN:  No, no, Your Honor, that was -- I shouldn't have phrased it in those terms.  What I was trying to say was that because -- undoubtedly, we have the burden here on the merits.  When we get to the merits of the petition, we have to show that the difference between what trial counsel did and what we're saying they could have and should have done would have been enough by reasonable probability to make the jury vote -- at least one juror vote not for death.

We have to prove that. That's a burden. I'm not ducking that in the slightest. And these are just very, very minute pieces of what we think we need to add to what we already have.

Because again, go back to the point that was made earlier about cumulativeness, all of these -- all of these, like, small category here, the significance of them is tiny among themselves, obviously. But when you put the entire picture together and the Court must consider each of counsel's failures with respect to the penalty phase.

And it's not that they, for example, was six things that weren't very good that ends up constituting ineffective assistance. That's not how it works. Before you even get to the cumulative analysis, each thing that counsel did or didn't do has to be deficient performance. That's a separate prong.

So, before we even start considering prejudice and cumulating the prejudice, we found that they've done six things that were -- fell below the professional standards. But the question becomes, was one of them or all of them enough, had the correct --

THE COURT: I want to give you case to consider. I'm not sure I brought Mr. Rosenthal's proposition that you look at the -- you can accumulate errors and say -- I think we found a case that says, that's not excepted in the Fourth Circuit.

MS. BRAIN: Your Honor is probably talking about

*Fisher versus Angelone*, which we're aware of.  It's a much older case than *Elmore*.  In fact, Your Honor just cited *Fisher* in a recent opinion in James Flood's case.

THE COURT:  And you're saying, it was overruled?

MS. BRAIN:  No, no.  No, not expressly.

First distinguishing point is what they were trying to do in *Fisher* was cumulatively analyze the prejudice from a guilt phase error and a selection -- not selection.  Yeah, selection error with a penalty -- aggravating circumstance and a penalty phase ineffective assistance claim.  So, they're trying to essentially smush together three different claims.

What we're saying is that within claims, at least, or within the penalty phase claim or within the guilt phrase claim, the Court has to consider the prejudice cumulatively.  Not deficiencies, the deficiency stand or fall on their own merits.

THE COURT:  Well, I think Mr. Rosenthal was talking about guilt phase though.  And your proposition is, his statement was that you can consider collectively all the errors even if separately they don't make the grade and I don't think that's the law.

You're saying now in the prejudice phase you can?

MS. BRAIN:  In the prejudice phase, you have to.

THE COURT:  And nobody said that yet, but you.  Has the court said that?

MS. BRAIN:  Yes, *Elmore versus Ozmint*, a 2011 case.

THE COURT:  From the Fourth Circuit.

MS. BRAIN:  Yes.  It was a guilt phase claim, but there's no reason to treat guilt versus penalty different.

In *Elmore*, there were multiple violations -- multiple deficiencies in counsel's performance in attacking guilt.  There were -- it took about five different experts for post-conviction counsel to work out all the things that were deficient.

They had a problem with not cross-examining the medical examiner about time of death.  There was hair evidence, there was blood evidence.  There was a whole array of deficiencies found.  And the question then was, well, how do you assess prejudice?  How do you decide whether or not there was a reasonable likelihood of a different result?  What the Fourth Circuit said was, you have to look at them together.  Not the deficiencies, but before you establish they are deficient, but would the result have been different.

THE COURT:  Where does this start?  Where is the front page here?

MS. BRAIN:  That analogy has to be right, Your Honor, because otherwise you'd be in situation where, for example, if you got two different errors -- guilt phase is a little easier to use as an example, but if for example trial counsel was ineffective for not properly arguing to keep out a murder and also we will allege ineffective for not cross-examining a jail house informant, if you were to -- either of these in isolation,

you'd end up in a situation where the court says, well, yes, you didn't -- you performed deficiently by not keeping out the murder, but you've got overwhelming evidence and so it's harmless.

And then on the other side, well, part of that overwhelming evidence is our other claim or our other witness. And so the court will say, well, yes, you performed deficiently in not cross-examining this evidence properly, but it's probably the case the jury would have voted for guilt anyway because you got this other murder.

So you have to be able to consider them cumulatively to say, what would -- and that's because *Strickland* asks, what would have been the result if this evidence were given to reasonably competent counsel.

Reasonably competent counsel wouldn't have made, by definition, these errors that matches deficient performance. And so you can't say, well, we gave it to counsel -- counsel screwed up one thing, but everything else was fine when, in fact, you know it wasn't fine because you've got this other deficiency and I'm not -- that's word salad.

That's *Elmore* and they specifically call out the state court -- for viewing the evidence piecemeal and disregarding, downplaying the significance of each piece and not saying, what would this trial have looked like if counsel had done all of these things that we've just found they should have?  And that's

how you come to the end of, you know what, this trial would likely have ended up in different verdict.  And considering them separately, you don't get there.

THE COURT:  All right.  Let me just quickly run through some of the -- you want the educational record of the defendant's maternal grandmother?

MS. BRAIN:  The lady who raised him.

THE COURT:  The what?

MS. BRAIN:  She's the lady who raised him.

THE COURT:  Right.  And again, I suppose, because she was a problematic student and she had issues that were --

MS. BRAIN:  Your Honor, a hunch based on what we know from other sources is that she had probably had some cognitive impairments and cognitive limitations, which have all kinds of implications for her ability to be an effective parent.

She wasn't an effective parent through no fault of her own.  We need our expert to be able to explain why that is and to point to all of the history that shows that this little kid, Kenny Lighty, when he was born, the deck was stacked against him right from jump.  In fact, from before jump because of the family history patterns of dysfunction and mental illness that had been passed down from generations.

THE COURT:  Well, let me hear from Ms. Wilkinson.  I guess the problem that I have -- and let's be fair to the government and the community for a moment.  This man has been

found guilty of a serious crime.  And it was what, 13 years ago and we're now revisiting this, in a sense, pointing toward and you're doing a good job in trying to make the point that maybe he shouldn't have been convicted.

And I hear you now saying, even though the jury specifically found that this man had a difficult, problematic childhood, there's more that the testimony that could have been on to make that point two or three times as strongly as it was made, and that the failure to do that was constitutionally deficient.  And, therefore, Judge, set the verdict aside. That's the full scope of where you are and I have to judge it essentially on that basis.

MS. BRAIN:  Not with respect to this motion, though, Your Honor, because we're only --

THE COURT:  No, because the question is discovery -- where does discovery take you in the end?  It isn't just that the discovery has got all sorts of theoretical possibilities. I have to weigh the proposition that maybe he could have made this point more forcefully, but how much more could the jury have said than we find that he had a difficult childhood?

MS. BRAIN:  I think, Your Honor, the ultimate product, when we've gathered all the information informally and this small amount formally and we've got it properly explained, the significance properly explained by experts who are specifically in the field of childhood trauma and the effects, the

neurobiological effects of --

Kids who grow up like Kenny Lighty, their brains are different.  It affects the structural functioning of the brain and the jury never heard that.  So they might have heard, yeah, he had a bit of a rough go of it, but we've got like -- no, that doesn't even begin to cover it.

First of all, you don't know how rough it was because it was a lot rough and here is why, and we can corroborate it because it was almost inevitable that these individuals were going to be -- fail at parenting, but then let's bring the experts in who can explain why, why does it matter?

We don't want the jury sitting there saying, you know what, a lot of people have rough childhoods.  They don't turn out like Kenny Light did.  Good point.  Let us explain why when you have the confluence of things that Kenny had, all of the adverse experiences, plus the science that explains what happens to a little kid when that's what their childhood is like.  Maybe the jury says, oh, it's not just that he had a rough childhood.  This kid couldn't catch a break and maybe we should be the break that he deserves.

THE COURT:  All right.  Let me hear from Ms. Wilkinson.

MS. WILKINSON:  Your Honor, Court's indulgence.  I just want to check the actual petition.

As I was listening to Ms. Brain speak and I don't

think it's in here, and perhaps she can correct me if I'm wrong. The claim that they are asking for discovery on is that trial counsel rendered constitutionally ineffective assistance at the penalty phase.  And it appears to be based on his lack of investigation into the depths of Mr. Lighty's history as a child and his family --

THE COURT:  Well, that's what she's arguing.

MS. WILKINSON:  -- growing up.

Yes, but I think I just heard her say that he also failed to hire an appropriate expert and I don't see that in the claim.  Is that in the claim?

MS. BRAIN:  It is in the claim.

MS. WILKINSON:  Which paragraph?

MS. BRAIN:  Oh, gosh, now you're asking.  I'll have to get it to you, but it's specifically in there, they should have hired an expert on trauma and the neurobiological effects of it.

MS. WILKINSON:  Because when I look at the discovery they are asking for and it goes right to the heart of what the Court is asking, all of the information that they claim is additional discovery that would be needed to support their claim is completely undermined by what, in fact, Mr. O'Toole did.

Because if the Court will recall, this was a lengthy penalty phase presentation.  In fact, the other -- the other death case I prosecuted before Your Honor did not contain nearly as much information as this one did about Mr. Lighty's

background for the jury.

And as set forth by the Fourth Circuit in their opinion, most of the penalty phase case was directed at the mitigation of his bad childhood so-to-speak. And I don't mean to minimize it when I just used those two phrases, because it was very significant evidence that they put in.

Mr. O'Toole called a clinical social worker who did make that link between the facts of Mr. Lighty's childhood and his risk factors to what the expert, Mr. Cunningham, Dr. Cunningham testified about.

And Dr. Cunningham and Ms. James-Monroe are very well-known penalty phase experts. These are not two people that Mr. O'Toole pulled out of the woodwork. These are people who have testified previously in other death penalty cases and I assume on occasion have convinced through their testimony a jury to find that the mitigating factors were strong enough to vote against death. But in this case, that's not what the jury found. And much of what Mr. O'Toole put on was not contested by the government.

In other words, we weren't doubting that he -- that his parents involved in criminal activity or that his father died prior to his birth, or that his mother had drug abuse during pregnancy and that she died at a critical time in his growth, and that the criminal activities of his uncles --

THE COURT: Slow down a bit, Ms. Wilkinson.

MS. WILKINSON:  I'm sorry, Your Honor.

THE COURT:  Slow down.

MS. WILKINSON:  All of these things were put before this jury.  And I like the Court do not see how these additional things, such as a birth certificate, changes any of that argument that was made before the jury by Mr. O'Toole in a very powerful way, because this testimony did have an effect on the jury.

They did find a number of -- remember there were 40 non-statutory factors and the jury went through them detail and checked off the ones that one or more of them found was a mitigating factor.

And so, we're left at square one here.  What was Mr. O'Toole to do?  On hindsight, attorneys that didn't even come to this trial, didn't see it, didn't watch it in place, wasn't there for all of the strategic decisions about how to best present that to this jury, and Mr. O'Toole and now Judge Dayson did.  And that's what they did.  And they put in all of this evidence that was not even contested by the government.

So, now this after-effect of going into the depths of Mr. Lighty's long lineage, first of all, it is not what's required by the ABA rules.  Mr. O'Toole and his co-counsel obviously abided by those rules, if you look at them on the face themselves, Your Honor.  And for those reasons, I don't see how discovery is warranted on this point in this case.

THE COURT:  Ms. Brain.

MS. BRAIN:  Just briefly, Your Honor.  It's not the case that the government didn't contest the evidence that was put forth in the penalty phase.  It did.  I mentioned earlier the specific example being the idea that Mr. Lighty was exposed to neurotoxins in-utero.  They contested that and other aspects of the case also.

And it's also not the case the ABA guidelines don't require this.  They do.  They are very explicit that a multigenerational family history investigation is minimal standard of care in a death penalty case.  And so, all of these --

Again, in no way could we or would we even Claim I birth certificate would be the straw that broke the camel's back.  What we're saying is we need these little pieces to make a much bigger claim, which is all outlined, all alleged, all our facts are in the petition.  We've got a broad outline of where we're going with this.  These are little bricks in the wall is all that is.

THE COURT:  Well, they're bricks or they're not bricks.  I mean, we'll see.  The argument here, of course, is they really are not bricks because they don't add anything.  That's essentially the response, I think, to what you're arguing.

This doesn't change what he did which is the key

inquiry or what your person now could say at a subsequent hearing, which is that his childhood was very bad and there are a lot of ways in which you could say it.  And you could say it, perhaps, much more emphatically.  I don't remember passion with which Ms. Rowe gave her testimony, but --

MS. BRAIN:  It's not a quantitative difference, Your Honor, although we do have quantitatively more --

THE COURT:  It's not a quantitative difference? What's the qualitative difference?

MS. BRAIN:  Part of it is quantitative -- I mean, sorry.  Yeah, quantitative in as much as we do have a lot more detail and a lot more to say about what Mr. Lighty's childhood was like.  But separate and apart from that, nobody ever explained to the jury the significance of these events, what happens to a kid structurally and psychologically when they're exposed to this kind of upbringing.

All it was was Dr. Cunningham saying there's risk factors of getting into trouble.  Well, we know he got into trouble.  The question is, why -- is there a link between what happened to him and where he ultimately ended up?  And the answer to that is, absolutely, yes, but was never put before this jury.

And that's probably the single biggest way to describe why we think that in addition to what we're doing informally that these little pieces will help us be able to explain to the

Court what trial counsel should have done, instead of calling people like Dr. Cunningham. I think at last count he's got 32 clients on death row. Instead would have called an expert in trauma who would have explained why does this matter, why does it matter that he had a rough go of it.

THE COURT: Anything else from either side?

Well, I was -- I will take this under advisement and write an opinion. I have to go back and look at some of these documents. I need to go back and study what the transcript says. I need to go back and see what he did, Mr. O'Toole and Ms. Dayson, did or did not do. That's the starting point on all of this. Not you know, could have been better. Not the standard either. Question is, is what they did constitutionally deficient. And so I need to see what they did do first. I don't know that I have that clearly other than assertion in many cases by defense counsel today.

MS. BRAIN: Well, it is the case, Your Honor, you can't actually find what they did was constitutional deficient without reference to what it was they could have and what we allege they should have done. Because if what they put on was all that was out there, then it was by definition constitutionally sufficient.

What we're saying is, it wasn't all that was out there. It was a lot more and we need to be able to show Your Honor that in order to make the claim that what they did, as

reasonable as it might seem on its face, although we take issue with that in our motion too, but even as reasonable, that's not enough because what they missed was more important.

THE COURT:  But you know, you argued and Mr. Rosenthal in particular, we don't know what was out there.  We don't know. We'd like to know what else was out there.  You're not arguing that in many of these cases -- in most of these cases, I think, except this last one, there's plenty out there that he could have looked at and he didn't.

And number one, I don't know whether he didn't, because I have no statement from him about what he did or didn't do.

MS. BRAIN:  Well, we do.

THE COURT:  Well, maybe you do.

Do we have a statement from him about what he didn't do?

MS. BRAIN:  No, no, not in the record at this point, Your Honor, but we certainly know -- that's how we put our petition together, we know what he did and what he didn't do.

THE COURT:  I know what you say, that I got to take your word for it.  And I'm not sure that's really fair.  You're asking for discovery in a case that's been looked over by me and the Fourth Circuit fairly meticulously in terms of the issue of guilt.  Some of the issues have come up either directly or tangentially previously, particularly the Whitley testimony you

want to get into now again after I looked at that specifically.

I mean, that stuff is out there and I commend you for looking at it all, but I'm not sure I buy the proposition that I simply cannot make determinations in whole or part, substantial part based on the record that Mr. Rosenthal said I had before me at this point.

We don't give discovery in every habeas case. I don't know that I've had -- I don't recall giving discovery in the other death penalty cases I've had in post-habeas either, because most of the time discovery is really a chance to revisit the whole case again.

And I'm not prepared to accept the proposition that there may be something out there that shows that he cut have done it better. I don't know if that's the standard. The standard is if what he did was constitutionally sufficient, that's probably the answer. Not if it's perfect, but unless I can show that --

And there's a plausible reason to believe that you might unearth something that would show that what he did was sufficient. That's really kind of the end of the inquiry. Not that it could have been better, not that it could have been perfect. I mean, it isn't where we are.

MS. BRAIN: Your Honor, no, but as you point out in the petition, there's a lot that we say should have been different and allegations at this point should be treated as

correct.  We have all kinds of evidence that we can use to prove that point.  All we're asking for here is just a very small number of --

THE COURT:  I don't think it's so small what you're asking for.  You're asking for quite a lot.  And the question in my point is, is it marginally relevant to where be are in this case?  I have to make that determination as you do in every discovery issue.  How relevant is it to open the doors wide to discovery that may be marginally relevant?

Let me leave it at that at this point.  But as I say, I'm certainly not prepared to agree that just because you're not sure what's out there might be better as to that aspect of your case, that I'm going to say go ahead and get that information. I just don't know that I'm ready to agree to that, but let me take it under advisement and we'll have something to say about it in writing.

Mr. Rosenthal.

MR. ROSENTHAL:  Thank you, Judge Messitte.  This is one small point going back to the beginning where we were talking about information that we have to inform the belief that Mr. Mathis may have been an informant and that counsel had an obligation to discover that.

We talked about the Julius Miller affidavit.  We talked about the Mathis 302 from the FBI.  I neglected to mention that when Mathis was murdered in 2006, Prince George's

County Police Department put out a $25,000 cash rewarded for information on his death.

We have no reason to believe that the Prince George's County Police Department does something like that for every murder victim, but it did for Mr. Mathis. So that's another, sort of, brick in the wall that supports our suspicion that Mr. Mathis may have been an informant and that counsel had an obligation to explore that. Thank you.

THE COURT: Okay. Anything else from you, Ms. Wilkinson?

MS. WILKINSON: No, sir.

THE COURT: All right. Thank you very much, counsel. We'll be in recess.

(Recess at 4:50 p.m.)

*   *   *

CERTIFICATE OF COURT REPORTER

I, Linda C. Marshall, certify that the foregoing is a correct transcript of the record of proceedings in the above-entitled matter.

/s/
_____
Linda C. Marshall, RPR
Official Court Reporter

**$**

**$25,000 [1]**  101/1

**.**

**.22 [5]**  56/22 57/3 57/4 57/10 64/20

**/**

**/s [1]**  102/7

**0**

**03-0457 [1]**  1/5
**0417 [1]**  1/22
**0457 [1]**  1/5

**1**

**1148 [1]**  12/10
**1188 [1]**  12/10
**12 [1]**  4/3
**12.2 [1]**  83/8
**127 [1]**  1/21
**13 [1]**  90/1
**1890 [1]**  77/25
**1900 [1]**  77/25
**19106 [1]**  1/22
**1920 [1]**  78/2
**1920's [1]**  78/1
**198 [1]**  49/10
**199 [1]**  50/7
**1997 [1]**  3/18

**2**

**20 [2]**  50/7 50/22
**200 [2]**  1/15 50/22
**20004 [1]**  1/19
**2002 [3]**  49/12 51/6 59/6
**2005 [3]**  27/23 41/5 49/9
**2006 [3]**  13/1 27/22 100/25
**2011 [2]**  10/6 86/25
**2018 [2]**  1/7 73/5
**202 [1]**  51/4
**202-344-4741 [1]**  1/20
**20770 [1]**  1/15
**22 [1]**  23/22
**2255 [5]**  3/19 6/5 7/9 7/16 36/20
**267-639-0417 [1]**  1/22
**27th [1]**  51/5
**28th [1]**  51/6
**29 [1]**  1/7
**2:15 [1]**  1/8
**2nd [1]**  1/21

**3**

**301 [1]**  1/24
**301-344-4235 [1]**  1/16
**302 [17]**  14/12 16/3 16/4 16/5 16/12
 18/18 20/6 20/7 22/2 25/6 25/9 30/7
 30/17 40/17 41/11 42/16 100/24
**32 [1]**  97/2
**3229 [1]**  1/24
**344-3229 [1]**  1/24

**4**

**40 [1]**  94/9
**404 [6]**  55/16 58/6 58/12 58/13 59/22
 59/25

**4235 [1]**  1/16
**457 [1]**  2/3
**4741 [1]**  1/20
**4:50 [1]**  101/14

**5**

**50 [1]**  70/3
**575 [1]**  1/19
**5th [1]**  41/6

**6**

**6500 [1]**  1/15
**661 [1]**  12/6
**689 [1]**  12/9

**7**

**773 [1]**  12/6
**7:00 [1]**  19/13
**7th [1]**  49/9

**8**

**868 [1]**  12/8
**871 [1]**  12/8

**9**

**911 [2]**  23/2 24/18

**A**

**ABA [6]**  66/5 66/12 72/13 72/19 94/22
 95/8
**abided [1]**  94/23
**ability [1]**  89/15
**able [10]**  3/10 24/16 41/5 54/8 70/15
 76/22 88/11 89/17 96/25 97/24
**about [114]**
**above [1]**  102/4
**above-entitled [1]**  102/4
**abrasion [1]**  60/3
**absence [2]**  9/19 38/17
**absolute [1]**  70/5
**absolutely [9]**  32/11 55/17 68/21 68/22
 71/25 72/20 77/10 80/4 96/21
**abuse [10]**  66/20 69/15 74/12 74/22
 75/16 76/8 76/11 78/24 81/8 93/22
**abusers [2]**  77/8 77/8
**accept [1]**  99/12
**accepted [1]**  82/19
**according [1]**  60/4
**accumulate [1]**  85/23
**accuse [1]**  24/24
**accused [1]**  70/21
**act [4]**  54/5 55/5 60/21 62/21
**Action [1]**  1/4
**activities [1]**  93/24
**activity [1]**  93/21
**acts [1]**  6/18
**actual [2]**  58/3 91/24
**actually [22]**  7/8 12/23 13/5 13/18 18/14
 20/23 22/13 37/12 40/21 51/1 54/24
 55/16 56/2 57/12 58/20 64/21 69/22
 71/15 72/9 72/10 73/23 97/18
**add [6]**  8/6 52/7 52/12 84/12 85/3 95/22
**added [1]**  29/14
**addiction [1]**  74/22
**addition [2]**  47/24 96/24
**additional [14]**  10/18 33/19 40/24 43/22

