**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | * | |
| | * | |
| **v.** | * | **CIVIL NO. PJM-12-3065** |
| | * | **CRIMINAL NO.   PJM-03-457** |
| **KENNETH JAMAL LIGHTY,** | * | |
| | * | |
| **Petitioner** | * | |

**\*\*\*\*\*\***

**GOVERNMENT'S RESPONSE TO PETITIONER'S "MERITS BRIEF"**

## TABLE OF CONTENTS

INTRODUCTION ........................................................................................................................1

I.   Response to Claimed Ineffectiveness At Penalty Phase ...................................................3
  A. Claimed Failures re: Lighty's Background  ...........................................................3
  B. Claimed Failures re: Mathis...................................................................................5
  C. Claimed Failures re: Penalty Phase Arguments....................................................13
  D. Claimed Failures re: Newbill Evidence ...............................................................16
  E. Claimed Failures re: Investigation of Trial Witnesses.........................................18
  F. Claimed Failures re: Hayes' Father testimony......................................................18
  G. Claimed Failure re: Hearsay Statements offered at Penalty Phase ......................18
  H. Claimed Failure re: Prior Armed Robbery Conviction ........................................18
  I. Claimed Failure re: Admission of Disciplinary Report .......................................18
  J. Claimed Failure re: Randy Lighty's Testimony  ..................................................19
  K. Claimed Failure re: Mercy Instruction ................................................................19
  L. Claimed Failure re: Penalty Phase Instructions  ..................................................21
  M. Cumulative Argument  ..........................................................................................21

II.  Response to Claimed Ineffectiveness at Guilty Phase....................................................21
  A. Claimed Failure re: Mathis ..................................................................................21
  B. Claimed Failure re: Alleged Government Misconduct..........................................21
  C. Claimed Failure re: Cross-Examination of Whitley  ............................................22
  D. Claimed Failure re: Whitley as an "informant"  ...................................................22
  E. Claimed Failure to call Anthony Leftwich  ..........................................................22
  F. Claimed Failure re: Afton Street incident  ...........................................................22
  G. Claimed Failure re:  Afton Street mitigation  ......................................................22

H.  Claimed Failure re: other Crimes Evidence .........................................................22

I.  Claimed Failure re: Cross-Examination of Forrest ..............................................23

J.   Claimed Failure re: Flood's opening statement .................................................23

K.  Cumulative Effect of Errors ................................................................................23

III.    Response Regarding Ineffectiveness During Direct Appeal .......................................23

A.  Claimed Failures re: Jury Selection ...................................................................23

B.  Claimed Failures re:  Penalty Phase Argument ..................................................23

IV.    Response to Allegations of Prosecutorial Misconduct ...............................................23

A.  Whitley was not an Informant..............................................................................23

B.  No Conflicting Theories of Afton Street ..............................................................25

C.  No False Testimony about Whitley ......................................................................25

D.  No Misrepresentations about Hampton  ..............................................................25

E.  No Suppression of Wilson's Motive ....................................................................25

V.    Response to Court's Claimed Errors at Penalty Phase ...............................................27

On October 11, 2019, Petitioner Lighty filed a Brief in Support of Petitioner's Amended Motion Regarding Claims other than Claim I in his Motion for Relief Under 28 U.S.C. § 2255). This new pleading is unduly lengthy and often repetitive of the Amended Motion to Vacate, Set Aside, Or Correct Sentence and for New Trial Pursuant to 28 U.S.C. § 2255 (ECF 451) ("Amended Motion") filed in December 2012. Counsel somewhat colloquially refers to the new pleading as the "Merits Brief" and the Government will refer to it the same way herein for sake of brevity. Counsel repeats much of the 182 page Amended Motion (ECF 451) in the Merits Brief. The Government already filed a detailed response to the Amended Motion on November 20, 2018 (ECF 597). Hence, the Government will not paper an already voluminous file with unnecessary and tedious responses to unfounded claims of misconduct and ineptitude by trial counsel (both defense and government).

The Government highlighted a copy of the "Merits Brief" to reflect what the Government has identified as "new" a copy of which is available to the Court upon request. To the extent, there is "new" information, the government attempts to respond concisely herein. Otherwise, the government refers the Court to the established the case law and arguments made in the Government's Response and fully incorporates that pleading and the Government's Response to Defendant Lighty's Motion for Discovery Regarding Claims Other Than Claim I Motion for Relief Under 28 U.S.C. § 2255 filed in 2013 (ECF 467), by reference here. For the most part, there should be no added "Reply" to its own "Merit Briefs" because the arguments are now fully briefed in three rounds of briefing (Defendant's Amended Motion, Government's Response, Merits Brief).

Counsel added five pages in the "Introduction" section to re-argue, using colorful and exaggerated language, what Lighty contends happened below. In short, Lighty claims counsel

1

should have (1) done more to assert the so-called "Tony Mathis" defense, (2) presented more

mitigation at the penalty phase about Lighty's background and upbringing as well as about the

Afton Street evidence and (3) objected better to the Government's closing arguments at the

penalty phase.  He also contends that trial counsel made other errors at trial and on appeal;

specifically that the government engaged in misconduct and that the Court committed

constitutional errors during the trial and penalty phase as well.  Most significantly, counsel filed

an affidavit signed by trial counsel Jeffrey O'Toole.   If O'Toole's 8-page list detailing his

professed ineptitude and negligence is believed, he should no longer be accepting court

appointments and representing felony defendants in federal court. Yet, according to PACER he

continues to do so.  It is noted that his co-counsel (Dayna Dayson), also blamed for much

negligence during the trial, is now a judge.  The Government contends "errors" by trial counsel,

if any, are not material.  The Government further contends that trial counsel acted strategically

and based on his judgment and experience in death-eligible cases as to what "may" work when

faced with insurmountable evidence.  Finally, O'Toole was likely bound and limited in his

representations by whatever confidential communications he had with his client as to what

happened the night Lighty participated in the kidnapping and murder of Eric Hayes. Should there

be further evidentiary proceedings in this case, O'Toole will need to testify about those

confidential communications and discretionary decisions as he has now waived the privilege by

filing the affidavit.[1]

---

[1] "[A] petitioner who claims ineffective assistance of counsel in a habeas petition waives the protection of attorney-client privilege over information that is relevant to those claims." *Courtade v. United States*, 243 F. Supp. 3d 699, 702–03 (E.D. Va. 2017) *citing United States v. Pinson*, 584 F.3d 972, 978 (10th Cir. 2009) ("Given the ample, unanimous federal authority on point, we hold that when a habeas petitioner claims ineffective assistance of counsel, he impliedly waives attorney-client privilege with respect to communications with his attorney necessary to prove or disprove his claim."); *Bittaker v. Woodford,* 331 F.3d 715, 716 (9th Cir. 2003); *Butler v. United States*, Nos. DKC 16–0330, DKC 12–0116, 2016 WL 1427090, at *2 (D.

