IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MARYLAND

SOUTHERN DIVISION

UNITED STATES OF AMERICA,        ) CRIMINAL
                                 ) NO. PJM-03-0457
            Plaintiff,           )
                                 )
v.                               )
                                 )
KENNETH JAMAL LIGHTY,            )
                                 )
            Defendant.           )

TRANSCRIPT OF RE-SENTENCING PROCEEDINGS
BEFORE THE HONORABLE PETER J. MESSITTE
UNITED STATES DISTRICT JUDGE
THURSDAY, JUNE 6, 2024; 11:09 A.M.
GREENBELT, MARYLAND

APPEARANCES:

FOR THE PLAINTIFF:

OFFICE OF THE UNITED STATES ATTORNEY
BY:  ELLEN E. NAZMY, ESQUIRE
BY:  DAVID I. SALEM, ESQUIRE
6406 Ivy Lane
Suite 800
Greenbelt, Maryland  20770
(301) 344-4126

Also Present: Paige Cameron, USPO

Renee A. Ewing, RMR, CRR - (301) 344-3227
Federal Official Court Reporter
6500 Cherrywood Lane, Suite 200
Greenbelt, Maryland  20770

***COMPUTER-AIDED TRANSCRIPTION OF STENOTYPE NOTES***

APPEARANCES (Continued):

FOR THE DEFENDANT:

      ATTORNEY AT LAW
      BY:  JULIE BRAIN
      127 Church Street
      2nd Floor
      Philadelphia, Pennsylvania  19106
      (267) 639-0417
           -and-
      OFFICE OF THE FEDERAL PUBLIC DEFENDER FOR THE MIDDLE
      DISTRICT OF PENNSYLVANIA
      BY:  LEANE RENEE, ESQUIRE
      BY:  BETH ANN MUHLHAUSER, ESQUIRE
      100 Chestnut Street
      Third Floor
      Harrisburg, Pennsylvania  17101
      (717) 782-3843

(Call to order of the Court.)

THE COURT:  Good morning, ladies and gentlemen.

(Counsel reply, "Good morning, Your Honor.")

THE COURT:  All right.  Have a seat.  Call the case.

THE DEPUTY CLERK:  The matter now pending before this Court is Criminal Action No. PJM-03-457, United States vs. Kenneth Lighty.  We are here today for the purpose of a sentencing hearing.

Counsel, please identify yourselves for the record.

MS. NAZMY:  Good morning.  Ellen Nazmy for the government, and with me at counsel table is AUSA David Salem. He hasn't entered in the case, but is present.

THE COURT:  All right.

MS. BRAIN:  Good morning.  Julie Brain on behalf of Kenneth Lighty.  With me is Beth Muhlhauser and Leane Renee from the Federal Public Defender Office in the Middle District of Pennsylvania.

THE COURT:  All right.  And the defendant is present.

We are here on re-sentencing as to Counts One and Two.  I have some questions about things that need to be addressed this morning.

But let me start by asking counsel, and I assume it's Ms. Nazmy, you will argue for the government and Ms. Brain for the defendant.  Is that correct?

MS. NAZMY:  Yes, Your Honor.

MS. BRAIN:  Yes, Your Honor.

THE COURT:  How do you want to proceed this morning, I mean, with the understanding that we are only here on Counts One and Two?  The other counts remain, of course, as they are.  Insofar as they were consecutive to the sentences in Counts One and Two, I have to recite that.

But with that background, what is it -- how is it that you'd like to proceed this morning?  You want to just get right into the, sort of the paperwork, or I -- I gather you have some people here; you have people that want to be heard from?  I mean, tell me what -- what you have in mind.

MS. NAZMY:  Yes, Your Honor.  The government provided several victim impact statements to the Court yesterday afternoon.

THE COURT:  Right.

MS. NAZMY:  And several members --

THE COURT:  You said several yesterday?  I have only two.

MS. NAZMY:  Two.  I apologize, Your Honor.  Two victim impact statements.  Family members are present and do wish to make impact statements to the Court, and we would call them at Your Honor's discretion either before or after any argument that may be made.

THE COURT:  All right.  Ms. Brain, what is your thought?  Ms. Brain?

MS. BRAIN:  I'm sorry, Your Honor.

THE COURT:  In response to the format this morning?

MS. BRAIN:  The format is fine with us.  We just have a couple preliminary requests.

THE COURT:  Are they preliminary requests, or can we hear directly from the -- from the people who filed the impact statements?

MS. BRAIN:  Oh, no.  Unrelated entirely to the impact statements.

THE COURT:  All right.  Do you want to say anything preliminarily, Ms. Nazmy, before you call the individuals?

MS. NAZMY:  No, Your Honor.  We would --

THE COURT:  All right.

MS. NAZMY:  -- call the family.

THE COURT:  All right.  Call your folks, then.

MS. NAZMY:  The first witness is Everett Hayes.

THE COURT:  All right, sir.  You don't have to take the stand.  You don't have to be sworn.  Come right up to the podium.  State your name and your relationship to the victim.

MR. EVERETT HAYES:  My name is Everett Hayes.  Eric Larry Hayes, II was my nephew, victim.

THE COURT:  All right.  All right, sir.  Go ahead.

MR. EVERETT HAYES:  This is very difficult for me, Your Honor, after almost 20 years, and I am -- I am glad to be here, but at the same time, I am sad to be here also.