43/22 45/2 46/14 47/17 55/11 55/12
 56/13 56/14 92/20 94/4
**addresses [1]**  74/6
**adjudications [1]**  70/23
**admission [2]**  48/17 58/9
**admit [1]**  58/11
**admitted [1]**  40/14
**adult [1]**  71/13
**advance [4]**  38/2 38/11 40/21 41/2
**adverse [1]**  91/16
**advised [1]**  19/9
**advisement [2]**  97/7 100/15
**affected [1]**  6/6
**affects [1]**  91/3
**affidavit [8]**  29/10 44/8 44/17 44/22 45/6
 51/19 53/11 100/23
**affidavits [1]**  29/13
**after [14]**  13/1 19/12 23/2 24/18 24/18
 27/19 38/9 38/18 44/3 49/21 56/23
 57/10 94/20 99/1
**after-effect [1]**  94/20
**afternoon [2]**  2/8 2/12
**afterwards [1]**  24/10
**Afton [36]**  30/23 30/25 32/25 33/1 33/2
 53/22 54/4 54/14 54/22 55/2 55/4 55/11
 55/13 55/18 55/24 56/4 56/15 56/23
 57/5 57/10 57/20 57/24 58/4 58/25 59/8
 59/15 59/19 59/22 60/19 61/9 61/20
 62/9 63/5 63/10 63/24 64/9
**again [31]**  18/23 21/9 29/19 34/3 38/25
 39/13 41/16 43/19 44/3 44/10 47/7 53/7
 53/13 53/14 55/14 56/10 57/8 57/9
 57/17 61/5 72/3 72/12 72/18 72/24
 73/13 74/24 85/5 89/10 95/13 99/1
 99/11
**against [6]**  24/1 29/25 34/10 45/19
 89/19 93/17
**age [1]**  67/12
**agency [1]**  71/19
**agent [6]**  16/12 16/13 16/13 40/7 40/18
 41/8
**agents [1]**  40/11
**aggravated [1]**  60/21
**aggravating [4]**  60/16 61/3 84/14 86/9
**aggravator [1]**  62/20
**aggressive [1]**  7/5
**ago [2]**  70/3 90/1
**agree [5]**  3/16 6/19 12/14 100/11 100/14
**agreement [1]**  18/17
**agrees [1]**  81/23
**ahead [2]**  12/13 100/13
**ahold [1]**  15/12
**AIDED [1]**  1/25
**akin [2]**  3/23 4/3
**albeit [1]**  4/2
**alcohol [7]**  71/11 71/21 75/16 76/11
 76/19 77/8 81/8
**alcoholism [1]**  74/1
**all [131]**
**allegation [5]**  26/18 27/3 36/15 39/16
 41/16
**allegations [4]**  3/20 5/7 5/15 99/25
**allege [8]**  35/15 35/20 36/2 37/5 38/19
 71/24 87/24 97/20
**alleged [9]**  6/18 26/25 35/13 35/15
 36/13 56/3 57/2 57/12 95/16

## A

**alleging [3]** 11/4 36/4 80/24
**allow [1]** 12/21
**allowed [1]** 83/10
**alluding [1]** 37/12
**almost [6]** 22/8 23/21 53/13 62/20 66/1 91/9
**alone [4]** 5/12 7/17 8/3 8/4
**along [3]** 70/18 81/17 82/16
**already [9]** 6/12 6/13 9/4 17/3 29/14 47/4 50/4 78/13 85/3
**also [21]** 3/6 10/4 28/4 30/22 31/16 31/17 40/11 44/1 45/10 47/11 48/12 65/6 65/22 66/4 70/8 70/22 80/9 87/24 92/9 95/7 95/8
**although [7]** 4/20 5/3 7/7 27/25 59/11 96/7 98/1
**altogether [1]** 8/16
**always [2]** 26/11 81/20
**am [4]** 19/3 36/15 44/6 83/20
**Amendment [2]** 26/4 27/7
**AMERICA [2]** 1/4 2/4
**among [1]** 85/8
**amount [3]** 67/21 71/6 90/23
**analogizing [1]** 11/8
**analogous [1]** 10/22
**analogy [2]** 10/20 87/19
**analysis [1]** 85/14
**analyze [1]** 86/7
**analyzed [1]** 11/16
**Angelone [1]** 86/1
**angle [2]** 27/2 28/15
**announced [1]** 3/17
**another [14]** 11/6 14/17 23/19 24/25 30/8 53/20 60/3 60/13 61/2 62/20 63/6 73/12 75/9 101/5
**answer [16]** 4/18 49/13 49/16 49/20 49/23 50/9 50/15 50/21 50/25 51/3 51/7 58/7 78/3 81/6 96/21 99/16
**answered [1]** 51/13
**answers [1]** 22/7
**Anthony [1]** 68/2
**any [30]** 2/25 5/20 7/19 8/8 12/2 15/22 18/15 22/14 35/23 35/24 36/22 41/7 45/7 47/5 58/14 59/16 60/8 64/6 66/3 67/15 68/7 68/19 69/14 70/23 76/25 77/11 78/2 79/17 83/11 94/5
**anybody [2]** 23/10 63/1
**anymore [1]** 84/4
**anything [16]** 2/14 18/15 22/1 25/5 27/6 35/16 35/20 43/20 50/23 52/7 63/21 65/8 74/4 95/22 97/6 101/9
**anyway [2]** 34/25 88/9
**apart [1]** 96/13
**apparently [2]** 35/24 46/4
**appeal [2]** 83/15 83/18
**appear [1]** 40/4
**APPEARANCES [1]** 1/12
**appears [1]** 92/4
**approach [1]** 47/8
**approached [1]** 34/20
**appropriate [5]** 3/1 5/20 11/7 30/24 92/10
**are [81]** 2/15 3/6 3/21 5/25 6/3 6/12 6/14 7/1 7/12 7/13 8/5 8/17 9/3 9/24 17/6

24/11 28/3 33/3 33/3 35/17 43/24 47/2 47/9 51/8 51/9 52/16 52/17 54/7 55/9 55/25 56/17 65/18 66/3 66/9 67/4 67/4 67/7 67/9 67/22 68/6 68/9 68/20 69/3 70/5 70/11 70/16 71/3 71/4 73/3 73/5 74/20 76/21 77/9 77/16 77/23 78/9 79/3 79/13 80/18 80/24 81/21 82/2 82/10 83/4 85/2 87/15 90/11 90/24 91/2 92/2 92/18 93/11 93/12 93/13 95/9 95/17 95/18 95/22 96/2 99/22 100/6
**arguable [1]** 30/9
**argue [5]** 3/11 8/10 58/2 61/6 75/4
**argued [6]** 25/21 25/25 32/13 83/4 83/7 98/4
**arguing [9]** 3/3 7/1 16/23 24/2 60/12 87/23 92/7 95/24 98/6
**argument [13]** 7/23 9/1 9/16 11/24 12/13 13/17 18/22 23/9 32/18 61/24 76/17 94/6 95/21
**arguments [1]** 6/4
**around [4]** 63/15 68/2 68/3 70/7
**array [1]** 87/10
**arrest [9]** 44/8 44/22 45/5 51/19 53/11 56/21 57/2 57/7 64/19
**arrested [3]** 51/1 57/9 63/8
**as [89]** 2/9 2/9 3/5 3/5 4/5 5/6 5/6 5/14 5/14 5/22 5/22 6/10 9/10 13/4 13/5 14/6 15/4 15/5 16/18 18/6 20/11 21/10 21/16 22/6 25/21 25/25 27/13 27/13 28/17 29/10 31/5 31/23 35/23 38/13 39/22 42/1 43/8 45/13 47/4 48/6 54/10 54/11 56/7 57/20 58/8 58/13 58/25 59/25 61/6 61/8 62/15 62/19 66/1 66/1 66/6 66/8 67/24 68/3 68/8 68/8 68/18 68/19 70/14 73/4 74/5 76/21 80/11 80/16 83/7 84/16 87/22 90/8 90/8 91/25 92/5 92/25 92/25 93/2 94/5 96/1 96/11 97/25 98/1 98/2 99/23 99/25 100/7 100/10 100/12
**aside [3]** 47/11 64/2 90/10
**ask [8]** 4/8 4/16 24/21 30/6 30/14 38/25 43/15 76/24
**asked [10]** 15/12 16/25 17/2 32/25 38/14 39/9 69/14 74/14 81/6 83/9
**asking [27]** 4/12 5/14 6/3 12/20 12/21 22/7 22/8 22/15 23/22 25/4 30/12 38/4 54/7 66/13 66/14 67/1 77/23 78/3 81/19 92/2 92/14 92/18 92/19 98/22 100/2 100/5 100/5
**asks [1]** 88/12
**aspect [1]** 100/12
**aspects [3]** 68/10 68/17 95/6
**assertion [1]** 97/15
**assess [1]** 87/12
**assistance [14]** 3/10 6/19 8/19 16/23 26/11 46/24 53/24 58/16 60/10 64/24 65/16 85/13 86/10 92/3
**associate [1]** 33/23
**associates [1]** 57/21
**assume [1]** 93/15
**assuming [1]** 6/3
**at [129]**
**attached [1]** 7/9
**attacked [1]** 71/16
**attacking [1]** 87/5
**attention [1]** 10/17
**attorney [2]** 11/6 26/12

**attorneys [3]** 1/14 2/13 94/14
**aunt [2]** 74/17 74/18
**authority [1]** 8/15
**automatically [1]** 15/24
**available [2]** 28/13 69/9
**aware [2]** 29/15 86/1
**away [2]** 19/23 25/13

## B

**Baby [1]** 19/3
**back [30]** 2/18 2/21 4/20 9/18 13/4 16/16 19/8 19/14 19/15 19/24 25/20 25/23 26/12 34/9 42/23 44/3 49/8 54/13 58/15 64/21 75/8 75/9 79/3 82/8 85/5 95/15 97/8 97/9 97/10 100/19
**background [7]** 13/21 39/19 61/8 77/13 79/19 81/3 93/1
**background that [1]** 79/19
**bad [4]** 8/13 63/14 93/4 96/2
**balance [1]** 48/21
**bargains [1]** 39/19
**based [11]** 25/8 29/23 37/23 43/16 48/16 53/1 56/25 77/9 89/12 92/4 99/5
**basic [1]** 66/11
**basically [5]** 14/16 14/22 18/25 20/14 47/1
**basis [6]** 14/9 28/25 36/2 36/4 36/23 90/12
**be [88]** 3/3 3/21 5/3 7/6 7/13 7/22 9/23 11/5 11/21 13/8 14/5 15/17 15/17 15/21 18/12 21/14 23/9 23/12 24/16 25/8 25/23 26/15 30/10 30/18 31/15 31/16 32/2 32/7 35/3 35/8 35/23 38/10 41/10 42/5 42/11 45/1 48/3 48/4 48/4 48/5 48/8 48/9 54/7 58/9 58/10 58/10 63/15 63/16 64/10 66/12 66/18 68/24 69/15 69/16 69/16 70/19 72/19 72/24 73/2 73/6 73/7 74/5 75/1 75/11 76/22 81/14 82/2 82/13 85/15 87/19 87/20 88/11 89/15 89/17 89/24 91/10 91/19 92/4 92/20 95/14 96/25 97/24 99/13 99/25 100/6 100/9 100/12 101/13
**bear [2]** 5/6 5/7
**Beard [2]** 52/25 69/6
**because [107]**
**become [1]** 42/16
**becomes [1]** 85/19
**becoming [2]** 79/14 83/10
**been [67]** 3/9 8/18 8/18 8/18 8/22 10/15 11/14 11/17 13/9 14/7 14/9 14/23 15/6 15/9 18/7 18/14 19/9 25/21 28/2 28/13 28/19 32/8 32/18 33/6 33/15 33/18 33/24 34/9 34/15 37/16 39/14 40/6 40/8 40/15 40/22 40/24 41/6 43/17 44/16 47/4 47/14 47/22 47/25 52/12 52/20 57/13 61/1 62/10 65/20 71/11 77/25 80/20 82/19 84/24 87/16 88/13 89/22 89/25 90/4 90/7 97/12 98/22 99/21 99/21 99/24 100/21 101/7
**beer [1]** 19/13
**before [35]** 1/10 2/2 2/4 4/19 6/16 14/13 23/1 33/2 33/11 37/2 37/13 37/25 38/7 38/8 38/21 42/17 42/20 42/22 42/22 44/2 44/24 45/1 53/23 55/4 55/24 80/25 85/13 85/16 87/15 89/20 92/24 94/3 94/6 96/21 99/5

# B

**Beg [1]** 75/14
**begin [1]** 91/6
**beginning [1]** 100/19
**behalf [2]** 2/9 2/13
**behavior [1]** 74/24
**being [17]** 14/6 14/7 20/20 21/11 21/21 21/22 23/5 24/14 29/25 30/24 38/9 42/6 42/7 57/20 61/8 66/20 95/5
**belied [1]** 23/14
**belief [1]** 100/20
**believably [1]** 28/2
**believe [18]** 3/20 6/14 17/7 26/25 36/24 37/19 41/10 43/16 46/19 48/19 48/24 56/25 64/20 71/17 83/16 83/16 99/18 101/3
**believed [4]** 22/20 35/3 48/4 48/19
**believes [1]** 5/22
**believing [1]** 14/9
**below [1]** 85/18
**benefit [1]** 61/23
**benefits [3]** 45/21 46/12 51/17
**besides [2]** 25/15 34/6
**best [4]** 23/18 27/11 38/13 94/17
**better [13]** 8/18 8/18 8/18 8/22 58/7 66/24 69/8 73/14 80/20 97/12 99/14 99/21 100/12
**between [9]** 57/23 67/5 67/16 72/4 73/5 74/9 84/22 93/8 96/19
**beyond [6]** 43/11 43/13 46/5 59/16 84/5 84/11
**big [1]** 71/7
**bigger [2]** 69/8 95/16
**biggest [1]** 96/23
**biological [1]** 71/10
**birth [15]** 66/22 66/23 73/17 74/3 74/13 74/25 75/4 75/9 75/15 76/9 76/12 81/11 93/22 94/5 95/14
**bit [8]** 25/4 58/10 67/19 75/25 76/5 76/5 91/5 93/25
**bleeds [1]** 31/7
**blood [3]** 23/12 27/11 87/10
**blooded [3]** 54/15 56/8 64/13
**blunt [1]** 64/8
**blur [1]** 66/2
**body [2]** 23/11 23/14
**boils [1]** 65/17
**bolster [1]** 20/22
**bona [1]** 51/10
**born [5]** 74/2 77/25 81/7 81/10 89/19
**both [9]** 6/6 21/13 21/14 31/3 53/24 54/14 56/17 57/24 61/20
**boxes [1]** 80/5
**boxy [1]** 40/15
**Bracey [1]** 3/17
**Bradley [1]** 16/12
**Brady [20]** 10/23 10/24 11/8 11/10 15/17 17/1 17/20 29/21 30/2 30/6 30/9 30/14 30/20 38/1 38/17 39/1 45/11 47/12 51/10 52/2
**Brady information [1]** 30/14
**Brady violations [1]** 10/24
**brain [11]** 1/21 2/10 3/11 36/8 65/1 65/12 65/14 79/1 91/3 91/25 95/1
**brains [1]** 91/2

**Branch [1]** 67/15
**break [5]** 29/25 65/2 65/12 91/19 91/19
**brick [1]** 101/6
**bricks [4]** 95/18 95/20 95/21 95/22
**brief [6]** 10/3 12/5 14/15 18/24 29/16 65/13
**briefing [1]** 4/2
**briefly [1]** 95/2
**bring [1]** 91/10
**bringing [1]** 70/12
**broad [1]** 95/17
**broke [1]** 95/14
**brother [1]** 72/4
**brought [4]** 5/6 5/7 10/17 85/22
**Bug [2]** 19/3 19/8
**bullet [3]** 58/4 59/11 60/18
**bullets [3]** 59/16 59/17 63/9
**bunch [1]** 54/6
**burden [3]** 6/14 84/20 85/1
**burglary [1]** 43/5
**bus [2]** 19/14 19/15
**but [151]**
**butt [1]** 60/5
**buy [5]** 36/3 83/24 83/25 84/17 99/3

# C

**calculus [1]** 84/4
**call [12]** 18/5 22/12 23/2 23/25 24/18 25/15 25/19 27/6 46/24 53/14 53/15 88/21
**called [11]** 10/7 18/3 21/25 22/16 22/25 25/23 26/2 70/22 80/16 93/7 97/3
**calling [1]** 97/1
**calls [1]** 7/13
**came [16]** 13/13 19/15 30/7 30/23 34/13 39/5 40/15 55/17 58/13 59/15 62/12 62/13 62/17 62/19 70/18 72/11
**camel's [1]** 95/14
**can [36]** 2/20 2/21 6/24 7/2 7/6 7/15 7/22 7/22 9/1 9/18 27/6 27/8 27/10 35/15 38/13 38/21 52/14 53/8 71/1 72/2 74/5 74/10 77/20 80/17 81/13 81/17 81/24 82/14 85/23 86/18 86/21 91/8 91/11 92/1 99/17 100/1
**can't [18]** 9/23 15/5 27/5 27/6 27/14 28/21 28/23 52/25 53/5 53/6 53/14 53/18 71/4 78/11 81/17 84/5 88/17 97/18
**candidly [2]** 35/7 47/8
**cannot [2]** 53/14 99/4
**capital [1]** 79/16
**car [21]** 14/23 19/2 19/17 19/21 20/5 23/4 23/11 34/15 34/22 35/4 37/16 37/19 40/15 42/24 42/25 43/1 43/3 56/3 57/1 57/12 63/5
**care [1]** 95/11
**carefully [1]** 66/1
**caretaker [1]** 67/23
**carjacked [4]** 33/11 33/16 37/1 42/25
**carjacking [5]** 33/5 33/15 33/22 34/11 43/6
**Carolina [2]** 72/1 72/2
**case [97]** 2/3 3/17 3/18 3/19 3/24 4/4 5/23 6/14 7/23 8/8 9/19 9/21 10/4 10/6 10/6 10/7 10/18 11/16 12/2 12/3 12/9 12/18 13/6 13/18 14/14 15/13 16/12

16/13 16/13 18/3 19/22 20/21 20/23 21/12 21/12 22/9 22/10 23/15 23/23 28/1 28/9 29/7 33/6 35/21 35/23 36/25 37/15 37/17 38/10 39/15 40/18 41/8 45/21 46/7 46/9 46/13 47/2 47/8 47/13 48/1 48/7 48/15 48/16 51/17 51/17 51/20 52/7 55/14 62/10 65/24 66/7 66/8 72/15 72/20 78/16 78/22 79/6 85/21 85/24 86/2 86/3 86/25 88/9 92/24 93/3 93/17 94/25 95/3 95/7 95/8 95/11 97/17 98/22 99/7 99/11 100/7 100/13
**cases [21]** 7/19 10/4 11/22 11/25 44/19 44/24 45/18 45/22 51/21 52/13 52/16 52/17 52/24 66/6 69/24 70/4 93/14 97/16 98/7 98/7 99/9
**cash [1]** 101/1
**casings [2]** 57/4 57/4
**catch [3]** 19/13 23/22 91/19
**categories [1]** 65/22
**category [1]** 85/7
**cause [1]** 5/22
**caused [1]** 60/21
**certain [3]** 18/9 53/13 79/13
**certainly [8]** 7/5 9/1 18/1 23/23 48/19 70/11 98/18 100/11
**certificate [14]** 66/16 66/22 73/18 73/25 74/3 74/13 75/4 75/9 76/10 76/12 81/11 94/5 95/14 102/1
**certificates [3]** 66/23 74/25 75/15
**certify [1]** 102/2
**cetera [1]** 51/8
**challenge [1]** 10/12
**challenged [1]** 10/16
**challenges [2]** 70/12 71/1
**chance [1]** 99/10
**Chaney [2]** 16/14 54/2
**change [1]** 95/25
**changes [1]** 94/5
**changing [1]** 44/2
**characteristics [2]** 59/12 61/8
**charge [2]** 40/9 70/20
**charged [3]** 42/7 47/22 62/15
**charges [2]** 49/15 49/19
**Charles [3]** 46/8 48/13 49/3
**check [3]** 25/20 25/23 91/24
**checked [2]** 82/22 94/11
**Cherrywood [1]** 1/15
**chief [1]** 28/1
**child [5]** 68/12 69/15 69/16 70/21 92/5
**child's [1]** 67/25
**childhood [17]** 68/8 68/11 68/11 69/19 70/8 71/13 79/8 82/21 90/7 90/20 90/25 91/17 91/18 93/4 93/8 96/2 96/12
**childhoods [1]** 91/13
**chose [1]** 14/5
**chronic [1]** 74/1
**Church [1]** 1/21
**Circuit [25]** 7/24 10/4 10/6 10/8 10/10 10/13 10/18 10/19 10/19 11/15 12/9 22/25 58/8 58/11 58/14 58/17 59/7 59/19 60/9 61/25 85/24 87/1 87/14 93/2 98/23
**circuits [1]** 10/5
**circumstance [1]** 86/9
**circumstances [2]** 7/15 84/3
**cite [6]** 10/4 10/4 10/6 10/19 12/10 69/6

# C

**cited [2]** 5/23 86/2
**civil [2]** 3/24 4/4
**claim [54]** 3/5 3/5 3/7 3/9 4/6 4/6 4/9 4/23 4/23 4/24 4/25 6/5 9/4 9/5 9/5 9/7 11/5 11/6 11/11 12/14 28/5 30/2 30/22 32/7 32/22 32/23 37/8 37/10 43/24 45/11 47/11 47/12 47/13 49/5 53/21 58/16 60/10 65/17 67/1 68/22 86/10 86/13 86/13 87/2 88/6 92/2 92/11 92/11 92/12 92/19 92/20 95/13 95/16 97/25
**claims [13]** 3/6 4/11 4/14 4/18 5/16 26/11 32/21 32/22 46/24 48/17 53/24 86/11 86/12
**clean [1]** 80/18
**clear [7]** 13/5 18/12 22/19 26/15 44/22 47/21 65/23
**clearly [7]** 4/18 7/11 11/10 46/6 47/13 73/25 97/15
**client [4]** 7/6 7/12 74/10 74/21
**clients [1]** 97/3
**clinical [4]** 78/22 79/22 80/1 93/7
**clinically [1]** 77/13
**close [3]** 33/12 33/13 33/23
**closely [1]** 37/7
**closest [1]** 37/1
**closing [1]** 63/24
**clothing [1]** 25/22
**co [6]** 2/10 33/6 36/8 36/25 44/9 94/22
**co-counsel [3]** 2/10 36/8 94/22
**co-defendants [3]** 33/6 36/25 44/9
**COBB [2]** 1/13 2/13
**cocaine [1]** 40/12
**cognitive [2]** 89/13 89/14
**Colbert [7]** 56/22 57/1 57/3 57/7 57/9 57/12 57/17
**cold [3]** 54/15 56/8 64/13
**cold-blooded [3]** 54/15 56/8 64/13
**coldblooded [1]** 57/21
**Cole [1]** 24/17
**Coles [1]** 23/3
**collectively [1]** 86/18
**Columbia [1]** 67/14
**come [17]** 26/12 35/19 51/1 54/25 58/16 59/24 59/25 60/9 62/11 62/15 63/10 76/14 80/17 83/3 89/1 94/15 98/24
**comes [3]** 2/4 35/7 36/1
**comfortable [1]** 82/2
**coming [1]** 36/3
**commend [1]** 99/2
**common [1]** 23/23
**community [1]** 89/25
**compelling [2]** 24/9 69/1
**competent [2]** 88/14 88/15
**compiling [1]** 74/5
**complaint [1]** 5/15
**completely [7]** 23/7 23/14 44/25 54/15 57/21 60/23 92/21
**complicated [1]** 54/20
**complying [1]** 66/11
**component [1]** 71/2
**compromise [1]** 17/9
**COMPUTER [1]** 1/25
**COMPUTER-AIDED [1]** 1/25
**concedes [1]** 36/22