The Court should deny without an evidentiary hearing the Section 2255 Motion because "the files and records of the case conclusively show that the prisoner is entitled to no relief."

I.        Response to Claimed Ineffectiveness at Penalty Phase (MB 9 – 190)

Habeas counsel submits trial counsel failed in the following ways during the Penalty Phase.

        A.  Claimed Failures re: Lighty's Background (MB 14 -96)

Counsel spends more than 80 pages chronicling the life of the Lighty family that apparently took them years to marshal and complete compared with what they describe as the "dauntingly short" "10 months" trial counsel had below.  MB at 19.  They acknowledge that the original defense team interviewed 18 witnesses but complain about the quality of those interviews.   Trial counsel below now asserts he took him awhile to realize how serious the case was.  MB at 19.  That assertion is not only ridiculous but flies in the face of trial counsel's represented experience and judgment when he was appointed as death-qualified counsel and simply cannot be credited now so that all defense counsel working together now can overturn a jury verdict of death.  As this Court has suggested in hearings on this case before, this type of after-the-fact representations when counsel was <u>clearly</u> qualified to represent Lighty would open the door to wily attorneys pretending to be ineffective to allow another bite at the apple in fairly tried federal trials.

Habeas counsel appears to be suggesting that what is constitutionally required in every capital murder case is the type of life story-account counsel included in the "Merits Brief" and

---

Md. Apr. 12, 2016); *Harris v. United States*, Nos. 3:15cv7814, 3:14cr42–01, 2016 WL 236988, at *2 (S.D.W.Va. Jan. 19, 2016); *see also Strickland v. Washington*, 466 U.S. 668, 691, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984) ("[I]nquiry into counsel's conversations with the defendant may be critical to a proper assessment of counsel's investigation decisions, just as it may be critical to a proper assessment of counsel's other litigation decisions.").

that simply cannot be so.  It is neither fair to the community and the victims – nor what is *per se* necessary to defend such a case – to require such a detailed biography of a person's life story. Any truly mitigating factor that would act to persuade a jury in like cases would certainly be immediately apparent to any professional. Factors such as child abuse, mental health issues left untreated or drug addiction are just a few examples and do not take years or countless/endless interviews to find and summarize.  How someone's birth certificate or their "father's death certificate, autopsy report and the court file from the prosecution of his murderer" is "vital" such that their absence constitutes constitutionally defective counsel is patently nonsensical.

Moreover, presentation of mitigation evidence is, like many trial decisions, a matter of strategy where quality is certainly more important than quantity.  Simply put, a defense attorney's rambling detail of a violent criminal's life including miscellaneous tribulations of various family members could very well backfire in front of a jury that actually hears the evidence in a particular case where the decision to be made is whether the aggravating circumstances sufficiently outweigh any mitigating circumstances[2].  Even for counsel and the Court, it is difficult to get through the pages and pages of mind-numbing detail.  This must be particularly so when much of what counsel writes about even does not even pertain directly to Lighty himself.    Moreover, counsel's efforts to contrast what they contend is "meager" mitigation evidence presented by trial counsel with its own only supports the contrary argument that trial counsel's efforts were streamlined and strategic.  For example, where habeas counsel shows disdain for the *"*succession of witnesses [called] whose principal purpose was to state that they loved Mr. Lighty and that they intended to remain in contact with him now that he was in

---

[2] Section 3593(e) of Title 18 states the jury shall consider whether "all the aggravating factor or factors found to exist sufficiently outweigh all the mitigating factor or factors found to exist to justify a sentence of death, or, in the absence of a mitigating factor, whether the aggravating factor or factors alone are sufficient to justify a sentence of death."

prison", a reasonable jury could find (and did here) that all life has meaning. This is not a constitutionally infirm representation. This Court should not overturn a jury's verdict on the basis of facts that include how an infant named Oliver passed away at a young age (MB at 52), or the details of how father Kenny Lighty Sr. died as described in the newly-acquired Autopsy. There was ample evidence of "mitigation" that the jury simply chose to reject given the aggravating circumstances in the case.

### B. Claimed Failures re: Mathis (MB 96-117)

Counsel makes multiple claims regarding trial counsel about the so-called Mathis "defense" that includes new witness affidavits, and further arguments regarding Mathis' baby's mother, Tamika Hampton, and the firearms examiner evidence.

The primary assertion is that three witnesses now state, **18 years** after the murder in this case, that Mathis "confessed" to each and trial counsel failed to find them. Much has happened since then. Mathis, of course, is now dead. The lead prosecutor passed away over two years ago. The FBI agent and homicide detective have retired. Yet habeas counsel asks this Court to credit hearsay statements made by a dead man. The so-called "confessions" to each implicate Mathis as not only being involved in the crime, a fact the government has always acknowledged, but as being the actual shooter that killed Lighty– a fact the government the hotly contests.

Before delving into the so-called witness statements, as well as other purported trial counsel failures regarding Mathis, the Court will certainly recall the key undisputable facts in this case as detailed in various pleadings and opinions during direct appeal and include:

- Antoine Forrest saw Hayes kidnapped by at least two men who were driving co-defendant James Flood's Lincoln.   JA 977-78.

- Hayes was wearing Nike shoes with swirls on them and a green Eddie Bauer coat and was carrying a two-text pager.

5

- Lighty forced Hayes into the trunk of the Lincoln. JA 1246-47, 1478.

- The Lincoln was driven across the District of Columbia/Maryland border to Keating Street in the Hillcrest Heights area of Prince George's County, Maryland, approximately 3.7 miles from the abduction scene.

- The travel time between the two points was seven minutes and 15 seconds. JA 1842.