There is no words that I can express the -- how I feel about the murder and execution of my -- my nephew back almost 20 years ago.  Not only did Mr. Lighty kill my nephew and executed my nephew, he also murdered and killed another individual in the same area of Temple Hills, where my mother used to reside, and -- and within a month's time.

And I want to make sure -- I don't want to hold the Court up, but, basically, Mr. Lighty should never see the light of day at this -- at any -- or any of his cohorts because the devastation he has put on my family, his father especially, and his mother and his sisters and everybody that's concerned, they loved Eric and wanted him to -- just recently, my brother ran into a -- a -- one of Eric's childhood friends.  He is a grown adult, almost 40 years old.  Eric would have been close to 40 years old had he lived through this murderous venture that Mr. Lighty has caused did to him.

He wasn't a threat to society.  He was at the wrong place at the wrong time, unfortunately, at this point -- at that point.

And I -- in closing, basically, I am hoping that the Court will -- will basically look at what has happened over the last 20 years, and please do not release this -- this killer, murderer, into society again.

You know, from my understanding, and I read some of the transcript that he had gotten ill-advised counsel during the

trial.  He got the fairest trial that he could have got through the United States court system.  And my whole thing of it is he is exactly where he is.  If he -- if he could have gotten the death penalty in the State of Maryland, I would have elected to have that.

It is -- it is something that -- it's unexplainable at this point because I was looking forward to spending quality time with my nephew.  He wasn't a bad child.  He was just a rambunctious teenager that made bad decisions at some point. But just like any -- all of us, when we are in our teens, we make bad decisions, but it didn't -- it shouldn't have cost him his life.

That's my statement.

THE COURT:  All right, sir.  Before you step down, Ms. Brain, do you have anything -- -- Mr. Hayes, just hold on -- any inquiry on your part?

MS. BRAIN:  No, Your Honor.  Thank you.

THE COURT:  Thank you, sir.  You may step back.

Ms. Nazmy.

MS. NAZMY:  The next witness is Rochelle Hayes.

THE COURT:  State your name -- are you both going to speak?

MS. ROCHELLE HAYES:  She is my support.

THE COURT:  Sorry.  Would you just state your name, then, and your relation to the victim, please.

MS. ROCHELLE HAYES:  Rochelle Hayes.  I am the mother of Eric Hayes.

THE COURT:  All right.

MS. MIA HAYES:  My name is Mia Hayes.  I am his sister.

THE COURT:  All right.

MS. ROCHELLE HAYES:  Good morning.  I know the Court and judges have heard thousands of family's victim impact statement regarding their loved ones and the individuals of criminals who have taken their life or lives; therefore, you know and heard the family's cries and pleas.

So, I won't dwell on what my son was like when he was here.  I only wish he could have been here to meet his son, Jordan, and great niece, Sorottia [phonetic].

It's been 22 years.  January 3rd, 2002, a day that I will always remember and never forget, this is the day my son was murdered.  Words can't express what I feel to go through each and every day.  The pain is always there.  Excuse me.

Every time I receive information or talk of a meeting or a hearing like this one regarding this case, I suffer a lot of anxiety, which takes a toll on me physically and mentally.  The only way I get through is my faith and belief in my Lord and Savior, Jesus Christ, and support of family and friends.  But my healing and peace still has a long way to go.

Since the death penalty is no longer warranted, I hope

these individuals are never released.  The time served and good behavior antics for criminals to be realized is unacceptable -- to be released is unacceptable.  They not only murdered my son, but they also murdered another young man the same month and year in January 2002.  Although I was relieved that these individuals have all been caught, tried, and convicted, if released, then I know the justice system would not only fail my son and the family, but others as well.

Thank you.

THE COURT:  Any inquiry from you, Ms. Brain?

MS. BRAIN:  No, Your Honor.

THE COURT:  Any further statements, Ms. Nazmy?

MS. NAZMY:  I believe there is one more, Your Honor, and that is Eric Hayes, Sr.

THE COURT:  Just state your name and your relation to the victim, please.

MR. ERIC L. HAYES:  Good morning, Your Honor.  Good morning.  My name is Eric Hayes, Eric L. Hayes.  I am Eric -- I was Eric Hayes' father.

He was -- Judge Messitte, I had wrote out a nine-page thing and talked about the day that my son was murdered, killed, robbed, and kidnapped.  That day, I saw my son on the couch, and I told him get up and go -- he was on spring break from P.G. College, so he was trying to do something for his self.  He just didn't have a job at that time.  Just got out of

-- just got out of high school at 18, 19 years old.  And I told him, Get up and go, child.

I went off to work.  I was -- at that time, I was a Metropolitan Police Department -- I worked for the Metropolitan Police Department as a lieutenant at the Fourth District.  And I went out on the street to do a community service leaflets that I handed out when I got a call from the CID unit saying that my son had been kidnapped.  And it didn't -- didn't register.  Who kidnaps a 19-year-old kid and for what reason?

Based on that, I went back to the station and got more further information about what was going on.  There was some other -- somebody else was shot during that time and wasn't sure if it was a mixup in communication.  You got to remember, back then, there weren't any cell phones like that going on, so information was very sketchy.

I eventually went home.  I had a friend of mine, Captain Michael Reese, took me home, and so I got -- I got a ride home.  And about 45 minutes after getting home, or less, other family members had gathered, got the information, and Reese and Prince George's County Police Department came to my house to let me know that my son was killed/murdered.  And I fell apart that day.