**concentrated [1]** 41/4
**concrete [2]** 22/24 23/14
**concretely [1]** 71/15
**conduct [1]** 6/22
**conducted [1]** 27/1
**confession [1]** 14/17
**confluence [1]** 91/15
**confused [2]** 29/8 41/13
**connecting [1]** 58/3
**connection [5]** 5/5 29/6 45/11 72/14 74/9
**connections [1]** 67/5
**consider [9]** 34/5 48/23 62/13 84/2 85/9 85/21 86/14 86/18 88/11
**consideration [3]** 21/16 45/18 46/15
**considering [2]** 85/16 89/2
**consistent [1]** 14/16
**constellation [3]** 10/11 10/13 12/1
**constituting [1]** 85/12
**constitutional [2]** 66/11 97/18
**constitutionally [7]** 80/15 80/20 90/9 92/3 97/13 97/22 99/15
**contacts [1]** 69/14
**contain [4]** 70/5 70/24 72/23 92/24
**contend [2]** 55/8 60/24
**contentious [1]** 30/15
**contents [1]** 20/13
**contest [1]** 95/3
**contested [4]** 62/18 93/18 94/19 95/6
**context [6]** 10/23 10/23 11/8 11/9 11/16 29/15
**continue [2]** 35/8 48/23
**contrary [2]** 7/21 66/10
**contributed [1]** 79/19
**convicted [2]** 48/25 90/4
**conviction [2]** 10/16 87/6
**convinced [1]** 93/15
**cooperate [1]** 52/9
**cooperated [2]** 52/8 52/16
**cooperating [4]** 23/24 28/3 46/6 46/12
**cooperation [18]** 17/21 18/14 21/12 44/19 44/23 45/8 45/17 45/21 46/1 46/4 46/13 47/10 48/8 51/16 51/20 51/24 52/2 52/13
**cooperator [9]** 20/20 20/21 22/8 22/11 45/13 47/24 47/25 52/6 52/10
**copies [1]** 54/8
**copy [1]** 56/12
**corpus [1]** 35/20
**correct [14]** 7/18 8/7 10/1 16/8 17/17 48/2 49/12 50/6 73/8 77/10 85/20 92/1 100/1 102/3
**Corrections [2]** 72/7 73/10
**corroborate [1]** 91/8
**corroborated [1]** 44/16
**corroboration [1]** 24/11
**corroborative [1]** 70/17
**could [76]** 6/22 8/4 8/17 8/18 8/18 8/22 9/25 10/20 11/21 13/15 14/7 15/24 16/24 17/2 18/10 23/18 24/24 25/10 25/23 26/2 27/12 27/15 27/16 27/16 28/19 30/1 30/10 30/13 31/14 31/15 32/5 32/5 32/7 32/8 32/8 33/15 33/21 35/10 42/11 43/17 43/21 45/18 46/14 46/17 48/3 48/11 48/12 52/5 52/5 52/11 52/20 58/22 58/23 60/14 63/16 66/1

67/20 68/8 69/15 69/16 69/16 71/5 80/20 84/23 90/7 90/18 90/19 95/13 96/1 96/3 96/3 97/12 97/19 98/8 99/21 99/21
**couldn't [7]** 13/20 16/24 46/17 59/12 66/3 71/14 91/19
**counsel [62]** 2/6 2/10 3/4 5/1 5/1 6/8 6/23 7/5 7/16 10/11 10/15 10/16 11/17 11/19 11/20 15/11 17/15 18/7 20/8 20/9 20/10 29/18 31/12 33/18 36/8 38/2 40/20 41/1 41/1 43/15 47/3 48/9 53/24 55/17 60/11 64/7 65/16 65/25 66/6 66/6 66/9 68/23 71/9 71/22 80/14 83/4 84/22 85/14 87/7 87/22 88/14 88/15 88/17 88/17 88/24 92/3 94/22 97/1 97/16 100/21 101/7 101/12
**counsel's [8]** 9/20 10/12 13/8 13/10 53/1 55/15 85/9 87/5
**count [2]** 44/1 97/2
**County [22]** 9/12 12/22 12/24 15/8 16/15 21/1 38/6 41/12 44/18 45/24 51/23 52/1 54/2 54/5 56/1 56/12 56/21 57/6 64/17 64/23 101/1 101/4
**couple [2]** 54/11 59/4
**course [14]** 6/9 7/9 11/24 16/4 30/15 32/9 36/10 42/3 61/15 73/1 77/3 77/5 83/8 95/21
**court [50]** 1/1 1/24 2/3 2/5 4/24 5/4 5/10 5/22 5/22 6/10 10/21 10/22 11/9 12/21 16/1 16/19 16/25 17/2 23/8 29/7 29/12 29/14 35/20 40/4 40/5 47/4 49/15 50/5 52/23 60/17 65/21 67/15 67/16 69/13 70/19 76/14 81/16 83/17 85/9 86/14 86/24 88/1 88/7 88/22 92/19 92/22 94/4 97/1 102/1 102/8
**Court's [6]** 3/17 5/21 6/15 59/5 83/13 91/23
**cousins [3]** 33/17 34/14 37/2
**cover [1]** 91/6
**covering [1]** 51/14
**crack [1]** 40/12
**created [1]** 40/18
**credibility [4]** 13/19 46/16 47/5 47/25
**credible [4]** 31/6 31/13 33/25 48/13
**crime [2]** 84/1 90/1
**crimes [4]** 44/15 45/22 52/8 62/14
**criminal [11]** 1/4 2/3 39/19 40/4 45/15 45/16 79/14 79/17 83/10 93/21 93/24
**critical [2]** 67/24 93/23
**critically [1]** 67/25
**cross [8]** 25/25 42/14 43/22 48/5 78/18 87/8 87/24 88/8
**cross-examination [4]** 25/25 42/14 43/22 48/5
**cross-examine [1]** 78/18
**cross-examining [3]** 87/8 87/24 88/8
**crossed [2]** 41/24 42/2
**Crystal [2]** 23/2 24/17
**cumulate [2]** 11/18 11/20
**cumulating [1]** 85/17
**cumulative [2]** 12/1 85/14
**cumulatively [4]** 9/20 86/7 86/14 88/11
**cumulativeness [1]** 85/6
**Cunningham [7]** 79/11 83/9 93/9 93/10 93/11 96/17 97/2
**Cunningham's [1]** 82/16

## C

**cut [2]** 46/17 99/13
**cuts [1]** 48/3

## D

**D.C [6]** 1/19 70/19 70/21 71/8 71/18 71/20
**date [1]** 73/4
**Davis [2]** 23/4 24/10
**Davis' [1]** 23/13
**day [11]** 6/3 7/4 7/13 8/9 19/10 27/10 42/6 42/17 42/20 43/12 43/14
**days [2]** 71/19 71/20
**Dayson [13]** 26/16 28/14 28/23 36/13 36/19 38/13 42/13 43/21 47/16 51/18 54/21 94/18 97/11
**dead [1]** 23/13
**deal [4]** 9/3 47/23 56/9 70/13
**deals [2]** 46/18 48/3
**dealt [3]** 9/4 9/4 44/1
**death [22]** 10/7 10/9 49/1 61/19 63/6 66/6 66/7 66/16 67/11 69/3 73/25 74/22 78/24 84/25 87/9 92/24 93/14 93/17 95/11 97/3 99/9 101/2
**deceased [3]** 66/14 67/18 74/14
**decide [1]** 87/12
**decided [1]** 61/5
**decision [9]** 6/7 8/2 47/3 47/16 47/18 53/2 53/5 53/17 53/18
**decisions [2]** 7/12 94/16
**deck [1]** 89/19
**declaration [6]** 14/10 21/10 28/25 29/2 29/5 29/7
**defendant [5]** 1/7 1/18 2/22 9/10 14/18
**defendant's [2]** 66/14 89/6
**defendant/petitioner [1]** 2/22
**defendants [4]** 33/6 36/25 37/17 44/9
**Defenders [1]** 36/9
**defending [1]** 26/10
**defense [28]** 6/14 13/8 22/11 23/16 30/8 38/2 39/21 40/19 41/1 41/5 42/11 42/20 43/15 44/20 44/21 45/5 46/2 46/11 48/9 55/17 62/22 62/23 64/7 64/16 64/22 66/5 84/11 97/16
**defense's [2]** 13/19 33/23
**deficiencies [4]** 86/15 87/5 87/11 87/15
**deficiency [3]** 81/10 86/15 88/20
**deficient [8]** 80/20 85/15 87/7 87/15 88/16 90/10 97/14 97/18
**deficiently [2]** 88/2 88/7
**definitely [1]** 78/17
**definition [2]** 88/16 97/21
**delinquency [3]** 69/23 69/25 70/20
**demonstrable [1]** 71/12
**denied [1]** 40/6
**department [22]** 9/12 12/22 12/24 15/8 16/15 38/6 41/12 45/25 51/23 52/1 54/2 54/6 54/8 56/1 56/12 56/21 57/6 64/17 64/23 73/10 101/1 101/4
**dependence [1]** 76/19
**depending [2]** 52/14 73/23
**depends [1]** 25/18
**depose [2]** 44/4 54/1
**depth [1]** 35/24
**depths [2]** 92/5 94/20

**describe [1]** 96/23
**described [3]** 19/6 19/25 82/7
**describes [1]** 20/1
**description [1]** 34/23
**deserved [1]** 54/18
**deserves [1]** 91/20
**desperately [2]** 71/22 71/23
**detail [2]** 94/10 96/12
**detailed [2]** 44/14 78/14
**detective [7]** 16/14 40/3 40/3 40/18 41/8 44/18 54/1
**determination [2]** 53/1 100/7
**determinations [1]** 99/4
**determine [10]** 4/6 4/25 5/14 6/18 6/25 8/2 10/14 11/2 11/14 53/16
**determined [1]** 59/7
**determining [1]** 5/8
**develop [1]** 54/21
**developed [1]** 3/21
**development [3]** 68/1 68/13 71/13
**did [104]**
**didn't [72]** 13/20 14/4 17/9 17/23 17/25 19/5 19/23 21/22 22/11 22/12 23/19 23/25 24/15 24/15 25/11 26/6 26/8 26/17 26/24 27/13 28/23 34/5 35/10 35/14 36/22 37/21 39/2 39/2 39/3 39/10 39/11 41/17 47/20 51/12 53/8 53/13 54/24 58/19 59/9 60/1 61/15 63/1 64/5 64/16 68/17 68/19 69/9 69/10 71/14 75/23 77/4 80/16 80/24 80/25 80/25 81/15 82/8 82/8 83/24 84/1 84/17 85/14 88/2 94/14 94/15 94/15 95/3 98/9 98/10 98/11 98/15 98/19
**die [2]** 23/7 54/18
**died [5]** 60/19 67/23 73/25 93/22 93/23
**differ [1]** 12/23
**difference [8]** 11/18 32/11 32/12 78/20 84/22 96/6 96/8 96/9
**different [20]** 10/15 11/3 11/14 24/7 32/21 37/15 42/12 44/25 61/17 67/16 79/8 86/11 87/3 87/6 87/13 87/16 87/21 89/2 91/3 99/25
**difficult [3]** 82/21 90/6 90/20
**dig [1]** 77/24
**direct [1]** 83/14
**directed [1]** 93/3
**directly [7]** 38/14 55/14 58/6 59/23 59/25 70/16 98/24
**disabuse [1]** 7/14
**disagree [1]** 5/24
**disagreement [1]** 5/20
**disagrees [1]** 6/8
**disclose [2]** 16/25 45/12
**disclosed [6]** 16/3 16/4 38/1 44/20 47/14 52/2
**discover [4]** 13/24 64/24 81/21 100/22
**discovered [4]** 38/25 43/11 43/13 73/6
**discovery [43]** 3/1 3/3 3/12 3/16 4/1 4/8 4/8 4/11 4/12 4/17 4/17 4/21 5/4 5/5 5/6 6/2 7/10 12/20 13/24 16/4 20/7 22/7 28/12 28/20 28/24 29/20 30/3 46/25 61/13 65/15 90/15 90/16 90/17 92/2 92/17 92/20 94/25 98/22 99/7 99/8 99/10 100/8 100/9
**discretion [1]** 5/21
**discrimination [1]** 9/5

**discussed [1]** 12/4
**discussing [1]** 70/12
**discussions [1]** 26/14
**diseased [1]** 67/17
**Dismiss [1]** 4/4
**disorders [1]** 76/8
**disposition [1]** 70/21
**dispositive [1]** 8/17
**dispute [5]** 7/6 76/25 77/4 77/17 78/4
**disregarding [1]** 88/22
**distinguishing [1]** 86/6
**DISTRICT [4]** 1/1 1/1 1/11 67/14
**DIVISION [3]** 1/2 1/14 72/7
**do [107]**
**document [2]** 71/19 77/9
**documented [1]** 71/12
**documents [8]** 9/10 12/25 23/21 56/18 56/20 72/13 72/19 97/9
**doer [4]** 12/18 13/11 14/24 28/18
**does [18]** 3/24 12/2 18/20 18/21 39/11 60/9 60/24 68/23 74/4 74/13 74/18 76/9 87/17 90/16 91/11 97/4 97/4 101/4
**doesn't [13]** 7/17 9/24 14/20 14/20 22/14 24/22 27/9 27/14 27/25 61/24 68/24 91/6 95/25
**doing [7]** 17/19 18/9 27/1 47/1 70/21 90/3 96/24
**domestic [1]** 69/17
**don't [106]**
**done [16]** 18/11 25/10 27/16 34/5 35/10 35/11 43/24 60/14 65/4 73/4 84/23 85/17 88/24 97/1 97/20 99/14
**doors [1]** 100/8
**doubt [8]** 25/14 51/9 59/16 61/18 62/12 62/12 84/5 84/11
**doubtful [1]** 8/19
**doubting [1]** 93/20
**doubts [1]** 61/23
**down [21]** 4/19 34/24 41/5 42/19 42/20 42/21 49/17 50/22 65/17 66/20 66/25 71/3 75/9 75/25 76/5 76/5 77/16 77/24 89/22 93/25 94/2
**downplaying [1]** 88/23
**Dr [5]** 83/9 93/10 93/11 96/17 97/2
**dragged [3]** 19/7 19/17 20/4
**drank [2]** 19/13 67/11
**draw [1]** 10/20
**drawn [1]** 66/4
**dreads [1]** 14/21
**drive [5]** 19/2 60/22 61/2 61/19 64/13
**drive-by [4]** 60/22 61/2 61/19 64/13
**driver [1]** 64/5
**driving [3]** 19/8 19/10 63/15
**dropping [2]** 49/17 50/22
**drove [1]** 23/13
**drug [7]** 33/17 71/21 76/11 77/8 78/24 81/8 93/22
**ducking [1]** 85/2
**dude [1]** 23/19
**due [1]** 74/1
**during [11]** 6/9 29/11 56/3 59/8 63/5 63/24 75/16 77/5 78/13 78/24 93/23
**dysfunction [2]** 66/19 89/21

## E

**each [12]** 4/11 4/13 5/2 5/10 7/1 63/16

**E**

**each... [6]** 66/4 69/21 84/9 85/9 85/14 88/23
**earlier [4]** 19/10 19/20 85/6 95/4
**early [3]** 67/11 76/19 76/20
**easier [1]** 87/21
**educational [1]** 89/5
**effect [8]** 40/19 57/18 58/23 58/24 64/8 70/15 94/7 94/20
**effective [3]** 83/23 89/15 89/16
**effects [6]** 71/12 81/1 81/2 90/25 91/1 92/16
**egregious [1]** 63/17
**eight [1]** 65/11
**Eighth [1]** 10/19
**either [9]** 29/8 38/5 78/17 80/13 87/25 97/6 97/13 98/24 99/9
**ELLEN [2]** 1/13 2/13
**Elmore [7]** 10/7 11/15 12/5 86/2 86/25 87/4 88/21
**else [15]** 9/3 23/10 24/8 25/5 25/24 30/20 31/6 37/9 49/2 63/25 74/4 88/18 97/6 98/6 101/9
**elsewhere [1]** 70/14
**emphatically [1]** 96/4
**end [11]** 6/2 7/3 7/13 8/9 8/17 23/13 84/5 88/1 89/1 90/16 99/20
**ended [2]** 89/2 96/20
**ends [1]** 85/12
**enough [9]** 11/17 11/21 12/1 12/11 24/15 84/24 85/19 93/16 98/3
**entire [6]** 47/2 58/9 68/3 68/3 70/7 85/8
**entirely [2]** 14/16 82/19
**entitle [3]** 4/14 5/12 5/15
**entitled [7]** 3/21 5/8 6/1 9/17 55/9 61/13 102/4
**Eric [4]** 9/9 13/6 14/22 37/1
**erratic [1]** 74/23
**erroneous [2]** 58/9 58/10
**error [8]** 9/24 58/11 59/21 62/1 83/13 83/17 86/8 86/9
**errors [8]** 9/20 11/18 11/20 12/1 85/23 86/18 87/21 88/16
**ESQUIRE [4]** 1/13 1/13 1/18 1/21
**essential [1]** 79/12
**essentially [7]** 54/17 58/25 65/17 81/18 86/11 90/12 95/23
**establish [10]** 43/8 66/23 67/4 73/13 74/7 74/8 74/8 74/25 81/25 87/15
**established [1]** 5/21
**establishing [1]** 72/3
**et [1]** 51/8
**Eugene [6]** 9/11 34/16 34/21 34/22 35/6 37/14
**evaluate [1]** 80/19
**evaluating [2]** 10/24 11/10
**evaluations [1]** 72/25
**even [30]** 7/10 9/24 9/24 12/2 13/19 19/23 23/22 24/22 25/2 32/9 36/4 41/10 44/4 44/21 59/23 61/17 63/18 66/11 68/24 69/7 80/19 85/13 85/16 86/19 90/5 91/6 94/14 94/19 95/13 98/2
**evening [1]** 55/7
**event [7]** 22/22 33/7 55/17 58/14 60/8 64/6 78/3

**events [5]** 14/16 22/13 24/19 47/23 96/14
**eventually [1]** 61/25
**ever [4]** 49/15 50/19 50/23 96/13
**every [9]** 8/2 47/3 66/7 66/9 66/10 72/20 99/7 100/7 101/4
**Everybody [1]** 24/7
**everything [6]** 6/3 29/22 41/14 53/9 55/7 88/18
**evidence [134]**
**evidentiary [1]** 76/3
**exact [1]** 10/5
**exactly [8]** 4/10 10/2 38/20 42/18 55/1 59/12 64/6 73/1
**examination [4]** 25/25 42/14 43/22 48/5
**examine [1]** 78/18
**examiner [1]** 87/9
**examining [3]** 87/8 87/24 88/8
**example [8]** 75/21 76/4 76/19 85/11 87/20 87/22 87/22 95/5
**except [2]** 29/23 98/8
**excepted [1]** 85/24
**exclude [1]** 59/22
**excluded [1]** 59/19
**exclusion [1]** 63/9
**exculpatory [3]** 15/17 16/18 47/13
**excuse [1]** 84/1
**exhibit [11]** 14/14 18/23 21/10 29/1 29/16 39/22 40/2 44/10 44/11 44/11 58/25
**exhibits [1]** 29/3
**exist [6]** 23/22 28/13 28/22 39/2 39/11 69/23
**existed [1]** 43/16
**expect [1]** 39/13
**experiences [3]** 68/11 68/12 91/16
**expert [22]** 60/4 66/18 75/20 75/21 76/3 76/18 76/21 77/12 77/21 79/6 79/11 79/11 80/25 81/4 81/13 81/14 82/2 89/17 92/10 92/16 93/9 97/3
**experts [5]** 67/24 87/6 90/24 91/11 93/12
**explain [6]** 15/10 67/25 89/17 91/11 91/14 96/25
**explained [4]** 90/23 90/24 96/14 97/4
**explains [2]** 14/4 91/16
**explicit [1]** 95/9
**explore [1]** 101/8
**explored [7]** 17/17 17/18 17/19 20/19 36/24 48/9 61/14
**exploring [1]** 18/1
**exposed [2]** 95/5 96/16
**exposure [2]** 71/21 81/2
**expound [1]** 2/22
**expressly [1]** 86/5
**extensive [2]** 46/3 46/4
**extensively [4]** 20/18 45/14 45/15 77/4
**extent [5]** 21/18 33/14 48/14 70/11 79/15
**extraordinarily [1]** 20/13
**extremely [1]** 14/5
**eyewitness [2]** 23/4 57/11

**F**

**F.3d [2]** 12/6 12/10
**face [4]** 4/15 68/25 94/23 98/1

**facie [1]** 3/19
**fact [28]** 13/11 23/7 28/2 28/13 28/18 29/24 30/12 31/5 33/10 35/9 43/3 44/3 46/6 50/10 52/13 53/12 57/16 59/13 63/4 68/25 69/24 71/10 82/20 86/2 88/19 89/20 92/21 92/23
**factor [3]** 84/9 84/14 94/12
**factors [10]** 63/3 77/13 79/18 83/5 83/10 84/15 93/9 93/16 94/10 96/18
**facts [5]** 3/21 4/5 82/13 93/8 95/17
**fail [4]** 27/2 69/1 69/1 91/10
**failed [14]** 26/19 26/22 28/14 28/15 31/13 31/13 36/13 40/25 41/1 43/15 45/13 51/18 68/16 92/10
**failing [2]** 9/8 33/18
**failure [4]** 10/12 13/8 32/6 90/9
**failures [2]** 10/13 85/10
**fair [2]** 89/24 98/21
**fairly [1]** 98/23
**faith [3]** 28/24 36/14 36/15
**fall [1]** 86/15
**Falls [2]** 23/2 24/17
**false [1]** 29/8
**falsely [2]** 24/24 30/1
**familial [1]** 67/5
**family [16]** 66/21 67/14 69/13 73/14 73/15 74/8 76/6 76/22 77/5 77/12 78/7 78/19 78/23 89/21 92/6 95/10
**far [8]** 27/13 52/14 68/8 68/18 69/17 72/5 82/9 82/9
**fashion [1]** 25/10
**father [4]** 74/10 78/8 78/25 93/21
**fault [1]** 89/16
**faulting [4]** 36/10 36/11 66/9 66/10
**FBI [8]** 16/9 16/11 16/13 38/5 40/5 41/11 45/25 100/24
**fearing [1]** 57/25
**federal [2]** 36/9 73/11
**feeling [1]** 44/2
**fell [1]** 85/18
**fetal [1]** 71/12
**feud [1]** 57/23
**fides [1]** 51/10
**field [1]** 90/25
**Fifth [2]** 26/3 27/7
**fighting [1]** 61/9
**figure [1]** 27/25
**file [4]** 57/6 70/22 71/18 72/8
**filed [1]** 54/4
**files [2]** 68/17 70/20
**filing [1]** 36/19
**fill [1]** 79/3
**finally [1]** 40/14
**find [12]** 13/25 30/3 34/21 52/6 71/5 81/8 81/9 81/9 90/20 93/16 94/9 97/18
**fine [3]** 27/4 88/18 88/19
**finger [3]** 14/6 17/4 49/19
**fire [1]** 63/7
**fired [6]** 56/2 56/2 56/6 56/7 56/11 60/18
**first [16]** 2/7 6/25 12/20 32/2 47/10 50/10 55/21 59/4 67/24 68/17 69/12 71/20 86/6 91/7 94/21 97/14
**Fisher [3]** 86/1 86/2 86/7
**five [7]** 9/25 40/10 52/16 65/17 65/22 66/25 87/6
**floating [1]** 9/23