- At approximately 8:30 p.m., Eugene ("Yogi") Scott, a friend of Flood's, saw a dark sedan speeding up Keating Street. Scott turned his back and started walking away, but heard the car screech to a halt and a voice ask if the person in the dark sedan was the person who had stolen Scott's vehicle earlier that day. JA 1363-64. Scott did not respond.

- At approximately 8:30 p.m., a homeowner, Michael Davis, saw an older car stop next to an undeveloped lot adjacent to his residence, JA 1084, 1842, and that the front passenger and rear right passenger of the vehicle (but not the driver) forcibly pull a man (Hayes) out of the rear right passenger area. JA 1087-89, 1104.

- Davis saw Hayes on his knees and heard him pleading "no" or "don't." Gunshots immediately followed. JA 1090-91. Davis called 911 and PGPD received his call at 8:51 p.m. JA 1127.

- The two men reentered the passenger side of the dark vehicle which fled from the scene.

- Hayes suffered multiple gunshot wounds, including three headshots which were each independently fatal and would have caused Hayes to immediately collapse and become unconscious. JA 1706-11. Hayes also suffered additional nonfatal gunshot wounds to the hand and leg, and a patterned blunt force nonfatal injury to his head, all of which preceded the fatal gunshots to his head. JA 1702-04, 1720-21.

- At approximately 8:43 p.m., Krystal Phauls, Wilson's girlfriend, began receiving urgent calls from Wilson, using Flood's cell phone, asking her to pick him up which she agreed to do. JA 1180, 1554.

- Phauls and her friend, Melissa Coles, saw and then picked up Wilson, Lighty & Flood (Junebug) as the last call at 9:03 p.m. was ending. JA 1180, 1185.

- Lighty held a pair of Nike foam posit shoes that matched the ones Forrest said Hayes wore that evening. JA 1175, 1214.

- The women heard Wilson, Lighty and Flood talking all at once discussing that they had done something bad to someone, "like killed him." JA 1214-16.

6

- At Wilson's direction, Phauls drove the three men to the same location on Keating Street where, earlier in the evening, Scott had seen the dark vehicle pull up. JA 1176, 1186, 1795.

- When Phauls stopped the vehicle, the three men got out, checked the street for blood, and got back into the vehicle. JA 1177.

- Later, Phauls saw Wilson with Hayes' pager. JA 1179, JA 976-77.

- In February 2002, Flood retrieved the Lincoln at the place where Phauls picked up the Lighty, Flood and Wilson on the night of the kidnapping, JA 1420-22, and drove it to North Carolina and gave it to his parents. JA 1421-23.

- After law enforcement located the car in February 2003, JA 1550-52, forensic technicians determined that a small blood spot found on the rear passenger side floor rug came from Hayes and that fibers from the passenger compartment and the trunk carpet matched those found on Hayes's clothing. JA 1590-1600.

- During the kidnapping, at approximately 8:37 p.m., Lighty, also using Flood's cellular telephone, called Ebony Miller. JA 1257-58, 1554.

- Later that evening, Lighty called Miller again and told her that he had "slumped" someone - i.e., that he had "just killed somebody, shot him," JA 1241, 1245, because "someone tried to steal his man's car." Lighty said he got "the man," put him in the trunk, and took him "around the way" and shot him. JA 1241-43.

- Lighty directed Miller to drive to the same place on Keating Street where Phauls drove the men the night of the murder. Lighty showed Miller the blood stains on the road. JA 1248.

- Lighty directed Miller to drive to the murder scene and stated that "they" (referring to the police) already got him (referring to Hayes' body). JA 1249-50.

- The next day, Miller asked Lighty whether he had killed Hayes, and Lighty replied that "that's what he get for trying to steal his man's car." JA 1252-53

- In March 2002, police arrested Lighty's friend, Whitley, on unrelated charges. Whitley told officers that he had information about homicides. JA 1542-43, 1482-83. Lighty made detailed, corroborated, admissions to Whitley regarding his involvement in Hayes' abduction and murder, JA 1443-76, including that Lighty had shot Hayes.

- Whitley's statements led police to the discovery of the Lincoln in North Carolina and to the forensic evidence linking the car to Lighty and his co-defendants. JA 1480-81.

7

- Flood's cellular telephone records reflected contacts with his girlfriend, Phauls and Miller at times consistent with their respective trial testimonies, JA 1554, and established that all three defendants used Flood's cellular telephone during the time of the kidnapping and shortly after the murder.

It is against this backdrop that counsel have found three people who contend to have spoken to dead Mathis about the Hayes' abduction and murder. Counsel writes to this end, "[B]ecause establishing Mathis' responsibility was central to the defense's plea to spare Mr. Lighty's life, reasonably competent counsel would have searched vigorously for witnesses in whom Mathis might have confided—particularly witnesses like Mathis' wife and associates."

First, if this issue sounds familiar, it is. This "new" issue is similar to the one already resolved in this very case where this Court found, and the Fourth Circuit affirmed on direct appeal, Lighty's conviction despite a witness who came forward after "Mathis was ever so conveniently dead" to point the finger at him. The Court will recall that, in December 2007, Lighty filed a motion for new trial based on this "newly discovered evidence" and prior to the evidentiary hearing, Lighty added a new claim, premised on a testifying witness' purported recantation of his trial testimony.

The Fourth Circuit affirmed the Court's denial of the motion for new trial based in large part on this Court's "credibility determination" as to the proffered "new evidence" to assess whether it would "probably produce an acquittal." *United States v. Lighty*, 616 F.3d 321, 374 (4th Cir. 2010), citing *United States v. Kelly*, 539 F.3d 172, 189 (3d Cir.2008); *United States v. Gantt*, 298 F.2d 21, 23 (4th Cir.1962) (noting the district court's fact-finding role where the credibility of the newly discovered evidence is in question). "To make a determination under this standard, the district court cannot view the proffered testimony in a vacuum; it must weigh the testimony against all of the other evidence in the record, including the evidence already weighed and considered by the jury in the defendant's first trial." *Kelly*, 539 F.3d at 189.

8

Similarly, when a witness recants testimony given at trial, the Fourth Circuit repeated the standard for granting a new trial:

> (1) the court is reasonably satisfied that the testimony given by a material witness is false; (2) without the evidence a jury might have reached a different conclusion; and (3) the party seeking the new trial was taken by surprise when the false testimony was given and was unable to meet it or did not know of its falsity until after the trial.