To fast forward, the trial took place, and things were revealed about Mr. Lighty, Defendant Lighty, and his cohorts, how devious they were at the same age my son was.  They were

able to get the car -- they put him in the trunk of a car, and all this excuse about he had done took his car -- he took and stole his car.  My son pleaded for his life, Your Honor.  He -- you know, he -- you know, he pleaded, and it still didn't make any difference.  They shot him and robbed him of all his belongings, threw him out in -- out in the suburbs on -- on a -- on a grassy area and -- like he was a piece of trash, like he was a dog.

Then they went on and -- went on and partied and even came back to the crime scene after -- after they had committed the crime.  And what's most devious about it was the fact that they took the car and took it down North Carolina, and thank God by the fact that it was crossing state lines from D.C. to Maryland that the FBI was instrumental in getting the car back and showing fibers that was in the trunk of the car, you know.

So -- and we -- you know, back then, when we went to trial, when you stood on -- at the trial, you know, I had all my family members.  Three of my family members are now gone: my sister; of course, Eric; my mother; and my oldest brother. And my mother -- what hurt me the most is that my mother had to stand every day for about three weeks of trial or more and listen to the lies that were spewed out from the defendant and the codefendants about what really happened, and -- and it was -- and it hurt me most and it still hurts me most.

My mother is no longer here, my sister is no longer here,

and my brother is no longer here.  And they died -- all -- all four, they died -- all three of them died not knowing that -- believing that Mr. Lighty was supposed to get the death penalty -- got the death penalty and was supposed to be executed.  But that didn't happen.  And it don't look like it will ever happen.

You know, the things about my son, as my brother -- twin brother expounded, you know, he -- he was a -- he was a teenager; didn't know what life was really all about.  This is a young man trying to find his way in a difficult world that we live in.  And he, you know, he took a wrong path that day and -- and lost his life behind it.

You know, my family has suffered.  My family has fallen apart.  Me and my wife, we separated.  You know, it's been a difficult task.  And if it wasn't for the -- for -- for Jesus Christ and -- and the people concerned about me, concerned about my wife, my daughters, and -- you know, we don't even -- we don't speak about it, you know.  And the problem is right now, it's a hard thing to even come in this courtroom to talk about it.  It's been devastating.

And no one, Your Honor, no one should have to lose their child over some senseless -- senseless violence as -- as it goes on day in and day out.  And every day I see crime that go on -- I served on the police department nearly 39 years, Your Honor, and I did my best when -- when I was there, you know.

You know, I saw a lot of stuff, homicides, but I never dreamed that my son -- that I would be -- my son would be a victim of a homicide during the crack era and so forth.

And Mr. Lighty, you know, he -- he's -- he was able to write books about his -- his -- his -- his -- his life and -- and -- and go on with his family. They can come and see him any time they want to wherever he is in prison at. He gets three -- three hots and a cot, like they say. I can't -- when I go to see my son, I have to go over to a -- the cemetery and look at -- and look at that. And I can tell you, Your Honor, it's a hurting thing.

And so -- and the rest -- and, like I said, you know, since -- since the death penalty is off, you know, I want to -- you know, my last statement, basically, is that, you know, he had a son. You know, his son doesn't understand the whole dynamics of why -- what happened, and he holds a little bit of hostility towards me. I didn't do anything to my son. If I could do right now, Your Honor -- if I could trade places with my son, I would.

But, like I said, it's been 22 years, and this -- this individual and his cohorts have been able to -- to live a life, write books, make money, visit, maybe have a conjugal visit. You didn't -- he didn't -- you didn't give a dang -- he didn't give a nothing about my son. He didn't care nothing about my son. And he still don't. No accountability. If he had any,

he could have reached out to me and my family and -- and showed some sympathy, but none in 22 years.

And, so, at -- at the conclusion, I wish you could not spare his life.  Eye for an eye.  But since that's not -- that's not the American way at this particular juncture and -- and -- and atmosphere, then he ought to spend his life, forever, and the rest -- and his cohorts, too, because they didn't give a doggone about my family and devastating them. And my family is torn apart.  And I will go to my grave knowing that -- I may go to my grave knowing that justice was not served, and I hope it is.

So, in conclusion, Your Honor, please look at my family and what has happened to my family since the murderous -- keep in mind he was viciously murdered, robbed, and then kidnapped for no reason.  For whatever reason -- what -- it didn't -- none of is it justified.  My son didn't even know none of these individuals, especially Lighty, didn't know -- didn't know him from a can of paint.  But this is what he felt that he can do, just kill people and without impunity and nothing is supposed to happen to him.  So I don't care -- you know, I hope he stay in jail for the rest of his life until he dies in jail.  That's my sentiment.

Thank you for your time, Your Honor.

THE COURT:  All right, sir.

Any further --

MS. NAZMY:  No further speakers, Your Honor.

THE COURT:  I think maybe the -- I gather you had no further inquiry, Ms. Brain, of this last statement?

MS. BRAIN:  No, Your Honor.  Thank you.

THE COURT:  All right.  Let me -- somewhat logistically, we sort of need to sort out what kind of papers get filed at this juncture.  And I guess I do need to at least file a new statement of reasons as to these two counts that are before me.  So -- and there has been an updated presentence report.  I gather no exceptions taken to the report, Ms. Nazmy?

MS. NAZMY:  Your Honor, no exceptions taken; however, as was -- the victim impact statements that were sent to chambers yesterday, we would ask that they be added to the presentence report.