**F**

**Flood [14]** 19/4 19/8 19/11 19/19 23/3 33/5 33/10 33/12 33/15 33/17 33/23 36/25 37/4 37/8
**Flood's [1]** 86/3
**Floor [1]** 1/21
**Foamposite [4]** 50/8 50/11 50/11 50/20
**focused [2]** 63/1 69/23
**focusing [1]** 73/3
**fold [1]** 14/10
**folk [1]** 79/10
**folks [1]** 55/2
**follow [6]** 20/16 27/2 28/8 45/7 46/2 51/18
**follow-up [3]** 20/16 28/8 46/2
**followed [2]** 28/6 40/20
**forcefully [1]** 90/19
**foregoing [1]** 102/2
**forensic [4]** 56/5 57/16 60/4 61/10
**forget [1]** 84/4
**form [3]** 41/11 56/18 64/19
**formal [1]** 41/11
**formally [1]** 90/23
**forth [6]** 2/18 2/21 4/21 64/21 93/2 95/4
**forward [2]** 8/25 39/5
**found [29]** 13/15 27/17 27/18 29/7 32/8 36/23 37/24 38/15 38/19 43/17 57/4 58/9 58/10 59/6 59/9 59/17 60/2 63/9 63/25 74/11 79/15 85/17 85/23 87/11 88/25 90/1 90/6 93/18 94/11
**foundation [1]** 13/22
**four [7]** 19/2 19/16 52/16 67/16 67/24 69/17 70/16
**fourth [24]** 7/24 10/4 10/6 10/8 10/10 10/13 11/15 19/5 22/21 22/25 24/14 58/8 58/11 58/14 58/17 59/7 59/18 60/9 61/25 85/24 87/1 87/13 93/2 98/23
**frankly [2]** 52/7 58/18
**friend [2]** 34/20 37/1
**front [8]** 19/9 44/9 58/18 60/15 61/3 61/6 78/16 87/17
**full [1]** 90/11
**fully [2]** 3/21 82/19
**functioning [2]** 71/13 91/3
**further [3]** 17/17 36/24 45/6

**G**

**gained [1]** 82/5
**gate [1]** 36/5
**gather [3]** 46/6 67/17 77/15
**gathered [2]** 72/19 90/22
**gave [13]** 24/5 25/9 30/9 30/16 30/20 38/5 38/11 40/4 45/23 51/24 78/14 88/17 96/5
**general [7]** 2/19 2/24 9/14 12/14 71/9 71/18 71/20
**generation [2]** 71/3 71/3
**generational [2]** 66/19 81/2
**generations [1]** 89/22
**generic [1]** 2/20
**genetic [9]** 67/5 71/2 72/3 73/13 74/8 74/9 74/25 75/2 81/25
**genetically [2]** 67/12 76/7
**genetically-related [1]** 76/7
**George [1]** 68/3

**George's [22]** 9/12 12/22 12/24 15/8 16/14 21/1 38/6 41/12 44/17 45/24 51/23 52/1 54/2 54/5 56/1 56/12 56/21 57/6 64/17 64/23 100/25 101/3
**Georgia [1]** 77/24
**get [34]** 3/11 5/11 6/1 7/11 11/21 12/12 12/14 20/6 24/15 28/23 30/3 33/19 39/10 40/10 45/18 50/14 56/11 65/20 66/3 66/6 68/17 72/2 75/16 77/6 77/12 77/20 77/24 82/14 84/21 85/13 89/3 92/15 99/1 100/13
**gets [1]** 36/5
**getting [9]** 6/8 15/16 18/9 18/12 18/13 47/23 70/14 78/2 96/18
**Giglio [2]** 39/8 39/10
**girl [1]** 25/20
**girlfriend [6]** 18/3 18/6 25/16 49/12 49/14 50/4
**girls [2]** 23/2 24/10
**give [7]** 11/22 22/2 39/25 71/5 74/4 85/21 99/7
**given [8]** 15/23 20/13 21/15 29/25 42/13 43/21 71/24 88/13
**gives [2]** 14/16 20/3
**giving [3]** 22/6 61/23 99/8
**go [28]** 2/18 2/21 2/21 4/20 6/11 8/25 9/18 12/13 13/4 18/25 25/20 25/23 42/23 46/25 47/6 48/5 58/15 69/17 75/8 75/9 82/8 85/5 91/5 97/5 97/8 97/9 97/10 100/13
**Goat [1]** 19/4
**goes [4]** 37/12 45/3 45/4 92/18
**going [33]** 4/20 7/13 13/25 15/25 19/12 19/22 30/18 33/2 34/9 35/8 38/10 52/12 52/16 52/17 61/25 64/25 67/19 68/14 70/6 70/24 73/2 73/5 73/6 77/6 77/17 81/8 81/11 83/5 91/10 94/20 95/18 100/13 100/19
**goldmine [1]** 70/6
**gone [1]** 68/8
**good [12]** 2/8 2/12 5/22 18/7 25/13 28/24 36/14 36/15 72/22 85/12 90/3 91/14
**gosh [1]** 92/14
**got [30]** 8/14 10/8 10/13 14/21 24/4 27/10 27/15 35/23 42/6 45/21 54/6 63/23 66/25 75/4 76/10 76/14 80/5 81/3 81/12 87/21 88/3 88/10 88/19 90/17 90/23 91/5 95/17 96/18 97/2 98/20
**gotten [8]** 15/11 15/13 15/15 15/24 16/19 55/4 55/6 64/22
**government [79]** 1/13 6/8 11/5 14/4 14/5 14/8 14/10 15/6 16/17 17/7 17/21 21/16 21/19 21/22 22/4 22/5 22/20 23/24 24/3 24/15 24/24 27/17 28/1 29/21 29/23 30/19 31/22 32/7 33/5 35/1 37/14 37/25 38/9 38/11 38/14 38/16 38/18 38/20 39/2 40/20 40/25 41/2 41/7 42/16 42/19 42/21 43/7 44/21 45/7 45/11 45/18 45/24 46/3 48/10 51/10 51/22 54/12 55/19 56/3 57/1 57/18 58/20 58/22 58/24 59/3 63/23 66/8 71/16 76/20 77/17 78/4 78/6 81/22 82/1 84/10 89/25 93/19 94/19 95/3
**government's [16]** 2/23 4/1 12/19 37/20 38/20 39/9 39/10 40/22 42/9 42/11

43/15 54/13 57/20 64/3 64/4 78/21
**grade [1]** 86/19
**Gramley [1]** 3/18
**grand [6]** 15/1 22/1 33/9 39/3 39/4 49/21
**grandfather [2]** 66/15 77/1
**grandma [1]** 70/9
**grandma's [1]** 72/4
**grandmother [2]** 82/10 89/6
**grant [1]** 41/3
**great [5]** 66/15 67/11 72/4 74/14 74/15
**greater [1]** 46/15
**Greenbelt [2]** 1/6 1/15
**grew [1]** 67/22
**ground [2]** 7/1 35/21
**grounds [5]** 17/1 27/24 42/13 43/9 43/21
**grow [1]** 91/2
**growing [1]** 92/8
**growth [1]** 93/24
**guarantee [1]** 53/8
**guess [9]** 6/22 30/2 35/8 38/12 41/13 42/16 51/9 84/4 89/24
**guessing [1]** 47/2
**guidelines [3]** 66/5 66/12 95/8
**guilt [33]** 3/4 4/12 4/23 11/19 25/18 25/19 31/1 31/4 31/7 31/15 31/18 31/25 32/7 32/11 32/22 48/25 53/24 54/14 58/23 59/9 65/4 65/5 65/5 65/6 86/7 86/13 86/17 87/2 87/3 87/5 87/21 88/9 98/24
**guilty [3]** 32/8 79/16 90/1
**gun [10]** 59/6 59/6 59/11 59/13 59/16 60/2 60/5 61/11 63/8 64/5
**guts [1]** 77/7
**guy [15]** 14/21 14/22 14/24 16/6 17/4 19/5 20/4 20/5 20/15 20/23 20/24 46/18 48/3 62/4 82/21
**guys [2]** 33/13 70/16

**H**

**habeas [3]** 35/20 99/7 99/9
**had [74]** 7/22 10/15 14/18 17/3 17/7 18/8 19/9 22/12 23/4 25/6 25/22 26/3 26/14 27/11 27/15 35/11 37/5 37/16 38/15 40/6 40/7 40/8 40/11 40/12 40/14 40/21 41/21 43/16 44/22 44/23 45/5 45/12 45/19 46/11 46/15 49/11 50/4 58/22 58/24 59/10 59/12 59/13 60/7 60/14 61/10 63/7 68/14 69/19 70/13 71/10 73/23 74/21 74/23 82/21 83/11 85/19 87/8 88/24 89/11 89/13 89/13 89/22 90/6 90/20 91/5 91/15 91/18 93/22 97/5 99/5 99/8 99/9 100/21 101/7
**hair [1]** 87/9
**hand [1]** 11/23
**handed [1]** 14/13
**handwritten [1]** 42/15
**handy [1]** 42/4
**hanging [1]** 48/21
**happen [3]** 19/22 23/20 53/14
**happened [10]** 19/13 20/2 22/13 24/6 24/8 53/12 53/13 55/1 58/25 96/20
**happening [1]** 41/3
**happens [3]** 84/2 91/16 96/15
**happy [1]** 6/15
**hard [2]** 7/11 37/21
**harm [1]** 60/21

# H

**harmless [5]** 58/11 58/15 59/21 62/1 88/4
**has [34]** 3/18 3/19 3/24 6/14 7/24 10/16 10/21 10/22 11/9 26/5 26/12 29/12 34/15 44/12 44/14 44/16 46/13 47/4 52/1 54/19 64/17 64/23 70/22 71/12 76/10 76/22 84/10 84/11 85/15 86/14 86/23 87/19 89/25 90/17
**Haus [1]** 11/1
**have [257]**
**haven't [6]** 3/9 35/24 35/25 73/2 80/6 80/13
**having [6]** 2/22 24/19 27/1 36/4 47/5 47/24
**Hayes [30]** 9/9 13/6 14/7 14/23 19/22 20/5 21/13 23/5 23/7 23/10 29/25 31/14 33/7 33/11 33/15 33/17 32/22 34/10 34/19 34/23 37/2 37/3 37/7 37/18 52/18 58/6 59/11 60/6 61/21 62/8
**Hayes' [5]** 19/1 33/17 35/2 37/2 60/4
**he [245]**
**he's [15]** 14/21 25/3 26/10 30/2 30/10 30/12 42/5 48/4 61/13 61/24 63/13 63/19 67/12 76/23 97/2
**head [2]** 30/5 60/4
**health [3]** 71/2 72/25 74/12
**hear [12]** 2/23 9/16 12/13 13/24 14/25 22/3 59/2 65/1 65/12 89/23 90/5 91/21
**heard [10]** 15/4 19/23 29/12 31/11 45/1 51/16 64/15 91/4 91/4 92/9
**hearing [5]** 2/5 38/18 75/21 76/4 96/2
**heart [1]** 92/18
**heavily [2]** 54/7 56/11
**Heights [3]** 55/3 55/23 57/24
**help [2]** 27/14 96/25
**helped [2]** 20/22 39/15
**helpful [1]** 74/5
**Henry [3]** 73/13 73/18 74/9
**her [16]** 25/23 51/13 70/16 74/22 78/18 79/20 80/3 80/9 82/10 82/12 82/16 82/18 89/15 89/16 92/9 96/5
**here [48]** 5/20 6/12 8/22 9/3 13/21 14/5 21/13 24/2 24/9 26/13 27/4 28/18 28/21 28/23 29/22 33/8 36/3 41/16 44/12 46/25 47/3 48/23 50/2 50/23 51/2 52/9 52/9 55/17 56/9 57/19 60/23 60/23 60/24 61/16 66/14 67/1 68/9 77/16 78/12 80/21 84/20 85/7 87/18 91/8 92/1 94/13 95/21 100/2
**here's [2]** 44/7 76/18
**hid [1]** 29/24
**hiding [1]** 24/24
**highly [1]** 74/24
**him [42]** 14/4 17/8 18/15 19/6 22/12 23/13 23/25 24/15 24/16 25/5 25/22 27/9 30/7 30/9 30/20 32/10 34/25 35/25 38/22 40/4 40/9 40/16 41/5 42/20 42/21 44/4 45/19 46/19 48/17 48/25 49/1 51/8 68/4 70/13 74/11 75/10 89/7 89/9 89/19 96/20 98/11 98/15
**himself [4]** 14/18 20/16 26/10 67/11
**hindsight [1]** 94/14
**hire [2]** 80/25 92/10
**hired [1]** 92/16

**his [83]** 2/22 7/6 7/8 7/12 19/14 21/2 21/3 21/5 21/7 21/9 23/11 23/14 24/4 27/11 27/25 29/25 34/20 39/3 39/5 39/5 39/18 42/24 43/1 44/3 45/15 45/16 45/17 45/21 47/25 52/11 52/12 52/13 57/25 60/5 60/24 61/16 62/8 62/14 63/3 67/17 67/22 67/23 67/24 68/3 68/7 68/11 68/11 70/7 70/8 70/9 70/12 70/14 71/20 72/4 72/4 72/8 72/12 74/11 74/12 74/22 77/1 77/1 77/1 78/18 78/22 78/24 78/25 79/18 82/10 86/17 92/4 92/6 93/4 93/9 93/21 93/21 93/22 93/22 93/23 93/24 94/22 96/2 101/2
**history [25]** 23/23 39/19 45/8 45/13 45/15 45/16 45/17 46/1 46/3 46/4 46/13 48/8 51/20 51/24 70/24 74/22 74/23 76/6 77/5 77/12 80/2 89/18 89/21 92/5 95/10
**homicide [7]** 33/1 55/24 56/4 56/23 57/20 64/9 79/16
**honestly [1]** 7/3
**Honor [116]**
**Honor's [1]** 3/10
**HONORABLE [1]** 1/10
**Hooks [1]** 12/9
**hope [1]** 69/18
**hours [1]** 79/12
**house [4]** 23/13 68/4 68/4 87/25
**household [1]** 67/21
**how [35]** 6/12 9/3 12/14 15/11 15/13 15/14 20/6 26/23 27/19 52/14 58/15 61/21 62/17 62/17 64/25 67/18 69/17 73/24 75/19 76/9 79/12 80/8 82/1 84/6 85/13 87/11 87/12 89/1 90/19 91/7 94/4 94/16 94/24 98/18 100/8
**huge [1]** 81/3
**human [1]** 61/8
**hunch [1]** 89/12
**hyphen [1]** 79/25
**hypothetical [1]** 32/5

# I

**I'd [3]** 25/20 25/23 80/6
**I'll [3]** 11/23 58/2 92/14
**I'm [55]** 8/19 11/8 16/5 17/12 18/5 18/10 18/11 21/4 22/18 23/21 24/19 26/9 27/15 32/13 32/20 34/13 35/8 36/10 36/11 40/1 41/1 41/13 47/7 48/2 49/7 50/22 51/25 52/19 53/13 57/4 58/13 59/18 62/20 65/4 66/13 74/18 75/23 76/1 78/2 78/12 79/23 82/2 82/6 82/12 85/1 85/21 88/20 92/1 94/1 98/21 99/3 99/12 100/11 100/13 100/14
**I've [5]** 27/10 66/25 75/4 99/8 99/9
**idea [11]** 18/7 20/19 22/9 30/10 36/24 43/7 51/23 56/5 61/16 72/22 95/5
**ideas [1]** 27/24
**identified [2]** 65/18 77/16
**identify [1]** 2/6
**identifying [1]** 66/2
**if [88]** 2/20 3/20 5/11 5/21 6/25 7/4 8/2 8/5 8/17 9/24 9/24 10/15 10/20 11/18 11/19 13/5 14/3 14/14 15/9 18/15 18/15 22/6 23/8 24/23 28/12 29/18 29/20 29/23 30/3 31/5 31/12 31/17 31/20 31/24 32/1 32/9 32/12 33/21 35/11

35/24 39/2 39/4 39/10 40/8 41/10 42/5 43/9 46/13 46/23 48/23 53/2 53/3 53/12 53/13 57/9 58/19 60/14 60/17 61/15 62/9 68/25 69/8 69/23 75/20 76/3 77/22 77/22 78/6 79/2 80/18 80/19 81/10 81/14 81/22 82/1 86/19 87/20 87/22 87/25 88/13 88/24 92/1 92/22 94/23 97/20 99/14 99/15 99/16
**II [5]** 9/7 11/5 30/22 37/10 43/24
**illness [8]** 66/20 73/16 73/21 74/24 76/7 76/11 81/10 89/21
**impact [1]** 46/15
**impairments [1]** 89/14
**impeach [2]** 38/21 53/10
**impeaching [3]** 43/9 47/13 47/17
**impeachment [5]** 40/24 43/22 45/2 46/14 48/8
**imperfect [1]** 7/5
**implicate [3]** 18/2 24/1 30/1
**implicating [1]** 9/11
**implication [3]** 17/10 35/22 48/3
**implications [1]** 89/15
**implicit [1]** 4/2
**important [9]** 3/14 4/22 6/10 48/22 50/19 67/25 68/10 77/13 98/3
**importantly [2]** 20/19 58/23
**in [392]**
**in-utero [1]** 95/6
**incarceration [2]** 72/10 73/9
**incarcerations [1]** 72/8
**incident [4]** 54/22 55/18 57/10 58/19
**included [1]** 39/22
**includes [1]** 80/16
**including [3]** 36/19 47/4 67/17
**inconsistent [2]** 39/17 40/23
**incredible [1]** 49/4
**incredibly [1]** 74/23
**independent [1]** 45/12
**independently [1]** 62/13
**indicative [1]** 23/12
**Indictment [1]** 14/13
**individual [4]** 19/17 56/22 67/22 84/9
**individually [1]** 7/23
**individuals [9]** 19/16 19/18 40/12 67/6 67/17 69/18 69/22 70/7 91/9
**indulgence [1]** 91/23
**ineffective [30]** 5/1 6/19 6/25 8/19 11/16 11/21 16/23 18/8 31/18 31/19 32/2 32/7 33/18 43/18 46/24 53/16 53/24 58/15 60/10 65/16 68/9 69/4 69/11 80/9 80/15 85/12 86/10 87/23 87/24 92/3
**ineffectiveness [21]** 3/4 3/7 3/8 4/12 4/13 4/22 4/23 4/24 6/6 6/23 11/9 31/15 31/16 32/22 32/23 45/4 47/11 49/5 52/24 53/1 53/4
**inevitable [1]** 91/9
**infective [2]** 26/11 28/16
**inferences [1]** 23/19
**influence [1]** 82/24
**inform [1]** 100/20
**informal [1]** 65/20
**informally [2]** 90/22 96/24
**informant [28]** 12/24 14/3 14/3 14/8 14/10 15/6 15/9 15/9 15/19 15/21 15/22 15/23 15/25 16/18 16/25 17/9 18/13 21/2 21/15 24/23 27/17 28/8 28/11

## I

informant... [5]  28/21 44/19 87/25 100/21 101/7
informant's [1]  18/10
informants [1]  15/13
information [48]  15/23 18/10 18/13 18/14 20/3 21/15 23/17 24/13 29/21 30/6 30/9 30/14 30/20 32/25 39/8 41/21 42/6 44/15 44/23 45/2 45/8 45/17 45/20 45/23 45/25 46/3 46/12 47/14 50/1 50/14 54/5 55/5 65/23 70/6 71/6 72/24 73/24 74/4 74/5 74/11 75/1 80/5 90/22 92/19 92/25 100/13 100/20 101/2
informs [1]  15/7
injunction [1]  3/23
injury [1]  60/6
innocence [2]  25/19 54/15
inquired [1]  45/15
inquiry [2]  96/1 99/20
instance [2]  32/2 66/5
instances [3]  65/19 70/25 81/25
instead [2]  97/1 97/3
instigated [1]  64/14
interesting [1]  80/18
intertwined [1]  59/23
interview [4]  14/12 16/14 25/6 41/15
interviewed [4]  24/3 37/24 37/24 38/6
interviews [1]  41/9
into [16]  6/1 6/8 9/7 14/19 23/11 27/25 31/7 31/8 34/13 35/19 65/1 92/5 94/20 96/18 96/18 99/1
introduced [4]  23/1 55/19 59/8 78/13
investigate [17]  9/8 11/7 13/8 26/23 27/13 28/15 31/13 32/6 37/6 52/22 53/2 53/3 53/5 53/17 53/18 68/16 69/1
investigated [4]  13/15 20/17 20/18 65/25
investigating [1]  28/7
investigation [16]  9/13 15/4 17/20 20/18 27/1 30/25 36/18 37/23 53/3 54/19 56/25 64/16 68/23 69/21 92/5 95/10
investigations [1]  70/25
investigative [2]  41/11 57/6
investigator [9]  38/8 41/5 41/15 41/18 42/11 42/20 43/12 43/14 43/17
investigator's [1]  39/22
involve [1]  66/5
involved [14]  22/21 24/14 35/3 48/24 49/12 54/16 60/13 60/22 60/25 61/7 61/18 64/21 69/22 93/21
involvement [1]  62/14
involving [2]  7/16 21/12
ironclad [1]  22/25
is [281]
isn't [4]  30/17 76/16 90/16 99/22
isolation [4]  5/2 5/11 6/25 87/25
issuance [1]  3/11
issue [7]  7/11 10/22 52/9 54/8 98/1 98/23 100/8
issues [7]  6/9 71/2 71/2 73/15 73/16 89/11 98/24
it [293]
it's [78]  4/3 4/22 4/23 6/3 6/10 8/3 8/19 13/16 14/14 14/24 16/13 18/12 18/13 18/24 22/8 22/19 23/21 24/20 26/9

26/10 29/3 29/16 30/13 31/10 34/9 36/7 39/3 39/11 40/2 41/16 42/24 45/10 47/6 47/11 47/13 48/11 48/12 50/19 52/12 58/14 64/18 65/2 66/8 67/12 72/9 72/12 72/18 72/22 72/23 73/10 75/2 76/13 77/11 77/22 77/22 79/5 80/4 80/22 80/23 81/20 81/22 82/9 82/19 84/8 84/16 85/11 86/1 88/3 88/8 91/18 92/1 92/15 95/2 95/8 96/6 96/8 99/16 100/4
item [3]  2/21 2/21 3/12
items [1]  4/21
its [6]  8/2 28/1 45/5 45/6 68/25 98/1
itself [2]  5/12 12/2