*United States v. Wallace*, 528 F.2d 863, 866 (4th Cir.1976); see also United States v. Carmichael, 726 F.2d 158, 160 (4th Cir.1984) (noting the "[f]indings of the district court made on a motion for a new trial based on newly discovered evidence should not be disturbed except for most extraordinary circumstances").  Most important, post-trial recantations of testimony are "looked upon with the utmost suspicion."  *Lighty,* 616 F.3d at 375 *citing United States v. Johnson*, 487 F.2d 1278, 1279 (4th Cir.1973).

As the Court did on direct appeal, the Court can do on the affidavits procured by new counsel. Like "JM", the witness at issue during the direct appeal, the witnesses counsel identifies now waited even longer (18 years) "to come forward about what [they] purported to know."   In addition, of course, none provided statements implicating Mathis as Hayes' shooter until after Mathis was murdered and the facts underlying the *Lighty* prosecution were available to the public in a myriad of ways.  Similarly, the "new" witnesses would not "probably have produced an acquittal" in light of "all of the trial evidence" the Court properly considered:

> including Ebony Miller's testimony that Lighty confessed within hours of the murder and provided details of the kidnapping and murder. Those details included the fact that Lighty had picked Hayes up off Alabama Avenue and brought him back to Keating Street to face allegations that he had tried to steal Scott's car. Lighty directed her to a location on Keating Street where he said he forced the victim to face his friends, and the location where Hayes was found by the PGPD. Phauls identified the same location as the place where she was directed to stop her car so Lighty, Flood, and Wilson could check the street for blood, and Scott identified that location as the place where an older model car pulled up and a voice asked words to the effect of, "Yogi, was this him?" Moreover, there was

9

> plenty of flimsy evidence concerning Mathis' role in the crimes before the jury,
> which the jury understandably rejected, and JM's testimony simply would have
> added to this flimsiness.

For these reasons, the Fourth Circuit affirmed this Court's findings: "after presiding over
Lighty's trial and listening to the proposed testimony of JM, the district court did not abuse its
discretion when it determined JM's testimony was incredible and would not have probably
resulted in an acquittal." *Lighty*, 616 F.3d at 375.

The Fourth Circuit also approved this Court's analysis regarding Whitley's "recantation"
and its possible effect on the trial:

> With regard to Whitley's recantation, the district court had ample opportunity to
> assess Whitley's credibility at trial. Although there were some inconsistencies in
> Whitley's trial testimony, the district court certainly was in the best position to
> determine if Whitley's trial testimony was credible. Moreover, Whitley's trial
> testimony was corroborated by the trial testimony of other witnesses, as well as
> physical evidence. With so much evidence corroborating Whitley's trial
> testimony and undercutting his post-trial recantation (e.g., the timing of the
> recantation, community pressure), we cannot take issue with the district court's
> conclusion that the material portions of Whitley's trial testimony were not false.

*Id.*

According to the Declaration of Ovidra Holder, signed in June 2019, "Tony kept his life
outside of the house a secret" yet she claimed he confessed to a murder about which she was
"appalled" yet she herself never went to the police about it despite the fact he purportedly told
her other "people were going down for it."   Another 2019 "find" by habeas counsel is "Urenzo
'Smoke' Mitchell" who also contended it was "wrong" that Tony did not get in trouble for the
murder yet failed to come forward when "other people were getting locked up for something he
had done."   Finally, Taylor, who purportedly came forward at least as of April 13, 2017 but who
it fails to mention in any previous defense filing that government counsel could find, is prima
facie unreliable for that reason alone.  Not only are these versions internally inconsistent but also

10

inconsistent with the trial evidence and forensics.  The statements do not exculpate Lighty

regarding his own involvement and they make one question the motive of people who would

allow purported "injustices" to go on for years.  Moreover, at best, the declarations are simply

years-old recollections of hearsay statements made by a dead man that are not corroborated and

should not be credited.

The arguments about Hampton are similarly weak. The Court knew Hampton would say

she saw a gun "that look[ed] like the gun had been seen in December 2001" and excluded it over

trial counsel's objections.  Though counsel does not quote or cite what he claims the

government's "misleading objection was" (MB at 105-106), had her testimony been allowed it

would not have changed one thing about the results of this case because it did not establish that

Mathis was at the scene of the Hayes' murder where he was executed.

Counsel thinks trial counsel should have called inmate Arnold to "corroborate" Wilson's

false statement about what happened that night where he implicated Flood and Mathis' as the

shooters as opposed to his friend Lighty.  However, trial counsel had better than that. He

convinced the Court to have Det. Chaney read word for word what Wilson's statement was.  His

decision not to highlight possible discrepancies by calling Arnold was clearly a strategic call. It

is boilerplate litigation strategy that no witness recounts things the exact same way, and having a

live witness to cross-examine about Wilson's false statement, would likely have flopped. Indeed,

according to Arnold, Wilson said Flood shot the victim "in the woods."  (MB at 111).  There is

no evidence of a "woods" shooting.

Counsel expands on the argument about trial counsel's failure to timely note William

Welch as an expert:

> Welch's testimony would have established conclusively that, consistent with the
> defense theory of the case, the bullet that entered Mr. Hayes' head behind his ear

11

could not have been fired from the guns seized from Mr. Lighty, and must have been fired from another weapon. This testimony would have decimated the Government's theory that Mr. Lighty was the lone shooter and that each of the three bullets recovered from Mr. Hayes' head came from the gun seized from Mr. Lighty. At the same time, Welch's testimony would have buttressed the defense theory that Mr. Mathis shot Mr. Hayes on Keating Street and that Mr. Hayes was already dead by the time he arrived at Hillcrest Parkway where his body was found.

MB at 113. Trial evidence "decimates" Welch's "theory" which is not at all "conclusive."