THE COURT:  All right.  Fair enough.

MS. NAZMY:  We understand the Court needs to order that.

THE COURT:  Fair enough.

Any other issues with the presentence report, Ms. Nazmy?

MS. NAZMY:  No.  Thank you, Your Honor.

THE COURT:  Ms. Brain?  Ms. Brain?

MS. BRAIN:  No, Your Honor.

THE COURT:  All right.  Well, the Court, then, will adopt the presentence investigation report without change, and I think, again, just for the sake of caution, I will make a

finding as to offense level and criminal history category so that we are clear on where we come out on this.

The total offense level, as calculated by Probation, is 43; criminal history category was a III. The custody range with regard to Count One was life -- well, it's actually life at this point, and with regard to Count Two as well, life. The supervised release range as to Count One was not authorized, and I gather that's still the case. It's life without parole. So that would be the range.

And then as to Count Two, the range was three to five years. The fine range as to custody -- guideline range as to a fine was $25,000 to $250,000.

All right. I think we are ready to hear from you on allocution, Ms. Nazmy.

MS. NAZMY: Your Honor, I just received a note from the -- the family and was advised that additional impact statements were emailed to all parties today, and we would ask that those be added to the presentence report as well.

THE COURT: I am not sure what the procedure is as far as what goes to the Bureau of Prisons. They are part of the court file, but I do have some additional ones that came in. I had not had them from either the victim's mother or father, but I heard them, and I have that here.

Well, insofar as I can do that, I will add -- request that they be added to the report.

MS. NAZMY:  Thank you, Your Honor.

THE COURT:  Are you ready to allocute at this point?

MS. NAZMY:  I'm sorry, Your Honor.

THE COURT:  Are you ready to be heard on your argument at this point?

MS. NAZMY:  Yes, Your Honor.

THE COURT:  Go ahead.

MS. NAZMY:  Thank you, Your Honor.

I am going to keep my remarks brief.  As discussed more fully in the government's sentencing memo, the government has withdrawn its notice of intention to seek the death penalty, and we have been authorized and directed by the Attorney General and the Department of Justice Capital Case Unit to do so.  We are asking the Court to impose the maximum sentences of incarceration available, consecutive life sentences on the two remaining counts of conviction.  The recommended sentence is sufficient, but no greater than necessary, to satisfy the sentencing goals.

Thank you, Your Honor.

THE COURT:  Ms. Brain.

MS. BRAIN:  Yes, Your Honor.

Just very, very briefly, we would ask -- as the Court is very well aware, there is a mandatory minimum sentence of life without possibility of parole on Count One.

THE COURT:  Would you pull the mic a little closer to

you, please?

MS. BRAIN:  Yes.  I'm sorry.

There is a mandatory minimum sentence -- or mandatory sentence, I should say, of life without possibility of release on Count One.  We would ask that the Court do as the Court did at the original sentencing, and run the sentence for Count Two concurrent to the sentence --

THE COURT:  What is the consequence of doing that?  What difference does it make?  And, of course, I am able to do it any way I would at this point, but what -- what is the actual effect of that?

MS. BRAIN:  As a practical matter, Your Honor, I am not sure there is one because with a mandatory sentence of life without, there is really -- the impact of Count Two -- there is no practical impact of Count Two.

The only other request that we would have is that to the extent that the -- that the Court not impose a fine because Mr. Lighty lacks the ability to pay.  And to the extent that the Court imposes restitution, we would ask that --

THE COURT:  Well, I think we had a restitution term, did we not, in the original judgment and commitment order?

MS. BRAIN:  We did, Your Honor.  That's right.

THE COURT:  Hold on a second.  Let me get that in front of me.

MS. BRAIN:  Very good.

THE COURT: Restitution was ordered in favor of Mr. Hayes, Mrs. Hayes, Mr. Hayes, Sr., care of Rochelle Hayes, in the amount of $7,578.18 jointly and severally with Defendant Flood. And I -- I raise that because I don't know -- one of the things that the government says in its memo is there really hasn't been any restitution at all, and I don't know -- although I did see, from Mr. Lighty's prison report, that he's earning some money that's being put somewhere. Is it going toward restitution?

MS. BRAIN: He's not earning any money at all, Your Honor. In Terre Haute on death row --

THE COURT: How long has he been at Terre Haute?

MS. BRAIN: Ever since he was sentenced in early 2006, Your Honor.

THE COURT: Well, where is he now?

MS. BRAIN: Currently, he was being held locally in Baltimore, but he's been at Terre Haute up until today.

THE COURT: Well, will he go back to Terre Haute?

MS. BRAIN: Our understanding -- our best understanding is that he will go back to Terre Haute just briefly, and then he will be transported away from that institution to a different one.

THE COURT: Well, could the Court not order, if he goes to another facility other than Terre Haute, that a certain amount of -- per month, if he's doing any kind of work, be

allocated toward restitution?

MS. BRAIN:  The Court absolutely can, Your Honor, and that's what we would request, that it be -- that the Court specify that it come from wages so that as soon as he's able to engage in employment, that the restitution amounts be subtracted from wages and not -- not from any small amounts of commissary money.

THE COURT:  No.  I understand.  Well, let me -- give me a moment here.

And I gather -- do you know whether you know this, Mr. Cook, or not; I will have to verify; I assume there is not a special assessment -- additional special assessment due and payable?  If there -- if -- we will have to verify this.  If there is again a requirement to reimpose a special assessment, it would be $200 that would be due there, and I will have to check that because I am not sure the clerk would -- would know that offhand.