## J

jail [2]  40/10 87/24
Jamal [1]  2/4
James [10]  19/4 33/5 36/25 77/4 78/14 79/21 79/24 79/25 86/3 93/11
James-Monroe [5]  77/4 78/14 79/21 79/24 93/11
January [3]  1/7 59/6 60/5
Jencks [6]  30/18 38/1 38/17 39/1 39/8 39/9
job [4]  25/13 47/1 70/15 90/3
John [6]  73/13 73/18 73/25 74/9 74/16 74/21
Johnson [1]  22/10
judge [10]  1/11 2/8 3/2 3/15 47/7 53/15 90/10 90/11 94/17 100/18
judgment [1]  46/23
JULIE [2]  1/21 2/10
Julius [6]  14/11 15/3 21/9 21/10 28/25 100/23
jump [5]  2/15 12/8 12/10 89/20 89/20
juncture [1]  3/1
June [2]  19/3 19/8
Junior [1]  68/4
jurisdiction [1]  73/24
juror [1]  84/25
jury [47]  9/5 15/1 22/1 23/1 28/17 31/10 33/10 39/3 39/4 48/11 48/12 48/18 48/23 49/22 49/22 50/2 60/15 61/4 61/7 61/24 62/3 64/15 69/3 79/15 81/1 82/20 82/20 83/12 83/24 84/16 84/24 88/9 90/5 90/19 91/4 91/12 91/18 93/1 93/15 93/17 94/4 94/6 94/8 94/10 94/17 96/14 96/22
jury's [2]  6/7 46/15
just [75]  3/3 5/1 6/16 7/6 8/10 9/18 10/11 11/1 11/8 11/12 14/21 15/25 16/16 17/12 18/12 19/20 19/22 19/23 23/23 24/25 25/23 30/4 30/13 31/2 32/5 33/11 34/4 35/19 35/22 38/3 42/20 51/20 52/19 54/13 56/8 56/18 56/22 58/1 59/5 64/2 64/9 66/3 67/12 67/18 68/22 69/6 69/11 70/20 71/4 71/5 72/1 74/25 75/12 75/24 77/11 77/14 79/15 81/17 81/17 82/5 83/21 84/11 85/2 86/2 88/25 89/4 90/16 91/18 91/24 92/9 93/5 95/2 100/2 100/11 100/14
juvenile [4]  67/9 67/15 69/22 70/19

## K

Keating [10]  14/23 19/1 19/12 19/15 23/8 23/11 27/8 34/24 40/6 40/15

keep [3]  54/22 55/15 87/23
keeping [1]  88/2
KENNETH [3]  1/6 1/18 2/4
Kenny [6]  19/4 71/6 89/19 91/2 91/14 91/15
kept [1]  19/23
key [2]  46/8 95/25
kid [5]  70/23 89/18 91/17 91/19 96/15
kidnapping [1]  32/9
kids [2]  70/16 91/2
kill [1]  63/1
killed [7]  9/9 13/6 14/7 33/11 37/2 37/3 60/19
killing [6]  33/14 33/22 43/9 54/16 55/4 57/21
kind [19]  2/20 8/3 8/25 17/21 18/16 22/9 23/12 28/3 29/19 30/11 34/10 46/25 56/8 68/23 68/24 74/6 81/15 96/16 99/20
kinds [3]  79/6 89/14 100/1
knew [9]  7/8 17/3 19/2 19/3 19/3 19/4 19/18 19/22 45/14
know [113]
knowing [4]  23/25 26/23 36/4 53/19
knowingly [1]  74/20
knowledge [1]  15/1
known [2]  20/11 93/12

## L

lack [2]  63/19 92/4
lady [2]  89/7 89/9
last [5]  14/25 40/2 53/23 97/2 98/8
late [2]  38/25 39/5
law [9]  6/22 7/18 8/7 9/19 9/21 10/1 10/18 48/7 86/20
lawyer [1]  8/13
lawyer's [1]  6/22
lay [1]  79/7
lead [1]  55/12
least [3]  5/7 84/25 86/12
leave [3]  6/16 19/13 100/10
led [1]  74/22
left [6]  22/6 46/18 48/3 62/4 65/3 94/13
legitimately [1]  71/16
length [3]  12/5 78/23 80/8
lengthy [1]  92/22
less [5]  60/16 61/3 63/14 63/17 69/3
lessons [1]  69/5
let [19]  9/16 12/13 22/3 23/25 25/20 47/6 47/7 52/4 58/2 59/2 64/10 75/12 76/24 89/4 89/23 91/14 91/21 100/10 100/14
let's [13]  2/24 3/22 12/14 12/16 13/4 27/4 42/23 65/11 69/12 69/14 79/3 89/24 91/10
level [1]  6/23
life [9]  48/20 57/25 67/24 68/3 68/3 71/20 71/25 74/11 80/2
lifetime [1]  75/16
lifted [1]  49/18
light [2]  34/6 91/14
LIGHTY [79]  1/6 1/18 2/4 2/7 2/9 3/18 3/24 4/14 4/17 5/8 5/12 5/15 7/4 9/9 12/18 13/7 14/6 19/4 19/9 19/10 19/19 20/24 23/3 23/10 30/1 30/16 33/12 34/20 37/3 37/8 48/14 48/16 48/17

## L

**LIGHTY... [46]** 48/24 49/4 50/8 50/11 50/15 54/16 54/17 55/3 55/23 56/3 57/2 57/12 57/22 57/22 57/25 58/5 58/22 59/1 59/5 59/10 60/2 60/13 60/18 60/24 61/18 63/4 63/25 64/4 64/5 67/12 67/22 68/2 68/4 68/5 68/14 68/20 70/4 70/7 70/18 71/7 79/16 82/10 83/11 89/19 91/2 95/5

**Lighty's [21]** 13/1 48/20 59/16 60/5 61/8 61/11 68/3 71/8 71/10 71/25 72/8 73/8 76/6 79/8 80/1 81/3 92/5 92/25 93/8 94/21 96/12

**like [26]** 16/17 23/21 25/16 30/7 31/2 47/22 51/25 56/11 64/24 66/15 67/21 75/20 79/11 80/6 81/22 85/7 88/24 91/2 91/5 91/14 91/17 94/4 96/13 97/2 98/6 101/4

**likelihood [3]** 3/25 69/2 87/13
**likely [3]** 72/23 82/20 89/2
**limitations [1]** 89/14
**limited [4]** 54/3 56/17 65/19 66/4
**Lincoln [3]** 19/8 19/10 19/16
**LINDA [3]** 1/24 102/2 102/8
**line [7]** 6/11 6/11 48/7 50/7 50/22 51/4 52/23
**line-by-line [1]** 6/11
**lineage [1]** 94/21
**link [7]** 67/5 72/3 75/1 75/2 81/25 93/8 96/19
**linked [3]** 59/25 60/3 61/10
**liquor [2]** 19/11 19/12
**list [1]** 67/16
**listened [1]** 82/20
**listening [1]** 91/25
**litany [1]** 83/3
**litigated [2]** 6/9 60/15
**little [11]** 13/1 25/4 33/11 67/18 75/25 87/21 89/18 91/17 95/15 95/18 96/25
**lived [4]** 55/2 55/4 68/4 74/6
**liver [1]** 74/1
**LLP [1]** 1/18
**Ln [1]** 1/15
**loaded [1]** 76/6
**loathed [1]** 81/14
**logic [2]** 36/11 36/12
**long [7]** 18/24 27/19 48/7 52/23 61/7 78/21 94/21
**longer [1]** 10/8
**look [34]** 4/7 4/24 5/2 5/4 5/10 5/13 6/2 6/17 6/24 6/24 7/3 7/15 8/1 8/15 9/19 10/10 10/14 10/24 10/25 11/2 11/11 11/13 11/23 14/14 19/24 25/16 68/25 80/6 81/20 85/22 87/14 92/17 94/23 97/8
**looked [4]** 88/24 98/9 98/22 99/1
**looking [10]** 39/20 49/7 53/9 54/4 55/21 55/25 66/25 67/2 83/22 99/3
**looks [2]** 51/25 69/7
**Lorenzo [4]** 14/17 14/18 19/3 44/8
**Lori [3]** 78/14 79/21 79/25
**loss [1]** 70/14
**lot [27]** 13/14 22/6 24/5 28/18 28/19 34/4 41/6 54/6 54/20 55/8 64/14 71/1 74/4 78/12 79/10 79/10 81/12 81/18

82/22 91/8 91/13 96/3 96/11 96/12 97/24 99/24 100/5
**loud [1]** 63/18

## M

**made [33]** 3/20 5/15 8/2 9/3 14/18 20/16 23/9 26/18 27/3 28/6 29/20 32/10 32/11 32/19 38/15 40/13 40/19 41/8 46/24 47/3 47/16 47/18 48/17 53/17 60/15 63/14 65/23 83/11 85/5 88/15 90/9 90/18 94/6
**maintained [2]** 67/16 71/18
**make [34]** 2/20 3/24 4/16 7/17 8/5 9/25 11/18 12/2 12/3 22/14 23/18 24/22 25/16 36/14 39/11 41/7 47/20 52/25 53/14 53/15 53/18 76/16 78/20 79/13 81/14 84/24 86/19 90/3 90/8 93/8 95/15 97/25 99/4 100/7
**makes [7]** 2/17 4/17 7/23 9/25 24/1 30/4 61/3
**making [5]** 17/20 28/24 28/25 46/18 65/6
**male [2]** 19/7 19/21
**man [7]** 20/4 24/25 47/21 60/19 83/6 89/25 90/6
**man's [1]** 34/15
**mangling [1]** 57/19
**many [4]** 7/12 79/12 97/15 98/7
**map [1]** 31/5
**March [3]** 49/11 51/5 51/6
**March 27th [1]** 51/5
**March 28th [1]** 51/6
**marginally [3]** 81/21 100/6 100/9
**Mark [2]** 79/11 82/16
**Marlow [3]** 55/3 55/23 57/24
**MARSHALL [3]** 1/24 102/2 102/8
**MARYLAND [5]** 1/1 1/6 1/15 72/7 73/10
**masked [1]** 19/18
**match [1]** 59/12
**matched [4]** 59/16 59/17 60/4 63/8
**matches [1]** 88/16
**material [5]** 13/9 38/18 38/21 46/14 53/4
**materiality [3]** 5/25 10/24 63/19
**materially [1]** 68/10
**maternal [4]** 66/15 67/8 67/18 89/6
**Mathis [80]** 9/9 9/11 9/14 12/17 12/23 12/25 13/7 13/11 13/18 14/13 14/15 14/25 15/6 15/8 16/6 16/7 16/8 17/3 17/4 17/7 17/21 17/24 18/2 18/21 19/1 19/9 19/13 20/14 20/15 20/19 20/20 20/23 21/11 21/15 21/25 22/8 22/10 22/16 22/21 23/6 23/9 23/17 23/24 24/3 24/23 25/5 25/6 25/7 25/17 26/2 26/3 27/2 27/7 27/11 27/17 27/19 28/7 28/8 28/11 28/18 28/21 29/20 29/24 30/18 31/14 31/23 32/6 33/12 33/12 33/24 35/6 37/8 37/12 37/17 49/3 100/21 100/24 100/25 101/5 101/7
**Mathis' [14]** 14/2 17/3 18/3 18/5 21/12 21/14 21/18 21/20 24/14 33/4 33/23 37/1 42/25 43/3
**matter [12]** 2/2 2/4 32/18 59/20 62/16 63/10 66/7 68/25 91/11 97/4 97/5 102/4
**mattered [2]** 82/25 83/2
**Mattie [4]** 72/5 74/16 74/17 74/23
**may [23]** 11/5 15/6 21/15 21/16 27/7

32/10 47/21 48/18 48/18 48/19 48/25 49/1 56/13 56/14 62/3 70/2 72/24 75/1 82/18 99/13 100/9 100/21 101/7
**maybe [28]** 8/14 9/23 16/21 16/24 21/22 25/16 26/4 30/8 35/11 43/3 47/20 47/23 51/11 51/13 52/5 58/7 65/1 66/24 67/1 76/25 81/17 83/13 83/25 90/3 90/18 91/17 91/19 98/14
**me [33]** 7/14 8/15 8/16 9/16 9/23 11/22 12/13 13/23 22/3 25/20 39/25 52/4 58/18 59/2 66/15 66/24 67/1 72/21 73/5 75/12 76/1 76/24 78/9 78/16 80/7 89/4 89/23 91/21 92/1 98/22 99/5 100/10 100/14
**mean [51]** 3/24 7/3 8/8 13/5 15/12 15/16 16/21 17/4 18/11 20/15 21/24 24/18 24/23 26/9 26/20 27/24 28/16 28/20 31/2 31/4 31/10 31/12 32/1 32/4 32/4 39/18 40/17 41/15 42/3 42/9 42/19 46/18 47/5 52/19 52/23 55/9 57/16 65/5 68/8 76/21 77/23 79/5 80/10 80/13 80/21 84/1 93/4 95/21 96/10 99/2 99/22
**Meaning [1]** 16/9
**meaningless [1]** 83/12
**means [4]** 4/2 4/3 16/9 65/20
**measure [1]** 81/20
**medical [2]** 72/25 87/9
**Melissa [2]** 23/3 24/17
**member [1]** 78/19
**members [1]** 78/23
**memo [3]** 39/4 39/22 44/11
**memorable [1]** 48/7
**men [2]** 23/1 63/15
**mental [11]** 66/20 72/25 73/15 73/21 74/12 74/24 76/7 76/11 81/9 81/10 89/21
**mention [1]** 100/25
**mentioned [2]** 79/2 95/4
**merely [1]** 36/3
**merits [5]** 3/25 35/18 84/21 84/21 86/15
**MESSITTE [4]** 1/10 2/8 3/2 100/18
**met [5]** 6/14 34/23 40/3 40/5 40/6
**meticulously [1]** 98/23
**might [24]** 11/14 14/9 15/9 15/10 15/23 17/21 18/14 25/20 28/1 33/6 39/14 41/8 55/10 55/11 56/14 61/1 68/24 69/18 73/23 79/19 91/4 98/1 99/19 100/12
**Miller [6]** 14/11 15/3 28/25 29/2 29/12 100/23
**Miller's [3]** 29/5 29/7 29/13
**minimal [1]** 95/10
**minimize [1]** 93/5
**minimum [1]** 66/11
**minor [1]** 64/14
**minute [6]** 26/12 26/22 35/19 73/3 75/3 85/3
**minutes [3]** 23/2 24/17 65/12
**misconduct [2]** 3/5 4/13
**missed [3]** 19/14 69/8 98/3
**misspoke [2]** 67/10 74/18
**mitigate [4]** 54/24 55/16 55/18 83/5
**mitigated [1]** 83/7
**mitigates [2]** 57/18 57/19
**mitigating [6]** 61/6 63/2 84/2 84/15 93/16 94/12

## M

**mitigation [10]** 3/9 54/25 55/11 55/12 56/13 56/15 65/24 72/24 78/22 93/4
**mitigators [1]** 82/23
**moment [1]** 89/25
**Monday [1]** 1/7
**Monroe [7]** 77/4 78/14 79/21 79/23 79/24 79/25 93/11
**month [1]** 37/2
**months [1]** 27/21
**more [41]** 4/3 13/19 20/18 20/19 25/4 25/4 25/15 27/16 32/24 32/25 33/24 37/7 42/12 42/13 43/20 43/25 54/20 58/21 58/23 60/14 60/16 61/7 61/14 63/2 63/21 64/15 65/3 65/8 66/25 69/1 74/3 90/7 90/19 90/19 94/11 96/4 96/7 96/11 96/12 97/24 98/3
**mortal [1]** 23/13
**most [8]** 3/14 30/1 46/24 72/9 72/12 93/3 98/7 99/10
**mother [10]** 67/7 67/17 67/22 70/15 71/10 74/14 77/1 78/7 78/24 93/22
**mother's [1]** 19/14
**motion [15]** 1/10 4/4 4/5 4/14 5/8 7/10 21/10 27/1 29/4 29/6 29/14 29/15 39/22 90/13 98/2
**motions [1]** 2/5
**motive [9]** 33/14 33/22 35/2 37/6 37/15 37/20 37/21 37/25 43/9
**mouth [2]** 50/17 63/13
**move [2]** 53/20 81/17
**Mr [124]**
**Mr. [132]**
**Mr. Cunningham [1]** 93/9
**Mr. Davis [1]** 23/4
**Mr. Davis' [1]** 23/13
**Mr. Flood [2]** 33/17 33/23
**Mr. Hayes [2]** 33/11 37/2
**Mr. Lighty [18]** 2/7 7/4 48/17 48/24 49/4 54/16 54/17 56/3 57/2 57/12 57/25 59/1 59/5 60/13 61/18 63/4 82/10 95/5
**Mr. Lighty's [1]** 68/3
**Mr. Mathis [18]** 13/7 13/11 14/15 23/9 23/24 24/3 24/23 25/5 25/6 25/7 26/3 29/20 29/24 30/18 31/14 100/21 101/5 101/7
**Mr. Mathis' [3]** 24/14 33/23 37/1
**Mr. Miller's [3]** 29/5 29/7 29/13
**Mr. O'Toole [32]** 7/11 23/18 25/3 25/13 26/6 26/7 26/15 29/20 29/22 30/6 30/14 34/4 39/9 41/14 47/16 51/18 52/5 53/8 54/21 60/14 61/5 63/13 68/15 68/16 78/22 92/21 93/7 93/13 93/18 94/6 94/14 94/22
**Mr. O'Toole's [1]** 7/4
**Mr. Rosenthal [20]** 2/25 5/23 6/17 8/11 8/14 9/1 24/2 25/2 26/8 29/22 35/5 39/1 39/14 60/25 61/11 61/24 63/22 86/16 98/4 99/5
**Mr. Rosenthal's [1]** 85/22
**Mr. Scott [15]** 37/23 38/8 38/9 38/10 38/15 38/18 38/24 40/25 41/4 41/9 41/15 42/10 43/8 43/10 43/23
**Mr. Scott's [4]** 37/16 37/19 38/2 42/10
**Mr. Whitley [6]** 44/13 47/17 49/11 49/21

50/24 53/10
**Mr. Whitley's [1]** 49/7
**Mr. Wilson [2]** 24/6 55/23
**Ms [44]** 4/20 5/17 22/10 26/16 28/14 34/2 36/8 36/13 36/19 37/13 38/13 38/23 42/13 43/21 47/16 49/9 51/18 54/21 58/2 58/7 64/2 64/7 65/1 65/9 65/12 65/14 68/14 76/24 77/4 78/9 78/14 79/1 79/20 82/5 82/6 89/23 91/22 91/25 93/11 93/25 95/1 96/5 97/11 101/10
**Ms. [1]** 3/11
**Ms. Brain [1]** 3/11
**much [16]** 33/13 52/13 53/8 64/25 69/8 69/8 73/24 83/12 86/1 90/19 92/25 93/18 95/16 96/4 96/11 101/12
**multi [1]** 66/19
**multi-generational [1]** 66/19
**multigenerational [1]** 95/10
**multiple [3]** 65/20 87/4 87/4
**murder [28]** 9/13 12/25 19/1 21/3 21/5 21/7 24/18 32/9 33/7 35/2 37/6 37/7 52/18 58/6 59/8 59/11 59/15 59/22 61/9 61/21 62/8 62/9 62/15 63/10 87/23 88/3 88/10 101/5
**murdered [4]** 21/11 27/19 28/2 100/25
**mushed [1]** 25/4
**must [6]** 40/18 41/10 48/8 48/9 77/25 85/9
**my [12]** 2/9 18/9 34/8 34/14 34/15 36/12 47/21 57/19 80/15 80/21 83/25 100/6
**myself [3]** 47/21 52/14 78/2

## N

**name [8]** 15/19 15/21 15/22 15/25 16/17 16/25 17/3 79/20
**named [2]** 14/19 56/22
**names [1]** 56/14
**narcotics [2]** 44/15 45/23
**narrowly [1]** 66/4
**nature [1]** 24/21
**nearly [1]** 92/24
**necessarily [4]** 16/2 32/2 52/20 75/5
**necessary [2]** 81/21 81/21
**need [25]** 3/10 7/10 10/23 10/25 11/24 18/6 59/9 60/1 72/3 74/7 74/25 76/2 76/14 76/16 80/10 80/10 80/19 81/12 85/3 89/17 95/15 97/9 97/10 97/14 97/24
**needed [3]** 41/21 79/18 92/20
**needing [1]** 79/16
**neglect [3]** 67/15 69/16 69/24
**neglected [1]** 100/24
**neighborhood [1]** 55/2
**neurobiological [4]** 68/13 81/1 91/1 92/16
**neurotoxins [1]** 95/6
**never [6]** 7/22 38/14 64/15 81/3 91/4 96/21
**new [4]** 29/6 29/13 32/14 32/16
**next [6]** 27/20 36/5 42/6 43/12 43/14 47/12
**night [7]** 19/1 22/14 22/22 24/6 40/9 55/4 55/24
**Nike [1]** 50/8
**no [78]** 1/4 2/16 7/6 7/7 7/23 9/24 10/8

16/2 20/10 21/25 22/1 22/12 23/12 24/1 24/25 28/8 28/12 30/4 30/12 30/24 31/20 32/17 34/3 34/24 36/7 36/23 38/1 38/1 39/16 40/17 43/1 43/4 43/7 45/25 47/17 47/20 50/9 50/18 50/21 50/25 51/23 54/3 61/18 62/12 62/12 62/15 63/10 65/10 68/7 68/21 68/21 73/7 73/22 73/22 76/13 77/3 77/10 77/10 79/5 79/5 79/5 82/8 84/18 84/18 86/5 86/5 86/5 87/3 89/16 90/15 91/5 95/13 98/11 98/17 98/17 99/23 101/3 101/11
**nobody [5]** 26/5 82/25 83/2 86/23 96/13
**non [7]** 18/17 62/19 63/2 82/23 84/7 84/8 94/10
**non-prosecution [1]** 18/17
**non-statutory [6]** 62/19 63/2 82/23 84/7 84/8 94/10
**none [2]** 7/9 30/12
**Nor [1]** 46/1
**not [184]**
**note [2]** 4/22 66/14
**notes [21]** 1/25 40/19 41/7 42/9 42/12 42/15 43/16 43/19 43/20 54/6 54/7 54/9 55/6 55/8 55/9 55/10 55/22 56/1 56/10 56/13 64/18
**nothing [5]** 29/13 29/23 55/18 64/8 64/9
**notion [4]** 5/24 6/1 7/14 23/6
**now [36]** 2/2 7/8 8/6 9/10 10/17 13/10 18/18 20/6 23/17 23/21 26/22 28/10 31/3 34/14 35/18 46/19 47/23 52/8 52/9 52/17 53/15 56/6 56/24 64/2 67/2 71/18 73/17 80/19 86/21 90/2 90/5 92/14 94/17 94/20 96/1 99/1
**nowhere [1]** 71/17
**number [8]** 2/3 45/8 51/21 51/22 70/23 94/9 98/10 100/3
**NW [1]** 1/19