Hayes was <u>alive</u> when Lighty shot him on Hillcrest Parkway and there is not a shred of evidence

(nor an assertion by habeas counsel) that Mathis was present on Hillcrest Parkway when Hayes'

was shot. The Court will recall that an eyewitness heard and saw the very events about which

counsel now speculates with "theories" about Mathis having fired the fatal shot on Keating Street

summarized at page 339 of the *Lighty* opinion:

> At approximately 8:30 p.m. that evening, Michael Davis was at his house on the 12800 block of Hillcrest Parkway in Temple Hills, Maryland. A dog outside the house was barking uncontrollably, so Davis, who was upstairs packing for an upcoming vacation, looked out a second-story window to see what was going on. Davis saw an older model car stopped at the end of the street, next to undeveloped land owned by Prince George's County. At the time, the presence of the car meant nothing to Davis, as it was not uncommon to see a car parked at the dead end. The dog continued to bark, however, which caused Davis to look out the window again. This time, Davis saw the front passenger and a rear passenger exit the car and proceed to forcibly pull a man, later identified as Hayes, out of the back passenger area of the car. Davis saw Hayes on his knees and heard him saying "no" or "don't." Davis then heard what sounded like two gunshots, which resulted in Hayes falling over. The front passenger and the rear passenger reentered through the passenger side of the car, and the car left the scene. Davis left his house, entered his car, and drove to the end of the road, where he found Hayes lying on the ground. At that time, he called 911.

Repeating over and over again that Mathis shot and killed Hayes on Keating Street does

not make it so. Putting him at the kidnapping or on Keating Street, a fact the government does

not dispute, does not change the dynamic in this case one iota. The physical evidence from the

Lincoln about which habeas counsel does not dispute simply does not support such a finding.

12

There was only a small amount of blood in the trunk of the Lincoln. There was no evidence of blood in the rear passenger seat of the Lincoln where Mr. Davis saw the men pull Hayes out before shooting him.  Hayes sustained a small head wound consistent with the small amount of blood and consistent with having been hit by the butt of a gun like the one Lighty had. Moreover, the testimony of the medical examiner is equally clear.   Each of the shots to Hayes' head were fatal.[3]  Mr. Davis established definitively that Hayes' was alive when Mr. Davis witnessed the execution.  **Mathis was not there. Period.**

  C. Claimed Failures re: Objections to Penalty Phase Arguments (MB 117-147)

Thirty pages of the "Merits Brief" is spent quoting from the government's closing argument and rebuttal with colorful arguments about how poor a lawyer trial counsel was for not objecting.   If trial counsel's line-by-line assault on government counsel was, in fact, supported by the law there could be no proper "argument" and government counsel should just remain mute at the end of a penalty phase case. *See United States v. Runyon,* 707 F.3d 475, 513 (4th Cir. 2013), *cert. denied,* 574 U.S. 813 (2014).  The Court made the following general observation regarding penalty phase closing arguments applicable here:

> Runyon, by contrast, seems to contemplate a more one-sided affair, with the defendant making his mitigation case more or less unfettered and the prosecution responding with but a narrow subset of the available aggravating evidence. Though we must uphold for capital defendants the procedural safeguards guaranteed them by the Constitution and the FDPA, we must also avoid constraining unduly the prosecution's ability to paint a complete picture of the defendant's crime and character, lest the jury be less than fully and amply informed.

---

[3] Dr. Laron Locke, the medical examiner, examined Lighty's .380 caliber handgun and concluded that one of the abrasions found on Hayes matched the barrel portion of Lighty's handgun and that another patterned abrasion matched the clip release of the handgun. Dr. Locke concluded these abrasions were consistent with Hayes being struck by Lighty's .380 caliber handgun. *See United States v. Lighty,* 616 F.3d 321 (4th Cir. 2010).

*Id.* at 492.  The Court stated further: "[while] courts should not hesitate to condemn those prosecutorial comments that truly offend constitutional norms, neither shall we attach constitutional significance to every verbal fillip, lest we unduly censor the clash of viewpoints that is essential to adversarial proceedings.  *Id.*  The Court also included an appropriate quote from *United States v. Johnson*, 587 F.3d 625, 632–33 (4th Cir.2009) for the principle that the Constitution does not strictly limit what the prosecution may say during its summation.

> [On the contrary], great latitude is accorded counsel in presenting closing arguments to a jury. In our adversary system, prosecutors are permitted to try their cases with earnestness and vigor, and the jury is entrusted within reason to resolve heated clashes of competing views.... To be sure, there are some lines that prosecutors may not cross. But to parse through a prosecutor's closing statement for minor infelicities loses sight of the function of our adversary system, which is to engage opposing views in a vigorous manner.

*Id.* at 632-33.  Much of the argument focuses on the claim that the government argued there was no nexus between the mitigation case and the crime but they cite no applicable case holding that such arguments are improper.  The government was simply arguing that the evidence was not "mitigating" – and trial counsel argued that it was.  The two cases they do cite *Le v. Mullin*, 311 F.3d 1002, 1017 (10th Cir. 2002) and *Simmons v. Bowersox*, 235 F.3d 1124, 1138 (8th Cir. 2000) MB at 124, are not on point.  The Court's instructions in this case on mitigation was spot on and there is no evidence whatsoever the jury did not understand it. In fact, they completed the factors they considered to be mitigating and just because defense counsel does not like the fact they did not consider his background to be particularly "mitigating" does not mean it was inappropriate much less "misconduct", for the government to argue the significance of the purported mitigation.

"To establish ineffective assistance for failing to object to a prosecutor's closing argument, [the Petitioner] must demonstrate, as in every ineffective assistance claim, not only

14

that counsel's performance was deficient, but also that there is a reasonable probability that, but for counsel's failure to object, the result of the proceeding would have been different." *Bucklew v. Luebbers*, 436 F.3d 1010, 1021–22 (8th Cir.2006) (rejecting constitutional challenge where prosecutor argued the victim's children would demand the death penalty although they did not testify and stating his personal belief that no one deserved the death penalty more than the defendant). Considering "the weight of the evidence and whether the [purportedly] improper argument misstated evidence or implicated other specific rights of the defendant, ... the comments in this case did not ... render the result of the proceedings unfair." and trial counsel was not ineffective in determining not to object to these comments. *Id.* at 1022–23.

In *Jackson v. United States*, 638 F.Supp.2d 514 (W.D.N.C. 2009), the district court reviewed Fourth Circuit law in the context of a habeas petition challenging trial counsel's failure to object to purportedly improper prosecutorial conduct about "pigs", "evil" and "masturbation."[4] The Court found that arguments meant to convey that by a life sentence, "Petitioner would have successfully committed an "evil" crime and retained life while the victim lost her life" was not improper. *Citing United States v. Fields*, 483 F.3d at 360 ("[t]he use of colorful pejoratives is not improper." (quotation omitted).