All right.

MS. BRAIN:  Thank you.

THE COURT:  Go ahead.  Anything further that you want to say?

MS. BRAIN:  That was it.  Just that -- just that the restitution order specify that the funds be taken from wages once Mr. Lighty can work.  Thank you, Your Honor.

THE COURT:  Fair enough.

All right. Let me be sure that I have some -- some other questions, though, that are addressed at this point. I don't know whether Mr. Lighty will be addressing the Court momentarily, but I do think, for purposes of background, I don't know that the family, in particular, has received a copy of the government's letter to the Court dated May 24, 2024, but the -- there was a specific reference at page 3 that I want to read into the record.

The Court should -- I am quoting now -- The Court should therefore consider the defendant's conduct in the Bureau of Prisons at re-sentencing. While the defendant has taken some classes in BOP, the record does not show extraordinary efforts at rehabilitation. Moreover, as of January 2024, no -- in restitution -- it should simply read, restitution to the family remains outstanding. The defendant's efforts are not comparable to the kind of efforts other inmates have taken to partake in BOP programming. Additionally, the defendant has multiple disciplinary infractions, including possession of a dangerous weapon, introduction of drugs and/or alcohol, fighting, assault, phone abuse, and disobeying orders.

That, at least, is what the Court has received by way of submission from the government; also backed by records from the Bureau of Prisons.

That said, anything further you want to say in response to what the Court has read, Ms. Brain?

MS. BRAIN:  Yes, Your Honor.  We would submit that that paragraph is extremely misleading.  The -- the amount of programming available at Terre Haute to inmates who are under death sentence is close to zero.  So there is -- the idea that Mr. Lighty -- that there are programs available -- were available to Mr. Lighty that he declined or didn't participate in is absolutely untrue.

As the attachment shows, the classes that were available to him, he completed.  Anything that is offered, he has done.  In fact, he's done a couple of courses since he's been at the Chesapeake Detention Facility in Baltimore in the last couple of weeks.

THE COURT:  How long has he been there?

MS. BRAIN:  Two weeks.  Two weeks, Your Honor.  And he's already done an anger management course and two modules of a culinary arts vocational training just in the two weeks that he's been there.  And that was all figured out for himself, that they were even available on the tablets there because he certainly wasn't informed.

So there is no basis whatsoever to assert that he has in any way performed less than optimally or less than any other inmates might have done with respect to rehabilitation.  If they were in different institutions, different security levels, they may have had programming available to them.  Mr. Lighty categorically did not, with the exception of those that are

reflected that he has completed.

THE COURT:  Any response to that, Ms. Nazmy?

MS. NAZMY:  No, Your Honor.

THE COURT:  All right.  Let me -- before you sit down, before I hear from the defendant as well, since, obviously, it is extremely unlikely that he would ever be on supervised release, but, first of all, let's talk about conditions while he is in custody because the Court can recommend to the Bureau of Prisons that while in custody, for example, the defendant be -- be required to undergo mental health testing and so on.  Whether substance abuse is required or not, I don't know.  Whether there is any further request as to his location in terms of being re-placed from Terre Haute, that's something we should talk about now rather than after the Court imposes the sentence.

In particular, I note that there -- and I have gone through that, Ms. Cameron; you are here from Probation -- I note that there are some requests for additional conditions to supervised release that were not in the original judgment and commitment order.  Obviously, the mandatory conditions and standard conditions remain as they were fully in the original sentence.

With regard to the special conditions, however, the -- do you have the J and C there? -- the only special conditions that were -- were added were for substance abuse treatment and also

cooperation in the collection of DNA.  Actually, the DNA requirement is now a standard condition.  But -- but the -- the substance abuse and/or alcohol abuse condition was also added.

But now in the proposed modification, special conditions that are being proposed, not only substance abuse, you must participate in an educational services program and follow the rules and regulations of that program.  Such programs may include high school equivalency preparation, English as a second language, other classes designed to improve your proficiency and skills, such as reading, writing, mathematics, or computer use.

Additional proposed condition:  You must participate in a mental health treatment program and follow the rules and regulations of that program.  Probation, in consultation with the treatment provider, will supervise your participation in the program as to who the provider would be, where it would be located, the modality, duration, intensity, et cetera.

And, further, the condition that you participate in a vocational services program and follow the rules and regulations of that program, which may include job readiness training and skills developmental -- development training.

Added as well I think a restitution term; that the restitution be made a condition -- a special condition of supervised release as well, and I understand that this is a highly theoretical situation, but the Court still needs to

address it.

Those are the proposed special conditions added.  Again, we already have the substance abuse, which is alcohol or drugs, mental health, and I added the ones about educational services, mental health, and vocational services.

Do you want to address that?  Hold on.  I want to hear from the government first.

MS. BRAIN:  Very good.

THE COURT:  Ms. Nazmy, do you want to address those proposed additional conditions, or do you want to hear from Probation on that?

MS. NAZMY:  No objections, Your Honor.

THE COURT:  Ms. Cameron, do you want to say anything in that regard?

U.S. PROBATION OFFICER PAIGE CAMERON:  No.  Probation realizes it's an unlikely scenario --

THE COURT:  Sorry.

U.S. PROBATION OFFICER PAIGE CAMERON:  Probation realizes that it's an unlikely scenario that he be placed on supervised release, but we would ask that those be added.