## O

**O'Toole [52]** 7/11 8/10 23/18 24/13 24/21 25/3 25/13 26/6 26/7 26/15 26/16 28/14 28/22 29/20 29/22 30/6 30/14 34/4 35/9 35/25 36/13 36/19 36/21 38/7 38/13 38/25 39/9 41/14 42/13 43/21 47/16 51/18 52/5 53/8 54/21 60/14 61/5 61/14 63/13 68/15 68/16 73/4 78/22 92/21 93/7 93/13 93/18 94/6 94/14 94/17 94/22 97/10
**O'Toole's [3]** 7/4 38/8 41/18
**oath [2]** 49/24 51/13
**objection [1]** 77/6
**obligated [1]** 4/24
**obligation [6]** 36/9 37/6 45/12 55/15 100/22 101/8
**obtain [7]** 3/10 28/15 40/25 41/1 44/21 45/7 46/3
**obviously [10]** 13/7 20/22 31/5 31/7 39/8 42/21 46/14 76/7 85/8 94/23
**occasion [1]** 93/15
**occasions [1]** 65/20
**occurred [2]** 55/11 55/13
**occurrence [1]** 76/19
**October [3]** 41/4 41/6 49/9
**October 5th [1]** 41/6
**October 7th [1]** 49/9
**odd [2]** 20/13 30/13

## O

**off [1]** 94/11
**offenses [1]** 45/23
**offer [1]** 50/23
**office [3]** 1/14 2/13 36/9
**officer [1]** 16/15
**OFFICIAL [2]** 1/24 102/8
**often [1]** 75/2
**oh [8]** 16/11 29/9 68/21 68/21 73/7 84/14 91/18 92/14
**okay [19]** 3/14 5/11 9/15 14/1 17/4 20/6 20/11 21/21 42/23 47/12 52/5 53/5 55/7 64/1 69/8 73/17 75/4 76/9 101/9
**old [2]** 70/5 78/2
**older [2]** 70/5 86/1
**omission [2]** 10/12 11/17
**omissions [5]** 6/18 9/20 10/11 11/19 11/20
**on [147]**
**once [1]** 38/14
**one [68]** 4/19 7/17 7/23 8/3 8/4 8/16 9/24 10/11 11/12 11/12 11/13 11/17 11/22 12/2 12/4 12/20 12/23 14/7 14/10 19/16 19/23 25/21 28/17 29/3 29/14 31/14 33/4 33/6 34/24 36/25 41/25 44/9 45/9 45/10 48/14 48/15 51/2 51/21 53/14 55/6 56/8 57/17 57/21 60/21 62/25 64/3 64/13 64/20 67/11 67/12 69/14 69/21 70/4 71/8 72/6 72/12 72/12 72/14 72/18 84/25 85/19 88/18 92/25 94/11 94/13 98/8 98/10 100/19
**one-sided [3]** 56/8 57/21 64/13
**ones [3]** 70/5 72/11 94/11
**ongoing [1]** 57/23
**only [10]** 25/9 25/19 27/7 48/14 48/15 64/19 65/19 66/3 70/7 90/14
**open [3]** 35/21 47/7 100/8
**opening [3]** 6/16 29/16 47/2
**opinion [4]** 58/17 86/3 93/3 97/8
**or [116]**
**oral [1]** 39/6
**order [3]** 3/25 43/8 97/25
**orders [1]** 69/17
**other [53]** 4/19 5/5 5/6 5/7 10/5 13/14 22/2 22/14 23/10 25/7 25/21 25/25 28/19 30/11 33/3 37/11 41/25 44/15 44/16 44/19 44/24 45/22 45/22 46/17 47/23 51/21 52/16 59/14 60/6 61/1 61/12 63/2 63/15 63/16 66/3 69/24 71/2 71/18 75/1 81/2 88/5 88/6 88/6 88/10 88/19 89/13 92/23 92/23 93/14 93/20 95/6 97/15 99/9
**others [3]** 34/20 55/23 63/9
**otherwise [4]** 7/22 28/7 60/25 87/20
**our [53]** 3/3 3/7 3/10 3/12 4/11 10/3 10/17 12/5 12/17 13/16 14/9 14/14 15/1 15/4 15/7 18/24 21/10 28/5 29/3 29/16 36/8 36/9 36/20 37/8 37/23 39/22 44/11 45/11 54/19 56/25 65/15 66/18 67/24 69/6 69/21 74/10 74/21 75/20 75/21 76/3 76/18 76/21 77/20 79/6 80/8 82/2 88/6 88/6 89/17 95/16 98/2 98/18 101/6
**out [43]** 6/12 13/15 13/16 13/20 14/18 14/23 19/7 20/1 23/5 23/14 27/17 27/18 28/19 30/3 30/11 38/15 38/19 41/15

43/17 52/6 54/22 55/15 61/21 63/18 64/12 74/11 75/12 87/7 87/23 88/2 88/21 91/14 93/13 97/21 97/23 98/5 98/6 98/8 99/2 99/13 99/23 100/12 101/1
**outcome [1]** 53/4
**outline [1]** 95/17
**outlined [1]** 95/16
**outrageous [2]** 25/1 30/1
**outside [2]** 23/13 40/14
**outweigh [1]** 84/15
**over [9]** 4/19 13/1 31/7 34/9 48/9 51/24 66/10 73/12 98/22
**overlooked [1]** 53/10
**overruled [1]** 86/4
**overstatement [1]** 72/10
**overwhelming [2]** 88/3 88/6
**own [5]** 3/10 56/25 71/8 86/15 89/17
**Ozmint [3]** 10/7 12/5 86/25

## P

**P-R-O-C-E-E-D-I-N-G-S [1]** 2/1
**p.m [3]** 1/8 19/14 101/14
**PA [1]** 1/22
**page [7]** 40/3 49/9 49/10 50/7 50/22 51/4 87/18
**pages [3]** 10/3 12/5 18/24
**paltry [1]** 13/14
**papers [2]** 14/11 34/9
**paragraph [2]** 40/2 92/13
**pardon [1]** 75/14
**parent [6]** 70/13 70/13 75/8 75/10 89/15 89/16
**parenting [1]** 91/10
**parents [5]** 74/5 75/6 78/7 82/1 93/21
**parlaying [1]** 45/17
**part [9]** 16/18 51/11 66/18 71/7 82/15 88/5 96/10 99/4 99/5
**participating [1]** 60/20
**particular [10]** 4/21 7/1 10/21 13/3 22/14 45/21 49/8 51/22 82/13 98/5
**particularly [3]** 55/19 81/4 98/25
**parties [1]** 3/16
**parts [1]** 65/24
**passed [3]** 66/20 71/3 89/22
**passenger [1]** 19/9
**passes [1]** 53/6
**passing [1]** 14/15
**passion [1]** 96/4
**past [4]** 47/22 47/25 52/6 52/13
**pattern [2]** 60/3 60/6
**patterns [4]** 66/19 73/15 73/15 89/21
**peace [1]** 69/17
**penalty [55]** 3/7 3/8 4/13 4/24 10/7 10/9 11/21 31/4 31/8 31/10 31/16 31/19 32/1 32/12 32/15 32/22 48/20 49/6 53/25 54/17 55/20 58/24 60/12 60/15 60/18 62/4 62/11 62/13 62/23 63/11 63/14 63/24 64/8 65/1 65/3 65/7 65/16 66/6 66/7 77/5 78/13 78/16 85/10 86/9 86/9 86/13 87/3 92/4 92/23 93/3 93/12 93/14 95/4 95/11 99/9
**pending [1]** 2/2
**people [23]** 19/2 19/3 19/25 24/1 24/5 25/7 33/16 34/21 37/16 40/7 57/23 57/24 60/22 61/1 64/20 77/16 77/18

79/2 79/14 91/13 93/12 93/13 97/2
**per [1]** 2/18
**perfect [3]** 8/22 99/16 99/22
**performance [3]** 85/15 87/5 88/16
**performed [2]** 88/2 88/7
**perhaps [13]** 2/17 2/19 2/24 11/17 17/2 24/14 30/8 40/17 52/14 53/7 53/21 92/1 96/4
**period [1]** 41/4
**perjury [2]** 40/9 42/7
**person [17]** 13/6 22/12 22/21 24/14 30/8 32/10 57/1 61/20 63/6 63/6 70/9 75/10 76/21 78/18 78/19 81/10 96/1
**persuaded [3]** 7/22 47/7 69/2
**pertain [2]** 3/4 65/6
**pertaining [1]** 4/25
**pertains [4]** 3/9 31/2 31/3 32/21
**PETER [1]** 1/10
**petition [8]** 3/19 60/24 80/8 84/21 91/24 95/17 98/19 99/24
**petitioner [2]** 2/7 2/22
**phase [68]** 3/4 3/7 3/8 4/12 4/13 4/23 4/24 11/19 11/21 25/19 25/19 31/1 31/4 31/7 31/8 31/10 31/15 31/16 31/18 31/19 31/25 32/1 32/7 32/11 32/12 32/15 32/22 32/23 36/5 48/20 48/25 49/6 53/24 53/25 54/17 55/20 58/23 58/24 59/9 60/12 60/15 60/18 62/4 62/12 62/13 62/23 63/11 63/14 63/24 64/8 65/2 65/5 65/16 77/5 85/10 86/8 86/10 86/13 86/17 86/21 86/22 87/2 87/21 92/4 92/23 93/3 93/12 95/4
**Philadelphia [1]** 1/22
**phone [1]** 24/9
**phrase [6]** 65/3 65/4 65/6 65/7 78/14 86/13
**phrased [1]** 84/19
**phrases [1]** 93/5
**picked [4]** 23/1 23/3 24/10 24/17
**picture [4]** 5/13 7/2 79/8 85/9
**piece [11]** 5/11 11/1 11/1 11/12 11/12 11/13 37/11 53/23 81/3 81/3 88/23
**piecemeal [1]** 88/22
**pieces [7]** 5/2 33/3 66/2 79/6 85/3 95/15 96/25
**pin [1]** 18/22
**PJM [2]** 1/5 2/3
**PJM-03-457 [1]** 2/3
**place [4]** 3/15 19/14 27/9 94/15
**placed [1]** 40/7
**plausibility [1]** 35/23
**plausible [5]** 4/6 4/9 26/18 36/2 99/18
**plausibly [2]** 4/14 69/7
**play [1]** 6/12
**plays [2]** 31/7 61/21
**plea [1]** 39/19
**pleadings [2]** 26/18 69/6
**plenty [2]** 76/14 98/8
**plus [1]** 91/16
**point [40]** 8/25 8/25 10/3 14/6 16/3 22/4 24/24 25/9 26/15 27/4 31/18 47/21 51/2 53/21 58/3 58/17 64/2 64/6 79/1 79/13 80/15 81/15 81/19 85/5 86/6 89/18 90/3 90/8 90/19 91/14 94/25 97/11 98/17 99/6 99/23 99/25 100/2 100/6 100/10 100/19

## P

**pointed [1]** 17/4
**pointing [2]** 24/7 90/2
**police [26]** 9/12 12/22 12/24 15/8 16/15 38/6 41/12 44/18 45/25 49/18 50/10 50/16 50/19 51/5 51/23 52/1 54/2 54/6 56/1 56/12 56/21 57/6 64/17 64/23 101/1 101/4
**portion [1]** 3/8
**portrayed [3]** 58/20 58/22 64/1
**pose [1]** 52/4
**posing [1]** 52/19
**positing [1]** 80/14
**positive [2]** 62/20 71/24
**possession [8]** 43/15 45/5 45/6 56/22 57/3 59/6 60/5 64/20
**possibilities [1]** 90/17
**possibility [1]** 28/7
**possible [8]** 30/20 31/23 35/2 48/11 48/12 53/9 57/8 82/19
**possibly [4]** 22/21 24/14 30/3 52/25
**post [3]** 10/16 87/6 99/9
**post-conviction [2]** 10/16 87/6
**post-habeas [1]** 99/9
**posture [2]** 29/19 30/13
**potential [3]** 14/2 37/6 45/4
**potentially [16]** 13/15 13/25 14/3 17/11 18/2 18/16 18/21 33/8 37/1 37/17 42/7 42/25 42/25 46/23 71/5 72/25
**powerful [5]** 23/20 24/19 59/10 78/21 94/7
**precipitating [1]** 33/7
**precision [1]** 66/2
**predator [3]** 54/18 56/9 59/1
**pregnancy [2]** 78/24 93/23
**pregnant [1]** 71/11
**prejudice [7]** 85/16 85/17 86/7 86/14 86/21 86/22 87/12
**prejudicial [2]** 55/15 60/2
**preliminarily [2]** 2/14 3/3
**preliminary [1]** 3/23
**prepared [2]** 99/12 100/11
**present [4]** 9/8 11/7 15/5 94/17
**presentation [3]** 54/14 57/20 92/23
**presented [5]** 61/17 65/25 79/9 79/9 81/4
**presenting [1]** 83/22
**presents [1]** 79/7
**pressured [2]** 41/20 42/6
**presumably [4]** 19/21 20/5 38/9 45/24
**pretrial [5]** 9/11 20/10 33/9 38/5 73/9
**pretty [4]** 53/8 54/3 82/6 83/12
**prevail [1]** 7/23
**previously [4]** 44/12 44/14 93/14 98/25
**prima [1]** 3/19
**primary [2]** 67/23 70/12
**Prince [22]** 9/12 12/22 12/24 15/8 16/14 21/1 38/6 41/12 44/17 45/24 51/23 51/25 54/2 54/5 56/1 56/12 56/21 57/5 64/17 64/23 100/25 101/3
**principal [3]** 12/18 13/18 28/5
**principally [3]** 11/23 74/7 75/2
**prior [8]** 27/1 36/19 38/16 43/6 52/8 55/7 72/11 93/22
**privilege [2]** 26/4 27/7

**probability [2]** 11/3 84/24
**probably [10]** 8/21 27/6 62/25 82/6 82/20 85/25 88/8 89/13 96/23 99/16
**probe [1]** 43/2
**problem [7]** 23/16 26/11 62/18 82/15 83/8 87/8 89/24
**problematic [3]** 55/20 89/11 90/6
**problems [4]** 49/11 74/12 74/12 74/22
**proceedings [2]** 1/10 102/3
**produced [2]** 35/2 53/3
**product [1]** 90/21
**production [2]** 33/4 51/11
**professional [1]** 85/18
**prong [1]** 85/15
**proof [1]** 71/24
**properly [4]** 87/23 88/8 90/23 90/24
**proposing [1]** 31/22
**proposition [13]** 6/17 6/20 8/20 9/22 10/5 12/15 31/22 36/3 85/22 86/17 90/18 99/3 99/12
**prosecute [6]** 14/4 14/6 17/8 22/10 24/15 24/16
**prosecuted [3]** 15/2 20/21 92/24
**prosecution [1]** 18/17
**prosecutorial [2]** 3/5 4/13
**prosecutors [3]** 40/5 40/13 51/24
**prove [7]** 32/6 67/5 71/15 84/10 84/11 85/1 100/1
**provide [7]** 30/19 39/2 39/2 50/1 55/10 55/12 56/14
**provided [19]** 17/22 18/15 20/7 23/17 24/13 25/5 30/7 30/17 30/19 39/6 39/8 39/11 44/14 44/18 44/23 44/23 45/20 46/1 64/18
**proving [1]** 81/18
**psychological [2]** 70/24 73/1
**psychologically [1]** 96/15
**Public [2]** 54/5 55/5
**pull [2]** 11/24 19/16
**pulled [4]** 19/21 20/24 23/5 93/13
**pulling [1]** 66/9
**punishment [1]** 83/5
**purpose [2]** 28/20 58/5
**purposes [1]** 48/19
**put [27]** 13/9 13/16 13/19 15/1 27/4 27/9 31/13 37/14 43/8 47/11 50/16 63/12 64/7 69/11 77/16 78/22 80/25 85/8 93/6 93/18 94/3 94/18 95/4 96/21 97/20 98/18 101/1
**puts [3]** 14/19 20/14 68/23
**putting [1]** 13/17

## Q

**qualitative [1]** 96/9
**quantitative [4]** 96/6 96/8 96/10 96/11
**quantitatively [1]** 96/7
**question [22]** 18/9 25/8 26/16 26/17 46/22 49/11 49/14 50/10 50/14 50/16 50/19 51/1 52/3 52/4 76/24 80/23 85/19 87/11 90/15 96/19 97/13 100/5
**questions [3]** 6/15 51/13 51/15
**quickly [1]** 89/4
**quite [3]** 8/5 73/8 100/5
**quoted [1]** 80/7

## R

**raise [3]** 25/14 53/22 71/10

**raised [11]** 26/18 70/8 70/9 74/10 74/20 75/10 82/10 83/14 83/18 89/7 89/9
**raises [1]** 18/21
**raising [1]** 71/6
**Randy [2]** 68/4 70/4
**rather [2]** 2/21 12/18
**reach [1]** 66/15
**read [5]** 27/5 27/14 51/16 80/10 80/13
**reading [1]** 28/6
**ready [3]** 2/15 9/2 100/14
**really [23]** 14/20 14/20 14/24 19/5 27/9 35/21 48/22 52/15 61/7 61/9 63/3 63/19 66/1 68/19 74/4 74/21 79/1 79/3 80/7 95/22 98/21 99/10 99/20
**reason [23]** 3/20 17/7 20/20 30/7 30/17 33/8 36/14 36/15 37/16 41/9 43/16 56/24 56/25 59/7 61/2 61/12 63/17 69/10 72/2 74/7 87/3 99/18 101/3
**reasonable [9]** 11/3 25/14 69/2 84/5 84/11 84/24 87/13 98/1 98/2
**reasonably [5]** 25/10 69/9 81/20 88/14 88/15
**reasons [3]** 6/13 63/15 94/24
**recall [14]** 13/4 18/6 23/8 32/13 38/24 39/7 41/25 58/9 59/18 60/17 63/3 71/9 92/22 99/8
**recantation [1]** 29/11
**recanted [1]** 48/18
**receive [1]** 18/16
**received [4]** 18/15 21/16 46/12 56/10
**receiving [2]** 38/17 71/20
**recent [3]** 72/9 72/12 86/3
**recess [3]** 65/13 101/13 101/14
**recollection [2]** 34/9 59/5
**record [16]** 7/7 22/20 25/4 25/24 26/5 33/9 36/24 46/23 47/6 52/1 52/20 73/12 89/5 98/17 99/5 102/3
**records [23]** 9/11 9/13 20/25 24/9 28/11 28/13 28/15 28/22 65/18 67/3 67/9 67/10 67/15 67/20 69/13 69/25 70/25 71/1 71/4 71/8 71/22 73/1 76/23
**recount [1]** 83/9
**redacted [3]** 54/7 56/11 64/19
**redactions [2]** 55/8 55/10
**redirect [1]** 49/9
**reference [1]** 97/19
**referring [1]** 73/8
**refresh [1]** 59/5
**regard [4]** 10/20 25/21 26/9 27/3
**regarding [10]** 17/24 30/25 31/23 32/25 44/15 45/8 47/10 55/22 57/6 64/19
**reject [3]** 84/3 84/3 84/4
**rejected [3]** 47/4 82/16 82/18
**related [14]** 21/14 54/10 54/11 67/12 76/7 76/21 76/23 77/7 77/14 77/15 77/18 79/4 81/15 82/2
**relating [2]** 9/13 12/25
**relationship [1]** 78/7
**relatives [2]** 77/23 81/7
**relevance [2]** 42/23 65/23
**relevant [14]** 3/7 14/5 33/8 42/5 42/24 49/5 52/15 70/17 72/24 73/6 82/13 100/6 100/8 100/9
**relief [10]** 3/19 3/21 4/6 4/7 4/9 4/15 5/9 5/13 5/16 6/5
**rely [1]** 11/23

**R**

**relying [2]** 11/25 82/3
**remember [7]** 13/10 24/5 62/17 82/9 84/6 94/9 96/4
**removed [1]** 72/5
**rendered [2]** 42/16 92/3
**rendition [1]** 42/10
**repeatedly [1]** 11/10
**repeating [1]** 73/15
**reply [3]** 10/3 14/15 18/24
**report [6]** 27/5 27/14 27/15 28/6 41/11 80/3
**REPORTER [3]** 1/24 102/1 102/8
**reports [2]** 70/24 72/25
**representation [4]** 7/4 7/16 8/23 30/16
**request [24]** 2/18 2/20 3/3 3/12 4/7 4/11 5/5 12/17 15/7 15/25 16/17 16/19 17/20 21/13 23/21 24/20 28/6 28/24 41/7 46/2 54/5 65/5 65/6 65/15
**requesting [2]** 5/25 6/12
**requests [13]** 2/18 4/8 4/16 5/3 5/5 5/10 7/10 9/2 20/16 24/11 29/21 55/5 56/17
**require [4]** 32/14 66/6 84/15 95/9
**required [2]** 32/16 94/22
**resorted [1]** 65/21
**respect [18]** 9/8 13/3 13/22 14/2 14/2 28/5 33/4 41/8 47/1 51/10 56/15 63/24 65/16 65/22 67/3 81/24 85/10 90/13
**respond [2]** 6/15 34/1
**respondent [1]** 2/11
**responding [2]** 22/6 24/20
**response [6]** 38/12 63/3 63/22 68/13 83/25 95/23
**responsible [1]** 77/11
**result [10]** 10/14 11/3 11/14 13/9 20/12 21/17 35/12 87/13 87/16 88/13
**resulted [2]** 61/19 63/6
**retaliation [2]** 21/11 34/10
**retry [1]** 31/9
**return [5]** 18/16 56/2 56/6 56/7 56/10
**returned [1]** 19/12
**revealed [1]** 39/14
**reverse [2]** 2/7 31/17
**revisit [2]** 58/15 99/10
**revisiting [4]** 44/6 44/7 83/20 90/2
**rewarded [1]** 101/1
**ridiculous [1]** 34/6
**riding [1]** 57/13
**rifling [1]** 59/12
**right [60]** 2/6 2/14 2/15 2/17 3/13 5/17 7/7 8/21 8/24 9/5 9/7 9/22 10/2 12/7 12/11 13/12 17/12 20/14 20/25 21/2 22/3 22/23 29/11 30/22 31/3 31/10 31/10 32/10 32/20 32/22 35/18 37/4 37/9 41/16 43/24 44/4 46/18 47/8 48/3 52/7 53/20 59/2 62/2 62/4 63/21 64/25 65/8 65/11 65/14 74/3 75/7 75/17 84/12 87/19 89/4 89/10 89/20 91/21 92/18 101/12
**rise [1]** 6/23
**risk [5]** 60/21 79/14 83/9 93/9 96/17
**risks [1]** 79/13
**Robert [4]** 56/22 57/7 57/11 57/17
**Roberto [1]** 57/9
**role [3]** 31/23 31/23 33/4