In fact, in *United States v. Oken*, 220 F.3d 269, 70 (4th Cir. 2000), the Fourth Circuit held that trial counsel was not constitutionally ineffective in failing to object to certain remarks made by the prosecutors in their closing argument including that the defendant was a "monster"

---

[4] The prosecutor's reference to the Petitioner masturbating in his cell was deemed a proper response to Lindsay's plea for closure. The evidence during the guilt phase was that the Petitioner masturbated while looking at a pornographic magazine while he had the victim tied to the tree. He then shot her. Defense counsel argued that life in prison would create closure. The prosecutor pointed out that the victim's parents would be forced to remember that the Petitioner masturbated while their daughter was tied up and that he then killed her. Thus, although she was dead at his hands, he would continue his behavior in prison with a life sentence. Thus, the evidence adduced during the trial supported this remark.

because it would have been futile for counsel to have done so, given the "wide latitude" accorded counsel in making closing arguments, and given that the prosecutors' remarks, read in context, did not ... otherwise infringe upon [the defendant's] constitutional rights. *See Drew v. Collins*, 964 F.2d 411, 419 (5th Cir.1992) (references to the defendant as a "sadistic killer" and referring to defendant's trip from Louisiana to Texas as a "rolling torture chamber" not prejudicial because supported by evidence).

All of the arguments challenged by counsel now were supported by evidence introduced at the guilt phase – such as the fact that the victim was transported in a trunk alive before he was executed and the heavy weight the victim's family felt because of the crime.[5]   These were not improper arguments and certainly the Fourth Circuit would have noted them as such when it reviewed the entirety of the government's closing argument during direct appeal at the request of trial counsel who challenged two arguments made.

D.  Claimed Failures re Newbill Evidence (MB 143-158)

According to habeas counsel, trial counsel did not effectively handle the Afton Street evidence either because they "unreasonably failed to investigate and present considerable available evidence to mitigate the impact of the Newbill homicide."  Habeas counsel contends the "Government's narrative" of what happened the night of the Afton Street shooting was fundamentally flawed.  MB 145.  The legal reason why this argument fails is covered in the Government's Response at 19-20.[6]

---

[5]   In this way, the case is distinguishable from *Baer v. Neal*, 879 F.3d 769, 787 (7th Cir. 2018) cited by habeas counsel at MB 143, Habeas counsel states that the Court in *Baer* found it unreasonable for defense counsel not to object to the prosecutor's penalty phase closing argument which referenced the prosecutor's own personal upbringing, 9/11, the Oklahoma City Bombings, and layoffs in the community).  Baer is factually distinguishable here because trial counsel did object twice to comments made in closing – albeit, the objections did not merit relief on direct appeal.  More important, government counsel did not refer to their own personal upbringing, or items outside the record and the evidence in this case (such as a bombing) to make its point in favor of capital punishment.
[6] At MB 156, counsel cites a case not discussed in the Government's Response:  *Rega v. Wetzel*, No. 2:13-cv-1781, 2018 WL 897126, at *63 (W.D. Pa. Feb. 15, 2018) for the proposition that trial counsel was ineffective for failing to

16

The Court will recall that an FBI firearms examiner analyzed a .380 caliber shell casing recovered from the Afton Street Shooting scene, and the handgun seized from Lighty at the time of his arrest. Based on his analysis, Mills was able to conclude that the shell casing recovered from the Afton Street Shooting was fired by Lighty's .380 caliber handgun (to the exclusion of all other firearms).   This fact alone was significant insofar as Lighty's involvement in the Afton Street shooting and no amount of so-called mitigation about how others may have shot at the car now (*See e.g.* MB 152 "A reasonable investigation ….would have established that shots were fired into the car Mr. Lighty was driving") offered by habeas counsel changes the simple fact that Lighty and Wilson were together that night, in a shooting incident, involving guns and one of the guns was in Lighty's possession.  Nor does it determine if the men on the street shot at the car *after* the shooting began.

Moreover, there are questionable factual assertions made in their brief.  For example, MB at 147 states, "Newbill's closest friend, eyewitness Marlon Hines, would have testified that Mr. Lighty did not in fact have a gun." There is no citation to the record here and no evidence that Hines ever stated that he had eyes on Lighty at all times.   More important, all of the so-called facts that habeas counsel believes it has dug up about the Afton Street shooting only reinforce that Lighty was involved in a fatal street shooting. Lighty does not explain at all how such "new" facts nullify the compelling evidence that a shell casing recovered from the Afton Street shooting was fired by Lighty's .380 caliber handgun (to the exclusion of all other firearms), *Lighty*, 616 F.3d at 342, and that same gun matched the pattern injury on Hayes' head.

---

investigate and introduce evidence to mitigate the petitioner's criminal record.  The *Rega* case is an unreported decision from a state death penalty prosecution currently on appeal. It has no precedential value but, more importantly, is distinguishable here.  In *Rega* the district court found trial counsel did not investigate and present available mitigating evidence, including not hiring a mitigation specialist, because his client did not want him too. Nevertheless, the Court found counsel had a duty to do so.  In addition, there was available mitigation about the non-violent nature of the defendant's criminal record that counsel did not exploit.  Neither fact is present in this case.

In conclusion, the fact that there could have been even more guns out there is not a sympathetic fact.  Any reasonable defense attorney could certain have concluded that "less is more" said about the Afton street shooting and moved on to other factors to represent his or her client in a favorable light.

E.   Claimed Failures re: Investigation of Trial Witnesses (MB 158-167)

According to habeas counsel, trial counsel failed at impeaching Miller and Whitley too. Not much more need be said then is set forth in the Government's Response. The Court will recall that trial counsel vigorously cross-examined both Whitley and Miller at trial but there is only so much any attorney could do given the cross-corroboration of Whitley and Miller's testimony with the forensic, phone and other physical evidence and witness testimony.  It is also ironic that habeas counsel spends a great deal of time comparing Whitley's cross-examination by co-defendant Wilson's attorneys at a separate trial with trial counsel for Lighty as if the additional information helped Wilson.  *See e.g.* MB 160-161.  Wilson was also convicted after trial on the same fundamental evidence and is serving life in prison.

F.   Claimed Failure re: Hayes' Father testimony (MB 167-171)

*See* Government's Response at 81-82.