THE COURT:  All right.  Ms. Brain.

MS. BRAIN:  That's fine with us, Your Honor.  We would point out Mr. Lighty got his G.E.D. within the first year of being sentenced in 2006, so the educational requirement is somewhat superfluous, but, nevertheless, Mr. Lighty is anxious

to engage in any kind of programming that is offered to him at any juncture. So -- and putting those conditions on is -- we have no objection at all. Same with substance abuse. He doesn't have, actually, a substance abuse problem. He's never had urine testing that has come back indicating the use of substances. Nevertheless, programming is always something he's interested in and willing to participate in and learn from, and so we have no objection.

THE COURT: All right. Mr. Lighty, before I reimpose sentence, you have an opportunity to address the Court.

THE DEFENDANT: Would you like me to stand up?

THE COURT: If it's easier to sit down if you have something written, that's fine.

THE DEFENDANT: Thank you.

Your Honor, first, I'd like to point out that I have been advised by my attorneys not to address you today; however, I feel that I must speak for myself.

I'd like to apologize in advance if anything that I am about to say may come across as unprofessional. I assure you that is not my intent. I stand before you today -- or sit with humility and respect.

From the inception of this case, I have faced a myriad of issues ranging from an under prepared and thus overwhelmed defense team at trial, to an unprofessional advocation of law enforcement and subsequent prosecution, and back to issues with

some of my post-conviction defense teams over the course of my 20 years of incarceration.

There are two major problems that I would like to speak about at this time. The first has to do with the blatant unprofessionalism of the prosecution. During my trial, they sought to introduce uncharged acts of violence based on testimony from one of their witnesses, Mr. Charles Whitley, that they knew to be false.

How did they know that they were presenting false testimony? They knew because they had grand jury testimony from the same witness, during which it was very clear that he did not and, thus, could not legally say the things that he was permitted to say, which ultimately resulted in unlawful admission of 404(b) evidence being introduced into my trial.

The aforementioned facts were later validated by a three-judge panel and cited as clear error, but deemed harmless, even though that 404(b) evidence was a significant portion of my trial equipped with additional witnesses to testify about the event. It even proved to be a factor in both my guilty verdict and my receiving the death sentence. Another excuse for the error's forgiveness was described as the, quote, overwhelming evidence of guilt, something that post-conviction investigation would indeed cast grave doubt upon but the jury would never get to hear.

Though the prosecution's tactic was explained and

ultimately forgiven as being a simple mistake at my trial, this would prove to be untrue many years later when Ms. Wilkinson would try it again in a case against Mr. Annappareddy, presenting false evidence and then destroying exculpatory evidence via orders to agents who worked beneath her in order to secure his conviction.  In this case, however, attorneys for Mr. Annappareddy were on top of their game and moved swiftly to expose her antics for what they were: misconduct.  This time, her excuse of it being a simple mistake was not tolerated, nor was the, quote, plenty evidence of guilt that was also claimed.

Judge George Russell found that the right to due process had been violated, and said that the conduct by the prosecutor, Ms. Wilkinson --

THE COURT:  Are you talking about this case or some other case?

THE DEFENDANT:  No.  This is another case that she prosecuted and did the same thing to me.

THE COURT:  Well, in all candor, I don't really need to hear about another case.  I can hear about your case, and you started on it, but don't go afield into other cases that you really don't know about.

THE DEFENDANT:  No.  I do know about it.

THE COURT:  No.  You don't know about it.

THE DEFENDANT:  It's public opinion.

THE COURT:  Listen, you could go on and talk about

anything in the world, but we are not here to hear you on that. I am giving you a chance to allocute with regard to this case, and you are not going to start talking about other prosecutors and other cases. You may feel that way. I will have something to say about that sort of approach when I sentence you. But in your own interests, don't go into that now. I really don't want to hear it.

THE DEFENDANT: Okay. Are you aware of it, though?

THE COURT: I am aware that you have made the argument. Go on to something else. Stay in this case.

THE DEFENDANT: Let me see. I guess I am winding down. I would like to say just a few more things.

To the family of Mr. Hayes, I want them to hear me very clearly, I did not abduct nor murder Mr. Hayes, as the other victim on the intent to kidnap him, Mr. Antoine Ford, made very clear. I believe with my entire being that your former prosecution team knew this to be a fact very early on.

There was not a single person that could say that they saw me at a crime scene, nor commit a single act, but, rather, what they were alleged to have heard, or they regurgitated force-fed theories formed by law enforcement and prosecution around circumstantial evidence.

Every single person that dare say otherwise in an attempt to expose what happened to me, including a paid police informant, was either turned away, not believed, or assumed to

have succumbed to community pressure with the insinuation that I somehow used violence as an apparatus for intimidation.  No. My community is outraged because they know that I didn't abduct and murder Mr. Hayes.

I have sat on federal death row in solitary confinement on 23-hour lockdown for the last 20 years.  That's all of my 20s, all of my 30s.  I was supposed to break, as I watched most do, but I grew.  Some resorted to cutting, playing with their own feces, and/or hanging due to the treatment we received.

I obtained my G.E.D. with no teacher when guards asked what was the point.  I have wrote and published books that both educate and simply challenged myself.  I have completed what little courses were available that I thought would be essential to building life skills.