**Rompilla [3]** 52/24 55/14 69/6
**room [1]** 40/14
**ROSENTHAL [24]** 1/18 2/9 2/25 5/23 6/17 8/11 8/14 9/1 24/2 25/2 26/8 29/22 35/5 35/8 39/1 39/14 60/25 61/11 61/24 63/22 86/16 98/4 99/5 100/17
**Rosenthal's [2]** 63/13 85/22
**rough [6]** 91/5 91/7 91/8 91/13 91/18 97/5
**routine [1]** 66/7
**routinely [1]** 72/19
**row [1]** 97/3
**Rowe [2]** 79/20 96/5
**RPR [1]** 102/8
**Rule [2]** 3/15 4/3
**ruled [2]** 10/13 10/21
**rules [2]** 94/22 94/23
**run [3]** 37/21 41/5 89/4

**S**

**said [48]** 6/17 7/21 7/24 10/22 11/10 19/5 19/7 19/14 19/20 21/11 24/7 25/7 27/5 29/21 34/24 35/22 40/7 40/11 40/12 40/13 40/14 41/20 42/10 48/12 48/15 52/5 52/9 53/8 53/11 59/19 59/21 60/1 60/9 63/24 67/10 69/13 72/2 75/24 76/4 80/8 80/17 82/21 83/24 86/23 86/24 87/14 90/20 99/5
**salad [1]** 88/20
**same [13]** 11/15 11/16 15/16 19/10 31/10 50/1 59/12 59/13 63/4 70/9 75/10 78/12 84/16
**SANDRA [2]** 1/13 2/12
**saved [1]** 83/8
**saw [2]** 19/15 19/20
**say [72]** 2/15 5/11 7/17 8/6 9/19 11/25 18/4 18/22 26/12 26/20 26/21 26/22 27/8 27/10 27/13 27/14 27/15 28/23 32/8 32/24 35/20 35/24 36/21 37/9 38/23 42/10 42/12 43/19 43/20 43/25 47/24 50/7 50/19 52/19 52/25 53/5 53/9 53/12 53/14 55/10 61/25 63/21 65/9 65/24 67/14 75/9 76/22 77/18 77/21 79/3 80/17 81/12 81/12 81/13 81/16 83/11 83/19 84/20 85/23 88/7 88/12 88/17 92/9 96/1 96/3 96/3 96/12 98/20 99/24 100/10 100/13 100/15
**saying [43]** 8/12 9/24 11/6 11/6 15/3 16/17 16/24 17/10 25/3 25/3 32/1 32/20 33/10 35/5 35/10 36/6 38/12 44/18 47/6 51/9 52/14 58/16 60/8 61/24 63/13 68/7 68/9 68/19 70/17 78/5 78/12 82/12 84/16 84/23 86/4 86/12 86/21 88/23 90/5 91/12 95/15 96/17 97/23
**says [22]** 6/22 7/19 11/1 14/11 14/20 14/22 18/25 19/18 34/15 40/3 42/24 43/1 44/12 48/14 58/14 72/19 76/18 76/20 85/24 88/1 91/18 97/10
**scenario [1]** 52/21
**scene [3]** 20/1 40/8 57/5
**schizophrenia [1]** 76/20
**school [1]** 70/25
**schooling [1]** 79/17
**science [2]** 68/11 91/16
**scientist [1]** 76/21
**sclerosis [1]** 74/1

**scope [1]** 90/11
**Scott [39]** 9/12 34/16 34/22 35/6 37/14 37/23 38/2 38/5 38/8 38/9 38/10 38/15 38/18 38/20 38/21 38/24 39/14 40/3 40/4 40/5 40/7 40/8 40/12 40/13 40/14 40/22 40/23 40/25 41/4 41/9 41/15 42/10 42/19 42/24 42/24 43/2 43/8 43/10 43/23
**Scott's [7]** 34/21 37/16 37/19 38/2 40/21 41/2 42/10
**screwed [1]** 88/18
**Sears [1]** 69/5
**second [9]** 12/25 14/12 32/3 39/25 47/2 47/15 55/25 56/15 71/8
**second-guessing [1]** 47/2
**secondly [3]** 21/3 21/5 21/6
**secret [1]** 24/23
**see [19]** 12/14 30/22 32/1 43/2 52/14 55/9 57/5 78/11 79/3 80/11 81/24 82/4 92/10 94/4 94/15 94/24 95/21 97/10 97/14
**seek [4]** 37/18 47/16 47/18 54/24
**seeking [10]** 3/6 4/22 9/14 28/12 29/20 32/21 33/3 45/10 46/25 47/12
**seem [2]** 63/14 98/1
**seemed [1]** 14/23
**seems [4]** 8/16 40/18 41/9 78/9
**seen [3]** 23/5 25/22 73/2
**sees [1]** 19/2
**selection [3]** 86/8 86/8 86/8
**sense [9]** 2/17 17/18 22/14 23/23 24/2 24/22 30/4 39/11 90/2
**sent [1]** 41/15
**sentence [2]** 69/3 84/15
**sentenced [1]** 49/1
**separate [2]** 85/15 96/13
**separately [3]** 44/9 86/19 89/3
**sequence [1]** 24/18
**serious [1]** 90/1
**seriously [3]** 36/8 36/8 36/9
**set [2]** 90/10 93/2
**SETH [2]** 1/18 2/9
**sets [1]** 55/6
**seven [1]** 65/11
**Seventh [2]** 1/19 10/18
**several [2]** 40/7 78/23
**severity [1]** 84/1
**she [18]** 18/3 25/22 51/13 67/23 70/15 71/11 76/4 79/21 79/25 80/12 82/8 82/8 89/10 89/11 89/13 89/16 92/1 93/23
**she's [3]** 78/10 89/9 92/7
**shell [2]** 57/3 57/4
**shoe [1]** 27/11
**shoes [3]** 50/8 50/12 50/20
**shoot [2]** 63/25 64/5
**shooter [15]** 17/7 18/21 23/6 23/25 29/25 31/24 32/6 33/24 48/15 48/16 48/24 49/2 49/3 49/5 62/7
**shooting [25]** 24/25 27/9 27/11 31/6 32/25 55/1 55/2 55/7 55/23 57/17 60/13 60/15 60/19 60/22 61/2 61/3 61/11 61/13 61/17 61/18 61/19 61/21 63/5 63/16 64/13
**shootings [1]** 63/16
**shoots [1]** 62/4
**short [2]** 65/2 81/6

## S

**shortcut [1]** 76/25
**shorter [1]** 68/5
**shortly [3]** 14/13 37/25 56/23
**shot [11]** 14/7 19/23 23/10 31/14 32/10 34/25 57/1 57/12 62/8 64/4 64/4
**shots [6]** 33/1 56/2 56/2 56/6 56/7 56/11
**should [41]** 5/4 5/10 8/15 16/25 17/16 17/17 20/11 20/16 20/17 20/18 20/19 24/21 25/3 25/3 28/6 30/2 34/4 38/19 40/20 46/19 47/14 53/1 61/14 63/14 64/22 65/25 66/12 71/23 72/19 73/4 73/6 75/5 83/5 84/23 88/25 91/19 92/15 97/1 97/20 99/24 99/25
**shouldn't [6]** 59/7 60/9 62/10 82/4 84/19 90/4
**show [18]** 28/11 33/21 38/12 54/25 56/13 56/14 69/19 72/17 73/20 73/20 73/22 74/19 75/5 75/5 84/22 97/24 99/17 99/19
**showed [2]** 49/15 54/16
**showing [4]** 3/20 3/25 33/10 57/8
**shown [3]** 50/5 51/8 54/19
**shows [5]** 57/15 63/18 73/25 89/18 99/13
**siblings [3]** 74/20 75/5 82/11
**side [3]** 57/24 88/5 97/6
**sided [3]** 56/8 57/21 64/13
**significance [6]** 68/12 81/4 85/7 88/23 90/24 96/14
**significant [4]** 13/8 56/24 77/13 93/6
**silly [1]** 22/9
**simply [8]** 16/17 54/21 55/15 60/20 64/13 81/25 83/21 99/4
**single [1]** 96/23
**sir [2]** 65/10 101/11
**sister [1]** 74/23
**sit [3]** 4/19 28/21 28/23
**site [2]** 12/8 23/8
**sitting [1]** 91/12
**situation [3]** 26/9 87/20 88/1
**six [5]** 7/24 8/5 9/25 85/11 85/17
**skew [1]** 25/13
**skipped [2]** 72/6 73/12
**slate [1]** 80/19
**slight [2]** 64/14 72/10
**slightest [1]** 85/2
**slightly [2]** 5/24 24/7
**slow [5]** 75/25 76/5 76/5 93/25 94/2
**small [5]** 85/7 90/23 100/2 100/4 100/19
**Smith [9]** 52/24 72/5 73/13 73/18 74/9 74/16 74/16 74/17 74/23
**Smith's [1]** 73/25
**smush [1]** 86/11
**so [103]**
**so-to-speak [1]** 93/4
**social [6]** 70/22 70/24 78/23 79/22 80/1 93/7
**sold [1]** 40/12
**some [32]** 4/1 8/17 9/2 16/3 18/16 19/25 20/3 20/17 23/18 26/12 30/23 33/16 34/10 35/3 40/19 42/21 51/9 60/14 61/12 64/14 65/19 68/23 68/24 69/11 70/4 70/25 72/2 81/21 89/5 89/13 97/8 98/24

**somebody [12]** 13/5 14/8 14/19 24/7 26/21 26/22 31/6 49/2 63/25 68/23 76/10 77/24
**somehow [11]** 5/25 23/9 24/3 24/21 25/3 29/23 29/24 34/23 47/24 61/3 61/14
**someone [1]** 34/15
**something [24]** 17/15 24/7 24/22 25/24 26/19 27/16 30/13 39/18 40/19 41/10 42/12 42/12 42/12 48/22 51/12 69/7 69/7 69/8 69/18 69/20 99/13 99/19 100/15 101/4
**sometime [1]** 43/6
**somewhere [1]** 27/10
**soon [1]** 63/7
**sorry [13]** 16/5 21/4 22/18 40/1 41/1 57/4 59/18 74/18 75/23 76/1 79/23 94/1 96/11
**sort [7]** 2/25 26/9 26/9 35/3 57/19 69/15 101/6
**sorts [1]** 90/17
**sought [3]** 44/21 54/21 54/22
**sound [2]** 36/4 60/16
**sounded [1]** 47/22
**sounds [2]** 66/15 81/22
**sources [2]** 44/16 89/13
**South [2]** 72/1 72/2
**SOUTHERN [2]** 1/2 1/14
**speak [2]** 91/25 93/4
**speaking [1]** 63/18
**speaks [1]** 55/14
**specific [11]** 3/20 4/16 5/3 5/4 8/14 9/2 17/20 18/9 46/2 69/14 95/5
**specifically [10]** 10/21 45/7 51/16 65/18 84/2 88/21 90/6 90/24 92/15 99/1
**specifics [1]** 39/7
**speculation [3]** 23/16 29/24 34/4
**speculative [2]** 24/12 24/20
**spend [1]** 81/18
**spent [2]** 61/7 71/19
**spin [1]** 75/12
**spoken [1]** 40/11
**square [1]** 94/13
**stacked [1]** 89/19
**stand [6]** 40/8 75/21 76/3 77/21 79/12 86/15
**standard [16]** 3/15 3/17 3/18 3/22 3/23 3/23 4/4 5/20 8/22 46/23 80/21 84/13 95/11 97/13 99/14 99/15
**standards [1]** 85/18
**standing [2]** 8/3 8/4
**start [9]** 2/19 2/24 3/15 12/16 69/12 71/25 80/15 85/16 87/17
**starters [1]** 12/12
**starting [4]** 49/10 68/6 79/1 97/11
**state [3]** 4/6 77/24 88/21
**stated [1]** 3/19
**statement [19]** 2/19 2/25 7/18 8/7 10/1 14/17 22/2 29/13 39/5 39/6 44/10 44/18 48/2 49/8 81/14 83/25 86/18 98/11 98/15
**statements [8]** 9/11 24/5 38/5 38/11 38/14 38/15 39/14 51/8
**STATES [5]** 1/1 1/4 1/11 1/14 2/3
**stating [2]** 6/4 9/23
**status [6]** 14/3 17/9 18/10 18/13 21/2 21/15

**statutory [7]** 62/19 63/2 63/2 82/23 84/7 84/8 94/10
**stay [1]** 18/20
**Ste [1]** 1/15
**STENOTYPE [1]** 1/25
**step [1]** 54/13
**still [4]** 6/2 6/24 31/1 32/8
**stipulate [3]** 78/6 81/17 82/1
**stipulated [2]** 77/22 77/22
**stole [2]** 34/21 37/19
**stolen [2]** 34/15 37/16
**stone [1]** 66/10
**stop [2]** 76/1 76/9
**store [2]** 19/11 19/12
**straightforward [1]** 7/16
**strange [1]** 14/15
**strategic [8]** 7/13 47/16 47/18 53/2 53/5 53/17 53/18 94/16
**strategy [1]** 7/8
**straw [1]** 95/14
**street [49]** 1/19 1/21 14/23 15/4 19/1 19/12 19/15 23/8 23/11 27/8 30/24 30/25 32/25 33/1 34/24 40/6 40/15 53/23 54/4 54/14 54/22 55/2 55/4 55/11 55/13 55/18 55/24 56/4 56/15 56/23 57/5 57/10 57/20 57/24 58/4 58/25 59/8 59/15 59/19 59/22 60/19 61/9 61/21 62/9 63/5 63/10 63/16 63/25 64/9
**stress [1]** 68/13
**Strickland [2]** 53/6 88/12
**strictly [1]** 66/4
**strong [1]** 93/16
**strongly [1]** 90/8
**structural [1]** 91/3
**structurally [1]** 96/15
**student [1]** 89/11
**study [1]** 97/9
**stuff [9]** 10/16 26/13 30/11 31/3 44/25 45/1 54/4 79/2 99/2
**sub [1]** 46/23
**sub-standard [1]** 46/23
**submission [1]** 51/11
**submit [4]** 4/10 13/14 68/19 82/15
**submitted [2]** 14/12 29/6
**subpoena [12]** 3/11 9/12 12/22 13/3 21/14 38/13 40/4 54/8 64/24 69/12 72/3 72/7
**subpoenas [4]** 65/17 65/18 66/25 81/7
**subscribes [1]** 66/12
**subsequent [3]** 71/13 73/10 96/1
**subsequently [1]** 48/18
**substance [4]** 74/12 74/21 75/16 76/7
**substances [1]** 71/11
**substandard [4]** 31/24 31/25 31/25 52/20
**substantial [3]** 54/25 64/12 99/4
**substantially [1]** 84/14
**success [1]** 3/25
**successfully [1]** 10/15
**such [3]** 70/14 74/5 94/5
**suddenly [1]** 40/15
**sufficient [4]** 71/14 97/22 99/15 99/20
**suggest [15]** 20/14 20/15 28/17 33/16 37/15 47/18 47/21 48/7 56/7 57/11 57/15 57/16 57/23 64/12 66/8
**suggested [4]** 6/11 8/25 28/17 46/5

**S**

**suggesting [13]** 17/6 24/21 29/22 30/2
30/10 47/15 49/4 51/17 51/19 51/25
61/1 61/12 63/20
**suggestion [4]** 4/1 21/25 22/1 30/23
**suggestive [1]** 74/24
**suggests [1]** 15/3
**summarize [1]** 67/2
**super [3]** 54/17 56/9 59/1
**supervision [1]** 70/25
**supplier [1]** 33/18
**support [9]** 4/8 4/17 6/5 13/16 37/25
47/12 56/5 64/18 92/20
**supports [2]** 6/4 101/6
**suppose [8]** 15/15 27/5 32/19 52/5
52/11 52/11 77/8 89/10
**supposed [1]** 41/14
**supposedly [2]** 45/23 53/17
**Supreme [6]** 3/17 5/22 10/21 10/22 11/9
52/23
**sure [23]** 3/2 9/18 12/4 17/14 18/5 18/10
26/14 27/16 31/15 32/14 34/13 42/18
45/16 48/2 58/13 59/24 66/13 82/2 82/6
85/22 98/21 99/3 100/12
**surmise [1]** 69/15
**suspect [1]** 26/3
**suspicion [1]** 101/6
**sustain [1]** 13/21
**sworn [1]** 44/17
**sympathetic [2]** 58/21 60/16
**system [1]** 69/22
**systems [1]** 30/4

**T**

**take [21]** 4/5 4/7 5/4 5/13 7/2 10/23
10/25 11/1 11/11 11/13 14/14 36/7 36/9
65/2 65/11 77/21 90/16 97/7 98/1 98/20
100/15
**taken [2]** 8/19 34/24
**takes [3]** 14/18 27/9 36/8
**taking [3]** 5/1 9/19 54/13
**talk [8]** 3/22 52/13 52/15 52/17 52/17
65/3 76/10 81/13
**talked [9]** 26/5 26/7 35/24 35/25 35/25
36/21 38/8 100/23 100/24
**talking [18]** 5/3 22/13 31/3 31/4 36/19
37/13 66/19 67/7 69/15 69/16 69/16
72/14 73/17 75/22 78/10 85/25 86/16
100/20
**talks [1]** 55/6
**tangentially [1]** 98/25
**tell [21]** 13/23 15/12 21/7 21/22 22/11
28/21 38/13 50/7 50/20 51/5 66/22
66/24 67/1 67/19 67/20 71/1 72/21
72/21 73/5 76/10 81/11
**telling [3]** 36/15 50/2 64/11
**tells [2]** 8/15 68/12
**ten [2]** 71/19 71/20
**tennis [2]** 50/12 50/20
**Tenth [2]** 10/19 12/9
**terms [8]** 5/21 17/19 25/16 27/21 61/5
82/13 84/19 98/23
**terrible [3]** 68/25 74/21 82/24
**test [1]** 53/6
**testified [11]** 38/3 39/17 40/8 40/23 41/4

42/21 77/4 78/23 80/1 93/10 93/14
**testifies [1]** 38/21
**testify [6]** 39/3 42/7 49/21 49/24 51/2
77/12
**testifying [1]** 38/16
**testimonial [1]** 56/6
**testimony [26]** 21/18 21/20 24/9 27/25
33/10 34/8 34/16 34/19 38/2 39/3 40/21
41/2 50/23 57/11 68/7 77/7 79/7 80/9
82/12 82/16 82/18 90/7 93/15 94/7 96/5
98/25
**than [19]** 2/22 12/18 22/2 23/10 29/14
33/13 37/8 44/25 54/20 58/22 61/8
64/15 66/25 69/3 74/3 79/8 86/2 90/20
97/15
**Thank [5]** 3/2 5/18 100/18 101/8 101/12
**thanks [1]** 2/16
**that [780]**
**that's [101]** 2/19 4/2 6/7 6/10 7/20 8/7
8/9 8/11 8/15 8/21 9/14 10/2 12/11
13/21 15/7 18/11 19/8 24/2 24/8 24/11
24/19 25/1 25/2 26/20 27/11 28/3 28/8
28/10 28/12 28/20 28/23 30/1 30/25
33/25 34/25 35/22 36/6 37/3 42/25
46/14 47/5 47/8 48/2 48/22 48/22 54/3
55/21 56/15 56/24 60/22 61/13 63/19
63/25 64/21 65/21 66/18 68/22 69/5
69/23 70/23 71/18 72/3 73/6 74/2 76/11
77/8 77/9 78/3 78/4 78/9 79/1 80/18
80/21 81/11 81/15 81/19 85/1 85/13
85/15 85/24 86/20 88/12 88/20 88/21
88/25 90/11 91/17 92/7 93/17 94/18
95/23 96/23 97/11 98/2 98/18 98/21
98/22 99/14 99/16 99/20 101/5
**theft [1]** 35/4
**their [12]** 4/15 6/14 20/22 22/7 43/17
69/25 86/15 91/2 91/17 92/20 93/2
93/15
**them [45]** 6/24 6/25 7/17 8/6 11/23
11/24 11/24 19/19 19/20 22/7 24/10
24/17 25/9 28/23 33/14 38/10 40/6
40/12 40/22 43/20 56/18 57/17 62/13
66/10 70/2 71/5 71/23 73/23 73/24
77/14 82/25 83/2 84/3 84/5 84/10 84/12
85/7 85/19 85/19 87/14 88/11 89/2
94/10 94/11 94/23
**themselves [2]** 85/8 94/24
**then [39]** 2/20 2/23 4/7 4/16 7/1 15/9
17/6 19/4 19/13 19/25 20/1 20/3 21/21
22/11 33/23 50/22 51/8 57/14 57/14
57/15 57/15 65/12 67/16 69/10 70/18
73/5 73/12 75/8 75/9 75/15 76/18 80/17
82/2 83/20 84/12 87/11 88/5 91/10
97/21
**theoretical [1]** 90/17
**theoretically [1]** 8/5
**theory [13]** 12/19 13/10 13/16 13/17
13/20 20/23 21/21 33/24 37/20 37/22
37/25 64/18 78/21
**there [128]**
**there's [35]** 5/19 5/22 6/19 6/21 7/9
10/18 11/3 12/9 14/10 24/25 28/4 28/11
29/13 30/11 30/22 33/16 35/23 39/16
41/9 47/17 51/9 51/19 55/8 57/11 61/18
67/10 71/17 72/24 77/17 87/3 90/7
96/17 98/8 99/18 99/24