G.   Claimed Failure re: Hearsay Statements offered at Penalty Phase (MB 171-174)

*See* Government's Response at 83-84 and concession by habeas counsel that the Fourth Circuit has held that that the Confrontation Clause does not apply at sentencing proceedings in capital cases. *United States v. Umana*, 750 F.3d 320, 346-48 (4th Cir. 2014).

H.   Claimed Failure re: Prior Armed Robbery Conviction (MB  174-175)

See Government's Response at 86-87.

I.   Claimed Failure re: Admission of Disciplinary Report (MB 175-178)

See Government's Response at 87-88.

J.   Claimed Failure re: Randy Lighty's Testimony  (MB 178-181)

*See* Government's Response at 88. Lighty claims his lawyer should have objected when a defense witness volunteered information about how his life without parole sentence was reversed. Lightly contends it "clearly conveyed" to the jury that, "even if they were to sentence, Lighty to life without parole, an appellate court could always reduce the sentence to a term of years later on and permit his release."  MB 180-181. The fact of a criminal appeal is a common factor known to anyone and it certainly does not mean that the jury impermissibly considered such a fact –particularly when the court instructed the jury specifically on what aggravating and mitigating factors it could consider.  Habeas counsel's exaggerated speculation hardly rises to the level of constitutional ineffectiveness.

K.  Claimed Failure re: Mercy Instruction (181-184)

Habeas counsel states that trial counsel failed to properly argue for a mercy instruction because it should have asked the Court to instruct the jury to consider mercy "when weighing -- rather than after weighing – aggravating circumstances."  This is a difference without a distinction here.  In fact, at the behest of defense counsel, the court ruled that "mercy is not precluded from entering into the balance of whether the aggravating factors outweigh the mitigating circumstances as long as it's based on the evidence. There is some latitude there to argue with the jury." JA 3305.  And, in fact, trial counsel did so.

Moreover, the following authority relied on by the district court but now cited for the opposition position by habeas counsel, MB 182, actually supports the view that a capital defendant is not entitled to have a mercy instruction given to the jury.

19

In a murder prosecution arising from the shooting of a security guard during the armed robbery of a bank, *United States v. Allen*, 247 F.3d 741, 781-82 (8th Cir. 2001), *judgment vacated on other grounds*, 536 U.S. 953, (2002), *cert. denied*, 123 S. Ct. 2273 (2003), the court found that district court committed no error in fairly and adequately presenting the applicable law and that it **properly refused** to submit to the jury the defendant's tendered "mercy instruction," which would have informed the jury that they never are required to impose a sentence of death.

The *Allen* court rejected the defendant's assertion that a jury is required to make two decisions: first, whether a sentence of death is justified and second, whether a sentence of death should actually be imposed. Although agreeing that 18 U.S.C.A. § 3593(e) could lend itself to this interpretation when read in isolation, the court found that such an interpretation was inconsistent with the FDPA as a whole as it would allow jurors to disregard a unanimous determination that a sentence of death is justified, in contravention of 18 U.S.C.A. § 3591(a), which states that a defendant "shall" be sentenced to death if the fact-finder determines that a sentence of death is justified after weighing the aggravating and mitigating circumstances. The court also noted that mercy is not precluded from entering into the balance of whether the aggravating circumstances outweigh the mitigating circumstances and that the defendant was not prohibited from urging the jury to be merciful in its deliberations and in its consideration of asserted mitigating factors, and that the FDPA merely precludes the jurors from arbitrarily disregarding its unanimous determination that a sentence of death is justified.

In fact, what happened in *Allen* happened in this case. The court did not give the mercy instruction requested by counsel but trial counsel was permitted to argue mercy.  Trial counsel vigorously argued for mercy during Lighty's penalty phase.[7]

L.  Claimed Failure re: Penalty Phase instructions (MB 184-190)

*See* Government's Response at 95-100.

M. Cumulative Argument (MB 190)

*See* Government's Response at 106-107 discussing the "cumulative error doctrine."

II.       Response to Claimed Failures of Trial Counsel at Guilt Phase

Habeas counsel raises 11 categories of "failures" committed by trial counsel during the guilt phase of Lighty's case.

A.  Claimed Failure Regarding Mathis (MB 198-199)

As habeas counsel did in MB Section IIA, the government refers the Court here to the responsive arguments made about Mathis above in connection with Lighty's Penalty Phase arguments, reminds the Court that the forensic and eyewitness testimony alone destroys the "Mathis-defense" Lighty  (who never asserts his own innocence to the crime charged) raises and refers the Court to its Response at 8-15.

B.  Claimed Failure regarding Alleged Government Misconduct (199-201)

Where there is no government misconduct, there can be no claimed trial counsel failures regarding government misconduct.

---

[7] Conversely, it is perfectly permissible for the prosecution to urge the jury not to show a capital defendant mercy,  *Runyon*, 707 F.3d at 513 *citing Higgs,* 353 F.3d at 331. In *Runyon*, the Court noted that government **and** defense counsel arguments regarding mercy "represents the sort of thrust and parry in which attorneys typically engage in the course of their last chance to persuade a jury."  The Court saw no error  in *Runyon* and this Court should see none here as well.

The government did not elicit false testimony from Whitley. *See* Government's Response 25-26 (Whitley Cross-examination), 59-62 (full excerpt of colloquy).

The government did not misrepresent Hampton's testimony. The court properly excluded evidence of her observations of a gun. *See* Government's Response 15-17.

The government did not present inconsistent motive testimony from Whitley. The focus of the Wilson case was on Wilson, and in Lighty's case, on Lighty. *See* Government's Response 59.

The government self-corrected its misstatement about the Afton Street incident before the district court admitted the evidence. Government Response 17-18.

C. Claimed Failure to adequately Cross-Examine Whitley (MB 201-202)

The government self-corrected its misstatement about the Afton Street incident before the district court admitted the evidence. Government Response 17-18.

D. Claimed Failure re: Whitley as an "Informant" (MB 201-201)

First and foremost, Whitley was not an "informant" hence there can be no failures to investigate and exploit same. *See* Government's Response 27-29 and section IVA *infra*.

E. Claimed Failure re: Anthony Leftwich (MB 202)

   *See* Government Response 15.

F. Claimed Failure re: Afton Street incident (MB 202-207).

   *See* Government Response 17-19.