I have maintained ties to my community, as well as established and cultivated additional relationships in communities around the country.  I managed to continue philanthropic efforts instilled in me by my grandmother from my cell by co-establishing a monthly feed initiative for the homeless with my beautiful Goddaughter that is rapidly approaching a consistent six years strong.

I still feel funny mentioning that today because I have always felt that guys like me who represent a certain walk of life tend to blacken the character of good things by association even though we are not bad people and have had the

best of intentions.

My Goddaughter repudiated that notion, refusing to allow me to cowardly stand comfortable in the shadows and do good with her, while so many only want to see me as a dark figure. Against my own wishes, our initiative bears my name: The Lighty Project.

I have learned many other life lessons from my closest friends as I have watched them grow into men and women and into community unions, have children, raise families, and get up every day to make an honest living providing for their families, myself included, providing both money and sweat so that I may have the opportunity to rise above my circumstances and demonstrate the person that they know me to be.

I would be remiss if I did not address my disciplinary history while incarcerated. I don't shy away from it, Your Honor. I take full responsibility for each and every incident, especially the violence. I acknowledge the assault, the fighting, the stabbing, the numerous weapons infractions, et cetera. I simply ask that you apply context derived from common sense when you or anyone else judges me.

Just as in society, in prison, there is a duality to life that exists there. It is an unhealthy place at which one is expected to heal. A person sentenced to prison has to reside in close proximity with every single person that society is terrified of. Not everyone is interested in growing in a

positive manner, to put it mildly. There are simply times when the question is not complex: Will it be him or me?

Your Honor, I am here to tell you, quality of life is everything in prison. How you respond to one act of disrespect or one threat, regardless of the size, race, or affiliation of the offender, cannot only determine whether you live or die in that moment, but can drastically affect the quality of life for both the duration -- for the duration of your incarceration. There is no help for you, period.

I have seen guards stir the pot and find humor in putting lives at risk. I have seen them stand and wait until battles have a clear winner or loser. I have seen the very ones responsible for upholding safety and security run off and leave their own coworkers to be butchered by inmates, or stand and watch it happen until unreasonable amounts of backup arrive only for it to be too late.

I am sure you and the prosecution see my record and are quick to draw a correlation between that and the crimes that I am going to be sentenced for today, but there is not one to be drawn. I'm sorry.

The environment that I try to paint a picture of here today is a very real one, and, unfortunately, unless you are willing to risk being prey, there are no choices. There are federal prisons from here to Hawaii, but I assure you, they are all one community. There is no moving someplace else like one

has the luxury of being able to do in society.

The things that I have done have assured my safety, my respect amongst my peers, regardless if they like me, and my integrity as a man.  However, it all comes at a price in me losing pieces of myself, and I want better for myself.

Despite all that has occurred since the inception of my case, I have no interest in arguing convictions after already having spent almost 22 years incarcerated.

I won't speak on the prosecutor.

I never claimed to be an angel just plucked off the street.  I am and always will be a work in progress.  Though I cannot accept responsibility for kidnapping and killing Mr. Hayes, I can accept responsibility for being a very real representation of what did take his life during the time period of my life where I could have done a lot of things much better.

I can accept these convictions on my record not out of guilt, but because I have the fortitude and resources to be successful despite them.  I have done everything in my power to grow as a person of my own volition because the programs that you and the prosecution think that I have not taken advantage of on death row have been available in title only.  One simple phone call can show that I have emailed a request to every department for programming to no avail.  I have the printout to myself to validate that.  Any official that works there can validate that, as well as my character.

Since being here in only a couple weeks, I have managed to enroll in and complete an anger management course, as well as enroll in a culinary program that I would very much like to finish as it has many long-term benefits that I can immediately transition into once I regain my freedom.

Thank you for the time and opportunity to speak here today.

(Conference at the bench.)

(It is the policy of this court that every guilty plea and sentencing proceeding include a bench conference concerning whether the defendant is or is not cooperating.)

THE COURT:  All right.  Now, this is not a conversation that I am going to have with you.  This is my turn to speak, so I don't expect you to interrupt me in any way even if you take issue with what I say.  Is that clear?

THE DEFENDANT:  Got you.

THE COURT:  You just sit quiet and listen to me.  All right.

I sat through this trial.  I have listened to the evidence.  I heard the witnesses.  I have filed -- read I don't know how many motions filed by your lawyers over the time, and they have done an excellent job, I might say.

I didn't make the final decision about guilt or innocence.  12 individuals that you did not know and I did not know beforehand listened to the same evidence and raised the

same kind of challenges that I have heard you make right now about various witnesses saying other things and nobody was there and so on. I remember the circumstantial evidence. You were at or near the sign of the -- the location of the murder. There were cell phone calls. There was blood. I remember all these things.

So when you sit there and tell me, after 20 years, there wasn't any evidence, that you were not involved in this transaction, I now am in a position to tell you I personally don't believe it. 12 people who heard it did not believe it.

You have had 22 years to rethink this in your mind and rethink yourself as somebody who is innocent. It's not what the evidence showed. Now, maybe somewhere in the great beyond there is somebody who is going to agree with you. I don't. The jury did not. And that's what the evidence showed.

And I have lived with the case as long as you have, plus other death penalty cases, I might say, and yours is right there. And you are very lucky to have been spared the death penalty because in one of my other cases, it was the last person executed at the end of the Trump Administration. He didn't make it. A different case, and he was unfortunate, but that's the way it worked, and that's what the jury found. So let me give you that by way of predicate.