**thereafter [1]** 63/7
**therefore [4]** 15/18 28/22 35/21 90/10
**these [54]** 4/11 5/10 5/16 6/17 19/16
24/11 26/11 28/22 33/13 36/13 36/22
40/13 41/9 45/22 45/22 45/22 47/23
56/17 67/6 68/16 68/17 69/13 69/17
69/21 70/6 70/16 71/7 77/18 77/23 79/2
80/14 82/10 82/13 83/4 83/9 85/2 85/6
85/6 87/25 88/16 88/25 91/9 93/12
93/13 94/3 94/4 95/12 95/15 95/18
96/14 96/25 97/8 98/7 98/7
**they [141]**
**they're [18]** 6/1 6/4 8/9 22/7 22/8 22/15
23/22 65/17 65/18 66/4 69/10 70/8 77/7
77/18 86/10 95/20 95/20 96/15
**they've [1]** 85/17
**thin [1]** 80/4
**thing [14]** 4/19 12/20 14/25 25/21 27/8
45/10 47/15 55/21 55/25 56/16 56/20
74/6 85/14 88/18
**things [27]** 5/14 6/11 12/21 12/23 14/1
18/9 30/7 34/6 36/14 36/22 45/3 47/9
54/11 59/4 68/14 71/2 79/13 80/14
80/24 81/21 85/11 85/17 87/7 88/25
91/15 94/3 94/5
**think [68]** 2/25 3/14 3/16 5/19 6/10 6/21
6/24 7/10 7/20 7/24 8/1 8/9 8/21 9/4
9/16 13/23 13/24 16/9 18/22 22/19 25/2
25/12 25/19 44/1 44/4 44/11 47/20
49/16 51/16 52/7 52/12 53/9 53/21
60/11 61/24 62/10 63/1 63/12 63/19
64/6 64/22 65/1 65/4 67/20 70/2 74/13
77/8 77/9 77/17 77/17 77/20 78/4 81/8
81/13 82/14 83/25 85/3 85/23 86/16
86/19 90/21 92/1 92/9 95/23 96/24 97/2
98/7 100/4
**thinking [2]** 52/11 52/12
**thinks [2]** 20/1 39/1
**third [1]** 56/20
**this [188]**
**this motion [1]** 90/13
**those [43]** 3/6 3/12 4/8 4/14 4/17 5/2
6/13 12/12 21/13 28/13 28/15 29/15
34/5 38/14 43/16 49/15 49/19 50/16
51/15 52/17 54/6 54/9 55/8 55/9 55/10
55/22 56/13 59/15 65/19 66/2 67/4 67/9
67/20 67/22 68/12 71/4 71/22 72/12
74/25 84/19 93/5 94/23 94/24
**though [13]** 10/7 12/2 12/13 15/4 32/14
44/22 61/17 68/6 75/3 75/13 86/17 90/5
90/13
**thought [10]** 7/21 8/11 19/25 34/8 34/23
58/3 58/5 58/11 62/3 72/6
**threats [1]** 40/13
**three [11]** 18/24 19/2 19/18 23/1 52/16
67/4 67/10 67/17 81/24 86/11 90/8
**threw [1]** 23/11
**through [16]** 3/11 6/11 10/3 12/5 17/13
18/25 28/17 36/5 66/1 66/20 70/23
78/22 89/5 89/16 93/15 94/10
**tie [4]** 9/1 35/6 37/7 74/11
**tied [2]** 6/1 23/4
**time [20]** 10/8 20/1 24/17 27/8 41/4 41/6
42/22 50/4 61/7 61/20 63/4 65/2 68/5
73/9 78/12 81/18 84/2 87/9 93/23 99/10
**timely [1]** 25/9

**T**

**times [3]** 22/6 67/25 90/8
**tiny [4]** 67/13 79/6 79/6 85/7
**today [6]** 49/22 50/2 50/24 51/2 67/2 97/16
**together [13]** 7/17 7/24 8/6 8/19 9/1 9/25 10/14 29/9 59/13 85/9 86/11 87/14 98/19
**told [11]** 38/9 38/10 38/20 40/22 49/22 50/8 50/10 50/11 77/14 82/25 83/2
**Tony [22]** 9/9 9/13 12/17 12/23 12/25 13/18 14/2 14/19 15/6 15/8 16/6 17/21 20/15 20/23 21/25 22/8 22/21 23/6 23/17 33/4 33/12 49/3
**too [7]** 46/17 61/2 68/25 71/23 82/3 82/15 98/2
**took [2]** 10/10 87/6
**tossed [1]** 23/14
**totality [4]** 6/18 6/22 7/15 11/11
**totally [3]** 49/4 81/22 81/23
**toward [1]** 90/2
**tracked [3]** 42/19 42/20 42/21
**trafficking [1]** 44/16
**transcript [9]** 1/10 41/23 42/1 42/4 78/15 80/11 80/12 97/9 102/3
**TRANSCRIPTION [1]** 1/25
**trauma [7]** 66/20 70/13 80/25 81/2 90/25 92/16 97/4
**travels [1]** 70/22
**treat [1]** 87/3
**treated [1]** 99/25
**treatment [1]** 71/20
**tree [3]** 73/14 74/8 76/22
**tremendous [2]** 67/21 71/6
**trial [64]** 5/1 6/10 6/12 7/9 9/20 10/11 10/12 10/15 11/17 11/19 11/20 13/2 13/10 15/11 16/16 17/5 17/16 20/10 22/12 24/19 27/19 27/22 27/25 28/14 29/6 31/12 33/24 34/22 35/1 37/14 37/20 37/22 38/1 38/7 38/8 40/23 41/1 49/7 51/13 52/15 54/14 59/9 65/24 66/9 68/23 71/9 71/10 71/17 71/22 72/11 73/5 73/9 79/9 79/9 80/11 80/14 81/16 84/22 87/22 88/24 89/1 92/2 94/15 97/1
**tried [6]** 18/3 26/4 28/16 44/9 65/19 71/9
**trigger [1]** 20/24
**trouble [3]** 24/20 96/18 96/19
**troubled [1]** 35/9
**true [9]** 4/5 6/3 11/15 11/16 28/10 30/3 31/17 62/7 71/25
**truly [1]** 24/8
**trunk [1]** 23/11
**truth [1]** 51/5
**try [5]** 26/10 30/3 43/8 55/15 64/8
**trying [14]** 8/9 17/12 24/1 25/13 25/16 34/21 35/5 70/13 71/24 73/13 84/19 86/6 86/10 90/3
**turbulent [1]** 69/19
**turn [5]** 4/19 18/16 69/18 69/20 91/13
**turned [1]** 48/9
**turning [1]** 66/10
**turns [2]** 30/4 30/11
**two [24]** 3/6 11/22 12/22 14/1 14/10 23/2 32/21 33/3 37/2 42/22 44/1 45/3 47/9 51/22 52/16 57/10 67/10 72/1

74/14 74/20 87/21 90/8 93/5 93/12
**two-fold [1]** 14/10
**TY [7]** 14/19 14/19 14/22 19/5 19/7 20/4 20/15
**tying [1]** 58/6
**type [3]** 56/9 59/11 59/13
**types [2]** 72/12 72/18

**U**

**U.S [1]** 2/13
**ultimate [1]** 90/21
**ultimately [8]** 13/16 13/20 13/21 14/4 52/2 58/10 71/17 96/20
**uncharged [2]** 62/14 62/21
**uncle [4]** 67/11 72/4 74/15 78/19
**uncles [9]** 67/8 67/18 67/18 68/2 70/8 71/7 74/14 77/2 93/24
**unconstitutional [1]** 6/7
**uncontested [2]** 61/10 78/13
**uncover [1]** 69/1
**under [12]** 3/15 5/16 6/5 37/10 49/24 51/13 58/12 59/22 59/24 67/1 97/7 100/15
**undercuts [1]** 47/25
**undermined [3]** 13/19 23/7 92/21
**understand [5]** 9/10 18/6 54/1 75/23 80/22
**understood [1]** 17/16
**undisputed [4]** 60/23 60/23 63/4 81/19
**undoubtedly [2]** 44/13 84/20
**unearth [1]** 99/19
**unfold [1]** 58/20
**unfolded [1]** 58/21
**unfolding [1]** 58/21
**UNITED [5]** 1/1 1/4 1/11 1/14 2/3
**unknown [4]** 19/7 19/21 20/4 20/4
**unless [2]** 36/14 99/16
**unlikely [2]** 81/9 81/9
**unnecessary [2]** 81/22 81/23
**unprovoked [1]** 54/15
**unredacted [7]** 54/8 55/22 55/25 56/12 56/18 64/18 72/8
**unsuccessful [1]** 65/21
**until [3]** 46/20 52/22 73/9
**up [47]** 8/6 10/8 13/13 14/13 19/2 19/16 20/16 23/1 23/3 24/10 24/17 25/4 27/2 28/6 28/8 30/8 37/14 38/12 40/15 40/20 45/7 46/2 47/2 47/7 49/15 50/5 51/14 51/18 54/25 63/23 66/9 67/22 69/18 69/20 70/12 73/9 75/8 77/12 84/12 85/12 88/1 88/18 89/2 91/2 92/8 96/20 98/24
**upbringing [2]** 68/20 96/16
**upon [2]** 37/23 40/15
**Upton [1]** 69/5
**us [17]** 12/21 15/3 15/13 21/7 22/8 38/25 40/18 47/6 47/7 50/20 64/18 67/20 68/12 71/1 71/5 91/14 96/25
**use [5]** 12/1 27/14 80/18 87/22 100/1
**used [11]** 15/14 21/18 21/20 21/22 23/18 28/1 43/5 43/5 58/4 58/25 93/5
**using [1]** 71/11
**usually [2]** 70/20 72/1
**utero [2]** 71/21 95/6

**V**

**vague [1]** 20/3

**various [1]** 65/24
**Venable [1]** 1/18
**vengeance [1]** 37/18
**verbal [1]** 64/14
**verdict [2]** 89/2 90/10
**version [1]** 14/16
**versions [1]** 55/22
**versus [8]** 2/4 12/5 69/5 69/6 84/8 86/1 86/25 87/3
**very [28]** 11/9 13/17 20/3 23/20 30/15 33/12 48/12 54/25 71/7 71/12 72/23 78/14 78/21 79/5 79/5 79/7 81/9 82/21 85/2 85/2 85/12 93/6 93/11 94/6 95/9 96/2 100/2 101/12
**VI [1]** 67/1
**victim [4]** 13/6 19/21 21/13 101/5
**view [5]** 24/4 38/20 40/22 61/16 61/17
**viewed [1]** 48/11
**viewing [1]** 88/22
**views [1]** 2/22
**violation [1]** 83/8
**violations [2]** 10/24 87/4
**violence [4]** 44/15 45/22 62/14 62/21
**violent [3]** 79/14 79/17 83/10
**vital [4]** 67/3 67/10 73/12 76/23
**vitals [2]** 72/1 72/2
**vote [5]** 69/3 83/6 84/25 84/25 93/16
**voted [1]** 88/9

**W**

**wait [5]** 26/12 26/22 35/19 73/3 75/3
**walk [2]** 17/12 23/25
**walked [1]** 19/22
**walking [2]** 16/16 19/23
**wall [2]** 95/18 101/6
**want [33]** 2/15 2/18 2/21 10/3 13/24 17/9 18/24 20/25 32/24 34/1 35/21 37/9 42/15 43/2 44/4 47/23 53/20 54/1 57/5 63/12 63/21 69/14 69/25 71/22 75/16 77/23 79/3 83/19 85/21 89/5 91/12 91/24 99/1
**wanted [4]** 37/18 61/6 71/23 72/6
**wants [2]** 9/10 23/17
**warrant [6]** 4/1 44/8 44/22 45/5 51/19 53/11
**warranted [1]** 94/25
**was [393]**
**Washington [1]** 1/19
**wasn't [36]** 7/4 15/1 15/2 18/2 18/2 20/20 21/20 22/16 23/20 23/24 24/16 25/5 30/18 31/18 31/18 32/9 32/12 32/19 39/4 47/3 47/14 48/24 52/2 52/9 56/8 57/25 58/5 60/25 64/13 83/4 83/10 83/23 88/19 89/16 94/16 97/23
**watch [1]** 94/15
**way [23]** 2/19 2/24 6/7 8/15 15/16 23/18 41/25 46/17 48/5 48/12 52/4 57/18 58/20 58/21 60/3 60/14 63/25 64/7 66/3 75/12 94/7 95/13 96/23
**ways [2]** 18/1 96/3
**we [207]**
**we'd [4]** 5/13 16/17 56/11 98/6
**we'll [6]** 5/3 12/12 65/12 95/21 100/15 101/13
**we're [47]** 3/6 4/12 4/20 4/21 5/14 9/7 12/20 12/21 15/16 22/6 24/1 28/12

## W

**we're... [35]**  28/24 30/13 31/3 32/21 38/4 42/18 42/19 45/10 47/12 51/17 54/4 54/7 55/21 55/25 64/11 65/1 65/3 65/5 66/10 69/22 70/17 73/3 73/17 75/2 84/23 86/1 86/12 90/2 90/14 94/13 95/15 95/18 96/24 97/23 100/2
**we've [13]**  15/4 26/14 26/18 26/25 55/4 65/19 76/14 80/5 88/25 90/22 90/23 91/5 95/17
**weak [2]**  13/17 13/17
**weapon [3]**  58/4 63/7 63/7
**wearing [1]**  25/22
**weed [1]**  66/9
**weeds [1]**  6/9
**week [1]**  42/22
**weeks [1]**  57/10
**weigh [1]**  90/18
**weird [2]**  14/24 29/19
**well [80]**  2/9 3/5 5/6 5/11 5/14 5/21 5/22 6/16 6/21 7/14 7/17 8/24 11/22 12/11 12/14 13/3 15/4 16/21 16/24 18/1 18/5 21/9 21/10 21/24 22/5 25/21 25/25 26/20 26/25 29/10 31/9 32/8 35/10 39/18 39/21 42/5 46/22 48/6 48/25 49/1 52/12 56/7 60/1 60/8 62/5 67/14 69/20 71/12 72/18 73/23 74/2 75/1 75/20 76/18 76/24 79/15 80/6 80/10 80/11 80/13 80/18 81/6 82/4 82/12 83/13 86/16 87/11 88/1 88/5 88/7 88/17 89/23 92/7 93/12 95/20 96/18 97/7 97/17 98/13 98/14
**well-documented [1]**  71/12
**well-established [1]**  5/21
**well-known [1]**  93/12
**went [8]**  19/11 40/4 49/8 52/14 66/1 70/17 71/17 94/10
**were [68]**  6/9 19/18 19/19 23/1 23/4 28/16 31/6 33/12 33/13 33/13 33/17 34/6 34/20 34/21 37/12 37/17 40/13 40/13 43/9 43/14 47/15 48/23 51/16 56/2 56/2 56/6 56/7 56/11 57/3 57/4 57/11 57/25 59/16 59/17 63/9 68/2 68/10 69/24 70/7 70/8 70/9 70/11 71/5 71/7 73/15 75/5 75/6 75/20 77/2 77/8 79/10 79/18 81/7 81/15 81/25 85/18 86/6 87/4 87/6 87/7 87/25 88/13 89/11 91/9 93/16 94/3 94/9 100/19
**weren't [3]**  79/16 85/12 93/20
**Westfield [1]**  82/6
**what [250]**
**what's [13]**  15/20 34/18 51/19 58/17 62/6 67/19 70/22 73/1 79/20 84/13 94/21 96/9 100/12
**whatever [9]**  17/8 18/17 34/14 41/21 48/4 50/12 69/10 81/16 84/8
**when [36]**  7/3 9/1 11/10 14/7 16/3 19/11 19/15 19/20 26/20 34/23 36/1 38/6 40/5 40/13 40/15 42/18 51/12 52/19 52/20 67/23 70/17 74/2 77/4 81/7 84/12 84/21 85/8 88/18 89/19 90/22 91/14 91/17 92/17 93/5 96/15 100/25
**whenever [1]**  76/1
**where [32]**  10/4 18/11 22/12 23/11 26/9 26/11 27/9 28/3 29/2 35/6 39/24 48/20

50/14 55/3 58/24 59/15 74/6 74/9 77/9 80/14 81/7 87/17 87/17 87/20 88/1 90/11 90/16 95/17 96/20 99/22 100/6 100/19
**whether [47]**  4/23 5/1 5/8 5/14 6/4 6/18 7/14 10/14 11/3 11/14 12/23 18/8 21/25 23/19 25/8 25/22 25/24 27/17 28/10 28/10 34/14 35/11 36/5 42/2 43/2 43/20 46/22 49/14 49/18 51/23 52/6 52/8 52/15 53/15 77/7 77/18 78/18 78/19 79/3 79/17 80/19 80/23 83/11 83/14 83/22 87/12 98/10
**which [54]**  3/9 4/12 9/4 10/7 10/23 12/6 12/18 13/1 14/11 14/14 15/16 18/2 19/15 20/9 20/14 20/17 20/21 21/10 25/9 28/25 37/13 37/15 40/22 43/16 44/11 45/11 48/17 48/23 53/23 55/3 55/19 57/12 59/1 60/3 61/9 64/7 69/6 70/16 70/20 71/11 72/4 72/4 73/12 75/4 79/8 81/25 86/1 89/14 92/13 95/16 95/25 96/2 96/3 96/5
**while [3]**  33/11 34/9 71/11
**Whitley [25]**  11/1 24/6 29/12 44/1 44/2 44/2 44/3 44/13 44/18 44/23 45/1 45/2 46/8 47/4 47/17 48/13 49/3 49/11 49/21 50/24 51/12 51/20 52/6 53/10 98/25
**Whitley's [7]**  29/10 45/8 45/13 46/16 47/10 49/7 52/1
**Whitney [1]**  52/24
**who [78]**  13/5 13/6 14/7 14/8 14/20 14/22 14/24 16/9 16/11 16/14 17/25 19/5 19/17 19/18 20/4 20/4 20/23 20/24 24/10 27/10 31/14 32/10 33/16 34/21 34/24 37/14 37/17 37/18 40/7 40/12 44/9 47/4 48/14 48/15 50/10 54/18 55/12 56/14 57/1 57/17 60/19 64/4 64/20 67/11 67/23 70/7 71/6 72/5 74/10 75/5 75/5 75/10 76/20 76/23 77/1 77/1 77/1 77/12 77/14 77/14 77/15 77/15 77/16 77/24 78/14 78/23 79/11 80/1 80/16 89/7 89/9 90/24 91/2 91/11 93/7 93/13 97/4
**whole [11]**  5/13 7/2 30/4 41/6 59/19 62/9 71/1 81/2 87/10 99/4 99/11
**whose [2]**  16/5 79/12
**why [47]**  2/25 6/10 9/16 14/4 18/5 20/1 22/16 24/8 24/11 24/19 28/8 28/12 28/24 30/7 30/17 30/18 33/20 33/25 37/3 44/6 44/7 46/18 59/1 59/7 61/13 63/15 65/21 67/2 72/22 74/7 78/11 79/18 82/4 82/15 82/18 82/25 83/2 83/20 89/17 91/8 91/11 91/11 91/14 96/19 96/24 97/4 97/4
**wide [1]**  100/8
**WILKINSON [19]**  1/13 2/12 4/20 5/17 34/2 37/13 38/23 49/9 58/2 58/7 64/7 65/9 76/25 78/9 82/5 89/23 91/22 93/25 101/10
**Wilkinson's [1]**  64/2
**will [22]**  3/3 3/11 13/4 21/7 23/8 60/17 66/18 66/22 66/23 67/25 69/20 70/19 71/9 72/17 73/22 81/14 82/13 87/24 88/7 92/22 96/25 97/7
**Willie [3]**  73/25 74/16 74/21
**willing [1]**  78/6
**Wilson [17]**  14/18 19/3 19/11 19/19 21/9

23/3 24/6 33/13 37/4 44/8 45/6 55/3 55/23 60/20 61/20 62/25 64/3
**wishing [1]**  81/25
**withheld [5]**  10/25 11/2 11/4 11/5 11/12
**within [5]**  5/8 7/12 86/12 86/13 86/13
**without [7]**  15/25 16/16 16/19 26/23 36/4 53/18 97/19
**witness [20]**  23/24 27/10 28/17 30/18 34/22 37/14 38/10 38/25 39/5 43/8 44/12 44/12 44/14 46/8 48/13 49/4 79/7 79/10 80/17 88/6
**witness' [1]**  48/7
**witnesses [7]**  26/1 39/9 39/10 55/12 56/14 79/11 79/11
**woman [2]**  74/10 75/10
**woodwork [1]**  93/13
**word [4]**  12/1 15/3 88/20 98/21
**words [7]**  22/14 50/16 57/19 60/6 63/12 73/14 93/20
**work [1]**  87/7
**worked [1]**  7/11
**worker [4]**  78/23 79/22 80/1 93/7
**working [1]**  80/18
**Workman [1]**  12/9
**workplaces [1]**  74/6
**works [2]**  84/6 85/13
**world [1]**  30/2
**would [93]**  2/17 3/10 3/21 5/12 5/15 6/5 10/15 11/17 13/7 13/9 13/14 14/5 15/11 15/12 15/13 15/14 15/15 15/17 15/17 15/18 15/21 16/20 18/7 20/22 21/7 21/14 22/10 23/12 25/8 28/13 28/16 32/2 32/11 32/14 32/14 32/18 33/18 33/24 36/12 37/5 37/7 37/8 37/18 38/12 39/13 39/15 40/9 40/10 40/22 40/24 42/13 45/1 46/5 48/5 48/5 52/7 53/3 55/12 57/16 59/24 59/25 61/16 62/11 62/12 62/15 63/10 63/15 64/24 69/2 71/19 71/23 73/20 73/20 75/3 75/4 75/11 77/12 81/16 82/1 82/2 84/23 87/16 88/9 88/12 88/13 88/24 89/1 92/20 95/13 95/14 97/3 97/4 99/19
**wouldn't [9]**  16/19 27/3 32/16 41/6 42/5 58/16 73/7 78/12 88/15
**wound [1]**  23/13
**write [1]**  97/8
**writing [1]**  100/16
**written [1]**  66/25
**wrong [2]**  70/17 92/1
**wrongfully [1]**  35/3
**wrote [4]**  16/10 16/11 16/11 16/12

## Y

**yanked [1]**  14/22
**yeah [11]**  8/1 8/4 43/13 44/11 46/10 62/24 66/17 79/25 86/8 91/4 96/11
**year [2]**  13/1 27/20
**years [5]**  40/10 44/3 67/24 70/3 90/1
**yes [40]**  4/18 9/6 17/11 17/14 18/19 21/6 31/6 31/12 31/14 34/12 39/21 41/19 42/3 44/5 45/20 46/11 48/11 49/13 49/23 49/25 50/3 51/3 51/7 70/1 70/4 72/16 73/19 74/15 75/11 75/18 76/22 79/21 80/4 80/12 86/25 87/2 88/1 88/7 92/9 96/21
**yet [2]**  23/25 86/23

| Y | | |
|---|---|---|
| **Yogi [3]**  34/22 34/24 35/4<br>**you [277]**<br>**you'd [2]**  87/20 88/1<br>**you're [52]**  9/2 9/14 9/17 9/22 11/4<br> 11/10 11/25 13/25 16/23 16/24 17/10<br> 32/1 35/10 36/6 39/19 44/3 44/7 46/25<br> 47/1 47/2 47/6 47/20 50/1 58/16 60/8<br> 66/13 66/14 66/24 67/1 67/2 68/7 68/19<br> 72/14 77/6 77/23 78/3 80/14 81/8 81/19<br> 83/5 83/21 83/21 86/4 86/21 90/3 92/14<br> 95/23 98/6 98/21 100/4 100/5 100/11<br>**you've [10]**  8/14 35/15 44/25 69/13<br> 69/13 74/14 81/6 81/12 88/3 88/19<br>**young [2]**  63/15 67/23<br>**younger [1]**  33/13<br>**your [140]**<br>**yourselves [1]**  2/6 | | |
| **Z** | | |
| **zealous [2]**  7/5 30/15<br>**zero [2]**  35/21 64/8 | | |