G. Claimed Failure re: Afton Street mitigation (MB 207-208)

   *See* Government Response 19-21.

H. Claimed Failure re: other Crimes Evidence (MB 208-214)

   *See* Government Response 21 - 22

I.  Claimed Failure re: cross examination of Forrest (MB 214-217)

   *See* Government Response 22 – 24.

J.  Claimed Failure re: Flood's opening statement. (MB 217-219)

   *See* Government Response 24 - 25

K.  Cumulative Effect of Errors (MB 219-221)

   *See* Government Response 106-107 explaining cumulative error doctrine.

III.    Response Regarding Ineffectiveness During Direct Appeal

A.  Claimed Failures re: Jury Selection (MB 222-251)

This Court long addressed allegations regarding Lighty's jury selection process and re-formatting the challenges as failures by appellate counsel is certainly not the basis for claimed ineffectiveness.  *See* Government's Response 33-55.  (ECF 538, Memorandum Opinion).

B.  Claimed Failures re: Penalty Phase Argument (MB 251)

   *See* Government's Response 32-33.

IV.    Response to Allegations of Prosecutorial Misconduct (MB 255-272)

   *See*  Government's Response 56-66.

A.  Whitley was not an Informant (MB 255-260)

The government did not withhold favorable material evidence about Whitley.  Habeas counsel submitted trial counsel's declaration (MB Ex. 2 at ¶10) that he never received Det. Chaney's June 20 2003 probable cause affidavit for the arrest of Lorenzo Wilson for the Afton Street shooting that states, in pertinent part:

> In March, 2002 a witness was interviewed who detailed that the above defendant, Lorenzo Wilson, and a co-defendant, Kenneth Lighty were responsible for shooting and killing Antoine Newbill. This witness advised that Lorenzo Wilson boasted about doing the murder and was able to give corroborating details furnished to him by Lorenzo Wilson that would only have been known by suspects in the homicide. The witness has previously provided detailed information regarding other crimes of violence and narcotics trafficking that has been corroborated by other sources.

Habeas counsel assumes from this note that Whitley was an "informant" (a term of art to mean a person who provides information to law enforcement in confidence sometimes in exchange for a benefit) but produces no evidence of such. To the best of undersigned counsel's knowledge, Whitley has never been referred to by as an "informant" except by habeas counsel.

According to Det. Chaney Whitley was never an "informant." When Det. Chaney authored this affidavit in June 2003, Whitley to be sure had also provided information about "other crimes of violence and narcotics trafficking" on March 23, 2002 that was "corroborated" by other sources. Specifically, the police separately interviewed Whitley about the Hayes murder in March 2002 and by 2003, and corroborated that information – for example, by the all-important discovery of the Lincoln in North Carolina in February 2003, JA 1550-52. There is no evidence that this paragraph means any more than a reference to the other information Whitley provided in March 2002. Det. Chaney, now retired, confirms the meaning of the reference here but will undertake to re-review the files given the passage of time to ensure the correctness of this statement. If it is necessary to supplement this response, the Government will promptly do so.

Moreover, the referenced document was produced, at the very least, to Wilson's counsel in a discovery letter to ALL counsel (including O'Toole) dated April 14, 2003 as described in Paragraph 14 of the letter

24

14. PG Detention records for Lorenzo Wilson (copy to Wilson's counsel only)(Bates #00140- #00182)

The document is Bates number 00144. The government believes that information was later shared with Lighty's counsel. The government may need to supplement as to this issue upon further review of the voluminous files in this case and requests leave to do so.

B. No "Conflicting" Theories about Afton Street Shooting (MB 260-261)

*See* Government Response at 59. To the extent, habeas counsel infers the government was deceptive in how it argued Lighty's role in the Afton Street shooting, when compared with how it argued Wilson's role in the Afton Street shooting, that is patently ridiculous. Not only was trial counsel well aware of the government's evidence at Wilson's trial as it occurred months before Lighty's, it is commonsense the government would focus on the respective roles of each when presented at their own respective trials and hardly "misconduct."

C. No False Testimony about Whitley (261-262)

The government did not present false testimony about benefits. A simple review of Whitley's direct and cross examination, puts to rest any such notion. *See* Government's Response 59-62.

D. No Misrepresentations about Hampton's Testimony (MB 262-267)

The government did not misrepresent the record regarding Hampton. *See* Government Response 9 -11. The government simply argued its position that her information was tenuous and irrelevant.

E. No Suppression of Wilson's Motive (MB 268 – 271)

The government did not fail to disclose Wilson's "motive for the Afton street incident" insofar as it was about "money Johnson owed Wilson for a .22 caliber rifle Wilson had sold." MB at 268.

As an initial matter, habeas counsel cites to a March 2002 interview of Wilson at MB 269

Ex. 187 at 5.  However, this document are notes of an interview in March 2002 with Charles

Whitley, not Wilson, and the government cannot respond specifically without the correct exhibit

about which they are referring.

Moreover, trial counsel knew Wilson sold Johnson a gun because it is contained in the

statement of Tommie Hart, provided in Jencks, Exhibit A attached hereto, and Hart was a

witness called during the Lighty proceedings.  Two excerpts from MB Ex. 195 are included

below:

The government believes the fact that trial counsel knew Wilson's possible motive is

contained in other discovery but given the voluminous nature of the case and the passage of time,

is seeking to supplement the record under separate cover as necessary.

F.  Cumulative Effect  (MB 271-272)

Because there was no misconduct, much less misconduct that would allow relief here, there is no "cumulative" harm meriting relief either.

V.      Court's Errors At Penalty Phase (MB 272–278)

The district court (this Court) did not err in instructing the jury regarding the effect of proportionality factors, and about aggravating and mitigating factors and the Court did not coerce a unanimous verdict. *See* Government's Response 90-99.

## CONCLUSION

The Government respectfully requests that this Court DENY Lighty's Motion.

Respectfully submitted,

Robert K. Hur
United States Attorney

By: _____/s/_____
Sandra Wilkinson
Assistant United States Attorney

_____/s/_____
Ellen E. Cobb
Special Assistant United States Attorney

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on February 28, 2020, a copy of the foregoing Response was e-filed and e-mailed to counsel of record for defendant Lighty.

By:      _____/s/_____
Sandra Wilkinson

27