This is a terrible crime. I mean, this is a case I remember clearly. There were other people involved in terms of

kidnapping this young man, taking him into the State of Maryland, putting him in the trunk.  I remember it was vivid.  And then he was basically executed.  I remember there was somebody who saw -- who heard the shots.  There was somebody from an apartment who heard and saw it; identified the vehicle if I am not mistaken.  I mean, that's the kind of evidence that sticks with me.  So it's not like there was nobody there.  So, I tell you that because you had a chance, yourself, I think, to rethink what the case was about, and it isn't what, frankly, an impartial jury saw, and it's not what I saw.

Was this -- and I am supposed to look at certain factors when I sentence you -- was this a serious crime?  Obviously, it's as serious as it can be.  There is no more serious crime than murder, and you are associated with it.

And I look at your own history and characteristics and so on, you know, whatever came before, there is not, Well, sorry; it was one murder; I was youthful; let's give me some credit for that.  I don't do that.

The fact that you have had some post-sentence rehabilitation, okay.  It doesn't, in my view, outweigh what's really going on here.  What do we say to other people out there in terms of deterring them?  This kind of behavior, this kind of action, unacceptable.  You were young, as was Mr. Hayes, but, you know, we have to keep some order in society, and that's what we do by imposing strict sentences in these cases.

And, of course, you know, there is -- that's really an important thing to do.

So, these are all factors.  You know, obviously, you are going to be deterred from ever doing anything antisocial again by reason of the sentence that I am going to impose, and insofar as there is some way that you can prove yourself while you are there, I will certainly try and provide for that, but that's where you are going to be.  Period.  Some odd chance you might be out at large some day.  Likely not, very likely not, but still, I need to address that possibility.

So that's sort of the background of the factors that I look at here.

The jury, again, found unanimously, and they don't in these cases because I have had other death penalty cases where they don't find the death penalty, and in your case, they did. They did.

But as to Count One, I am going to sentence you to life without parole.

And as to Count Two, I am going to sentence you consecutively to life without parole.

As a practical matter, it may not make much difference. As a moral matter, what it says to you, in effect, is what you did was really reprehensible.  Often gets concurred.  Every crime, if you will, is separately charged.

So it's life on Count One and life consecutive on Count

Two.

And then I adopt all that -- those conditions that were part of your supervised release, which will be -- I guess it's actually only a five-year term since it's not authorized in connection with Count One, but all the mandatory and statutory conditions that we recited earlier, we continue.

I said there would be some special conditions, which I think only work to your benefit, and we will see that they are imposed; that is, that you participate in a substance abuse treatment program, follow the rules and regulations of the program, and you will be supervised by your probation officer in that regard.

Participate in an educational services program and follow the rules and regulations of that program, including high school equivalency preparation, et cetera, English as a second language, and other classes designed to improve your skills in reading, writing, math, and computer use.

Mental health treatment. Certainly, there is an appropriate condition to follow the rules and regulations for a treatment program, and, again, your probation officer would be able to indicate the specifics.

And, again, a vocational services program. On the very rare chance that you might be outside some day, you would have that vocation. So those are the issues that are involved.

There is no fine, obviously, imposed in connection with

this case.  I don't find that you have the wherewithal.

There is no special assessment that gets reimposed at this point in this re-sentencing.

So it seems to me that that basically exhausts the sentence in the case.

You have a right to appeal this matter.  Ms. Brain can tell you more about that.  But that appeal should be filed within 14 days.

In any event, that is where we stand with your case, Mr. Lighty, and everybody is simply going to have to go on living; you, with what you may feel is an injustice, I do not; the family, with the pain that you have caused and the tragedy. And that is life in America in the world today.  We just have to go forward and live with what -- what we are faced with.

Anything further from the government?

MS. NAZMY:  Your Honor, we would just inquire whether restitution is part of the new judgment.

THE COURT:  Restitution is part of the judgment.  It continues as before.  You are quite right, restitution was originally ordered, but I -- I do want to follow up on what Ms. Brain recited.

Specifically, the Court will order that the restitution be 20 percent of any wages that you earn.  I am not making it 50, 75, or 100 in the sense that I should say to you, You got to give it all, because you may not want to do anything at this

point, and I want to create some incentive for you to work. But I do think, just as a gesture, you need to allocate a percentage, and I can order that, and it is 20 percent of whatever you earn.  Not much, I understand, but at least it makes a point, and I think that's what we need to do here as best we can.  20 percent of any wages earned in accordance with the Financial Responsibility Program of the Bureau of Prisons.

Anything else from the government?

MS. NAZMY:  No.  Thank you, Your Honor.

THE COURT:  Ms. Brain?

MS. BRAIN:  No, Your Honor.  Thank you.

THE COURT:  All right.  Thank you.  We are adjourned.

(The proceedings were concluded at 12:11 p.m.)

C E R T I F I C A T E

I, Renee A. Ewing, an Official Court Reporter for the United States District Court for the District of Maryland, do hereby certify that the foregoing is a true and correct transcript of the stenographically reported proceedings taken on the date and time previously stated in the above matter; that the testimony of witnesses and statements of the parties were correctly recorded in machine shorthand by me and thereafter transcribed under my supervision with computer-aided transcription to the best of my ability; and that I am neither of counsel nor kin to any party in said action, nor interested in the outcome thereof.

/s/ Renee A  Ewing

Renee A. Ewing, RPR, RMR, CRR
Official Court Reporter
June 18, 2024